IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RENEE RICHARDSON | § | |
| *Plaintiff* | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 5:18-cv-00151-FB |
| | § | |
| THE MEDICAL TEAM, INC., d/b/a | § | |
| THE MED TEAM, INC. | § | |
| *Defendant* | | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE FRED BIERY:

Comes now **RENEE RICHARDSON** ("Ms. Richardson"), Plaintiff in the above entitled and numbered action against Defendant THE MED TEAM, INC. ("Med Team"), alleging discrimination and retaliation based on race, and files this Motion for Partial Summary Judgment as to liability for retaliation based on a protected complaint of discrimination. This Motion for Summary Judgment demonstrates that Plaintiff Richardson is entitled to summary judgment on her claims for retaliation and on Defendant waived affirmative defenses, and for cause shows unto the Court the following:

### I. PARTIES

1. Plaintiff **RENEE RICHARDSON** is a former employee of Defendant The Med Team employed as a Branch Manager over a New Braunfels branch of Defendant. She had been a faithful employee of Defendant for over a year and a half and was promoted within four months of being hired by Defendant. The decision to terminate her employment was made on January 20, 2017 the same day she complained of race discrimination in an email sent to HR Representative Sarah Gogo.[1] Plaintiff was the only black branch manager and the only branch manager to complain of

---

[1] Exhibit A: January 20, 2017 email from Renee Richardson to Sarah Gogo

race discrimination.[2]  5 of the 7 branch managers worked at branches with falling census numbers, but none were disciplined for census except for Plaintiff.  The decision to terminate Plaintiff was made the same day she sent an email to HR complaining of race discrimination.

2. Defendant **THE MEDICAL TEAM, INC., d/b/a THE MED TEAM, INC.,** is a corporation that provides home healthcare provider services and operates home healthcare agencies. Defendant had a census that tracked the retention of billable patients or growth in the number of billable patients.[3]

## II. RELEVANT FACTUAL BACKGROUND

3. It is against federal law for a company to terminate an employee for complaining of or reporting to human resources race discrimination. Defendant terminated Plaintiff Richardson for performance, an employee with excellent performance history for performance, making the decision to terminate Plaintiff the same day she complained of race discrimination. Defendant does not have a written retaliation policy. Defendant's corporate representatives testified that it made the decision to terminate Plaintiff for two years of bad performance related solely to low census numbers on the same day she sent an email to human resources complaining of race discrimination. Plaintiff's evaluations demonstrate that she was receiving 4 out of 5, or "commendable" evaluations. Defendant testified they have never fired a branch manager for the census besides Plaintiff.  Defendant testified that five of seven branches in the State of Texas had problems with the census.  Defendant testified that per the nature of their business there are always issues with census.  Defendant testified that census is not in Plaintiff's job description.  Defendant testified that other employees responsible for the census at Plaintiff's branch were not disciplined nor terminated.  Prior to Plaintiff's termination, Defendant was "looking for an email" that they claim

---

[2] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 44 Ln. 22-25 to Pg. 45 Ln. 6
[3] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 44 Ln. 4-14

they never received and had no notice of, which on it's face lacks credence.    It was not HR Representative Sarah Gogo's birthday, so she was not sitting by her email anticipating an email from Ms. Richardson emanating well wishes, nor was there any scheduled email from Ms. Richardson on that day.

7. Pursuant to Federal Rule of Civil Procedure Rule 30(b)(6), Richardson asked for the deposition of a corporate representative to testify on behalf of Defendants regarding a number of separate areas relevant to her claims and the Defendants' asserted defenses.  On November 28, 2018, Defendant Produced Corporate Representatives Human Resources Manager Tia Jackson and Chief Financial Officer Ryan Grisard.   HR Manager Jackson was produced to speak on corporate representative topics to include the employee personnel file and the employee handbook, guidelines, policies, and practices, including those that apply to complaints of and investigations into discrimination, harassment, and retaliation.   CFO Ryan Grisard testified about Plaintiff's termination, job performance, the decision makers related to termination, the corporate structure, and Plaintiff's job duties and performance of the branch where she worked.  Their testimony, along with that of Plaintiff and former HR Representative Sarah Gogo, provides in relevant part the following:

***Testimony of Human Resources Manager Tia Jackson***

a. Defendant has a discrimination and anti-harassment policy, but Defendant does not have a written policy against retaliation for employees making protected complaints.[4]

b. HR Manager Jackson testified that it is important to protect employees who complain of discrimination and to have a thorough investigation of complaints of discrimination.[5]

---

[4] Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 20 Ln. 2-7
[5] Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 23 Ln. 25 to Pg. 24 Ln. 7

c.  HR Manager Jackson testified that the appropriate time period to respond to a written complaint of discrimination is within 24 hours. She further testified that witness statements should be gathered in an investigation.[6] Defendant never responded to Plaintiff's opposition to race discrimination, instead pretending it never received the email opposing discrimination.

d.  HR Manager Jackson testified that Defendant gave performance evaluations annually to apprise employees of how they are performing and to let them know where they can improve. The scale rating was 1 to 5, with 5 being the best performance possible. A 3 indicates the employee is meeting expectations. There is a comment box for additional comments by the supervisor or manager rating the employee. Plaintiff Richardson received predominately 4's, which indicated her performance was "commendable." HR Manager Jackson testified that Ms. Richardson's performance was commendable based on her performance evaluations and she WOULD NOT have had performance issues as an employee and also had the scores she received in her evaluations.[7] On 9 areas she received a 4 out of 5, or commendable, and on 3 out of 5 she met expectations.[8]

e.  Ms. Richardson was promoted within four months of being employed by Defendant. Employees are promoted after consideration of several "factors" to include not only their actual credentials and skills, but also their overall performance, character, and initiative as an employee. Jackson confirmed that an employee who was hired then promoted within four months after hire had proven to their employer they are excelling in these "factors."[9]

---

[6] Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 26 Ln. 1-24
[7] Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 28 Ln. 6 to Pg. 29 Ln. 15; Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 33 Ln. 22-25 to Pg. 34 Ln. 8; Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 44  Ln. 8-14
[8] Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 39 Ln. 14-25 to Pg. 40 Ln. 1
[9] Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 30 Ln. 14-25 to Pg. 31 Ln. 1

f. Defendant has a progressive discipline policy. If an employee is performing below par or not to Defendant's satisfaction, they are first provided a verbal notice, then written notice, then a performance improvement plan. [10] Defendant's Corp Repo Grisard claimed there were attempts to provide verbal warnings to Plaintiff, but this is in the face of Defendant's responses to discovery and the evidence in the record.

### *Testimony of former Human Resources Representative Sarah Gogo*

a. Former HR Representative Sarah Gogo said that she never received Plaintiff's complaint of discrimination via email.

b. Sarah Gogo testified that CFO Grisard showed up to her office to search for the email she alleges she never received prior to Plaintiff Richardson's termination. [11]

### *Testimony of Chief Financial Officer Ryan Grisard*

a. CFO Grisard testified he wasn't aware that Plaintiff complained of discrimination via e-mail until after Plaintiff was terminated, in direct conflict with the testimony of Sarah Gogo. [12]

b. CFO Grisard testified he did not know about the January 20, 2017 email complaining of race discrimination, but that the decision to terminate Plaintiff was made either the same day, or the day before or after. [13] Specifically he testified:

> Q. And based on the testimony provided by
> 25 Ms. Jackson, she -- in fact, the only evidence of her
> Page 15
> 1 performance, at least in her evaluations, is that she
> 2 was commendable as an employee, correct?
> 3    A. Sure.
> 4    Q. Okay. So, she's got commendable performance,

---

[10] Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 36 Ln. 20-25 to Pg. 37 Ln. 22
[11] Ex. D:  Deposition Testimony of Sarah Gogo
[12] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 13 Ln. 18-25
[13] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 14 Ln. 1-20

```
5   she has no prior discipline, but around the same day she
6   complains about being treated differently for being a
7   black woman, the decision is made to terminate her,
8   correct?
    9      A.   Correct.
```

c.   Grisard testified that Plaintiff Richardson was terminated for performance.[14]   He later specified that although there is not a single word about census in her job description[15], Plaintiff was in fact terminated solely for a lowering of the census.[16]   He further testified that no similarly situated comparator or branch manager had ever been terminated for census except for Plaintiff Richardson.[17]   However, 5 of the 7 branches of Defendant in the State of Texas had a decline in census over the same time period that Ms. Richardson's branch had a decline in census.[18]   During the entire time that Ms. Richardson and branch managers at four other branches were employed, there was a decline in census.   However, there was never a decision to terminate Ms. Richardson until the same day she complained of discrimination in writing to HR.[19]   No other branch managers have been terminated for census.[20]   Any low numbers on the census would be the responsibility of the entire team at the branch, including Rea Cazares, whose job responsibilities included marketing directly related to increasing the census.[21]   However, none of the employees responsible for the census that worked with Ms. Richardson at her branch were disciplined in any capacity. Alan Garza, one of the decision makers in terminating Plaintiff, would have also been responsible for the low census at the New Braunfels' branch.[22]   Additionally, Branch Manager Christina Luna's branch had low

---

[14] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 14 Ln. 21-23
[15] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 20 Ln. 7-21
[16] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 20 Ln. 22-25 to Pg. 21 Ln. 7
[17] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 19 Ln. 13-16
[18] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 22 Ln. 23-25 to Pg. 23 Ln. 10
[19] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 23 Ln. 11-13
[20] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 38 Ln. 9-15
[21] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 68 Ln. 14-25 to Pg. 69 Ln. 4
[22] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 69 Ln. 5-17

census, but she never received any discipline related to the census.  Instead, Branch Manager Luna was placed on a PIP related to her repeated failures to follow unrelated policies of Defendant.[23]

d.  Plaintiff complained that Alan Garza discriminated against her because she was a black woman in her email to HR.  Alan Garza was one of the decision makers involved in the decision to terminate Ms. Richardson.[24]

e.  Defendant represents that all other emails transmitted between Plaintiff and Sarah Gogo before and after January 20, 2017[25] (the email opposing and complaining of discrimination) except for one other email complaining of a hostile work environment.[26]

f.  Defendant testified that turnover is high in their industry and that there were always issues with the census.[27]  He confirmed that, as a result of high turnover, Defendant needed to work with Plaintiff to improve any issues with the census, indicating they had in fact tried to help her.[28]  There is nothing in the record to corroborate that Defendant attempted to help Plaintiff with performance nor that she needed help with performance.

### III. THE STANDARD OF REVIEW

8.  Under Rule 56(a), this Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In *In re Texas EZPawn Fair Labor Standards Act Litigation*, 633 F. Supp. 2nd 395,

---

[23] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 39 Ln. 3-25 to Pg. 40 Ln. 9
[24] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg 26 Ln. 15-25 to Pg. 27 Ln. 1
[25] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg 32 Ln. 21-25 to Pg. 33 Ln. 11
[26] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 29 Ln. 4-10
[27] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 35 Ln. 14-25 to Pg. 36 Ln. 7
[28] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg 35 Ln. 18-25 to Pg. 36 Ln. 7

398 (W.D. Tex. 2008), this Court described the nonmovant's burden on summary judgment as follows:

> "[T]he nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir.2002). The nonmovant may not rely on mere allegations in the pleadings. *Id.* Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a proper motion for summary judgment. *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir.1995). Rather, the nonmoving party must set forth specific facts showing the existence of a "genuine" issue concerning every essential component of its case. *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 777 (5th Cir.1997). The standard of review "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the record before the court."

*James v. Sadler*, 909 F.2d 834, 837 (5th Cir.1990) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).

9.  When Plaintiff moves for summary judgment on its own cause of action, she must prove she is entitled to summary judgment by establishing each element of her claim as a matter of law. *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex.1986). Defendant's evidence must be sufficient to allow reasonable and fair-minded people to differ in their conclusions on whether the challenged fact exists; evidence that raises only a speculation or surmise is insufficient. If less than a scintilla of evidence is produced, the Plaintiff is entitled to a summary judgment on liability. Summary judgment is appropriate when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

10. Employment-discrimination cases employ a unique burden-shifting analysis. Plaintiff is entitled to a presumption of discrimination if she meets the minimal initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Although the precise elements of the *prima facie* showing vary

depending on the circumstances, the plaintiff's burden at this stage of the case "is not onerous." ***Mission Consolidated Independent School District v. Garcia***, 372 S.W.3d 629, 634 (Tex.2012) (internal citation omitted). "The ***McDonnell Douglas*** presumption is 'merely an evidence producing mechanism that can aid the plaintiff in [her]ultimate task of proving illegal discrimination by a preponderance of the evidence.'" ***Id***. "The prima facie case raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." ***Id***.

11. If a plaintiff successfully demonstrates a *prima facie* case, the burden of production shifts to the defendant employer to show a legitimate and non-discriminatory basis for the adverse employment decision. ***McDonnell Douglas***, 411 U.S. at 802. "If the defendant employer demonstrates a non-discriminatory reason for its employment action, the plaintiff must show that the defendant's proffered reason is merely a pretext." ***Id***. at 804. Here, Defendant cannot provide a reason for termination that is not pretextual.

12. Because there are no genuine issues of material fact as to whether Defendant's reasons for termination are pretextual and as to each and every element of Plaintiff's prima facie case, Plaintiff's motion should be granted.

13. Plaintiff believes there are no questions of fact to be determined in the issues pursuant to this motion. Purely legal issues that can be resolved by summary judgment on undisputed facts include the Interpretation of unambiguous contract. *See Constitution State Ins. v. Iso-Tex Inc.*, 61 F.3d 405, 407 (5th Cir. 1995). Defendant must prove, by a preponderance of the evidence, that there is a legitimate, non-discriminatory reason for termination. Defendant cannot do so. Plaintiff's summary judgment must be granted.

## IV. METHOD OF PROOF

14. Direct evidence is rare in employment cases. As one court once put it, "[e]mployers rarely leave concrete evidence of their retaliatory purposes and motives." ***Nowlin v. Resolution Trust Corp.***, 33 F.3d 498, 508 (5th Cir. 1994). Another court put it this way:

> Unless the employer is a latter-day George Washington, employment discrimination is as difficult to prove as who chopped down the cherry tree. (Citation omitted). Employers are rarely so cooperative as to include a notation in the personnel file, fired due to age, or to inform a dismissed employee candidly that he is too old for the job.***Thornbrough v. Columbus & Greenville R.R. Co.***, 760 F.2d 633, 640–41 (5th Cir. 1985).

15. As a result, and "to ease the evidentiary burden on employment plaintiffs, most employment cases turn on circumstantial evidence, which is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." ***Desert Palace v. Costa***, 539 U.S. 90, 100 (2003). The present case follows this trend. In our case, however, there is evidence of an email complaining of discrimination based on race the same day that the decision to terminate was made.

## V. PLAINTIFF'S SUMMARY JUDGMENT EVIDENCE

16. Plaintiff relies upon and incorporates herein the pleadings on file with the court (and requests the court take judicial notice of the court file), and Plaintiff's exhibits attached to her Appendix, EX. 1, filed with this response, including the deposition of Defendant's Corporate Representatives and former HR Representative Sarah Gogo.

## VI. ARGUMENTS AND AUTHORITIES

### A. PLAINTIFF ESTABLISHES EACH ELEMENT OF HER PRIMA FACIA CASE

17. Defendant took an adverse employment action against Plaintiff because of her opposition in writing to race discrimination in violation of Title VII of the Civil Rights Act of 1964 as

amended and the Texas Commission on Human Rights Act codified as Chapter 21 of the Texas Labor Code.

18. Following the framework for a Title VII or Chapter 21 claim, Plaintiff must first establish her prima facie case of retaliation. To establish a claim of retaliation, an employee must establish the following three elements:

(1)That s/he engaged in activity protected by the applicable statutes; (2) that s/he suffered from an adverse employment action; and (3) that there is a causal connection between the taken protected activity and the adverse employment action. *See City of Waco v. Lopez*, 259 S.W.3d 147, 150 (Tex.2008) (protected activity under the TCHRA includes: (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing). *See also Lopez v. Tex. State Univ.*, 368 S.W.3d 695,703 (Tex. App.—Austin 2012, pet. denied). So long as a Plaintiff meets the "minimal" initial burden of establishing a prima facie case, she is entitled to a presumption of retaliation. *Mission Consolidated Independent School District*, 372 S.W.3d at 634, *citing Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).The causal link required by the third prong does not rise to the level of a "but for" standard at the prima facie stage.

It is undisputed that Ms. Richardson sent an email on January 20, 2017 alleging she was being discriminated against because of her race, meeting her first element. Defendant instead tries to dispute this email by saying that it was not received, the only email never sent or received to not reach its destination between Sarah Gogo and Plaintiff besides one other email alleging hostile work environment. Defendant's assertions lack credence.

19. Additionally, it is undisputed that Ms. Richardson meets her second element: an adverse employment action occurred when the decision to terminate Ms. Richardson was made the same day she complained of race discrimination. Ms. Richardson was terminated within one week of complaining of race discrimination.

20. Thus, Ms. Richardson must show whether a causal nexus exists between Richardson's protected activity and her termination. Temporal proximity between a protected activity and an adverse employment action may be sufficient circumstantial evidence to justify an inference of retaliatory motive. *Martin v. Kroger Co.*, 65 F. Supp. 2d 516 (S.D. Tex. 1999). Temporal proximity between an employer's knowledge of protected activity (Complaint to HR or EEOC Charge of Discrimination) and an adverse employment action (termination) suffice as sufficient evidence of causality to establish a prima facie case, particularly where, as in this case, there is other evidence of factors evidencing pretext. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). In Ms. Richardson's case, the same day she complained of discrimination is the same day a decision to terminate was made.

21. In *Bregon v. Autonation USA Corp.*, 128 Fed. Appx. 358, 361-362 (5th Cir. 2005), the district court concluded that Bregon had not made a prima facie case for retaliatory termination. Specifically, it found that he failed to show that Athere was a causal connection between the participation in the protected activity ... and the adverse employment action. However, Bregon was fired only a week after he filed his complaint and he offered evidence that people at work were likely aware of his complaint. The appellate court recognized that it had held that the combination of temporal proximity and possibility of knowledge of the complaint is sufficient to satisfy a defendant's prima facie burden for a retaliation claim. Therefore, the court held

that Bregon satisfied his burden of proof.   In evaluating the "causal link" element of a retaliation claim, the court may consider the following:

22. "Close timing between an employee's protected activity and the adverse action can provide the causal connection required for a prima facie case" of retaliation under the TCHRA and Title VII. *Johnson*, 203 S.W.3d at 11; *Tex. State Office of Admin. Hearings v. Birch*, No. 04–12–00681–CV, 2013 WL 3874473, at *23 (Tex.App.—San Antonio July 24, 2013, pet. denied) (mem.op.). Periods of three months, four months, and twenty months between an employee's protected activity and the adverse action, however, have been deemed insufficient without other evidence. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001).   *Alamo Heights Indep. Sch. Dist. v. Clark*, 04-14-00746-CV, 2015 WL 6163252, at *7 (Tex. App.--San Antonio Oct. 21, 2015).

23. Plaintiff has established each and every element of her prima facie case.

### *Defendant lacks a legitimate reason for termination*

24. Once the claimant makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. If the employer meets this burden of production, then the burden shifts back to the Claimant to show that the employer's proffered explanation is a pretext for retaliation. *See Dutton v. Univ. Healthcare Sys., L.L.C.*, 136 Fed. App. 596, 599-600 (5th Cir. 2005).   Plaintiff believes Defendant fails to even establish a legitimate non-discriminatory reason for termination.   Defendant failed to follow it's own progressive discipline policy in terminating the only branch manager that has ever been terminated for low census.   At the time Plaintiff was terminated, there were four other branch managers with low census at their branches, and none had received as much as a single write up.   This argument goes not only to a lack of legitimate reasons for termination

but also that this reason is clearly pretextual, addressed below.  Plaintiff's motion should be granted.

*Plaintiff establishes that the alleged reasons for termination are pretextual*

25. A plaintiff may establish pretext either through demonstrating evidence that there is evidence of disparate treatment, by showing that the employer's proffered explanation is false or "unworthy of credence" or that an inference of discrimination is reason for adverse employment action; *Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). *De Luna v. Cheers, Inc.*, SA06CV525WRF, 2007 WL 708561, at *5 (W.D. Tex. Feb. 2, 2007).   It has been established that Plaintiff was treated differently than other branch managers in discipline and that employees at her branch that were also responsible for census were not disciplined in any capacity.

26. Pretext can further be shown in a variety of ways (although not all are relevant and there are additional ways of showing pretext):

27. **Suspicious Timing**. Close timing alone may be sufficient to provide not only a causal connection but also pretext, when the adverse action happens in close proximity to the discrimination complaint. "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F. 3d 1180, 1188 (5th Cir. 1997), cert. denied, 529 U.S. 948 (1998); *see also Armstrong v. City of Dallas*, 997 F. 2d 62, 27 (5th Cir. 1993) (finding the causal link prong established where "[t]he only evidence available to support an inference of discrimination . . . is the temporal proximity" of the protected activity and the adverse employment action). In numerous cases the Fifth Circuit has recognized that close temporary proximity alone sufficed to establish a causal connection.  In

the instant case, the Plaintiff was terminated within the same day of sending an email to HR complaining of discrimination

28. **Lack of Investigation in violation of Defendant's procedures and/or policies.** Defendant failed to conduct any form of a reasonable investigation that would be expected if the allegations in the direct face of what the HR Manager believed was appropriate. Plaintiff's complaints of discrimination were never once looked into, which is further evidence of pretext. *O.C. v. Chevron Phillips Chemical Co.*, LP, 570 F.3d 606, 624-625 (5th Cir. 2009) ("jury could find alleged misrepresentation was a pretext because neither decision maker had read the questionnaire or made any effort to investigate whether their medical assumptions were incorrect, even though the plaintiff had given them info that did not support the assumption; jury reasonably could find that employer first decided to fire plaintiff because of her disability or accommodation requests, "and only afterwards developed the purely pretextual reasons they advanced for their actions." Further, a company's deviation from its own policy or procedure may be evidence of pretext. *Quezada v. Earnhardt El Paso Motors, LP*, 592 F.Supp.2d 915, 923 (W.D. Tex. 2009) (*citing Machinchick v. PB Power*, 398 F.3d 345, 355 n.29 (5th Cir. 2005)); *Mercer v. Arbor E & T, LLC*, 11-CV-3600, 2013 WL 164107, at *12 (S.D. Tex. Jan. 15, 2013). Defendant failed to follow it's own progressive discipline policies, and didn't even have a retaliation policy in place.

29. **More Favorable Treatment of Employees not Opposing Discrimination and Failure to Apply a Neutral Policy on Discipline and Failure to Follow Procedures.** A lack of a uniformly applied disciplinary process, combined with a lack of a uniformly implemented process for rules regarding the census allows Defendant to pick and choose which employee to use policies against as weapons as opposed to neutral implementations of practice, or alternatively, shows a grave departure from Defendant's alleged normal policies, which is further evidence of pretext, particularly when there is a double standard in the application of the policy. For example, Defendant failed to discipline any other branch managers for low

census.   Defendant failed to follow it's own progressive discipline policy.   Defendant repeatedly indicated to Plaintiff her performance was commendable and above average. Only when she complained of discrimination was she now not doing her job.   And regardless of lower census numbers the question still arises, why, if there are months of low census, was the decision to terminate her made when she complained of discrimination? When decision making criteria is entirely subjective, it forces the court to make improper credibility determinations in the summary judgment context *See Medina v. Ramsey Steel Co.*, 238 F. 3d 674, 681-82 (5th Cir. 2001). Plaintiff's motion should be granted.

## VII. PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Richardson respectfully prays that judgment be entered for the Plaintiff Richardson against Defendants for her claims of retaliation based on race and/or for damages in an amount within the jurisdictional limits of the Court, damages, including past and future lost wage damages, past and future compensatory damages, attorneys' fees and expert fees, together with interest, including pre and post judgment interest, as allowed by law; costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully submitted,

BY:  */s/ Thomas N. Cammack, III*

      **ADAM PONCIO**
      **State Bar No. 16109800**
      salaw@msn.com
      **THOMAS N. CAMMACK, III**
      **State Bar No. 24073762**
      tcammack@ponciolaw.com
      **ALAN BRAUN**
      **State Bar No. 24054488**
      abraun@ponciolaw.com

**PONCIO LAW OFFICES**
**A Professional Corporation**
**5410 Fredericksburg Road, Suite 109**
**San Antonio, Texas 78229-3550**
**Telephone:**    **(210) 212-7979**
**Facsimile:**     **(210) 212-5880**

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was forwarded to

the following counsel of record by the court's filing system on this the 20th day of March, 2019:


Richard G. Garza                    VIA EFILE
Jackson Walker LLP
State Bar No. 07737200
rgarza@jw.com
112 E. Pecan, Suite 2400
San Antonio, Tx 78205
210-978-7734 Telephone
210-242-4606 Facsimile

Judy Bennett Garner                 VIA EFILE
Jackson Walker LLP
State Bar No. 24092403
jgarner@jw.com
2323 Ross Avenue, Suite 600
Dallas, Tx 75201
214-953-6000 Telephone
214-953-5822 Facsimile



                              */s/ Thomas N. Cammack, III*
                              **Thomas N. Cammack, III**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **RENEE RICHARDSON** | § | |
| *Plaintiff* | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.  5:18-cv-00151-FB** |
| | § | |
| **THE MEDICAL TEAM, INC., d/b/a** | § | |
| **THE MED TEAM, INC.** | § | |

**ORDER REGARDING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Before the Court Is Plaintiff's Partial Motion for Summary Judgment. After due consideration of this motion the Court orders that Plaintiff's Motion for Partial Summary Judgment is GRANTED in favor of Plaintiff as to liability for her claims of retaliation. It is therefore ORDERED that Plaintiff's Motion is GRANTED.

Signed on _____ 2019

_____
FRED BIERY
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

RENEE RICHARDSON                    §
*Plaintiff*                         §
                                    §
VS.                                 §  CIVIL ACTION NO.  5:18-cv-00151-FB
                                    §
THE MEDICAL TEAM, INC., d/b/a       §
THE MED TEAM, INC.                  §
*Defendant*

APPENDIX FOR PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Respectfully Submitted,

PONCIO LAW OFFICES
A Professional Corporation
5410 Fredericksburg Road, Suite 109
San Antonio, Texas 78229-3550
Telephone:(210) 212-7979
Facsimile:(210) 212-5880

BY: /s/ Thomas N. Cammack, III
        ADAM PONCIO
        State Bar No. 16109800
        THOMAS N. CAMMACK, III
        State Bar No. 24073762

ATTORNEYS FOR PLAINTIFF
RENEE RICHARDSON

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was forwarded to

the following counsel of record by the court's filing system on this the 19th day of March, 2019:


Richard G. Garza                    VIA EFILE
Jackson Walker LLP
State Bar No. 07737200
rgarza@jw.com
112 E. Pecan, Suite 2400
San Antonio, Tx 78205
210-978-7734 Telephone
210-242-4606 Facsimile

Judy Bennett Garner                 VIA EFILE
Jackson Walker LLP
State Bar No. 24092403
jgarner@jw.com
2323 Ross Avenue, Suite 600
Dallas, Tx 75201
214-953-6000 Telephone
214-953-5822 Facsimile



                                    */s/ Thomas N. Cammack, III*
                                    **Thomas N. Cammack, III**

**TABLE OF CONTENTS**

1. **EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

    a.   January 20, 2017 Email from Renee Richarson to Sarah Gogo (**Exhibit "A"**);

    b.   Deposition Transcript of Corporate Representative Tia Jackson (**Exhibit "B"**);

    c.   Deposition Transcript of Corporate Representative Ryan Grisard (**Exhibit "C"**);

    d.   Deposition Transcript of Sarah Gogo (**Exhibit "D"**);

# Exhibit A

# Renee Richardson

| | |
|---|---|
| **From:** | Renee Richardson |
| **Sent:** | Friday, January 20, 2017 7:39 AM |
| **To:** | Sarah Gogo |
| **Subject:** | NB Situation |
| **Importance:** | High |

Good Morning Sarah,

I want to update you on the situation I emailed you about Wednesday, January 18, 2017. I met with Christina and Ms. Harvey in person; and Alan by speaker phone on Wednesday regarding the situation I emailed you about.

The situation remains unresolved until Ms. Harvey meets with Elka. Sarah, given the current situation and past instances, I have always felt like Alan has never supported me or respected me in this position because I am a black woman. The reason I am expressing it now is because of the bias in this situation with Elka and another incident Christina informed me of recently, which I will discuss in the closing of my email.

Although, I have not worked closely with Ms. Harvey, I have always respected her and held her in high regard. However, after meeting with Ms. Harvey on Wednesday, I am still troubled by the handling of the situation and the allegations Elka has made against the staff in the NB office. Ms. Harvey's questions to me, "Is it because she's out of the office most of the time, the reason they don't want to work with her"? This type of questioning without proof, nor having witnessed her being treated inappropriately by others is something I cannot answer. This entire situation has defeated me and has created a hostile work environment, which has made me very uncomfortable. I am using the "open door communication policy" to communicate with you, the HR Corporate Director, or someone who is willing to take an unbiased approach in resolving this matter.

The last concern I have is regarding a written counseling against me regarding a self-reported incident that incurred a monetary fine against the company. I consulted with Christina regarding a case for guidance on how to handle what I considered to be Medicaid Fraud. After Christina reviewed the case, she instructed me to file an APS report which I did immediately. According to Christina, Alan informed her that I will be written up, despite her telling him that she gave me directions on how to handle my findings. I did the responsible thing by obtaining guidance from my superior on an issue. I should not be punished for instructions given to me by my direct boss. I only want to be treated fairly. Based on Alan's insistence that I be written up despite being aware that my actions were based on instructions given to me, reinforces my belief regarding his treatment towards me.

I am following company policy regarding the open door policy. Also, I am only asking that the employees, including myself, to be treated with fairness, dignity, and respect.

Respectfully,

Renee

**Renee Richardson**
Branch Manager
**MED TEAM, INC.**
1423 N. Walnut Ave. # 102



EXHIBIT

6

1

RICHARDSON, L. - 000484

New Braunfels, TX 78130
Office: 830-626-3525
Fax: 830-629-2465
E-mail: RRichardson@medteam.com
Visit our new website: www.medicalteam.com



THE
MEDICAL
TEAM®    Care that matters, where it counts.
         At home.

CONFIDENTIALITY NOTICE: *This electronic message and all contents contain information which may be privileged, confidential or otherwise protected from disclosure. The information is intended to be for the addressee only. If you are not the addressee, any disclosure, copying, distribution or use of the contents of this message is prohibited. If you have received this electronic message in error, please notify us immediately and destroy the original message without retaining any copies. Any views or opinions presented in this email are solely those of the author and do not necessarily represent those of THE MEDICAL TEAM, INC. - MED TEAM, INC. - THE MEDICAL TEAM Personal Care Services - Catastrophic Care Solutions.*

2

RICHARDSON, L. - 000485

# Exhibit B

Transcript of the Testimony of

# Tia Jackson

## Date:

November 28, 2018

## Case:

RENEE RICHARDSON vs MEDICAL TEAM, et al

Tia Jackson                                          November 28, 2018

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

RENEE RICHARDSON,      )
      Plaintiff      )
                )
VS.                    )   NO. 5:18-CV-151-FB
                )
THE MEDICAL TEAM, INC. )
d/b/a THE MED TEAM, INC.,  )
      Defendant      )

*********************************************************

VIDEOTAPED DEPOSITION OF

TIA JACKSON

A CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC.

d/b/a THE MED TEAM, INC.

NOVEMBER 28, 2018

*********************************************************

VIDEOTAPED DEPOSITION of TIA JACKSON, a

CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC. d/b/a

THE MED TEAM, INC., produced as a witness at the

instance of the Plaintiff, and duly sworn, was taken in

the above-styled and numbered cause on the 28th day of

November, 2018, from 9:35 a.m. to 10:42 a.m., before

Naomi R. Peltier, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of JACKSON

WALKER, LLP, 112 East Pecan Street, Suite 2400, San

Antonio, Texas, pursuant to the Federal Rules of Civil

Procedure.

Tia Jackson

Page 2

```
 1            A P P E A R A N C E S
 2
   FOR THE PLAINTIFF:  RENEE RICHARDSON
 3      THOMAS N. CAMMACK, III
          and LORNA GRIFFIN
 4      PONCIO LAW OFFICES
        5410 Fredericksburg Road, Suite 103
 5      San Antonio, Texas  78229
        (210) 212-7979
 6      tcammack@ponciolaw.com
 7 FOR THE DEFENDANT:  THE MEDICAL TEAM, INC. D/B/A THE MED
   TEAM, INC.
 8      RICK GARZA
        JACKSON WALKER, LLP
 9      112 E. Pecan Street, Suite 2400
        San Antonio, Texas  78205
10      (210) 978-7700
        rgarza@jw.com
11
   THE VIDEOGRAPHER:
12      NEAL CASTILE
13 ALSO APPEARING:
        RYAN GRISARD
14
               * * * * * *
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1               I N D E X
 2
                                      PAGE
 3 Appearances .........................................2
 4            EXAMINATIONS
                                      PAGE
 5 TIA JACKSON
     Examination By Mr. Cammack ......................4
 6
 7            EXHIBITS
                                FIRST
 8 NO.     DESCRIPTION         REFERENCED
 9 1  Deposition Notice ...........................11
10 2  Administrative Employee Handbook ...............16
11 3  Employee Guide to Workforce HR Self Service
         and Performance Management .................32
12
   4  Performance Review ..........................38
13
14             -o-O-o-
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1      THE VIDEOGRAPHER:  Today's date is
2 November 28, 2018.  We're on the record at approximately
3 9:35 a.m. to take the oral video deposition of corporate
4 representative of The Medical Team, Tia Jackson, in the
5 case styled Renee Richardson versus The Medical Team,
6 Incorporated, d/b/a The Med Team, Incorporated.  By
7 previous agreement, we are forgoing the formal federal
8 preamble.  If the attorneys would introduce themselves,
9 and the court reporter can swear in the witness, please.
10      MR. CAMMACK:  Yes, my name is Thomas
11 Cammack.  I'm taking this deposition -- or the Poncio
12 Law Offices, taking this deposition, and we are here on
13 behalf of the Plaintiff, Renee Richardson.
14      MR. GARZA:  Rick Garza, with Jackson
15 Walker, on behalf of The Medical Team.
16      THE VIDEOGRAPHER:  Thank you.
17      MR. CAMMACK:  All right.  I'm sorry.  Go
18 ahead.
19           TIA JACKSON,
20 A CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC.
21      d/b/a THE MED TEAM, INC.,
22 having been first duly sworn, testified as follows:
23           EXAMINATION
24   Q.  (BY MR. CAMMACK)  Okay.  And Ms. Jackson, could
25 you please state your job title with The Med Team?

Page 5

1   A.  Human resources manager.
2   Q.  And what's your full name?
3   A.  Tia Alisa Jackson.
4   Q.  Okay.  And Ms. Jackson, you currently have been
5 designated as a corporate representative to testify on
6 their behalf; is that correct?
7   A.  That's correct.
8      MR. CAMMACK:  Okay.  And now, as far as
9 Rick and I were briefly having a discussion, we also
10 have another corporate representative that's actually in
11 the room right now.  Usually, if I'm garnishing
12 testimony, I would invoke the Rule, and I would say,
13 "Any other witnesses that aren't essential would need to
14 leave the room," and my understanding there's a
15 disagreement related to that.
16      MR. GARZA:  Yes, there is a disagreement,
17 because what we have done is -- and we've -- we've --
18 we -- we -- you and I have spoken about the topics that
19 Ms. Jackson is going to testify.  And Mr. Grisard, who
20 is the other person present, he is the CFO of The
21 Medical Team.  He's not a -- not a -- a lower level
22 employee.  He is going to testify regarding the
23 remaining items to be discussed.
24      MR. CAMMACK:  So, if I'm clarifying, the
25 understanding you-all have of the Rule is that if

Page 6

1 someone is a higher level employee, they're allowed to
2 stay in the room while I'm taking deposition testimony
3 of the other employees?
4          MR. GARZA:  It is -- It is -- My
5 understanding of the Rule is that a -- at each
6 deposition, the corporation has a right to have a
7 corporate rep -- corporate representative at, and attend
8 that deposition.
9          MR. CAMMACK:  And what is --
10          MR. GARZA:  And so --
11          MR. CAMMACK:  -- Ms. Jackson's role?
12          MR. GARZA:  Her role here is to testify
13 regarding certain aspects of the corporate
14 representative deposition.  And so, my position is, is
15 that Mr. Grisard can stay in and -- and watch this
16 deposition to the extent that Ms. Jackson is being
17 examined.
18          MR. CAMMACK:  And -- And I think the whole
19 purpose of the Rule is to get the individuals' testimony
20 one by one.  She's been designated on specific topics --
21 in fact, we just went over it.  It's 3, 8, 12, 38, 39,
22 40, 41, and 42, as a corporate representative, which she
23 just testified she is a corporate representative.
24          MR. GARZA:  Yes.
25          MR. CAMMACK:  So, her role is fulfilling

Page 7

1 the role of a corporate representative in her capacity.
2 Why does he need to be present -- or why is he even
3 allowed to be present, pursuant to the Rules, if he's
4 not being asked questions about those -- those specific
5 parameters?
6          MR. GARZA:  She testifying regarding those
7 particular topics, and at every deposition a -- the
8 corporation has a right to have a corporate
9 representative attend the deposition.
10          MR. CAMMACK:  But she is the corporate
11 rep.
12          MR. GARZA:  She's testifying regarding
13 certain aspects.
14          MR. CAMMACK:  As the corporate
15 representative.
16          MR. GARZA:  Well, certainly.  As -- She is
17 going to testify on behalf of the corporation, but it is
18 a separate question as to whether or not the -- the
19 corporation has a right to have a corporate
20 representative present to watch that deposition and to
21 be present during the deposition.
22          MR. CAMMACK:  I mean, I -- I disagree with
23 the understanding of it.  I've never heard it put that
24 way either.  I think this is something -- you know, I
25 don't want to start off so early getting a ruling on or

Page 8

1 calling the Court about, but I think it's essential that
2 we go through the process.  And the process is that
3 she's here, she's the corp rep, she's allowed to have
4 counsel here, but there's not supposed to be other
5 people here.  Let's say you had five corporate reps here
6 that were all going to testify today.  Is -- Is it my
7 understanding that you're saying all five could sit in,
8 based on the fact they're corporate reps and they'd be
9 providing testimony today?
10          MR. GARZA:  No.
11          MR. CAMMACK:  Okay.
12          MR. GARZA:  No, not necessarily.  I mean,
13 if -- if -- if those individuals are providing
14 additional testimony regarding aspects different from
15 what Ms. Jackson is going to testify about, then the
16 corporation has a right to have a representative -- a
17 corporate representative.  It doesn't mean that we can
18 bring in a hundred people in -- nor can we bring other
19 witnesses in -- in this deposition to act as the
20 corporate representative.  I can't bring in a branch
21 manager of The Medical Team to sit in on this deposition
22 when Mr. Grisard is the CFO upper management and is --
23 I -- in my -- in my contention, allowed to be present
24 during this particular deposition.
25          MR. CAMMACK:  Okay.  I mean, I just

Page 9

1 disagree that -- that he's allowed to be here, and I
2 think -- you know, part of the purpose of the rule is
3 that -- so there's not a parroting of testimony by
4 individuals that will be testifying.
5          MR. GARZA:  Understood.
6          MR. CAMMACK:  And --
7          MR. GARZA:  And -- I'm sorry.  Go ahead.
8          MR. CAMMACK:  Go ahead.
9          MR. GARZA:  I understand that.  And the --
10 the -- the topics -- and that's why we've designated
11 Ms. Jackson to testify regarding certain aspects of
12 those topics.  And -- And Mr. Grisard is going to answer
13 questions regarding the other topics that have been --
14 that have been listed in your deposition notice.
15          MR. CAMMACK:  Okay.  I mean, I don't
16 see --
17          MR. GARZA:  So, I don't -- I don't see a
18 doubling up of -- of the questions.  And if that's what
19 you're -- If that's the intent, then we need to have
20 another discussion.  You're not going to ask Ms. Jackson
21 questions and then ask Mr. Grisard the same questions --
22          MR. CAMMACK:  Well, I'm not --
23          MR. GARZA:  -- I assume.
24          MR. CAMMACK:  -- going to ask -- I'm --
25 I'm not here to ask the same questions, but I am going

Tia Jackson

November 28, 2018
Pages 10 to 13

Page 10

1  to, obviously, have some overlap.  I have a
2  discrimination/harassment/retaliation case.  If she's
3  going to talk about policies and he's going to talk
4  about investigations pursuant to those policies, there's
5  going to be some overlap.  Let's say I say, hey --
6          MR. GARZA:  Sure.  And I -- And I -- I --
7  That, I understand.  I -- I -- I can see that there
8  would be some overlap, but it's not as if you're asking
9  Ms. Jackson the exact same questions as you're asking
10  Mr. Grisard.  So -- So, although there may be some
11  overlap, there's -- there are vast differences, in my --
12  You're going to be in control of the questions.  There
13  are vast differences in what Ms. Jackson is going to
14  testifying about as opposed to what Mr. Grisard is going
15  to test about --
16          MR. CAMMACK:  Okay.
17          MR. GARZA:  -- testify about.
18          MR. CAMMACK:  Can we -- So, do you think,
19  then, that we -- Because my -- my position, I think, is
20  that she can sit here as a representative.  You're
21  saying absolutely not, you disagree with that.  There's
22  not a way we could agree that he could just not sit in
23  during her testimony?  I don't -- I don't see what the
24  point of him would be to be here, in any event.
25          MR. GARZA:  Well, I -- I think that -- The

Page 11

1  point is, is that the corporation has the right to --
2  to -- to a corporate representative at every deposition.
3  My contention, even at the corporate -- at a corporate
4  representative's deposition.  You know, once again, I
5  mean, there may be some -- some small overlap, but
6  Ms. Jackson is designated to testify regarding certain
7  aspects of this case and Mr. Grisard is going to
8  testify regarding other aspects of the case.
9          MR. CAMMACK:  Okay.  Do you mind if we go
10  off the record and then I make a phone call real quick?
11          MR. GARZA:  Sure.
12          MR. CAMMACK:  Okay.
13          THE VIDEOGRAPHER:  We're off the record at
14  9:43.
15          (Recess 9:43 a.m. to 10:05 a.m.)
16          THE VIDEOGRAPHER:  We're back on the
17  record at 10:05.
18      Q.  (BY MR. CAMMACK) All right.  And I'm sorry,
19  again, could you please state your full name again?
20      A.  Tia Alisa Jackson.
21          (Exhibit No. 1 marked.)
22      Q.  (BY MR. CAMMACK) Okay, Ms. Jackson.  You've
23  been designated to speak on some topics, and you have
24  before you Exhibit Number 1.  And Exhibit Number 1 is
25  the notice of intent to take the deposition of corporate

Page 12

1  representative.  Could you turn to the second page with
2  me?
3      A.  Okay.
4      Q.  My understanding is, one of the topics you've
5  been designated on is number 3, the employee handbook
6  and guidelines.
7      A.  Yes.
8      Q.  Are you prepared to speak about that today?
9      A.  Yes.
10      Q.  Okay.  And number 8, the employee's personnel
11  file and prior attendance and discipline and prior leave
12  requests?
13      A.  Yes.
14      Q.  Are you prepared to speak on that today?
15      A.  Yes.
16      Q.  And number 12, the Defendant's policies related
17  to discipline, including of management and policies of
18  progressive discipline?
19      A.  Yes.
20      Q.  Are you prepared to speak on that today, as
21  well?
22      A.  Yes.
23      Q.  Okay.  If you could turn a couple of pages with
24  me to the second to the last page until you see topic
25  number 38.

Page 13

1      A.  I'm there.
2      Q.  Okay.  And number 38, the policies and/or
3  guidelines of Defendant regarding the appropriate or
4  expected manner of conduct between male and female
5  employees.
6      A.  Yes.
7      Q.  Okay.  Number 39, the policies, guidelines, and
8  procedures of Defendant regarding the reporting by
9  employees of sexual harassment or other inappropriate
10  sexual conduct, or of harassment based on race or
11  national origin?
12      A.  Yes.
13      Q.  Okay.  Number 40, the policies, guidelines, and
14  procedures of Defendant regarding the documentation of
15  employees' reports of sexual harassment or other
16  inappropriate sexual conduct, or the documentation of
17  reports of harassment based on race or national origin?
18      A.  Yes.
19      Q.  Number 41, the policies, guidelines, and
20  procedures of Defendant regarding the investigation of
21  claims made by employees of sexual harassment, or other
22  inappropriate sexual conduct, or of harassment based on
23  race or national origin?
24      A.  Yes.
25      Q.  And number 42, the policies, guidelines, and

Page 14

1  procedures of Defendant regarding the documentation of
2  the investigation of claims made by employees of sexual
3  harassment, or other inappropriate sexual conduct, or of
4  harassment based on race or national origin.
5      A.  Yes.
6      Q.  Okay.  Have you ever provided a deposition
7  before?
8      A.  No.
9      Q.  Okay.  I'm going to go over some of the ground
10 rules of the deposition, a lot of them will make her job
11 a little bit easier today.
12     A.  Okay.
13     Q.  You're doing a good job today so far.  She
14 can't record nonverbal responses, or "uh-huhs" or
15 "huh-uhs" aren't clear on the record, so if you can
16 continue to provide a "yes," "no," or whatever your
17 answer is, so we can have a clear record.
18     A.  Okay.
19     Q.  And then, she also can't record anytime where
20 we're talking over each other.  You may know where I'm
21 going with a question, I may think I know where you're
22 going with an answer, but if you could wait until I
23 finish my question, and I'll extend you the same
24 courtesy.
25     A.  Absolutely.

Page 15

1      Q.  And then, I don't mean you any disrespect by
2  this question.  I ask this of every witness.  And I know
3  it's early in the morning, but have you had anything to
4  drink today?
5      A.  Like alcohol?
6      Q.  Correct.
7      A.  No.
8      Q.  All right.  And have you taken any medication
9  that would affect your memory?
10     A.  No.
11     Q.  Is there any reason you couldn't give full and
12 truthful testimony today?
13     A.  No.
14     Q.  And even though we're in a conference room, is
15 it your understanding that your testimony has the same
16 weight as it would in a trial?
17     A.  Yes.
18     Q.  And you understand that, in the state of Texas,
19 it's a third degree felony to purger yourself?
20     A.  Yes.
21     Q.  Okay.  Now, sometimes I get in a rush or I may
22 be trying to think of a question and I word it a little
23 strange.  If you have a problem understanding my
24 question or if I word it in a way that doesn't quite
25 make sense, could you please ask me to clarify?

Page 16

1      A.  Yes.
2      Q.  And if you provide an answer and don't ask me
3  to clarify, can we assume that you understood my
4  question?
5      A.  Yes.
6      Q.  And at the end, I'm going to ask you if you
7  need to clarify any of your testimony, but feel free to
8  do it on the spot if you need to, you know, make a
9  clarification or change to your testimony.
10     A.  Okay.
11     Q.  Okay.  Thank you.
12         (Exhibit No. 2 marked.)
13     Q.  (BY MR. CAMMACK) I'm going to hand you -- So,
14 we'll be skipping back and forth between Exhibit Number
15 1, but I'm going to hand you Plaintiff's Exhibit
16 Number 2.  Are you familiar with this document?
17     A.  Yes.
18     Q.  And what is this document?
19     A.  Employee handbook.
20     Q.  And when did you first become familiar with the
21 employee handbook?
22     A.  When I was hired in September of 2017.
23     Q.  Okay.  And when you were hired, what did you
24 say your job title was?  I'm sorry.
25     A.  Human resources manager.

Page 17

1      Q.  And you said September of 2017?
2      A.  That's correct.
3      Q.  And were you promoted or was this the first
4  time you were hired with The Med Team?
5      A.  That's the first time I was hired with The Med
6  Team.
7      Q.  Okay.  And do you have prior experience as an
8  HR manager?
9      A.  Yes.
10     Q.  Where is your prior experience?
11     A.  Do you want it all, or my last previous job?
12     Q.  Your previous job.
13     A.  I worked for Padgett Stratemann, also known as
14 RSM at this point.
15     Q.  Okay.  And how long were you with them?
16     A.  Two years.
17     Q.  Okay.  I haven't printed out the whole manual,
18 I printed out a couple of pages relevant to our case.
19 If you could turn to the second page of Exhibit Number 2
20 with me.
21         MR. GARZA:  Just for clarification, would
22 you -- let's designate it by the --
23         MR. CAMMACK:  The Bates?
24         MR. GARZA:  -- designation number, please,
25 yeah.

Tia Jackson

Page 18

1    MR. CAMMACK: Oh, perfect.

2    MR. GARZA: That might make it easier.

3    Q. (BY MR. CAMMACK) And that's -- that's another

4 thing I didn't go over today. So, at the bottom of the

5 page, you'll see "Richardson, L," and then a dash and

6 some numbers. That means that this document was

7 produced in discovery. This particular designation

8 means that our office produced it. You'll see some that

9 say "Med Team" and some numbers, and that means that The

10 Med Team produced those documents.

11    But for frame of references, Rick has

12 pointed out there's -- there's numbers to which document

13 page it is, and so this page in particular is 000421.

14 And on this page is the Equal Employment Opportunity

15 policy. What's your understanding of this policy?

16    A. That we don't discriminate against any employee

17 based on race, creed, color, national origin, sex, age,

18 or gender, or disability.

19    Q. Okay. And when you say you don't discriminate,

20 does that mean in making any employment-related

21 decisions?

22    A. Correct.

23    Q. So, if you were to determine whether or not to

24 discipline an employee, your -- this policy prevents it

25 from being done based on their race?

Page 19

1    A. Correct.

2    Q. And if you were to discipline an employee based

3 on their race, that would be a violation of this policy,

4 correct?

5    A. Correct.

6    Q. And if you were to suspend an employee based on

7 their race, that would be a violation of this policy?

8    A. Yes.

9    Q. And to terminate an employee based on their

10 race would be a violation of this policy?

11    A. Yes.

12    Q. Now, this -- this policy particularly -- or

13 specifically prohibits discrimination. Do you know if

14 there's a separate policy that prohibits harassment or

15 retaliation?

16    A. We have an anti-harassment policy.

17    Q. Okay. Is that also in the handbook or in

18 another location?

19    A. There -- I'm not sure if it's in the handbook.

20 I know that there is another policy.

21    Q. Okay. Do -- Do you know the name of the policy

22 that prohibits harassment retaliation?

23    A. It's called anti-harassment.

24    Q. Okay. So, is it a separate document or a

25 separate policy book?

Page 20

1    A. I believe it's a separate document.

2    Q. Okay. And is -- is there also a separate one

3 for retaliation, as well -- an anti-retaliation policy?

4    A. No.

5    Q. Do you have an anti-retaliation policy that

6 you're aware of?

7    A. Not that I'm aware of.

8    Q. Okay. And is it -- So, it's your understanding

9 that the employees are not instructed on retaliation if

10 they report discrimination?

11    A. They are, but I don't know that it's a separate

12 policy.

13    Q. Okay. So, they are instructed on it, but

14 there's not a written policy indicating who they can

15 report to or how to go about reporting it?

16    A. Separate from the anti-harassment policy.

17    Q. And I didn't understand your answer. You're

18 saying there is or isn't one separate?

19    A. So, there isn't a specific policy on

20 retaliation, but a policy on anti-harassment which

21 should include retaliation.

22    Q. Okay. And is that harassment specific to

23 sexual harassment?

24    A. All harassment.

25    Q. Okay. So, when an employee says, "I've been

Page 21

1 harassed in the workplace," that policy says, based on

2 their complaint of harassment, retaliation is

3 prohibited?

4    A. Correct.

5    Q. And are you aware of whether or not

6 Ms. Richardson would have signed or reviewed that

7 policy?

8    A. I am not aware.

9    Q. Okay. Currently, what kind of training is

10 provided to employees related to the retaliation policy?

11    A. Each employee is provided an employee handbook

12 and some policies when they are onboarded. There's also

13 orientation that they go through. I can only speak to

14 from the time that I was hired to the present. So, as

15 far as orientation when Ms. Richardson was hired, I

16 cannot speak to that.

17    Q. Okay. So, currently, employees, they're handed

18 a handbook and they're supposed to review it?

19    A. Yes. And they sign an acknowledgment that they

20 have reviewed it.

21    Q. And then, during their initial hiring,

22 there's -- there's an orientation checklist they go

23 through?

24    A. Yes. Now --

25    Q. And --

Tia Jackson

Page 22

1 A. -- from September 2017 to present, again, I
2 can't speak on.
3 Q. Oh, sure, sure. So, from September 2017 to
4 present, there's an orientation process. Now, you're
5 saying you can't speak onto it. Is that because that's
6 a new policy, or you're just not aware of prior --
7 A. I'm not aware to prior.
8 Q. Okay.
9 MR. CAMMACK: Am I talking too fast?
10 THE REPORTER: Yes.
11 MR. CAMMACK: Okay. Sorry.
12 Q. (BY MR. CAMMACK) What all is covered in the
13 orientation as it relates to discrimination retaliation?
14 A. We talk about our anti-harassment policy, we
15 talk about -- Off the top of my head, I can't remember
16 everything that's in the orientation. I'm actually not
17 the one that gives it on a daily -- on a weekly basis.
18 Q. Okay. Beyond the handbook and this
19 orientation, though, is there any additional training
20 provided regarding compliance with discrimination
21 retaliation policies?
22 A. Not unless we do a separate -- if -- if there
23 was an issue in the office and we did, a separate
24 training on it. There are annual in-services that
25 they -- that employees take, provided through our HRIS

Page 23

1 system. It's not a classroom training.
2 Q. Now, what is an annual in-service? You're
3 saying it's online, they go onto --
4 A. They -- For our agency, we are required to have
5 employees sign off on certain policies on an annual
6 basis, so that's an in-service.
7 Q. Okay. So, annually, an employee, to continue
8 their employment with The Med Team, will go on and click
9 yes that they reviewed the policy?
10 A. Yes.
11 Q. Okay. Is there any other additional training
12 that's provided regarding compliance with the
13 discrimination retaliation policy?
14 A. Not that I'm aware of.
15 Q. Why do you think it's important to have the
16 Equal Employment Opportunity policy?
17 A. Well, the employee needs to know their rights
18 and the company needs to have something to stand on, to
19 allow the employee to know that these are our rules, and
20 its state regulation or federal regulation.
21 Q. Do you think it's also important to protect
22 those employees from any type of discrimination in the
23 workplace?
24 A. Absolutely.
25 Q. And it's also to prevent them from being

Page 24

1 harmed, if they believe they have been discriminated
2 against, correct?
3 A. Correct.
4 Q. And do you think if an employee reports
5 discrimination, it's important to thoroughly investigate
6 that, pursuant to this policy?
7 A. Absolutely.
8 Q. Why is it important to have a thorough
9 investigation related to complaints of discrimination?
10 A. Because we don't -- Well, it's -- it's a strict
11 rule that we don't allow it to happen in the
12 organization, so we need to do our due diligence to make
13 sure an employee feels comfortable when they're working
14 in -- in our agency -- or, period.
15 Q. Now, if an employee -- And I don't know if
16 you're designated --
17 MR. CAMMACK: Is she designated to talk
18 about, kind of, policies related to the investigation,
19 Rick, or is that going to be more...
20 MR. GARZA: That's going to be
21 Mr. Grisard, I believe.
22 MR. CAMMACK: Say again? I'm sorry.
23 MR. GARZA: I think that's going to be
24 Mr. Grisard --
25 MR. CAMMACK: Okay. I'll -- I'll --

Page 25

1 MR. GARZA: -- I believe.
2 MR. CAMMACK: I'll skip over that then.
3 Q. (BY MR. CAMMACK) If you could turn to the next
4 page, and that's going to be Richardson 425.
5 A. Okay.
6 MR. CAMMACK: I knocked off my microphone.
7 MR. GARZA: And Thomas, I'm assuming you
8 were -- you were going to go down the -- Pertaining to
9 the investigation, you were going to talk -- question
10 about Richardson, any investigation of any complaints by
11 Richardson, or anyone?
12 MR. CAMMACK: I was going to ask her her
13 understanding of just the investigation policies related
14 to complaints of discrimination, in general.
15 MR. GARZA: Okay. I mean, I -- I think --
16 I think she can -- she can answer that question.
17 MR. CAMMACK: Okay.
18 Q. (BY MR. CAMMACK) Now, if an employee makes a
19 complaint of discrimination, let's say they say, "I've
20 been discriminated because -- against because of my race
21 or my gender," what -- what is the process pursuant to
22 the policy of investigating that complaint?
23 A. A verbal statement of what happened, any
24 witnesses that were present when the situation happened,
25 and then a full investigation of the complaint.

Page 26

1    Q.   And so, if I'm understanding you, the first
2 step is to get a verbal statement of the complainant?
3    A.   From the person complaining, yeah.
4    Q.   And then, to get witness statements?
5    A.   Not necessarily witness statements, but
6 investigate -- or talk to the witnesses.  A written
7 statement can be requested, yes.
8    Q.   Okay.  And then, any -- just gather facts, in
9 general, about what did or didn't happen?
10   A.   Correct.
11   Q.   Now, let's say that witness makes a complaint
12 to HR specifically, sends an email, sends a letter,
13 makes a phone call.  Is that process still the same for
14 processing the investigation?
15   A.   Well, if they've written an email, that would
16 be a written statement already, so then a conversation
17 would need to happen after that.
18   Q.   Okay.  Do you know what the timeline would be
19 for, I guess, escalating their complaint or -- or
20 responding to their complaint?
21   A.   Not written, but no more than 24 hours.
22   Q.   So, 24 hours is an appropriate timeline for
23 responding to a complaint of discrimination?
24   A.   In my opinion.
25   Q.   Okay.  Do you think that more than 48 hours

Page 27

1 would be way too long to follow up with that
2 complainant?
3    A.   Yes.
4    Q.   How about a week, would that be way too long to
5 respond to a complaint?
6    A.   Yes.
7    Q.   And why is that too long to respond to that
8 complaint?
9    A.   Because it could still be happening, one; and
10 depending on the situation, it may not be safe.  So, as
11 soon as possible is always better.
12   Q.   Would you believe that taking a week to respond
13 to that complaint would be a violation of the policies
14 of the company?
15   A.   I can't say it's a violation if there's no
16 documentation that says it has to be done in 24 hours.
17   Q.   I got you.  But you find that it's
18 inappropriate to take longer than 24 hours?
19   A.   Yes.
20   Q.   Okay.  Now, back to Richardson 425, this is the
21 performance reviews policy.  Is that your understanding
22 of this policy?
23   A.   Yes.
24   Q.   And what is the purpose of giving an employee
25 an annual performance review?

Page 28

1    A.   To allow them to -- To allow the supervisor and
2 the employee to see where they are performing, whether
3 or not, you know, they need to work on some things, to
4 pat them on the back if they're doing a good job, set
5 some goals for the next year.
6    Q.   Okay.  And -- And my understanding is, is that
7 there's an -- someone giving an appraisal, someone -- a
8 manager or supervisor, correct?
9    A.   Yes.
10   Q.   And first, they give a numerical score, a 1 to
11 a 5?
12   A.   Yes.
13   Q.   And a 1 being as bad as it can be, and a 5
14 being as good as the employee can be scored?
15   A.   Correct.
16   Q.   And then, after that, there's a comment box for
17 the supervisor to further evaluate the employee?
18   A.   Yes.
19   Q.   Okay.  And is it your understanding that a 3
20 meets expectations, under that grading system?
21   A.   Without looking at the document, I believe so,
22 but off the top of my head, I can't say that that's -- 3
23 is -- meets expectations.  I don't --
24   Q.   Okay.  But if 5 is the best you can get, a 4
25 would be a high score on the scale?

Page 29

1    A.   Right.
2    Q.   And 3 is the mid-point between 1 and 5?
3    A.   So -- Yes.
4    Q.   Okay.  Now, if an employee is -- not doing
5 well, is it the policy to provide specific -- a
6 numerical reflection of their scores?  For instance,
7 something to indicate they need improvement or they're
8 not doing their job?
9    A.   Yes.
10   Q.   So, if they're not meeting their job
11 performance duties, it would be reflected in the numbers
12 as -- as a score, correct?
13   A.   That, as well as a comment --
14   Q.   Okay.
15   A.   -- yes.
16   Q.   So, a combination of both the numbers and the
17 comments would say, "Here's an employee who needs to
18 improve"?
19   A.   Yes.
20   Q.   Or, alternatively, "Here's an employee who's
21 doing what they need to do, here's our goals to getting
22 them better"?
23   A.   Yes.
24   Q.   Okay.  Now, even if the employee would have
25 predominantly 4s, there's always room for improvement

Tia Jackson

Page 30

1 for an employee?
2    A.  Absolutely.
3    Q.  And sometimes the room -- Is there ever
4 comments in the box that you're aware of that are
5 saying, "Hey, this particular branch needs to grow, as
6 well as the employee, and here's how we can meet those
7 goals"?
8    A.  Depending on the position, yes.
9    Q.  Okay.  If you could turn to the next page, it's
10 Richardson 426.  This is the opportunities for
11 advancement specific to promotions policy.  Is that your
12 understanding of this policy?
13    A.  Yes.
14    Q.  And it looks like, if you look at the third
15 paragraph down, it starts with "Factors," that an
16 employee's -- not only their performance, but their
17 actual credentials, their skills, their overall
18 initiative and character are factors that are considered
19 in whether or not to promote an employee, correct?
20    A.  Correct.
21    Q.  Now, if an employee is hired, let's say in
22 March, and then is promoted, you know, a few months
23 later, would you find that that's because it's been
24 evaluated that they are -- they are meeting all these
25 factors?

Page 31

1    A.  Yes.
2    Q.  Okay.  And what's your understanding of the
3 reasons that people are provided promotions?  Are they
4 handpicked?  Do they apply for the jobs?  How does that
5 usually work?
6    A.  Could be either/or, it depends on the -- the
7 situation.  If we have an employee who works in that
8 same department and we -- and they meet all these
9 requirements, then it may be -- we may feel that it's a
10 good idea to push them into another position.
11    Q.  Okay.  And if you could turn to Richardson 449,
12 and this is the work environment policy.  I believe this
13 may be the separate sexual harassment policy you
14 mentioned.  Is this that one?
15    A.  Yes.
16    Q.  Okay.  So, this policy specifies that the work
17 environment is supposed to be free from any form of
18 discrimination or sexual harassment, correct?
19    A.  Correct.
20    Q.  An employee who believes they have been a
21 victim of discrimination or sexual harassment should
22 report immediately to HR?
23    A.  Yes.
24    Q.  Okay.  Do you know if there's any other
25 policies besides this one and the one we just observed

Page 32

1 related to discrimination or harassment?
2    A.  Not that I'm aware of.
3    Q.  Okay.  Now, if you could turn a couple more
4 pages to Richardson 455, and towards the bottom of this
5 page it looks like there's a grievance policy.  What's
6 your understanding of the grievances policy?
7    A.  If an employee is feeling like they're
8 treating -- treated unfairly in regards to policy,
9 wages, or any unequal treatment, then they should report
10 it.
11    Q.  And is it your understanding that an employee
12 can try and use the grievance process to also complain
13 of discrimination and harassment?
14    A.  If it's against a particular individual, yes.
15    Q.  Okay.  I'm going to hand you what's being
16 marked as Plaintiff's Exhibit Number 3.
17       (Exhibit No. 3 marked.)
18       MR. GARZA:  Thank you.
19       MR. CAMMACK:  Uh-huh.
20    Q.  (BY MR. CAMMACK) Are you familiar with this
21 document?
22    A.  I have not actually seen it, no.
23    Q.  Do you-all still use a program called Workforce
24 Employee Self Service?
25    A.  No.

Page 33

1    Q.  Okay.  And since you were hired on, has that no
2 longer been something that's been used?
3    A.  Correct, because I have never seen it.
4    Q.  Okay.  Do they have some type of program called
5 a Performance Management Process, that you're aware of,
6 still?
7    A.  No, not that I'm aware of.
8    Q.  And have you ever heard them say that they set
9 SMART objectives, using SMART as an acronym?
10    A.  I've seen it, yes.
11    Q.  Okay.  What -- What -- What's your
12 understanding of the SMART objective set for a
13 manager -- or by managers?
14    A.  There's specific goals, there are measurable
15 goals, actions taken -- I can't remember the -- the
16 definition -- I mean the --
17       THE VIDEOGRAPHER:  Excuse me.
18       THE WITNESS:  -- what the acronym stands
19 for.
20       THE VIDEOGRAPHER:  -- could you push your
21 hair off?  Thank you.
22    Q.  (BY MR. CAMMACK) Okay.  If you could turn to
23 Richardson 396, it looks like, at the bottom, there's an
24 overall performance rating scale.  And then, this looks
25 like the number system we discussed earlier, the 1 to 5?

Tia Jackson

Page 34

1    A.  Yes.
2    Q.  It has 3 listed as proficient with, in
3  parentheses, work is thorough and complete.  And a 4 as
4  commendable, meaning they regularly meet performance
5  levels to ensure successful work completion.  Is that
6  your understanding that's still the -- the ranking
7  system for performance evaluations?
8    A.  Yes.
9    Q.  Okay.  Are you familiar with Ms. Richardson's
10  prior evaluations?
11    A.  No.  I mean, I wasn't there.
12    Q.  Okay.  Well, the reason I ask is -- So, you've
13  been designated to testify as to the employee's
14  personnel file, prior attendance, prior discipline, and
15  prior leave requests.  So, as to her personnel file,
16  what -- what would you have knowledge of and be able to
17  testify about?
18    A.  What do you mean?
19    Q.  Sure.  So, in her personnel file, or at least
20  in theory, I assume would be any requests for time off,
21  any discipline she's received, any evaluations of the
22  employee, any -- any performance improvement plans,
23  things of that nature, correct?
24    A.  Correct.
25    Q.  So, would her evaluations be separate to her

Page 35

1  personnel file?
2    A.  No.  They would be in her personnel file.
3    Q.  Okay.  Are you familiar, then, with her
4  evaluations in her personnel file then?
5    A.  Meaning, like, what they said or --
6    Q.  Sure.
7    A.  No.
8    Q.  Okay.  Is that more of a topic for the other
9  corporate representative?
10      MR. GARZA:  Well, it may be a topic for --
11  for Mr. Grisard, but -- but as far as the -- the -- the
12  personnel file, the description wasn't as -- didn't get
13  into the content or the knowledge of the content --
14      MR. CAMMACK:  Okay.
15      MR. GARZA:  -- of the -- of the personnel
16  file.  So, if -- if you're asking for people who have
17  knowledge of the content that's in the evaluations or --
18      MR. CAMMACK:  I got --
19      MR. GARZA:  -- anything else --
20      MR. CAMMACK:  -- what you're saying.
21      MR. GARZA:  -- I just -- we'll have to
22  find out who that would be.
23      MR. CAMMACK:  Okay.
24    Q.  (BY MR. CAMMACK)  So, let me ask you this.  If I
25  were to review her performance evaluation with you,

Page 36

1  would you be able to say -- to be able to say, "Oh, yes,
2  I'm familiar with these performance evaluations," as we
3  went over it, or...
4    A.  Meaning, if you had her evaluation, would I be
5  familiar with what's in her --
6    Q.  Her specific one, yes.
7    A.  No.
8    Q.  Okay.  Would you be familiar with, kind of, her
9  pay stubs and pay structure?
10    A.  No, not specifics.
11    Q.  Okay.  Do you know if she's ever been
12  disciplined prior to her termination?
13    A.  Off the top of my head, no.
14    Q.  Off the top of your head, you don't know or she
15  hasn't?
16    A.  No, I do not know.
17    Q.  Okay.  Do you know if she ever requested leave
18  requests or had any request for time off from work?
19    A.  I don't, no.
20    Q.  Okay.  Do you know if the company has a
21  progressive discipline policy?
22    A.  We do.
23    Q.  What's your understanding of the progressive
24  discipline policy?
25    A.  That it's up to -- it's up to management's

Page 37

1  discretion on how they want to proceed with the -- the
2  employee, meaning that there's no specific "you must do
3  this, this, and this first."
4    Q.  Okay.  So, there's a policy in place, though,
5  for progressive discipline, correct?
6    A.  Correct.
7    Q.  And that policy indicates that if an employee's
8  got deficiencies, they could at least help them to meet
9  their goals, correct?
10    A.  Correct.
11    Q.  And so, if an employee is lacking in, let's
12  say, their performance overall, there's a way to give
13  them verbal notice of that, right?
14    A.  Correct.
15    Q.  And then give them a written notice of that?
16    A.  Right.
17    Q.  And then put them on a performance improvement
18  plan --
19    A.  Yes.
20    Q.  -- so that not only they, but the company, can
21  both improve together?
22    A.  Yes.
23    Q.  Okay.  And that's preferable when you have
24  someone that's been there for a while, you know, for a
25  lot of reasons, but also to include to get them in the

Tia Jackson

Page 38

1 spot they need to be, correct?

2    A.  Correct.

3    Q.  And it's also expensive to get a new employee

4 in a position that's been fulfilled for a while, right?

5    A.  Yes.

6    Q.  Okay.  I'm going to see if you have knowledge

7 of, otherwise we may ask the next corp rep on -- on her

8 actual performance evaluation.

9    A.  Okay.

10    Q.  You may -- Because I have actual -- Here, let

11 me hand this to Rick first, and see what he...

12        MR. GARZA:  Thank you.

13        (Exhibit No. 4 marked.)

14    Q.  (BY MR. CAMMACK) But here's Plaintiff's Exhibit

15 Number 4 that I've marked.  Are you familiar with this

16 format for the review of employees?

17    A.  Yes.

18    Q.  Is this still the current format?

19    A.  Yes.

20    Q.  And on the system, it looks like there's about

21 12 categories -- or not on the system -- on the page.

22 I'm sorry.

23    A.  Yes.

24    Q.  And this is Med Team 311 through 313.  And it

25 looks like this was given to Ms. Richardson on

Page 39

1 April 8th, 2016.

2    A.  This is to be completed by the appraiser only.

3 There is a self evaluation form.  So, this was given to

4 the manager.

5    Q.  Okay.  So, this is not completed by Alan Garza?

6    A.  Yes --

7    Q.  It is --

8    A.  -- the manager.

9    Q.  Okay.

10    A.  You said "Ms. Richardson."

11    Q.  I'm sorry.  But it is completed by Alan Garza,

12 reviewing Ms. Richardson?

13    A.  Yes.

14    Q.  Okay.  And Alan Garza went through, and it

15 looks like besides two categories -- or I'm sorry --

16 three categories, gave her 4 on nine of 12 categories.

17 Is that your understanding of this?

18    A.  That's what it looks like, yes.

19    Q.  Okay.  And then she got 3s on the other three.

20    A.  Yes.

21    Q.  Okay.  Based on this numerical evaluation, like

22 we just discussed, this would indicate that the employee

23 was not only meeting expectations, but they were

24 commendable in -- in meeting their performance and work

25 completion, correct?

Page 40

1    A.  Correct.

2    Q.  Okay.  Now, you had mentioned that if an

3 employee reported to HR discrimination, that it had to

4 be thoroughly investigated, correct?

5    A.  Correct.

6    Q.  Besides taking witness statements, is there any

7 other documentation that would be produced within that

8 24- to 48-hour period of time regarding the

9 investigation?

10    A.  Not unless there was pictures or something of

11 that nature that -- No.  I mean...

12    Q.  So, HR wouldn't put together a separate report?

13    A.  Oh, yes.

14    Q.  Okay.

15    A.  I'm sorry.  I must have misunderstood.

16    Q.  Okay.  And I might have worded the question

17 strange.  So, HR puts together documentation, and what

18 kind of documentation do they put together?

19    A.  Well, I write an investigative report, so

20 everybody that I've talked to will be on that -- when I

21 talked to them, what day I talked to them, what time I

22 talked to them would be on that report.

23    Q.  Okay.  And then -- So, the whos, the whats, the

24 wheres, the whens, and the whys?

25    A.  Correct.

Page 41

1    Q.  Okay.  And then, from that, do you have a final

2 result or a final determination that you -- you also put

3 together?

4    A.  Yes.

5    Q.  And who -- who are these documents put together

6 for or on behalf of?  And I can reword that.

7    A.  Yes, please.

8    Q.  Sure.  So, once you put together this report,

9 what's the next step?  Who -- Who do you talk to next,

10 who is it submitted to next?

11    A.  I would usually submit it to the corporate

12 office, to have them review it.

13    Q.  Okay.

14    A.  And, you know, see what their next step -- they

15 wanted it to be, depending on the findings.  So, if it

16 was an unsubstantiated claim, then it doesn't need to go

17 any further than that.

18    Q.  Now, how soon, once you receive a complaint, do

19 you notify corporate from the receipt of a complaint?

20    A.  I'm going to first do the investigation before

21 I report it to them.

22    Q.  Okay.  How long would that investigation take?

23    A.  Depends on how many people are involved.  So --

24 and whether or not they're there that day, you know,

25 their attendance or not.  So, it could take a few days,

Tia Jackson

Page 42

1 depending on, you know, the availability of the other
2 employees that I need to speak to.
3     Q.   Okay.  So, if I say to you, on Monday, "Hey, I
4 think this one individual discriminated against me,"
5 based on the fact that it's one individual I'm
6 complaining about and I haven't listed a bunch of
7 witnesses, does that change your time frame at all?
8     A.   Yeah.  Maybe 48 hours, if I get to talk to all
9 the people involved.
10     Q.   And 48 hours within your report being complete
11 and submitted to corporate?
12     A.   Yeah.
13     Q.   Okay.  And then, what's -- Is -- Are you aware
14 of what the next step is, or is that corporate's job to
15 then --
16     A.   They're going to -- We're going to discuss
17 it -- Well, they'll discuss it between those two parties
18 in the corporate office, and then they'll discuss it
19 with me, and then that's it.
20     Q.   Okay.  And then, do you ever say to that
21 individual, "Here's our determination, we could or
22 couldn't substantiate your claims"?
23     A.   Yes.
24     Q.   Besides your investigative report, does
25 corporate put together a separate investigative report?

Page 43

1     A.   I do not know that.
2     Q.   Okay.  Now, is it discretionary whether or not
3 you submit it to corporate, or is that something that
4 has to be done once the complaint is made?
5     A.   I submit it.
6     Q.   Okay.  If you could look back at Exhibit Number
7 4, to the last page, or Med Team 313.
8     A.   Okay.
9     Q.   These are comments left by the manager related
10 to what looks like, at least on my review, struggles
11 that the New Braunfels office branch had in -- in
12 general.  I mean, without having read the whole thing,
13 is that pretty common for them to discuss what the
14 office is or isn't lacking, the appraiser?
15     A.   I would say, depending on the person's
16 position, and then her position as a branch manager,
17 yes.
18     Q.   Okay.  Now, if I am an appraiser and I've given
19 someone predominantly 4s and a few 3s, if I had problems
20 with their individual performance and not necessarily
21 the branch, would I have reflected that in the numerical
22 evaluations?
23     A.   Say that again.  I'm sorry.
24     Q.   Sure.  So, she's got numbers to indicate
25 commendable overall.

Page 44

1     A.   Uh-huh.
2     Q.   But there's some mentions in the written part
3 about the office.  And if you'd like, you can take the
4 time to read that, and then I can ask questions about
5 it, or -- or I can just kind of keep with my line of
6 questioning.  Which would you prefer?
7     A.   You can go on with your questions.
8     Q.   Okay.  So, she's got -- she's been shown to
9 have 4s, right --
10     A.   Uh-huh.
11     Q.   -- overall.  If she was having personal
12 performance issues, she wouldn't have predominantly 4s,
13 correct?
14     A.   Correct.
15     Q.   Okay.  I don't believe I have any other
16 questions for you.  Did you understand my questions
17 today?
18     A.   Yes.
19     Q.   Is there any part of your testimony you'd like
20 to clarify?
21     A.   No.
22          MR. CAMMACK:  All right.  Thank you for
23 your time.
24          THE WITNESS:  All right.  Thank you.
25          MR. GARZA:  Take a break.

Page 45

1          THE VIDEOGRAPHER:  We're off the record at
2 10:42.
3          (Deposition concluded 10:42 a.m.)
4          (Pursuant to FRCP 30(e)(1), request to
5          review the transcript was not made by
6          either deponent or party before the
7          deposition was completed.)
8                    * * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Tia Jackson                                                    November 28, 2018
                                                                Pages 46 to 47

Page 46

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION
 3
    RENEE RICHARDSON,            )
 4                              )
           Plaintiff            )
 5                              )
    VS.                         ) NO. 5:18-CV-151-FB
 6                              )
    THE MEDICAL TEAM, INC.      )
 7  d/b/a THE MED TEAM, INC.,   )
                                )
 8         Defendant            )
 9       _____
10             REPORTER'S CERTIFICATE
11         VIDEOTAPED DEPOSITION OF TIA JACKSON
12  A CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC.
13              d/b/a THE MED TEAM, INC.
14                 NOVEMBER 28, 2018
15       _____
16         I, NAOMI R. PELTIER, Certified Shorthand
17  Reporter in and for the State of Texas, do hereby
18  certify to the following:
19         That the witness, TIA JACKSON, A CORPORATE
20  REPRESENTATIVE OF THE MEDICAL TEAM, INC. d/b/a THE MED
21  TEAM, INC., was duly sworn by the officer and that the
22  transcript of the oral deposition is a true record of
23  the testimony given by the Witness.
24         I further certify that pursuant to FRCP Rule
25  30(e)(1) that the signature of the Deponent:
```

Page 47

```
 1         _____ was requested by the Deponent or a party
 2  before the completion of the deposition and is to be
 3  returned within 30 days from date of receipt of the
 4  transcript.
 5         If returned, the attached Changes and Signature
 6  Page contains any changes and the reasons therefor;
 7         __X__ was not requested by the Deponent or a
 8  party before the completion of the deposition.
 9         That the amount of time used by each party at
10  the deposition is as follows:
11         Thomas N. Cammack, III - 1 hour 17 minutes
12         I further certify that I am neither attorney,
13  nor counsel for, related to, nor employed by any of the
14  parties to the action in which this testimony is taken.
15  Further, I am not a relative or employee of any attorney
16  of record in this cause, nor do I have a financial
17  interest in the action.
18         SUBSCRIBED AND SWORN TO on this _____ day of
19  _____, 2018.
20                     Naomi R Peltier
                      _____
21                     Naomi R. Peltier, CSR, RPR
                       Texas CSR 3672
22                     Expiration:  10/31/21
                       Kim Tindall & Associates, LLC
23                     Firm No. 631
                       16414 San Pedro, Suite 900
24                     San Antonio, Texas  78232
                       (210) 697-3400
25
```

**Exhibits**

**Jackson, Tia Ex 01** 11:21,24 16:14,15

**Jackson, Tia Ex 02** 16:12,15,16 17:19

**Jackson, Tia Ex 03** 32:16,17

**Jackson, Tia Ex 04** 38:13,14,15 43:6,7

**0**

**000421** 18:13

**1**

**1** 11:21,24 16:15 28:10,13 29:2 33:25

**10:05** 11:15,17

**10:42** 45:2,3

**12** 6:21 12:16 38:21 39:16

**2**

**2** 16:12,16 17:19

**2016** 39:1

**2017** 16:22 17:1 22:1,3

**2018** 4:2

**24** 26:21,22 27:16,18

**24-** 40:8

**28** 4:2

**3**

**3** 6:21 12:5 28:19,22 29:2 32:16,17 34:2

**30(e)(1)** 45:4

**311** 38:24

**313** 38:24 43:7

**38** 6:21 12:25 13:2

**39** 6:21 13:7

**396** 33:23

**3s** 39:19 43:19

**4**

**4** 28:24 34:3 38:13,15 39:16 43:7

**40** 6:22 13:13

**41** 6:22 13:19

**42** 6:22 13:25

**425** 25:4 27:20

**426** 30:10

**449** 31:11

**455** 32:4

**48** 26:25 42:8,10

**48-hour** 40:8

**4s** 29:25 43:19 44:9,12

**5**

**5** 28:11,13,24 29:2 33:25

**8**

**8** 6:21 12:10

**8th** 39:1

**9**

**9:35** 4:3

**9:43** 11:14,15

**A**

**a.m.** 4:3 11:15 45:3

**absolutely** 10:21 14:25 23:24 24:7 30:2

**acknowledgment** 21:19

**acronym** 33:9,18

**act** 8:19

**actions** 33:15

**actual** 30:17 38:8,10

**additional** 8:14 22:19 23:11

**advancement** 30:11

**affect** 15:9

**age** 18:17

**agency** 23:4 24:14

**agree** 10:22

**agreement** 4:7

**ahead** 4:18 9:7,8

**Alan** 39:5,11,14

**alcohol** 15:5

**Alisa** 5:3 11:20

**allowed** 6:1 7:3 8:3,23 9:1

**alternatively** 29:20

**and/or** 13:2

**annual** 22:24 23:2,5 27:25

**annually** 23:7

**anti-harassment** 19:16,23 20:16, 20 22:14

**anti-retaliation** 20:3,5

**anytime** 14:19

**apply** 31:4

**appraisal** 28:7

**appraiser** 39:2 43:14,18

**approximately** 4:2

**April** 39:1

**aspects** 6:13 7:13 8:14 9:11 11:7,8

**assume** 9:23 16:3 34:20

**assuming** 25:7

**attend** 6:7 7:9

**attendance** 12:11 34:14 41:25

**attorneys** 4:8

**availability** 42:1

**aware** 20:6,7 21:5,8 22:6,7 23:14 30:4 32:2 33:5,7 42:13

**B**

**back** 11:16 16:14 27:20 28:4 43:6

**bad** 28:13

Tia Jackson

**based** 8:8 13:10,17,22 14:4 18:17, 25 19:2,6,9 21:1 39:21 42:5

**basis** 22:17 23:6

**Bates** 17:23

**behalf** 4:13,15 5:6 7:17 41:6

**believes** 31:20

**bit** 14:11

**book** 19:25

**bottom** 18:4 32:4 33:23

**box** 28:16 30:4

**branch** 8:20 30:5 43:11,16,21

**Braunfels** 43:11

**break** 44:25

**briefly** 5:9

**bring** 8:18,20

**bunch** 42:6

### C

**call** 11:10 26:13

**called** 19:23 32:23 33:4

**calling** 8:1

**Cammack** 4:10,11,17,24 5:8,24 6:9, 11,18,25 7:10,14,22 8:11,25 9:6,8, 15,22,24 10:16,18 11:9,12,18,22 16:13 17:23 18:1,3 22:9,11,12 24:17,22,25 25:2,3,6,12,17,18 32:19,20 33:22 35:14,18,20,23,24 38:14 44:22

**capacity** 7:1

**case** 4:5 10:2 11:7,8 17:18

**categories** 38:21 39:15,16

**CFO** 5:20 8:22

**change** 16:9 42:7

**character** 30:18

**checklist** 21:22

**claim** 41:16

**claims** 13:21 14:2 42:22

**clarification** 16:9 17:21

**clarify** 15:25 16:3,7 44:20

**clarifying** 5:24

**classroom** 23:1

**clear** 14:15,17

**click** 23:8

**color** 18:17

**combination** 29:16

**comfortable** 24:13

**commendable** 34:4 39:24 43:25

**comment** 28:16 29:13

**comments** 29:17 30:4 43:9

**common** 43:13

**company** 23:18 27:14 36:20 37:20

**complain** 32:12

**complainant** 26:2 27:2

**complaining** 26:3 42:6

**complaint** 21:2 25:19,22,25 26:11, 19,20,23 27:5,8,13 41:18,19 43:4

**complaints** 24:9 25:10,14

**complete** 34:3 42:10

**completed** 39:2,5,11 45:7

**completion** 34:5 39:25

**compliance** 22:20 23:12

**concluded** 45:3

**conduct** 13:4,10,16,22 14:3

**conference** 15:14

**considered** 30:18

**content** 35:13,17

**contention** 8:23 11:3

**continue** 14:16 23:7

**control** 10:12

**conversation** 26:16

**corp** 8:3 38:7

**corporate** 4:3,20 5:5,10 6:7,13,22, 23 7:1,8,10,14,19 8:5,8,17,20 11:2, 3,25 35:9 41:11,19 42:11,18,25 43:3

**corporate's** 42:14

**corporation** 6:6 7:8,17,19 8:16 11:1

**correct** 5:6,7 15:6 17:2 18:22 19:1,

4,5 21:4 24:2,3 26:10 28:8,15 29:12 30:19,20 31:18,19 33:3 34:23,24 37:5,6,9,10,14 38:1,2 39:25 40:1,4, 5,25 44:13,14

**counsel** 8:4

**couple** 12:23 17:18 32:3

**court** 4:9 8:1

**courtesy** 14:24

**covered** 22:12

**credentials** 30:17

**creed** 18:17

**current** 38:18

### D

**d/b/a** 4:6,21

**daily** 22:17

**dash** 18:5

**date** 4:1

**day** 40:21 41:24

**days** 41:25

**decisions** 18:21

**Defendant** 13:3,8,14,20 14:1

**Defendant's** 12:16

**deficiencies** 37:8

**definition** 33:16

**degree** 15:19

**department** 31:8

**depending** 27:10 30:8 41:15 42:1 43:15

**depends** 31:6 41:23

**deponent** 45:6

**deposition** 4:3,11,12 6:2,6,8,14,16 7:7,9,20,21 8:19,21,24 9:14 11:2,4, 25 14:6,10 45:3,7

**description** 35:12

**designate** 17:22

**designated** 5:5 6:20 9:10 11:6,23 12:5 24:16,17 34:13

**designation** 17:24 18:7

Tia Jackson

**determination** 41:2 42:21

**determine** 18:23

**differences** 10:11,13

**diligence** 24:12

**disability** 18:18

**disagree** 7:22 9:1 10:21

**disagreement** 5:15,16

**discipline** 12:11,17,18 18:24 19:2 34:14,21 36:21,24 37:5

**disciplined** 36:12

**discovery** 18:7

**discretion** 37:1

**discretionary** 43:2

**discriminate** 18:16,19

**discriminated** 24:1 25:20 42:4

**discrimination** 19:13 20:10 22:13, 20 23:13,22 24:5,9 25:14,19 26:23 31:18,21 32:1,13 40:3

**discrimination/harassment/ retaliation** 10:2

**discuss** 42:16,17,18 43:13

**discussed** 5:23 33:25 39:22

**discussion** 5:9 9:20

**disrespect** 15:1

**document** 16:16,18 18:6,12 19:24 20:1 28:21 32:21

**documentation** 13:14,16 14:1 27:16 40:7,17,18

**documents** 18:10 41:5

**doubling** 9:18

**drink** 15:4

**due** 24:12

**duly** 4:22

**duties** 29:11

---

**E**

**earlier** 33:25

**early** 7:25 15:3

**easier** 14:11 18:2

**either/or** 31:6

**email** 26:12,15

**employee** 5:22 6:1 12:5 16:19,21 18:16,24 19:2,6,9 20:25 21:11 23:7, 17,19 24:4,13,15 25:18 27:24 28:2, 14,17 29:4,17,20,24 30:1,6,19,21 31:7,20 32:7,11,24 34:22 37:2,11 38:3 39:22 40:3

**employee's** 12:10 30:16 34:13 37:7

**employees** 6:3 13:5,9,21 14:2 20:9 21:10,17 22:25 23:5,22 38:16 42:2

**employees'** 13:15

**employment** 18:14 23:8,16

**employment-related** 18:20

**end** 16:6

**ensure** 34:5

**environment** 31:12,17

**Equal** 18:14 23:16

**escalating** 26:19

**essential** 5:13 8:1

**evaluate** 28:17

**evaluated** 30:24

**evaluation** 35:25 36:4 38:8 39:3,21

**evaluations** 34:7,10,21,25 35:4,17 36:2 43:22

**event** 10:24

**exact** 10:9

**EXAMINATION** 4:23

**examined** 6:17

**Excuse** 33:17

**exhibit** 11:21,24 16:12,14,15 17:19 32:16,17 38:13,14 43:6

**expectations** 28:20,23 39:23

**expected** 13:4

**expensive** 38:3

**experience** 17:7,10

**extend** 14:23

**extent** 6:16

---

**F**

**fact** 6:21 8:8 42:5

**factors** 30:15,18,25

**facts** 26:8

**familiar** 16:16,20 32:20 34:9 35:3 36:2,5,8 38:15

**fast** 22:9

**federal** 4:7 23:20

**feel** 16:7 31:9

**feeling** 32:7

**feels** 24:13

**felony** 15:19

**female** 13:4

**file** 12:11 34:14,15,19 35:1,2,4,12,16

**final** 41:1,2

**find** 27:17 30:23 35:22

**findings** 41:15

**finish** 14:23

**follow** 27:1

**forgoing** 4:7

**form** 31:17 39:3

**formal** 4:7

**format** 38:16,18

**frame** 18:11 42:7

**FRCP** 45:4

**free** 16:7 31:17

**fulfilled** 38:4

**fulfilling** 6:25

**full** 5:2 11:19 15:11 25:25

---

**G**

**garnishing** 5:11

**Garza** 4:14 5:16 6:4,10,12,24 7:6,12, 16 8:10,12 9:5,7,9,17,23 10:6,17,25 11:11 17:21,24 18:2 24:20,23 25:1, 7,15 32:18 35:10,15,19,21 38:12 39:5,11,14 44:25

Tia Jackson

gather 26:8

gave 39:16

gender 18:18 25:21

general 25:14 26:9 43:12

give 15:11 28:10 37:12,15

giving 27:24 28:7

goals 28:5 29:21 30:7 33:14,15 37:9

good 14:13 28:4,14 31:10

grading 28:20

grievance 32:5,12

grievances 32:6

Grisard 5:19 6:15 8:22 9:12,21 10:10,14 11:7 24:21,24 35:11

ground 14:9

grow 30:5

guess 26:19

guidelines 12:6 13:3,7,13,19,25

**H**

hair 33:21

hand 16:13,15 32:15 38:11

handbook 12:5 16:19,21 19:17,19 21:11,18 22:18

handed 21:17

handpicked 31:4

happen 24:11 26:9,17

happened 25:23,24

happening 27:9

harassed 21:1

harassment 13:9,10,15,17,21,22 14:3,4 19:14,22 20:22,23,24 21:2 31:13,18,21 32:1,13

harmed 24:1

head 22:15 28:22 36:13,14

heard 7:23 33:8

hey 10:5 30:5 42:3

high 28:25

higher 6:1

hired 16:22,23 17:4,5 21:14,15 30:21 33:1

hiring 21:21

hours 26:21,22,25 27:16,18 42:8,10

HR 17:8 26:12 31:22 40:3,12,17

HRIS 22:25

huh-uhs 14:15

Human 5:1 16:25

hundred 8:18

**I**

idea 31:10

immediately 31:22

important 23:15,21 24:5,8

improve 29:18 37:21

improvement 29:7,25 34:22 37:17

in-service 23:2,6

in-services 22:24

inappropriate 13:9,16,22 14:3 27:18

include 20:21 37:25

including 12:17

Incorporated 4:6

indicating 20:14

individual 32:14 42:4,5,21 43:20

individuals 8:13 9:4

individuals' 6:19

initial 21:21

initiative 30:18

instance 29:6

instructed 20:9,13

intent 9:19 11:25

introduce 4:8

investigate 24:5 26:6

investigated 40:4

investigating 25:22

investigation 13:20 14:2 24:9,18 25:9,10,13,25 26:14 40:9 41:20,22

investigations 10:4

investigative 40:19 42:24,25

invoke 5:12

involved 41:23 42:9

issue 22:23

issues 44:12

items 5:23

**J**

Jackson 4:4,14,19,24 5:3,4,19 6:16 8:15 9:11,20 10:9,13 11:6,20,22

Jackson's 6:11

job 4:25 14:10,13 16:24 17:11,12 28:4 29:8,10 42:14

jobs 31:4

**K**

kind 21:9 24:18 36:8 40:18 44:5

knocked 25:6

knowledge 34:16 35:13,17 38:6

**L**

lacking 37:11 43:14

Law 4:12

leave 5:14 12:11 34:15 36:17

left 43:9

letter 26:12

level 5:21 6:1

levels 34:5

listed 9:14 34:2 42:6

location 19:18

long 17:15 27:1,4,7 41:22

longer 27:18 33:2

lot 14:10 37:25

lower 5:21

Tia Jackson

**M**

made 13:21 14:2 43:4 45:5

make 11:10 14:10 15:25 16:8 18:2 24:12

makes 25:18 26:11,13

making 18:20

male 13:4

management 8:22 12:17 33:5

management's 36:25

manager 5:1 8:21 16:25 17:8 28:8 33:13 39:4,8 43:9,16

managers 33:13

manner 13:4

manual 17:17

March 30:22

marked 11:21 16:12 32:16,17 38:13, 15

meaning 34:4 35:5 36:4 37:2

means 18:6,8,9

measurable 33:14

Med 4:6,21,25 17:4,5 18:9,10 23:8 38:24 43:7

Medical 4:4,5,15,20 5:21 8:21

medication 15:8

meet 30:6 34:4 37:8

meet all 31:8

meeting 29:10 30:24 39:23,24

meets 28:20,23

memory 15:9

mentioned 31:14 40:2

mentions 44:2

microphone 25:6

mid-point 29:2

mind 11:9

misunderstood 40:15

Monday 42:3

months 30:22

morning 15:3

**N**

national 13:11,17,23 14:4 18:17

nature 34:23 40:11

necessarily 8:12 26:5 43:20

nonverbal 14:14

notice 9:14 11:25 37:13,15

notify 41:19

November 4:2

number 11:24 12:5,10,16,25 13:2,7, 13,19,25 16:14,16 17:19,24 32:16 33:25 38:15 43:6

numbers 18:6,9,12 29:11,16 43:24

numerical 28:10 29:6 39:21 43:21

**O**

objective 33:12

objectives 33:9

observed 31:25

office 18:8 22:23 41:12 42:18 43:11, 14 44:3

Offices 4:12

onboarded 21:12

online 23:3

opinion 26:24

opportunities 30:10

Opportunity 18:14 23:16

opposed 10:14

oral 4:3

organization 24:12

orientation 21:13,15,22 22:4,13,16, 19

origin 13:11,17,23 14:4 18:17

overlap 10:1,5,8,11 11:5

**P**

Padgett 17:13

pages 12:23 17:18 32:4

paragraph 30:15

parameters 7:5

parentheses 34:3

parroting 9:3

part 9:2 44:2,19

parties 42:17

party 45:6

pat 28:4

pay 36:9

people 8:5,18 31:3 35:16 41:23 42:9

perfect 18:1

performance 27:21,25 29:11 30:16 33:5,24 34:4,7,22 35:25 36:2 37:12, 17 38:8 39:24 43:20 44:12

performing 28:2

period 24:14 40:8

person 5:20 26:3

person's 43:15

personal 44:11

personnel 12:10 34:14,15,19 35:1, 2,4,12,15

Pertaining 25:8

phone 11:10 26:13

pictures 40:10

place 37:4

Plaintiff 4:13

Plaintiff's 16:15 32:16 38:14

plan 37:18

plans 34:22

point 10:24 11:1 17:14

pointed 18:12

policies 10:3,4 12:16,17 13:2,7,13, 19,25 21:12 22:21 23:5 24:18 25:13 27:13 31:25

policy 18:15,24 19:3,7,10,12,14,16, 20,21,25 20:3,5,12,14,16,19,20 21:1,7,10 22:6,14 23:9,13,16 24:6 25:22 27:21,22 29:5 30:11,12 31:12, 13,16 32:5,6,8 36:21,24 37:4,7

Tia Jackson

**Poncio** 4:11

**position** 6:14 10:19 30:8 31:10 38:4 43:16

**preamble** 4:8

**predominantly** 29:25 43:19 44:12

**prefer** 44:6

**preferable** 37:23

**prepared** 12:8,14,20

**present** 5:20 7:2,3,20,21 8:23 21:14 22:1,4 25:24

**pretty** 43:13

**prevent** 23:25

**prevents** 18:24

**previous** 4:7 17:11,12

**printed** 17:17,18

**prior** 12:11 17:7,10 22:6,7 34:10,14, 15 36:12

**problem** 15:23

**problems** 43:19

**procedures** 13:8,14,20 14:1

**proceed** 37:1

**process** 8:2 22:4 25:21 26:13 32:12 33:5

**processing** 26:14

**produced** 18:7,8,10 40:7

**proficient** 34:2

**program** 32:23 33:4

**progressive** 12:18 36:21,23 37:5

**prohibited** 21:3

**prohibits** 19:13,14,22

**promote** 30:19

**promoted** 17:3 30:22

**promotions** 30:11 31:3

**protect** 23:21

**provide** 14:16 16:2 29:5

**provided** 14:6 21:10,11 22:20,25 23:12 31:3

**providing** 8:9,13

**purger** 15:19

**purpose** 6:19 9:2 27:24

**pursuant** 7:3 10:4 24:6 25:21 45:4

**push** 31:10 33:20

**put** 7:23 37:17 40:12,18 41:2,5,8 42:25

**puts** 40:17

**Q**

**question** 7:18 14:21,23 15:2,22,24 16:4 25:9,16 40:16

**questioning** 44:6

**questions** 7:4 9:13,18,21,25 10:9, 12 44:4,7,16

**quick** 11:10

**R**

**race** 13:10,17,23 14:4 18:17,25 19:3, 7,10 25:20

**ranking** 34:6

**rating** 33:24

**read** 43:12 44:4

**real** 11:10

**reason** 15:11 34:12

**reasons** 31:3 37:25

**receipt** 41:19

**receive** 41:18

**received** 34:21

**recess** 11:15

**record** 4:2 11:10,13,17 14:14,15,17, 19 45:1

**references** 18:11

**reflected** 29:11 43:21

**reflection** 29:6

**regularly** 34:4

**regulation** 23:20

**related** 5:15 12:16 21:10 24:9,18 25:13 32:1 43:9

**relates** 22:13

**relevant** 17:18

**remaining** 5:23

**remember** 22:15 33:15

**Renee** 4:5,13

**rep** 6:7 7:11 8:3 38:7

**report** 20:10,15 31:22 32:9 40:12, 19,22 41:8,21 42:10,24,25

**reported** 40:3

**reporter** 4:9 22:10

**reporting** 13:8 20:15

**reports** 13:15,17 24:4

**representative** 4:4,20 5:5,10 6:7, 14,22,23 7:1,9,15,20 8:16,17,20 10:20 11:2 12:1 35:9

**representative's** 11:4

**reps** 8:5,8

**request** 36:18 45:4

**requested** 26:7 36:17

**requests** 12:12 34:15,20 36:18

**required** 23:4

**requirements** 31:9

**resources** 5:1 16:25

**respond** 27:5,7,12

**responding** 26:20,23

**responses** 14:14

**result** 41:2

**retaliation** 19:15,22 20:3,9,20,21 21:2,10 22:13,21 23:13

**review** 21:18 27:25 35:25 38:16 41:12 43:10 45:5

**reviewed** 21:6,20 23:9

**reviewing** 39:12

**reviews** 27:21

**reword** 41:6

**Richardson** 4:5,13 18:5 21:6,15 25:4,10,11 27:20 30:10 31:11 32:4 33:23 38:25 39:10,12

**Richardson's** 34:9

Rick  4:14 5:9 18:11 24:19 38:11

rights  23:17

role  6:11,12,25 7:1

room  5:11,14 6:2 15:14 29:25 30:3

RSM  17:14

rule  5:12,25 6:5,19 9:2 24:11

rules  7:3 14:10 23:19

ruling  7:25

rush  15:21

---

**S**

safe  27:10

scale  28:25 33:24

score  28:10,25 29:12

scored  28:14

scores  29:6

sends  26:12

sense  15:25

separate  7:18 19:14,24,25 20:1,2, 11,16,18 22:22,23 31:13 34:25 40:12 42:25

September  16:22 17:1 22:1,3

Service  32:24

set  28:4 33:8,12

sex  18:17

sexual  13:9,10,15,16,21,22 14:2,3 20:23 31:13,18,21

shown  44:8

sign  21:19 23:5

signed  21:6

sit  8:7,21 10:20,22

situation  25:24 27:10 31:7

skills  30:17

skip  25:2

skipping  16:14

small  11:5

SMART  33:9,12

speak  11:23 12:8,14,20 21:13,16 22:2,5 42:2

specific  6:20 7:4 20:19,22 29:5 30:11 33:14 36:6 37:2

specifically  19:13 26:12

specifics  36:10

specifies  31:16

spoken  5:18

spot  16:8 38:1

stand  23:18

stands  33:18

start  7:25

starts  30:15

state  4:25 11:19 15:18 23:20

statement  25:23 26:2,7,16

statements  26:4,5 40:6

stay  6:2,15

step  26:2 41:9,14 42:14

strange  15:23 40:17

Stratemann  17:13

strict  24:10

structure  36:9

struggles  43:10

stubs  36:9

styled  4:5

submit  41:11 43:3,5

submitted  41:10 42:11

substantiate  42:22

successful  34:5

supervisor  28:1,8,17

supposed  8:4 21:18 31:17

suspend  19:6

swear  4:9

sworn  4:22

system  23:1 28:20 33:25 34:7 38:20,21

---

**T**

taking  4:11,12 6:2 27:12 40:6

talk  10:3 22:14,15 24:17 25:9 26:6 41:9 42:8

talked  40:20,21,22

talking  14:20 22:9

Team  4:4,5,6,15,20,21,25 5:21 8:21 17:4,6 18:9,10 23:8 38:24 43:7

terminate  19:9

termination  36:12

test  10:15

testified  4:22 6:23

testify  5:5,19,22 6:12 7:17 8:6,15 9:11 10:17 11:6,8 34:13,17

testifying  7:6,12 9:4 10:14

testimony  5:12 6:2,19 8:9,14 9:3 10:23 15:12,15 16:7,9 44:19

Texas  15:18

theory  34:20

thing  18:4 43:12

things  28:3 34:23

Thomas  4:10 25:7

Tia  4:4,19 5:3 11:20

time  17:4,5 21:14 34:20 36:18 40:8, 21 42:7 44:4,23

timeline  26:18,22

title  4:25 16:24

today  8:6,9 12:8,14,20 14:11,13 15:4,12 18:4 44:17

Today's  4:1

top  22:15 28:22 36:13,14

topic  12:24 35:8,10

topics  5:18 6:20 7:7 9:10,12,13 11:23 12:4

training  21:9 22:19,24 23:1,11

transcript  45:5

treated  32:8

treating  32:8

**treatment** 32:9

**trial** 15:16

**truthful** 15:12

**turn** 12:1,23 17:19 25:3 30:9 31:11 32:3 33:22

**type** 23:22 33:4

**U**

**Uh-huh** 32:19 44:1,10

**uh-huhs** 14:14

**understand** 9:9 10:7 15:18 20:17 44:16

**understanding** 5:14,25 6:5 7:23 8:7 12:4 15:15,23 18:15 20:8 25:13 26:1 27:21 28:6,19 30:12 31:2 32:6, 11 33:12 34:6 36:23 39:17

**understood** 9:5 16:3

**unequal** 32:9

**unfairly** 32:8

**unsubstantiated** 41:16

**upper** 8:22

**V**

**vast** 10:11,13

**verbal** 25:23 26:2 37:13

**versus** 4:5

**victim** 31:21

**video** 4:3

**violation** 19:3,7,10 27:13,15

**W**

**wages** 32:9

**wait** 14:22

**Walker** 4:15

**wanted** 41:15

**watch** 6:15 7:20

**week** 27:4,12

**weekly** 22:17

**weight** 15:16

**whats** 40:23

**whens** 40:24

**wheres** 40:24

**whos** 40:23

**whys** 40:24

**witnesses** 5:13 8:19 25:24 26:6 42:7

**word** 15:22,24

**worded** 40:16

**work** 28:3 31:5,12,16 34:3,5 36:18 39:24

**worked** 17:13

**Workforce** 32:23

**working** 24:13

**workplace** 21:1 23:23

**works** 31:7

**write** 40:19

**written** 20:14 26:6,15,16,21 37:15 44:2

**Y**

**year** 28:5

**years** 17:16

**you-all** 5:25 32:23

# Exhibit C

Transcript of the Testimony of

# Ryan Grisard

## Date:

November 28, 2018

## Case:

RENEE RICHARDSON vs MEDICAL TEAM

Ryan Grisard                                    November 28, 2018

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

RENEE RICHARDSON,                )
          Plaintiff              )
                                 )
VS.                              )  NO. 5:18-CV-151-FB
                                 )
THE MEDICAL TEAM, INC.           )
d/b/a THE MED TEAM, INC.,        )
          Defendant              )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VIDEOTAPED DEPOSITION OF

RYAN GRISARD

A CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC.

d/b/a THE MED TEAM, INC.

NOVEMBER 28, 2018

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VIDEOTAPED DEPOSITION of RYAN GRISARD, a

CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC. d/b/a

THE MED TEAM, INC., produced as a witness at the

instance of the Plaintiff, and duly sworn, was taken in

the above-styled and numbered cause on the 28th day of

November, 2018, from 10:52 a.m. to 12:45 p.m., before

Naomi R. Peltier, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of JACKSON

WALKER, LLP, 112 East Pecan Street, Suite 2400, San

Antonio, Texas, pursuant to the Federal Rules of Civil

Procedure.

Ryan Grisard

## Page 2

```
 1              A P P E A R A N C E S
 2
    FOR THE PLAINTIFF:  RENEE RICHARDSON
 3      THOMAS N. CAMMACK, III
        and LORNA GRIFFIN
 4      PONCIO LAW OFFICES
        5410 Fredericksburg Road, Suite 103
 5      San Antonio, Texas  78229
        (210) 212-7979
 6      tcammack@ponciolaw.com
 7  FOR THE DEFENDANT:  THE MEDICAL TEAM, INC. D/B/A THE MED
    TEAM, INC.
 8      RICK GARZA
        JACKSON WALKER, LLP
 9      112 E. Pecan Street, Suite 2400
        San Antonio, Texas  78205
10      (210) 978-7700
        rgarza@jw.com
11
    THE VIDEOGRAPHER:
12      NEAL CASTILE
13
                    * * * * * *
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                  I N D E X
 2
                                              PAGE
 3  Appearances .......................................2
 4              EXAMINATION
                                              PAGE
 5  RYAN GRISARD
        Examination By Mr. Cammack ....................5
 6
 7              EXHIBITS
                                              FIRST
 8  NO.     DESCRIPTION                     REFERENCED
 9   1  (Previously marked) ..........................7
10   5  Defendant's Responses and/or Objections to
        Plaintiff's First Set of Interrogatories ....12
11
12   6  1/20/17 Email from Renee Richardson to
        Sarah Gogo Regarding NB Situation ...........13
13   7  Job Description (Branch Manager) ............19
14   8  Census ......................................21
15   9  Med Team, Inc. Organizational Chart .........23
16  10  3/8/17 Email from R. Richardson to S. Gogo,
        Regarding Pay Stubs .........................29
17
    11  Pay Stubs ...................................29
18
    12  Performance Improvement Plan ................39
19
    13  9/25/15 Email String Regarding Employee
20      Discharge Project ...........................45
21  14  10/8/15 Email String Regarding New Braunfels
        Visit on 10/5/15 ............................48
22
    15  3/16/16 Email String Regarding Rae Cazares ..50
23
    16  3/16/16 Email String Regarding Rae Cazares ..52
24
    17  3/16/16 Email String Regarding Rae Cazares ..54
25
```

## Page 4

```
 1                  I N D E X
                    (continued)
 2
 3              EXHIBITS
                                              FIRST
 4  NO.     DESCRIPTION                     REFERENCED
 5  18  4/1/16 Email String Regarding New Braunfels
        Client Count ................................59
 6
    19  4/25/16 Email String Regarding New Braunfels
 7      Referrals Report for April 2016 .............61
 8  20  6/7/16 Email String Regarding Recruiting &
        Marketing Proposals .........................65
 9
    21  6/14/16 Email String Regarding Recruiting &
10      Marketing Proposals .........................65
11
                    -o-0-o-
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1         THE VIDEOGRAPHER:  Today's date is
 2  November 28, 2018.  We're on the record at approximately
 3  10:52 a.m. to take the oral video deposition of the
 4  corporate representative of The Medical Team, Ryan
 5  Grisard.  By previous agreement, attorneys have agreed
 6  that we will not be doing the formal federal preamble.
 7              RYAN GRISARD,
 8  A CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC.
 9         d/b/a THE MED TEAM, INC.,
10  having been first duly sworn, testified as follows:
11              EXAMINATION
12  BY MR. CAMMACK
13     Q.  Good morning, Mr. Grisard.
14     A.  Good morning.
15     Q.  Could you please state your full name for the
16  record?
17     A.  Ryan Grisard.
18     Q.  And Mr. Grisard, have you ever been deposed
19  before?
20     A.  I haven't.
21     Q.  I know I went over the rules with Ms. Jackson,
22  but I feel comfortable just going through it again with
23  each --
24     A.  Sure.
25     Q.  -- deponent.  So, she's going to be writing
```

Ryan Grisard

November 28, 2018
Pages 6 to 9

Page 6

1 down everything we're saying. And if you could just
2 wait until I finish my question and I'll wait until you
3 provide your answer, that way we're not talking over
4 each other.
5    A.  Okay.
6    Q.  And then, you're also doing a good job, if you
7 could please provide verbal responses and make sure to
8 not do "uh-huhs" or "huh-uhs."
9    A.  Okay.
10    Q.  Now, sometimes I phrase a question in a way
11 where the answer could be, "No, I didn't," or, "No, I
12 didn't know," or you may give an "uh-huh" or "huh-uh."
13 I might press you for a yes or a no.  I'm not doing it
14 to mess with you, I'm just trying to get a clear record.
15    A.  Okay.
16    Q.  And again, I don't mean any disrespect.  I ask
17 this question of every deponent.  Have you had anything
18 the drink today?
19    A.  I have not.
20    Q.  Have you taken any medication that would affect
21 your memory?
22    A.  No.
23    Q.  Do you have any reason you couldn't provide
24 full and truthful testimony?
25    A.  I don't.

Page 7

1    Q.  And you understand that, even though we're in a
2 conference room, your testimony has the same weight as
3 if you're talking to a judge or a jury?
4    A.  I do.
5    Q.  And do you also understand that, in Texas, it's
6 a third degree felony to perjure yourself?
7    A.  Yes.
8    Q.  Okay.  And you are here today in your capacity
9 as a corporate representative and -- Do you understand
10 that?
11    A.  Yes.
12    Q.  And that your testimony today binds The Med
13 Team?
14    A.  Correct.
15    Q.  Okay.  You have before you Exhibit Number 1.
16 And Exhibit Number 1 is that notice of intent to take
17 the 30(b)(6) oral deposition of you as a corporate
18 representative.
19    A.  Okay.
20    Q.  And you've been designated on several topics in
21 this list.  I note that there are a few references --
22 and Rick and I have talked about it briefly in an email.
23 There are a few references to a gentleman named William
24 Wilkins, and there's also references to a school.  Med
25 Team does not have a William Wilkins with you, correct?

Page 8

1    A.  Not to my knowledge.
2    Q.  And you're not a school?
3    A.  Correct.
4    Q.  Okay.  So, those are in error.  I would like
5 to, to the extent I can, still ask you questions about
6 the parameters of those topics, though.
7    A.  Okay.
8    Q.  And, of course, you know, Rick and I may talk
9 about it when we get to those, whatever -- whatever we
10 want to do on that.  But on the first topic on the
11 second page, it's listed any investigation and
12 determination related to the complaints of, termination
13 and/or any prior discipline and/or evaluations of the
14 Plaintiff.  Are you able to testify about that today?
15    A.  I am.
16    Q.  Okay.  Number 2, any investigation and
17 determination related to any complaints of harassment,
18 discrimination, termination, and/or retaliation by
19 Plaintiff.  Are you able to testify about that today?
20    A.  Yes.
21    Q.  And then, we're skipping to number 4.  Any
22 harassment, discrimination and retaliation policy
23 related to Plaintiff's claims.  Are you able to testify
24 about that today?
25    A.  Yes.

Page 9

1    Q.  All right.  I wanted to go -- I've kind of
2 talked a little bit already with the other
3 representative about the harassment, discrimination, and
4 retaliation policy.  Is it your understanding that
5 there's a separate retaliation policy that we have not
6 already covered today?
7    A.  Not that I'm aware of.
8    Q.  Okay.  And would there have been one in place
9 at the time Ms. Richardson was an employee?
10    A.  I mean, part of the employee handbook.
11    Q.  Sure.  So, the -- the Exhibit Number 2, then,
12 the policies that are reflected in Exhibit Number 2
13 would be the policies that would include anything
14 related to EEO compliance?
15    A.  To my knowledge.
16    Q.  Okay.  Is it your -- Is it your understanding
17 that there's any other policies besides that related to
18 EEO compliance?
19    A.  I'm unsure.
20    Q.  Okay.  But as you sit here today, you can't
21 think of a separate policy?
22    A.  Correct.
23    Q.  Okay.  And then, back to topic 1 and 2, do you
24 recall any investigation taking place to any complaints
25 made by Plaintiff about being discriminated against?

Ryan Grisard

Page 10

1    A.   There were no investigations.
2    Q.   And do you recall any prior discipline being
3  given to her prior to her termination?
4    A.   I don't recall.
5    Q.   Okay.  And as you sit here today, is there any
6  -- besides discipline, is there any verbal warnings, or
7  any performance improvement plans, or anything of that
8  nature she would have been placed on during her
9  employment?
10    A.   I do believe there were some verbal warnings.
11    Q.   And who would have given her those verbal
12  warnings?
13    A.   That would have been Alan Garza.
14    Q.   And Alan Garza would have given her these
15  verbal warnings -- are you aware what time frame they
16  were given?
17    A.   They would have been during 2016.
18    Q.   Okay.  And before or after she received her
19  performance evaluation that's been marked as Plaintiff's
20  Exhibit Number 4?
21    A.   After.
22    Q.   Okay.  And is it your understanding, then, that
23  she was given them in a disciplinary capacity?
24    A.   Could you clarify?
25    Q.   Sure.  So, Ms. Jackson's testimony, my

Page 11

1  understanding was, is that there is a progressive
2  discipline policy that Med Team has.
3    A.   Okay.
4    Q.   Is that your understanding, as well?
5    A.   Yes.
6    Q.   And then, the first step on most progressive
7  discipline policies is a verbal warning.
8    A.   Uh-huh.
9    Q.   Is that also Med Team's policy?
10    A.   I believe so.
11    Q.   And then, so, in providing those verbal
12  warnings, was he starting the first step of the
13  progressive discipline policy?
14    A.   That would be my assumption.
15    Q.   Okay.  Did he ever escalate that to a written?
16    A.   Not that I'm aware of.
17    Q.   Okay.  And is it your understanding that, in
18  providing answers to discovery, that the -- that the
19  Defendant has, in fact, indicated she's never received
20  any discipline prior to her determination?
21    A.   I can't say that.
22    Q.   Okay.  Well, let me show you --
23         MR. CAMMACK:  And I only have one copy,
24  and I've got it tagged up with my highlights, so I don't
25  know if it matters whether we enter it as an exhibit or

Page 12

1  not, with my highlights on it.
2         MR. GARZA:  Well, just -- just -- We can
3  enter it as an exhibit, as long as we state that the
4  highlights are yours.
5         MR. CAMMACK:  Okay.  So, what it looks
6  like -- And what I'm marking is Plaintiff's Exhibit
7  Number 5.
8         (Exhibit No. 5 marked.)
9    Q.   (BY MR. CAMMACK) Are you familiar with this
10  document?
11    A.   Yes.
12    Q.   And it looks like, in response to number 1,
13  that yourself, Ms. Jackson, and Alan Garza were
14  responsible for providing information to answer those
15  questions, correct?
16    A.   Uh-huh.
17    Q.   And then, if you turn a couple of pages, or it
18  may be one page, to interrogatory number 6, it looks
19  like there's no documentation of any prior discipline.
20  Is that your understanding of the answer to that
21  question?
22    A.   Yes.
23    Q.   Now, when -- when The Med Team provides verbal
24  warning, do they not also document that they've given
25  those verbal warnings, as well, as a part of their

Page 13

1  progressive discipline policy?
2    A.   I can't answer that.
3    Q.   You're not aware of whether they do or not?
4    A.   No.
5    Q.   Okay.  And why was there not an investigation
6  conducted into her complaints of discrimination?
7    A.   There was never a complaint of discrimination
8  received.
9    Q.   Okay.  I'm going to hand you what's been marked
10  as Plaintiff's Exhibit Number 6.
11         (Exhibit No. 6 marked.)
12    Q.   (BY MR. CAMMACK) And do you mind if I snatch
13  back 5 --
14    A.   Yes.
15    Q.   -- from you?  Thanks.  All right.  Are you
16  familiar with this email?
17    A.   I am.
18    Q.   Okay.  And how are you familiar with this
19  email?
20    A.   After Renee was -- it was determined that Renee
21  was going to be terminated, this email came to light.
22  And -- Yeah, I don't remember the exact specifics of --
23  of how or when, but this email was -- came to light
24  after, you know, the determination was to terminate
25  Ms. Richardson.

Ryan Grisard

Page 14

1  Q.  Okay.  So, this email was sent by Renee
2 Richardson January 20th, 2017, at 7:39 a.m. --
3     A.  Uh-huh.
4     Q.  -- to Sarah Gogo, who my understanding is an HR
5 representative?
6     A.  Correct.
7     Q.  And it indicates, if you look at the second
8 paragraph, in the second sentence, that, "...given the
9 current situation and past instances, I have always felt
10 like Alan has never supported me or respected me in this
11 position because I am a black woman."  Did I read that
12 correctly?
13    A.  Yes.
14    Q.  And when was the decision to terminate her
15 made?
16    A.  I do not remember the exact date, but I believe
17 it was around this time period.
18    Q.  Around this time period, being the same day?
19    A.  It may have been the same day, it may have been
20 a day before or a day after.
21    Q.  Okay.  And it was based on her performance,
22 correct?
23    A.  That is correct.
24    Q.  And based on the testimony provided by
25 Ms. Jackson, she -- in fact, the only evidence of her

Page 15

1 performance, at least in her evaluations, is that she
2 was commendable as an employee, correct?
3     A.  Sure.
4     Q.  Okay.  So, she's got commendable performance,
5 she has no prior discipline, but around the same day she
6 complains about being treated differently for being a
7 black woman, the decision is made to terminate her,
8 correct?
9     A.  Correct.
10    Q.  Okay.  And then, your understanding is, that's
11 because she has -- How long has she had those
12 performance problems?
13    A.  So, as a branch manager, she was in charge --
14 one of her main objectives is to grow the census.
15    Q.  Okay.
16    A.  And throughout 2016, the census continued to
17 decline at a very rapid rate.
18    Q.  Okay.
19    A.  And on a monthly basis, as the CFO, I meet with
20 the board of directors and we discuss financial results
21 of each operation.  And, you know, when we were
22 discussing the December results, it was determined that
23 it was time to, you know, let Ms. Richardson go.
24    Q.  Okay.  And was that branch the New Braunfels --
25 So, first, my understanding is, is that part of a branch

Page 16

1 manager's main job is to keep the census up or growing?
2     A.  Correct.
3     Q.  And is that part of her job description?
4     A.  I would think so.
5     Q.  Okay.  So, that's specifically going to be
6 detailed to her in her job description, that she's
7 supposed to keep the census up?
8     A.  Without seeing it, I can't be 100 percent sure,
9 but I would certainly think so.
10    Q.  Okay.  I'm going to show it to you, but I'm
11 going to go ahead and tell you it's not in there.
12 But -- But I'll ask you about it in a minute.
13         The next question I have for you:  Were
14 there other branches that were having census problems?
15    A.  Yes.
16    Q.  And that includes the San Antonio office and
17 the Mercedes branch, correct?
18    A.  Not that I'm aware of.
19    Q.  Okay.
20    A.  It would have included the Austin office and
21 the Brownsville office.
22    Q.  Okay.  So, your understanding is, it's Austin
23 and Brownsville?
24    A.  That's correct.
25    Q.  Okay.  Well -- So, were those Austin and

Page 17

1 Brownsville branch managers terminated for --
2     A.  They were.
3     Q.  Okay.  And when were they terminated?
4     A.  The Austin administrator was terminated around
5 the same time, so towards the end of January of 2017.
6     Q.  Okay.  Because, again, your discovery responses
7 indicated that no other branch managers were terminated
8 for issues with poor performance.
9     A.  Well, that -- that would be a correct
10 statement, because this -- these other two individuals
11 had a job title of "administrator."  So, instead of
12 "branch manager," they had a separate title of
13 "administrator."
14    Q.  Okay.  But were there not branch managers in
15 those offices?
16    A.  There were not branch managers in those
17 offices.
18    Q.  There was no branch managers in -- And which
19 two offices are you saying there were terminations at?
20    A.  Austin and Brownsville.
21    Q.  Austin and Brownsville.  And so, do you know
22 which office Lacy Richard was in?
23    A.  Lacy Richard was in Austin.
24    Q.  And how about Christina Luna?
25    A.  Christina Luna was in Mercedes, I believe.

Ryan Grisard

Page 18

1    Q.   Okay.  And then, how about Eileen Gregory?
2    A.   She was in Brownsville.
3    Q.   And how about Christina Hernandez Ayala?
4    A.   She would have been the administrator of
5 San Antonio.
6    Q.   And she is the administrator that was working
7 in conjunction with Ms. Richardson?
8    A.   So, Ms. Richardson would have had, sort of, a
9 dual reporting role to Alan Garza and Ms. Christina
10 Hernandez.
11    Q.   Okay.  And then, by process of elimination, it
12 looks like our Dallas -- Well, is it Dallas or
13 Huntsville that you-all have another office in?
14    A.   We have an office in Dallas.  We don't have
15 anything in Huntsville.
16    Q.   Okay.
17    A.   We have an office in Hebbronville.
18    Q.   Hebbronville.  That's what that -- Okay.  Is
19 K-A-M-L-A, Kamla, B-E-H-A-R-R-Y-L-A --
20    A.   She's in our Dallas office.
21    Q.   Okay.  Dallas.  And then, who is in your
22 Hebbronville office?
23    A.   Ademar Garza, A-D-E-M-A-R, Garza.
24    Q.   Okay.
25    A.   But again, some of these people are

Page 19

1 administrators, not branch managers.
2    Q.   What's the difference between the administrator
3 and the branch manager?
4    A.   It -- It's more your provider.  So, for
5 example, you have a parent provider number with DADS,
6 and your parent provider number, you have an
7 administrator.  But then you can have branch offices
8 that offset off of that parent provider number.
9    Q.   Okay.
10    A.   So, you can't have an administrator in a
11 branch.  You can only have a branch manager.  Whereas,
12 in that parent, you would have an administrator.
13    Q.   Okay.  But you would agree with me, no other
14 branch managers were terminated at the same time period
15 for low census or poor performance, correct?
16    A.   No other branch managers.
17    Q.   Okay.  I'm going to hand you Plaintiff's
18 Exhibit Number 7.
19        (Exhibit No. 7 marked.)
20    Q.   (BY MR. CAMMACK) And this is a job description
21 for a branch manager in the New Braunfels office,
22 specifically.  Is it your understanding that
23 Ms. Richardson was the branch manager in the New
24 Braunfels office?
25    A.   That's correct.

Page 20

1    Q.   Okay.  You can -- You know, if you'd like, you
2 can review the document, but if you could indicate to me
3 anywhere where there's any discussion of census, or
4 anything related to census, on this document.
5    A.   (Reviews document).  Is this a duplicate page,
6 4, 5, and 6?
7    Q.   It -- Let me -- Let double -- Did I hand you --
8 Oh, I'm sorry.  Yeah, 4, 5, and 6 looks like just a
9 change has been made from salary to hourly, and that
10 there's a little initial next to it.  Besides that,
11 everything else is the same, yes.  And -- And for
12 reference where that change is made, that's Med Team 14,
13 under employee [sic] class, "salaried" has been
14 scratched out with initials I'm not quite familiar with,
15 and then "hourly" has been checked.
16    A.   I don't see word -- mention of the specific
17 word "census," but I would interpret (i) to basically
18 incorporate that.
19    Q.   (i).  So, "Manage operations of the branch in
20 accordance with established fiscal parameters"?
21    A.   Correct.
22    Q.   Okay.  Now, beyond the census, what other
23 problems was she having with her performance?
24    A.   I'm not aware.
25    Q.   So, you -- Nothing was brought to your

Page 21

1 attention that would indicate she had any other issues
2 beyond census?
3    A.   Not that I recall.
4    Q.   Okay.  Would that be something that you would
5 be made aware of in making the determination whether to
6 discipline or terminate a branch manager?
7    A.   Sure.
8    Q.   Okay.
9        (Exhibit No. 8 marked.)
10    Q.   (BY MR. CAMMACK) I'm going to hand you what's
11 been marked as Plaintiff's Exhibit Number 8.  Have you
12 ever seen this document before?
13    A.   I have seen something similar.
14    Q.   And what is this document or what would the
15 similar document indicate to you -- or what is it, I
16 should say?
17    A.   The census of each branch.
18    Q.   Okay.  And so, on the left, there's a column
19 called Month, and it starts with August 15, and it looks
20 like at the very bottom it ends November 2016.
21    A.   Okay.
22    Q.   At the top, I see SA, I assume is San Antonio,
23 NB for New Braunfels, the next column is Austin, or AUS,
24 B'ville for Brownsville, Merc for Mercedes, Dallas, and
25 then H'ville for Hebbronville, correct?

Ryan Grisard

Page 22

1    A.  Correct.
2    Q.  And if you look at -- For instance, the
3  San Antonio office starts August 15th with 796.
4    A.  Uh-huh.
5    Q.  But they end in November of 2016 with 740.
6    A.  Uh-huh.
7    Q.  A 56 percent -- or not percent, I'm sorry -- 56
8  numbers below the original census.
9    A.  Uh-huh.
10   Q.  Does that concern you that there's a drop in
11  56?
12   A.  Sure.
13   Q.  And let's look at Mercedes.  It starts with 146
14  and ends at 120.  It looks like there's a drop in 26.
15   A.  Uh-huh.
16   Q.  Does it concern you there was a drop in 26?
17   A.  Sure.
18   Q.  And you said there's also issues with the
19  Austin and Brownsville offices, but I don't see it
20  reflected in this document.  Is that from the same time
21  period or a different time period, the drop?
22   A.  Same period.
23   Q.  Okay.  Now, based on what you've indicated and
24  based on what this document indicates, all but two of
25  the offices would not have had a drop in census; is that

Page 23

1  your understanding?
2    A.  For this line of business, yes.
3    Q.  And so, the only branch manager that's been
4  terminated is terminated -- is Ms. Richardson, correct?
5    A.  Correct.
6    Q.  And she's terminated approximately the same
7  day -- or the decision to make -- to terminate her is
8  made approximately the same day she complains about race
9  discrimination, correct?
10   A.  Correct.
11   Q.  And of all the time periods there was drops in
12  census, no other decisions were made to terminate her on
13  these other months, correct?
14   A.  Correct.
15   Q.  Okay.
16       (Exhibit No. 9 marked.)
17   Q.  (BY MR. CAMMACK) I'm going to hand you what's
18  been marked as Plaintiff's Exhibit Number 9.  And the
19  sticker kind of covers the number, but this is
20  Richardson 530.  Have you ever seen this document
21  before?
22   A.  It looks familiar.
23   Q.  What's your understanding of this document?
24   A.  It's an org chart.
25   Q.  Okay.  And by "org chart," you just mean

Page 24

1  organizational chart?
2    A.  Yes.
3    Q.  And then, where does -- Are you in the board of
4  directors on this chart?
5    A.  I am not.
6    Q.  Okay.  Where would you fall in this -- this
7  chart then?  Right under Ms. Pembrook?
8    A.  Yeah.
9    Q.  Okay.  And then, where would a Nick
10  T-Z-I-R-I-M-I [sic] fall on this chart?
11   A.  The board of directors.
12   Q.  Okay.  What's his official title on the board?
13   A.  Vice president.
14   Q.  And is it your understanding that he was
15  involved in the decision to terminate Ms. Richardson?
16   A.  Yes.
17   Q.  What was his capacity --
18       MR. GARZA:  What was your response?
19       THE WITNESS:  "Yes."
20   Q.  (BY MR. CAMMACK) And what was his capacity in
21  that decision to terminate?
22   A.  Well, like I said, we -- I -- I present to the
23  board on a monthly basis the financial results of each
24  branch, so that would be Leslie and Nick and myself.
25   Q.  Okay.

Page 25

1    A.  And, you know, based on the results over the
2  past several months, we decided collectively that it was
3  time to eliminate that position.
4    Q.  Okay.  Is that -- When you say "eliminate that
5  position," is there no longer a branch manager position?
6    A.  There was not a branch manager position for
7  quite some time.  There is one today.
8    Q.  Okay.  And do you know when that position was
9  filled or reinstated?
10   A.  If I had to guess, I would say about --
11       MR. GARZA:  Don't guess.
12   Q.  (BY MR. CAMMACK) Was it this year, though?  Was
13  it 2018?
14   A.  Yes.
15   Q.  Do you know if it was early 2018?
16   A.  I don't -- I don't recall.
17   Q.  Okay.  And so, you make a report, "Hey, we need
18  to terminate this position, branch manager"?
19   A.  Uh-huh.
20   Q.  Okay.
21       MR. GARZA:  Is that a "yes"?
22       THE WITNESS:  Yes.
23   Q.  (BY MR. CAMMACK) And -- And does -- Is there
24  any other capacity that you're aware of that Nick served
25  as VP on the board in -- in his decision-making?

Ryan Grisard

Page 26

1    A.  No.
2    Q.  Okay.  Was there anything else that you
3 reviewed in making your decision to terminate?
4    A.  No.
5    Q.  Okay.  And it's also my understanding that
6 Linda Harvey was involved in the decision to terminate?
7    A.  Yes.
8    Q.  If you look at the chart, I have her listed
9 twice, unless there's two Linda Harveys.  I have her
10 listed as director of program and policy development
11 above Alan Garza -- or, I'm sorry, above Angie Harris,
12 but I also have her listed below Alan Garza, as BSN, RN.
13 Is that the same Linda Harvey?
14    A.  It is.
15    Q.  Okay.  What was her role in the decision to
16 terminate?
17    A.  She was just part of the discussion of whether
18 or not we could, you know, go without -- you know,
19 eliminate that position and sort of manage it from the
20 San Antonio operation.
21    Q.  Do you recall her saying anything else related
22 to that termination decision?
23    A.  I don't.
24    Q.  And then, Alan Garza, what was his role in the
25 decision to terminate?

Page 27

1    A.  Similar to Linda's.
2    Q.  Okay.  And where was -- Was -- Where did these
3 discussions take place?  Were they in person, were they
4 on the phone?
5    A.  Nick, Leslie, and I would have been in person.
6    Q.  Okay.
7    A.  Discussions with Linda and Alan would have been
8 over the phone.
9    Q.  Okay.  And do you recall what day these
10 discussions took place?
11    A.  I do not.
12    Q.  Would there be phone logs related to the phone
13 calls?
14    A.  I would certainly think so.
15    Q.  Okay.  And what -- what phone numbers would you
16 have been calling from?
17    A.  The -- The main number is (703) 390-2300.
18    Q.  What were the last four numbers?
19    A.  2300.
20    Q.  Okay.  And when you say there are call logs, is
21 that -- is there actually a separate written log, or
22 just a record that would have been on the phone?
23    A.  Just a record that would have been on the
24 phone.
25    Q.  Okay.  Would you have had a meeting calendar

Page 28

1 that you would have said, "Hey, I'm meeting with Nick
2 and Leslie today"?
3    A.  Unlikely.
4    Q.  Okay.  It wouldn't have been in an Outlook
5 or --
6    A.  (Shakes head from side to side).
7    Q.  Okay.  Was that Number 9 I gave you?
8    A.  It is.
9    Q.  Okay.  If you could come back with me to
10 Plaintiff's Exhibit Number 1, topic number 5 is benefits
11 and pay the employee received or was entitled to.
12    A.  Uh-huh.
13    Q.  Are you able to testify about that today?
14    A.  Yes, I am.
15    Q.  Okay.  And then, number 6, any prior complaints
16 of discrimination, wrongful termination and/or
17 harassment, including those involving the employees
18 and/or supervisors involved in the present matter?
19    A.  Yes.
20    Q.  Number 7, any investigation and/or background
21 check conducted involving the employees and/or
22 supervisors involved in the present matter, including
23 investigations conducted regarding Plaintiff's
24 complaints?
25    A.  Yes, I can speak to that.

Page 29

1    Q.  Okay.  I'm going to hand you Plaintiff's
2 Exhibit Number 10 and 11.
3         (Exhibit Nos. 10 and 11 marked.)
4    Q.  (BY MR. CAMMACK) It looks like Ms. Richardson
5 requested her pay stubs on 10, to Sarah Gogo, from
6 December 2016 to February 2017.
7    A.  Okay.
8    Q.  And it looks like this is after her
9 termination.  It says March 8, 2017, correct?
10    A.  Correct.
11    Q.  Okay.  And then, in Number 11, it looks like
12 some pay stubs.  Would you be aware if these were the
13 ones produced to her, the pay stubs?
14    A.  Yeah, they look -- they look familiar.
15    Q.  Okay.  And would this be an accurate reflection
16 of the pay that Ms. Richardson would be receiving at
17 that time?
18    A.  Yes.
19    Q.  And do you know if she was entitled to any
20 additional benefits or retirement plans or anything
21 that's not reflected on this document?
22    A.  I see voluntary benefits, I see health
23 insurance.  She would have been entitled to contribute
24 to the 401(k) plan.
25    Q.  Okay.  But if it's not reflected on here, would

Ryan Grisard

Page 30

1 that mean that she's not getting it, or would that be a
2 separate document?
3    A.  That would mean she did not elect to have that
4 payroll deduction.
5    Q.  Okay.  Now, is it your understanding -- or let
6 me reword this.
7         Have there been any prior complaints of
8 discrimination made of the supervisors at the New
9 Braunfels branch?
10    A.  No.
11    Q.  Have there been any prior complaints related to
12 Alan Garza being discriminatory?
13    A.  No.
14    Q.  Have there been any employees that have sent an
15 email saying, "I feel I've been discriminated against,
16 I'm going to resign or quit"?
17    A.  No.
18    Q.  Okay.  Are you aware that there's allegations
19 that Alan Garza made a comment about Ms. Richardson's
20 afro the same day she was terminated?
21    A.  I believe I saw that in one of the discovery
22 questions or somewhere.
23    Q.  Okay.  Are you aware of any comments that were
24 made by Alan that day?
25    A.  No.

Page 31

1    Q.  Are you aware of any statements he made the day
2 of the termination?
3    A.  No.
4    Q.  Okay.  So, you wouldn't be privy to any
5 conversations he had that day?
6    A.  No.
7    Q.  Okay.  If a former employee -- I believe she
8 was the -- Christina Hernandez -- had indicated that he
9 had made such comments, would you have reason to
10 disagree with her then?
11    A.  Yeah, I wouldn't believe it.
12    Q.  You wouldn't believe that he made those
13 comments?
14    A.  Not at all.
15    Q.  Why not?
16    A.  Because I know Alan pretty well, and don't feel
17 that he would have made those comments.
18    Q.  Okay.  So, based on you knowing him pretty
19 well, you don't think he'd make a comment about
20 Ms. Richardson's hair?
21    A.  Correct.
22    Q.  What about you knowing him well makes you
23 believe that?
24    A.  And he's also told me he hasn't made those
25 comments.

Page 32

1    Q.  Oh.  So, based on his representation, he never
2 said it?
3    A.  Correct.
4    Q.  Okay.  But that's the main reason, because he
5 said he didn't do it?
6    A.  Yeah.
7    Q.  Okay.  If you could look back to Exhibit Number
8 1, topic number 9, any defenses asserted by Defendant,
9 and then there's 10, the claims made the basis of the
10 present suit.
11         Is -- Is there anything besides -- And I
12 think I've already asked this.  I don't mean to be
13 repetitive, but besides the lowering in the census, is
14 there any other reason that Ms. Richardson would have
15 been terminated?
16    A.  That was the main -- That was the reason.
17    Q.  Okay.  Now, is it your understanding that there
18 was ever an investigation to her complaints of race
19 prior to her termination or after?
20    A.  Never an investigation.
21    Q.  Was there ever -- Did you ever think it was
22 prudent to make sure that there isn't any discriminatory
23 behavior in the workplace, after she complained?
24    A.  Complaint was never received.
25    Q.  Okay.  And when you say it was never received,

Page 33

1 what do you mean by that?  Do you mean, like, the email
2 didn't go through?
3    A.  I can't answer that.  I just know that the --
4 that the complaint was never received.
5    Q.  So, Sarah Gogo never received that complaint?
6    A.  That is correct.
7    Q.  Okay.  And so, if I have dozens of emails
8 between Sarah Gogo, some prior to Plaintiff's January
9 20th email and some post, why would it be that only one
10 email she doesn't receive?
11    A.  I cannot answer that.
12    Q.  So, then, how did you say to me just a few
13 minutes ago, "We had knowledge, prior to terminating
14 her, of this email," if the email didn't go through?
15         MR. GARZA:  That's not what he said.
16    Q.  (BY MR. CAMMACK) What was your testimony then?
17    A.  That we had no knowledge of any emails prior to
18 the decision being made to terminate her.
19    Q.  Wait a minute.  Your testimony earlier was --
20 My understanding of your testimony earlier was, is that
21 "We became aware of this complaint around the same time
22 we terminated her."
23    A.  After the decision to terminate her.
24    Q.  And how did you become aware of it after the
25 decision?

Ryan Grisard

Page 34

1    A.   I don't recall.
2    Q.   Is it because there was an email that was sent?
3    A.   I don't recall how we were made aware, but Nick
4  Tzirimis and I went and sat at Sarah's desk after the
5  decision had been made -- after the termination, and
6  looked through her email.
7    Q.   Okay.
8    A.   We looked through her in-box, her trash can,
9  you know, every -- every folder in her Outlook, and
10  could not find that email.  We asked Sarah about the
11  email.  She said she never received it.
12    Q.   Okay.  What was -- So, what -- what prompted
13  you to look for the email, though, if you don't know it
14  exists?
15    A.   Again, I don't remember the specifics about it,
16  whether it was, you know -- I don't remember the
17  specifics of what prompted that discussion and us
18  looking at the email -- at her Outlook account.
19    Q.   Okay.  But the testimony today is -- Because
20  you notice I handed you an email that indicates that she
21  received emails post her termination, correct?
22  Including the one with the pay stub Sarah responds to,
23  right?
24    A.   Correct.
25    Q.   And then -- I mean, I -- We can spend all day

Page 35

1  going through all the emails in January that were
2  received by Sarah and responded to.
3    A.   Sure.
4    Q.   Your testimony is, is that that one email
5  didn't go through, the one email that was sent about the
6  same day the decision was made to terminate her, that
7  she complained about race?
8    A.   My testimony is that we had no knowledge of
9  that email prior to making a decision to terminate
10  Renee.
11    Q.   Okay.  Now, did the New Braunfels office always
12  have, kind of, some issues with the census?
13    A.   Not that I recall.
14    Q.   Did they have issues with complying with some
15  of the -- some of, I guess, the parameters needed to be
16  a successful office?
17    A.   Not that I recall.
18    Q.   Do you recall them having any problems with
19  high turnover of employees or clients?
20    A.   I mean, in our industry, turnover is high in
21  all locations.
22    Q.   Okay.
23    A.   It's the nature of the industry.
24    Q.   So, based on the nature of that industry, would
25  it be prudent, then, when you have an employee who had

Page 36

1  census issues, to try and help them with their
2  performance prior to termination?
3    A.   Yes.  And we did that.
4    Q.   Okay.  But there's just no evidence of that,
5  correct?
6    A.   I can't believe that there's no evidence of
7  that.
8    Q.   Okay.  Well, I'll go through some of the emails
9  with you related to that, but let's -- let's go through
10  some more of the topics first.
11    A.   Sure.
12    Q.   Number 11, damages sought by the Plaintiff,
13  including pay and benefits received by Plaintiff and/or
14  to which he or she was entitled or would have been
15  entitled.  We've already looked at a pay stub and we've
16  already talked about some of the benefits, correct?
17    A.   Correct.
18    Q.   Was there any other health benefits, whether it
19  be dental or vision, that she would have had that would
20  not be listed on Exhibit Number 11?
21    A.   By having the medical deduction, that
22  incorporated vision and dental.
23    Q.   Okay.
24    A.   So, it was one bucket, so to speak.
25    Q.   When an employee is involuntarily separated

Page 37

1  from The Med Team --
2    A.   Uh-huh.
3    Q.   -- are they still entitled to payouts on their
4  vacation time?
5    A.   Yes.
6    Q.   Are they still entitled to payouts on accrued
7  PTO?
8    A.   It's the same thing.
9    Q.   Okay.  They're listed as the same thing?
10    A.   Yeah.
11    Q.   So, there's not separate holiday pay, vacation
12  pay?
13    A.   There's separate holiday pay, but PTO is the
14  only bucket that encompasses your sick and vacation, so
15  to speak.
16    Q.   Okay.  So, any sick leave or vacation pay, that
17  would have been all encompassed in the PTO?
18    A.   Correct.
19    Q.   Okay.  If you'll look at topic number 13 and
20  number 14, the identity and facts regarding any and all
21  employees of Defendant who were demoted, disciplined,
22  suspended, counseled, reprimanded, placed on leave,
23  terminated, discharged and/or laid off within the last
24  10 years under and for the same policy, procedure, rule
25  and/or regulation that was utilized and implemented by

Page 38

1 Defendant with regard to Plaintiff.
2          The second section of that, or number 14,
3 is to identify any and all of those employees that were
4 not disciplined that way, but could have simply been
5 given a warning, suspended, and/or given other
6 disciplinary measures other than termination. Do you
7 have knowledge of that?
8    A.  Sure.
9    Q.  Okay. Within the last 10 years, what other
10 branch managers have been terminated for low census?
11    A.  Branch managers, none.
12    Q.  None. And have any other branch managers been
13 given warnings or performance improvement plans as
14 opposed to termination?
15    A.  Not that I'm aware of.
16    Q.  Are you familiar with Christina Luna?
17    A.  Yes.
18    Q.  And is it your understanding that Christina
19 Luna was placed on a performance improvement plan?
20    A.  I don't -- I don't recall that.
21    Q.  Okay. I'm going to hand you --
22          MR. CAMMACK: Do we already have 12 out
23 there? Okay.
24    Q.  (BY MR. CAMMACK) I'm going to hand you what's
25 been marked as Plaintiff's Exhibit Number 13. You know

Page 39

1 what, I'm going to mark that one as 12. I'm sorry.
2          (Exhibit No. 12 marked.)
3    Q.  (BY MR. CAMMACK) And this looks like it's the
4 performance improvement plan of Christina Luna, a branch
5 manager, correct?
6    A.  Yes.
7    Q.  And this was given to her July 30th, 2017?
8    A.  Looks like it was June 1st of 2017.
9    Q.  Oh, I'm sorry. In the PIP -- I guess I was
10 looking at the end date. So, it was about a
11 two-month-long PIP, or 60 days?
12    A.  Correct.
13    Q.  And Christina Luna was at the Mercedes office,
14 correct?
15    A.  Correct.
16    Q.  And that's an office we looked at that had low
17 performance -- or low census, correct?
18    A.  Correct.
19    Q.  It looks like, though, if you look at her PIP,
20 they don't even talk about census in this document,
21 despite her low census at her office. Regardless,
22 though, she is being put on a PIP for her failure to
23 comply with Med Team policies and procedures, specific
24 to, it looks like, EVV in-service, unwillingness to
25 accept her role in completing and maintaining records,

Page 40

1 unwillingness as a branch manager to prioritize and
2 receive specific agency training, and incomplete
3 personnel records with regard to attendance references,
4 office staff references, job descriptions, annual
5 evaluations, and corresponding with verification
6 documents as per South Texas operations manager's audit.
7 Is that your understanding of the reason she was placed
8 on this PIP?
9    A.  Yes.
10    Q.  Now, attendance references, would that have
11 anything to do with recording attendance -- of -- of --
12 of what, specifically, if you're aware?
13          MR. GARZA: You said "attendance"?
14          MR. CAMMACK: I'm sorry. "Attendant," I
15 should be saying.
16    Q.  (BY MR. CAMMACK) Attendant references. What
17 exactly is an attendant reference?
18    A.  So, attendants are the employees, the providers
19 that are out seeing -- doing the hands-on care, seeing
20 the patients. So, to me, if it says attendant
21 references, I assume it's a reference check at hire.
22    Q.  And what does the census particularly gauge?
23 What -- What is it a census of?
24    A.  Your number of billable patients.
25    Q.  Your number of billable patients. Okay. And

Page 41

1 then, would this attendant reference, then, have
2 anything to do with the number of billable patients?
3    A.  No.
4    Q.  Okay. What about EVV in-service, what does
5 that have to do with? Is that a tracking system?
6    A.  EVV stands for Electronic Visit Verification.
7    Q.  Okay. And that's visit of the billable
8 patients?
9    A.  Correct.
10    Q.  And it looks like there was a violation of the
11 policy related to the electronic visit verification
12 in-service. What -- What does the in-service mean, or
13 EVV in-service?
14    A.  That would be when you're training those new
15 attendants on using the -- the -- that electronic system
16 to capture their time in and time out at the patient's
17 home.
18    Q.  Okay. And so, their time in and time out is
19 how you actually bill the billable patients?
20    A.  That's how you pay the attendant and,
21 obviously, yes, how you would also bill the --- for that
22 patient.
23    Q.  Okay.
24          MR. GARZA: Let's go off the record for a
25 second.

Ryan Grisard

November 28, 2018
Pages 42 to 45

Page 42

1        MR. CAMMACK:  Okay.  Sure.
2        THE VIDEOGRAPHER:  We're off the record at
3  11:34.
4        (Recess 11:34 a.m. to 11:37 a.m.)
5        THE VIDEOGRAPHER:  We're back on the
6  record at 11:37.
7    Q.  (BY MR. CAMMACK) All right.  We're back from a
8  brief break.  Do you understand that your testimony is
9  still under oath?
10    A.  Yes.
11    Q.  Okay.  If you can look at topic number 15 on
12  Plaintiff's Exhibit Number 1.  And that's the persons
13  involved in the decision to terminate Plaintiff.  Have
14  we already discussed all the people involved?
15    A.  Yes.
16    Q.  I -- I think I skipped over Ms. Pembrook and
17  her involvement.  Do you know what input she had related
18  to the termination besides what we've already discussed?
19    A.  Again, she would have been in that meeting with
20  Nick and -- and myself --
21    Q.  Okay.
22    A.  -- discussing financial performance for each
23  location for the month.
24    Q.  Okay.
25    A.  And would have been part of that conversation

Page 43

1  to terminate.
2    Q.  And then, number 16, any and all discipline,
3  performance evaluations, performance, terminations,
4  and/or the race of Plaintiff's comparators, to include
5  branch managers in Texas.
6        Number 17, any and all census numbers,
7  patient retention numbers, patient turnover rates,
8  compliance with State of Texas requirements, employee
9  retention, employee compliance with State requirements,
10  Electronic Visit Verification implementation, referral
11  counts, client discharge numbers, and customer
12  complaints at all branches in Texas.
13        I know that's very broad, but do you have
14  general knowledge of those topics?
15    A.  I believe so.
16    Q.  Okay.  And then, I believe number 18, we've
17  already gone over the job descriptions and job duties
18  and job requirements of Plaintiff as a branch manager in
19  New Braunfels.
20    A.  Yes.
21    Q.  Outside of that job description, was there any
22  other job duties or job descriptions she would have had?
23    A.  Well, again, she would have been responsible
24  for the census.
25    Q.  Sure.  But it's not specified in her job

Page 44

1  description, correct?
2    A.  Like I said, I -- I -- I would interpret point
3  (i), I believe it was, to incorporate that.
4    Q.  Sure.  So, census is retention of billable
5  patients, either the retention of or the growth in the
6  number of billable patients?
7    A.  Correct.
8    Q.  And the census is the way you measure that,
9  correct?
10    A.  Correct.
11    Q.  So, that would be anything related to patient
12  retention numbers or turnover rates, correct?
13    A.  And the financial results of that branch,
14  because a patient leads to sales.
15    Q.  Okay.
16    A.  So, as the sales decrease, obviously, they're a
17  correlation to the census decrease.
18    Q.  Sure.  Now, are you aware of -- Now, you know,
19  comparators is just a fancy word for -- that lawyers use
20  to say employees that are in similar positions --
21    A.  Uh-huh.
22    Q.  -- to, in this case, other branch managers.
23  Are you aware of the racial background of the other
24  branch managers?  And I can -- I can narrow that down,
25  instead of having you guess what race people are.

Page 45

1        Do you know if any of the other branch
2  managers were black?
3    A.  I don't believe so.
4    Q.  Okay.  And certainly, none of the other branch
5  managers complained about race discrimination?
6    A.  Not to my knowledge.
7    Q.  Okay.  I'm going to hand you what's been marked
8  as Plaintiff's Exhibit --
9        MR. CAMMACK:  I don't even know where I am
10  now -- 13.  We're finally to actual 13.
11        (Exhibit No. 13 marked.)
12    Q.  (BY MR. CAMMACK) And this is Richardson 119.
13  Now, it looks like, at the bottom email, on September
14  25th, 2015, Renee Richardson has indicated that there's
15  a backlog of approximately 150 employee files that need
16  to be discharged properly, and that there was an October
17  19th deadline.
18        And then, a Colleen Shelton indicated she
19  can't help because she's got family plans.  Is that your
20  understanding of this email chain?
21    A.  That's the way I read it.
22    Q.  Now, what would have caused 150 employee files
23  to not be properly discharged, and secondary to that,
24  what is the proper discharging method for an employee
25  file?

Page 46

1    A.   Well, in our industry, you know, these are
2  hourly attendants, so they apply for a job and they're
3  available to work.
4    Q.   Okay.
5    A.   But you may not use them for a period, they go
6  out of the country, they go on vacation, but you don't
7  necessarily discharge them, because they haven't been
8  terminated, they're still available to work.
9    Q.   I gotcha.
10   A.   So, at some point throughout the year, we'll go
11  through, we'll run a query and say, "Okay, you've got
12  these 150 people that haven't worked in a year" --
13   Q.   Sure.
14   A.   -- "so shouldn't we go ahead and terminate them
15  or discharge them from the system so that they're not on
16  the active list to show as available, since, obviously,
17  they haven't worked in quite some time?"
18   Q.   Okay.
19   A.   So, it's not uncommon in our branches to just
20  have employees that are listed as active that really
21  just haven't seen a patient in a while.
22   Q.   And does that impact the overall flow of the
23  office when you have a bunch of backlogged employees?
24   A.   No.
25   Q.   Well, let me -- I'm just trying to understand.

Page 47

1  When you have a list of, let's say, 300 names --
2    A.   Uh-huh.
3    Q.   -- or however many, and I've got 150 on there,
4  are these ones that you're -- you're calling or
5  contacting to see if they can go see a patient?
6    A.   Probably not.
7    Q.   Okay.  So, they're just listed, potentially
8  some, because they were family members and that patient
9  has now passed, some because, like you said, they've
10  gone out of the country?
11   A.   Yeah.
12   Q.   So, that -- them being on that list and being
13  backlogged, why would there be a stringent deadline to
14  get that cleared up?
15   A.   I don't know why they would have put a
16  stringent deadline on that.
17   Q.   Okay.  But -- But to --
18   A.   Maybe -- Maybe the -- You know, back then, we
19  were paper, so maybe the filing cabinets were getting
20  full and they wanted to clean up some filing cabinet
21  space.  I can't answer as to why.
22   Q.   Okay.  So, overall, though, in your opinion,
23  that wouldn't be something related to issues with the
24  census or performance of the office?
25   A.   Not at all.

Page 48

1    Q.   Okay.
2         (Exhibit No. 14 marked.)
3    Q.   (BY MR. CAMMACK) I'm going to hand you what's
4  been marked as Plaintiff's Exhibit Number 14.  And
5  there's a sticker on it, but it's Richardson 495 to 496.
6  And it looks like, if you look at the secondary email,
7  that a Frances Gonzalez sent an email to Alan Garza on
8  October 8th of 2015.  And she was discussing some of the
9  roles of both Renee Richardson as branch manager, and it
10  looks like a Norma Leal, L-E-A-L, in her capacity in HR.
11  It also looks like that they found that the office had
12  multiple areas where they were not compliant, including,
13  if you look at the first sentence on the -- the last
14  paragraph, posters for labor boards in the kitchen/break
15  room are not in the view where an applicant applies.
16  Besides --
17        MR. GARZA:  It says "posture."
18   Q.   (BY MR. CAMMACK) I'm sorry.  Posture labor
19  boards are in the kitchen/break room and not in viewing
20  of where the applicant applies.  Did I read that
21  correctly?
22   A.   Yes.
23   Q.   And what -- what is your definition -- or what
24  is your understanding of what these labor boards that
25  they're posting are -- or posture of the labor boards?

Page 49

1    A.   They would show them what the minimum wage is,
2  you know, different labor laws for state and federal
3  level that the employer has to comply with.
4    Q.   So, the required posting for federal and state
5  laws related to discrimination or retaliation haven't
6  been properly displayed is what this email indicates,
7  correct?
8    A.   That's what it shows.
9    Q.   Okay.  Do you know if that office ever came
10  into compliance with that?
11   A.   I'm not sure.
12   Q.   Okay.  But it certainly hasn't been on
13  anybody's priority list to make sure that that's been
14  posted, correct?
15   A.   I can't -- I can't answer that.
16   Q.   Okay.  But it is your understanding that it is,
17  in fact, a requirement to have those laws posted so that
18  employees have knowledge of discrimination retaliation?
19        MR. GARZA:  I'll object on the basis that
20  it asks him as a nonexpert to make a legal conclusion.
21   Q.   (BY MR. CAMMACK) Okay.  Is it your
22  understanding, though, as VP, in your position, that you
23  are required to post that for employees to have
24  knowledge of and view?
25   A.   I believe so.

Ryan Grisard

November 28, 2018
Pages 50 to 53

Page 50

1   Q.   Okay.  Now, you said that the EVV system would
2   not have affected census if there were issues with it?
3       A.   No.
4       Q.   Okay.  What about marketing, would marketing
5   have a reflection on the census or the number of
6   patients you received?
7       A.   Sure.
8       Q.   Okay.
9           (Exhibit No. 15 marked.)
10      Q.   (BY MR. CAMMACK) I'm going to hand you what's
11  been marked Plaintiff's Exhibit Number 15.  This is an
12  email from Alan Garza to Renee Richardson, and this is
13  in reference to a Rae Cazares, C-A-Z-A-R-E-S.  Do you
14  know who Rae Cazares is?
15      A.   I do.
16      Q.   And it looks like Rae had expressed an interest
17  in becoming an administrative coordinator, as well as
18  her role as a marketing person -- position.
19      A.   Okay.
20      Q.   Do you know if she currently is employed as an
21  administrative coordinator?
22      A.   She's not currently employed with The Medical
23  Team.
24      Q.   Okay.  Did she ever leave her role in marketing
25  with The Medical Team?

Page 51

1       A.   She got dragged into the office quite often to
2   help in some administrative coordinator roles.
3       Q.   Okay.  Was she, though, for the New Braunfels
4   branch, was it her main role to -- to do marketing or --
5       A.   That was supposed to be her main role, yes.
6       Q.   Okay.  And when you say "supposed to be," it
7   ended up not being or...
8       A.   Quite often, she ended up getting dragged into
9   the office to do an admin coordinator role.
10      Q.   Okay.  And what -- Why was she being dragged in
11  that capacity?  Was there a specific reason or specific
12  person requesting her to do so?
13      A.   They didn't have that position filled.
14      Q.   Okay.  So, it was a lack of actually having an
15  administrative coordinator there?
16      A.   Correct.
17      Q.   Now, it -- it looks like Alan Garza is
18  acknowledging, on March 16th of 2016, that Rae is
19  contributing in her marketing role, but the referral
20  counts aren't as exciting as we would like.  Is the
21  referral count -- does that affect the census?
22      A.   It does.
23      Q.   And so, as of March 16, 2016, they're --
24  they're not getting the referral count or the marketing
25  that they want, correct?

Page 52

1       A.   Yeah.
2       Q.   Do you know what steps were taken to add to the
3   referral count or to the marketing?
4       A.   I don't recall.
5       Q.   Okay.
6           MR. GARZA:  And let me just ask, would you
7   speak up a little bit, because I -- I can't hear you.
8   I'm a little bit old.
9           THE WITNESS:  Sure.
10          MR. GARZA:  And -- And make sure that --
11  that you don't say "uh-huh" or "huh-uh," because
12  that's -- that's causing some difficulty.  It has to be
13  a word response, please.  Thank you.
14          THE WITNESS:  Got it.
15      Q.   (BY MR. CAMMACK) Do you know if they ever hired
16  an administrative coordinator before she was separated
17  from the company?
18      A.   Before who was separated from the company?
19      Q.   Rae Cazares.
20      A.   I don't recall.
21      Q.   Okay.
22          (Exhibit No. 16 marked.)
23      Q.   (BY MR. CAMMACK) I'm going to hand you what's
24  been marked as Plaintiff's Exhibit Number 16.  And this
25  is an email from Alan Garza to Renee Richardson on

Page 53

1   March 23rd, 2016.  Rae is responding to Renee's
2   inquiries related to moving Rae into the administrative
3   coordinator position.  And he indicates that "Rae is a
4   valued employee at a high level of pay with the
5   expectation of helping us to grow our business."  He
6   also indicates that her reducing her marketing hours to
7   move into this administrative role would not help the
8   census or revenue.  Is that your understanding of that
9   first paragraph?
10      A.   Yes, it is.
11      Q.   Okay.  He indicates, in the -- the last
12  highlighted section, that they should -- him and
13  Ms. Richardson should come up with a time to discuss
14  their marketing strategy so they could increase the
15  client census as well as revenue.  Is that your
16  understanding of that paragraph?
17      A.   Yes.
18      Q.   Okay.  Do you know if they ever had that
19  meeting to discuss their marketing strategy, or would
20  you have been involved in that meeting?
21      A.   I wouldn't have been involved in that meeting.
22      Q.   Okay.  Do you know, was Rae voluntarily
23  separated or was she terminated?
24      A.   I think she voluntarily resigned.
25      Q.   Okay.  Do you know if she was ever disciplined

Ryan Grisard

Page 54

1  for reasons related to census?
2      A.  I do not know.
3      Q.  Okay.  Do you know if she was ever told that,
4  "Hey, look, you've really got to pick up your marketing,
5  our census and revenue's bad, or not where we want it to
6  be"?
7      A.  Yeah, I'm pretty confident, based on these
8  emails, she was told.
9      Q.  Okay.  But you don't have specific knowledge
10  outside of these emails between Renee and Alan that she
11  was informed, correct?
12      A.  No.
13      Q.  Okay.  I'm handing you what's been marked as
14  Plaintiff's Exhibit Number 17.
15          (Exhibit No. 17 marked.)
16      Q.  (BY MR. CAMMACK) And my understanding of this
17  email is that Ms. Richardson took the previous exhibit,
18  or Number 16, and she wrote in her responses, indicating
19  on the left-hand side "Alan," what he said, and then
20  writing "Renee" for her response.  And this was sent
21  March 24th, 2016.  Is that your understanding of this
22  document?
23          MR. GARZA:  Hold on.
24          THE WITNESS:  I don't understand the
25  question.

Page 55

1      Q.  (BY MR. CAMMACK) Sure.  Sure.  Have you ever
2  seen this email before?
3      A.  I have not.
4      Q.  Okay.  Renee is responding to Exhibit
5  Number 16.  What -- What she's done is, it looks like
6  she has taken specific paragraphs out of Exhibit 16.
7  For instance, you'll look, the first paragraph he starts
8  with, "I don't think this is the best move for MTI," and
9  then his next paragraph on Exhibit 16 starts with, "We
10  should currently have an active ad out."  Is that what
11  it looks like on Exhibit 16?
12      A.  Sure.
13      Q.  Now, if you look over here, the first paragraph
14  is the same, "I don't think this is the best move for
15  MTI," and it's kind of cut off, but it looks like LAN,
16  for Alan, is written right to the left of that paragraph
17  on 17.
18      A.  Okay.
19      Q.  And then, underneath it is a different
20  paragraph from the other exhibit.  "Renee" is written
21  next to that.  Do you see that on 17?
22      A.  I do.
23      Q.  Okay.  So, that's her rebuttal or her response
24  to his questions.  Is that -- Does that seem more
25  apparent, the way I've worded it now?

Page 56

1      A.  That you're saying that's her response to --
2      Q.  Correct.
3      A.  -- these -- Okay.
4      Q.  Okay.  She indicates that she has doubts of the
5  business growing due to high turnover rate with PCAs.
6  What's a PCA?
7      A.  Personal care attendant.
8      Q.  And are those the ones that are getting --
9  they're going out and visiting the billable patients --
10  or the patients with billable hours?
11      A.  Yes.
12      Q.  Okay.  So, she's indicating we have unstaffed
13  clients who are tired of waiting on the PCAs, so they
14  transfer.
15      A.  Okay.
16      Q.  Is that pretty common in your industry?
17      A.  High turnover is common in our industry.
18      Q.  Is that part of a concern about the rate of
19  pay?
20      A.  It can be.
21      Q.  What are other reasons that you can have high
22  turnover?
23      A.  Benefits, family members, not enough hours, you
24  know.
25      Q.  Well, what she indicates here is -- part of it

Page 57

1  is also -- Did I cut you off?  I'm sorry.
2      A.  No, I think I was -- I was finished.
3      Q.  Okay.  She also indicates some of the patients,
4  they're going to expire, they're -- they're providing
5  care to them, correct, so there's going to be -- the
6  census will change due to that, correct?
7      A.  When someone passes away?
8      Q.  Yes.
9      A.  Yeah.
10      Q.  And then, she also indicates some of these
11  patients are moved to long-term care facilities.  That
12  can also affect the census?
13      A.  (Nods head up and down).
14      Q.  Okay.  You have problems that, unfortunately,
15  some of the PCAs are not reliable, she indicates that,
16  as well?
17      A.  Okay.
18      Q.  And then, of course, we discussed the benefits
19  and pay also add to a turnover rate?
20      A.  Okay.
21      Q.  Were any of these things discussed as potential
22  reasons that the census was low in the decision to
23  terminate Ms. Richardson?
24      A.  They were not discussed at the corporate office
25  level.

Ryan Grisard

Page 58

1  Q.  Okay.  But that would have been a daily
2  consideration by any branch manager, correct?
3    A.  Yes.  And I believe Alan and Renee would have
4  had those conversations.
5    Q.  Okay.  Now, it looks like she also recommends
6  an employee incentive or recognition plan beyond the one
7  that was already in place.  Do you know if she ever
8  implemented an employee incentive program?
9    A.  I'm not sure.  I don't -- I don't -- I don't
10  recall.
11    Q.  Okay.  So, if you go down to the paragraph that
12  starts with, "We should currently have an active ad
13  out," by Alan --
14    A.  Okay.
15    Q.  -- her response is, "Yes, there is an ad out
16  and I've scheduled a couple of interviews."  So, he's
17  asking her, as part of her role to -- to respond to
18  business growth is to get an ad out, and she's indicated
19  she's already done that, correct?
20    A.  That's what she's indicating, yes.
21    Q.  Okay.  Now, if you turn to the next page, it
22  looks like, again, it begins with Alan's comments from
23  16, "Let's come up with a few dates to meet and discuss
24  our marketing strategy."
25        And it looks like her response is, "I

Page 59

1  believe it would be to our advantage to meet to discuss
2  the expected census, revenue, and objectives for this
3  branch."  Is that your understanding of her response?
4    A.  Uh-huh.
5    Q.  And again, you would --
6    A.  Yes.
7        MR. GARZA:  Yes?
8        THE WITNESS:  Yes.
9    Q.  (BY MR. CAMMACK) And I'm sorry, I should have
10  asked you to clarify, as well.  But do you -- And you
11  already testified you're not privy to those meetings,
12  though, right?
13    A.  No.
14    Q.  Okay.
15        MR. GARZA:  What was your last response?
16        THE WITNESS:  Yes.  Oh.  Which question?
17        MR. CAMMACK:  I'm not sure.
18        (Requested portion was read.)
19        MR. CAMMACK:  Okay.
20        MR. GARZA:  Again, I can't hear.
21        (Exhibit No. 18 marked.)
22    Q.  (BY MR. CAMMACK) All right.  I'm going to hand
23  you what's been marked as Plaintiff's Exhibit Number 18.
24  Number 18 is an email chain between Renee Richardson and
25  Alan Garza.  It looks like Renee is indicating on

Page 60

1  April 1st of 2016 to Alan some of the reasons that
2  they've had clients discharged.  And what she indicates,
3  for instance, on the beginning of the second paragraph,
4  is that some of the discharges are due to death.  For
5  instance, they had 17 clients pass away in December,
6  some have transferred due to EVV-related issues because
7  attendants are not getting paid, some are due to clients
8  being transferred due to relocation, some due to higher
9  pay, some due to constant changes because they are not
10  being permanently staffed, what we've already discussed,
11  long-term care facilities where some clients have been
12  moved, and then at least two or three cases where
13  clients were abusive to the PCAs.
14        Do you know -- And if you notice, this is
15  in response to Alan's email that, hey, look, in December
16  we had a huge drop in clients, so did we in January and
17  February, in his first sentence to -- to Renee and Rae.
18  Do you know, at this time, if she was given any
19  discipline for the drop in census?
20    A.  I don't know.
21    Q.  Okay.  But certainly, here, there's nothing to
22  indicate that she was disciplined for this almost
23  10 percent drop in clients in a couple of months?
24    A.  Correct.
25    Q.  Okay.  What is MCOs?

Page 61

1    A.  Managed care organization.
2    Q.  Okay.  And what specifically is a managed care
3  organization?
4    A.  Insurance company, like Superior, Amerigroup --
5    Q.  Okay.
6    A.  -- United Healthcare.
7    Q.  How would The Med Team be able to enforce a
8  managed care organization to move faster in getting
9  authorizations for rendering services?
10    A.  How would they be able to enforce it?
11    Q.  Yeah.  I guess, how do they get, let's say,
12  TDADS or MCOs to move faster in authorizing services
13  being rendered?
14        MR. GARZA:  What's TDADS?  I'm sorry, I
15  didn't understand.  You said TDADS?
16        MR. CAMMACK:  Yeah, T-D-A-D-S, Texas
17  Department of Aging and Disability Services, I believe.
18        MR. GARZA:  Okay.  Thank you.
19        THE WITNESS:  Well, how they get them to
20  move any faster, I can't answer to that.  I mean -- But
21  there's a process in place to submit paperwork to get
22  them to authorize the services.
23        (Exhibit No. 19 marked.)
24    Q.  (BY MR. CAMMACK) Okay.  I'm going to hand you
25  what's been marked as Plaintiff's Exhibit Number 19.

Ryan Grisard

Page 62

1 This is an email chain between Alan Garza and Renee
2 Richardson on April 28, 2016. And of the past few
3 exhibits, this is the first email that's post her April
4 2016 performance evaluation.
5    A. Okay.
6    Q. So, Alan is indicating to Renee that, it looks
7 like related to referrals, "Okay, great. These numbers
8 are outstanding. We need to have the MCOs or TDADS" --
9 T-D-A-D-S -- "to move a little faster in getting the
10 authorization out to us so that we can begin rendering
11 services."
12        Do you know what he's referring to then by
13 getting the authorization out to them faster?
14    A. So, there's a process in place where we submit
15 paperwork to the MCO or TDADS, saying, "This patient has
16 elected Med Team, Inc. Here is the" -- I don't know the
17 number of the form, but there's a form number you fill
18 out, requesting services and a certain number of hours,
19 so like a care plan. And then the person at the MCO or
20 TDADS reviews that documentation and sends you back an
21 authorization -- paper authorization saying, "Med Team,
22 Inc. is authorized, with MPI number 123, to see
23 Ms. Jones for 30 hours a week, and here are the services
24 that you need to render."
25    Q. Okay. So, this email is indicating, as far as

Page 63

1 getting the paperwork together to them, you've just got
2 to get them out to them quick, but it's not indicating,
3 "Hey, look, we can give TDADS a call and they'll move
4 faster." That's just based on them once we get the
5 paperwork to them, right?
6    A. Yeah. I mean, I assume there's a -- there
7 could be a follow-up step where you call the case
8 manager and follow up and say, "Did you get the
9 paperwork," you know, "What's the status of the
10 authorization?"
11    Q. Okay. What -- What is the SAM system, as well?
12    A. That's a -- It's a niche product for home
13 health agencies. So, it's a scheduling/billing
14 platform, sort of like our operating system, to manage
15 the day-to-day scheduling and billing activities.
16    Q. Okay. Now, if he's indicating to her that the
17 referral numbers or the data tracking referrals is ---
18 the numbers are outstanding, is it your impression that
19 he's -- he's impressed with what Renee Richardson is
20 getting accomplished or with the numbers?
21    A. Sure.
22    Q. Okay. Do you know if she was ever switched
23 from salary to hourly?
24    A. She was not.
25    Q. Okay. Is it your understanding that she was

Page 64

1 hourly or salary?
2    A. Salary.
3    Q. Did you say salary?
4    A. Salary.
5    Q. Okay. What's Workuments?
6    A. It's an HRIS platform.
7    Q. What does that mean?
8    A. It's basically a human resource product that
9 will manage your demographic information if you were to
10 move, manage your onboarding, manage your, you know, tax
11 forms, you can look up your pay stubs in there. So,
12 anything related to your employment changes is kind of
13 managed by an HRIS system.
14    Q. Is that still what you-all have in place today?
15    A. Workuments is what we have in place today.
16    Q. Okay. But that has nothing -- That's -- That's
17 on the HR side for track- -- I can log into it and say,
18 "Hey, look, I -- I took three days off," or "I should
19 have an hour in overtime," or anything like that?
20    A. Request PTO, yeah.
21    Q. Okay.
22    A. It's...
23    Q. But that doesn't track anything related to
24 census or turnover or anything like that. It's all
25 employee benefits or time off or stuff like that?

Page 65

1    A. Correct.
2    Q. Okay.
3        (Exhibit No. 20 marked.)
4    Q. (BY MR. CAMMACK) I have what's been marked as
5 Plaintiff's Exhibit Number 20. Okay. So, this is kind
6 of like that one where some were on 16 and some were on
7 17.
8    A. Okay.
9    Q. So, I'm going to go ahead and mark 20 and hand
10 it to you.
11    A. It correlates to 19 or...
12    Q. Well, I'm about to give you 21, as well.
13    A. Oh, I'm sorry.
14        (Exhibit No. 21 marked.)
15    Q. (BY MR. CAMMACK) And here is 21. Now, on
16 Number 20, this is an email from Leslie Pembrook on
17 June 7, 2016 to Renee Richardson, to Kimberly Rhodes,
18 and cc'ing Alan R. Garza. The subject is "Recruiting &
19 Marketing Proposals."
20        MR. GARZA: Is that Exhibit 20?
21        MR. CAMMACK: Yes, Exhibit 20.
22        MR. GARZA: Okay.
23        MR. CAMMACK: Or did I --
24        THE WITNESS: Yeah.
25    Q. (BY MR. CAMMACK) Yeah, okay. And it looks like

Ryan Grisard

Page 66

1  Leslie is indicating a few things she'd like to have
2  knowledge of and she's got a list of five things at the
3  top. One is how much does McDonald's offer, starting
4  pay in New Braunfels; number 2 is what's the approximate
5  number of cases staffed by family members; 3 is who are
6  our top three competitors; 4 is are we actively
7  recruiting, and how do we track how many applicants are
8  coming in; and 5 is what are they doing to be in the
9  community or involved in the community, with regular
10  events, including -- she's requesting Rae's input on --
11  on what they're doing and what they have planned. Is
12  that your understanding of these five areas?
13    A.  Yes.
14    Q.  Okay.
15        MR. GARZA:  Just to clarify, in number 3,
16  you say "who are our top three competitors," but that's
17  not exactly what that says.
18        MR. CAMMACK:  Oh, sure. Sure.
19        MR. GARZA:  What are they offering as
20  rates.
21        MR. CAMMACK:  That -- That's correct.
22  Yeah. So, what are our top competitors offering to new
23  hires, that's correct. Thank you.
24    Q.  (BY MR. CAMMACK) Now, if you turn to the second
25  page of Exhibit Number 277 [sic], it looks like, on

Page 67

1  June 7th -- Well, is that June -- I'm sorry -- on June
2  14th, Alan Garza provided a response.
3        MR. GARZA:  Hold on a second. You said
4  Exhibit 277.
5        MR. CAMMACK:  I'm sorry. Let me -- Let me
6  start that whole thing over.
7    Q.  (BY MR. CAMMACK) If you look at Exhibit 21,
8  which is -- starts with Richardson 277 and goes to
9  Richardson 279, at the bottom of 277, it looks like the
10  beginning of the same question number 1, "What is
11  McDonald's offering?"
12    A.  Uh-huh.
13    Q.  And the answer on the next page looks like
14  McDonald's pays between 7.25 and $9 per hour. Do you
15  know how much PCAs are paid in the New Braunfels branch,
16  on average?
17    A.  Back then?
18    Q.  Uh-huh.
19    A.  Eight and a quarter an hour.
20    Q.  Eight and a quarter? So, comparable to the --
21  the McDonald's rate?
22    A.  Yeah.
23    Q.  Okay. And number 2, it looks like there's an
24  estimate of about 60 percent of the PCAs are family
25  members or preferred employees?

Page 68

1    A.  Okay.
2    Q.  What is a preferred employee?
3    A.  I would assume it was a family member.
4    Q.  Okay. So, it's the same thing?
5    A.  Yeah.
6    Q.  And then, it looks like the comparable rates of
7  your comparators, Kindred at Home paid 9.15 at the time,
8  Girling Health, which is G-I-R-L-I-N-G, paid 8, and
9  Right at Home paid 9. Do you know if you ever lost --
10  or would you be privy to conversations about how many
11  employees were lost to any of those comparators based on
12  rate of pay?
13    A.  I wouldn't.
14    Q.  Okay. Now, did Rae Cazares, did she work
15  directly under Ms. Richardson?
16    A.  Yes.
17    Q.  And would it have been both her and
18  Ms. Richardson's job to recruit and to market?
19    A.  Yes.
20    Q.  Was it primarily Rae's goal, though -- or role?
21    A.  The day-to-day function with the oversight
22  of -- and guidance of Renee.
23    Q.  Sure. But I guess what I mean is, Rae has a
24  duty to recruit and to be the marketer, correct?
25    A.  Uh-huh.

Page 69

1    Q.  And then, if Rae is insufficient in those
2  duties, does that fall on Rae or does that fall on the
3  whole team?
4    A.  The whole team.
5    Q.  Okay. So, when Ms. Richardson's office is low
6  on census, does that also fall on Alan Garza, as well?
7    A.  He would have some -- I mean, he would -- he --
8  he would be responsible for, yeah, helping -- give them
9  some guidance to grow the census.
10    Q.  Do you know if either Rae or Alan were
11  disciplined related to the census at the New Braunfels
12  office?
13    A.  I do not know.
14    Q.  But you would have knowledge if they had been
15  disciplined, correct?
16    A.  Alan, yes, I would have knowledge of. Renee,
17  not necessarily.
18    Q.  Okay. But to your memory, he was never
19  disciplined related to anything related to census,
20  correct?
21    A.  Not that I recall.
22    Q.  Okay. We can go back to Exhibit 1. Now,
23  Ms. -- Looking at Number 21, Ms. Richardson never signed
24  any form of a release, did she, related to her
25  termination?

Ryan Grisard

Page 70

1    A.   No, she did not.

2    Q.   Okay.  And it looks like my 20, 21 again become

3  20 and 21.  Let me ask you this, though, related to the

4  next two topics.  Have we already listed all of

5  Plaintiff's supervisors?

6    A.   I believe so.

7    Q.   Okay.  Any of those other supervisors would

8  have been responded to in discovery, correct?

9    A.   Yes.

10   Q.   I have listed a Eileen McCleary as an

11 administrator when Plaintiff was hired.  Was she one of

12 her supervisors?

13   A.   She would have been at some point during her

14 employment.

15   Q.   Was she involved in any way with the decision

16 to terminate?

17   A.   No.

18   Q.   Okay.  And how about Christina Hernandez?

19   A.   If I believe the chronological order, Christina

20 Hernandez replaced Eileen McCleary.

21   Q.   Okay.

22   A.   So they both would have, at some point, been

23 involved in her employment.

24   Q.   Would she have been involved in the decision to

25 terminate?

Page 71

1    A.   No.

2    Q.   I have listed a Freddy Waters.  Was he involved

3  at all in the decision to terminate?

4    A.   He wasn't employed at that time.

5    Q.   Okay.  How about Brian Deaver?

6    A.   Also wasn't employed at that time.

7    Q.   Okay.  Now, is it your understanding that

8  Ms. Richardson -- that some people came to talk to

9  Ms. Richardson about her termination, but she wasn't

10 present because she was out with a stomach bug?

11   A.   That's correct.

12   Q.   Okay.  Do you know if that leave was approved

13 that she was out for?

14   A.   I mean, I don't think it was preapproved.

15   Q.   Okay.

16   A.   But it's part of your PTO bucket, so, sort of,

17 by default, it's approved, it's just not -- it wasn't

18 preapproved.  There was no knowledge that she wasn't

19 going to be there.

20   Q.   Okay.  But certainly, it wasn't part of the

21 decision to terminate her that she wasn't there that

22 morning?

23   A.   No.

24   Q.   Okay.  And if she had accrued PTO, that would

25 have been something that would have been acceptable to

Page 72

1  use if she woke up sick that morning?

2    A.   Right.

3    Q.   Okay.  If you'll look at topic number 22, the

4  existence of any documents in Plaintiff's requests for

5  production sent to Defendant.  I'm also going to ask you

6  about this in conjunction with 25, on the next page,

7  the -- the methods of search for documents requested,

8  and then 26, the identification of persons involved in

9  the search for documents requested in Plaintiff's

10 requests for production.

11        MR. GARZA:  Before we get involved -- into

12 that, could we take about a five-minute break?

13        MR. CAMMACK:  Sure.

14        MR. GARZA:  Thanks.

15        THE VIDEOGRAPHER:  We're off the record at

16 12:15.

17        (Recess 12:15 p.m. to 12:22 p.m.)

18        THE VIDEOGRAPHER:  We're back on the

19 record at 12:22.

20   Q.   (BY MR. CAMMACK)  Now, as to 22, 25, and 26,

21 before I ask you questions about it, I don't want to

22 know confidential communications with your attorney, I

23 don't want to know any information related to that in

24 the search for documents.  I just want to know your

25 understanding of the process of what was done to respond

Page 73

1  to our requests for production, and who was involved

2  that wasn't part of the legal team, and how you went to

3  identify those documents.

4    A.   Okay.  So, when we got the request to keep all

5  documentation related to the case, Nhan Nguyen, who is

6  our director of IT --

7    Q.   Okay.

8    A.   -- it's N-H-A-N, N-G-U-Y-E-N -- was notified

9  to, you know, back up the server, back up the emails, to

10 keep all documentation related to the lawsuit.

11   Q.   Okay.  And then, was a search conducted by

12 yourself, or do you know what individuals were involved

13 in that search?

14   A.   No.  Nhan would have done the search of

15 documentation.  Like I said earlier, Nick and I sat down

16 at Sarah's computer and searched through her Outlook

17 email --

18   Q.   I got --

19   A.   -- Outlook to -- to look for that specific

20 email, and it did not -- it wasn't present.

21   Q.   Okay.

22   A.   I'm not sure what specific documents you're

23 referring to in your question.

24   Q.   Sure.  I meant in general.  When you get this

25 requests for production, what, kind of, was the process

Ryan Grisard

Page 74

1 on it? I think I got an understanding. You-all
2 actually went through Sarah's emails, yourself and Nick,
3 and then IT also put a hold on documents so you-all
4 could make that search.
5    A.   That's correct.
6    Q.   Okay. And other than that, let's say, for
7 instance, Ms. Richard's personnel file, is that -- is
8 that digital, is that in a file cabinet? How is that
9 stored?
10   A.   It's in a file cabinet.
11   Q.   Okay. Does she have one personnel file or a
12 second separate one for medical records?
13   A.   She has one personnel file.
14   Q.   Okay. And -- And that document would have
15 already been produced in the file itself?
16   A.   That's correct.
17   Q.   Okay. Now, I believe I have asked you
18 questions related to 27 and 28. You've already
19 discussed with me the communications between supervisors
20 and management involved in the decision to terminate,
21 correct?
22   A.   Correct.
23   Q.   Are you aware of any other conversations that
24 we haven't already discussed?
25   A.   I'm not.

Page 76

1    A.   Correct.
2    Q.   Were you notified or do you know who was
3 specifically notified, "Hey, she's not here today"?
4    A.   We were notified. That would have been Alan
5 Garza and I believe her name was Heather Siegmund --
6    Q.   Okay.
7    A.   -- was the HR person in Texas at that time
8 prior to Tia, and they went on two occasions to do the
9 termination and she wasn't there on two consecutive
10 days, so they went back a third time the following week
11 to terminate Ms. Richardson.
12   Q.   Okay. So, they go back twice. And you said
13 Heather Siegmund?
14   A.   Heather Siegmund.
15   Q.   And how is her name spelled, if you know?
16   A.   S-I-E-G-M-U-N-D.
17   Q.   Okay. And Ms. Siegmund, was she from the
18 corporate office?
19   A.   No, she was from the San Antonio, Texas office.
20   Q.   Okay. Now, did the San Antonio, Texas office,
21 does her HR role serve for all the other Texas offices?
22   A.   She would be the leader of the HR function
23 throughout the state of Texas.
24   Q.   Okay. So, she and Mr. Garza show up one day
25 she's not there. Do you first receive a communication

Page 75

1    Q.   And are there any other communication that
2 you're aware of, whether they be a phone, email,
3 internal messaging?
4    A.   I'm not.
5    Q.   Would there be any text messages that were sent
6 about the reason to terminate?
7    A.   No.
8    Q.   Would there be any text messages or other
9 communications about the time to meet related to that
10 meeting?
11   A.   I don't believe so.
12   Q.   Okay. And are there any other meetings besides
13 what we discussed today about her complaint of race and
14 gender discrimination?
15   A.   No.
16   Q.   Okay. Do you remember having any meetings
17 after the fact, or communications after the fact, that
18 the decision was made to terminate, related to her
19 termination? And I can break that down, too.
20   A.   If you could.
21   Q.   Sure. So, a decision is made to terminate
22 her --
23   A.   Uh-huh.
24   Q.   -- but at some point people go up to her and
25 inform she's terminated, she's not even there.

Page 77

1 that day that she's not there?
2    A.   I believe so.
3    Q.   Do you recall if it was a phone call or an
4 email?
5    A.   I believe it was a phone call.
6    Q.   Okay. And what is your response?
7    A.   Just accepting the information that she wasn't
8 there and that they would try to go back tomorrow and to
9 make the termination.
10   Q.   And then, on the second day, did they call you
11 again?
12   A.   I don't recall.
13   Q.   Okay.
14   A.   But I would -- I would think so.
15   Q.   Are you aware that they called anybody else
16 about their attempts to --
17   A.   No.
18   Q.   And when they show up to the office, do you
19 know if they -- did they kind of detail what they went
20 through to see if she was there or not, or did they just
21 walk over to her office?
22   A.   I don't know what transpired.
23   Q.   Okay. So, you wouldn't be aware if they
24 communicated to any of the employees that they were
25 there to terminate her?

Ryan Grisard

Page 78

1    A.  I would think they didn't, but no, I -- I -- I
2  wouldn't beware of that, if they did that or not.
3    Q.  Okay.  And then, she's -- she's finally
4  terminated that next week, correct?
5    A.  I believe it was a Monday.
6    Q.  Okay.  And was it discussed with you, "Hey,
7  look, we're just going to follow up next week when we
8  think she'll be there"?
9    A.  Well, because she hadn't shown up the previous
10  two times, it was, you know, a foregone conclusion they
11  were going to go back the next business day to try to
12  make the termination.
13    Q.  And do you recall any -- any further
14  conversations that you had related to that?
15    A.  I do not.
16    Q.  After she's given notice of her termination, do
17  you recall any other discussions of her -- her
18  termination or her separation of employment, besides
19  what we've discussed today?
20    A.  I don't recall.
21    Q.  Okay.  Is there any other discussions of her
22  complaint of race, besides what we've discussed today?
23    A.  Not besides what we've discussed today.
24    Q.  Okay.  Okay.  So, number 30, the policies and
25  procedures of Defendant regarding the hiring and firing

Page 79

1  of supervisory and managerial personnel; number 31, the
2  policies and procedures used by Defendant to determine
3  the qualifications of that supervisory and managerial
4  personnel; and number 32, the policies and procedures of
5  Defendant regarding the training, discipline, promotion,
6  and performance evaluations of supervisory and
7  managerial personnel.  Do you have knowledge of those
8  topics?
9    A.  I do.
10    Q.  Okay.  What was the -- Do you recall when Alan
11  Garza was hired?
12    A.  I don't know the exact date, but I've been
13  employed, for The Medical Team, for 21 years, and he had
14  been there for about five years when I started, so he
15  would have started sometime in the early '90s.
16    Q.  Okay.  So, you wouldn't have been aware if
17  there had been a background check or anything like that
18  conducted on him?
19    A.  That would have been the policy.
20    Q.  Okay.  And do you know what training he would
21  receive related to compliance with the discrimination
22  and harassment policy?
23    A.  I don't have knowledge of what happened back in
24  the early '90s, but I have knowledge of what happened
25  when I was hired and what goes on today.

Page 80

1    Q.  Sure.  From when you were hired forward, what
2  is your knowledge of the training he received on
3  discrimination and harassment?
4    A.  So, there's an employee handbook to discuss
5  that policy, there's -- that you acknowledge that you
6  have read through and understand the policies and
7  procedures within the handbook.  There's an orientation
8  process where policies are pointed out and gone over.
9  But besides that, that's basically what happens for
10  all -- all employees.
11    Q.  So, if he had been hired 26 years ago, his --
12  his training would have been:  Provided a policy that he
13  acknowledges --
14    A.  Uh-huh.
15    Q.  -- and then an orientation about those
16  policies?
17    A.  Yeah.
18    Q.  And then nothing else related to it?
19    A.  Well, annual, we have in-services where, you
20  know, you acknowledge any change to policies, any new
21  policies.  There's specific topics that are discussed in
22  the in-services.  You know, every year, the topics
23  change, but he may have also had something annually at
24  some point during one of those in-services.
25    Q.  Do you know what the length of those

Page 81

1  in-services are on an annual basis?
2    A.  A couple of hours.
3    Q.  Couple of hours?  Okay.  Is there a test at the
4  end of them or how -- how are they graded or how are
5  they shown that they've learned the material?
6    A.  If there's a test -- If -- Yeah, there can be a
7  test.  If you're just acknowledging a change of a policy
8  or a new policy, then it's just a signature
9  acknowledging that you've read and understand the change
10  of policy or the new policy.
11    Q.  Okay.  And you said if there's a test.  Is
12  there a test, that you know of, that they would be given
13  related to discrimination and harassment?
14    A.  Not that I'm aware of.
15    Q.  Okay.  So, overall, there's -- there's a couple
16  of hours given annually, and they sign off, "Hey, we --
17  we know this material now"?
18    A.  That's correct.
19    Q.  And it's not two hours specifically going over
20  discrimination and harassment, but all the changes in
21  policy, correct?
22    A.  That would be correct.
23    Q.  Okay.  So, if there's multiple -- Well, let me
24  rephrase that.
25        So, if you have a couple of hours each

Ryan Grisard

Page 82

1 year, that would include everything related to federal
2 discrimination laws, correct?
3     A.   Uh-huh.  I'm sorry.  Yes.
4     Q.   State discrimination laws, correct?
5     A.   Yes.
6     Q.   Policies related to discrimination, correct?
7     A.   Yes.
8     Q.   Any changes in timekeeping?
9     A.   Yes.
10    Q.   Any changes in how -- I guess, how the company
11 remains profitable, correct -- or any updates on the
12 policies related to that?
13    A.   Any updates on policies.
14    Q.   Sure.  So, any and all -- any and all policies
15 in the handbook, whether it be PTO or timekeeping or
16 dress code or smoking in the workplace, would have been
17 covered in that two-hour policy time?
18    A.   If there was a change in that policy.
19    Q.   Gotcha.
20    A.   Yes.
21    Q.   Okay.  So, if there are no changes in the
22 policy, then there's nothing covered in the in-service?
23    A.   Correct.
24    Q.   Okay.  Since you've been there, do you recall
25 Alan Garza, kind of, the promotions he's been through or

Page 83

1 how he's made his way through The Med Team?
2     A.   Yes, I know, for the most part, his promotions.
3     Q.   Could you describe some of those or describe
4 them to me?
5     A.   Sure.  So, Alan is an MBA, got a master's of
6 business somewhere in Texas, started off actually in our
7 IT department, and then got promoted into the accounting
8 department.  Was in our accounting department for
9 several years, got promoted to be in charge of all of
10 the accounting for Texas, and then eventually got
11 promoted to regional manager, which I believe is where
12 he is today.
13    Q.   Okay.  Now, on number 33, that regards policies
14 and procedures for documentation of an employee's report
15 of discrimination, harassment, or retaliation.
16 Ms. Jackson testified a little bit about that
17 documentation process.  Is there anything in addition to
18 her testimony that -- that you would add?
19    A.   No.
20    Q.   Okay.  And have you had any other employees in
21 the past 10 years complain of race discrimination?
22    A.   No.
23    Q.   Of national origin discrimination?
24    A.   No.
25    Q.   Of gender discrimination?

Page 84

1     A.   No.
2     Q.   Okay.  And we've already gone over all the
3 training that would have been received on compliance
4 with Title VII of the Civil Rights Act, or Chapter 21 of
5 the Texas Labor Code, by Alan Garza?
6     A.   We've gone over that?
7     Q.   Have we already gone over all that training?
8     A.   Yeah.
9     Q.   Okay.
10    A.   I believe so.
11         MR. CAMMACK:  I'm going to review my
12 notes, but I think I'm about done, so --
13         THE WITNESS:  Okay.
14         MR. CAMMACK:  -- if we can take about five
15 minutes?
16         THE VIDEOGRAPHER:  We're off the record at
17 12:36.
18         (Recess 12:36 p.m. to 12:44 p.m.)
19         THE VIDEOGRAPHER:  We're back on the
20 record at 12:44.
21    Q.   (BY MR. CAMMACK)  All right.  Is it your
22 understanding that Ms. Richardson was provided notice of
23 her termination on January 27th, 2017?
24    A.   That's my understanding.
25    Q.   Okay.  Were there any phone call attempts made

Page 85

1 to notify her of her termination?
2     A.   Not that I'm aware of.
3     Q.   Is it policy that they need to be told in
4 person, or is that just kind of how it happened that
5 day?
6     A.   It's kind of how it happened that day.
7     Q.   Okay.  Was anything memorialized about the
8 meeting to terminate, that you're aware of?
9     A.   Not that I'm aware of.
10    Q.   Do you recall if she was provided any specific
11 termination paperwork?
12    A.   I don't recall.
13    Q.   Okay.  Do you recall if she protested or filed
14 any type of grievance as a result of her termination?
15    A.   Not that I'm aware of.
16    Q.   Are you aware of who a Z-I-N-I-N-A Harris --
17 Zinina Harris is?
18    A.   I am not.
19    Q.   Do you know who Valerie Castellon is?
20    A.   I do not.
21    Q.   Okay.  Have you understood all my questions
22 today?
23    A.   I have.
24    Q.   Is there any part of your testimony you'd like
25 to clarify?

Ryan Grisard

November 28, 2018
Pages 86 to 88

---

Page 86

1    A.  There is not.

2         MR. CAMMACK:  Okay.  I will pass the

3    witness.

4         MR. GARZA:  Reserve until the time of

5    trial.

6         MR. CAMMACK:  Okay.  Thank you for your

7    time.

8         THE WITNESS:  Thank you.

9         THE VIDEOGRAPHER:  We're off the record at

10   12:45.

11        (Deposition concluded 12:45 p.m.)

12        (Pursuant to FRCP 30(e)(1), request to

13         review the transcript was not made by

14         either deponent or party before the

15         deposition was completed.)

16              * * * * *

17

18

19

20

21

22

23

24

25

---

Page 87

1              IN THE UNITED STATES DISTRICT COURT

              FOR THE WESTERN DISTRICT OF TEXAS

2                   SAN ANTONIO DIVISION

3

     RENEE RICHARDSON,          )

4                               )

          Plaintiff             )

5                               )

     VS.                        )  NO. 5:18-CV-151-FB

6                               )

     THE MEDICAL TEAM, INC.     )

7    d/b/a THE MED TEAM, INC.,  )

                                )

8         Defendant             )

9    _____

10             REPORTER'S CERTIFICATE

11        VIDEOTAPED DEPOSITION OF RYAN GRISARD

12   A CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC.

13              d/b/a THE MED TEAM, INC.

14                 NOVEMBER 28, 2018

15   _____

16        I, NAOMI R. PELTIER, Certified Shorthand

17   Reporter in and for the State of Texas, do hereby

18   certify to the following:

19        That the witness, RYAN GRISARD, A CORPORATE

20   REPRESENTATIVE OF THE MEDICAL TEAM, INC. d/b/a THE MED

21   TEAM, INC., was duly sworn by the officer and that the

22   transcript of the oral deposition is a true record of

23   the testimony given by the Witness.

24        I further certify that pursuant to FRCP Rule

25   30(e)(1) that the signature of the Deponent:

---

Page 88

1         _____ was requested by the Deponent or a party

2    before the completion of the deposition and is to be

3    returned within 30 days from date of receipt of the

4    transcript.

5         If returned, the attached Changes and Signature

6    Page contains any changes and the reasons therefor;

7         __X__ was not requested by the Deponent or a

8    party before the completion of the deposition.

9         That the amount of time used by each party at

10   the deposition is as follows:

11        Thomas N. Cammack, III - 1 hour 55 minutes

12        I further certify that I am neither attorney,

13   nor counsel for, related to, nor employed by any of the

14   parties to the action in which this testimony is taken.

15   Further, I am not a relative or employee of any attorney

16   of record in this cause, nor do I have a financial

17   interest in the action.

18        SUBSCRIBED AND SWORN TO on this _____ day of

19   _____, 2018.

20

21

22                  Naomi R. Peltier, CSR, RPR

                    Texas CSR 3672

                    Expiration:  10/31/21

23                  Kim Tindall & Associates, LLC

                    Firm No. 631

24                  16414 San Pedro, Suite 900

                    San Antonio, Texas  78232

25                  (210) 697-3400

---

Ryan Grisard

November 28, 2018
Index: $9..56

## Exhibits

**Grisard, Ryan Ex 01** 7:15,16
28:10 32:7,8 42:12 69:22

**Grisard, Ryan Ex 05** 12:6,7,8

**Grisard, Ryan Ex 06** 13:10,11

**Grisard, Ryan Ex 07** 19:18,19

**Grisard, Ryan Ex 08** 21:9,11

**Grisard, Ryan Ex 09** 23:16,18

**Grisard, Ryan Ex 10** 29:2

**Grisard, Ryan Ex 11** 36:20

**Grisard, Ryan Ex 12** 39:2

**Grisard, Ryan Ex 13** 38:25 45:11

**Grisard, Ryan Ex 14** 48:2,4

**Grisard, Ryan Ex 15** 50:9,11

**Grisard, Ryan Ex 16** 52:22,24
55:4,5,6,9,11

**Grisard, Ryan Ex 17** 54:14,15

**Grisard, Ryan Ex 18** 59:21,23

**Grisard, Ryan Ex 19** 61:23,25

**Grisard, Ryan Ex 20** 65:3,5,20,21

**Grisard, Ryan Ex 21** 65:14 67:7

## $

**$9** 67:14

## (

**(i)** 20:17,19 44:3

## 1

**1** 7:15,16 9:23 12:12 28:10 32:8
42:12 67:10 69:22

**10** 29:2,3,5 32:9 37:24 38:9 60:23
83:21

**100** 16:8

**10:52** 5:3

**11** 29:2,3,11 36:12,20

**119** 45:12

**11:34** 42:3,4

**11:37** 42:4,6

**12** 38:22 39:1,2

**120** 22:14

**123** 62:22

**12:15** 72:16,17

**12:22** 72:17,19

**12:36** 84:17,18

**12:44** 84:18,20

**12:45** 86:10,11

**13** 37:19 38:25 45:10,11

**14** 20:12 37:20 38:2 48:2,4

**146** 22:13

**14th** 67:2

**15** 21:19 42:11 50:9,11

**150** 45:15,22 46:12 47:3

**15th** 22:3

**16** 43:2 51:23 52:22,24 54:18 55:5,6,
9,11 58:23 65:6

**16th** 51:18

**17** 43:6 54:14,15 55:17,21 60:5 65:7

**18** 43:16 59:21,23,24

**19** 61:23,25 65:11

**19th** 45:17

**1st** 39:8 60:1

## 2

**2** 8:16 9:11,12,23 66:4 67:23

**20** 65:3,5,9,16,20,21 70:2,3

**2015** 45:14 48:8

**2016** 10:17 15:16 21:20 22:5 29:6
51:18,23 53:1 54:21 60:1 62:2,4
65:17

**2017** 14:2 17:5 29:6,9 39:7,8 84:23

**2018** 5:2 25:13,15

**20th** 14:2 33:9

**21** 65:12,14,15 67:7 69:23 70:2,3
79:13 84:4

**22** 72:3,20

**2300** 27:19

**23rd** 53:1

**24th** 54:21

**25** 72:6,20

**25th** 45:14

**26** 22:14,16 72:8,20 80:11

**27** 74:18

**277** 66:25 67:4,8,9

**279** 67:9

**27th** 84:23

**28** 5:2 62:2 74:18

## 3

**3** 66:5,15

**30** 62:23 78:24

**30(b)(6)** 7:17

**30(e)(1)** 86:12

**300** 47:1

**30th** 39:7

**31** 79:1

**32** 79:4

**33** 83:13

## 4

**4** 8:21 10:20 20:6,8 66:6

**401(k)** 29:24

**495** 48:5

**496** 48:5

## 5

**5** 12:7,8 13:13 20:6,8 28:10 66:8

**530** 23:20

**56** 22:7,11

Ryan Grisard

**6**

**6** 12:18 13:10,11 20:6,8 28:15

**60** 39:11 67:24

**7**

**7** 19:18,19 28:20 65:17

**7.25** 67:14

**703 390-2300** 27:17

**740** 22:5

**796** 22:3

**7:39** 14:2

**7th** 67:1

**8**

**8** 21:9,11 29:9 68:8

**8th** 48:8

**9**

**9** 23:16,18 28:7 32:8 68:9

**9.15** 68:7

**90s** 79:15,24

**A**

**A-D-E-M-A-R** 18:23

**a.m.** 5:3 14:2 42:4

**abusive** 60:13

**accept** 39:25

**acceptable** 71:25

**accepting** 77:7

**accomplished** 63:20

**accordance** 20:20

**account** 34:18

**accounting** 83:7,8,10

**accrued** 37:6 71:24

**accurate** 29:15

**acknowledge** 80:5,20

**acknowledges** 80:13

**acknowledging** 51:18 81:7,9

**Act** 84:4

**active** 46:16,20 55:10 58:12

**actively** 66:6

**activities** 63:15

**actual** 45:10

**ad** 55:10 58:12,15,18

**add** 52:2 57:19 83:18

**addition** 83:17

**additional** 29:20

**Ademar** 18:23

**admin** 51:9

**administrative** 50:17,21 51:2,15 52:16 53:2,7

**administrator** 17:4,11,13 18:4,6 19:2,7,10,12 70:11

**administrators** 19:1

**advantage** 59:1

**affect** 6:20 51:21 57:12

**affected** 50:2

**afro** 30:20

**agencies** 63:13

**agency** 40:2

**Aging** 61:17

**agree** 19:13

**agreed** 5:5

**agreement** 5:5

**ahead** 16:11 46:14 65:9

**Alan** 10:13,14 12:13 14:10 18:9 26:11,12,24 27:7 30:12,19,24 31:16 48:7 50:12 51:17 52:25 54:10,19 55:16 58:3,13 59:25 60:1 62:1,6 65:18 67:2 69:6,10,16 76:4 79:10 82:25 83:5 84:5

**Alan's** 58:22 60:15

**allegations** 30:18

**Amerigroup** 61:4

**and/or** 8:13,18 28:16,18,20,21 36:13 37:23,25 38:5 43:4

**Angie** 26:11

**annual** 40:4 80:19 81:1

**annually** 80:23 81:16

**answers** 11:18

**Antonio** 16:16 18:5 21:22 22:3 26:20 76:19,20

**anybody's** 49:13

**apparent** 55:25

**applicant** 48:15,20

**applicants** 66:7

**applies** 48:15,20

**apply** 46:2

**approved** 71:12,17

**approximate** 66:4

**approximately** 5:2 23:6,8 45:15

**April** 60:1 62:2,3

**areas** 48:12 66:12

**asks** 49:20

**asserted** 32:8

**assume** 21:22 40:21 63:6 68:3

**assumption** 11:14

**attempts** 77:16 84:25

**attendance** 40:3,10,11,13

**attendant** 40:14,16,17,20 41:1,20 56:7

**attendants** 40:18 41:15 46:2 60:7

**attention** 21:1

**attorney** 72:22

**attorneys** 5:5

**audit** 40:6

**August** 21:19 22:3

**AUS** 21:23

**Austin** 16:20,22,25 17:4,20,21,23 21:23 22:19

**authorization** 62:10,13,21 63:10

**authorizations** 61:9

Ryan Grisard

**authorize** 61:22

**authorized** 62:22

**authorizing** 61:12

**average** 67:16

**aware** 9:7 10:15 11:16 13:3 16:18 20:24 21:5 25:24 29:12 30:18,23 31:1 33:21,24 34:3 38:15 40:12 44:18,23 74:23 75:2 77:15,23 79:16 81:14 85:2,8,9,15,16

**Ayala** 18:3

**B**

**B'VILLE** 21:24

**B-E-H-A-R-R-Y-L-A** 18:19

**back** 9:23 13:13 28:9 32:7 42:5,7 47:18 62:20 67:17 69:22 72:18 73:9 76:10,12 77:8 78:11 79:23 84:19

**background** 28:20 44:23 79:17

**backlog** 45:15

**backlogged** 46:23 47:13

**bad** 54:5

**based** 14:21,24 22:23,24 25:1 31:18 32:1 35:24 54:7 63:4 68:11

**basically** 20:17 64:8 80:9

**basis** 15:19 24:23 32:9 49:19 81:1

**begin** 62:10

**beginning** 60:3 67:10

**begins** 58:22

**behavior** 32:23

**benefits** 28:10 29:20,22 36:13,16, 18 56:23 57:18 64:25

**beware** 78:2

**bill** 41:19,21

**billable** 40:24,25 41:2,7,19 44:4,6 56:9,10

**billing** 63:15

**binds** 7:12

**bit** 9:2 52:7,8 83:16

**black** 14:11 15:7 45:2

**board** 15:20 24:3,11,12,23 25:25

**boards** 48:14,19,24,25

**bottom** 21:20 45:13 67:9

**branch** 15:13,24,25 16:17 17:1,7, 12,14,16,18 19:1,3,7,11,14,16,21,23 20:19 21:6,17 23:3 24:24 25:5,6,18 30:9 38:10,11,12 39:4 40:1 43:5,18 44:13,22,24 45:1,4 48:9 51:4 58:2 59:3 67:15

**branches** 16:14 43:12 46:19

**Braunfels** 15:24 19:21,24 21:23 30:9 35:11 43:19 51:3 66:4 67:15 69:11

**break** 42:8 72:12 75:19

**Brian** 71:5

**briefly** 7:22

**broad** 43:13

**brought** 20:25

**Brownsville** 16:21,23 17:1,20,21 18:2 21:24 22:19

**BSN** 26:12

**bucket** 36:24 37:14 71:16

**bug** 71:10

**bunch** 46:23

**business** 23:2 53:5 56:5 58:18 78:11 83:6

**C**

**C-A-Z-A-R-E-S** 50:13

**cabinet** 47:20 74:8,10

**cabinets** 47:19

**calendar** 27:25

**call** 27:20 63:3,7 77:3,5,10 84:25

**called** 21:19 77:15

**calling** 27:16 47:4

**calls** 27:13

**CAMMACK** 5:12 11:23 12:5,9 13:12 19:20 21:10 23:17 24:20 25:12,23 29:4 33:16 38:22,24 39:3 40:14,16 42:1,7 45:9,12 48:3,18 49:21 50:10 52:15,23 54:16 55:1 59:9,17,19,22 61:16,24 65:4,15,21,23,25 66:18,21,

24 67:5,7 72:13,20 84:11,14,21 86:2,6

**capacity** 7:8 10:23 24:17,20 25:24 48:10 51:11

**capture** 41:16

**care** 40:19 56:7 57:5,11 60:11 61:1, 2,8 62:19

**case** 44:22 63:7 73:5

**cases** 60:12 66:5

**Castellon** 85:19

**caused** 45:22

**causing** 52:12

**Cazares** 50:13,14 52:19 68:14

**cc'ing** 65:18

**census** 15:14,16 16:1,7,14 19:15 20:3,4,17,22 21:2,17 22:8,25 23:12 32:13 35:12 36:1 38:10 39:17,20,21 40:22,23 43:6,24 44:4,8,17 47:24 50:2,5 51:21 53:8,15 54:1,5 57:6,12, 22 59:2 60:19 64:24 69:6,9,11,19

**CFO** 15:19

**chain** 45:20 59:24 62:1

**change** 20:9,12 57:6 80:20,23 81:7, 9 82:18

**Chapter** 84:4

**charge** 15:13 83:9

**chart** 23:24,25 24:1,4,7,10 26:8

**check** 28:21 40:21 79:17

**checked** 20:15

**Christina** 17:24,25 18:3,9 31:8 38:16,18 39:4,13 70:18,19

**chronological** 70:19

**Civil** 84:4

**claims** 8:23 32:9

**clarify** 10:24 59:10 66:15 85:25

**class** 20:13

**clean** 47:20

**clear** 6:14

**cleared** 47:14

**client** 43:11 53:15

Ryan Grisard

**clients** 35:19 56:13 60:2,5,7,11,13, 16,23

**code** 82:16 84:5

**collectively** 25:2

**Colleen** 45:18

**column** 21:18,23

**comfortable** 5:22

**commendable** 15:2,4

**comment** 30:19 31:19

**comments** 30:23 31:9,13,17,25 58:22

**common** 56:16,17

**communicated** 77:24

**communication** 75:1 76:25

**communications** 72:22 74:19 75:9,17

**community** 66:9

**company** 52:17,18 61:4 82:10

**comparable** 67:20 68:6

**comparators** 43:4 44:19 68:7,11

**competitors** 66:6,16,22

**complain** 83:21

**complained** 32:23 35:7 45:5

**complains** 15:6 23:8

**complaint** 13:7 32:24 33:4,5,21 75:13 78:22

**complaints** 8:12,17 9:24 13:6 28:15,24 30:7,11 32:18 43:12

**completed** 86:15

**completing** 39:25

**compliance** 9:14,18 43:8,9 49:10 79:21 84:3

**compliant** 48:12

**comply** 39:23 49:3

**complying** 35:14

**computer** 73:16

**concern** 22:10,16 56:18

**concluded** 86:11

**conclusion** 49:20 78:10

**conducted** 13:6 28:21,23 73:11 79:18

**conference** 7:2

**confident** 54:7

**confidential** 72:22

**conjunction** 18:7 72:6

**consecutive** 76:9

**consideration** 58:2

**constant** 60:9

**contacting** 47:5

**continued** 15:16

**contribute** 29:23

**contributing** 51:19

**conversation** 42:25

**conversations** 31:5 58:4 68:10 74:23 78:14

**coordinator** 50:17,21 51:2,9,15 52:16 53:3

**copy** 11:23

**corporate** 5:4,8 7:9,17 57:24 76:18

**correct** 7:14,25 8:3 9:22 12:15 14:6, 22,23 15:2,8,9 16:2,17,24 17:9 19:15,25 20:21 21:25 22:1 23:4,5,9, 10,13,14 29:9,10 31:21 32:3 33:6 34:21,24 36:5,16,17 37:18 39:5,12, 14,15,17,18 41:9 44:1,7,9,10,12 49:7,14 51:16,25 54:11 56:2 57:5,6 58:2,19 60:24 65:1 66:21,23 68:24 69:15,20 70:8 71:11 74:5,16,21,22 76:1 78:4 81:18,21,22 82:2,4,6,11, 23

**correctly** 14:12 48:21

**correlates** 65:11

**correlation** 44:17

**counseled** 37:22

**count** 51:21,24 52:3

**country** 46:6 47:10

**counts** 43:11 51:20

**couple** 12:17 58:16 60:23 81:2,3,15, 25

**covered** 9:6 82:17,22

**covers** 23:19

**current** 14:9

**customer** 43:11

**cut** 55:15 57:1

---

### D

**d/b/a** 5:9

**DADS** 19:5

**daily** 58:1

**Dallas** 18:12,14,20,21 21:24

**damages** 36:12

**data** 63:17

**date** 5:1 14:16 39:10 79:12

**dates** 58:23

**day** 14:18,19,20 15:5 23:7,8 27:9 30:20,24 31:1,5 34:25 35:6 76:24 77:1,10 78:11 85:5,6

**day-to-day** 63:15 68:21

**days** 39:11 64:18 76:10

**deadline** 45:17 47:13,16

**death** 60:4

**Deaver** 71:5

**December** 15:22 29:6 60:5,15

**decided** 25:2

**decision** 14:14 15:7 23:7 24:15,21 26:3,6,15,22,25 33:18,23,25 34:5 35:6,9 42:13 57:22 70:15,24 71:3,21 74:20 75:18,21

**decision-making** 25:25

**decisions** 23:12

**decline** 15:17

**decrease** 44:16,17

**deduction** 30:4 36:21

**default** 71:17

**Defendant** 11:19 32:8 37:21 38:1 72:5 78:25 79:2,5

**defenses** 32:8

**definition** 48:23

degree 7:6

demographic 64:9

demoted 37:21

dental 36:19,22

department 61:17 83:7,8

deponent 5:25 6:17 86:14

deposed 5:18

deposition 5:3 7:17 86:11,15

describe 83:3

description 16:3,6 19:20 43:21 44:1

descriptions 40:4 43:17,22

designated 7:20

desk 34:4

detail 77:19

detailed 16:6

determination 8:12,17 11:20 13:24 21:5

determine 79:2

determined 13:20 15:22

development 26:10

difference 19:2

differently 15:6

difficulty 52:12

digital 74:8

directly 68:15

director 26:10 73:6

directors 15:20 24:4,11

Disability 61:17

disagree 31:10

discharge 43:11 46:7,15

discharged 37:23 45:16,23 60:2

discharges 60:4

discharging 45:24

disciplinary 10:23 38:6

discipline 8:13 10:2,6 11:2,7,13,20 12:19 13:1 15:5 21:6 43:2 60:19 79:5

disciplined 37:21 38:4 53:25 60:22 69:11,15,19

discovery 11:18 17:6 30:21 70:8

discriminated 9:25 30:15

discrimination 8:18,22 9:3 13:6,7 23:9 28:16 30:8 45:5 49:5,18 75:14 79:21 80:3 81:13,20 82:2,4,6 83:15, 21,23,25

discriminatory 30:12 32:22

discuss 15:20 53:13,19 58:23 59:1 80:4

discussed 42:14,18 57:18,21,24 60:10 74:19,24 75:13 78:6,19,22,23 80:21

discussing 15:22 42:22 48:8

discussion 20:3 26:17 34:17

discussions 27:3,7,10 78:17,21

displayed 49:6

disrespect 6:16

document 12:10,24 20:2,4,5 21:12, 14,15 22:20,24 23:20,23 29:21 30:2 39:20 54:22 74:14

documentation 12:19 62:20 73:5, 10,15 83:14,17

documents 40:6 72:4,7,9,24 73:3, 22 74:3

double 20:7

doubts 56:4

dozens 33:7

dragged 51:1,8,10

dress 82:16

drink 6:18

drop 22:10,14,16,21,25 60:16,19,23

drops 23:11

dual 18:9

due 56:5 57:6 60:4,6,7,8,9

duly 5:10

duplicate 20:5

duties 43:17,22 69:2

duty 68:24

## E

earlier 33:19,20 73:15

early 25:15 79:15,24

EEO 9:14,18

Eileen 18:1 70:10,20

elect 30:3

elected 62:16

electronic 41:6,11,15 43:10

eliminate 25:3,4 26:19

elimination 18:11

email 7:22 13:16,19,21,23 14:1 30:15 33:1,9,10,14 34:2,6,10,11,13, 18,20 35:4,5,9 45:13,20 48:6,7 49:6 50:12 52:25 54:17 55:2 59:24 60:15 62:1,3,25 65:16 73:17,20 75:2 77:4

emails 33:7,17 34:21 35:1 36:8 54:8,10 73:9 74:2

employed 50:20,22 71:4,6 79:13

employee 9:9,10 15:2 20:13 28:11 31:7 35:25 36:25 43:8,9 45:15,22,24 53:4 58:6,8 64:25 68:2 80:4

employee's 83:14

employees 28:17,21 30:14 35:19 37:21 38:3 40:18 44:20 46:20,23 49:18,23 67:25 68:11 77:24 80:10 83:20

employer 49:3

employment 10:9 64:12 70:14,23 78:18

encompassed 37:17

encompasses 37:14

end 17:5 22:5 39:10 81:4

ended 51:7,8

ends 21:20 22:14

enforce 61:7,10

enter 11:25 12:3

entitled 28:11 29:19,23 36:14,15 37:3,6

error 8:4

escalate 11:15

Ryan Grisard

established 20:20

estimate 67:24

evaluation 10:19 62:4

evaluations 8:13 15:1 40:5 43:3
79:6

events 66:10

eventually 83:10

evidence 14:25 36:4,6

EVV 39:24 41:4,6,13 50:1

EVV-RELATED 60:6

exact 13:22 14:16 79:12

EXAMINATION 5:11

exciting 51:20

exhibit 7:15,16 9:11,12 10:20 11:25
12:3,6,8 13:10,11 19:18,19 21:9,11
23:16,18 28:10 29:2,3 32:7 36:20
38:25 39:2 42:12 45:8,11 48:2,4
50:9,11 52:22,24 54:14,15,17 55:4,
6,9,11,20 59:21,23 61:23,25 65:3,5,
14,20,21 66:25 67:4,7 69:22

exhibits 62:3

existence 72:4

exists 34:14

expectation 53:5

expected 59:2

expire 57:4

expressed 50:16

extent 8:5

---

F

---

facilities 57:11 60:11

fact 11:19 14:25 49:17 75:17

facts 37:20

failure 39:22

fall 24:6,10 69:2,6

familiar 12:9 13:16,18 20:14 23:22
29:14 38:16

family 45:19 47:8 56:23 66:5 67:24
68:3

fancy 44:19

faster 61:8,12,20 62:9,13 63:4

February 29:6 60:17

federal 5:6 49:2,4 82:1

feel 5:22 30:15 31:16

felony 7:6

felt 14:9

file 45:25 74:7,8,10,11,13,15

filed 85:13

files 45:15,22

filing 47:19,20

fill 62:17

filled 25:9 51:13

finally 45:10 78:3

financial 15:20 24:23 42:22 44:13

find 34:10

finish 6:2

finished 57:2

firing 78:25

fiscal 20:20

five-minute 72:12

flow 46:22

folder 34:9

follow 63:8 78:7

follow-up 63:7

foregone 78:10

form 62:17 69:24

formal 5:6

forms 64:11

forward 80:1

found 48:11

frame 10:15

Frances 48:7

FRCP 86:12

Freddy 71:2

full 5:15 6:24 47:20

function 68:21 76:22

---

G

---

G-I-R-L-I-N-G 68:8

Garza 10:13,14 12:2,13 18:9,23
24:18 25:11,21 26:11,12,24 30:12,
19 33:15 40:13 41:24 48:7,17 49:19
50:12 51:17 52:6,10,25 54:23 59:7,
15,20,25 61:14,18 62:1 65:18,20,22
66:15,19 67:2,3 69:6 72:11,14 76:5,
24 79:11 82:25 84:5 86:4

gauge 40:22

gave 28:7

gender 75:14 83:25

general 43:14 73:24

gentleman 7:23

Girling 68:8

give 6:12 63:3 65:12 69:8

goal 68:20

Gogo 14:4 29:5 33:5,8

Gonzalez 48:7

good 5:13,14 6:6

gotcha 46:9 82:19

graded 81:4

great 62:7

Gregory 18:1

grievance 85:14

Grisard 5:5,7,13,17,18

grow 15:14 53:5 69:9

growing 16:1 56:5

growth 44:5 58:18

guess 25:10,11 35:15 39:9 44:25
61:11 68:23 82:10

guidance 68:22 69:9

---

H

---

H'VILLE 21:25

hair 31:20

hand 13:9 19:17 20:7 21:10 23:17
29:1 38:21,24 45:7 48:3 50:10 52:23
59:22 61:24 65:9

**handbook** 9:10 80:4,7 82:15

**handed** 34:20

**handing** 54:13

**hands-on** 40:19

**happened** 79:23,24 85:4,6

**harassment** 8:17,22 9:3 28:17
79:22 80:3 81:13,20 83:15

**Harris** 26:11 85:16,17

**Harvey** 26:6,13

**Harveys** 26:9

**head** 28:6 57:13

**health** 29:22 36:18 63:13 68:8

**Healthcare** 61:6

**hear** 52:7 59:20

**Heather** 76:5,13,14

**Hebbronville** 18:17,18,22 21:25

**helping** 53:5 69:8

**Hernandez** 18:3,10 31:8 70:18,20

**hey** 25:17 28:1 54:4 60:15 63:3
64:18 76:3 78:6 81:16

**high** 35:19,20 53:4 56:5,17,21

**higher** 60:8

**highlighted** 53:12

**highlights** 11:24 12:1,4

**hire** 40:21

**hired** 52:15 70:11 79:11,25 80:1,11

**hires** 66:23

**hiring** 78:25

**hold** 54:23 67:3 74:3

**holiday** 37:11,13

**home** 41:17 63:12 68:7,9

**hour** 64:19 67:14,19

**hourly** 20:9,15 46:2 63:23 64:1

**hours** 53:6 56:10,23 62:18,23 81:2,
3,16,19,25

**HR** 14:4 48:10 64:17 76:7,21,22

**HRIS** 64:6,13

**huge** 60:16

**huh-uh** 6:12 52:11

**huh-uhs** 6:8

**human** 64:8

**Huntsville** 18:13,15

---

**I**

**identification** 72:8

**identify** 38:3 73:3

**identity** 37:20

**impact** 46:22

**implementation** 43:10

**implemented** 37:25 58:8

**impressed** 63:19

**impression** 63:18

**improvement** 10:7 38:13,19 39:4

**in-box** 34:8

**in-service** 39:24 41:4,12,13 82:22

**in-services** 80:19,22,24 81:1

**incentive** 58:6,8

**include** 9:13 43:4 82:1

**included** 16:20

**includes** 16:16

**including** 28:17,22 34:22 36:13
48:12 66:10

**incomplete** 40:2

**incorporate** 20:18 44:3

**incorporated** 36:22

**increase** 53:14

**indicating** 54:18 56:12 58:20 59:25
62:6,25 63:2,16 66:1

**individuals** 17:10 73:12

**industry** 35:20,23,24 46:1 56:16,17

**inform** 75:25

**information** 12:14 64:9 72:23 77:7

**informed** 54:11

**initial** 20:10

**initials** 20:14

**input** 42:17 66:10

**inquiries** 53:2

**instance** 22:2 55:7 60:3,5 74:7

**instances** 14:9

**insufficient** 69:1

**insurance** 29:23 61:4

**intent** 7:16

**interest** 50:16

**internal** 75:3

**interpret** 20:17 44:2

**interrogatory** 12:18

**interviews** 58:16

**investigation** 8:11,16 9:24 13:5
28:20 32:18,20

**investigations** 10:1 28:23

**involuntarily** 36:25

**involved** 24:15 26:6 28:18,22 42:13,
14 53:20,21 66:9 70:15,23,24 71:2
72:8,11 73:1,12 74:20

**involvement** 42:17

**involving** 28:17,21

**issues** 17:8 21:1 22:18 35:12,14
36:1 47:23 50:2 60:6

---

**J**

**Jackson** 5:21 12:13 14:25 83:16

**Jackson's** 10:25

**January** 14:2 17:5 33:8 35:1 60:16
84:23

**job** 6:6 16:1,3,6 17:11 19:20 40:4
43:17,18,21,22,25 46:2 68:18

**Jones** 62:23

**judge** 7:3

**July** 39:7

**June** 39:8 65:17 67:1

**jury** 7:3

---

**K**

**K-A-M-L-A** 18:19

Ryan Grisard

**Kamla** 18:19

**Kimberly** 65:17

**kind** 9:1 23:19 35:12 55:15 64:12 65:5 73:25 77:19 82:25 85:4,6

**Kindred** 68:7

**kitchen/break** 48:14,19

**knowing** 31:18,22

**knowledge** 8:1 9:15 33:13,17 35:8 38:7 43:14 45:6 49:18,24 54:9 66:2 69:14,16 71:18 79:7,23,24 80:2

---

**L**

**L-E-A-L** 48:10

**labor** 48:14,18,24,25 49:2 84:5

**lack** 51:14

**Lacy** 17:22,23

**laid** 37:23

**LAN** 55:15

**laws** 49:2,5,17 82:2,4

**lawsuit** 73:10

**lawyers** 44:19

**leader** 76:22

**leads** 44:14

**Leal** 48:10

**learned** 81:5

**leave** 37:16,22 50:24 71:12

**left** 21:18 55:16

**left-hand** 54:19

**legal** 49:20 73:2

**length** 80:25

**Leslie** 24:24 27:5 28:2 65:16 66:1

**level** 49:3 53:4 57:25

**light** 13:21,23

**Linda** 26:6,9,13 27:7

**Linda's** 27:1

**list** 7:21 46:16 47:1,12 49:13 66:2

**listed** 8:11 26:8,10,12 36:20 37:9 46:20 47:7 70:4,10 71:2

**location** 42:23

**locations** 35:21

**log** 27:21 64:17

**logs** 27:12,20

**long** 12:3 15:11

**long-term** 57:11 60:11

**longer** 25:5

**looked** 34:6,8 36:15 39:16

**lost** 68:9,11

**low** 19:15 38:10 39:16,17,21 57:22 69:5

**lowering** 32:13

**Luna** 17:24,25 38:16,19 39:4,13

---

**M**

**made** 9:25 14:15 15:7 20:9,12 21:5 23:8,12 30:8,19,24 31:1,9,12,17,24 32:9 33:18 34:3,5 35:6 75:18,21 83:1 84:25 86:13

**main** 15:14 16:1 27:17 32:4,16 51:4,5

**maintaining** 39:25

**make** 6:7 23:7 25:17 31:19 32:22 49:13,20 52:10 74:4 77:9 78:12

**makes** 31:22

**making** 21:5 26:3 35:9

**manage** 20:19 26:19 63:14 64:9,10

**managed** 61:1,2,8 64:13

**management** 74:20

**manager** 15:13 17:12 19:3,11,21,23 21:6 23:3 25:5,6,18 39:5 40:1 43:18 48:9 58:2 63:8 83:11

**manager's** 16:1 40:6

**managerial** 79:1,3,7

**managers** 17:1,7,14,16,18 19:1,14,16 38:10,11,12 43:5 44:22,24 45:2,5

**March** 29:9 51:18,23 53:1 54:21

**mark** 39:1 65:9

**marked** 10:19 12:8 13:9,11 19:19 21:9,11 23:16,18 29:3 38:25 39:2 45:7,11 48:2,4 50:9,11 52:22,24

54:13,15 59:21,23 61:23,25 65:3,4,14

**market** 68:18

**marketer** 68:24

**marketing** 50:4,18,24 51:4,19,24 52:3 53:6,14,19 54:4 58:24 65:19

**marking** 12:6

**master's** 83:5

**material** 81:5,17

**matter** 28:18,22

**matters** 11:25

**MBA** 83:5

**Mccleary** 70:10,20

**Mcdonald's** 66:3 67:11,14,21

**MCO** 62:15,19

**MCOS** 60:25 61:12 62:8

**meant** 73:24

**measure** 44:8

**measures** 38:6

**Med** 5:9 7:12,24 11:2,9 12:23 20:12 37:1 39:23 61:7 62:16,21 83:1

**medical** 5:4,8 36:21 50:22,25 74:12 79:13

**medication** 6:20

**meet** 15:19 58:23 59:1 75:9

**meeting** 27:25 28:1 42:19 53:19,20, 21 75:10 85:8

**meetings** 59:11 75:12,16

**member** 68:3

**members** 47:8 56:23 66:5 67:25

**memorialized** 85:7

**memory** 6:21 69:18

**mention** 20:16

**Merc** 21:24

**Mercedes** 16:17 17:25 21:24 22:13 39:13

**mess** 6:14

**messages** 75:5,8

**messaging** 75:3

method 45:24

methods 72:7

mind 13:12

minimum 49:1

minute 16:12 33:19

minutes 33:13 84:15

Monday 78:5

month 21:19 42:23

monthly 15:19 24:23

months 23:13 25:2 60:23

morning 5:13,14 71:22 72:1

move 53:7 55:8,14 61:8,12,20 62:9 63:3 64:10

moved 57:11 60:12

moving 53:2

MPI 62:22

MTI 55:8,15

multiple 48:12 81:23

## N

N-G-U-Y-E-N 73:8

N-H-A-N 73:8

named 7:23

names 47:1

narrow 44:24

national 83:23

nature 10:8 35:23,24

NB 21:23

necessarily 46:7 69:17

needed 35:15

Nguyen 73:5

Nhan 73:5,14

niche 63:12

Nick 24:9,24 25:24 27:5 28:1 34:3 42:20 73:15 74:2

nods 57:13

nonexpert 49:20

Norma 48:10

Nos 29:3

note 7:21

notes 84:12

notice 7:16 34:20 60:14 78:16 84:22

notified 73:8 76:2,3,4

notify 85:1

November 5:2 21:20 22:5

number 7:15,16 8:16,21 9:11,12 10:20 12:7,12,18 13:10 19:5,6,8,18 21:11 23:18,19 27:17 28:7,10,15,20 29:2,11 32:7,8 36:12,20 37:19,20 38:2,25 40:24,25 41:2 42:11,12 43:2,6,16 44:6 48:4 50:5,11 52:24 54:14,18 55:5 59:23,24 61:25 62:17, 18,22 65:5,16 66:4,5,15,25 67:10,23 69:23 72:3 78:24 79:1,4 83:13

numbers 22:8 27:15,18 43:6,7,11 44:12 62:7 63:17,18,20

## O

oath 42:9

object 49:19

objectives 15:14 59:2

occasions 76:8

October 45:16 48:8

offer 66:3

offering 66:19,22 67:11

office 16:16,20,21 17:22 18:13,14, 17,20,22 19:21,24 22:3 35:11,16 39:13,16,21 40:4 46:23 47:24 48:11 49:9 51:1,9 57:24 69:5,12 76:18,19, 20 77:18,21

offices 17:15,17,19 19:7 22:19,25 76:21

official 24:12

offset 19:8

onboarding 64:10

operating 63:14

operation 15:21 26:20

operations 20:19 40:6

opinion 47:22

opposed 38:14

oral 5:3 7:17

order 70:19

org 23:24,25

organization 61:1,3,8

organizational 24:1

orientation 80:7,15

origin 83:23

original 22:8

Outlook 28:4 34:9,18 73:16,19

outstanding 62:8 63:18

oversight 68:21

overtime 64:19

## P

p.m. 72:17 84:18 86:11

pages 12:17

paid 60:7 67:15 68:7,8,9

paper 47:19 62:21

paperwork 61:21 62:15 63:1,5,9 85:11

paragraph 14:8 48:14 53:9,16 55:7, 9,13,16,20 58:11 60:3

paragraphs 55:6

parameters 8:6 20:20 35:15

parent 19:5,6,8,12

part 9:10 12:25 15:25 16:3 26:17 42:25 56:18,25 58:17 71:16,20 73:2 83:2 85:24

party 86:14

pass 60:5 86:2

passed 47:9

passes 57:7

past 14:9 25:2 62:2 83:21

patient 41:22 43:7 44:11,14 46:21 47:5,8 62:15

patient's 41:16

**patients** 40:20,24,25 41:2,8,19
44:5,6 50:6 56:9,10 57:3,11

**pay** 28:11 29:5,12,13,16 34:22
36:13,15 37:11,12,13,16 41:20 53:4
56:19 57:19 60:9 64:11 66:4 68:12

**payouts** 37:3,6

**payroll** 30:4

**pays** 67:14

**PCA** 56:6

**PCAS** 56:5,13 57:15 60:13 67:15,24

**Pembrook** 24:7 42:16 65:16

**people** 18:25 42:14 44:25 46:12
71:8 75:24

**percent** 16:8 22:7 60:23 67:24

**performance** 10:7,19 14:21 15:1,4,
12 17:8 19:15 20:23 36:2 38:13,19
39:4,17 42:22 43:3 47:24 62:4 79:6

**period** 14:17,18 19:14 22:21,22 46:5

**periods** 23:11

**perjure** 7:6

**permanently** 60:10

**person** 27:3,5 50:18 51:12 62:19
76:7 85:4

**Personal** 56:7

**personnel** 40:3 74:7,11,13 79:1,4,7

**persons** 42:12 72:8

**phone** 27:4,8,12,15,22,24 75:2 77:3,
5 84:25

**phrase** 6:10

**pick** 54:4

**PIP** 39:9,11,19,22 40:8

**place** 9:8,24 27:3,10 58:7 61:21
62:14 64:14,15

**Plaintiff** 8:14,19 9:25 36:12,13 38:1
42:13 43:18 70:11

**Plaintiff's** 8:23 10:19 12:6 13:10
19:17 21:11 23:18 28:10,23 29:1
33:8 38:25 42:12 43:4 45:8 48:4
50:11 52:24 54:14 59:23 61:25 65:5
70:5 72:4,9

**plan** 29:24 38:19 39:4 58:6 62:19

**planned** 66:11

**plans** 10:7 29:20 38:13 45:19

**platform** 63:14 64:6

**point** 44:2 46:10 70:13,22 75:24
80:24

**pointed** 80:8

**policies** 9:12,13,17 11:7 39:23
78:24 79:2,4 80:6,8,16,20,21 82:6,
12,13,14 83:13

**policy** 8:22 9:4,5,21 11:2,9,13 13:1
26:10 37:24 41:11 79:19,22 80:5,12
81:7,8,10,21 82:17,18,22 85:3

**poor** 17:8 19:15

**portion** 59:18

**position** 14:11 25:3,5,6,8,18 26:19
49:22 50:18 51:13 53:3

**positions** 44:20

**post** 33:9 34:21 49:23 62:3

**posted** 49:14,17

**posters** 48:14

**posting** 48:25 49:4

**posture** 48:17,18,25

**potential** 57:21

**potentially** 47:7

**preamble** 5:6

**preapproved** 71:14,18

**preferred** 67:25 68:2

**present** 24:22 28:18,22 32:10 71:10
73:20

**president** 24:13

**press** 6:13

**pretty** 31:16,18 54:7 56:16

**previous** 5:5 54:17 78:9

**primarily** 68:20

**prior** 8:13 10:2,3 11:20 12:19 15:5
28:15 30:7,11 32:19 33:8,13,17 35:9
36:2 76:8

**prioritize** 40:1

**priority** 49:13

**privy** 31:4 59:11 68:10

**problems** 15:12 16:14 20:23 35:18
57:14

**procedure** 37:24

**procedures** 39:23 78:25 79:2,4
80:7 83:14

**process** 18:11 61:21 62:14 72:25
73:25 80:8 83:17

**produced** 29:13 74:15

**product** 63:12 64:8

**production** 72:5,10 73:1,25

**profitable** 82:11

**program** 26:10 58:8

**progressive** 11:1,6,13 13:1

**promoted** 83:7,9,11

**promotion** 79:5

**promotions** 82:25 83:2

**prompted** 34:12,17

**proper** 45:24

**properly** 45:16,23 49:6

**Proposals** 65:19

**protested** 85:13

**provide** 6:3,7,23

**provided** 14:24 67:2 80:12 84:22
85:10

**provider** 19:4,5,6,8

**providers** 40:18

**providing** 11:11,18 12:14 57:4

**prudent** 32:22 35:25

**PTO** 37:7,13,17 64:20 71:16,24
82:15

**pursuant** 86:12

**put** 39:22 47:15 74:3

---

**Q**

**qualifications** 79:3

**quarter** 67:19,20

**query** 46:11

**question** 6:2,10,17 12:21 16:13
54:25 59:16 67:10 73:23

**questions** 8:5 12:15 30:22 55:24 72:21 74:18 85:21

**quick** 63:2

**quit** 30:16

## R

**race** 23:8 32:18 35:7 43:4 44:25 45:5 75:13 78:22 83:21

**racial** 44:23

**Rae** 50:13,14,16 51:18 52:19 53:1,2, 3,22 60:17 68:14,23 69:1,2,10

**Rae's** 66:10 68:20

**rapid** 15:17

**rate** 15:17 56:5,18 57:19 67:21 68:12

**rates** 43:7 44:12 66:20 68:6

**read** 14:11 45:21 48:20 59:18 80:6 81:9

**reason** 6:23 31:9 32:4,14,16 40:7 51:11 75:6

**reasons** 54:1 56:21 57:22 60:1

**rebuttal** 55:23

**recall** 9:24 10:2,4 21:3 25:16 26:21 27:9 34:1,3 35:13,17,18 38:20 52:4, 20 58:10 69:21 77:3,12 78:13,17,20 79:10 82:24 85:10,12,13

**receive** 33:10 40:2 76:25 79:21

**received** 10:18 11:19 13:8 28:11 32:24,25 33:4,5 34:11,21 35:2 36:13 50:6 80:2 84:3

**receiving** 29:16

**recess** 42:4 72:17 84:18

**recognition** 58:6

**recommends** 58:5

**record** 5:2,16 6:14 27:22,23 41:24 42:2,6 72:15,19 84:16,20 86:9

**recording** 40:11

**records** 39:25 40:3 74:12

**recruit** 68:18,24

**recruiting** 65:18 66:7

**reducing** 53:6

**reference** 20:12 40:17,21 41:1 50:13

**references** 7:21,23,24 40:3,4,10,16, 21

**referral** 43:10 51:19,21,24 52:3 63:17

**referrals** 62:7 63:17

**referring** 62:12 73:23

**reflected** 9:12 22:20 29:21,25

**reflection** 29:15 50:5

**regard** 38:1 40:3

**regional** 83:11

**regular** 66:9

**regulation** 37:25

**reinstated** 25:9

**related** 8:12,17,23 9:14,17 20:4 26:21 27:12 30:11 36:9 41:11 42:17 44:11 47:23 49:5 53:2 54:1 62:7 64:12,23 69:11,19,24 70:3 72:23 73:5,10 74:18 75:9,18 78:14 79:21 80:18 81:13 82:1,6,12

**release** 69:24

**reliable** 57:15

**relocation** 60:8

**remains** 82:11

**remember** 13:22 14:16 34:15,16 75:16

**render** 62:24

**rendered** 61:13

**rendering** 61:9 62:10

**Renee** 13:20 14:1 35:10 45:14 48:9 50:12 52:25 54:10,20 55:4,20 58:3 59:24,25 60:17 62:1,6 63:19 65:17 68:22 69:16

**Renee's** 53:1

**repetitive** 32:13

**rephrase** 81:24

**replaced** 70:20

**report** 25:17 83:14

**reporting** 18:9

**representation** 32:1

**representative** 5:4,8 7:9,18 9:3 14:5

**reprimanded** 37:22

**request** 64:20 73:4 86:12

**requested** 29:5 59:18 72:7,9

**requesting** 51:12 62:18 66:10

**requests** 72:4,10 73:1,25

**required** 49:4,23

**requirement** 49:17

**requirements** 43:8,9,18

**Reserve** 86:4

**resign** 30:16

**resigned** 53:24

**resource** 64:8

**respected** 14:10

**respond** 58:17 72:25

**responded** 35:2 70:8

**responding** 53:1 55:4

**responds** 34:22

**response** 12:12 24:18 52:13 54:20 55:23 56:1 58:15,25 59:3,15 60:15 67:2 77:6

**responses** 6:7 17:6 54:18

**responsible** 12:14 43:23 69:8

**result** 85:14

**results** 15:20,22 24:23 25:1 44:13

**retaliation** 8:18,22 9:4,5 49:5,18 83:15

**retention** 43:7,9 44:4,5,12

**retirement** 29:20

**revenue** 53:8,15 59:2

**revenue's** 54:5

**review** 20:2 84:11 86:13

**reviewed** 26:3

**reviews** 20:5 62:20

**reword** 30:6

**Rhodes** 65:17

**Richard** 17:22,23

**Richard's** 74:7

**Richardson** 9:9 13:25 14:2 15:23 18:7,8 19:23 23:4,20 24:15 29:4,16 32:14 45:12,14 48:5,9 50:12 52:25 53:13 54:17 57:23 59:24 62:2 63:19 65:17 67:8,9 68:15 69:23 71:8,9 76:11 84:22

**Richardson's** 30:19 31:20 68:18 69:5

**Rick** 7:22 8:8

**Rights** 84:4

**RN** 26:12

**role** 18:9 26:15,24 39:25 50:18,24 51:4,5,9,19 53:7 58:17 68:20 76:21

**roles** 48:9 51:2

**room** 7:2 48:15,19

**rule** 37:24

**rules** 5:21

**run** 46:11

**Ryan** 5:4,7,17

---

**S**

**S-I-E-G-M-U-N-D** 76:16

**SA** 21:22

**salaried** 20:13

**salary** 20:9 63:23 64:1,2,3,4

**sales** 44:14,16

**SAM** 63:11

**San** 16:16 18:5 21:22 22:3 26:20 76:19,20

**Sarah** 14:4 29:5 33:5,8 34:10,22 35:2

**Sarah's** 34:4 73:16 74:2

**sat** 34:4 73:15

**scheduled** 58:16

**scheduling** 63:15

**scheduling/billing** 63:13

**school** 7:24 8:2

**scratched** 20:14

**search** 72:7,9,24 73:11,13,14 74:4

**searched** 73:16

**secondary** 45:23 48:6

**section** 38:2 53:12

**sends** 62:20

**sentence** 14:8 48:13 60:17

**separate** 9:5,21 17:12 27:21 30:2 37:11,13 74:12

**separated** 36:25 52:16,18 53:23

**separation** 78:18

**September** 45:13

**serve** 76:21

**served** 25:24

**server** 73:9

**services** 61:9,12,17,22 62:11,18,23

**shakes** 28:6

**she'd** 66:1

**she'll** 78:8

**Shelton** 45:18

**show** 11:22 16:10 46:16 49:1 76:24 77:18

**shown** 78:9 81:5

**shows** 49:8

**sic** 20:13 24:10 66:25

**sick** 37:14,16 72:1

**side** 28:6 54:19 64:17

**Siegmund** 76:5,13,14,17

**sign** 81:16

**signature** 81:8

**signed** 69:23

**similar** 21:13,15 27:1 44:20

**simply** 38:4

**sit** 9:20 10:5

**situation** 14:9

**skipped** 42:16

**skipping** 8:21

**smoking** 82:16

**snatch** 13:12

**sort** 18:8 26:19 63:14 71:16

**sought** 36:12

**South** 40:6

**space** 47:21

**speak** 28:25 36:24 37:15 52:7

**specific** 20:16 39:23 40:2 51:11 54:9 55:6 73:19,22 80:21 85:10

**specifically** 16:5 19:22 40:12 61:2 76:3 81:19

**specifics** 13:22 34:15,17

**spelled** 76:15

**spend** 34:25

**staff** 40:4

**staffed** 60:10 66:5

**stands** 41:6

**start** 67:6

**started** 79:14,15 83:6

**starting** 11:12 66:3

**starts** 21:19 22:3,13 55:7,9 58:12 67:8

**state** 5:15 12:3 43:8,9 49:2,4 76:23 82:4

**statement** 17:10

**statements** 31:1

**status** 63:9

**step** 11:6,12 63:7

**steps** 52:2

**sticker** 23:19 48:5

**stomach** 71:10

**stored** 74:9

**strategy** 53:14,19 58:24

**stringent** 47:13,16

**stub** 34:22 36:15

**stubs** 29:5,12,13 64:11

**stuff** 64:25

**subject** 65:18

**submit** 61:21 62:14

successful 35:16

suit 32:10

Superior 61:4

supervisors 28:18,22 30:8 70:5,7, 12 74:19

supervisory 79:1,3,6

supported 14:10

supposed 16:7 51:5,6

suspended 37:22 38:5

switched 63:22

sworn 5:10

system 41:5,15 46:15 50:1 63:11,14 64:13

**T**

T-D-A-D-S 61:16 62:9

T-Z-I-R-I-M-I 24:10

tagged 11:24

taking 9:24

talk 8:8 39:20 71:8

talked 7:22 9:2 36:16

talking 6:3 7:3

tax 64:10

TDADS 61:12,14,15 62:8,15,20 63:3

team 5:4,8,9 7:13,25 11:2 12:23 20:12 37:1 39:23 50:23,25 61:7 62:16,21 69:3,4 73:2 79:13 83:1

Team's 11:9

terminate 13:24 14:14 15:7 21:6 23:7,12 24:15,21 25:18 26:3,6,16,25 33:18,23 35:6,9 42:13 43:1 46:14 57:23 70:16,25 71:3,21 74:20 75:6, 18,21 76:11 77:25 85:8

terminated 13:21 17:1,3,4,7 19:14 23:4,6 30:20 32:15 33:22 37:23 38:10 46:8 53:23 75:25 78:4

terminating 33:13

termination 8:12,18 10:3 26:22 28:16 29:9 31:2 32:19 34:5,21 36:2 38:6,14 42:18 69:25 71:9 75:19 76:9 77:9 78:12,16,18 84:23 85:1,11,14

terminations 17:19 43:3

test 81:3,6,7,11,12

testified 5:10 59:11 83:16

testify 8:14,19,23 28:13

testimony 6:24 7:2,12 10:25 14:24 33:16,19,20 34:19 35:4,8 42:8 83:18 85:24

Texas 7:5 40:6 43:5,8,12 61:16 76:7,19,20,21,23 83:6,10 84:5

text 75:5,8

thing 37:8,9 67:6 68:4

things 57:21 66:1,2

Tia 76:8

time 9:9 10:15 14:17,18 15:23 17:5 19:14 22:20,21 23:11 25:3,7 29:17 33:21 37:4 41:16,18 46:17 53:13 60:18 64:25 68:7 71:4,6 75:9 76:7, 10 82:17 86:4,7

timekeeping 82:8,15

times 78:10

tired 56:13

title 17:11,12 24:12 84:4

today 6:18 7:8,12 8:14,19,24 9:6,20 10:5 25:7 28:2,13 34:19 64:14,15 75:13 76:3 78:19,22,23 79:25 83:12 85:22

Today's 5:1

told 31:24 54:3,8 85:3

tomorrow 77:8

top 21:22 66:3,6,16,22

topic 8:10 9:23 28:10 32:8 37:19 42:11 72:3

topics 7:20 8:6 36:10 43:14 70:4 79:8 80:21,22

track 64:23 66:7

track- 64:17

tracking 41:5 63:17

training 40:2 41:14 79:5,20 80:2,12 84:3,7

transcript 86:13

transfer 56:14

transferred 60:6,8

transpired 77:22

trash 34:8

treated 15:6

trial 86:5

truthful 6:24

turn 12:17 58:21 66:24

turnover 35:19,20 43:7 44:12 56:5, 17,22 57:19 64:24

two-hour 82:17

two-month-long 39:11

type 85:14

Tzirimis 34:4

**U**

uh-huh 6:12 11:8 12:16 14:3 22:4,6, 9,15 25:19 28:12 37:2 44:21 47:2 52:11 59:4 67:12,18 68:25 75:23 80:14 82:3

uh-huhs 6:8

uncommon 46:19

underneath 55:19

understand 7:1,5,9 42:8 46:25 54:24 61:15 80:6 81:9

understanding 9:4,16 10:22 11:1, 4,17 12:20 14:4 15:10,25 16:22 19:22 23:1,23 24:14 26:5 30:5 32:17 33:20 38:18 40:7 45:20 48:24 49:16, 22 53:8,16 54:16,21 59:3 63:25 66:12 71:7 72:25 74:1 84:22,24

understood 85:21

United 61:6

unstaffed 56:12

unsure 9:19

unwillingness 39:24 40:1

updates 82:11,13

utilized 37:25

**V**

vacation 37:4,11,14,16 46:6

**Valerie** 85:19

**valued** 53:4

**verbal** 6:7 10:6,10,11,15 11:7,11
12:23,25

**verification** 40:5 41:6,11 43:10

**Vice** 24:13

**video** 5:3

**view** 48:15 49:24

**viewing** 48:19

**VII** 84:4

**violation** 41:10

**vision** 36:19,22

**visit** 41:6,7,11 43:10

**visiting** 56:9

**voluntarily** 53:22,24

**voluntary** 29:22

**VP** 25:25 49:22

---

**W**

**wage** 49:1

**wait** 6:2 33:19

**waiting** 56:13

**walk** 77:21

**wanted** 9:1 47:20

**warning** 11:7 12:24 38:5

**warnings** 10:6,10,12,15 11:12
12:25 38:13

**Waters** 71:2

**week** 62:23 76:10 78:4,7

**weight** 7:2

**Wilkins** 7:24,25

**William** 7:23,25

**woke** 72:1

**woman** 14:11 15:7

**word** 20:16,17 44:19 52:13

**worded** 55:25

**work** 46:3,8 68:14

**worked** 46:12,17

**working** 18:6

**workplace** 32:23 82:16

**Workuments** 64:5,15

**writing** 5:25 54:20

**written** 11:15 27:21 55:16,20

**wrongful** 28:16

**wrote** 54:18

---

**Y**

**year** 25:12 46:10,12 80:22 82:1

**years** 37:24 38:9 79:13,14 80:11
83:9,21

**you-all** 18:13 64:14 74:1,3

---

**Z**

**Z-I-N-I-N-A** 85:16

**Zinina** 85:17

# Exhibit D

In the Matter Of:

*RENEE RICHARDSON*

*vs*

*THE MEDICAL TEAM, INC., ET AL.*

---

*SARAH GOGO*

*February 06, 2019*

epiq
court reporting solutions

SARAH GOGO - 02/06/2019

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF TEXAS

3                   San Antonio Division

4

5      - - - - - - - - - - - - x

6      RENEE RICHARDSON,            :

7              Plaintiff,           :

8        vs.                        :   CA No.

9      THE MEDICAL TEAM, INC.,      :  5:18-CV-151-FB

10     d/b/a THE MED TEAM,          :

11     INC.,                        :

12             Defendant.           :

13     - - - - - - - - - - - - x

14            VIDEOTAPED DEPOSITION OF SARAH GOGO

15                   McLean, Virginia

16                   February 6, 2019

17                      3:15 p.m.

18

19

20

21

22

23     Job No.:  NY-207193

24     Pages: 1 - 21

25     Reporter:  Sandria Cox

```
1              Videotaped Deposition of Sarah Gogo, a
2      witness, held at the offices of:
3              REGUS
4              2010 Corporate Ridge
5              Suite 700
6              McLean, Virginia  22102
7
8
9
10
11              Pursuant to notice and/or agreement,
12      before Sandria L. Cox, Court Reporter and
13      Notary Public in and for the Commonwealth of
14      Virginia.
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              A-P-P-E-A-R-A-N-C-E-S

 2

 3       ON BEHALF OF THE PLAINTIFF:

 4            (by video conference)

 5       THOMAS N. CAMMACK, III, ESQUIRE

 6       Poncio Law Offices, PC

 7       5410 Fredericksburg Road, Suite 109

 8       San Antonio, Texas   78229

 9       210-441-7058

10

11

12

13       ON BEHALF OF THE DEFENDANT:

14       JUDY BENNETT GARNER, ESQUIRE

15       Jackson Walker, LLP

16       2323 Ross Avenue, Suite 600

17       Dallas, Texas   75201

18       214-953-6167

19       jgarner@jw.com

20

21

22  Also Present:

23  Akim Graham, Video Technician

24  Nick Tzirimis, Vice President, The Med Team

25
```

```
 1                 C-O-N-T-E-N-T-S

 2

 3   EXAMINATION OF SARAH GOGO              PAGE:

 4        By Ms. Garner                       6

 5        By Mr. Cammack                     18

 6

 7

 8

 9

10                E-X-H-I-B-I-T-S

11                 (Attached)

12

13   GOGO DEPOSITION                    MARKED:

14   Exhibit 1 (Richardson/Gogo Email)    15

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                P-R-O-C-E-E-D-I-N-G-S
 2                VIDEO TECHNICIAN:   Here begins the
 3      deposition of Sarah Gogo in the matter of
 4      Renee Richardson versus The Medical Team,
 5      Incorporated, doing business as The Med Team,
 6      Incorporated, in the United States District
 7      Court for the Western  District of Texas, San
 8      Antonio Division, Civil Action No.
 9      5:18-CV-151-FB.
10                Today's date is February 6, 2019.
11      The time on the video monitor is 3:21 p.m.
12                The video operator today is Akim
13      Graham.
14                This video deposition is taking
15      place at 2010 Corporate Ridge in McLean,
16      Virginia.
17                Counsel, please voice-identify
18      yourselves and state whom you represent.
19                MS. GARNER:   Judy Bennett Garner for
20      The Med Team.
21                MR. CAMMACK:   Thomas Cammack for
22      Renee Richardson.
23                VIDEO TECHNICIAN:   The court
24      reporter today is Sandy Cox of Epiq.   Would
25      the reporter please swear in the witness.
```

```
 1               (Witness sworn.)
 2          Whereupon,
 3               SARAH GOGO,
 4     a witness, was called for examination by
 5     counsel for defendant, and, after having been
 6     first duly sworn, was examined and testified
 7     as follows:
 8               EXAMINATION BY COUNSEL FOR DEFENDANT
 9               BY MS. GARNER:
10          Q.   Ms. Gogo, thank you so much for
11     being here today.  We hope not to keep you
12     that long.
13               Renee Richardson has filed a lawsuit
14     against The Med Team, Incorporated, and I
15     represent The Med Team.
16               Have you ever been deposed before?
17          A.   Deposed?
18          Q.   Deposed.
19          A    Oh.  No.
20          Q.   Okay.  So the court reporter just
21     swore you in.  Do you understand that you're
22     testimony here today is under oath under
23     penalty of perjury?
24          A    Yes.
25          Q.   Do you undersand that you are
```

```
 1    testifying today as if you were in a courtroom
 2    with a jury?
 3         A    Yes.
 4         Q.   And just before we get started, I
 5    would just like to set a few groundrules that
 6    just makes the deposition proceed a little bit
 7    easier.
 8              The first is I'm going to ask you a
 9    series of questions and hopefully you will
10    provide answers to those questions.
11              I just ask that you allow me to
12    finish my question before you answer.  Will
13    you agree to do that?
14         A.   Yes.
15         Q.   Also, the court reporter is here,
16    taking down everything that's said during the
17    deposition.  So that we have a clean record, I
18    just ask that you provide verbal responses for
19    all of your answers.  Will you agree to do
20    that?
21         A    Yes.
22         Q.   If you don't understand a question,
23    will you agree that you will let me know and
24    ask me to ask the question again or provide
25    clarity to the question?
```

1       A.    Yes.

2       Q.    Now, I don't expect that this

3    deposition will take very long.  However, if

4    at any time you need a break, that's fine.  I

5    just ask that if a question is on the floor,

6    if I've asked a question, that you answer that

7    question before we take a break.  Will you

8    agree to do that?

9       A    Yes.

10      Q.    Perfect.  Are you on any medications

11   that would prohibit you from testifying

12   truthfully and honestly today?

13      A    No.

14      Q.    Is there any other reason that you

15   would not be able to testify truthfully and

16   honestly today?

17      A    No.

18      Q.    Will you let me know anytime during

19   this deposition if anything happens that would

20   prohibit you from testifying truthfully and

21   honestly today?

22      A    Yes.

23      Q.    Just a couple background questions.

24   What is your current address?

25      A.    12865 Kitchen House Way, Germantown,

```
 1    Maryland  20874.
 2         Q.    And how long have you lived there?
 3         A.    A year.
 4         Q.    When did you begin working for The
 5    Med Team?
 6         A.    September 2016.
 7         Q.    Okay.  And what was your job title
 8    at the time of hire?
 9         A.    Director of HR.
10         Q.    And "HR" meaning Human Resources?
11         A     Yes.
12         Q.    Did your job title change at all
13    during your tenure with The Med Team?
14         A     No.
15         Q.    And what were some of your
16    responsibilities as the Director of Human
17    Resources?
18         A.    Oversight of the HR function,
19    training of HR staff, implementation of any
20    executive policies, participating with
21    leadership teams, some low-level employee
22    relations, benefit administration.  All HR
23    functions.
24         Q.    Did you ever receive any complaints
25    from employees while you were the Director of
```

```
 1    Human Resources?
 2         A.    No.
 3         Q.    No?
 4         A.    Unh-unh.
 5         Q.    What was the process, I guess?  If
 6    you had received complaints from someone, an
 7    employee, what would have been your process to
 8    deal with that complaint?
 9         A.    I would notify the leadership,
10    executive leadership, Leslie and Ryan, and
11    also copy Nick in, and then recommend sending
12    it out to their attorney if it warranted it.
13         Q.    Do you currently work for The Med
14    Team?
15         A.    I do not.
16         Q.    And when was your last day of
17    employment with The Med Team?
18         A.    April 13, 2018.
19         Q.    Okay.  And are you currently
20    employed?
21         A.    And who is your current employer?
22         A.    I'm self-employed.
23         Q.    Self-employed?
24         A.    Uh-huh.
25         Q.    When you worked for The Med Team,
```

```
 1    did you work out of the Reston, Virginia

 2    office?

 3         A.    That was my home base.

 4         Q.    That was your home base.  Okay.  But

 5    you traveled some in your role as the Director

 6    of Human Resources?

 7         A     Yes.

 8         Q.    Did you know the plaintiff Renee

 9    Richardson before you began working for The

10    Med Team?

11         A     No.

12         Q.    Okay.  But you met her as a result

13    of your working for The Med Team?

14         A     Yes.

15         Q.    And do you recall when you met her?

16         A.    December.

17         Q.    December of 20 --

18         A.    -- 17.

19         Q.    So you met Renee in December of

20    2017?

21         A.    Yes.

22               Oh, no.  I met her -- .  I started

23    in 2016 with The Med Team, so I met her

24    December 2016.

25         Q.    '16.  And did you interact with her
```

```
 1    frequently while you were employed by The Med

 2    Team?

 3         A.    No.

 4         Q.    And when you met her, did you first

 5    meet her face-to-face or was it over the

 6    e-mail or over the phone?

 7         A.    It was face-to-face.

 8         Q.    Okay.  Tell me about that

 9    face-to-face meeting.  Was it a meeting

10    actually?

11         A.    It was on a trip to Texas.  It was

12    my initial training.  I visited San Antonio,

13    Austin, and then the office where Renee

14    worked.  So it was just a general go and see

15    the workings of Med Team and to meet some of

16    the staff and have them get to know me as

17    well.

18         Q.    Okay.  Did you meet with Ms.

19    Richardson one-on-one during that time?

20         A.    I did.

21         Q.    And tell me about your conversation

22    the one-on-one meeting with her.

23         A.    It was basic.  We talked about her

24    background, what it was like for her to work

25    in the office; any things that she thought HR
```

```
 1    could be doing better for her and her team,
 2    training needs.
 3        Q.   During that one-on-one meeting that
 4    occurred I guess in December of 2016 -- is
 5    that right?
 6        A.   Uh-huh.
 7        Q.   -- during that meeting did Ms.
 8    Richardson make any complaints to you of race
 9    discrimination?
10        A.   No.
11        Q.   During that meeting did Ms.
12    Richardson make any complaints to you of
13    harassment or a hostile work environment?
14        A.   No.
15        Q.   During that meeting did Ms.
16    Richardson ever tell you that she felt that
17    she was being treated unfairly because of her
18    race?
19        A.   No.
20        Q.   If Ms. Richardson had told you that
21    she felt that she was being treated unfairly
22    because of her race or would suffer from
23    discrimination or harassment, would you have
24    followed the complaint procedure we discussed
25    earlier?
```

```
 1        A     Yes.

 2        Q.    Outside of that meeting --.

 3              Was that your only face-to-face

 4     meeting with Ms. Richardson?

 5        A.    Yes.

 6        Q.    So December 2016 was the only time

 7     you met with her face-to-face?

 8        A.    Yes.

 9        Q.    Did you have other communications

10     with her via phone and e-mail after that

11     meeting?

12        A.    No.

13        Q.    No.   Okay.   So did Ms. Richardson

14     ever call you or e-mail you with questions

15     about anything after that meeting?

16        A.    She claims to have e-mailed me but I

17     didn't receive an e-mail.

18        Q.    We'll talk about that in one second.

19              Outside of the meeting that you had

20     with her in December of 2016, during any other

21     time that you were employed by The Med Team

22     did Ms. Richardson make any complaints to you

23     of race discrimination?

24        A     No.

25        Q.    Outside of your one-on-one meeting
```

```
 1    with her in December 2016, did Ms. Richardson
 2    make any complaints to you of harassment or
 3    hostile work environment?
 4         A.    No.
 5               (The Richardson/Gogo e-mail
 6               dated 1/20/17 was marked
 7               Gogo Exhibit 1 for
 8               identification.)
 9               BY MS. GARNER:
10         Q.    I'm going to hand you what I have
11    marked as Exhibit 1 there.  There you go.
12               MS. GARNER:  Thomas, I sent you the
13    copy of the exhibit.  E-mailed it to you.
14               MR. CAMMACK:  I received it.
15               MS. GARNER:  Okay.  Perfect.
16               MR. CAMMACK:  I received it.
17               MS. GARNER:  Great.
18               BY MS. GARNER:
19         Q.    Ms. Gogo, do you recognize this
20    document?  If you need time to read through
21    it, you're more than welcome to take the time
22    reading it.
23         A.    (Reading.)
24               I don't recognize it.
25         Q.    At the top it says from Renee
```

```
 1    Richardson, sent on Friday, January 20, 2017,
 2    at 7:39 a.m., to Sarah Gogo.  Subject: NB
 3    Situation.
 4              Did I read that correctly?
 5        A    Yes.
 6        Q.   Do you recall receiving a copy of
 7    this email in your Med Team e-mail in-box on
 8    January 20, 2017?
 9        A.   No, I don't recall that.
10        Q.   While you were employed with The Med
11    Team, did any other Med Team employee ever ask
12    you if you received an e-mail from Ms.
13    Richardson in which she alleged race
14    discrimination or a hostile work environment?
15        A.   Yes.
16        Q.   And who asked you about that?
17        A.   Ryan, Chris, the CFO, and Nick.
18        Q.   Do you recall when they asked you?
19        A.   It had to be this week, that week of
20    January 18th.
21        Q.   So sometime around January 20th or
22    so is when they asked you about it?
23        A.   I think so.
24        Q.   Okay.  Do you recall if they asked
25    you before Ms. Richardson was terminated?
```

```
 1        A.    I don't recall that.

 2        Q.    Okay.  And what did they ask you?

 3        A.    They asked me if I had received an

 4   e-mail from her and I said no.  And they

 5   actually came in and looked at my e-mail

 6   account.  And I think maybe the IT director

 7   was there as well.  And they looked, searched,

 8   to see if I had actually received it.

 9        Q.    So they took your computer and they

10   looked through -- what you believe -- they

11   looked through your files to see if you

12   received an e-mail from Ms. Richardson?

13        A     Yes.

14        Q.    Okay.  And do you know if they found

15   an e-mail from Ms. Richardson in which she

16   made a complaint of race discrimination or

17   hostile work environment?

18        A.    I would say no, they didn't find it.

19        Q.    Okay.  If you had received this

20   e-mail which is marked as Exhibit 1, would you

21   have followed the complaint procedure that we

22   discussed earlier?

23        A     Yes.

24        Q.    Were you involved in the decision to

25   terminate Ms. Richardson's employment with The
```

```
 1    Med Team?
 2         A.    No.
 3         Q.    Did you make the decision to
 4    terminate Ms. Richardson's employment with The
 5    Med Team?
 6         A.    No.
 7         Q.    All right.  I'll pass the witness.
 8               EXAMINATION BY COUNSEL FOR THE
 9               PLAINTIFF
10               BY MR. CAMMACK:
11         Q.    I'm sorry, Ms. Gogo.  I didn't hear
12    what your response was when they asked if you
13    had been questioned about the e-mail before or
14    after termination.  You were questioned about
15    the e-mail before or after termination?
16         A.    I think it was before.  I don't
17    recall exactly.
18         Q.    So Ryan came to you and he was aware
19    that she sent an e-mail claiming
20    discrimination prior to her termination;
21    correct?
22         A     Yes.
23               MS. GARNER:  Objection.
24    Mischaracterizes testimony.
25               BY MR. CAMMACK:
```

```
 1        Q.   But that is your understanding, that
 2   they were looking for an e-mail claiming
 3   discrimination prior to her termination;
 4   correct?
 5        A.   They were looking for an e-mail from
 6   her to me.
 7        Q.   Okay.  I have no further questions.
 8   And as far as a copy of the video, I'll take
 9   one. Or if you e-mail me, I can sign whatever
10   you all need.
11             MS. GARNER:  And we would like to
12   review and sign.
13             VIDEO TECHNICIAN:  This concludes
14   the deposition of Sarah Gogo.  Going off the
15   record.  The time is 3:33 p.m.
16
17
18
19
20
21
22
23
24
25
```

1    I have examined and read the

2    foregoing 19 pages and find the

3    answers contained therein with

4    changes made by me, if any, to

5    be true and correct.

6

7

8    _____
                Sarah Gogo

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SARAH GOGO - 02/06/2019                          Page 21

```
 1              CERTIFICATE OF REPORTER
 2        I, Sandria L. Cox, do hereby certify that
 3   the foregoing proceedings were taken by me in
 4   stenotype and thereafter reduced to transcript
 5   under my supervision; that said proceedings
 6   are a true record of the testimony given by
 7   said witness; that I am neither counsel for,
 8   related to, nor employed by any of the parties
 9   to the action in which these proceedings were
10   taken; and further, that I am not a relative
11   or employee of any attorney or counsel
12   employed by the parties hereto, nor
13   financially or otherwise interested in the
14   outcome of the action.
15        Given under my hand this 13th day of
16   February, 2019.
17
18
19                    Sandria L. Cox
20                    Court Reporter
21
22
23
24
25
```

**Exhibits**

Gogo 1
  4:14 15:7,11 17:20

**1**

1
  15:7,11 17:20
1/20/17
  15:6
12865
  8:25
13
  10:18
16
  11:25
17
  11:18
18th
  16:20

**2**

20
  11:17 16:1,8
2010
  5:15
2016
  9:6 11:23,24 13:4 14:6,
  20 15:1
2017
  11:20 16:1,8
2018
  10:18
2019
  5:10
20874
  9:1
20th
  16:21

**3**

3:21

5:11
3:33
  19:15

**5**

5:18-CV-151-FB
  5:9

**6**

6
  5:10

**7**

7:39
  16:2

**A**

a.m.
  16:2
able
  8:15
account
  17:6
Action
  5:8
address
  8:24
administration
  9:22
agree
  7:13,19,23 8:8
Akim
  5:12
alleged
  16:13
allow
  7:11
answer
  7:12 8:6
answers
  7:10,19

Antonio
  5:8 12:12
anytime
  8:18
April
  10:18
asked
  8:6 16:16,18,22,24 17:3
  18:12
attorney
  10:12
Austin
  12:13
aware
  18:18

**B**

background
  8:23 12:24
base
  11:3,4
basic
  12:23
began
  11:9
begins
  5:2
believe
  17:10
benefit
  9:22
Bennett
  5:19
better
  13:1
bit
  7:6
break
  8:4,7
business
  5:5

**C**

call
  14:14
called
  6:4
Cammack
  5:21 15:14,16 18:10,25
CFO
  16:17
change
  9:12
Chris
  16:17
Civil
  5:8
claiming
  18:19 19:2
claims
  14:16
clarity
  7:25
clean
  7:17
communications
  14:9
complaint
  10:8 13:24 17:16,21
complaints
  9:24 10:6 13:8,12 14:22
  15:2
computer
  17:9
concludes
  19:13
conversation
  12:21
copy
  10:11 15:13 16:6 19:8
Corporate
  5:15
correct
  18:21 19:4

**correctly**
16:4

**counsel**
5:17 6:5,8 18:8

**couple**
8:23

**court**
5:7,23 6:20 7:15

**courtroom**
7:1

**Cox**
5:24

**current**
8:24 10:21

**currently**
10:13,19

---

**D**

**date**
5:10

**dated**
15:6

**day**
10:16

**deal**
10:8

**December**
11:16,17,19,24 13:4
14:6,20 15:1

**decision**
17:24 18:3

**defendant**
6:5,8

**deposed**
6:16,17,18

**deposition**
5:3,14 7:6,17 8:3,19
19:14

**didn't**
14:17 17:18 18:11

**director**
9:9,16,25 11:5 17:6

**discrimination**
13:9,23 14:23 16:14

17:16 18:20 19:3

**discussed**
13:24 17:22

**District**
5:6,7

**Division**
5:8

**document**
15:20

**doing**
5:5 13:1

**don't**
7:22 8:2 15:24 16:9
17:1 18:16

**duly**
6:6

---

**E**

**e-mail**
12:6 14:10,14,17 15:5
16:7,12 17:4,5,12,15,20
18:13,15,19 19:2,5,9

**e-mailed**
14:16 15:13

**earlier**
13:25 17:22

**easier**
7:7

**email**
16:7

**employed**
10:20 12:1 14:21 16:10

**employee**
9:21 10:7 16:11

**employees**
9:25

**employer**
10:21

**employment**
10:17 17:25 18:4

**environment**
13:13 15:3 16:14 17:17

**Epiq**
5:24

**exactly**
18:17

**examination**
6:4,8 18:8

**examined**
6:6

**executive**
9:20 10:10

**exhibit**
15:7,11,13 17:20

**expect**
8:2

---

**F**

**face-to-face**
12:5,7,9 14:3,7

**far**
19:8

**February**
5:10

**felt**
13:16,21

**filed**
6:13

**files**
17:11

**find**
17:18

**fine**
8:4

**finish**
7:12

**first**
6:6 7:8 12:4

**floor**
8:5

**followed**
13:24 17:21

**follows**
6:7

**found**
17:14

**frequently**
12:1

**Friday**
16:1

**function**
9:18

**functions**
9:23

**further**
19:7

---

**G**

**Garner**
5:19 6:9 15:9,12,15,17,
18 18:23 19:11

**general**
12:14

**Germantown**
8:25

**go**
12:14 15:11

**Gogo**
5:3 6:3,10 15:7,19 16:2
18:11 19:14

**going**
7:8 15:10 19:14

**Graham**
5:13

**Great**
15:17

**groundrules**
7:5

**guess**
10:5 13:4

---

**H**

**hand**
15:10

**happens**
8:19

**harassment**
13:13,23 15:2

**hear**
18:11

**hire**

9:8

**home**
11:3,4

**honestly**
8:12,16,21

**hope**
6:11

**hopefully**
7:9

**hostile**
13:13 15:3 16:14 17:17

**House**
8:25

**HR**
9:9,10,18,19,22 12:25

**Human**
9:10,16 10:1 11:6

---
**I**
---

**I'LL**
18:7 19:8

**I'M**
7:8 10:22 15:10 18:11

**I'VE**
8:6

**identification**
15:8

**implementation**
9:19

**in-box**
16:7

**Incorporated**
5:5,6 6:14

**initial**
12:12

**interact**
11:25

**involved**
17:24

---
**J**
---

**January**
16:1,8,20,21

**job**
9:7,12

**Judy**
5:19

**jury**
7:2

---
**K**
---

**keep**
6:11

**Kitchen**
8:25

**know**
7:23 8:18 11:8 12:16
17:14

---
**L**
---

**lawsuit**
6:13

**leadership**
9:21 10:9,10

**Leslie**
10:10

**little**
7:6

**lived**
9:2

**long**
6:12 8:3 9:2

**looked**
17:5,7,10,11

**looking**
19:2,5

**low-level**
9:21

---
**M**
---

**marked**
15:6,11 17:20

**Maryland**
9:1

**matter**
5:3

**Mclean**
5:15

**meaning**
9:10

**Med**
5:5,20 6:14,15 9:5,13
10:13,17,25 11:10,13,
23 12:1,15 14:21 16:7,
10,11 18:1,5

**Medical**
5:4

**medications**
8:10

**meet**
12:5,15,18

**meeting**
12:9,22 13:3,7,11,15
14:2,4,11,15,19,25

**met**
11:12,15,19,22,23 12:4
14:7

**Mischaracterizes**
18:24

**monitor**
5:11

---
**N**
---

**NB**
16:2

**need**
8:4 15:20 19:10

**needs**
13:2

**Nick**
10:11 16:17

**notify**
10:9

---
**O**
---

**oath**
6:22

**Objection**
18:23

**occurred**
13:4

**office**
11:2 12:13,25

**Oh**
6:19 11:22

**Okay**
6:20 9:7 10:19 11:4,12
12:8,18 14:13 15:15
16:24 17:2,14,19 19:7

**one-on-one**
12:19,22 13:3 14:25

**operator**
5:12

**Outside**
14:2,19,25

**Oversight**
9:18

---
**P**
---

**P-R-O-C-E-E-D-I-N-G-S**
5:1

**p.m.**
5:11 19:15

**participating**
9:20

**pass**
18:7

**penalty**
6:23

**Perfect**
8:10 15:15

**perjury**
6:23

**phone**
12:6 14:10

**place**
5:15

**plaintiff**
11:8 18:9

**please**
5:17,25

**policies**

9:20

prior
18:20 19:3

procedure
13:24 17:21

proceed
7:6

process
10:5,7

prohibit
8:11,20

provide
7:10,18,24

**Q**

question
7:12,22,24,25 8:5,6,7

questioned
18:13,14

questions
7:9,10 8:23 14:14 19:7

**R**

race
13:8,18,22 14:23 16:13
17:16

read
15:20 16:4

reading
15:22,23

reason
8:14

recall
11:15 16:6,9,18,24 17:1
18:17

receive
9:24 14:17

received
10:6 15:14,16 16:12
17:3,8,12,19

receiving
16:6

recognize

15:19,24

recommend
10:11

record
7:17 19:15

relations
9:22

Renee
5:4,22 6:13 11:8,19
12:13 15:25

reporter
5:24,25 6:20 7:15

represent
5:18 6:15

Resources
9:10,17 10:1 11:6

response
18:12

responses
7:18

responsibilities
9:16

Reston
11:1

result
11:12

review
19:12

Richardson
5:4,22 6:13 11:9 12:19
13:8,12,16,20 14:4,13,
22 15:1 16:1,13,25
17:12,15

Richardson's
17:25 18:4

Richardson/gogo
15:5

Ridge
5:15

right
13:5 18:7

role
11:5

Ryan
10:10 16:17 18:18

**S**

San
5:7 12:12

Sandy
5:24

Sarah
5:3 6:3 16:2 19:14

says
15:25

searched
17:7

second
14:18

see
12:14 17:8,11

self-employed
10:22,23

sending
10:11

sent
15:12 16:1 18:19

September
9:6

series
7:9

set
7:5

sign
19:9,12

Situation
16:3

sorry
18:11

staff
9:19 12:16

started
7:4 11:22

state
5:18

States
5:6

Subject
16:2

suffer
13:22

swear
5:25

swore
6:21

sworn
6:1,6

**T**

take
8:3,7 15:21 19:8

talk
14:18

talked
12:23

team
5:4,5,20 6:14,15 9:5,13
10:14,17,25 11:10,13,
23 12:2,15 13:1 14:21
16:7,11 18:1,5

teams
9:21

TECHNICIAN
5:2,23 19:13

tell
12:8,21 13:16

tenure
9:13

terminate
17:25 18:4

terminated
16:25

termination
18:14,15,20 19:3

testified
6:6

testify
8:15

testifying
7:1 8:11,20

testimony
6:22 18:24

Texas

5:7 12:11

**thank**
6:10

**things**
12:25

**think**
16:23 17:6 18:16

**Thomas**
5:21 15:12

**thought**
12:25

**time**
5:11 8:4 9:8 12:19 14:6,
21 15:20,21 19:15

**title**
9:7,12

**today**
5:12,24 6:11,22 7:1
8:12,16,21

**Today's**
5:10

**told**
13:20

**top**
15:25

**training**
9:19 12:12 13:2

**traveled**
11:5

**treated**
13:17,21

**trip**
12:11

**truthfully**
8:12,15,20

---

**U**

**Uh-huh**
10:24 13:6

**undersand**
6:25

**understand**
6:21 7:22

**understanding**
19:1

**unfairly**
13:17,21

**Unh-unh**
10:4

**United**
5:6

---

**V**

**verbal**
7:18

**versus**
5:4

**video**
5:2,11,12,14,23 19:8,13

**Virginia**
5:16 11:1

**visited**
12:12

**voice-identify**
5:17

---

**W**

**warranted**
10:12

**Way**
8:25

**We'll**
14:18

**week**
16:19

**welcome**
15:21

**Western**
5:7

**witness**
5:25 6:1,4 18:7

**work**
10:13 11:1 12:24 13:13
15:3 16:14 17:17

**worked**
10:25 12:14

**working**
9:4 11:9,13

**workings**
12:15

---

**Y**

**year**
9:3

**you're**
6:21 15:21

**Renee Richardson**

**From:** Renee Richardson
**Sent:** Friday, January 20, 2017 7:39 AM
**To:** Sarah Gogo
**Subject:** NB Situation

**Importance:** High

Good Morning Sarah,

I want to update you on the situation I emailed you about Wednesday, January 18, 2017. I met with Christina and Ms. Harvey in person; and Alan by speaker phone on Wednesday regarding the situation I emailed you about.

The situation remains unresolved until Ms. Harvey meets with Elka. Sarah, given the current situation and past instances, I have always felt like Alan has never supported me or respected me in this position because I am a black woman. The reason I am expressing it now is because of the bias in this situation with Elka and another incident Christina informed me of recently, which I will discuss in the closing of my email.

Although, I have not worked closely with Ms. Harvey, I have always respected her and held her in high regard. However, after meeting with Ms. Harvey on Wednesday, I am still troubled by the handling of the situation and the allegations Elka has made against the staff in the NB office. Ms. Harvey's questions to me, "Is it because she's out of the office most of the time, the reason they don't want to work with her"? This type of questioning without proof, nor having witnessed her being treated inappropriately by others is something I cannot answer. This entire situation has defeated me and has created a hostile work environment, which has made me very uncomfortable. I am using the "open door communication policy" to communicate with you, the HR Corporate Director, or someone who is willing to take an unbiased approach in resolving this matter.

The last concern I have is regarding a written counseling against me regarding a self-reported incident that incurred a monetary fine against the company. I consulted with Christina regarding a case for guidance on how to handle what I considered to be Medicaid Fraud. After Christina reviewed the case, she instructed me to file an APS report which I did immediately. According to Christina, Alan informed her that I will be written up, despite her telling him that she gave me directions on how to handle my findings. I did the responsible thing by obtaining guidance from my superior on an issue. I should not be punished for instructions given to me by my direct boss. I only want to be treated fairly. Based on Alan's insistence that I be written up despite being aware that my actions were based on instructions given to me, reinforces my belief regarding his treatment towards me.

I am following company policy regarding the open door policy. Also, I am only asking that the employees, including myself, to be treated with fairness, dignity, and respect.

Respectfully,

Renee

**Renee Richardson**
Branch Manager
**MED TEAM, INC.**
1423 N. Walnut Ave. # 102



1

RICHARDSON, L. - 000484

New Braunfels, TX 78130
Office: 830-626-3525
Fax: 830-629-2465
E-mail: RRichardson@medteam.com
Visit our new website: www.medicalteam.com



THE
MEDICAL
TEAM*   Care that matters, where it counts.
        At home.

CONFIDENTIALITY NOTICE: *This electronic message and all contents contain information which may be privileged, confidential or otherwise protected from disclosure. The information is intended to be for the addressee only. If you are not the addressee, any disclosure, copying, distribution or use of the contents of this message is prohibited. If you have received this electronic message in error, please notify us immediately and destroy the original message without retaining any copies. Any views or opinions presented in this email are solely those of the author and do not necessarily represent those of THE MEDICAL TEAM, INC. - MED TEAM, INC. - THE MEDICAL TEAM Personal Care Services - Catastrophic Care Solutions.*

RICHARDSON, L. - 000485