**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **RENEE RICHARDSON** | § | |
| *Plaintiff* | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.  5:18-cv-00151-FB** |
| | § | |
| **THE MEDICAL TEAM, INC., d/b/a** | § | |
| **THE MED TEAM, INC.** | § | |
| *Defendant* | | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE FRED BIERY:

Comes now **RENEE RICHARDSON** ("Ms. Richardson"), Plaintiff in the above entitled and numbered action against Defendant THE MED TEAM, INC. ("Med Team"), alleging discrimination and retaliation based on race, and files this Plaintiff's Response to Defendant's Motion for Summary Judgment, and for cause shows unto the Court the following:

## I. PARTIES

1. Plaintiff **RENEE RICHARDSON** is a former employee of Defendant "Med Team" employed as a Branch Manager over a New Braunfels branch of Defendant. Plaintiff alleges race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, codified under Title 42 U.S.C. Section 2000e *et. seq.,* and pursuant to supplemental jurisdiction under Chapter 21 of the Texas Labor Code. She had been a faithful employee of Defendant for over a year and a half and was promoted within four months of being hired by Defendant. The decision to terminate her employment was made on January 20, 2017, the same day she complained of race discrimination in an email sent to HR Representative Sarah Gogo.[1]  Plaintiff

---

[1] Exhibit A: January 20, 2017 email from Renee Richardson to Sarah Gogo

was the only black branch manager and the only branch manager to complain of race discrimination.[2] 5 of the 7 branch managers worked at branches with falling census numbers, but none were disciplined for census except for Plaintiff, who was terminated. The decision to terminate Plaintiff was made the same day she sent an email to HR complaining of race discrimination. These factors alone create enough fact issues to preclude Defendant's motion for summary judgment.

2. Defendant **THE MEDICAL TEAM, INC., d/b/a THE MED TEAM, INC.,** is a corporation that provides home healthcare provider services and operates home healthcare agencies. Defendant had a census that tracked the retention of billable patients or growth in the number of billable patients.[3]

## II. RELEVANT FACTUAL BACKGROUND

3. It is against federal law for a company to terminate an employee for complaining of or reporting to human resources race discrimination. Defendant does not have a written retaliation policy. Defendant terminated Plaintiff Richardson for performance, an employee with excellent performance history. Defendant's corporate representatives testified that it made the decision to terminate Plaintiff for two years of bad performance related solely to low census numbers on the same day she sent an email to human resources complaining of race discrimination. Plaintiff's evaluations demonstrate that she was receiving 4 out of 5, or "commendable" evaluations. Defendant testified that five of seven branches in the State of Texas had problems with the census. Defendant testified that per the nature of their business there are always issues with census. Defendant testified that census is not in Plaintiff's job description. Defendant testified that other employees responsible for the census at Plaintiff's branch were not disciplined nor terminated.

---

[2] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 44 Ln. 22-25 to Pg. 45 Ln. 6
[3] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 44 Ln. 4-14

Defendant testified they have never fired a branch manager for the census besides Plaintiff.  Prior to Plaintiff's termination, Defendant was "looking for an email" that they claim they never received and had no notice of, which on it's face lacks credence.   It was not HR Representative Sarah Gogo's birthday and there was no reason to anticipate an email from Plaintiff, so she was not sitting by her email anticipating an email from Ms. Richardson, nor was there any scheduled email from Ms. Richardson on that day for Defendant to search except the one email regarding discrimination.

7. Pursuant to Federal Rule of Civil Procedure Rule 30(b)(6), Richardson asked for the deposition of a corporate representative to testify on behalf of Defendants regarding a number of separate areas relevant to her claims and the Defendants' asserted defenses.   On November 28, 2018, Defendant Produced Corporate Representatives Human Resources Manager Tia Jackson and Chief Financial Officer Ryan Grisard.   HR Manager Jackson was produced to speak on corporate representative topics to include the employee personnel file and the employee handbook, guidelines, policies, and practices, including those that apply to complaints of and investigations into discrimination, harassment, and retaliation.   CFO Ryan Grisard testified about Plaintiff's termination, job performance, the decision makers related to termination, the corporate structure, and Plaintiff's job duties and performance of the branch where she worked.   Their testimony, along with that of Plaintiff and former HR Representative Sarah Gogo, provides in relevant part the following:

***Testimony of Human Resources Manager Tia Jackson***

  a.  Defendant has a discrimination and anti-harassment policy, but Defendant does not have a written policy against retaliation for employees making protected complaints.[4]

---

[4] Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 20 Ln. 2-7

b.  HR Manager Jackson testified that it is important to protect employees who complain of discrimination and to have a thorough investigation of complaints of discrimination.[5]

c.  HR Manager Jackson testified that the appropriate time period to respond to a written complaint of discrimination is within 24 hours.  She further testified that witness statements should be gathered in an investigation.[6] Defendant never responded to Plaintiff's opposition to race discrimination, instead pretending it never received the email opposing discrimination.

d.  HR Manager Jackson testified that Defendant gave performance evaluations annually to apprise employees of how they are performing and to let them know where they can improve. The scale rating was 1 to 5, with 5 being the best performance possible.  A 3 indicates the employee is meeting expectations.  There is a comment box for additional comments by the supervisor or manager rating the employee.  Plaintiff Richardson received predominately 4's, which indicated her performance was "commendable."   HR Manager Jackson testified that Ms. Richardson's performance was commendable based on her performance evaluations and she ***WOULD NOT have had performance issues as an employee a****nd also had the scores she received in her evaluations***.[7] Ms. Richardson's performance was ranked in 12 categories. On 9 areas she received a 4 out of 5, or commendable, and on 3 out of 5 she met expectations.[8]

e.  Ms. Richardson was promoted within four months of being employed by Defendant. Employees are promoted after consideration of several "factors" to include not only their actual credentials and skills, but also their overall performance, character, and initiative as an

---

[5] Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 23 Ln. 25 to Pg. 24 Ln. 7
[6] Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 26 Ln. 1-24
[7] Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 28 Ln. 6 to Pg. 29 Ln. 15; Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 33 Ln. 22-25 to Pg. 34 Ln. 8; Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 44  Ln. 8-14
[8] Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 39 Ln. 14-25 to Pg. 40 Ln. 1

employee.  Jackson confirmed that an employee who was hired then promoted within four months after hire had proven to their employer they are excelling in these "factors." [9]

f.  Defendant has a progressive discipline policy.  If an employee is performing below par or not to Defendant's satisfaction, they are first provided a verbal notice, then written notice, then a performance improvement plan. [10]  Defendant's Corp Repo Grisard claimed there were attempts to provide verbal warnings to Plaintiff, but this is in the face of Defendant's responses to discovery and the evidence in the record.

### *Testimony of former Human Resources Representative Sarah Gogo*

a.  Former HR Representative Sarah Gogo said that she never received Plaintiff's complaint of discrimination via email.

b.  Sarah Gogo testified that CFO Grisard showed up to her office to search for the email she alleges she never received prior to Plaintiff Richardson's termination. [11]

### *Testimony of Chief Financial Officer Ryan Grisard*

a.  CFO Grisard testified he wasn't aware that Plaintiff complained of discrimination via e-mail until after Plaintiff was terminated, in direct conflict with the testimony of Sarah Gogo. [12]

b.  CFO Grisard testified he did not know about the January 20, 2017 email complaining of race discrimination, but that the decision to terminate Plaintiff was made either the same day, or the day before or after.[13] Specifically he testified:

> Q.   And based on the testimony provided by
> 25  Ms. Jackson, she -- in fact, the only evidence of her

---

[9]Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 30 Ln. 14-25 to Pg. 31 Ln. 1
[10] Ex. B: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Tia Jackson, Pg. 36 Ln. 20-25 to Pg. 37 Ln. 22
[11] Ex. D:  Deposition Testimony of Sarah Gogo
[12] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 13 Ln. 18-25
[13] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 14 Ln. 1-20

Page 15
1  performance, at least in her evaluations, is that she
2  was commendable as an employee, correct?
3     A.  Sure.
4     Q.  Okay.  So, she's got commendable performance,
5  she has no prior discipline, but around the same day she
6  complains about being treated differently for being a
7  black woman, the decision is made to terminate her,
8  correct?
9     A.  Correct.

c. Grisard testified that Plaintiff Richardson was terminated for performance.[14]  He later specified that although there is not a single word about census in her job description[15], Plaintiff was in fact terminated solely for a lowering of the census.[16]  Plaintiff had no other performance issues. He further testified that no similarly situated comparator or branch manager had ever been terminated for census except for Plaintiff Richardson.[17]  However, 5 of the 7 branches of Defendant in the State of Texas had a decline in census over the same time period that Ms. Richardson's branch had a decline in census.[18]  During the entire time that Ms. Richardson and branch managers at four other branches were employed, there was a decline in census.  However, there was never a decision to terminate Ms. Richardson until the same day she complained of discrimination in writing to HR.[19] No other branch managers have been terminated for census.[20]  Any low numbers on the census would be the responsibility of the entire team at the branch, including Rea Cazares, whose job responsibilities included marketing directly related to increasing the census.[21]  However, none of the employees responsible for the census that worked with Ms. Richardson at her

---

[14] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 14 Ln. 21-23
[15] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 20 Ln. 7-21
[16] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 20 Ln. 22-25 to Pg. 21 Ln. 7
[17] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 19 Ln. 13-16
[18] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 22 Ln. 23-25 to Pg. 23 Ln. 10
[19] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 23 Ln. 11-13
[20] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 38 Ln. 9-15
[21] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 68 Ln. 14-25 to Pg. 69 Ln. 4

branch were disciplined in any capacity. Alan Garza, one of the decision makers in terminating Plaintiff, would have also been responsible for the low census at the New Braunfels' branch.[22]  Additionally, Branch Manager Christina Luna's branch had low census, but she never received any discipline related to the census.  Instead, Branch Manager Luna was placed on a PIP related to her repeated failures to follow unrelated policies of Defendant.[23]

d.  Plaintiff complained that Alan Garza discriminated against her because she was a black woman in her email to HR.  Alan Garza was one of the decision makers involved in the decision to terminate Ms. Richardson.[24]

e.  Defendant represents that all other emails transmitted between Plaintiff and Sarah Gogo before and after January 20, 2017[25] (the email opposing and complaining of discrimination) were received without issue, except for one other email complaining of a hostile work environment.[26]

f.  Defendant testified that turnover is high in their industry and that there were always issues with the census.[27]  He confirmed that, as a result of high turnover, Defendant needed to work with Plaintiff to improve any issues with the census, indicating they had in fact tried to help her.[28]  There is nothing in the record to corroborate that Defendant attempted to help Plaintiff with performance nor that she needed help with performance.

---

[22] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 69 Ln. 5-17
[23] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 39 Ln. 3-25 to Pg. 40 Ln. 9
[24] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 26 Ln. 15-25 to Pg. 27 Ln. 1
[25] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg 32 Ln. 21-25 to Pg. 33 Ln. 11
[26] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 29 Ln. 4-10
[27] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg. 35 Ln. 14-25 to Pg. 36 Ln. 7
[28] Ex. C: Nov. 28, 2018 Deposition Testimony of Corp. Rep. Ryan Grisard, Pg 35 Ln. 18-25 to Pg. 36 Ln. 7

*Deposition Testimony of Plaintiff Renee Richardson*

a. Prior to Ms. Richardson being hired, the census numbers were declining.  As a result, Ms. Richardson brought up the census numbers to Manager Alan Garza.[29]  As the corporate representatives testified, census was a problem Defendant always had an issue with over the years as a company and in the industry as a whole.

b. Renee Richardson was hired by Defendant on or around March 2015 as a Provider Assistance Supervisor ("PAS"). Approximately three months later, Richardson was promoted to Branch Manager of the New Braunfels, Texas location.[30]

c. As Branch Manager, Renee Richardson supervised administrative assistants, PAS supervisors, and field staff. Richardson was not responsible for supervising the marketer that worked at the New Braunfels branch.[31]

d. The marketer at the New Braunfels branch, who was not under Plaintiff's supervision, was Rea Cazares.  Rea Cazares was responsible for census number at the New Braunfels branch.[32]

e. Plaintiff complained to HR that Alan Garzas discriminated against her because she was black.

f. Alan Garza, Plaintiff's supervisor, changed Plaintiff from salary to hourly. She was the only employee whose pay structure was changed.[33]

---

[29] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 114 Ln. 1-12
[30] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg 41 Ln. 24-25 to Pg. 42 Ln. 23
[31]  Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 52 Ln. 24-25 to Pg. 53 Ln 1-5
[32] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 117 Ln. 8-25 to Pg. 118 Ln. 1-6; Pg. 119 Ln. 8-19
[33] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 57 Ln. 9-19

g. Alan Garza denied Plaintiff resources that her similarly situated employees were not denied.[34]  For instance, she was told there was no money in the budget for a computer. Defendant was implementing an electronic visit verification ("EVV") program that electronically verified patient visits and would require computer use by a staff member.[35] When Executive Rebecca Marquez visited the New Braunfels branch, she comments on the staff not having a computer.  When Plaintiff Richardson informed her that Garza had denied it, Marquez made sure that Garza provided the branch with a computer.[36]  Alan Garza further denied monitors for another employee on Plaintiff's staff[37], and then denied a printer for "budgetary reasons."[38]  This was despite the fact that the printer was used to receive referrals from the State and had been breaking down or "going haywire."

h. Alan Garza habitually yelled at and humiliated Plaintiff in front of her co-workers and staff.[39] This included blaming Ms. Richardson for a EVV system failure that was not her responsibility.[40]

i. When Alan Garza he showed up to terminate Plaintiff, he made a comment about her afro.[41]

j. Alan Garza excluded Plaintiff from important meetings regarding the New Braunfels Branch.[42]

k. If Alan Garza wanted Plaintiff to improve her census numbers, he made it hard for her to improve her census.  He specifically instructed Plaintiff's immediate supervisor Christina

---

[34] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 58 Ln. 2-4
[35] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 81 Ln. 10-25 to Pg. 82 Ln 1-24
[36] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 82 Ln. 25- Pg. 83 Ln. 1-24
[37] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 84 Ln. 3-22
[38] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 86 Ln. 23-25 to Pg. 87 Ln. 23
[39] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 58 Ln. 7-8
[40] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 90 Ln. 8-24; Pg. 94 Ln. 14-19
[41] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 58 Ln. 14-22
[42] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 58 Ln. 9-13

Hernandez to limit her visits to the New Braunfels Branch, despite Plaintiff not taking up any extra time of Ms. Hernandez.[43]

l.   R.N. Supervisor Christina Hernandez Ayala was Plaintiff's direct supervisor.[44]  She directly communicated with Plaintiff regarding many of Alan Garza's discriminatory behavior.

m.  On Friday, January 20, 2017, Plaintiff Richardson sent an email to Corporate HR Representative Sarah Gogo complaining of race discrimination by Alan Garza. Ms. Richardson was sick the next Tuesday through Wednesday.  She was terminated the following Friday by Alan Garza.[45]

### III. THE STANDARD OF REVIEW

8.   Pursuant to the summary judgment standard, Defendant's evidence must be sufficient to allow reasonable and fair-minded people to differ in their conclusions on whether the challenged fact exists; evidence that raises only a speculation or surmise is insufficient.  Summary judgment is appropriate when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

9.   Defendant cannot meet this burden.  Defendant, in claiming they did not receive Plaintiff's email, creates fact issues.  In not terminating any other similarly situated employees for their lowered census, they create fact issues.  Defendant's own HR representative testified that Plaintiff's record demonstrates she was a commendable employee and wouldn't have had

---

[43] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 107 Ln. 1-8
[44] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 74 Ln. 2-7
[45] Ex. E: December 4, 2018 Deposition of Renee Richardson, Pg. 173 Ln. 23-25 to Pg. 174 Ln. 1-24;  Pg. 171 Ln. 9-13

performance issues based on her performance evaluations, Defendant creates fact issues. Defendant's failure to document any performance issues of Plaintiff further creates fact issues. Defendant's failure to discipline comparators for the same decline in census creates fact issues. Defendant's motion should be denied.

10. Employment-discrimination cases employ a unique burden-shifting analysis.  Plaintiff is entitled to a presumption of discrimination if she meets the minimal initial burden of establishing a *prima facie* case of discrimination. ***McDonnell Douglas Corp. v. Green***, 411 U.S. 792, 802-05 (1973). Although the precise elements of the *prima facie* showing vary depending on the circumstances, the plaintiff's burden at this stage of the case "is not onerous." ***Mission Consolidated Independent School District v. Garcia***, 372 S.W.3d 629, 634 (Tex.2012) (internal citation omitted). "The ***McDonnell Douglas*** presumption is 'merely an evidence producing mechanism that can aid the plaintiff in [her]ultimate task of proving illegal discrimination by a preponderance of the evidence.'" ***Id***. "The prima facie case raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." ***Id***.

11. If a plaintiff successfully demonstrates a *prima facie* case, the burden of production shifts to the defendant employer to show a legitimate and non-discriminatory basis for the adverse employment decision. ***McDonnell Douglas***, 411 U.S. at 802. "If the defendant employer demonstrates a non-discriminatory reason for its employment action, the plaintiff must show that the defendant's proffered reason is merely a pretext." ***Id***. at 804.  Here, Defendant cannot provide a reason for termination that is not pretextual.  Defendant's motion should be denied.

12. The Supreme Court of the United States, in reversing a summary judgment affirmed by the Fifth Circuit, recently reminded us that courts cannot resolve genuine disputes of fact in favor

of the moving party, especially where there are competing affidavits. ***Tolan v. Cotton***, 134 S.

Ct. 1861, 1868 (May 5, 2014); See also ***Brosseau v. Haugen***, 543 U.S. 194, 195, n. 2, 125

S.Ct. 596, 160 L.Ed.2d 583(2004)(per curiam).  In ruling on a motion for summary judgment,

a judge's role is to determine whether there is a genuine issue for trial, not "to weight the

evidence and determine the truth of the matter." ***Tolan v. Cotton*** at 1866. The fundamental

principal at the summary judgment stage of a case is that all reasonable inferences should be

drawn in favor of the nonmoving party. ***Id***.

13. Moreover, the Supreme Court, reiterated the importance of a jury as opposed to a single judge

deciding the facts, most recently announcing in ***Hana Financial, Inc., v. Hana Bank***, __ S.Ct.

, 2015 WL 248559 (Jan.21, 2015):

> Indeed, we have long recognized across a variety of doctrinal contexts that, when the
> relevant question is how an ordinary person or community would make an assessment, the
> jury is generally the decisionmaker that ought to provide the fact-intensive answer. See,
> *e.g.,* ***United States v. Gaudin***, 515 U.S. 506, 512, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)
> (recognizing that "delicate assessments of the inferences a 'reasonable [decisionmaker]'
> would draw ... [are] peculiarly one[s] for the trier of fact" (quoting *TSC Industries, Inc. v.
> Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); first alteration
> in original)); *id.,* at 450, n. 12, 96 S.Ct. 2126 (observing that the jury has a 'unique
> competence in applying the reasonable man standard'); *Hamling v. United States,* 418 U.S.
> 87, 104¢105, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (emphasizing ¢the ability of the juror
> to ascertain the sense of the average person by drawing upon his own knowledge of the
> views of the average person in the community or vicinage from which he comes and his
> knowledge of the propensities of a reasonable person); ***Railroad Co. v. Stout,*** 17 Wall. 657,
> 664, 21 L.Ed. 745 (1874) (It is assumed that twelve men know more of the common affairs
> of life than does one man, [and] that they can draw wiser and safer conclusions from
> admitted facts thus occurring than can a single judge).

***Id***., 2015 WL 248559 at pp.4-5 (hn 5).

## IV. METHOD OF PROOF

14. Direct evidence is rare in employment cases. As one court once put it, "[e]mployers rarely leave concrete evidence of their retaliatory purposes and motives." ***Nowlin v. Resolution Trust Corp.***, 33 F.3d  498, 508 (5th Cir. 1994). Another court put it this way:

> Unless the employer is a latter-day George Washington, employment discrimination is as difficult to prove as who chopped down the cherry tree. (Citation omitted). Employers are rarely so cooperative as to include a notation in the personnel file, fired due to age, or to inform a dismissed employee candidly that he is too old for the job.***Thornbrough v. Columbus & Greenville R.R. Co.***, 760 F.2d 633, 640–41 (5th Cir. 1985).

15. As a result, and "to ease the evidentiary burden on employment plaintiffs, most employment cases turn on circumstantial evidence, which is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." ***Desert Palace v. Costa***, 539 U.S. 90, 100 (2003).

## V. PLAINTIFF'S SUMMARY JUDGMENT RESPONSE EVIDENCE

16. Plaintiff relies upon and incorporates herein the pleadings on file with the court (and requests the court take judicial notice of the court file), and Plaintiff's exhibits attached to her Appendix, EX. 1, filed with this response, including the deposition of Defendant's Corporate Representatives and former HR Representative  Sarah Gogo. Plaintiff further relies on her own testimony in her deposition.

## VI. ARGUMENTS AND AUTHORITIES

A. **PLAINTIFF ESTABLISHES EACH ELEMENT OF HER PRIMA FACIA CASE FOR RETALIATION BASED ON RACE**

17. Defendant took an adverse employment action against Plaintiff because of her opposition in writing to race discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended and the Texas Commission on Human Rights Act codified as Chapter 21 of the Texas Labor Code.

18. Following the framework for a Title VII or Chapter 21 claim, Plaintiff must first establish her prima facie case of retaliation. To establish a claim of retaliation, an employee must establish the following three elements:

(1)That s/he engaged in activity protected by the applicable statutes; (2) that s/he suffered from an adverse employment action; and (3) that there is a causal connection between the taken protected activity and the adverse employment action. *See* ***City of Waco v. Lopez***, 259 S.W.3d 147, 150 (Tex.2008) (protected activity under the TCHRA includes: (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing). *See also* ***Lopez v. Tex. State Univ***., 368 S.W.3d 695,703 (Tex. App.—Austin 2012, pet. denied).  So long as a Plaintiff meets the "minimal" initial burden of establishing a prima facie case, she is entitled to a presumption of retaliation. ***Mission Consolidated Independent School District***, 372 S.W.3d at 634, *citing* ***Texas Dep't of Cmty. Affairs v. Burdine***, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).The causal link required by the third prong does not rise to the level of a "but for" standard at the prima facie stage.  It is undisputed that Ms. Richardson sent an email on January 20, 2017 alleging she was being discriminated against because of her race, meeting her first element. Defendant instead tries to dispute this email by saying that it was not received, the only email never sent or received to not reach its destination between Sarah Gogo and Plaintiff besides one other email alleging hostile work environment. Defendant's assertions lack credence.

19. Additionally, it is undisputed that Ms. Richardson meets her second element: an adverse employment action occurred when the decision to terminate Ms. Richardson was made the

same day she complained of race discrimination.  Ms. Richardson was terminated within one week of complaining of race discrimination.

20. Thus, Ms. Richardson must show whether a ***causal nexus*** exists between Richardson's protected activity and her termination.  Temporal proximity between a protected activity and an adverse employment action may be sufficient circumstantial evidence to justify an inference of retaliatory motive. ***Martin v. Kroger Co***., 65 F. Supp. 2d 516 (S.D. Tex. 1999). Temporal proximity between an employer's knowledge of protected activity (Complaint to HR or EEOC Charge of Discrimination) and an adverse employment action (termination) suffice as sufficient evidence of causality to establish a prima facie case, particularly where, as in this case, there is other evidence of factors evidencing pretext. ***Clark Cnty. Sch. Dist. v. Breeden***, 532 U.S. 268, 273 (2001). In Ms. Richardson's case, the same day she complained of discrimination is the same day a decision to terminate was made.

21. In ***Bregon v. Autonation USA Corp***., 128 Fed. Appx. 358, 361-362 (5th Cir. 2005), the district court concluded that Bregon had not made a prima facie case for retaliatory termination. Specifically, it found that he failed to show that there was a causal connection between the participation in the protected activity ... and the adverse employment action. However, Bregon was fired only a week after he filed his complaint and he offered evidence that people at work were likely aware of his complaint. The appellate court recognized that it had held that the combination of temporal proximity and possibility of knowledge of the complaint is sufficient to satisfy a defendant's prima facie burden for a retaliation claim.  Therefore, the court held that Bregon satisfied his burden of proof.  In evaluating the "causal link" element of a retaliation claim, the court may consider the following:

22. "Close timing between an employee's protected activity and the adverse action can provide the causal connection required for a prima facie case" of retaliation under the TCHRA and Title VII. *Johnson*, 203 S.W.3d at 11; *Tex. State Office of Admin. Hearings v. Birch*, No. 04–12–00681–CV, 2013 WL 3874473, at *23 (Tex.App.—San Antonio July 24, 2013, pet. denied) (mem.op.). Periods of three months, four months, and twenty months between an employee's protected activity and the adverse action, however, have been deemed insufficient without other evidence. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001). *Alamo Heights Indep. Sch. Dist. v. Clark*, 04-14-00746-CV, 2015 WL 6163252, at *7 (Tex. App.--San Antonio Oct. 21, 2015).

23. Important to our consideration is also the fact that, whether Defendant alleges that the Plaintiff's claims for discrimination do not reach the level of a violation of law, this is irrelevant to whether Plaintiff has met her burden pursuant to a retaliation claim and is not the legal standard in reviewing such a claim. Under prevailing Fifth Circuit authority, it is not necessary for the court to conclude whether or not the alleged complaint regarding harassment or discrimination was in fact a violation of Title VII or not. *Payne v. McLemore's Wholesale and Retail Stores,* 654 F.2d 1130, 1138 (5th Cir.1981). The court need only find that the Plaintiff held a reasonable or good faith belief that the complaint was a genuine complaint of discrimination or harassment. *Jenkins v. Orkin Exterminating Co., Inc*., 646 F. Supp. 1274, 1278 (E.D. Tex. 1986). Further, the courts have sketched an outline of indicia of causation in Title VII cases, because causation is difficult to prove. Employers rarely leave concrete evidence of their retaliatory purposes and motives. For example, in *Jenkins*, the court looked to three factors for guidance in determining causation. First, the court examined the employee's past disciplinary record. Second, the court investigated whether the employer followed its

typical policy and procedures in terminating the employee. Third, it examined the temporal relationship between the employee's conduct and discharge. ***Jenkins***, 646 F. Supp. at 1278. This analysis is highly fact specific, as the Supreme Court recently noted. ***St. Mary's***,      U.S. at      , 113 S. Ct. at 2756 ("the question facing triers of fact in discrimination cases is both sensitive and difficult.") (quoting ***United States Postal Service Bd. of Governors v. Aikens***, 460 U.S. 711, 716, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983)). ***Nowlin v. Resolution Tr. Corp***., 33 F.3d 498, 508 (5th Cir. 1994).  Here we have a Defendant failing to follow its progressive discipline policy, close temporal proximity, and a Plaintiff with no prior discipline and exemplary evaluations.

24. Plaintiff has established each and every element of her prima facie case.

## B.  PLAINTIFF ESTABLISHES EACH ELEMENT OF HER PRIMA FACIA CASE FOR RETALIATION BASED ON RACE

25. Mrs. Richardson's allegation for discrimination on the basis of race are brought under the Texas Labor Code and Title VII of the Civil Rights Act. To establish a prima facie case, a plaintiff must "provid[e] evidence that she: (1) is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class or, in the case of disparate treatment, shows that others similarly situated were treated more favorably." **Okoye v. Univ. of Tex. Houston Health Sci. Cntr.,** 245 F.3d 507, 512–13 (5th Cir. 2001) (***Lee v. Mission Chevrolet, Ltd***., EP-16-CV-00034-DCG, 2017 WL 4784368, at *18 (W.D. Tex. Oct. 23, 2017).  It is undisputed that Plaintiff was in protected class based on race, black, that she was qualified for her job bases on her performance evaluations and discipline history, and that she suffered an adverse employment action, she was terminated.  It is also undisputed that Plaintiff was treated less favorably than her similarly situated branch managers.  She was the only one disciplined in any capacity for census and 4 others outside of her class were not disciplined for their lowered census numbers.

C. **DEFENDANT'S LEGITIMATE NON-DISCRIMINATORY REASON FOR TERMINATION IS PRETEXTUAL**

26. Once the claimant makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. If the employer meets this burden of production, then the burden shifts back to the Claimant to show that the employer's proffered explanation is a pretext for retaliation. *See **Dutton v. Univ. Healthcare Sys., L.L.C**., 136 Fed. App. 596, 599-600 (5th Cir. 2005). Plaintiff believes Defendant fails to even establish a legitimate non-discriminatory reason for termination. Defendant failed to follow it's own progressive discipline policy in terminating the only branch manager that has ever been terminated for low census. At the time Plaintiff was terminated, there were four other branch managers with low census at their branches, and none had received as much as a single write up. This argument goes not only to a lack of legitimate reasons for termination but also that this reason is clearly pretextual, addressed below. Defendant's motion should be denied

27. A plaintiff may establish pretext either through demonstrating evidence that there is evidence of disparate treatment, by showing that the employer's proffered explanation is false or "unworthy of credence" or that an inference of discrimination is reason for adverse employment action; ***Reeves***, 530 U.S. at 143, 120 S.Ct. at 2106. ***Laxton v. Gap Inc***., 333 F.3d 572, 578 (5th Cir. 2003). ***De Luna v. Cheers, Inc***., SA06CV525WRF, 2007 WL 708561, at *5 (W.D. Tex. Feb. 2, 2007).[46]   It has been established that Plaintiff was treated differently

---

[46] **The Supreme Court, in rejecting the Fifth Circuit's "Pre-Text Plus" standard, explained that the rejection of the defendant's proffered reason for the adverse employment action will permit the trier of fact to infer the ultimate fact of intentional discrimination**. *Reeves*, 120 S.Ct. at 2109; *St. Mary's Honor Ctr, v. Hicks*, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.*, 120 S. Ct. at 2109. **Here Defendant's proffered reason of terminating plaintiff for census, when no other branch manager has ever been disciplined for census, is patently false**

---

than other branch managers in discipline and that employees at her branch that were also responsible for census were not disciplined in any capacity.

28. ***Pretext can further be shown in a variety of ways (although not all are relevant and there are additional ways of showing pretext):***

29. **Suspicious Timing**. Close timing alone may be sufficient to provide not only a causal connection but also pretext, when the adverse action happens in close proximity to the discrimination complaint. "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." ***Swanson v. Gen. Servs. Admin***., 110 F. 3d 1180, 1188 (5th Cir. 1997), cert. denied, 529 U.S. 948 (1998); *see also* ***Armstrong v. City of Dallas***, 997 F. 2d 62, 27 (5th Cir. 1993) (finding the causal link prong established where "[t]he only evidence available to support an inference of discrimination . . . is the temporal proximity" of the protected activity and the adverse employment action). In numerous cases the Fifth Circuit has recognized that close temporary proximity alone sufficed to establish a causal connection.  In the instant case, the Plaintiff was terminated within the same day of sending an email to HR complaining of discrimination.

30. **Lack of Investigation in violation of Defendant's procedures and/or policies**.  Defendant failed to conduct any form of a reasonable investigation that would be expected if the allegations in the direct face of what the HR Manager believed was appropriate.  Plaintiff's complaints of discrimination were never once looked into, which is further evidence of pretext. ***O.C. v. Chevron Phillips Chemical Co***., LP, 570 F.3d 606, 624-625 (5th Cir. 2009) ("jury could find alleged misrepresentation was a pretext because neither decision maker had read the questionnaire or made any effort to investigate whether their medical assumptions were

incorrect, even though the plaintiff had given them info that did not support the assumption; jury reasonably could find that employer first decided to fire plaintiff because of her disability or accommodation requests, "and only afterwards developed the purely pretextual reasons they advanced for their actions." Further, a company's deviation from its own policy or procedure may be evidence of pretext. *Quezada v. Earnhardt El Paso Motors*, *LP*, 592 F.Supp.2d 915, 923 (W.D. Tex. 2009) (*citing* *Machinchick v. PB Power*, 398 F.3d 345, 355 n.29 (5th Cir. 2005)); *Mercer v. Arbor E & T, LLC*, 11-CV-3600, 2013 WL 164107, at *12 (S.D. Tex. Jan. 15, 2013). Defendant failed to follow it's own progressive discipline policies, and didn't even have a retaliation policy in place.

31. **More Favorable Treatment of Employees not Opposing Discrimination and Failure to Apply a Neutral Policy on Discipline and Failure to Follow Procedures**. A lack of a uniformly applied disciplinary process, combined with a lack of a uniformly implemented process for rules regarding the census allows Defendant to pick and choose which employee to use policies against as weapons as opposed to neutral implementations of practice, or alternatively, shows a grave departure from Defendant's alleged normal policies, which is further evidence of pretext, particularly when there is a double standard in the application of the policy. For example, Defendant failed to discipline any other branch managers for low census. Defendant failed to follow it's own progressive discipline policy. Defendant repeatedly indicated to Plaintiff her performance was commendable and above average. Only when she complained of discrimination was she now not doing her job. And regardless of lower census numbers the question still arises, why, if there are months of low census, was the decision to terminate her made when she complained of discrimination? When decision making criteria is entirely subjective, it forces the court to make improper credibility

determinations in the summary judgment context *See Medina v. Ramsey Steel Co.*, 238 F. 3d 674, 681-82 (5th Cir. 2001). Defendant's Motion should be denied.

## VII. PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Richardson respectfully prays that Defendant's motion be denied in full; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

**Respectfully submitted,**

**BY: /s/ Thomas N. Cammack, III**

**ADAM PONCIO**
**State Bar No. 16109800**
salaw@msn.com
**THOMAS N. CAMMACK, III**
**State Bar No. 24073762**
tcammack@ponciolaw.com
**ALAN BRAUN**
**State Bar No. 24054488**
abraun@ponciolaw.com

**PONCIO LAW OFFICES**
**A Professional Corporation**
**5410 Fredericksburg Road, Suite 109**
**San Antonio, Texas 78229-3550**
**Telephone:   (210) 212-7979**
**Facsimile:   (210) 212-5880**

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was forwarded to

the following counsel of record by the court's filing system on this the 3rd day of April, 2019:


Richard G. Garza                    VIA EFILE
Jackson Walker LLP
State Bar No. 07737200
rgarza@jw.com
112 E. Pecan, Suite 2400
San Antonio, Tx 78205
210-978-7734 Telephone
210-242-4606 Facsimile

Judy Bennett Garner                 VIA EFILE
Jackson Walker LLP
State Bar No. 24092403
jgarner@jw.com
2323 Ross Avenue, Suite 600
Dallas, Tx 75201
214-953-6000 Telephone
214-953-5822 Facsimile


*/s/ Thomas N. Cammack, III*
**Thomas N. Cammack, III**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| **RENEE RICHARDSON** | § |
| *Plaintiff* | § |
| | § |
| **VS.** | § CIVIL ACTION NO.  5:18-cv-00151-FB |
| | § |
| **THE MEDICAL TEAM, INC., d/b/a** | § |
| **THE MED TEAM, INC.** | § |
| *Defendant* | |

**APPENDIX FOR PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
_____

Respectfully Submitted,

**PONCIO LAW OFFICES**
**A Professional Corporation**
**5410 Fredericksburg Road, Suite 109**
**San Antonio, Texas 78229-3550**
**Telephone:(210) 212-7979**
**Facsimile:(210) 212-5880**


BY: /s/ <u>Thomas N. Cammack, III</u>
   **ADAM PONCIO**
   **State Bar No. 16109800**
   **THOMAS N. CAMMACK, III**
   **State Bar No. 24073762**


**ATTORNEYS FOR PLAINTIFF**
**RENEE RICHARDSON**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record by the court's filing system on this the 3rd of April, 2019:

Richard G. Garza                   VIA EFILE
Jackson Walker LLP
State Bar No. 07737200
rgarza@jw.com
112 E. Pecan, Suite 2400
San Antonio, Tx 78205
210-978-7734 Telephone
210-242-4606 Facsimile

Judy Bennett Garner              VIA EFILE
Jackson Walker LLP
State Bar No. 24092403
jgarner@jw.com
2323 Ross Avenue, Suite 600
Dallas, Tx 75201
214-953-6000 Telephone
214-953-5822 Facsimile

*/s/ Thomas N. Cammack, III*
**Thomas N. Cammack, III**

## <u>TABLE OF CONTENTS</u>

1. **EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

   a. January 20, 2017 Email from Renee Richardson to Sarah Gogo (**Exhibit "A"**);

   b. Deposition Transcript of Corporate Representative Tia Jackson (**Exhibit "B"**);

   c. Deposition Transcript of Corporate Representative Ryan Grisard (**Exhibit "C"**);

   d. Deposition Transcript of Sarah Gogo (**Exhibit "D"**);

   e. Deposition Testimony of Renee Richardson (**Exhibit "E"**);

# Exhibit A

## Renee Richardson

**From:** Renee Richardson
**Sent:** Friday, January 20, 2017 7:39 AM
**To:** Sarah Gogo
**Subject:** NB Situation

**Importance:** High

Good Morning Sarah,

I want to update you on the situation I emailed you about Wednesday, January 18, 2017. I met with Christina and Ms. Harvey in person; and Alan by speaker phone on Wednesday regarding the situation I emailed you about.

The situation remains unresolved until Ms. Harvey meets with Elka. Sarah, given the current situation and past instances, I have always felt like Alan has never supported me or respected me in this position because I am a black woman. The reason I am expressing it now is because of the bias in this situation with Elka and another incident Christina informed me of recently, which I will discuss in the closing of my email.

Although, I have not worked closely with Ms. Harvey, I have always respected her and held her in high regard. However, after meeting with Ms. Harvey on Wednesday, I am still troubled by the handling of the situation and the allegations Elka has made against the staff in the NB office. Ms. Harvey's questions to me, "Is it because she's out of the office most of the time, the reason they don't want to work with her"? This type of questioning without proof, nor having witnessed her being treated inappropriately by others is something I cannot answer. This entire situation has defeated me and has created a hostile work environment, which has made me very uncomfortable. I am using the "open door communication policy" to communicate with you, the HR Corporate Director, or someone who is willing to take an unbiased approach in resolving this matter.

The last concern I have is regarding a written counseling against me regarding a self-reported incident that incurred a monetary fine against the company. I consulted with Christina regarding a case for guidance on how to handle what I considered to be Medicaid Fraud. After Christina reviewed the case, she instructed me to file an APS report which I did immediately. According to Christina, Alan informed her that I will be written up, despite her telling him that she gave me directions on how to handle my findings. I did the responsible thing by obtaining guidance from my superior on an issue. I should not be punished for instructions given to me by my direct boss. I only want to be treated fairly. Based on Alan's insistence that I be written up despite being aware that my actions were based on instructions given to me, reinforces my belief regarding his treatment towards me.

I am following company policy regarding the open door policy. Also, I am only asking that the employees, including myself, to be treated with fairness, dignity, and respect.

Respectfully,

Renee

**Renee Richardson**
Branch Manager
**MED TEAM, INC.**
1423 N. Walnut Ave. # 102



EXHIBIT
6

RICHARDSON, L. - 000484

New Braunfels, TX 78130
Office: 830-626-3525
Fax: 830-629-2465
E-mail: RRichardson@medteam.com
Visit our new website: www.medicalteam.com



THE
MEDICAL
TEAM*

Care that matters, where it counts.
At home.

CONFIDENTIALITY NOTICE: *This electronic message and all contents contain information which may be privileged, confidential or otherwise protected from disclosure. The information is intended to be for the addressee only. If you are not the addressee, any disclosure, copying, distribution or use of the contents of this message is prohibited. If you have received this electronic message in error, please notify us immediately and destroy the original message without retaining any copies. Any views or opinions presented in this email are solely those of the author and do not necessarily represent those of THE MEDICAL TEAM, INC. - MED TEAM, INC. - THE MEDICAL TEAM Personal Care Services - Catastrophic Care Solutions.*

RICHARDSON, L. - 000485

# Exhibit B

Transcript of the Testimony of

# Tia Jackson

## Date:

November 28, 2018

## Case:

RENEE RICHARDSON vs MEDICAL TEAM, et al

Tia Jackson                                              November 28, 2018

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

```
RENEE RICHARDSON,            )
          Plaintiff          )
                             )
VS.                          )  NO. 5:18-CV-151-FB
                             )
THE MEDICAL TEAM, INC.       )
d/b/a THE MED TEAM, INC.,    )
          Defendant          )
```

*************************************************************

VIDEOTAPED DEPOSITION OF

TIA JACKSON

A CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC.

d/b/a THE MED TEAM, INC.

NOVEMBER 28, 2018

*************************************************************

VIDEOTAPED DEPOSITION of TIA JACKSON, a

CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC. d/b/a

THE MED TEAM, INC., produced as a witness at the

instance of the Plaintiff, and duly sworn, was taken in

the above-styled and numbered cause on the 28th day of

November, 2018, from 9:35 a.m. to 10:42 a.m., before

Naomi R. Peltier, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of JACKSON

WALKER, LLP, 112 East Pecan Street, Suite 2400, San

Antonio, Texas, pursuant to the Federal Rules of Civil

Procedure.

Tia Jackson

November 28, 2018
Pages 2 to 5

---

Page 2

```
1            A P P E A R A N C E S
2
  FOR THE PLAINTIFF:  RENEE RICHARDSON
3     THOMAS N. CAMMACK, III
      and LORNA GRIFFIN
4     PONCIO LAW OFFICES
      5410 Fredericksburg Road, Suite 103
5     San Antonio, Texas  78229
      (210) 212-7979
6     tcammack@ponciolaw.com
7 FOR THE DEFENDANT:  THE MEDICAL TEAM, INC. D/B/A THE MED
  TEAM, INC.
8     RICK GARZA
      JACKSON WALKER, LLP
9     112 E. Pecan Street, Suite 2400
      San Antonio, Texas  78205
10    (210) 978-7700
      rgarza@jw.com
11
  THE VIDEOGRAPHER:
12    NEAL CASTILE
13 ALSO APPEARING:
      RYAN GRISARD
14
              * * * * * *
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
1            I N D E X
2
                                    PAGE
3 Appearances ........................................2
4          EXAMINATIONS
                                    PAGE
5 TIA JACKSON
      Examination By Mr. Cammack ....................4
6
7          EXHIBITS
                                    FIRST
8 NO.    DESCRIPTION              REFERENCED
9  1   Deposition Notice .............................11
10 2   Administrative Employee Handbook ..............16
11 3   Employee Guide to Workforce HR Self Service
          and Performance Management .................32
12
    4   Performance Review ............................38
13
14              -o-O-o-
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

1        THE VIDEOGRAPHER:  Today's date is

2 November 28, 2018.  We're on the record at approximately

3 9:35 a.m. to take the oral video deposition of corporate

4 representative of The Medical Team, Tia Jackson, in the

5 case styled Renee Richardson versus The Medical Team,

6 Incorporated, d/b/a The Med Team, Incorporated.  By

7 previous agreement, we are forgoing the formal federal

8 preamble.  If the attorneys would introduce themselves,

9 and the court reporter can swear in the witness, please.

10        MR. CAMMACK:  Yes, my name is Thomas

11 Cammack.  I'm taking this deposition -- or the Poncio

12 Law Offices, taking this deposition, and we are here on

13 behalf of the Plaintiff, Renee Richardson.

14        MR. GARZA:  Rick Garza, with Jackson

15 Walker, on behalf of The Medical Team.

16        THE VIDEOGRAPHER:  Thank you.

17        MR. CAMMACK:  All right.  I'm sorry.  Go

18 ahead.

19            TIA JACKSON,

20 A CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC.

21        d/b/a THE MED TEAM, INC.,

22 having been first duly sworn, testified as follows:

23            EXAMINATION

24    Q.  (BY MR. CAMMACK) Okay.  And Ms. Jackson, could

25 you please state your job title with The Med Team?

---

Page 5

1    A.  Human resources manager.

2    Q.  And what's your full name?

3    A.  Tia Alisa Jackson.

4    Q.  Okay.  And Ms. Jackson, you currently have been

5 designated as a corporate representative to testify on

6 their behalf; is that correct?

7    A.  That's correct.

8        MR. CAMMACK:  Okay.  And now, as far as

9 Rick and I were briefly having a discussion, we also

10 have another corporate representative that's actually in

11 the room right now.  Usually, if I'm garnishing

12 testimony, I would invoke the Rule, and I would say,

13 "Any other witnesses that aren't essential would need to

14 leave the room," and my understanding there's a

15 disagreement related to that.

16        MR. GARZA:  Yes, there is a disagreement,

17 because what we have done is -- and we've -- we've

18 we -- we -- you and I have spoken about the topics that

19 Ms. Jackson is going to testify.  And Mr. Grisard, who

20 is the other person present, he is the CFO of The

21 Medical Team.  He's not a -- not a -- a lower level

22 employee.  He is going to testify regarding the

23 remaining items to be discussed.

24        MR. CAMMACK:  So, if I'm clarifying, the

25 understanding you-all have of the Rule is that if

---

Tia Jackson

November 28, 2018
Pages 6 to 9

Page 6

1 someone is a higher level employee, they're allowed to
2 stay in the room while I'm taking deposition testimony
3 of the other employees?
4           MR. GARZA:  It is -- It is -- My
5 understanding of the Rule is that a -- at each
6 deposition, the corporation has a right to have a
7 corporate rep -- corporate representative at, and attend
8 that deposition.
9           MR. CAMMACK:  And what is --
10          MR. GARZA:  And so --
11          MR. CAMMACK:  -- Ms. Jackson's role?
12          MR. GARZA:  Her role here is to testify
13 regarding certain aspects of the corporate
14 representative deposition.  And so, my position is, is
15 that Mr. Grisard can stay in and -- and watch this
16 deposition to the extent that Ms. Jackson is being
17 examined.
18          MR. CAMMACK:  And -- And I think the whole
19 purpose of the Rule is to get the individuals' testimony
20 one by one.  She's been designated on specific topics --
21 in fact, we just went over it.  It's 3, 8, 12, 38, 39,
22 40, 41, and 42, as a corporate representative, which she
23 just testified she is a corporate representative.
24          MR. GARZA:  Yes.
25          MR. CAMMACK:  So, her role is fulfilling

Page 7

1 the role of a corporate representative in her capacity.
2 Why does he need to be present -- or why is he even
3 allowed to be present, pursuant to the Rules, if he's
4 not being asked questions about those -- those specific
5 parameters?
6           MR. GARZA:  She testifying regarding those
7 particular topics, and at every deposition a -- the
8 corporation has a right to have a corporate
9 representative attend the deposition.
10          MR. CAMMACK:  But she is the corporate
11 rep.
12          MR. GARZA:  She's testifying regarding
13 certain aspects.
14          MR. CAMMACK:  As the corporate
15 representative.
16          MR. GARZA:  Well, certainly.  As -- She is
17 going to testify on behalf of the corporation, but it is
18 a separate question as to whether or not the -- the
19 corporation has a right to have a corporate
20 representative present to watch that deposition and to
21 be present during the deposition.
22          MR. CAMMACK:  I mean, I -- I disagree with
23 the understanding of it.  I've never heard it put that
24 way either.  I think this is something -- you know, I
25 don't want to start off so early getting a ruling on or

Page 8

1 calling the Court about, but I think it's essential that
2 we go through the process.  And the process is that
3 she's here, she's the corp rep, she's allowed to have
4 counsel here, but there's not supposed to be other
5 people here.  Let's say you had five corporate reps here
6 that were all going to testify today.  Is -- Is it my
7 understanding that you're saying all five could sit in,
8 based on the fact they're corporate reps and they'd be
9 providing testimony today?
10          MR. GARZA:  No.
11          MR. CAMMACK:  Okay.
12          MR. GARZA:  No, not necessarily.  I mean,
13 if -- if -- if those individuals are providing
14 additional testimony regarding aspects different from
15 what Ms. Jackson is going to testify about, then the
16 corporation has a right to have a representative -- a
17 corporate representative.  It doesn't mean that we can
18 bring in a hundred people in -- nor can we bring other
19 witnesses in -- in this deposition to act as the
20 corporate representative.  I can't bring in a branch
21 manager of The Medical Team to sit in on this deposition
22 when Mr. Grisard is the CFO upper management and is --
23 I -- in my -- in my contention, allowed to be present
24 during this particular deposition.
25          MR. CAMMACK:  Okay.  I mean, I just

Page 9

1 disagree that -- that he's allowed to be here, and I
2 think -- you know, part of the purpose of the rule is
3 that -- so there's not a parroting of testimony by
4 individuals that will be testifying.
5           MR. GARZA:  Understood.
6           MR. CAMMACK:  And --
7           MR. GARZA:  And -- I'm sorry.  Go ahead.
8           MR. CAMMACK:  Go ahead.
9           MR. GARZA:  I understand that.  And the --
10 the -- the topics -- and that's why we've designated
11 Ms. Jackson to testify regarding certain aspects of
12 those topics.  And -- And Mr. Grisard is going to answer
13 questions regarding the other topics that have been --
14 that have been listed in your deposition notice.
15          MR. CAMMACK:  Okay.  I mean, I don't
16 see --
17          MR. GARZA:  So, I don't -- I don't see a
18 doubling up of -- of the questions.  And if that's what
19 you're -- If that's the intent, then we need to have
20 another discussion.  You're not going to ask Ms. Jackson
21 questions and then ask Mr. Grisard the same questions --
22          MR. CAMMACK:  Well, I'm not --
23          MR. GARZA:  -- I assume.
24          MR. CAMMACK:  -- going to ask -- I'm --
25 I'm not here to ask the same questions, but I am going

Tia Jackson

November 28, 2018
Pages 10 to 13

Page 10

1 to, obviously, have some overlap.  I have a
2 discrimination/harassment/retaliation case.  If she's
3 going to talk about policies and he's going to talk
4 about investigations pursuant to those policies, there's
5 going to be some overlap.  Let's say I say, hey --
6          MR. GARZA:  Sure.  And I -- And I -- I --
7 That, I understand.  I -- I -- I can see that there
8 would be some overlap, but it's not as if you're asking
9 Ms. Jackson the exact same questions as you're asking
10 Mr. Grisard.  So -- So, although there may be some
11 overlap, there's -- there are vast differences, in my --
12 You're going to be in control of the questions.  There
13 are vast differences in what Ms. Jackson is going to
14 testifying about as opposed to what Mr. Grisard is going
15 to test about --
16          MR. CAMMACK:  Okay.
17          MR. GARZA:  -- testify about.
18          MR. CAMMACK:  Can we -- So, do you think,
19 then, that we -- Because my -- my position, I think, is
20 that she can sit here as a representative.  You're
21 saying absolutely not, you disagree with that.  There's
22 not a way we could agree that he could just not sit in
23 during her testimony?  I don't -- I don't see what the
24 point of him would be to be here, in any event.
25          MR. GARZA:  Well, I -- I think that -- The

Page 11

1 point is, is that the corporation has the right to --
2 to -- to a corporate representative at every deposition.
3 My contention, even at the corporate -- at a corporate
4 representative's deposition.  You know, once again, I
5 mean, there may be some -- some small overlap, but
6 Ms. Jackson is designated to testify regarding certain
7 aspects of this case and Mr. Grisard is -- is going to
8 testify regarding other aspects of the case.
9          MR. CAMMACK:  Okay.  Do you mind if we go
10 off the record and then I make a phone call real quick?
11          MR. GARZA:  Sure.
12          MR. CAMMACK:  Okay.
13          THE VIDEOGRAPHER:  We're off the record at
14 9:43.
15          (Recess 9:43 a.m. to 10:05 a.m.)
16          THE VIDEOGRAPHER:  We're back on the
17 record at 10:05.
18     Q.  (BY MR. CAMMACK) All right.  And I'm sorry,
19 again, could you please state your full name again?
20     A.  Tia Alisa Jackson.
21          (Exhibit No. 1 marked.)
22     Q.  (BY MR. CAMMACK) Okay, Ms. Jackson.  You've
23 been designated to speak on some topics, and you have
24 before you Exhibit Number 1.  And Exhibit Number 1 is
25 the notice of intent to take the deposition of corporate

Page 12

1 representative.  Could you turn to the second page with
2 me?
3     A.  Okay.
4     Q.  My understanding is, one of the topics you've
5 been designated on is number 3, the employee handbook
6 and guidelines.
7     A.  Yes.
8     Q.  Are you prepared to speak about that today?
9     A.  Yes.
10     Q.  Okay.  And number 8, the employee's personnel
11 file and prior attendance and discipline and prior leave
12 requests?
13     A.  Yes.
14     Q.  Are you prepared to speak on that today?
15     A.  Yes.
16     Q.  And number 12, the Defendant's policies related
17 to discipline, including of management and policies of
18 progressive discipline?
19     A.  Yes.
20     Q.  Are you prepared to speak on that today, as
21 well?
22     A.  Yes.
23     Q.  Okay.  If you could turn a couple of pages with
24 me to the second to the last page until you see topic
25 number 38.

Page 13

1     A.  I'm there.
2     Q.  Okay.  And number 38, the policies and/or
3 guidelines of Defendant regarding the appropriate or
4 expected manner of conduct between male and female
5 employees.
6     A.  Yes.
7     Q.  Okay.  Number 39, the policies, guidelines, and
8 procedures of Defendant regarding the reporting by
9 employees of sexual harassment or other inappropriate
10 sexual conduct, or of harassment based on race or
11 national origin?
12     A.  Yes.
13     Q.  Okay.  Number 40, the policies, guidelines, and
14 procedures of Defendant regarding the documentation of
15 employees' reports of sexual harassment or other
16 inappropriate sexual conduct, or the documentation of
17 reports of harassment based on race or national origin?
18     A.  Yes.
19     Q.  Number 41, the policies, guidelines, and
20 procedures of Defendant regarding the investigation of
21 claims made by employees of sexual harassment, or other
22 inappropriate sexual conduct, or of harassment based on
23 race or national origin?
24     A.  Yes.
25     Q.  And number 42, the policies, guidelines, and

Tia Jackson

November 28, 2018
Pages 14 to 17

Page 14

1 procedures of Defendant regarding the documentation of
2 the investigation of claims made by employees of sexual
3 harassment, or other inappropriate sexual conduct, or of
4 harassment based on race or national origin.
5     A.   Yes.
6     Q.   Okay.  Have you ever provided a deposition
7 before?
8     A.   No.
9     Q.   Okay.  I'm going to go over some of the ground
10 rules of the deposition, a lot of them will make her job
11 a little bit easier today.
12     A.   Okay.
13     Q.   You're doing a good job today so far.  She
14 can't record nonverbal responses, or "uh-huhs" or
15 "huh-uhs" aren't clear on the record, so if you can
16 continue to provide a "yes," "no," or whatever your
17 answer is, so we can have a clear record.
18     A.   Okay.
19     Q.   And then, she also can't record anytime where
20 we're talking over each other.  You may know where I'm
21 going with a question, I may think I know where you're
22 going with an answer, but if you could wait until I
23 finish my question, and I'll extend you the same
24 courtesy.
25     A.   Absolutely.

Page 15

1     Q.   And then, I don't mean you any disrespect by
2 this question.  I ask this of every witness.  And I know
3 it's early in the morning, but have you had anything to
4 drink today?
5     A.   Like alcohol?
6     Q.   Correct.
7     A.   No.
8     Q.   All right.  And have you taken any medication
9 that would affect your memory?
10     A.   No.
11     Q.   Is there any reason you couldn't give full and
12 truthful testimony today?
13     A.   No.
14     Q.   And even though we're in a conference room, is
15 it your understanding that your testimony has the same
16 weight as it would in a trial?
17     A.   Yes.
18     Q.   And you understand that, in the state of Texas,
19 it's a third degree felony to purger yourself?
20     A.   Yes.
21     Q.   Okay.  Now, sometimes I get in a rush or I may
22 be trying to think of a question and I word it a little
23 strange.  If you have a problem understanding my
24 question or if I word it in a way that doesn't quite
25 make sense, could you please ask me to clarify?

Page 16

1     A.   Yes.
2     Q.   And if you provide an answer and don't ask me
3 to clarify, can we assume that you understood my
4 question?
5     A.   Yes.
6     Q.   And at the end, I'm going to ask you if you
7 need to clarify any of your testimony, but feel free to
8 do it on the spot if you need to, you know, make a
9 clarification or change to your testimony.
10     A.   Okay.
11     Q.   Okay.  Thank you.
12          (Exhibit No. 2 marked.)
13     Q.   (BY MR. CAMMACK) I'm going to hand you -- So,
14 we'll be skipping back and forth between Exhibit Number
15 1, but I'm going to hand you Plaintiff's Exhibit
16 Number 2.  Are you familiar with this document?
17     A.   Yes.
18     Q.   And what is this document?
19     A.   Employee handbook.
20     Q.   And when did you first become familiar with the
21 employee handbook?
22     A.   When I was hired in September of 2017.
23     Q.   Okay.  And when you were hired, what did you
24 say your job title was?  I'm sorry.
25     A.   Human resources manager.

Page 17

1     Q.   And you said September of 2017?
2     A.   That's correct.
3     Q.   And were you promoted or was this the first
4 time you were hired with The Med Team?
5     A.   That's the first time I was hired with The Med
6 Team.
7     Q.   Okay.  And do you have prior experience as an
8 HR manager?
9     A.   Yes.
10     Q.   Where is your prior experience?
11     A.   Do you want it all, or my last previous job?
12     Q.   Your previous job.
13     A.   I worked for Padgett Stratemann, also known as
14 RSM at this point.
15     Q.   Okay.  And how long were you with them?
16     A.   Two years.
17     Q.   Okay.  I haven't printed out the whole manual,
18 I printed out a couple of pages relevant to our case.
19 If you could turn to the second page of Exhibit Number 2
20 with me.
21          MR. GARZA:  Just for clarification, would
22 you -- let's designate it by the --
23          MR. CAMMACK:  The Bates?
24          MR. GARZA:  -- designation number, please,
25 yeah.

Tia Jackson

November 28, 2018
Pages 18 to 21

Page 18

1    MR. CAMMACK: Oh, perfect.
2    MR. GARZA: That might make it easier.
3    Q. (BY MR. CAMMACK) And that's -- that's another
4 thing I didn't go over today. So, at the bottom of the
5 page, you'll see "Richardson, L," and then a dash and
6 some numbers. That means that this document was
7 produced in discovery. This particular designation
8 means that our office produced it. You'll see some that
9 say "Med Team" and some numbers, and that means that The
10 Med Team produced those documents.
11    But for frame of references, Rick has
12 pointed out there's -- there's numbers to which document
13 page it is, and so this page in particular is 000421.
14 And on this page is the Equal Employment Opportunity
15 policy. What's your understanding of this policy?
16    A. That we don't discriminate against any employee
17 based on race, creed, color, national origin, sex, age,
18 or gender, or disability.
19    Q. Okay. And when you say you don't discriminate,
20 does that mean in making any employment-related
21 decisions?
22    A. Correct.
23    Q. So, if you were to determine whether or not to
24 discipline an employee, your -- this policy prevents it
25 from being done based on their race?

Page 19

1    A. Correct.
2    Q. And if you were to discipline an employee based
3 on their race, that would be a violation of this policy,
4 correct?
5    A. Correct.
6    Q. And if you were to suspend an employee based on
7 their race, that would be a violation of this policy?
8    A. Yes.
9    Q. And to terminate an employee based on their
10 race would be a violation of this policy?
11    A. Yes.
12    Q. Now, this -- this policy particularly -- or
13 specifically prohibits discrimination. Do you know if
14 there's a separate policy that prohibits harassment or
15 retaliation?
16    A. We have an anti-harassment policy.
17    Q. Okay. Is that also in the handbook or in
18 another location?
19    A. There -- I'm not sure if it's in the handbook.
20 I know that there is another policy.
21    Q. Okay. Do -- Do you know the name of the policy
22 that prohibits harassment retaliation?
23    A. It's called anti-harassment.
24    Q. Okay. So, is it a separate document or a
25 separate policy book?

Page 20

1    A. I believe it's a separate document.
2    Q. Okay. And is -- is there also a separate one
3 for retaliation, as well -- an anti-retaliation policy?
4    A. No.
5    Q. Do you have an anti-retaliation policy that
6 you're aware of?
7    A. Not that I'm aware of.
8    Q. Okay. And is it -- So, it's your understanding
9 that the employees are not instructed on retaliation if
10 they report discrimination?
11    A. They are, but I don't know that it's a separate
12 policy.
13    Q. Okay. So, they are instructed on it, but
14 there's not a written policy indicating who they can
15 report to or how to go about reporting it?
16    A. Separate from the anti-harassment policy.
17    Q. And I didn't understand your answer. You're
18 saying there is or isn't one separate?
19    A. So, there isn't a specific policy on
20 retaliation, but a policy on anti-harassment which
21 should include retaliation.
22    Q. Okay. And is that harassment specific to
23 sexual harassment?
24    A. All harassment.
25    Q. Okay. So, when an employee says, "I've been

Page 21

1 harassed in the workplace," that policy says, based on
2 their complaint of harassment, retaliation is
3 prohibited?
4    A. Correct.
5    Q. And are you aware of whether or not
6 Ms. Richardson would have signed or reviewed that
7 policy?
8    A. I am not aware.
9    Q. Okay. Currently, what kind of training is
10 provided to employees related to the retaliation policy?
11    A. Each employee is provided an employee handbook
12 and some policies when they are onboarded. There's also
13 orientation that they go through. I can only speak to
14 from the time that I was hired to the present. So, as
15 far as orientation when Ms. Richardson was hired, I
16 cannot speak to that.
17    Q. Okay. So, currently, employees, they're handed
18 a handbook and they're supposed to review it?
19    A. Yes. And they sign an acknowledgment that they
20 have reviewed it.
21    Q. And then, during their initial hiring,
22 there's -- there's an orientation checklist they go
23 through?
24    A. Yes. Now --
25    Q. And --

Tia Jackson

November 28, 2018
Pages 22 to 25

Page 22

1  A.  -- from September 2017 to present, again, I
2  can't speak on.
3  Q.  Oh, sure, sure.  So, from September 2017 to
4  present, there's an orientation process.  Now, you're
5  saying you can't speak onto it.  Is that because that's
6  a new policy, or you're just not aware of prior --
7  A.  I'm not aware to prior.
8  Q.  Okay.
9      MR. CAMMACK:  Am I talking too fast?
10      THE REPORTER:  Yes.
11      MR. CAMMACK:  Okay.  Sorry.
12  Q.  (BY MR. CAMMACK)  What all is covered in the
13  orientation as it relates to discrimination retaliation?
14  A.  We talk about our anti-harassment policy, we
15  talk about -- Off the top of my head, I can't remember
16  everything that's in the orientation.  I'm actually not
17  the one that gives it on a daily -- on a weekly basis.
18  Q.  Okay.  Beyond the handbook and this
19  orientation, though, is there any additional training
20  provided regarding compliance with discrimination
21  retaliation policies?
22  A.  Not unless we do a separate -- if -- if there
23  was an issue in the office and we did, like, a separate
24  training on it.  There are annual in-services that
25  they -- that employees take, provided through our HRIS

Page 23

1  system.  It's not a classroom training.
2  Q.  Now, what is an annual in-service?  You're
3  saying it's online, they go onto --
4  A.  They -- For our agency, we are required to have
5  employees sign off on certain policies on an annual
6  basis, so that's an in-service.
7  Q.  Okay.  So, annually, an employee, to continue
8  their employment with The Med Team, will go on and click
9  yes that they reviewed the policy?
10  A.  Yes.
11  Q.  Okay.  Is there any other additional training
12  that's provided regarding compliance with the
13  discrimination retaliation policy?
14  A.  Not that I'm aware of.
15  Q.  Why do you think it's important to have the
16  Equal Employment Opportunity policy?
17  A.  Well, the employee needs to know their rights
18  and the company needs to have something to stand on, to
19  allow the employee to know that these are our rules, and
20  its state regulation or federal regulation.
21  Q.  Do you think it's also important to protect
22  those employees from any type of discrimination in the
23  workplace?
24  A.  Absolutely.
25  Q.  And it's also to prevent them from being

Page 24

1  harmed, if they believe they have been discriminated
2  against, correct?
3  A.  Correct.
4  Q.  And do you think if an employee reports
5  discrimination, it's important to thoroughly investigate
6  that, pursuant to this policy?
7  A.  Absolutely.
8  Q.  Why is it important to have a thorough
9  investigation related to complaints of discrimination?
10  A.  Because we don't -- Well, it's -- it's a strict
11  rule that we don't allow it to happen in the
12  organization, so we need to do our due diligence to make
13  sure an employee feels comfortable when they're working
14  in -- in our agency -- or, period.
15  Q.  Now, if an employee -- And I don't know if
16  you're designated --
17      MR. CAMMACK:  Is she designated to talk
18  about, kind of, policies related to the investigation,
19  Rick, or is that going to be more...
20      MR. GARZA:  That's going to be
21  Mr. Grisard, I believe.
22      MR. CAMMACK:  Say again?  I'm sorry.
23      MR. GARZA:  I think that's going to be
24  Mr. Grisard --
25      MR. CAMMACK:  Okay.  I'll -- I'll --

Page 25

1      MR. GARZA:  -- I believe.
2      MR. CAMMACK:  I'll skip over that then.
3  Q.  (BY MR. CAMMACK)  If you could turn to the next
4  page, and that's going to be Richardson 425.
5  A.  Okay.
6      MR. CAMMACK:  I knocked off my microphone.
7      MR. GARZA:  And Thomas, I'm assuming you
8  were -- you were going to go down the -- Pertaining to
9  the investigation, you were going to talk -- question
10  about Richardson, any investigation of any complaints by
11  Richardson, or anyone?
12      MR. CAMMACK:  I was going to ask her her
13  understanding of just the investigation policies related
14  to complaints of discrimination, in general.
15      MR. GARZA:  Okay.  I mean, I -- I think --
16  I think she can -- she can answer that question.
17      MR. CAMMACK:  Okay.
18  Q.  (BY MR. CAMMACK)  Now, if an employee makes a
19  complaint of discrimination, let's say they say, "I've
20  been discriminated because -- against because of my race
21  or my gender," what -- what is the process pursuant to
22  the policy of investigating that complaint?
23  A.  A verbal statement of what happened, any
24  witnesses that were present when the situation happened,
25  and then a full investigation of the complaint.

Tia Jackson

November 28, 2018
Pages 26 to 29

Page 26

1    Q.   And so, if I'm understanding you, the first
2  step is to get a verbal statement of the complainant?
3    A.   From the person complaining, yeah.
4    Q.   And then, to get witness statements?
5    A.   Not necessarily witness statements, but
6  investigate -- or talk to the witnesses.  A written
7  statement can be requested, yes.
8    Q.   Okay.  And then, any -- just gather facts, in
9  general, about what did or didn't happen?
10   A.   Correct.
11   Q.   Now, let's say that witness makes a complaint
12 to HR specifically, sends an email, sends a letter,
13 makes a phone call.  Is that process still the same for
14 processing the investigation?
15   A.   Well, if they've written an email, that would
16 be a written statement already, so then a conversation
17 would need to happen after that.
18   Q.   Okay.  Do you know what the timeline would be
19 for, I guess, escalating their complaint or -- or
20 responding to their complaint?
21   A.   Not written, but no more than 24 hours.
22   Q.   So, 24 hours is an appropriate timeline for
23 responding to a complaint of discrimination?
24   A.   In my opinion.
25   Q.   Okay.  Do you think that more than 48 hours

Page 27

1  would be way too long to follow up with that
2  complainant?
3    A.   Yes.
4    Q.   How about a week, would that be way too long to
5  respond to a complaint?
6    A.   Yes.
7    Q.   And why is that too long to respond to that
8  complaint?
9    A.   Because it could still be happening, one; and
10 depending on the situation, it may not be safe.  So, as
11 soon as possible is always better.
12   Q.   Would you believe that taking a week to respond
13 to that complaint would be a violation of the policies
14 of the company?
15   A.   I can't say it's a violation if there's no
16 documentation that says it has to be done in 24 hours.
17   Q.   I got you.  But you find that it's
18 inappropriate to take longer than 24 hours?
19   A.   Yes.
20   Q.   Okay.  Now, back to Richardson 425, this is the
21 performance reviews policy.  Is that your understanding
22 of this policy?
23   A.   Yes.
24   Q.   And what is the purpose of giving an employee
25 an annual performance review?

Page 28

1    A.   To allow them to -- To allow the supervisor and
2  the employee to see where they are performing, whether
3  or not, you know, they need to work on some things, to
4  pat them on the back if they're doing a good job, set
5  some goals for the next year.
6    Q.   Okay.  And -- And my understanding is, is that
7  there's an -- someone giving an appraisal, someone -- a
8  manager or supervisor, correct?
9    A.   Yes.
10   Q.   And first, they give a numerical score, a 1 to
11 a 5?
12   A.   Yes.
13   Q.   And a 1 being as bad as it can be, and a 5
14 being as good as the employee can be scored?
15   A.   Correct.
16   Q.   And then, after that, there's a comment box for
17 the supervisor to further evaluate the employee?
18   A.   Yes.
19   Q.   Okay.  And is it your understanding that a 3
20 meets expectations, under that grading system?
21   A.   Without looking at the document, I believe so,
22 but off the top of my head, I can't say that that's -- 3
23 is -- meets expectations.  I don't --
24   Q.   Okay.  But if 5 is the best you can get, a 4
25 would be a high score on the scale?

Page 29

1    A.   Right.
2    Q.   And 3 is the mid-point between 1 and 5?
3    A.   So -- Yes.
4    Q.   Okay.  Now, if an employee is -- is not doing
5  well, is it the policy to provide specific -- a
6  numerical reflection of their scores?  For instance,
7  something to indicate they need improvement or they're
8  not doing their job?
9    A.   Yes.
10   Q.   So, if they're not meeting their job
11 performance duties, it would be reflected in the numbers
12 as -- as a score, correct?
13   A.   That, as well as a comment --
14   Q.   Okay.
15   A.   -- yes.
16   Q.   So, a combination of both the numbers and the
17 comments would say, "Here's an employee who needs to
18 improve"?
19   A.   Yes.
20   Q.   Or, alternatively, "Here's an employee who's
21 doing what they need to do, here's our goals to getting
22 them better"?
23   A.   Yes.
24   Q.   Okay.  Now, even if the employee would have
25 predominantly 4s, there's always room for improvement

Tia Jackson

November 28, 2018
Pages 30 to 33

Page 30

1 for an employee?
2    A.  Absolutely.
3    Q.  And sometimes the room -- Is there ever
4 comments in the box that you're aware of that are
5 saying, "Hey, this particular branch needs to grow, as
6 well as the employee, and here's how we can meet those
7 goals"?
8    A.  Depending on the position, yes.
9    Q.  Okay.  If you could turn to the next page, it's
10 Richardson 426.  This is the opportunities for
11 advancement specific to promotions policy.  Is that your
12 understanding of this policy?
13    A.  Yes.
14    Q.  And it looks like, if you look at the third
15 paragraph down, it starts with "Factors," that an
16 employee's -- not only their performance, but their
17 actual credentials, their skills, their overall
18 initiative and character are factors that are considered
19 in whether or not to promote an employee, correct?
20    A.  Correct.
21    Q.  Now, if an employee is hired, let's say in
22 March, and then is promoted, you know, a few months
23 later, would you find that that's because it's been
24 evaluated that they are -- they are meeting all these
25 factors?

Page 31

1    A.  Yes.
2    Q.  Okay.  And what's your understanding of the
3 reasons that people are provided promotions?  Are they
4 handpicked?  Do they apply for the jobs?  How does that
5 usually work?
6    A.  Could be either/or, it depends on the -- the
7 situation.  If we have an employee who works in that
8 same department and we -- and they meet all these
9 requirements, then it may be -- we may feel that it's a
10 good idea to push them into another position.
11    Q.  Okay.  And if you could turn to Richardson 449,
12 and this is the work environment policy.  I believe this
13 may be the separate sexual harassment policy you
14 mentioned.  Is this that one?
15    A.  Yes.
16    Q.  Okay.  So, this policy specifies that the work
17 environment is supposed to be free from any form of
18 discrimination or sexual harassment, correct?
19    A.  Correct.
20    Q.  An employee who believes they have been a
21 victim of discrimination or sexual harassment should
22 report immediately to HR?
23    A.  Yes.
24    Q.  Okay.  Do you know if there's any other
25 policies besides this one and the one we just observed

Page 32

1 related to discrimination or harassment?
2    A.  Not that I'm aware of.
3    Q.  Okay.  Now, if you could turn a couple more
4 pages to Richardson 455, and towards the bottom of this
5 page it looks like there's a grievance policy.  What's
6 your understanding of the grievances policy?
7    A.  If an employee is feeling like they're
8 treating -- treated unfairly in regards to policy,
9 wages, or any unequal treatment, then they should report
10 it.
11    Q.  And is it your understanding that an employee
12 can try and use the grievance process to also complain
13 of discrimination and harassment?
14    A.  If it's against a particular individual, yes.
15    Q.  Okay.  I'm going to hand you what's being
16 marked as Plaintiff's Exhibit Number 3.
17       (Exhibit No. 3 marked.)
18       MR. GARZA:  Thank you.
19       MR. CAMMACK:  Uh-huh.
20    Q.  (BY MR. CAMMACK) Are you familiar with this
21 document?
22    A.  I have not actually seen it, no.
23    Q.  Do you-all still use a program called Workforce
24 Employee Self Service?
25    A.  No.

Page 33

1    Q.  Okay.  And since you were hired on, has that no
2 longer been something that's been used?
3    A.  Correct, because I have never seen it.
4    Q.  Okay.  Do they have some type of program called
5 a Performance Management Process, that you're aware of,
6 still?
7    A.  No, not that I'm aware of.
8    Q.  And have you ever heard them say that they set
9 SMART objectives, using SMART as an acronym?
10    A.  I've seen it, yes.
11    Q.  Okay.  What -- What -- What's your
12 understanding of the SMART objective set for a
13 manager -- or by managers?
14    A.  There's specific goals, there are measurable
15 goals, actions taken -- I can't remember the -- the
16 definition -- I mean the --
17       THE VIDEOGRAPHER:  Excuse me.
18       THE WITNESS:  -- what the acronym stands
19 for.
20       THE VIDEOGRAPHER:  -- could you push your
21 hair off?  Thank you.
22    Q.  (BY MR. CAMMACK) Okay.  If you could turn to
23 Richardson 396, it looks like, at the bottom, there's an
24 overall performance rating scale.  And then, this looks
25 like the number system we discussed earlier, the 1 to 5?

Tia Jackson

November 28, 2018
Pages 34 to 37

Page 34

1   A.   Yes.
2   Q.   It has 3 listed as proficient with, in
3  parentheses, work is thorough and complete.  And a 4 as
4  commendable, meaning they regularly meet performance
5  levels to ensure successful work completion.  Is that
6  your understanding that's still the -- the ranking
7  system for performance evaluations?
8   A.   Yes.
9   Q.   Okay.  Are you familiar with Ms. Richardson's
10 prior evaluations?
11  A.   No.  I mean, I wasn't there.
12  Q.   Okay.  Well, the reason I ask is -- So, you've
13 been designated to testify as to the employee's
14 personnel file, prior attendance, prior discipline, and
15 prior leave requests.  So, as to her personnel file,
16 what -- what would you have knowledge of and be able to
17 testify about?
18  A.   What do you mean?
19  Q.   Sure.  So, in her personnel file, or at least
20 in theory, I assume would be any requests for time off,
21 any discipline she's received, any evaluations of the
22 employee, any -- any performance improvement plans,
23 things of that nature, correct?
24  A.   Correct.
25  Q.   So, would her evaluations be separate to her

Page 35

1  personnel file?
2   A.   No.  They would be in her personnel file.
3   Q.   Okay.  Are you familiar, then, with her
4  evaluations in her personnel file then?
5   A.   Meaning, like, what they said or --
6   Q.   Sure.
7   A.   No.
8   Q.   Okay.  Is that more of a topic for the other
9  corporate representative?
10     MR. GARZA:  Well, it may be a topic for --
11 for Mr. Grisard, but -- but as far as the -- the -- the
12 personnel file, the description wasn't as -- didn't get
13 into the content or the knowledge of the content --
14     MR. CAMMACK:  Okay.
15     MR. GARZA:  -- of the -- of the personnel
16 file.  So, if -- if you're asking for people who have
17 knowledge of the content that's in the evaluations or --
18     MR. CAMMACK:  I got --
19     MR. GARZA:  -- anything else --
20     MR. CAMMACK:  -- what you're saying.
21     MR. GARZA:  -- I just -- we'll have to
22 find out who that would be.
23     MR. CAMMACK:  Okay.
24  Q.   (BY MR. CAMMACK) So, let me ask you this.  If I
25 were to review her performance evaluation with you,

Page 36

1  would you be able to say -- to be able to say, "Oh, yes,
2  I'm familiar with these performance evaluations," as we
3  went over it, or...
4   A.   Meaning, if you had her evaluation, would I be
5  familiar with what's in her --
6   Q.   Her specific one, yes.
7   A.   No.
8   Q.   Okay.  Would you be familiar with, kind of, her
9  pay stubs and pay structure?
10  A.   No, not specifics.
11  Q.   Okay.  Do you know if she's ever been
12 disciplined prior to her termination?
13  A.   Off the top of my head, no.
14  Q.   Off the top of your head, you don't know or she
15 hasn't?
16  A.   No, I do not know.
17  Q.   Okay.  Do you know if she ever requested leave
18 requests or had any request for time off from work?
19  A.   I don't, no.
20  Q.   Okay.  Do you know if the company has a
21 progressive discipline policy?
22  A.   We do.
23  Q.   What's your understanding of the progressive
24 discipline policy?
25  A.   That it's up to -- it's up to management's

Page 37

1  discretion on how they want to proceed with the -- the
2  employee, meaning that there's no specific "you must do
3  this, this, and this first."
4   Q.   Okay.  So, there's a policy in place, though,
5  for progressive discipline, correct?
6   A.   Correct.
7   Q.   And that policy indicates that if an employee's
8  got deficiencies, they could at least help them to meet
9  their goals, correct?
10  A.   Correct.
11  Q.   And so, if an employee is lacking in, let's
12 say, their performance overall, there's a way to give
13 them verbal notice of that, right?
14  A.   Correct.
15  Q.   And then give them a written notice of that?
16  A.   Right.
17  Q.   And then put them on a performance improvement
18 plan --
19  A.   Yes.
20  Q.   -- so that not only they, but the company, can
21 both improve together?
22  A.   Yes.
23  Q.   Okay.  And that's preferable when you have
24 someone that's been there for a while, you know, for a
25 lot of reasons, but also to include to get them in the

Page 38

1  spot they need to be, correct?
2     A.   Correct.
3     Q.   And it's also expensive to get a new employee
4  in a position that's been fulfilled for a while, right?
5     A.   Yes.
6     Q.   Okay.  I'm going to see if you have knowledge
7  of, otherwise we may ask the next corp rep on -- on her
8  actual performance evaluation.
9     A.   Okay.
10    Q.   You may -- Because I have actual -- Here, let
11 me hand this to Rick first, and see what he...
12        MR. GARZA:  Thank you.
13        (Exhibit No. 4 marked.)
14    Q.   (BY MR. CAMMACK) But here's Plaintiff's Exhibit
15 Number 4 that I've marked.  Are you familiar with this
16 format for the review of employees?
17    A.   Yes.
18    Q.   Is this still the current format?
19    A.   Yes.
20    Q.   And on the system, it looks like there's about
21 12 categories -- or not on the system -- on the page.
22 I'm sorry.
23    A.   Yes.
24    Q.   And this is Med Team 311 through 313.  And it
25 looks like this was given to Ms. Richardson on

Page 39

1  April 8th, 2016.
2     A.   This is to be completed by the appraiser only.
3  There is a self evaluation form.  So, this was given to
4  the manager.
5     Q.   Okay.  So, this is not completed by Alan Garza?
6     A.   Yes --
7     Q.   It is --
8     A.   -- the manager.
9     Q.   Okay.
10    A.   You said "Ms. Richardson."
11    Q.   I'm sorry.  But it is completed by Alan Garza,
12 reviewing Ms. Richardson?
13    A.   Yes.
14    Q.   Okay.  And Alan Garza went through, and it
15 looks like besides two categories -- or I'm sorry --
16 three categories, gave her 4 on nine of 12 categories.
17 Is that your understanding of this?
18    A.   That's what it looks like, yes.
19    Q.   Okay.  And then she got 3s on the other three.
20    A.   Yes.
21    Q.   Okay.  Based on this numerical evaluation, like
22 we just discussed, this would indicate that the employee
23 was not only meeting expectations, but they were
24 commendable in -- in meeting their performance and work
25 completion, correct?

Page 40

1     A.   Correct.
2     Q.   Okay.  Now, you had mentioned that if an
3  employee reported to HR discrimination, that it had to
4  be thoroughly investigated, correct?
5     A.   Correct.
6     Q.   Besides taking witness statements, is there any
7  other documentation that would be produced within that
8  24- to 48-hour period of time regarding the
9  investigation?
10    A.   Not unless there was pictures or something of
11 that nature that -- No.  I mean...
12    Q.   So, HR wouldn't put together a separate report?
13    A.   Oh, yes.
14    Q.   Okay.
15    A.   I'm sorry.  I must have misunderstood.
16    Q.   Okay.  And I might have worded the question
17 strange.  So, HR puts together documentation, and what
18 kind of documentation do they put together?
19    A.   Well, I write an investigative report, so
20 everybody that I've talked to will be on that -- when I
21 talked to them, what day I talked to them, what time I
22 talked to them would be on that report.
23    Q.   Okay.  And then -- So, the whos, the whats, the
24 wheres, the whens, and the whys?
25    A.   Correct.

Page 41

1     Q.   Okay.  And then, from that, do you have a final
2  result or a final determination that you -- you also put
3  together?
4     A.   Yes.
5     Q.   And who -- who are these documents put together
6  for or on behalf of?  And I can reword that.
7     A.   Yes, please.
8     Q.   Sure.  So, once you put together this report,
9  what's the next step?  Who -- Who do you talk to next,
10 who is it submitted to next?
11    A.   I would usually submit it to the corporate
12 office, to have them review it.
13    Q.   Okay.
14    A.   And, you know, see what their next step -- they
15 wanted it to be, depending on the findings.  So, if it
16 was an unsubstantiated claim, then it doesn't need to go
17 any further than that.
18    Q.   Now, how soon, once you receive a complaint, do
19 you notify corporate from the receipt of a complaint?
20    A.   I'm going to first do the investigation before
21 I report it to them.
22    Q.   Okay.  How long would that investigation take?
23    A.   Depends on how many people are involved.  So --
24 and whether or not they're there that day, you know,
25 their attendance or not.  So, it could take a few days,

Tia Jackson

Page 42

1  depending on, you know, the availability of the other
2  employees that I need to speak to.
3      Q.   Okay.  So, if I say to you, on Monday, "Hey, I
4  think this one individual discriminated against me,"
5  based on the fact that it's one individual I'm
6  complaining about and I haven't listed a bunch of
7  witnesses, does that change your time frame at all?
8      A.   Yeah.  Maybe 48 hours, if I get to talk to all
9  the people involved.
10      Q.   And 48 hours within your report being complete
11  and submitted to corporate?
12      A.   Yeah.
13      Q.   Okay.  And then, what's -- Is -- Are you aware
14  of what the next step is, or is that corporate's job to
15  then --
16      A.   They're going to -- We're going to discuss
17  it -- Well, they'll discuss it between those two parties
18  in the corporate office, and then they'll discuss it
19  with me, and then that's it.
20      Q.   Okay.  And then, do you ever say to that
21  individual, "Here's our determination, we could or
22  couldn't substantiate your claims"?
23      A.   Yes.
24      Q.   Besides your investigative report, does
25  corporate put together a separate investigative report?

Page 43

1      A.   I do not know that.
2      Q.   Okay.  Now, is it discretionary whether or not
3  you submit it to corporate, or is that something that
4  has to be done once the complaint is made?
5      A.   I submit it.
6      Q.   Okay.  If you could look back at Exhibit Number
7  4, to the last page, or Med Team 313.
8      A.   Okay.
9      Q.   These are comments left by the manager related
10  to what looks like, at least on my review, struggles
11  that the New Braunfels office branch had in -- in
12  general.  I mean, without having read the whole thing,
13  is that pretty common for them to discuss what the
14  office is or isn't lacking, the appraiser?
15      A.   I would say, depending on the person's
16  position, and then her position as a branch manager,
17  yes.
18      Q.   Okay.  Now, if I am an appraiser and I've given
19  someone predominantly 4s and a few 3s, if I had problems
20  with their individual performance and not necessarily
21  the branch, would I have reflected that in the numerical
22  evaluations?
23      A.   Say that again.  I'm sorry.
24      Q.   Sure.  So, she's got numbers to indicate
25  commendable overall.

Page 44

1      A.   Uh-huh.
2      Q.   But there's some mentions in the written part
3  about the office.  And if you'd like, you can take the
4  time to read that, and then I can ask questions about
5  it, or -- or I can just kind of keep with my line of
6  questioning.  Which would you prefer?
7      A.   You can go on with your questions.
8      Q.   Okay.  So, she's got -- she's been shown to
9  have 4s, right --
10      A.   Uh-huh.
11      Q.   -- overall.  If she was having personal
12  performance issues, she wouldn't have predominantly 4s,
13  correct?
14      A.   Correct.
15      Q.   Okay.  I don't believe I have any other
16  questions for you.  Did you understand my questions
17  today?
18      A.   Yes.
19      Q.   Is there any part of your testimony you'd like
20  to clarify?
21      A.   No.
22          MR. CAMMACK:  All right.  Thank you for
23  your time.
24          THE WITNESS:  All right.  Thank you.
25          MR. GARZA:  Take a break.

Page 45

1          THE VIDEOGRAPHER:  We're off the record at
2  10:42.
3          (Deposition concluded 10:42 a.m.)
4          (Pursuant to FRCP 30(e)(1), request to
5           review the transcript was not made by
6           either deponent or party before the
7           deposition was completed.)
8                    * * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Tia Jackson

November 28, 2018
Pages 46 to 47

Page 46

```
1           IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                SAN ANTONIO DIVISION
3
   RENEE RICHARDSON,          )
4                             )
          Plaintiff           )
5                             )
   VS.                        ) NO. 5:18-CV-151-FB
6                             )
   THE MEDICAL TEAM, INC.     )
7  d/b/a THE MED TEAM, INC.,  )
                              )
8          Defendant          )
9  _____
10               REPORTER'S CERTIFICATE
11          VIDEOTAPED DEPOSITION OF TIA JACKSON
12    A CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC.
13                d/b/a THE MED TEAM, INC.
14                  NOVEMBER 28, 2018
    _____
15
16          I, NAOMI R. PELTIER, Certified Shorthand
17  Reporter in and for the State of Texas, do hereby
18  certify to the following:
19          That the witness, TIA JACKSON, A CORPORATE
20  REPRESENTATIVE OF THE MEDICAL TEAM, INC. d/b/a THE MED
21  TEAM, INC., was duly sworn by the officer and that the
22  transcript of the oral deposition is a true record of
23  the testimony given by the Witness.
24          I further certify that pursuant to FRCP Rule
25  30(e)(1) that the signature of the Deponent:
```

Page 47

```
1          _____ was requested by the Deponent or a party
2  before the completion of the deposition and is to be
3  returned within 30 days from date of receipt of the
4  transcript.
5          If returned, the attached Changes and Signature
6  Page contains any changes and the reasons therefor;
7          __X__ was not requested by the Deponent or a
8  party before the completion of the deposition.
9          That the amount of time used by each party at
10 the deposition is as follows:
11          Thomas N. Cammack, III - 1 hour 17 minutes
12          I further certify that I am neither attorney,
13 nor counsel for, related to, nor employed by any of the
14 parties to the action in which this testimony is taken.
15 Further, I am not a relative or employee of any attorney
16 of record in this cause, nor do I have a financial
17 interest in the action.
18          SUBSCRIBED AND SWORN TO on this _____ day of
19 _____, 2018.
20                        _____
21                        Naomi R. Peltier, CSR, RPR
                          Texas CSR 3672
22                        Expiration:  10/31/21
                          Kim Tindall & Associates, LLC
23                        Firm No. 631
                          16414 San Pedro, Suite 900
24                        San Antonio, Texas  78232
                          (210) 697-3400
25
```

Tia Jackson

---

**Exhibits**

**Jackson, Tia Ex 01** 11:21,24 16:14,15

**Jackson, Tia Ex 02** 16:12,15,16 17:19

**Jackson, Tia Ex 03** 32:16,17

**Jackson, Tia Ex 04** 38:13,14,15 43:6,7

---

**0**

**000421** 18:13

---

**1**

**1** 11:21,24 16:15 28:10,13 29:2 33:25

**10:05** 11:15,17

**10:42** 45:2,3

**12** 6:21 12:16 38:21 39:16

---

**2**

**2** 16:12,16 17:19

**2016** 39:1

**2017** 16:22 17:1 22:1,3

**2018** 4:2

**24** 26:21,22 27:16,18

**24-** 40:8

**28** 4:2

---

**3**

**3** 6:21 12:5 28:19,22 29:2 32:16,17 34:2

**30(e)(1)** 45:4

**311** 38:24

**313** 38:24 43:7

**38** 6:21 12:25 13:2

**39** 6:21 13:7

**396** 33:23

---

**3s** 39:19 43:19

---

**4**

**4** 28:24 34:3 38:13,15 39:16 43:7

**40** 6:22 13:13

**41** 6:22 13:19

**42** 6:22 13:25

**425** 25:4 27:20

**426** 30:10

**449** 31:11

**455** 32:4

**48** 26:25 42:8,10

**48-hour** 40:8

**4s** 29:25 43:19 44:9,12

---

**5**

**5** 28:11,13,24 29:2 33:25

---

**8**

**8** 6:21 12:10

**8th** 39:1

---

**9**

**9:35** 4:3

**9:43** 11:14,15

---

**A**

**a.m.** 4:3 11:15 45:3

**absolutely** 10:21 14:25 23:24 24:7 30:2

**acknowledgment** 21:19

**acronym** 33:9,18

**act** 8:19

**actions** 33:15

**actual** 30:17 38:8,10

**additional** 8:14 22:19 23:11

---

**advancement** 30:11

**affect** 15:9

**age** 18:17

**agency** 23:4 24:14

**agree** 10:22

**agreement** 4:7

**ahead** 4:18 9:7,8

**Alan** 39:5,11,14

**alcohol** 15:5

**Alisa** 5:3 11:20

**allowed** 6:1 7:3 8:3,23 9:1

**alternatively** 29:20

**and/or** 13:2

**annual** 22:24 23:2,5 27:25

**annually** 23:7

**anti-harassment** 19:16,23 20:16, 20 22:14

**anti-retaliation** 20:3,5

**anytime** 14:19

**apply** 31:4

**appraisal** 28:7

**appraiser** 39:2 43:14,18

**approximately** 4:2

**April** 39:1

**aspects** 6:13 7:13 8:14 9:11 11:7,8

**assume** 9:23 16:3 34:20

**assuming** 25:7

**attend** 6:7 7:9

**attendance** 12:11 34:14 41:25

**attorneys** 4:8

**availability** 42:1

**aware** 20:6,7 21:5,8 22:6,7 23:14 30:4 32:2 33:5,7 42:13

---

**B**

**back** 11:16 16:14 27:20 28:4 43:6

**bad** 28:13

---

Tia Jackson

**based**  8:8 13:10,17,22 14:4 18:17, 25 19:2,6,9 21:1 39:21 42:5

**basis**  22:17 23:6

**Bates**  17:23

**behalf**  4:13,15 5:6 7:17 41:6

**believes**  31:20

**bit**  14:11

**book**  19:25

**bottom**  18:4 32:4 33:23

**box**  28:16 30:4

**branch**  8:20 30:5 43:11,16,21

**Braunfels**  43:11

**break**  44:25

**briefly**  5:9

**bring**  8:18,20

**bunch**  42:6

### C

**call**  11:10 26:13

**called**  19:23 32:23 33:4

**calling**  8:1

**Cammack**  4:10,11,17,24 5:8,24 6:9, 11,18,25 7:10,14,22 8:11,25 9:6,8, 15,22,24 10:16,18 11:9,12,18,22 16:13 17:23 18:1,3 22:9,11,12 24:17,22,25 25:2,3,6,12,17,18 32:19,20 33:22 35:14,18,20,23,24 38:14 44:22

**capacity**  7:1

**case**  4:5 10:2 11:7,8 17:18

**categories**  38:21 39:15,16

**CFO**  5:20 8:22

**change**  16:9 42:7

**character**  30:18

**checklist**  21:22

**claim**  41:16

**claims**  13:21 14:2 42:22

**clarification**  16:9 17:21

**clarify**  15:25 16:3,7 44:20

**clarifying**  5:24

**classroom**  23:1

**clear**  14:15,17

**click**  23:8

**color**  18:17

**combination**  29:16

**comfortable**  24:13

**commendable**  34:4 39:24 43:25

**comment**  28:16 29:13

**comments**  29:17 30:4 43:9

**common**  43:13

**company**  23:18 27:14 36:20 37:20

**complain**  32:12

**complainant**  26:2 27:2

**complaining**  26:3 42:6

**complaint**  21:2 25:19,22,25 26:11, 19,20,23 27:5,8,13 41:18,19 43:4

**complaints**  24:9 25:10,14

**complete**  34:3 42:10

**completed**  39:2,5,11 45:7

**completion**  34:5 39:25

**compliance**  22:20 23:12

**concluded**  45:3

**conduct**  13:4,10,16,22 14:3

**conference**  15:14

**considered**  30:18

**content**  35:13,17

**contention**  8:23 11:3

**continue**  14:16 23:7

**control**  10:12

**conversation**  26:16

**corp**  8:3 38:7

**corporate**  4:3,20 5:5,10 6:7,13,22, 23 7:1,8,10,14,19 8:5,8,17,20 11:2, 3,25 35:9 41:11,19 42:11,18,25 43:3

**corporate's**  42:14

**corporation**  6:6 7:8,17,19 8:16 11:1

**correct**  5:6,7 15:6 17:2 18:22 19:1,

4,5 21:4 24:2,3 26:10 28:8,15 29:12 30:19,20 31:18,19 33:3 34:23,24 37:5,6,9,10,14 38:1,2 39:25 40:1,4, 5,25 44:13,14

**counsel**  8:4

**couple**  12:23 17:18 32:3

**court**  4:9 8:1

**courtesy**  14:24

**covered**  22:12

**credentials**  30:17

**creed**  18:17

**current**  38:18

### D

**d/b/a**  4:6,21

**daily**  22:17

**dash**  18:5

**date**  4:1

**day**  40:21 41:24

**days**  41:25

**decisions**  18:21

**Defendant**  13:3,8,14,20 14:1

**Defendant's**  12:16

**deficiencies**  37:8

**definition**  33:16

**degree**  15:19

**department**  31:8

**depending**  27:10 30:8 41:15 42:1 43:15

**depends**  31:6 41:23

**deponent**  45:6

**deposition**  4:3,11,12 6:2,6,8,14,16 7:7,9,20,21 8:19,21,24 9:14 11:2,4, 25 14:6,10 45:3,7

**description**  35:12

**designate**  17:22

**designated**  5:5 6:20 9:10 11:6,23 12:5 24:16,17 34:13

**designation**  17:24 18:7

Tia Jackson

**determination** 41:2 42:21

**determine** 18:23

**differences** 10:11,13

**diligence** 24:12

**disability** 18:18

**disagree** 7:22 9:1 10:21

**disagreement** 5:15,16

**discipline** 12:11,17,18 18:24 19:2 34:14,21 36:21,24 37:5

**disciplined** 36:12

**discovery** 18:7

**discretion** 37:1

**discretionary** 43:2

**discriminate** 18:16,19

**discriminated** 24:1 25:20 42:4

**discrimination** 19:13 20:10 22:13, 20 23:13,22 24:5,9 25:14,19 26:23 31:18,21 32:1,13 40:3

**discrimination/harassment/ retaliation** 10:2

**discuss** 42:16,17,18 43:13

**discussed** 5:23 33:25 39:22

**discussion** 5:9 9:20

**disrespect** 15:1

**document** 16:16,18 18:6,12 19:24 20:1 28:21 32:21

**documentation** 13:14,16 14:1 27:16 40:7,17,18

**documents** 18:10 41:5

**doubling** 9:18

**drink** 15:4

**due** 24:12

**duly** 4:22

**duties** 29:11

---

**E**

---

**earlier** 33:25

**early** 7:25 15:3

**easier** 14:11 18:2

**either/or** 31:6

**email** 26:12,15

**employee** 5:22 6:1 12:5 16:19,21 18:16,24 19:2,6,9 20:25 21:11 23:7, 17,19 24:4,13,15 25:18 27:24 28:2, 14,17 29:4,17,20,24 30:1,6,19,21 31:7,20 32:7,11,24 34:22 37:2,11 38:3 39:22 40:3

**employee's** 12:10 30:16 34:13 37:7

**employees** 6:3 13:5,9,21 14:2 20:9 21:10,17 22:25 23:5,22 38:16 42:2

**employees'** 13:15

**employment** 18:14 23:8,16

**employment-related** 18:20

**end** 16:6

**ensure** 34:5

**environment** 31:12,17

**Equal** 18:14 23:16

**escalating** 26:19

**essential** 5:13 8:1

**evaluate** 28:17

**evaluated** 30:24

**evaluation** 35:25 36:4 38:8 39:3,21

**evaluations** 34:7,10,21,25 35:4,17 36:2 43:22

**event** 10:24

**exact** 10:9

**EXAMINATION** 4:23

**examined** 6:17

**Excuse** 33:17

**exhibit** 11:21,24 16:12,14,15 17:19 32:16,17 38:13,14 43:6

**expectations** 28:20,23 39:23

**expected** 13:4

**expensive** 38:3

**experience** 17:7,10

**extend** 14:23

**extent** 6:16

---

**F**

---

**fact** 6:21 8:8 42:5

**factors** 30:15,18,25

**facts** 26:8

**familiar** 16:16,20 32:20 34:9 35:3 36:2,5,8 38:15

**fast** 22:9

**federal** 4:7 23:20

**feel** 16:7 31:9

**feeling** 32:7

**feels** 24:13

**felony** 15:19

**female** 13:4

**file** 12:11 34:14,15,19 35:1,2,4,12,16

**final** 41:1,2

**find** 27:17 30:23 35:22

**findings** 41:15

**finish** 14:23

**follow** 27:1

**forgoing** 4:7

**form** 31:17 39:3

**formal** 4:7

**format** 38:16,18

**frame** 18:11 42:7

**FRCP** 45:4

**free** 16:7 31:17

**fulfilled** 38:4

**fulfilling** 6:25

**full** 5:2 11:19 15:11 25:25

---

**G**

---

**garnishing** 5:11

**Garza** 4:14 5:16 6:4,10,12,24 7:6,12, 16 8:10,12 9:5,7,9,17,23 10:6,17,25 11:11 17:21,24 18:2 24:20,23 25:1, 7,15 32:18 35:10,15,19,21 38:12 39:5,11,14 44:25

Tia Jackson

**gather** 26:8

**gave** 39:16

**gender** 18:18 25:21

**general** 25:14 26:9 43:12

**give** 15:11 28:10 37:12,15

**giving** 27:24 28:7

**goals** 28:5 29:21 30:7 33:14,15 37:9

**good** 14:13 28:4,14 31:10

**grading** 28:20

**grievance** 32:5,12

**grievances** 32:6

**Grisard** 5:19 6:15 8:22 9:12,21
10:10,14 11:7 24:21,24 35:11

**ground** 14:9

**grow** 30:5

**guess** 26:19

**guidelines** 12:6 13:3,7,13,19,25

**H**

**hair** 33:21

**hand** 16:13,15 32:15 38:11

**handbook** 12:5 16:19,21 19:17,19
21:11,18 22:18

**handed** 21:17

**handpicked** 31:4

**happen** 24:11 26:9,17

**happened** 25:23,24

**happening** 27:9

**harassed** 21:1

**harassment** 13:9,10,15,17,21,22
14:3,4 19:14,22 20:22,23,24 21:2
31:13,18,21 32:1,13

**harmed** 24:1

**head** 22:15 28:22 36:13,14

**heard** 7:23 33:8

**hey** 10:5 30:5 42:3

**high** 28:25

**higher** 6:1

**hired** 16:22,23 17:4,5 21:14,15
30:21 33:1

**hiring** 21:21

**hours** 26:21,22,25 27:16,18 42:8,10

**HR** 17:8 26:12 31:22 40:3,12,17

**HRIS** 22:25

**huh-uhs** 14:15

**Human** 5:1 16:25

**hundred** 8:18

**I**

**idea** 31:10

**immediately** 31:22

**important** 23:15,21 24:5,8

**improve** 29:18 37:21

**improvement** 29:7,25 34:22 37:17

**in-service** 23:2,6

**in-services** 22:24

**inappropriate** 13:9,16,22 14:3
27:18

**include** 20:21 37:25

**including** 12:17

**Incorporated** 4:6

**indicating** 20:14

**individual** 32:14 42:4,5,21 43:20

**individuals** 8:13 9:4

**individuals'** 6:19

**initial** 21:21

**initiative** 30:18

**instance** 29:6

**instructed** 20:9,13

**intent** 9:19 11:25

**introduce** 4:8

**investigate** 24:5 26:6

**investigated** 40:4

**investigating** 25:22

**investigation** 13:20 14:2 24:9,18
25:9,10,13,25 26:14 40:9 41:20,22

**investigations** 10:4

**investigative** 40:19 42:24,25

**invoke** 5:12

**involved** 41:23 42:9

**issue** 22:23

**issues** 44:12

**items** 5:23

**J**

**Jackson** 4:4,14,19,24 5:3,4,19 6:16
8:15 9:11,20 10:9,13 11:6,20,22

**Jackson's** 6:11

**job** 4:25 14:10,13 16:24 17:11,12
28:4 29:8,10 42:14

**jobs** 31:4

**K**

**kind** 21:9 24:18 36:8 40:18 44:5

**knocked** 25:6

**knowledge** 34:16 35:13,17 38:6

**L**

**lacking** 37:11 43:14

**Law** 4:12

**leave** 5:14 12:11 34:15 36:17

**left** 43:9

**letter** 26:12

**level** 5:21 6:1

**levels** 34:5

**listed** 9:14 34:2 42:6

**location** 19:18

**long** 17:15 27:1,4,7 41:22

**longer** 27:18 33:2

**lot** 14:10 37:25

**lower** 5:21

## M

**made** 13:21 14:2 43:4 45:5

**make** 11:10 14:10 15:25 16:8 18:2 24:12

**makes** 25:18 26:11,13

**making** 18:20

**male** 13:4

**management** 8:22 12:17 33:5

**management's** 36:25

**manager** 5:1 8:21 16:25 17:8 28:8 33:13 39:4,8 43:9,16

**managers** 33:13

**manner** 13:4

**manual** 17:17

**March** 30:22

**marked** 11:21 16:12 32:16,17 38:13, 15

**meaning** 34:4 35:5 36:4 37:2

**means** 18:6,8,9

**measurable** 33:14

**Med** 4:6,21,25 17:4,5 18:9,10 23:8 38:24 43:7

**Medical** 4:4,5,15,20 5:21 8:21

**medication** 15:8

**meet** 30:6 34:4 37:8

**meet all** 31:8

**meeting** 29:10 30:24 39:23,24

**meets** 28:20,23

**memory** 15:9

**mentioned** 31:14 40:2

**mentions** 44:2

**microphone** 25:6

**mid-point** 29:2

**mind** 11:9

**misunderstood** 40:15

**Monday** 42:3

**months** 30:22

**morning** 15:3

## N

**national** 13:11,17,23 14:4 18:17

**nature** 34:23 40:11

**necessarily** 8:12 26:5 43:20

**nonverbal** 14:14

**notice** 9:14 11:25 37:13,15

**notify** 41:19

**November** 4:2

**number** 11:24 12:5,10,16,25 13:2,7, 13,19,25 16:14,16 17:19,24 32:16 33:25 38:15 43:6

**numbers** 18:6,9,12 29:11,16 43:24

**numerical** 28:10 29:6 39:21 43:21

## O

**objective** 33:12

**objectives** 33:9

**observed** 31:25

**office** 18:8 22:23 41:12 42:18 43:11, 14 44:3

**Offices** 4:12

**onboarded** 21:12

**online** 23:3

**opinion** 26:24

**opportunities** 30:10

**Opportunity** 18:14 23:16

**opposed** 10:14

**oral** 4:3

**organization** 24:12

**orientation** 21:13,15,22 22:4,13,16, 19

**origin** 13:11,17,23 14:4 18:17

**overlap** 10:1,5,8,11 11:5

## P

**Padgett** 17:13

**pages** 12:23 17:18 32:4

**paragraph** 30:15

**parameters** 7:5

**parentheses** 34:3

**parroting** 9:3

**part** 9:2 44:2,19

**parties** 42:17

**party** 45:6

**pat** 28:4

**pay** 36:9

**people** 8:5,18 31:3 35:16 41:23 42:9

**perfect** 18:1

**performance** 27:21,25 29:11 30:16 33:5,24 34:4,7,22 35:25 36:2 37:12, 17 38:8 39:24 43:20 44:12

**performing** 28:2

**period** 24:14 40:8

**person** 5:20 26:3

**person's** 43:15

**personal** 44:11

**personnel** 12:10 34:14,15,19 35:1, 2,4,12,15

**Pertaining** 25:8

**phone** 11:10 26:13

**pictures** 40:10

**place** 37:4

**Plaintiff** 4:13

**Plaintiff's** 16:15 32:16 38:14

**plan** 37:18

**plans** 34:22

**point** 10:24 11:1 17:14

**pointed** 18:12

**policies** 10:3,4 12:16,17 13:2,7,13, 19,25 21:12 22:21 23:5 24:18 25:13 27:13 31:25

**policy** 18:15,24 19:3,7,10,12,14,16, 20,21,25 20:3,5,12,14,16,19,20 21:1,7,10 22:6,14 23:9,13,16 24:6 25:22 27:21,22 29:5 30:11,12 31:12, 13,16 32:5,6,8 36:21,24 37:4,7

**Poncio** 4:11

**position** 6:14 10:19 30:8 31:10 38:4 43:16

**preamble** 4:8

**predominantly** 29:25 43:19 44:12

**prefer** 44:6

**preferable** 37:23

**prepared** 12:8,14,20

**present** 5:20 7:2,3,20,21 8:23 21:14 22:1,4 25:24

**pretty** 43:13

**prevent** 23:25

**prevents** 18:24

**previous** 4:7 17:11,12

**printed** 17:17,18

**prior** 12:11 17:7,10 22:6,7 34:10,14, 15 36:12

**problem** 15:23

**problems** 43:19

**procedures** 13:8,14,20 14:1

**proceed** 37:1

**process** 8:2 22:4 25:21 26:13 32:12 33:5

**processing** 26:14

**produced** 18:7,8,10 40:7

**proficient** 34:2

**program** 32:23 33:4

**progressive** 12:18 36:21,23 37:5

**prohibited** 21:3

**prohibits** 19:13,14,22

**promote** 30:19

**promoted** 17:3 30:22

**promotions** 30:11 31:3

**protect** 23:21

**provide** 14:16 16:2 29:5

**provided** 14:6 21:10,11 22:20,25 23:12 31:3

**providing** 8:9,13

**purger** 15:19

**purpose** 6:19 9:2 27:24

**pursuant** 7:3 10:4 24:6 25:21 45:4

**push** 31:10 33:20

**put** 7:23 37:17 40:12,18 41:2,5,8 42:25

**puts** 40:17

---

## Q

**question** 7:18 14:21,23 15:2,22,24 16:4 25:9,16 40:16

**questioning** 44:6

**questions** 7:4 9:13,18,21,25 10:9, 12 44:4,7,16

**quick** 11:10

---

## R

**race** 13:10,17,23 14:4 18:17,25 19:3, 7,10 25:20

**ranking** 34:6

**rating** 33:24

**read** 43:12 44:4

**real** 11:10

**reason** 15:11 34:12

**reasons** 31:3 37:25

**receipt** 41:19

**receive** 41:18

**received** 34:21

**recess** 11:15

**record** 4:2 11:10,13,17 14:14,15,17, 19 45:1

**references** 18:11

**reflected** 29:11 43:21

**reflection** 29:6

**regularly** 34:4

**regulation** 23:20

**related** 5:15 12:16 21:10 24:9,18 25:13 32:1 43:9

**relates** 22:13

**relevant** 17:18

**remaining** 5:23

**remember** 22:15 33:15

**Renee** 4:5,13

**rep** 6:7 7:11 8:3 38:7

**report** 20:10,15 31:22 32:9 40:12, 19,22 41:8,21 42:10,24,25

**reported** 40:3

**reporter** 4:9 22:10

**reporting** 13:8 20:15

**reports** 13:15,17 24:4

**representative** 4:4,20 5:5,10 6:7, 14,22,23 7:1,9,15,20 8:16,17,20 10:20 11:2 12:1 35:9

**representative's** 11:4

**reps** 8:5,8

**request** 36:18 45:4

**requested** 26:7 36:17

**requests** 12:12 34:15,20 36:18

**required** 23:4

**requirements** 31:9

**resources** 5:1 16:25

**respond** 27:5,7,12

**responding** 26:20,23

**responses** 14:14

**result** 41:2

**retaliation** 19:15,22 20:3,9,20,21 21:2,10 22:13,21 23:13

**review** 21:18 27:25 35:25 38:16 41:12 43:10 45:5

**reviewed** 21:6,20 23:9

**reviewing** 39:12

**reviews** 27:21

**reword** 41:6

**Richardson** 4:5,13 18:5 21:6,15 25:4,10,11 27:20 30:10 31:11 32:4 33:23 38:25 39:10,12

**Richardson's** 34:9

Tia Jackson

**Rick**  4:14 5:9 18:11 24:19 38:11

**rights**  23:17

**role**  6:11,12,25 7:1

**room**  5:11,14 6:2 15:14 29:25 30:3

**RSM**  17:14

**rule**  5:12,25 6:5,19 9:2 24:11

**rules**  7:3 14:10 23:19

**ruling**  7:25

**rush**  15:21

**S**

**safe**  27:10

**scale**  28:25 33:24

**score**  28:10,25 29:12

**scored**  28:14

**scores**  29:6

**sends**  26:12

**sense**  15:25

**separate**  7:18 19:14,24,25 20:1,2,
11,16,18 22:22,23 31:13 34:25
40:12 42:25

**September**  16:22 17:1 22:1,3

**Service**  32:24

**set**  28:4 33:8,12

**sex**  18:17

**sexual**  13:9,10,15,16,21,22 14:2,3
20:23 31:13,18,21

**shown**  44:8

**sign**  21:19 23:5

**signed**  21:6

**sit**  8:7,21 10:20,22

**situation**  25:24 27:10 31:7

**skills**  30:17

**skip**  25:2

**skipping**  16:14

**small**  11:5

**SMART**  33:9,12

**speak**  11:23 12:8,14,20 21:13,16
22:2,5 42:2

**specific**  6:20 7:4 20:19,22 29:5
30:11 33:14 36:6 37:2

**specifically**  19:13 26:12

**specifics**  36:10

**specifies**  31:16

**spoken**  5:18

**spot**  16:8 38:1

**stand**  23:18

**stands**  33:18

**start**  7:25

**starts**  30:15

**state**  4:25 11:19 15:18 23:20

**statement**  25:23 26:2,7,16

**statements**  26:4,5 40:6

**stay**  6:2,15

**step**  26:2 41:9,14 42:14

**strange**  15:23 40:17

**Stratemann**  17:13

**strict**  24:10

**structure**  36:9

**struggles**  43:10

**stubs**  36:9

**styled**  4:5

**submit**  41:11 43:3,5

**submitted**  41:10 42:11

**substantiate**  42:22

**successful**  34:5

**supervisor**  28:1,8,17

**supposed**  8:4 21:18 31:17

**suspend**  19:6

**swear**  4:9

**sworn**  4:22

**system**  23:1 28:20 33:25 34:7
38:20,21

**T**

**taking**  4:11,12 6:2 27:12 40:6

**talk**  10:3 22:14,15 24:17 25:9 26:6
41:9 42:8

**talked**  40:20,21,22

**talking**  14:20 22:9

**Team**  4:4,5,6,15,20,21,25 5:21 8:21
17:4,6 18:9,10 23:8 38:24 43:7

**terminate**  19:9

**termination**  36:12

**test**  10:15

**testified**  4:22 6:23

**testify**  5:5,19,22 6:12 7:17 8:6,15
9:11 10:17 11:6,8 34:13,17

**testifying**  7:6,12 9:4 10:14

**testimony**  5:12 6:2,19 8:9,14 9:3
10:23 15:12,15 16:7,9 44:19

**Texas**  15:18

**theory**  34:20

**thing**  18:4 43:12

**things**  28:3 34:23

**Thomas**  4:10 25:7

**Tia**  4:4,19 5:3 11:20

**time**  17:4,5 21:14 34:20 36:18 40:8,
21 42:7 44:4,23

**timeline**  26:18,22

**title**  4:25 16:24

**today**  8:6,9 12:8,14,20 14:11,13
15:4,12 18:4 44:17

**Today's**  4:1

**top**  22:15 28:22 36:13,14

**topic**  12:24 35:8,10

**topics**  5:18 6:20 7:7 9:10,12,13
11:23 12:4

**training**  21:9 22:19,24 23:1,11

**transcript**  45:5

**treated**  32:8

**treating**  32:8

**treatment** 32:9

**trial** 15:16

**truthful** 15:12

**turn** 12:1,23 17:19 25:3 30:9 31:11
32:3 33:22

**type** 23:22 33:4

---

**U**

**Uh-huh** 32:19 44:1,10

**uh-huhs** 14:14

**understand** 9:9 10:7 15:18 20:17
44:16

**understanding** 5:14,25 6:5 7:23
8:7 12:4 15:15,23 18:15 20:8 25:13
26:1 27:21 28:6,19 30:12 31:2 32:6,
11 33:12 34:6 36:23 39:17

**understood** 9:5 16:3

**unequal** 32:9

**unfairly** 32:8

**unsubstantiated** 41:16

**upper** 8:22

---

**V**

**vast** 10:11,13

**verbal** 25:23 26:2 37:13

**versus** 4:5

**victim** 31:21

**video** 4:3

**violation** 19:3,7,10 27:13,15

---

**W**

**wages** 32:9

**wait** 14:22

**Walker** 4:15

**wanted** 41:15

**watch** 6:15 7:20

**week** 27:4,12

**weekly** 22:17

**weight** 15:16

**whats** 40:23

**whens** 40:24

**wheres** 40:24

**whos** 40:23

**whys** 40:24

**witnesses** 5:13 8:19 25:24 26:6
42:7

**word** 15:22,24

**worded** 40:16

**work** 28:3 31:5,12,16 34:3,5 36:18
39:24

**worked** 17:13

**Workforce** 32:23

**working** 24:13

**workplace** 21:1 23:23

**works** 31:7

**write** 40:19

**written** 20:14 26:6,15,16,21 37:15
44:2

---

**Y**

**year** 28:5

**years** 17:16

**you-all** 5:25 32:23

# Exhibit C

Transcript of the Testimony of

# Ryan Grisard

## Date:

November 28, 2018

## Case:

RENEE RICHARDSON vs MEDICAL TEAM

Ryan Grisard                                          November 28, 2018

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

```
RENEE RICHARDSON,            )
         Plaintiff           )
                             )
VS.                          ) NO. 5:18-CV-151-FB
                             )
THE MEDICAL TEAM, INC.       )
d/b/a THE MED TEAM, INC.,    )
         Defendant           )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED DEPOSITION OF

RYAN GRISARD

A CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC.

d/b/a THE MED TEAM, INC.

NOVEMBER 28, 2018

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED DEPOSITION of RYAN GRISARD, a

CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC. d/b/a

THE MED TEAM, INC., produced as a witness at the

instance of the Plaintiff, and duly sworn, was taken in

the above-styled and numbered cause on the 28th day of

November, 2018, from 10:52 a.m. to 12:45 p.m., before

Naomi R. Peltier, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of JACKSON

WALKER, LLP, 112 East Pecan Street, Suite 2400, San

Antonio, Texas, pursuant to the Federal Rules of Civil

Procedure.

Ryan Grisard

## Page 2

```
1              A P P E A R A N C E S
2
   FOR THE PLAINTIFF:  RENEE RICHARDSON
3      THOMAS N. CAMMACK, III
       and LORNA GRIFFIN
4      PONCIO LAW OFFICES
       5410 Fredericksburg Road, Suite 103
5      San Antonio, Texas  78229
       (210) 212-7979
6      tcammack@ponciolaw.com
7  FOR THE DEFENDANT:  THE MEDICAL TEAM, INC. D/B/A THE MED
   TEAM, INC.
8      RICK GARZA
       JACKSON WALKER, LLP
9      112 E. Pecan Street, Suite 2400
       San Antonio, Texas  78205
10     (210) 978-7700
       rgarza@jw.com
11
   THE VIDEOGRAPHER:
12     NEAL CASTILE
13
              * * * * * *
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1              I N D E X
               (continued)
2
3              EXHIBITS
                                   FIRST
4  NO.     DESCRIPTION           REFERENCED
5  18  4/1/16 Email String Regarding New Braunfels
           Client Count ............................59
6
   19  4/25/18 Email String Regarding New Braunfels
7          Referrals Report for April 2016 .........61
8  20  6/7/16 Email String Regarding Recruiting &
           Marketing Proposals .....................65
9
   21  6/14/16 Email String Regarding Recruiting &
10         Marketing Proposals .....................65
11
                  -o-O-o-
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1              I N D E X
2
                                        PAGE
3  Appearances ..................................2
4              EXAMINATION
                                        PAGE
5  RYAN GRISARD
      Examination By Mr. Cammack .................5
6
7              EXHIBITS
                                   FIRST
8  NO.     DESCRIPTION           REFERENCED
9  1  (Previously marked) .........................7
10 5  Defendant's Responses and/or Objections to
       Plaintiff's First Set of Interrogatories ....12
11
   6  1/20/17 Email from Renee Richardson to
12     Sarah Gogo Regarding NB Situation ...........13
13 7  Job Description (Branch Manager) .............19
14 8  Census ......................................21
15 9  Med Team, Inc. Organizational Chart .........23
16 10 3/8/17 Email from R. Richardson to S. Gogo,
       Regarding Pay Stubs .........................29
17
   11  Pay Stubs ..................................29
18
   12  Performance Improvement Plan ...............39
19
   13  9/25/15 Email String Regarding Employee
20     Discharge Project ...........................45
21 14 10/8/15 Email String Regarding New Braunfels
       Visit on 10/5/15 ............................48
22
   15  3/16/16 Email String Regarding Rae Cazares ...50
23
   16  3/16/16 Email String Regarding Rae Cazares ...52
24
   17  3/16/16 Email String Regarding Rae Cazares ...54
25
```

## Page 5

```
1       THE VIDEOGRAPHER:  Today's date is
2  November 28, 2018.  We're on the record at approximately
3  10:52 a.m. to take the oral video deposition of the
4  corporate representative of The Medical Team, Ryan
5  Grisard.  By previous agreement, attorneys have agreed
6  that we will not be doing the formal federal preamble.
7           RYAN GRISARD,
8  A CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC.
9           d/b/a THE MED TEAM, INC.,
10 having been first duly sworn, testified as follows:
11           EXAMINATION
12 BY MR. CAMMACK
13    Q.  Good morning, Mr. Grisard.
14    A.  Good morning.
15    Q.  Could you please state your full name for the
16 record?
17    A.  Ryan Grisard.
18    Q.  And Mr. Grisard, have you ever been deposed
19 before?
20    A.  I haven't.
21    Q.  I know I went over the rules with Ms. Jackson,
22 but I feel comfortable just going through it again with
23 each --
24    A.  Sure.
25    Q.  -- deponent.  So, she's going to be writing
```

Ryan Grisard

November 28, 2018
Pages 6 to 9

Page 6

1  down everything we're saying.  And if you could just
2  wait until I finish my question and I'll wait until you
3  provide your answer, that way we're not talking over
4  each other.
5      A.  Okay.
6      Q.  And then, you're also doing a good job, if you
7  could please provide verbal responses and make sure to
8  not do "uh-huhs" or "huh-uhs."
9      A.  Okay.
10      Q.  Now, sometimes I phrase a question in a way
11  where the answer could be, "No, I didn't," or, "No, I
12  didn't know," or you may give an "uh-huh" or "huh-uh."
13  I might press you for a yes or a no.  I'm not doing it
14  to mess with you, I'm just trying to get a clear record.
15      A.  Okay.
16      Q.  And again, I don't mean any disrespect.  I ask
17  this question of every deponent.  Have you had anything
18  the drink today?
19      A.  I have not.
20      Q.  Have you taken any medication that would affect
21  your memory?
22      A.  No.
23      Q.  Do you have any reason you couldn't provide
24  full and truthful testimony?
25      A.  I don't.

Page 7

1      Q.  And you understand that, even though we're in a
2  conference room, your testimony has the same weight as
3  if you're talking to a judge or a jury?
4      A.  I do.
5      Q.  And do you also understand that, in Texas, it's
6  a third degree felony to perjure yourself?
7      A.  Yes.
8      Q.  Okay.  And you are here today in your capacity
9  as a corporate representative and -- Do you understand
10  that?
11      A.  Yes.
12      Q.  And that your testimony today binds The Med
13  Team?
14      A.  Correct.
15      Q.  Okay.  You have before you Exhibit Number 1.
16  And Exhibit Number 1 is that notice of intent to take
17  the 30(b)(6) oral deposition of you as a corporate
18  representative.
19      A.  Okay.
20      Q.  And you've been designated on several topics in
21  this list.  I note that there are a few references --
22  and Rick and I have talked about it briefly in an email.
23  There are a few references to a gentleman named William
24  Wilkins, and there's also references to a school.  Med
25  Team does not have a William Wilkins with you, correct?

Page 8

1      A.  Not to my knowledge.
2      Q.  And you're not a school?
3      A.  Correct.
4      Q.  Okay.  So, those are in error.  I would like
5  to, to the extent I can, still ask you questions about
6  the parameters of those topics, though.
7      A.  Okay.
8      Q.  And, of course, you know, Rick and I may talk
9  about it when we get to those, whatever -- whatever we
10  want to do on that.  But on the first topic on the
11  second page, it's listed any investigation and
12  determination related to the complaints of, termination
13  and/or any prior discipline and/or evaluations of the
14  Plaintiff.  Are you able to testify about that today?
15      A.  I am.
16      Q.  Okay.  Number 2, any investigation and
17  determination related to any complaints of harassment,
18  discrimination, termination, and/or retaliation by
19  Plaintiff.  Are you able to testify about that today?
20      A.  Yes.
21      Q.  And then, we're skipping to number 4.  Any
22  harassment, discrimination and retaliation policy
23  related to Plaintiff's claims.  Are you able to testify
24  about that today?
25      A.  Yes.

Page 9

1      Q.  All right.  I wanted to go -- I've kind of
2  talked a little bit already with the other
3  representative about the harassment, discrimination, and
4  retaliation policy.  Is it your understanding that
5  there's a separate retaliation policy that we have not
6  already covered today?
7      A.  Not that I'm aware of.
8      Q.  Okay.  And would there have been one in place
9  at the time Ms. Richardson was an employee?
10      A.  I mean, part of the employee handbook.
11      Q.  Sure.  So, the -- the Exhibit Number 2, then,
12  the policies that are reflected in Exhibit Number 2
13  would be the policies that would include anything
14  related to EEO compliance?
15      A.  To my knowledge.
16      Q.  Okay.  Is it your -- Is it your understanding
17  that there's any other policies besides that related to
18  EEO compliance?
19      A.  I'm unsure.
20      Q.  Okay.  But as you sit here today, you can't
21  think of a separate policy?
22      A.  Correct.
23      Q.  Okay.  And then, back to topic 1 and 2, do you
24  recall any investigation taking place to any complaints
25  made by Plaintiff about being discriminated against?

Ryan Grisard

Page 10

1    A.   There were no investigations.
2    Q.   And do you recall any prior discipline being
3  given to her prior to her termination?
4    A.   I don't recall.
5    Q.   Okay.  And as you sit here today, is there any
6  -- besides discipline, is there any verbal warnings, or
7  any performance improvement plans, or anything of that
8  nature she would have been placed on during her
9  employment?
10   A.   I do believe there were some verbal warnings.
11   Q.   And who would have given her those verbal
12 warnings?
13   A.   That would have been Alan Garza.
14   Q.   And Alan Garza would have given her these
15 verbal warnings -- are you aware what time frame they
16 were given?
17   A.   They would have been during 2016.
18   Q.   Okay.  And before or after she received her
19 performance evaluation that's been marked as Plaintiff's
20 Exhibit Number 4?
21   A.   After.
22   Q.   Okay.  And is it your understanding, then, that
23 she was given them in a disciplinary capacity?
24   A.   Could you clarify?
25   Q.   Sure.  So, Ms. Jackson's testimony, my

Page 11

1  understanding was, is that there is a progressive
2  discipline policy that Med Team has.
3    A.   Okay.
4    Q.   Is that your understanding, as well?
5    A.   Yes.
6    Q.   And then, the first step on most progressive
7  discipline policies is a verbal warning.
8    A.   Uh-huh.
9    Q.   Is that also Med Team's policy?
10   A.   I believe so.
11   Q.   And then, so, in providing those verbal
12 warnings, was he starting the first step of the
13 progressive discipline policy?
14   A.   That would be my assumption.
15   Q.   Okay.  Did he ever escalate that to a written?
16   A.   Not that I'm aware of.
17   Q.   Okay.  And is it your understanding that, in
18 providing answers to discovery, that the -- that the
19 Defendant has, in fact, indicated she's never received
20 any discipline prior to her determination?
21   A.   I can't say that.
22   Q.   Okay.  Well, let me show you --
23       MR. CAMMACK:  And I only have one copy,
24 and I've got it tagged up with my highlights, so I don't
25 know if it matters whether we enter it as an exhibit or

Page 12

1  not, with my highlights on it.
2        MR. GARZA:  Well, just -- just -- We can
3  enter it as an exhibit, as long as we state that the
4  highlights are yours.
5        MR. CAMMACK:  Okay.  So, what it looks
6  like -- And what I'm marking is Plaintiff's Exhibit
7  Number 5.
8        (Exhibit No. 5 marked.)
9    Q.   (BY MR. CAMMACK) Are you familiar with this
10 document?
11   A.   Yes.
12   Q.   And it looks like, in response to number 1,
13 that yourself, Ms. Jackson, and Alan Garza were
14 responsible for providing information to answer those
15 questions, correct?
16   A.   Uh-huh.
17   Q.   And then, if you turn a couple of pages, or it
18 may be one page, to interrogatory number 6, it looks
19 like there's no documentation of any prior discipline.
20 Is that your understanding of the answer to that
21 question?
22   A.   Yes.
23   Q.   Now, when -- when The Med Team provides verbal
24 warning, do they not also document that they've given
25 those verbal warnings, as well, as a part of their

Page 13

1  progressive discipline policy?
2    A.   I can't answer that.
3    Q.   You're not aware of whether they do or not?
4    A.   No.
5    Q.   Okay.  And why was there not an investigation
6  conducted into her complaints of discrimination?
7    A.   There was never a complaint of discrimination
8  received.
9    Q.   Okay.  I'm going to hand you what's been marked
10 as Plaintiff's Exhibit Number 6.
11       (Exhibit No. 6 marked.)
12   Q.   (BY MR. CAMMACK) And do you mind if I snatch
13 back 5 --
14   A.   Yes.
15   Q.   -- from you?  Thanks.  All right.  Are you
16 familiar with this email?
17   A.   I am.
18   Q.   Okay.  And how are you familiar with this
19 email?
20   A.   After Renee was -- it was determined that Renee
21 was going to be terminated, this email came to light.
22 And -- Yeah, I don't remember the exact specifics of --
23 of how or when, but this email was -- came to light
24 after, you know, the determination was to terminate
25 Ms. Richardson.

Ryan Grisard

November 28, 2018
Pages 14 to 17

Page 14

1    Q.   Okay.  So, this email was sent by Renee
2   Richardson January 20th, 2017, at 7:39 a.m. --
3    A.   Uh-huh.
4    Q.   -- to Sarah Gogo, who my understanding is an HR
5   representative?
6    A.   Correct.
7    Q.   And it indicates, if you look at the second
8   paragraph, in the second sentence, that, "...given the
9   current situation and past instances, I have always felt
10   like Alan has never supported me or respected me in this
11   position because I am a black woman."  Did I read that
12   correctly?
13    A.   Yes.
14    Q.   And when was the decision to terminate her
15   made?
16    A.   I do not remember the exact date, but I believe
17   it was around this time period.
18    Q.   Around this time period, being the same day?
19    A.   It may have been the same day, it may have been
20   a day before or a day after.
21    Q.   Okay.  And it was based on her performance,
22   correct?
23    A.   That is correct.
24    Q.   And based on the testimony provided by
25   Ms. Jackson, she -- in fact, the only evidence of her

Page 15

1   performance, at least in her evaluations, is that she
2   was commendable as an employee, correct?
3    A.   Sure.
4    Q.   Okay.  So, she's got commendable performance,
5   she has no prior discipline, but around the same day she
6   complains about being treated differently for being a
7   black woman, the decision is made to terminate her,
8   correct?
9    A.   Correct.
10    Q.   Okay.  And then, your understanding is, that's
11   because she has -- How long has she had those
12   performance problems?
13    A.   So, as a branch manager, she was in charge --
14   one of her main objectives is to grow the census.
15    Q.   Okay.
16    A.   And throughout 2016, the census continued to
17   decline at a very rapid rate.
18    Q.   Okay.
19    A.   And on a monthly basis, as the CFO, I meet with
20   the board of directors and we discuss financial results
21   of each operation.  And, you know, when we were
22   discussing the December results, it was determined that
23   it was time to, you know, let Ms. Richardson go.
24    Q.   Okay.  And was that branch the New Braunfels --
25   So, first, my understanding is, is that part of a branch

Page 16

1   manager's main job is to keep the census up or growing?
2    A.   Correct.
3    Q.   And is that part of her job description?
4    A.   I would think so.
5    Q.   Okay.  So, that's specifically going to be
6   detailed to her in her job description, that she's
7   supposed to keep the census up?
8    A.   Without seeing it, I can't be 100 percent sure,
9   but I would certainly think so.
10    Q.   Okay.  I'm going to show it to you, but I'm
11   going to go ahead and tell you it's not in there.
12   But -- But I'll ask you about it in a minute.
13         The next question I have for you:  Were
14   there other branches that were having census problems?
15    A.   Yes.
16    Q.   And that includes the San Antonio office and
17   the Mercedes branch, correct?
18    A.   Not that I'm aware of.
19    Q.   Okay.
20    A.   It would have included the Austin office and
21   the Brownsville office.
22    Q.   Okay.  So, your understanding is, it's Austin
23   and Brownsville?
24    A.   That's correct.
25    Q.   Okay.  Well -- So, were those Austin and

Page 17

1   Brownsville branch managers terminated for --
2    A.   They were.
3    Q.   Okay.  And when were they terminated?
4    A.   The Austin administrator was terminated around
5   the same time, so towards the end of January of 2017.
6    Q.   Okay.  Because, again, your discovery responses
7   indicated that no other branch managers were terminated
8   for issues with poor performance.
9    A.   Well, that -- that would be a correct
10   statement, because this -- these other two individuals
11   had a job title of "administrator."  So, instead of
12   "branch manager," they had a separate title of
13   "administrator."
14    Q.   Okay.  But were there not branch managers in
15   those offices?
16    A.   There were not branch managers in those
17   offices.
18    Q.   There was no branch managers in -- And which
19   two offices are you saying there were terminations at?
20    A.   Austin and Brownsville.
21    Q.   Austin and Brownsville.  And so, do you know
22   which office Lacy Richard was in?
23    A.   Lacy Richard was in Austin.
24    Q.   And how about Christina Luna?
25    A.   Christina Luna was in Mercedes, I believe.

Ryan Grisard

November 28, 2018
Pages 18 to 21

Page 18

1   Q.   Okay.  And then, how about Eileen Gregory?
2   A.   She was in Brownsville.
3   Q.   And how about Christina Hernandez Ayala?
4   A.   She would have been the administrator of
5   San Antonio.
6   Q.   And she is the administrator that was working
7   in conjunction with Ms. Richardson?
8   A.   So, Ms. Richardson would have had, sort of, a
9   dual reporting role to Alan Garza and Ms. Christina
10   Hernandez.
11   Q.   Okay.  And then, by process of elimination, it
12   looks like our Dallas -- Well, is it Dallas or
13   Huntsville that you-all have another office in?
14   A.   We have an office in Dallas.  We don't have
15   anything in Huntsville.
16   Q.   Okay.
17   A.   We have an office in Hebbronville.
18   Q.   Hebbronville.  That's what that -- Okay.  Is
19   K-A-M-L-A, Kamla, B-E-H-A-R-R-Y-L-A --
20   A.   She's in our Dallas office.
21   Q.   Okay.  Dallas.  And then, who is in your
22   Hebbronville office?
23   A.   Ademar Garza, A-D-E-M-A-R, Garza.
24   Q.   Okay.
25   A.   But again, some of these people are

Page 19

1   administrators, not branch managers.
2   Q.   What's the difference between the administrator
3   and the branch manager?
4   A.   It -- It's more your provider.  So, for
5   example, you have a parent provider number with DADS,
6   and your parent provider number, you have an
7   administrator.  But then you can have branch offices
8   that offset off of that parent provider number.
9   Q.   Okay.
10   A.   So, you can't have an administrator in a
11   branch.  You can only have a branch manager.  Whereas,
12   in that parent, you would have an administrator.
13   Q.   Okay.  But you would agree with me, no other
14   branch managers were terminated at the same time period
15   for low census or poor performance, correct?
16   A.   No other branch managers.
17   Q.   Okay.  I'm going to hand you Plaintiff's
18   Exhibit Number 7.
19        (Exhibit No. 7 marked.)
20   Q.   (BY MR. CAMMACK) And this is a job description
21   for a branch manager in the New Braunfels office,
22   specifically.  Is it your understanding that
23   Ms. Richardson was the branch manager in the New
24   Braunfels office?
25   A.   That's correct.

Page 20

1   Q.   Okay.  You can -- You know, if you'd like, you
2   can review the document, but if you could indicate to me
3   anywhere where there's any discussion of census, or
4   anything related to census, on this document.
5   A.   (Reviews document).  Is this a duplicate page,
6   4, 5, and 6?
7   Q.   It -- Let me -- Let double -- Did I hand you --
8   Oh, I'm sorry.  Yeah, 4, 5, and 6 looks like just a
9   change has been made from salary to hourly, and that
10   there's a little initial next to it.  Besides that,
11   everything else is the same, yes.  And -- And for
12   reference where that change is made, that's Med Team 14,
13   under employee [sic] class, "salaried" has been
14   scratched out with initials I'm not quite familiar with,
15   and then "hourly" has been checked.
16   A.   I don't see word -- mention of the specific
17   word "census," but I would interpret (i) to basically
18   incorporate that.
19   Q.   (i).  So, "Manage operations of the branch in
20   accordance with established fiscal parameters"?
21   A.   Correct.
22   Q.   Okay.  Now, beyond the census, what other
23   problems was she having with her performance?
24   A.   I'm not aware.
25   Q.   So, you -- Nothing was brought to your

Page 21

1   attention that would indicate she had any other issues
2   beyond census?
3   A.   Not that I recall.
4   Q.   Okay.  Would that be something that you would
5   be made aware of in making the determination whether to
6   discipline or terminate a branch manager?
7   A.   Sure.
8   Q.   Okay.
9        (Exhibit No. 8 marked.)
10   Q.   (BY MR. CAMMACK) I'm going to hand you what's
11   been marked as Plaintiff's Exhibit Number 8.  Have you
12   ever seen this document before?
13   A.   I have seen something similar.
14   Q.   And what is this document or what would the
15   similar document indicate to you -- or what is it, I
16   should say?
17   A.   The census of each branch.
18   Q.   Okay.  And so, on the left, there's a column
19   called Month, and it starts with August 15, and it looks
20   like at the very bottom it ends November 2016.
21   A.   Okay.
22   Q.   At the top, I see SA, I assume is San Antonio,
23   NB for New Braunfels, the next column is Austin, or AUS,
24   B'ville for Brownsville, Merc for Mercedes, Dallas, and
25   then H'ville for Hebbronville, correct?

Ryan Grisard

Page 22

1    A.   Correct.
2    Q.   And if you look at -- For instance, the
3 San Antonio office starts August 15th with 796.
4    A.   Uh-huh.
5    Q.   But they end in November of 2016 with 740.
6    A.   Uh-huh.
7    Q.   A 56 percent -- or not percent, I'm sorry -- 56
8 numbers below the original census.
9    A.   Uh-huh.
10   Q.   Does that concern you that there's a drop in
11 56?
12   A.   Sure.
13   Q.   And let's look at Mercedes.  It starts with 146
14 and ends at 120.  It looks like there's a drop in 26.
15   A.   Uh-huh.
16   Q.   Does it concern you there was a drop in 26?
17   A.   Sure.
18   Q.   And you said there's also issues with the
19 Austin and Brownsville offices, but I don't see it
20 reflected in this document.  Is that from the same time
21 period or a different time period, the drop?
22   A.   Same period.
23   Q.   Okay.  Now, based on what you've indicated and
24 based on what this document indicates, all but two of
25 the offices would not have had a drop in census; is that

Page 23

1 your understanding?
2    A.   For this line of business, yes.
3    Q.   And so, the only branch manager that's been
4 terminated is terminated -- is Ms. Richardson, correct?
5    A.   Correct.
6    Q.   And she's terminated approximately the same
7 day -- or the decision to make -- to terminate her is
8 made approximately the same day she complains about race
9 discrimination, correct?
10   A.   Correct.
11   Q.   And of all the time periods there was drops in
12 census, no other decisions were made to terminate her on
13 these other months, correct?
14   A.   Correct.
15   Q.   Okay.
16        (Exhibit No. 9 marked.)
17   Q.   (BY MR. CAMMACK) I'm going to hand you what's
18 been marked as Plaintiff's Exhibit Number 9.  And the
19 sticker kind of covers the number, but this is
20 Richardson 530.  Have you ever seen this document
21 before?
22   A.   It looks familiar.
23   Q.   What's your understanding of this document?
24   A.   It's an org chart.
25   Q.   Okay.  And by "org chart," you just mean

Page 24

1 organizational chart?
2    A.   Yes.
3    Q.   And then, where does -- Are you in the board of
4 directors on this chart?
5    A.   I am not.
6    Q.   Okay.  Where would you fall in this -- this
7 chart then?  Right under Ms. Pembrook?
8    A.   Yeah.
9    Q.   Okay.  And then, where would a Nick
10 T-Z-I-R-I-M-I [sic] fall on this chart?
11   A.   The board of directors.
12   Q.   Okay.  What's his official title on the board?
13   A.   Vice president.
14   Q.   And is it your understanding that he was
15 involved in the decision to terminate Ms. Richardson?
16   A.   Yes.
17   Q.   What was his capacity --
18        MR. GARZA:  What was your response?
19        THE WITNESS:  "Yes."
20   Q.   (BY MR. CAMMACK) And what was his capacity in
21 that decision to terminate?
22   A.   Well, like I said, we -- I -- I present to the
23 board on a monthly basis the financial results of each
24 branch, so that would be Leslie and Nick and myself.
25   Q.   Okay.

Page 25

1    A.   And, you know, based on the results over the
2 past several months, we decided collectively that it was
3 time to eliminate that position.
4    Q.   Okay.  Is that -- When you say "eliminate that
5 position," is there no longer a branch manager position?
6    A.   There was not a branch manager position for
7 quite some time.  There is one today.
8    Q.   Okay.  And do you know when that position was
9 filled or reinstated?
10   A.   If I had to guess, I would say about --
11        MR. GARZA:  Don't guess.
12   Q.   (BY MR. CAMMACK) Was it this year, though?  Was
13 it 2018?
14   A.   Yes.
15   Q.   Do you know if it was early 2018?
16   A.   I don't -- I don't recall.
17   Q.   Okay.  And so, you make a report, "Hey, we need
18 to terminate this position, branch manager"?
19   A.   Uh-huh.
20   Q.   Okay.
21        MR. GARZA:  Is that a "yes"?
22        THE WITNESS:  Yes.
23   Q.   (BY MR. CAMMACK) And -- And does -- Is there
24 any other capacity that you're aware of that Nick served
25 as VP on the board in -- in his decision-making?

Ryan Grisard

November 28, 2018
Pages 26 to 29

Page 26

1    A.   No.
2    Q.   Okay.  Was there anything else that you
3  reviewed in making your decision to terminate?
4    A.   No.
5    Q.   Okay.  And it's also my understanding that
6  Linda Harvey was involved in the decision to terminate?
7    A.   Yes.
8    Q.   If you look at the chart, I have her listed
9  twice, unless there's two Linda Harveys.  I have her
10  listed as director of program and policy development
11  above Alan Garza -- or, I'm sorry, above Angie Harris,
12  but I also have her listed below Alan Garza, as BSN, RN.
13  Is that the same Linda Harvey?
14    A.   It is.
15    Q.   Okay.  What was her role in the decision to
16  terminate?
17    A.   She was just part of the discussion of whether
18  or not we could, you know, go without -- you know,
19  eliminate that position and sort of manage it from the
20  San Antonio operation.
21    Q.   Do you recall her saying anything else related
22  to that termination decision?
23    A.   I don't.
24    Q.   And then, Alan Garza, what was his role in the
25  decision to terminate?

Page 27

1    A.   Similar to Linda's.
2    Q.   Okay.  And where was -- Was -- Where did these
3  discussions take place?  Were they in person, were they
4  on the phone?
5    A.   Nick, Leslie, and I would have been in person.
6    Q.   Okay.
7    A.   Discussions with Linda and Alan would have been
8  over the phone.
9    Q.   Okay.  And do you recall what day these
10  discussions took place?
11    A.   I do not.
12    Q.   Would there be phone logs related to the phone
13  calls?
14    A.   I would certainly think so.
15    Q.   Okay.  And what -- what phone numbers would you
16  have been calling from?
17    A.   The -- The main number is (703) 390-2300.
18    Q.   What were the last four numbers?
19    A.   2300.
20    Q.   Okay.  And when you say there are call logs, is
21  that -- is there actually a separate written log, or
22  just a record that would have been on the phone?
23    A.   Just a record that would have been on the
24  phone.
25    Q.   Okay.  Would you have had a meeting calendar

Page 28

1  that you would have said, "Hey, I'm meeting with Nick
2  and Leslie today"?
3    A.   Unlikely.
4    Q.   Okay.  It wouldn't have been in an Outlook
5  or --
6    A.   (Shakes head from side to side).
7    Q.   Okay.  Was that Number 9 I gave you?
8    A.   It is.
9    Q.   Okay.  If you could come back with me to
10  Plaintiff's Exhibit Number 1, topic number 5 is benefits
11  and pay the employee received or was entitled to.
12    A.   Uh-huh.
13    Q.   Are you able to testify about that today?
14    A.   Yes, I am.
15    Q.   Okay.  And then, number 6, any prior complaints
16  of discrimination, wrongful termination and/or
17  harassment, including those involving the employees
18  and/or supervisors involved in the present matter?
19    A.   Yes.
20    Q.   Number 7, any investigation and/or background
21  check conducted involving the employees and/or
22  supervisors involved in the present matter, including
23  investigations conducted regarding Plaintiff's
24  complaints?
25    A.   Yes, I can speak to that.

Page 29

1    Q.   Okay.  I'm going to hand you Plaintiff's
2  Exhibit Number 10 and 11.
3         (Exhibit Nos. 10 and 11 marked.)
4    Q.   (BY MR. CAMMACK) It looks like Ms. Richardson
5  requested her pay stubs on 10, to Sarah Gogo, from
6  December 2016 to February 2017.
7    A.   Okay.
8    Q.   And it looks like this is after her
9  termination.  It says March 8, 2017, correct?
10    A.   Correct.
11    Q.   Okay.  And then, in Number 11, it looks like
12  some pay stubs.  Would you be aware if these were the
13  ones produced to her, the pay stubs?
14    A.   Yeah, they look -- they look familiar.
15    Q.   Okay.  And would this be an accurate reflection
16  of the pay that Ms. Richardson would be receiving at
17  that time?
18    A.   Yes.
19    Q.   And do you know if she was entitled to any
20  additional benefits or retirement plans or anything
21  that's not reflected on this document?
22    A.   I see voluntary benefits, I see health
23  insurance.  She would have been entitled to contribute
24  to the 401(k) plan.
25    Q.   But if it's not reflected on here, would

Ryan Grisard

Page 30

1  that mean that she's not getting it, or would that be a
2  separate document?
3      A.  That would mean she did not elect to have that
4  payroll deduction.
5      Q.  Okay.  Now, is it your understanding -- or let
6  me reword this.
7          Have there been any prior complaints of
8  discrimination made of the supervisors at the New
9  Braunfels branch?
10     A.  No.
11     Q.  Have there been any prior complaints related to
12  Alan Garza being discriminatory?
13     A.  No.
14     Q.  Have there been any employees that have sent an
15  email saying, "I feel I've been discriminated against,
16  I'm going to resign or quit"?
17     A.  No.
18     Q.  Okay.  Are you aware that there's allegations
19  that Alan Garza made a comment about Ms. Richardson's
20  afro the same day she was terminated?
21     A.  I believe I saw that in one of the discovery
22  questions or somewhere.
23     Q.  Okay.  Are you aware of any comments that were
24  made by Alan that day?
25     A.  No.

Page 31

1      Q.  Are you aware of any statements he made the day
2  of the termination?
3      A.  No.
4      Q.  Okay.  So, you wouldn't be privy to any
5  conversations he had that day?
6      A.  No.
7      Q.  Okay.  If a former employee -- I believe she
8  was the -- Christina Hernandez -- had indicated that he
9  had made such comments, would you have reason to
10  disagree with her then?
11     A.  Yeah, I wouldn't believe it.
12     Q.  You wouldn't believe that he made those
13  comments?
14     A.  Not at all.
15     Q.  Why not?
16     A.  Because I know Alan pretty well, and don't feel
17  that he would have made those comments.
18     Q.  Okay.  So, based on you knowing him pretty
19  well, you don't think he'd make a comment about
20  Ms. Richardson's hair?
21     A.  Correct.
22     Q.  What about you knowing him well makes you
23  believe that?
24     A.  And he's also told me he hasn't made those
25  comments.

Page 32

1      Q.  Oh.  So, based on his representation, he never
2  said it?
3      A.  Correct.
4      Q.  Okay.  But that's the main reason, because he
5  said he didn't do it?
6      A.  Yeah.
7      Q.  Okay.  If you could look back to Exhibit Number
8  1, topic number 9, any defenses asserted by Defendant,
9  and then there's 10, the claims made the basis of the
10  present suit.
11     Is -- Is there anything besides -- And I
12  think I've already asked this.  I don't mean to be
13  repetitive, but besides the lowering in the census, is
14  there any other reason that Ms. Richardson would have
15  been terminated?
16     A.  That was the main -- That was the reason.
17     Q.  Okay.  Now, is it your understanding that there
18  was ever an investigation to her complaints of race
19  prior to her termination or after?
20     A.  Never an investigation.
21     Q.  Was there ever -- Did you ever think it was
22  prudent to make sure that there isn't any discriminatory
23  behavior in the workplace, after she complained?
24     A.  Complaint was never received.
25     Q.  Okay.  And when you say it was never received,

Page 33

1  what do you mean by that?  Do you mean, like, the email
2  didn't go through?
3      A.  I can't answer that.  I just know that the --
4  that the complaint was never received.
5      Q.  So, Sarah Gogo never received that complaint?
6      A.  That is correct.
7      Q.  Okay.  And so, if I have dozens of emails
8  between Sarah Gogo, some prior to Plaintiff's January
9  20th email and some post, why would it be that only one
10  email she doesn't receive?
11     A.  I cannot answer that.
12     Q.  So, then, how did you say to me just a few
13  minutes ago, "We had knowledge, prior to terminating
14  her, of this email," if the email didn't go through?
15         MR. GARZA:  That's not what he said.
16     Q.  (BY MR. CAMMACK)  What was your testimony then?
17     A.  That we had no knowledge of any emails prior to
18  the decision being made to terminate her.
19     Q.  Wait a minute.  Your testimony earlier was --
20  My understanding of your testimony earlier was, is that
21  "We became aware of this complaint around the same time
22  we terminated her."
23     A.  After the decision to terminate her.
24     Q.  And how did you become aware of it after the
25  decision?

Ryan Grisard

November 28, 2018
Pages 34 to 37

Page 34

1    A.  I don't recall.
2    Q.  Is it because there was an email that was sent?
3    A.  I don't recall how we were made aware, but Nick
4  Tzirimis and I went and sat at Sarah's desk after the
5  decision had been made -- after the termination, and
6  looked through her email.
7    Q.  Okay.
8    A.  We looked through her in-box, her trash can,
9  you know, every -- every folder in her Outlook, and
10  could not find that email.  We asked Sarah about the
11  email.  She said she never received it.
12    Q.  Okay.  What was -- So, what -- what prompted
13  you to look for the email, though, if you don't know it
14  exists?
15    A.  Again, I don't remember the specifics about it,
16  whether it was, you know -- I don't remember the
17  specifics of what prompted that discussion and us
18  looking at the email -- at her Outlook account.
19    Q.  Okay.  But the testimony today is -- Because
20  you notice I handed you an email that indicates that she
21  received emails post her termination, correct?
22  Including the one with the pay stub Sarah responds to,
23  right?
24    A.  Correct.
25    Q.  And then -- I mean, I -- We can spend all day

Page 35

1  going through all the emails in January that were
2  received by Sarah and responded to.
3    A.  Sure.
4    Q.  Your testimony is, is that that one email
5  didn't go through, the one email that was sent about the
6  same day the decision was made to terminate her, that
7  she complained about race?
8    A.  My testimony is that we had no knowledge of
9  that email prior to making a decision to terminate
10  Renee.
11    Q.  Okay.  Now, did the New Braunfels office always
12  have, kind of, some issues with the census?
13    A.  Not that I recall.
14    Q.  Did they have issues with complying with some
15  of the -- some of, I guess, the parameters needed to be
16  a successful office?
17    A.  Not that I recall.
18    Q.  Do you recall them having any problems with
19  high turnover of employees or clients?
20    A.  I mean, in our industry, turnover is high in
21  all locations.
22    Q.  Okay.
23    A.  It's the nature of the industry.
24    Q.  So, based on the nature of that industry, would
25  it be prudent, then, when you have an employee who had

Page 36

1  census issues, to try and help them with their
2  performance prior to termination?
3    A.  Yes.  And we did that.
4    Q.  Okay.  But there's just no evidence of that,
5  correct?
6    A.  I can't believe that there's no evidence of
7  that.
8    Q.  Okay.  Well, I'll go through some of the emails
9  with you related to that, but let's -- let's go through
10  some more of the topics first.
11    A.  Sure.
12    Q.  Number 11, damages sought by the Plaintiff,
13  including pay and benefits received by Plaintiff and/or
14  to which he or she was entitled or would have been
15  entitled.  We've already looked at a pay stub and we've
16  already talked about some of the benefits, correct?
17    A.  Correct.
18    Q.  Was there any other health benefits, whether it
19  be dental or vision, that she would have had that would
20  not be listed on Exhibit Number 11?
21    A.  By having the medical deduction, that
22  incorporated vision and dental.
23    Q.  Okay.
24    A.  So, it was one bucket, so to speak.
25    Q.  When an employee is involuntarily separated

Page 37

1  from The Med Team --
2    A.  Uh-huh.
3    Q.  -- are they still entitled to payouts on their
4  vacation time?
5    A.  Yes.
6    Q.  Are they still entitled to payouts on accrued
7  PTO?
8    A.  It's the same thing.
9    Q.  Okay.  They're listed as the same thing?
10    A.  Yeah.
11    Q.  So, there's not separate holiday pay, vacation
12  pay?
13    A.  There's separate holiday pay, but PTO is the
14  only bucket that encompasses your sick and vacation, so
15  to speak.
16    Q.  Okay.  So, any sick leave or vacation pay, that
17  would have been all encompassed in the PTO?
18    A.  Correct.
19    Q.  Okay.  If you'll look at topic number 13 and
20  number 14, the identity and facts regarding any and all
21  employees of Defendant who were demoted, disciplined,
22  suspended, counseled, reprimanded, placed on leave,
23  terminated, discharged and/or laid off within the last
24  10 years under and for the same policy, procedure, rule
25  and/or regulation that was utilized and implemented by

Ryan Grisard

November 28, 2018
Pages 38 to 41

Page 38

1 Defendant with regard to Plaintiff.
2          The second section of that, or number 14,
3 is to identify any and all of those employees that were
4 not disciplined that way, but could have simply been
5 given a warning, suspended, and/or given other
6 disciplinary measures other than termination.  Do you
7 have knowledge of that?
8    A.  Sure.
9    Q.  Okay.  Within the last 10 years, what other
10 branch managers have been terminated for low census?
11    A.  Branch managers, none.
12    Q.  None.  And have any other branch managers been
13 given warnings or performance improvement plans as
14 opposed to termination?
15    A.  Not that I'm aware of.
16    Q.  Are you familiar with Christina Luna?
17    A.  Yes.
18    Q.  And is it your understanding that Christina
19 Luna was placed on a performance improvement plan?
20    A.  I don't -- I don't recall that.
21    Q.  Okay.  I'm going to hand you --
22          MR. CAMMACK:  Do we already have 12 out
23 there?  Okay.
24    Q.  (BY MR. CAMMACK) I'm going to hand you what's
25 been marked as Plaintiff's Exhibit Number 13.  You know

Page 39

1 what, I'm going to mark that one as 12.  I'm sorry.
2          (Exhibit No. 12 marked.)
3    Q.  (BY MR. CAMMACK) And this looks like it's the
4 performance improvement plan of Christina Luna, a branch
5 manager, correct?
6    A.  Yes.
7    Q.  And this was given to her July 30th, 2017?
8    A.  Looks like it was June 1st of 2017.
9    Q.  Oh, I'm sorry.  In the PIP -- I guess I was
10 looking at the end date.  So, it was about a
11 two-month-long PIP, or 60 days?
12    A.  Correct.
13    Q.  And Christina Luna was at the Mercedes office,
14 correct?
15    A.  Correct.
16    Q.  And that's an office we looked at that had low
17 performance -- or low census, correct?
18    A.  Correct.
19    Q.  It looks like, though, if you look at her PIP,
20 they don't even talk about census in this document,
21 despite her low census at her office.  Regardless,
22 though, she is being put on a PIP for her failure to
23 comply with Med Team policies and procedures, specific
24 to, it looks like, EVV in-service, unwillingness to
25 accept her role in completing and maintaining records,

Page 40

1 unwillingness as a branch manager to prioritize and
2 receive specific agency training, and incomplete
3 personnel records with regard to attendance references,
4 office staff references, job descriptions, annual
5 evaluations, and corresponding with verification
6 documents as per South Texas operations manager's audit.
7 Is that your understanding of the reason she was placed
8 on this PIP?
9    A.  Yes.
10    Q.  Now, attendance references, would that have
11 anything to do with recording attendance -- of -- of --
12 of what, specifically, if you're aware?
13          MR. GARZA:  You said "attendance"?
14          MR. CAMMACK:  I'm sorry.  "Attendant," I
15 should be saying.
16    Q.  (BY MR. CAMMACK) Attendant references.  What
17 exactly is an attendant reference?
18    A.  So, attendants are the employees, the providers
19 that are out seeing -- doing the hands-on care, seeing
20 the patients.  So, to me, if it says attendant
21 references, I assume it's a reference check at hire.
22    Q.  And what does the census particularly gauge?
23 What -- What is it a census of?
24    A.  Your number of billable patients.
25    Q.  Your number of billable patients.  Okay.  And

Page 41

1 then, would this attendant reference, then, have
2 anything to do with the number of billable patients?
3    A.  No.
4    Q.  Okay.  What about EVV in-service, what does
5 that have to do with?  Is that a tracking system?
6    A.  EVV stands for Electronic Visit Verification.
7    Q.  Okay.  And that's visit of the billable
8 patients?
9    A.  Correct.
10    Q.  And it looks like there was a violation of the
11 policy related to the electronic visit verification
12 in-service.  What -- What does the in-service mean, or
13 EVV in-service?
14    A.  That would be when you're training those new
15 attendants on using the -- the -- that electronic system
16 to capture their time in and time out at the patient's
17 home.
18    Q.  Okay.  And so, their time in and time out is
19 how you actually bill the billable patients?
20    A.  That's how you pay the attendant and,
21 obviously, yes, how you would also bill the -- for that
22 patient.
23    Q.  Okay.
24          MR. GARZA:  Let's go off the record for a
25 second.

Ryan Grisard

November 28, 2018
Pages 42 to 45

Page 42

1    MR. CAMMACK: Okay. Sure.
2    THE VIDEOGRAPHER: We're off the record at
3 11:34.
4    (Recess 11:34 a.m. to 11:37 a.m.)
5    THE VIDEOGRAPHER: We're back on the
6 record at 11:37.
7    Q. (BY MR. CAMMACK) All right. We're back from a
8 brief break. Do you understand that your testimony is
9 still under oath?
10   A. Yes.
11   Q. Okay. If you can look at topic number 15 on
12 Plaintiff's Exhibit Number 1. And that's the persons
13 involved in the decision to terminate Plaintiff. Have
14 we already discussed all the people involved?
15   A. Yes.
16   Q. I -- I think I skipped over Ms. Pembrook and
17 her involvement. Do you know what input she had related
18 to the termination besides what we've already discussed?
19   A. Again, she would have been in that meeting with
20 Nick and -- and myself --
21   Q. Okay.
22   A. -- discussing financial performance for each
23 location for the month.
24   Q. Okay.
25   A. And would have been part of that conversation

Page 43

1 to terminate.
2    Q. And then, number 16, any and all discipline,
3 performance evaluations, performance, terminations,
4 and/or the race of Plaintiff's comparators, to include
5 branch managers in Texas.
6    Number 17, any and all census numbers,
7 patient retention numbers, patient turnover rates,
8 compliance with State of Texas requirements, employee
9 retention, employee compliance with State requirements,
10 Electronic Visit Verification implementation, referral
11 counts, client discharge numbers, and customer
12 complaints at all branches in Texas.
13   I know that's very broad, but do you have
14 general knowledge of those topics?
15   A. I believe so.
16   Q. Okay. And then, I believe number 18, we've
17 already gone over the job descriptions and job duties
18 and job requirements of Plaintiff as a branch manager in
19 New Braunfels.
20   A. Yes.
21   Q. Outside of that job description, was there any
22 other job duties or job descriptions she would have had?
23   A. Well, again, she would have been responsible
24 for the census.
25   Q. Sure. But it's not specified in her job

Page 44

1 description, correct?
2    A. Like I said, I -- I -- I would interpret point
3 (i), I believe it was, to incorporate that.
4    Q. Sure. So, census is retention of billable
5 patients, either the retention of or the growth in the
6 number of billable patients?
7    A. Correct.
8    Q. And the census is the way you measure that,
9 correct?
10   A. Correct.
11   Q. So, that would be anything related to patient
12 retention numbers or turnover rates, correct?
13   A. And the financial results of that branch,
14 because a patient leads to sales.
15   Q. Okay.
16   A. So, as the sales decrease, obviously, they're a
17 correlation to the census decrease.
18   Q. Sure. Now, are you aware of -- Now, you know,
19 comparators is just a fancy word for -- that lawyers use
20 to say employees that are in similar positions --
21   A. Uh-huh.
22   Q. -- to, in this case, other branch managers.
23 Are you aware of the racial background of the other
24 branch managers? And I can -- I can narrow that down,
25 instead of having you guess what race people are.

Page 45

1    Do you know if any of the other branch
2 managers were black?
3    A. I don't believe so.
4    Q. Okay. And certainly, none of the other branch
5 managers complained about race discrimination?
6    A. Not to my knowledge.
7    Q. Okay. I'm going to hand you what's been marked
8 as Plaintiff's Exhibit --
9    MR. CAMMACK: I don't even know where I am
10 now -- 13. We're finally to actual 13.
11   (Exhibit No. 13 marked.)
12   Q. (BY MR. CAMMACK) And this is Richardson 119.
13 Now, it looks like, at the bottom email, on September
14 25th, 2015, Renee Richardson has indicated that there's
15 a backlog of approximately 150 employee files that need
16 to be discharged properly, and that there was an October
17 19th deadline.
18   And then, a Colleen Shelton indicated she
19 can't help because she's got family plans. Is that your
20 understanding of this email chain?
21   A. That's the way I read it.
22   Q. Now, what would have caused 150 employee files
23 to not be properly discharged, and secondary to that,
24 what is the proper discharging method for an employee
25 file?

Ryan Grisard

November 28, 2018
Pages 46 to 49

Page 46

1    A.  Well, in our industry, you know, these are
2  hourly attendants, so they apply for a job and they're
3  available to work.
4    Q.  Okay.
5    A.  But you may not use them for a period, they go
6  out of the country, they go on vacation, but you don't
7  necessarily discharge them, because they haven't been
8  terminated, they're still available to work.
9    Q.  I gotcha.
10   A.  So, at some point throughout the year, we'll go
11  through, we'll run a query and say, "Okay, you've got
12  these 150 people that haven't worked in a year" --
13   Q.  Sure.
14   A.  -- "so shouldn't we go ahead and terminate them
15  or discharge them from the system so that they're not on
16  the active list to show as available, since, obviously,
17  they haven't worked in quite some time?"
18   Q.  Okay.
19   A.  So, it's not uncommon in our branches to just
20  have employees that are listed as active that really
21  just haven't seen a patient in a while.
22   Q.  And does that impact the overall flow of the
23  office when you have a bunch of backlogged employees?
24   A.  No.
25   Q.  Well, let me -- I'm just trying to understand.

Page 47

1  When you have a list of, let's say, 300 names --
2    A.  Uh-huh.
3    Q.  -- or however many, and I've got 150 on there,
4  are these ones that you're -- you're calling or
5  contacting to see if they can go see a patient?
6    A.  Probably not.
7    Q.  Okay.  So, they're just listed, potentially
8  some, because they were family members and that patient
9  has now passed, some because, like you said, they've
10  gone out of the country?
11   A.  Yeah.
12   Q.  So, that -- them being on that list and being
13  backlogged, why would there be a stringent deadline to
14  get that cleared up?
15   A.  I don't know why they would have put a
16  stringent deadline on that.
17   Q.  Okay.  But -- But to --
18   A.  Maybe -- Maybe the -- You know, back then, we
19  were paper, so maybe the filing cabinets were getting
20  full and they wanted to clean up some filing cabinet
21  space.  I can't answer as to why.
22   Q.  Okay.  So, overall, though, in your opinion,
23  that wouldn't be something related to issues with the
24  census or performance of the office?
25   A.  Not at all.

Page 48

1    Q.  Okay.
2       (Exhibit No. 14 marked.)
3    Q.  (BY MR. CAMMACK) I'm going to hand you what's
4  been marked as Plaintiff's Exhibit Number 14.  And
5  there's a sticker on it, but it's Richardson 495 to 496.
6  And it looks like, if you look at the secondary email,
7  that a Frances Gonzalez sent an email to Alan Garza on
8  October 8th of 2015.  And she was discussing some of the
9  roles of both Renee Richardson as branch manager, and it
10  looks like a Norma Leal, L-E-A-L, in her capacity in HR.
11  It also looks like that they found that the office had
12  multiple areas where they were not compliant, including,
13  if you look at the first sentence on the -- the last
14  paragraph, posters for labor boards in the kitchen/break
15  room are not in the view where an applicant applies.
16  Besides --
17       MR. GARZA:  It says "posture."
18   Q.  (BY MR. CAMMACK) I'm sorry.  Posture labor
19  boards are in the kitchen/break room and not in viewing
20  of where the applicant applies.  Did I read that
21  correctly?
22   A.  Yes.
23   Q.  And what -- what is your definition -- or what
24  is your understanding of what these labor boards that
25  they're posting are -- or posture of the labor boards?

Page 49

1    A.  They would show them what the minimum wage is,
2  you know, different labor laws for state and federal
3  level that the employer has to comply with.
4    Q.  So, the required posting for federal and state
5  laws related to discrimination or retaliation haven't
6  been properly displayed is what this email indicates,
7  correct?
8    A.  That's what it shows.
9    Q.  Okay.  Do you know if that office ever came
10  into compliance with that?
11   A.  I'm not sure.
12   Q.  Okay.  But it certainly hasn't been on
13  anybody's priority list to make sure that that's been
14  posted, correct?
15   A.  I can't -- I can't answer that.
16   Q.  Okay.  But it is your understanding that it is,
17  in fact, a requirement to have those laws posted so that
18  employees have knowledge of discrimination retaliation?
19       MR. GARZA:  I'll object on the basis that
20  it asks him as a nonexpert to make a legal conclusion.
21   Q.  (BY MR. CAMMACK) Okay.  Is it your
22  understanding, though, as VP, in your position, that you
23  are required to post that for employees to have
24  knowledge and view?
25   A.  I believe so.

Ryan Grisard

Page 50

1    Q.   Okay.  Now, you said that the EVV system would
2  not have affected census if there were issues with it?
3    A.   No.
4    Q.   Okay.  What about marketing, would marketing
5  have a reflection on the census or the number of
6  patients you received?
7    A.   Sure.
8    Q.   Okay.
9        (Exhibit No. 15 marked.)
10   Q.   (BY MR. CAMMACK) I'm going to hand you what's
11 been marked Plaintiff's Exhibit Number 15.  And this is
12 an email from Alan Garza to Renee Richardson, and this is
13 in reference to a Rae Cazares, C-A-Z-A-R-E-S.  Do you
14 know who Rae Cazares is?
15   A.   I do.
16   Q.   And it looks like Rae had expressed an interest
17 in becoming an administrative coordinator, as well as
18 her role as a marketing person -- position.
19   A.   Okay.
20   Q.   Do you know if she currently is employed as an
21 administrative coordinator?
22   A.   She's not currently employed with The Medical
23 Team.
24   Q.   Okay.  Did she ever leave her role in marketing
25 with The Medical Team?

Page 51

1    A.   She got dragged into the office quite often to
2  help in some administrative coordinator roles.
3    Q.   Okay.  Was she, though, for the New Braunfels
4  branch, was it her main role to -- to do marketing or --
5    A.   That was supposed to be her main role, yes.
6    Q.   Okay.  And when you say "supposed to be," it
7  ended up not being or...
8    A.   Quite often, she ended up getting dragged into
9  the office to do an admin coordinator role.
10   Q.   Okay.  And what -- Why was she being dragged in
11 that capacity?  Was there a specific reason or specific
12 person requesting her to do so?
13   A.   They didn't have that position filled.
14   Q.   Okay.  So, it was a lack of actually having an
15 administrative coordinator there?
16   A.   Correct.
17   Q.   Now, it -- it looks like Alan Garza is
18 acknowledging, on March 16th of 2016, that Rae is
19 contributing in her marketing role, but the referral
20 counts aren't as exciting as we would like.  Is the
21 referral count -- does that affect the census?
22   A.   It does.
23   Q.   And so, as of March 16, 2016, they're --
24 they're not getting the referral count or the marketing
25 that they want, correct?

Page 52

1    A.   Yeah.
2    Q.   Do you know what steps were taken to add to the
3  referral count or to the marketing?
4    A.   I don't recall.
5    Q.   Okay.
6        MR. GARZA:  And let me just ask, would you
7  speak up a little bit, because I -- I can't hear you.
8  I'm a little bit old.
9        THE WITNESS:  Sure.
10       MR. GARZA:  And -- And make sure that --
11 that you don't say "uh-huh" or "huh-uh," because
12 that's -- that's causing some difficulty.  It has to be
13 a word response, please.  Thank you.
14       THE WITNESS:  Got it.
15   Q.   (BY MR. CAMMACK) Do you know if they ever hired
16 an administrative coordinator before she was separated
17 from the company?
18   A.   Before who was separated from the company?
19   Q.   Rae Cazares.
20   A.   I don't recall.
21   Q.   Okay.
22       (Exhibit No. 16 marked.)
23   Q.   (BY MR. CAMMACK) I'm going to hand you what's
24 been marked as Plaintiff's Exhibit Number 16.  And this
25 is an email from Alan Garza to Renee Richardson on

Page 53

1  March 23rd, 2016.  Rae is responding to Renee's
2  inquiries related to moving Rae into the administrative
3  coordinator position.  And he indicates that "Rae is a
4  valued employee at a high level of pay with the
5  expectation of helping us to grow our business."  He
6  also indicates that her reducing her marketing hours to
7  move into this administrative role would not help the
8  census or revenue.  Is that your understanding of that
9  first paragraph?
10   A.   Yes, it is.
11   Q.   Okay.  He indicates, in the -- the last
12 highlighted section, that they should -- him and
13 Ms. Richardson should come up with a time to discuss
14 their marketing strategy so they could increase the
15 client census as well as revenue.  Is that your
16 understanding of that paragraph?
17   A.   Yes.
18   Q.   Okay.  Do you know if they ever had that
19 meeting to discuss their marketing strategy, or would
20 you have been involved in that meeting?
21   A.   I wouldn't have been involved in that meeting.
22   Q.   Okay.  Do you know, was Rae voluntarily
23 separated or was she terminated?
24   A.   I think she voluntarily resigned.
25   Q.   Okay.  Do you know if she was ever disciplined

Ryan Grisard

Page 54

1 for reasons related to census?

2    A.  I do not know.

3    Q.  Okay.  Do you know if she was ever told that,

4 "Hey, look, you've really got to pick up your marketing,

5 our census and revenue's bad, or not where we want it to

6 be"?

7    A.  Yeah, I'm pretty confident, based on these

8 emails, she was told.

9    Q.  Okay.  But you don't have specific knowledge

10 outside of these emails between Renee and Alan that she

11 was informed, correct?

12    A.  No.

13    Q.  Okay.  I'm handing you what's been marked as

14 Plaintiff's Exhibit Number 17.

15       (Exhibit No. 17 marked.)

16    Q.  (BY MR. CAMMACK) And my understanding of this

17 email is that Ms. Richardson took the previous exhibit,

18 or Number 16, and she wrote in her responses, indicating

19 on the left-hand side "Alan," what he said, and then

20 writing "Renee" for her response.  And this was sent

21 March 24th, 2016.  Is that your understanding of this

22 document?

23       MR. GARZA:  Hold on.

24       THE WITNESS:  I don't understand the

25 question.

Page 55

1    Q.  (BY MR. CAMMACK) Sure.  Sure.  Have you ever

2 seen this email before?

3    A.  I have not.

4    Q.  Okay.  Renee is responding to Exhibit

5 Number 16.  What -- What she's done is, it looks like

6 she has taken specific paragraphs out of Exhibit 16.

7 For instance, you'll see, the first paragraph he starts

8 with, "I don't think this is the best move for MTI," and

9 then his next paragraph on Exhibit 16 starts with, "We

10 should currently have an active ad out."  Is that what

11 it looks like on Exhibit 16?

12    A.  Sure.

13    Q.  Now, if you look over here, the first paragraph

14 is the same, "I don't think this is the best move for

15 MTI," and it's kind of cut off, but it looks like LAN,

16 for Alan, is written right to the left of that paragraph

17 on 17.

18    A.  Okay.

19    Q.  And then, underneath it is a different

20 paragraph from the other exhibit.  "Renee" is written

21 next to that.  Do you see that on 17?

22    A.  I do.

23    Q.  Okay.  So, that's her rebuttal or her response

24 to his questions.  Is that -- Does that seem more

25 apparent, the way I've worded it now?

Page 56

1    A.  That you're saying that's her response to --

2    Q.  Correct.

3    A.  -- these -- Okay.

4    Q.  Okay.  She indicates that she has doubts of the

5 business growing due to high turnover rate with PCAs.

6 What's a PCA?

7    A.  Personal care attendant.

8    Q.  And are those the ones that are getting --

9 they're going out and visiting the billable patients --

10 or the patients with billable hours?

11    A.  Yes.

12    Q.  Okay.  So, she's indicating we have unstaffed

13 clients who are tired of waiting on the PCAs, so they

14 transfer.

15    A.  Okay.

16    Q.  Is that pretty common in your industry?

17    A.  High turnover is common in our industry.

18    Q.  Is that part of a concern about the rate of

19 pay?

20    A.  It can be.

21    Q.  What are other reasons that you can have high

22 turnover?

23    A.  Benefits, family members, not enough hours, you

24 know.

25    Q.  Well, what she indicates here is -- part of it

Page 57

1 is also -- Did I cut you off?  I'm sorry.

2    A.  No, I think I was -- I was finished.

3    Q.  Okay.  She also indicates some of the patients,

4 they're going to expire, they're -- they're providing

5 care to them, correct, so there's going to be -- the

6 census will change due to that, correct?

7    A.  When someone passes away?

8    Q.  Yes.

9    A.  Yeah.

10    Q.  And then, she also indicates some of these

11 patients are moved to long-term care facilities.  That

12 can also affect the census?

13    A.  (Nods head up and down).

14    Q.  Okay.  You have problems that, unfortunately,

15 some of the PCAs are not reliable, she indicates that,

16 as well?

17    A.  Okay.

18    Q.  And then, of course, we discussed the benefits

19 and pay also add to a turnover rate?

20    A.  Okay.

21    Q.  Were any of these things discussed as potential

22 reasons that the census was low in the decision to

23 terminate Ms. Richardson?

24    A.  They were not discussed at the corporate office

25 level.

Ryan Grisard

November 28, 2018
Pages 58 to 61

Page 58

1  Q.  Okay.  But that would have been a daily
2  consideration by any branch manager, correct?
3  A.  Yes.  And I believe Alan and Renee would have
4  had those conversations.
5  Q.  Okay.  Now, it looks like she also recommends
6  an employee incentive or recognition plan beyond the one
7  that was already in place.  Do you know if she ever
8  implemented an employee incentive program?
9  A.  I'm not sure.  I don't -- I don't -- I don't
10  recall.
11  Q.  Okay.  So, if you go down to the paragraph that
12  starts with, "We should currently have an active ad
13  out," by Alan --
14  A.  Okay.
15  Q.  -- her response is, "Yes, there is an ad out
16  and I've scheduled a couple of interviews."  So, he's
17  asking her, as part of her role to -- to respond to
18  business growth is to get an ad out, and she's indicated
19  she's already done that, correct?
20  A.  That's what she's indicating, yes.
21  Q.  Okay.  Now, if you turn to the next page, it
22  looks like, again, it begins with Alan's comments from
23  16, "Let's come up with a few dates to meet and discuss
24  our marketing strategy."
25      And it looks like her response is, "I

Page 59

1  believe it would be to our advantage to meet to discuss
2  the expected census, revenue, and objectives for this
3  branch."  Is that your understanding of her response?
4  A.  Uh-huh.
5  Q.  And again, you would --
6  A.  Yes.
7      MR. GARZA:  Yes?
8      THE WITNESS:  Yes.
9  Q.  (BY MR. CAMMACK) And I'm sorry, I should have
10  asked you to clarify, as well.  But do you -- And you
11  already testified you're not privy to those meetings,
12  though, right?
13  A.  No.
14  Q.  Okay.
15      MR. GARZA:  What was your last response?
16      THE WITNESS:  Yes.  Oh.  Which question?
17      MR. CAMMACK:  I'm not sure.
18      (Requested portion was read.)
19      MR. CAMMACK:  Okay.
20      MR. GARZA:  Again, I can't hear.
21      (Exhibit No. 18 marked.)
22  Q.  (BY MR. CAMMACK) All right.  I'm going to hand
23  you what's been marked as Plaintiff's Exhibit Number 18.
24  Number 18 is an email chain between Renee Richardson and
25  Alan Garza.  It looks like Renee is indicating on

Page 60

1  April 1st of 2016 to Alan some of the reasons that
2  they've had clients discharged.  And what she indicates,
3  for instance, on the beginning of the second paragraph,
4  is that some of the discharges are due to death.  For
5  instance, they had 17 clients pass away in December,
6  some have transferred due to EVV-related issues because
7  attendants are not getting paid, some are due to clients
8  being transferred due to relocation, some due to higher
9  pay, some due to constant changes because they are not
10  being permanently staffed, what we've already discussed,
11  long-term care facilities where some clients have been
12  moved, and then at least two or three cases where
13  clients were abusive to the PCAs.
14      Do you know -- And if you notice, this is
15  in response to Alan's email that, hey, look, in December
16  we had a huge drop in clients, so did we in January and
17  February, in his first sentence to -- to Renee and Rae.
18  Do you know, at this time, if she was given any
19  discipline for the drop in census?
20  A.  I don't know.
21  Q.  Okay.  But certainly, here, there's nothing to
22  indicate that she was disciplined for this almost
23  10 percent drop in clients in a couple of months?
24  A.  Correct.
25  Q.  Okay.  What is MCOs?

Page 61

1  A.  Managed care organization.
2  Q.  Okay.  And what specifically is a managed care
3  organization?
4  A.  Insurance company, like Superior, Amerigroup --
5  Q.  Okay.
6  A.  -- United Healthcare.
7  Q.  How would The Med Team be able to enforce a
8  managed care organization to move faster in getting
9  authorizations for rendering services?
10  A.  How would they be able to enforce it?
11  Q.  Yeah.  I guess, how do they get, let's say,
12  TDADS or MCOs to move faster in authorizing services
13  being rendered?
14      MR. GARZA:  What's TDADS?  I'm sorry, I
15  didn't understand.  You said TDADS?
16      MR. CAMMACK:  Yeah, T-D-A-D-S, Texas
17  Department of Aging and Disability Services, I believe.
18      MR. GARZA:  Okay.  Thank you.
19      THE WITNESS:  Well, how they get them to
20  move any faster, I can't answer to that.  I mean -- But
21  there's a process in place to submit paperwork to get
22  them to authorize the services.
23      (Exhibit No. 19 marked.)
24  Q.  (BY MR. CAMMACK) Okay.  I'm going to hand you
25  what's been marked as Plaintiff's Exhibit Number 19.

Ryan Grisard

Page 62

1 This is an email chain between Alan Garza and Renee
2 Richardson on April 28, 2016.  And of the past few
3 exhibits, this is the first email that's post her April
4 2016 performance evaluation.
5     A.  Okay.
6     Q.  So, Alan is indicating to Renee that, it looks
7 like related to referrals, "Okay, great.  These numbers
8 are outstanding.  We need to have the MCOs or TDADS" --
9 T-D-A-D-S -- "to move a little faster in getting the
10 authorization out to us so that we can begin rendering
11 services."
12          Do you know what he's referring to then by
13 getting the authorization out to them faster?
14     A.  So, there's a process in place where we submit
15 paperwork to the MCO or TDADS, saying, "This patient has
16 elected Med Team, Inc.  Here is the" -- I don't know the
17 number of the form, but there's a form number you fill
18 out, requesting services and a certain number of hours,
19 so like a care plan.  And then the person at the MCO or
20 TDADS reviews that documentation and sends you back an
21 authorization -- paper authorization saying, "Med Team,
22 Inc. is authorized, with MPI number 123, to see
23 Ms. Jones for 30 hours a week, and here are the services
24 that you need to render."
25     Q.  Okay.  So, this email is indicating, as far as

Page 63

1 getting the paperwork together to them, you've just got
2 to get them out to them quick, but it's not indicating,
3 "Hey, look, we can give TDADS a call and they'll move
4 faster."  That's just based on them once we get the
5 paperwork to them, right?
6     A.  Yeah.  I mean, I assume there's a -- there
7 could be a follow-up step where you call the case
8 manager and follow up and say, "Did you get the
9 paperwork," you know, "What's the status of the
10 authorization?"
11     Q.  Okay.  What -- What is the SAM system, as well?
12     A.  That's a -- It's a niche product for home
13 health agencies.  So, it's a scheduling/billing
14 platform, sort of like our operating system, to manage
15 the day-to-day scheduling and billing activities.
16     Q.  Okay.  Now, if he's indicating to her that the
17 referral numbers or the data tracking referrals is --
18 the numbers are outstanding, is it your impression that
19 he's -- he's impressed with what Renee Richardson is
20 getting accomplished or with the numbers?
21     A.  Sure.
22     Q.  Okay.  Do you know if she was ever switched
23 from salary to hourly?
24     A.  She was not.
25     Q.  Okay.  Is it your understanding that she was

Page 64

1 hourly or salary?
2     A.  Salary.
3     Q.  Did you say salary?
4     A.  Salary.
5     Q.  Okay.  What's Workuments?
6     A.  It's an HRIS platform.
7     Q.  What does that mean?
8     A.  It's basically a human resource product that
9 will manage your demographic information if you were to
10 move, manage your onboarding, manage your, you know, tax
11 forms, you can look up your pay stubs in there.  So,
12 anything related to your employment changes is kind of
13 managed by an HRIS system.
14     Q.  Is that still what you-all have in place today?
15     A.  Workuments is what we have in place today.
16     Q.  Okay.  But that has nothing -- That's -- That's
17 on the HR side for track-- I can log into it and say,
18 "Hey, look, I -- I took three days off," or "I should
19 have an hour in overtime," or anything like that?
20     A.  Request PTO, yeah.
21     Q.  Okay.
22     A.  It's...
23     Q.  But that doesn't track anything related to
24 census or turnover or anything like that.  It's all
25 employee benefits or time off or stuff like that?

Page 65

1     A.  Correct.
2     Q.  Okay.
3          (Exhibit No. 20 marked.)
4     Q.  (BY MR. CAMMACK) I have what's been marked as
5 Plaintiff's Exhibit Number 20.  Okay.  So, this is kind
6 of like that one where some were on 16 and some were on
7 17.
8     A.  Okay.
9     Q.  So, I'm going to go ahead and mark 20 and hand
10 it to you.
11     A.  It correlates to 19 or...
12     Q.  Well, I'm about to give you 21, as well.
13     A.  Oh, I'm sorry.
14          (Exhibit No. 21 marked.)
15     Q.  (BY MR. CAMMACK) And here is 21.  Now, on
16 Number 20, this is an email from Leslie Pembrook on
17 June 7, 2016 to Renee Richardson, to Kimberly Rhodes,
18 and cc'ing Alan R. Garza.  The subject is "Recruiting &
19 Marketing Proposals."
20          MR. GARZA:  Is that Exhibit 20?
21          MR. CAMMACK:  Yes, Exhibit 20.
22          MR. GARZA:  Okay.
23          MR. CAMMACK:  Or did I --
24          THE WITNESS:  Yeah.
25     Q.  (BY MR. CAMMACK) Yeah, okay.  And it looks like

Ryan Grisard

November 28, 2018
Pages 66 to 69

Page 66

1  Leslie is indicating a few things she'd like to have
2  knowledge of and she's got a list of five things at the
3  top.  One is how much does McDonald's offer, starting
4  pay in New Braunfels; number 2 is what's the approximate
5  number of cases staffed by family members; 3 is who are
6  our top three competitors; 4 is are we actively
7  recruiting, and how do we track how many applicants are
8  coming in; and 5 is what are they doing to be in the
9  community or involved in the community, with regular
10  events, including -- she's requesting Rae's input on --
11  on what they're doing and what they have planned.  Is
12  that your understanding of these five areas?
13     A.   Yes.
14     Q.   Okay.
15          MR. GARZA:  Just to clarify, in number 3,
16  you say "who are our top three competitors," but that's
17  not exactly what that says.
18          MR. CAMMACK:  Oh, sure.  Sure.
19          MR. GARZA:  What are they offering as
20  rates.
21          MR. CAMMACK:  That -- That's correct.
22  Yeah.  So, what are our top competitors offering to new
23  hires, that's correct.  Thank you.
24     Q.   (BY MR. CAMMACK) Now, if you turn to the second
25  page of Exhibit Number 277 [sic], it looks like, on

Page 67

1  June 7th -- Well, is that June -- I'm sorry -- on June
2  14th, Alan Garza provided a response.
3          MR. GARZA:  Hold on a second.  You said
4  Exhibit 277.
5          MR. CAMMACK:  I'm sorry.  Let me -- Let me
6  start that whole thing over.
7     Q.   (BY MR. CAMMACK) If you look at Exhibit 21,
8  which is -- starts with Richardson 277 and goes to
9  Richardson 279, at the bottom of 277, it looks like the
10  beginning of the same question number 1, "What is
11  McDonald's offering?"
12     A.   Uh-huh.
13     Q.   And the answer on the next page looks like
14  McDonald's pays between 7.25 and $9 per hour.  Do you
15  know how much PCAs are paid in the New Braunfels branch,
16  on average?
17     A.   Back then?
18     Q.   Uh-huh.
19     A.   Eight and a quarter an hour.
20     Q.   Eight and a quarter?  So, comparable to the --
21  the McDonald's rate?
22     A.   Yeah.
23     Q.   Okay.  And number 2, it looks like there's an
24  estimate of about 60 percent of the PCAs are family
25  members or preferred employees?

Page 68

1     A.   Okay.
2     Q.   What is a preferred employee?
3     A.   I would assume it was a family member.
4     Q.   Okay.  So, it's the same thing?
5     A.   Yeah.
6     Q.   And then, it looks like the comparable rates of
7  your comparators, Kindred at Home paid 9.15 at the time,
8  Girling Health, which is G-I-R-L-I-N-G, paid 8, and
9  Right at Home paid 9.  Do you know if you ever lost --
10  or would you be privy to conversations about how many
11  employees were lost to any of those comparators based on
12  rate of pay?
13     A.   I wouldn't.
14     Q.   Okay.  Now, did Rae Cazares, did she work
15  directly under Ms. Richardson?
16     A.   Yes.
17     Q.   And would it have been both her and
18  Ms. Richardson's job to recruit and to market?
19     A.   Yes.
20     Q.   Was it primarily Rae's goal, though -- or role?
21     A.   The day-to-day function with the oversight
22  of -- and guidance of Renee.
23     Q.   Sure.  But I guess what I mean is, Rae has a
24  duty to recruit and to be the marketer, correct?
25     A.   Uh-huh.

Page 69

1     Q.   And then, if Rae is insufficient in those
2  duties, does that fall on Rae or does that fall on the
3  whole team?
4     A.   The whole team.
5     Q.   Okay.  So, when Ms. Richardson's office is low
6  on census, does that also fall on Alan Garza, as well?
7     A.   He would have some -- I mean, he would -- he --
8  he would be responsible for, yeah, helping -- give them
9  some guidance to grow the census.
10     Q.   Do you know if either Rae or Alan were
11  disciplined related to the census at the New Braunfels
12  office?
13     A.   I do not know.
14     Q.   But you would have knowledge if they had been
15  disciplined, correct?
16     A.   Alan, yes, I would have knowledge of.  Renee,
17  not necessarily.
18     Q.   Okay.  But to your memory, he was never
19  disciplined related to anything related to census,
20  correct?
21     A.   Not that I recall.
22     Q.   Okay.  We can go back to Exhibit 1.  Now,
23  Ms. -- Looking at Number 21, Ms. Richardson never signed
24  any form of a release, did she, related to her
25  termination?

Ryan Grisard

Page 70

1    A.  No, she did not.
2    Q.  Okay.  And it looks like my 20, 21 again become
3  20 and 21.  Let me ask you this, though, related to the
4  next two topics.  Have we already listed all of
5  Plaintiff's supervisors?
6    A.  I believe so.
7    Q.  Okay.  Any of those other supervisors would
8  have been responded to in discovery, correct?
9    A.  Yes.
10    Q.  I have listed a Eileen McCleary as an
11  administrator when Plaintiff was hired.  Was she one of
12  her supervisors?
13    A.  She would have been at some point during her
14  employment.
15    Q.  Was she involved in any way with the decision
16  to terminate?
17    A.  No.
18    Q.  Okay.  And how about Christina Hernandez?
19    A.  If I believe the chronological order, Christina
20  Hernandez replaced Eileen McCleary.
21    Q.  Okay.
22    A.  So they both would have, at some point, been
23  involved in her employment.
24    Q.  Would she have been involved in the decision to
25  terminate?

Page 71

1    A.  No.
2    Q.  I have listed a Freddy Waters.  Was he involved
3  at all in the decision to terminate?
4    A.  He wasn't employed at that time.
5    Q.  Okay.  How about Brian Deaver?
6    A.  Also wasn't employed at that time.
7    Q.  Okay.  Now, is it your understanding that
8  Ms. Richardson -- that some people came to talk to
9  Ms. Richardson about her termination, but she wasn't
10  present because she was out with a stomach bug?
11    A.  That's correct.
12    Q.  Okay.  Do you know if that leave was approved
13  that she was out for?
14    A.  I mean, I don't think it was preapproved.
15    Q.  Okay.
16    A.  But it's part of your PTO bucket, so, sort of,
17  by default, it's approved, it's just not -- it wasn't
18  preapproved.  There was no knowledge that she wasn't
19  going to be there.
20    Q.  Okay.  But certainly, it wasn't part of the
21  decision to terminate her that she wasn't there that
22  morning?
23    A.  No.
24    Q.  Okay.  And if she had accrued PTO, that would
25  have been something that would have been acceptable to

Page 72

1  use if she woke up sick that morning?
2    A.  Right.
3    Q.  Okay.  If you'll look at topic number 22, the
4  existence of any documents in Plaintiff's requests for
5  production sent to Defendant.  I'm also going to ask you
6  about this in conjunction with 25, on the next page,
7  the -- the methods of search for documents requested,
8  and then 26, the identification of persons involved in
9  the search for documents requested in Plaintiff's
10  requests for production.
11       MR. GARZA:  Before we get involved -- into
12  that, could we take about a five-minute break?
13       MR. CAMMACK:  Sure.
14       MR. GARZA:  Thanks.
15       THE VIDEOGRAPHER:  We're off the record at
16  12:15.
17       (Recess 12:15 p.m. to 12:22 p.m.)
18       THE VIDEOGRAPHER:  We're back on the
19  record at 12:22.
20    Q.  (BY MR. CAMMACK) Now, as to 22, 25, and 26,
21  before I ask you questions about it, I don't want to
22  know confidential communications with your attorney, I
23  don't want to know any information related to that in
24  the search for documents.  I just want to know your
25  understanding of the process of what was done to respond

Page 73

1  to our requests for production, and who was involved
2  that wasn't part of the legal team, and how you went to
3  identify those documents.
4    A.  Okay.  So, when we got the request to keep all
5  documentation related to the case, Nhan Nguyen, who is
6  our director of IT --
7    Q.  Okay.
8    A.  -- it's N-H-A-N, N-G-U-Y-E-N -- was notified
9  to, you know, back up the server, back up the emails, to
10  keep all documentation related to the lawsuit.
11    Q.  Okay.  And then, was a search conducted by
12  yourself, or do you know what individuals were involved
13  in that search?
14    A.  No.  Nhan would have done the search of
15  documentation.  Like I said earlier, Nick and I sat down
16  at Sarah's computer and searched through her Outlook
17  email --
18    Q.  I got --
19    A.  -- Outlook to -- to look for that specific
20  email, and it did not -- it wasn't present.
21    Q.  Okay.
22    A.  I'm not sure what specific documents you're
23  referring to in your question.
24    Q.  Sure.  I meant in general.  When you get this
25  requests for production, what, kind of, was the process

Ryan Grisard

November 28, 2018
Pages 74 to 77

Page 74

1 on it? I think I got an understanding. You-all
2 actually went through Sarah's emails, yourself and Nick,
3 and then IT also put a hold on documents so you-all
4 could make that search.
5    A. That's correct.
6    Q. Okay. And other than that, let's say, for
7 instance, Ms. Richard's personnel file, is that -- is
8 that digital, is that in a file cabinet? How is that
9 stored?
10    A. It's in a file cabinet.
11    Q. Okay. Does she have one personnel file or a
12 second separate one for medical records?
13    A. She has one personnel file.
14    Q. Okay. And -- And that document would have
15 already been produced in the file itself?
16    A. That's correct.
17    Q. Okay. Now, I believe I have asked you
18 questions related to 27 and 28. You've already
19 discussed with me the communications between supervisors
20 and management involved in the decision to terminate,
21 correct?
22    A. Correct.
23    Q. Are you aware of any other conversations that
24 we haven't already discussed?
25    A. I'm not.

Page 75

1    Q. And are there any other communication that
2 you're aware of, whether they be a phone, email,
3 internal messaging?
4    A. I'm not.
5    Q. Would there be any text messages that were sent
6 about the reason to terminate?
7    A. No.
8    Q. Would there be any text messages or other
9 communications about the time to meet related to that
10 meeting?
11    A. I don't believe so.
12    Q. Okay. And are there any other meetings besides
13 what we discussed today about her complaint of race and
14 gender discrimination?
15    A. No.
16    Q. Okay. Do you remember having any meetings
17 after the fact, or communications after the fact, that
18 the decision was made to terminate, related to her
19 termination? And I can break that down, too.
20    A. If you could.
21    Q. Sure. So, a decision is made to terminate
22 her --
23    A. Uh-huh.
24    Q. -- but at some point people go up to her and
25 inform her she's terminated, she's not even there.

Page 76

1    A. Correct.
2    Q. Were you notified or do you know who was
3 specifically notified, "Hey, she's not here today"?
4    A. We were notified. That would have been Alan
5 Garza and I believe her name was Heather Siegmund --
6    Q. Okay.
7    A. -- was the HR person in Texas at that time
8 prior to Tia, and they went on two occasions to do the
9 termination and she wasn't there on two consecutive
10 days, so they went back a third time the following week
11 to terminate Ms. Richardson.
12    Q. Okay. So, they go back twice. And you said
13 Heather Siegmund?
14    A. Heather Siegmund.
15    Q. And how is her name spelled, if you know?
16    A. S-I-E-G-M-U-N-D.
17    Q. Okay. And Ms. Siegmund, was she from the
18 corporate office?
19    A. No, she was from the San Antonio, Texas office.
20    Q. Okay. Now, did the San Antonio, Texas office,
21 does her HR role serve for all the other Texas offices?
22    A. She would be the leader of the HR function
23 throughout the state of Texas.
24    Q. Okay. So, she and Mr. Garza show up one day
25 she's not there. Do you first receive a communication

Page 77

1 that day that she's not there?
2    A. I believe so.
3    Q. Do you recall if it was a phone call or an
4 email?
5    A. I believe it was a phone call.
6    Q. Okay. And what is your response?
7    A. Just accepting the information that she wasn't
8 there and that they would try to go back tomorrow and to
9 make the termination.
10    Q. And then, on the second day, did they call you
11 again?
12    A. I don't recall.
13    Q. Okay.
14    A. But I would -- I would think so.
15    Q. Are you aware that they called anybody else
16 about their attempts to --
17    A. No.
18    Q. And when they show up to the office, do you
19 know if they -- did they kind of detail what they went
20 through to see if she was there or not, or did they just
21 walk over to her office?
22    A. I don't know what transpired.
23    Q. Okay. So, you wouldn't be aware if they
24 communicated to any of the employees that they were
25 there to terminate her?

Ryan Grisard

November 28, 2018
Pages 78 to 81

Page 78

1    A.  I would think they didn't, but no, I -- I -- I
2  wouldn't beware of that, if they did that or not.
3    Q.  Okay.  And then, she's -- she's finally
4  terminated that next week, correct?
5    A.  I believe it was a Monday.
6    Q.  Okay.  And was it discussed with you, "Hey,
7  look, we're just going to follow up next week when we
8  think she'll be there"?
9    A.  Well, because she hadn't shown up the previous
10 two times, it was, you know, a foregone conclusion they
11 were going to go back the next business day to try to
12 make the termination.
13   Q.  And do you recall any -- any further
14 conversations that you had related to that?
15   A.  I do not.
16   Q.  After she's given notice of her termination, do
17 you recall any other discussions of her -- her
18 termination or her separation of employment, besides
19 what we've discussed today?
20   A.  I don't recall.
21   Q.  Okay.  Is there any other discussions of her
22 complaint of race, besides what we've discussed today?
23   A.  Not besides what we've discussed today.
24   Q.  Okay.  Okay.  So, number 30, the policies and
25 procedures of Defendant regarding the hiring and firing

Page 79

1  of supervisory and managerial personnel; number 31, the
2  policies and procedures used by Defendant to determine
3  the qualifications of that supervisory and managerial
4  personnel; and number 32, the policies and procedures of
5  Defendant regarding the training, discipline, promotion,
6  and performance evaluations of supervisory and
7  managerial personnel.  Do you have knowledge of those
8  topics?
9    A.  I do.
10   Q.  Okay.  What was the -- Do you recall when Alan
11 Garza was hired?
12   A.  I don't know the exact date, but I've been
13 employed, for The Medical Team, for 21 years, and he had
14 been there for about five years when I started, so he
15 would have started sometime in the early '90s.
16   Q.  Okay.  So, you wouldn't have been aware if
17 there had been a background check or anything like that
18 conducted on him?
19   A.  That would have been the policy.
20   Q.  Okay.  And do you know what training he would
21 receive related to compliance with the discrimination
22 and harassment policy?
23   A.  I don't have knowledge of what happened back in
24 the early '90s, but I have knowledge of what happened
25 when I was hired and what goes on today.

Page 80

1    Q.  Sure.  From when you were hired forward, what
2  is your knowledge of the training he received on
3  discrimination and harassment?
4    A.  So, there's an employee handbook to discuss
5  that policy, there's -- that you acknowledge that you
6  have read through and understand the policies and
7  procedures within the handbook.  There's an orientation
8  process where policies are pointed out and gone over.
9  But besides that, that's basically what happens for
10 all -- all employees.
11   Q.  So, if he had been hired 26 years ago, his --
12 his training would have been:  Provided a policy that he
13 acknowledges --
14   A.  Uh-huh.
15   Q.  -- and then an orientation about those
16 policies?
17   A.  Yeah.
18   Q.  And then nothing else related to it?
19   A.  Well, annual, we have in-services where, you
20 know, you acknowledge any change to policies, any new
21 policies.  There's specific topics that are discussed in
22 the in-services.  You know, every year, the topics
23 change, but he may have also had something annually at
24 some point during one of those in-services.
25   Q.  Do you know what the length of those

Page 81

1  in-services are on an annual basis?
2    A.  A couple of hours.
3    Q.  Couple of hours?  Okay.  Is there a test at the
4  end of them or how -- how are they graded or how are
5  they shown that they've learned the material?
6    A.  If there's a test -- If -- Yeah, there can be a
7  test.  If you're just acknowledging a change of a policy
8  or a new policy, then it's just a signature
9  acknowledging that you've read and understand the change
10 of policy or the new policy.
11   Q.  Okay.  And you said if there's a test.  Is
12 there a test, that you know of, that they would be given
13 related to discrimination and harassment?
14   A.  Not that I'm aware of.
15   Q.  Okay.  So, overall, there's -- there's a couple
16 of hours given annually, and they sign off, "Hey, we --
17 we know this material now"?
18   A.  That's correct.
19   Q.  And it's not two hours specifically going over
20 discrimination and harassment, but all the changes in
21 policy, correct?
22   A.  That would be correct.
23   Q.  Okay.  So, if there's multiple -- Well, let me
24 rephrase that.
25       So, if you have a couple of hours each

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900     San Antonio, Texas 78232
210-697-3400                                                     210-697-3408

Ryan Grisard

Page 82

1 year, that would include everything related to federal
2 discrimination laws, correct?
3    A.  Uh-huh.  I'm sorry.  Yes.
4    Q.  State discrimination laws, correct?
5    A.  Yes.
6    Q.  Policies related to discrimination, correct?
7    A.  Yes.
8    Q.  Any changes in timekeeping?
9    A.  Yes.
10   Q.  Any changes in how -- I guess, how the company
11 remains profitable, correct -- or any updates on the
12 policies related to that?
13   A.  Any updates on policies.
14   Q.  Sure.  So, any and all -- any and all policies
15 in the handbook, whether it be PTO or timekeeping or
16 dress code or smoking in the workplace, would have been
17 covered in that two-hour policy time?
18   A.  If there was a change in that policy.
19   Q.  Gotcha.
20   A.  Yes.
21   Q.  Okay.  So, if there are no changes in the
22 policy, then there's nothing covered in the in-service?
23   A.  Correct.
24   Q.  Okay.  Since you've been there, do you recall
25 Alan Garza, kind of, the promotions he's been through or

Page 83

1 how he's made his way through The Med Team?
2    A.  Yes, I know, for the most part, his promotions.
3    Q.  Could you describe some of those or describe
4 them to me?
5    A.  Sure.  So, Alan is an MBA, got a master's of
6 business somewhere in Texas, started off actually in our
7 IT department, and then got promoted into the accounting
8 department.  Was in our accounting department for
9 several years, got promoted to be in charge of all of
10 the accounting for Texas, and then eventually got
11 promoted to regional manager, which I believe is where
12 he is today.
13   Q.  Okay.  Now, on number 33, that regards policies
14 and procedures for documentation of an employee's report
15 of discrimination, harassment, or retaliation.
16 Ms. Jackson testified a little bit about that
17 documentation process.  Is there anything in addition to
18 her testimony that -- that you would add?
19   A.  No.
20   Q.  Okay.  And have you had any other employees in
21 the past 10 years complain of race discrimination?
22   A.  No.
23   Q.  Of national origin discrimination?
24   A.  No.
25   Q.  Of gender discrimination?

Page 84

1    A.  No.
2    Q.  Okay.  And we've already gone over all the
3 training that would have been received on compliance
4 with Title VII of the Civil Rights Act, or Chapter 21 of
5 the Texas Labor Code, by Alan Garza?
6    A.  We've gone over that?
7    Q.  Have we already gone over all that training?
8    A.  Yeah.
9    Q.  Okay.
10   A.  I believe so.
11        MR. CAMMACK:  I'm going to review my
12 notes, but I think I'm about done, so --
13        THE WITNESS:  Okay.
14        MR. CAMMACK:  -- if we can take about five
15 minutes?
16        THE VIDEOGRAPHER:  We're off the record at
17 12:36.
18        (Recess 12:36 p.m. to 12:44 p.m.)
19        THE VIDEOGRAPHER:  We're back on the
20 record at 12:44.
21   Q.  (BY MR. CAMMACK) All right.  Is it your
22 understanding that Ms. Richardson was provided notice of
23 her termination on January 27th, 2017?
24   A.  That's my understanding.
25   Q.  Okay.  Were there any phone call attempts made

Page 85

1 to notify her of her termination?
2    A.  Not that I'm aware of.
3    Q.  Is it policy that they need to be told in
4 person, or is that just kind of how it happened that
5 day?
6    A.  It's kind of how it happened that day.
7    Q.  Okay.  Was anything memorialized about the
8 meeting to terminate, that you're aware of?
9    A.  Not that I'm aware of.
10   Q.  Do you recall if she was provided any specific
11 termination paperwork?
12   A.  I don't recall.
13   Q.  Okay.  Do you recall if she protested or filed
14 any type of grievance as a result of her termination?
15   A.  Not that I'm aware of.
16   Q.  Are you aware of who a Z-I-N-I-N-A Harris --
17 Zinina Harris is?
18   A.  I am not.
19   Q.  Do you know who Valerie Castellon is?
20   A.  I do not.
21   Q.  Okay.  Have you understood all my questions
22 today?
23   A.  I have.
24   Q.  Is there any part of your testimony you'd like
25 to clarify?

Ryan Grisard

November 28, 2018
Pages 86 to 88

---

Page 86

```
 1   A.   There is not.
 2          MR. CAMMACK:  Okay.  I will pass the
 3   witness.
 4          MR. GARZA:  Reserve until the time of
 5   trial.
 6          MR. CAMMACK:  Okay.  Thank you for your
 7   time.
 8          THE WITNESS:  Thank you.
 9          THE VIDEOGRAPHER:  We're off the record at
10   12:45.
11          (Deposition concluded 12:45 p.m.)
12          (Pursuant to FRCP 30(e)(1), request to
13          review the transcript was not made by
14          either deponent or party before the
15          deposition was completed.)
16          * * * * *
17
18
19
20
21
22
23
24
25
```

Page 87

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION
 3
     RENEE RICHARDSON,          )
 4                              )
            Plaintiff           )
 5                              )
     VS.                        ) NO. 5:18-CV-151-FB
 6                              )
     THE MEDICAL TEAM, INC.     )
 7   d/b/a THE MED TEAM, INC.,  )
                                )
 8          Defendant           )
 9   _____
10              REPORTER'S CERTIFICATE
11         VIDEOTAPED DEPOSITION OF RYAN GRISARD
12   A CORPORATE REPRESENTATIVE OF THE MEDICAL TEAM, INC.
13              d/b/a THE MED TEAM, INC.
14                 NOVEMBER 28, 2018
15   _____
16          I, NAOMI R. PELTIER, Certified Shorthand
17   Reporter in and for the State of Texas, do hereby
18   certify to the following:
19          That the witness, RYAN GRISARD, A CORPORATE
20   REPRESENTATIVE OF THE MEDICAL TEAM, INC. d/b/a THE MED
21   TEAM, INC., was duly sworn by the officer and that the
22   transcript of the oral deposition is a true record of
23   the testimony given by the Witness.
24          I further certify that pursuant to FRCP Rule
25   30(e)(1) that the signature of the Deponent:
```

Page 88

```
 1          _____ was requested by the Deponent or a party
 2   before the completion of the deposition and is to be
 3   returned within 30 days from date of receipt of the
 4   transcript.
 5          If returned, the attached Changes and Signature
 6   Page contains any changes and the reasons therefor;
 7          __X__ was not requested by the Deponent or a
 8   party before the completion of the deposition.
 9          That the amount of time used by each party at
10   the deposition is as follows:
11          Thomas N. Cammack, III - 1 hour 55 minutes
12          I further certify that I am neither attorney,
13   nor counsel for, related to, nor employed by any of the
14   parties to the action in which this testimony is taken.
15   Further, I am not a relative or employee of any attorney
16   of record in this cause, nor do I have a financial
17   interest in the action.
18          SUBSCRIBED AND SWORN TO on this _____ day of
19   _____, 2018.
20
21
22          Naomi R. Peltier, CSR, RPR
            Texas CSR 3672
            Expiration:  10/31/21
23          Kim Tindall & Associates, LLC
            Firm No. 631
24          16414 San Pedro, Suite 900
            San Antonio, Texas  78232
25          (210) 697-3400
```

---

Ryan Grisard

## Exhibits

**Grisard, Ryan Ex 01** 7:15,16 28:10 32:7,8 42:12 69:22
**Grisard, Ryan Ex 05** 12:6,7,8
**Grisard, Ryan Ex 06** 13:10,11
**Grisard, Ryan Ex 07** 19:18,19
**Grisard, Ryan Ex 08** 21:9,11
**Grisard, Ryan Ex 09** 23:16,18
**Grisard, Ryan Ex 10** 29:2
**Grisard, Ryan Ex 11** 36:20
**Grisard, Ryan Ex 12** 39:2
**Grisard, Ryan Ex 13** 38:25 45:11
**Grisard, Ryan Ex 14** 48:2,4
**Grisard, Ryan Ex 15** 50:9,11
**Grisard, Ryan Ex 16** 52:22,24 55:4,5,6,9,11
**Grisard, Ryan Ex 17** 54:14,15
**Grisard, Ryan Ex 18** 59:21,23
**Grisard, Ryan Ex 19** 61:23,25
**Grisard, Ryan Ex 20** 65:3,5,20,21
**Grisard, Ryan Ex 21** 65:14 67:7

## $

**$9** 67:14

## (

**(i)** 20:17,19 44:3

## 1

**1** 7:15,16 9:23 12:12 28:10 32:8 42:12 67:10 69:22
**10** 29:2,3,5 32:9 37:24 38:9 60:23 83:21
**100** 16:8
**10:52** 5:3
**11** 29:2,3,11 36:12,20

**119** 45:12
**11:34** 42:3,4
**11:37** 42:4,6
**12** 38:22 39:1,2
**120** 22:14
**123** 62:22
**12:15** 72:16,17
**12:22** 72:17,19
**12:36** 84:17,18
**12:44** 84:18,20
**12:45** 86:10,11
**13** 37:19 38:25 45:10,11
**14** 20:12 37:20 38:2 48:2,4
**146** 22:13
**14th** 67:2
**15** 21:19 42:11 50:9,11
**150** 45:15,22 46:12 47:3
**15th** 22:3
**16** 43:2 51:23 52:22,24 54:18 55:5,6, 9,11 58:23 65:6
**16th** 51:18
**17** 43:6 54:14,15 55:17,21 60:5 65:7
**18** 43:16 59:21,23,24
**19** 61:23,25 65:11
**19th** 45:17
**1st** 39:8 60:1

## 2

**2** 8:16 9:11,12,23 66:4 67:23
**20** 65:3,5,9,16,20,21 70:2,3
**2015** 45:14 48:8
**2016** 10:17 15:16 21:20 22:5 29:6 51:18,23 53:1 54:21 60:1 62:2,4 65:17
**2017** 14:2 17:5 29:6,9 39:7,8 84:23
**2018** 5:2 25:13,15
**20th** 14:2 33:9

**21** 65:12,14,15 67:7 69:23 70:2,3 79:13 84:4
**22** 72:3,20
**2300** 27:19
**23rd** 53:1
**24th** 54:21
**25** 72:6,20
**25th** 45:14
**26** 22:14,16 72:8,20 80:11
**27** 74:18
**277** 66:25 67:4,8,9
**279** 67:9
**27th** 84:23
**28** 5:2 62:2 74:18

## 3

**3** 66:5,15
**30** 62:23 78:24
**30(b)(6)** 7:17
**30(e)(1)** 86:12
**300** 47:1
**30th** 39:7
**31** 79:1
**32** 79:4
**33** 83:13

## 4

**4** 8:21 10:20 20:6,8 66:6
**401(k)** 29:24
**495** 48:5
**496** 48:5

## 5

**5** 12:7,8 13:13 20:6,8 28:10 66:8
**530** 23:20
**56** 22:7,11

---
**6**
---

**6** 12:18 13:10,11 20:6,8 28:15

**60** 39:11 67:24

---
**7**
---

**7** 19:18,19 28:20 65:17

**7.25** 67:14

**703 390-2300** 27:17

**740** 22:5

**796** 22:3

**7:39** 14:2

**7th** 67:1

---
**8**
---

**8** 21:9,11 29:9 68:8

**8th** 48:8

---
**9**
---

**9** 23:16,18 28:7 32:8 68:9

**9.15** 68:7

**90s** 79:15,24

---
**A**
---

**A-D-E-M-A-R** 18:23

**a.m.** 5:3 14:2 42:4

**abusive** 60:13

**accept** 39:25

**acceptable** 71:25

**accepting** 77:7

**accomplished** 63:20

**accordance** 20:20

**account** 34:18

**accounting** 83:7,8,10

**accrued** 37:6 71:24

**accurate** 29:15

**acknowledge** 80:5,20

**acknowledges** 80:13

**acknowledging** 51:18 81:7,9

**Act** 84:4

**active** 46:16,20 55:10 58:12

**actively** 66:6

**activities** 63:15

**actual** 45:10

**ad** 55:10 58:12,15,18

**add** 52:2 57:19 83:18

**addition** 83:17

**additional** 29:20

**Ademar** 18:23

**admin** 51:9

**administrative** 50:17,21 51:2,15 52:16 53:2,7

**administrator** 17:4,11,13 18:4,6 19:2,7,10,12 70:11

**administrators** 19:1

**advantage** 59:1

**affect** 6:20 51:21 57:12

**affected** 50:2

**afro** 30:20

**agencies** 63:13

**agency** 40:2

**Aging** 61:17

**agree** 19:13

**agreed** 5:5

**agreement** 5:5

**ahead** 16:11 46:14 65:9

**Alan** 10:13,14 12:13 14:10 18:9 26:11,12,24 27:7 30:12,19,24 31:16 48:7 50:12 51:17 52:25 54:10,19 55:16 58:3,13 59:25 60:1 62:1,6 65:18 67:2 69:6,10,16 76:4 79:10 82:25 83:5 84:5

**Alan's** 58:22 60:15

**allegations** 30:18

**Amerigroup** 61:4

**and/or** 8:13,18 28:16,18,20,21 36:13 37:23,25 38:5 43:4

**Angie** 26:11

**annual** 40:4 80:19 81:1

**annually** 80:23 81:16

**answers** 11:18

**Antonio** 16:16 18:5 21:22 22:3 26:20 76:19,20

**anybody's** 49:13

**apparent** 55:25

**applicant** 48:15,20

**applicants** 66:7

**applies** 48:15,20

**apply** 46:2

**approved** 71:12,17

**approximate** 66:4

**approximately** 5:2 23:6,8 45:15

**April** 60:1 62:2,3

**areas** 48:12 66:12

**asks** 49:20

**asserted** 32:8

**assume** 21:22 40:21 63:6 68:3

**assumption** 11:14

**attempts** 77:16 84:25

**attendance** 40:3,10,11,13

**attendant** 40:14,16,17,20 41:1,20 56:7

**attendants** 40:18 41:15 46:2 60:7

**attention** 21:1

**attorney** 72:22

**attorneys** 5:5

**audit** 40:6

**August** 21:19 22:3

**AUS** 21:23

**Austin** 16:20,22,25 17:4,20,21,23 21:23 22:19

**authorization** 62:10,13,21 63:10

**authorizations** 61:9

Ryan Grisard

November 28, 2018
Index: authorize..client

**authorize** 61:22

**authorized** 62:22

**authorizing** 61:12

**average** 67:16

**aware** 9:7 10:15 11:16 13:3 16:18 20:24 21:5 25:24 29:12 30:18,23 31:1 33:21,24 34:3 38:15 40:12 44:18,23 74:23 75:2 77:15,23 79:16 81:14 85:2,8,9,15,16

**Ayala** 18:3

---

**B**

---

**B'VILLE** 21:24

**B-E-H-A-R-R-Y-L-A** 18:19

**back** 9:23 13:13 28:9 32:7 42:5,7 47:18 62:20 67:17 69:22 72:18 73:9 76:10,12 77:8 78:11 79:23 84:19

**background** 28:20 44:23 79:17

**backlog** 45:15

**backlogged** 46:23 47:13

**bad** 54:5

**based** 14:21,24 22:23,24 25:1 31:18 32:1 35:24 54:7 63:4 68:11

**basically** 20:17 64:8 80:9

**basis** 15:19 24:23 32:9 49:19 81:1

**begin** 62:10

**beginning** 60:3 67:10

**begins** 58:22

**behavior** 32:23

**benefits** 28:10 29:20,22 36:13,16, 18 56:23 57:18 64:25

**beware** 78:2

**bill** 41:19,21

**billable** 40:24,25 41:2,7,19 44:4,6 56:9,10

**billing** 63:15

**binds** 7:12

**bit** 9:2 52:7,8 83:16

**black** 14:11 15:7 45:2

**board** 15:20 24:3,11,12,23 25:25

**boards** 48:14,19,24,25

**bottom** 21:20 45:13 67:9

**branch** 15:13,24,25 16:17 17:1,7, 12,14,16,18 19:1,3,7,11,14,16,21,23 20:19 21:6,17 23:3 24:24 25:5,6,18 30:9 38:10,11,12 39:4 40:1 43:5,18 44:13,22,24 45:1,4 48:9 51:4 58:2 59:3 67:15

**branches** 16:14 43:12 46:19

**Braunfels** 15:24 19:21,24 21:23 30:9 35:11 43:19 51:3 66:4 67:15 69:11

**break** 42:8 72:12 75:19

**Brian** 71:5

**briefly** 7:22

**broad** 43:13

**brought** 20:25

**Brownsville** 16:21,23 17:1,20,21 18:2 21:24 22:19

**BSN** 26:12

**bucket** 36:24 37:14 71:16

**bug** 71:10

**bunch** 46:23

**business** 23:2 53:5 56:5 58:18 78:11 83:6

---

**C**

---

**C-A-Z-A-R-E-S** 50:13

**cabinet** 47:20 74:8,10

**cabinets** 47:19

**calendar** 27:25

**call** 27:20 63:3,7 77:3,5,10 84:25

**called** 21:19 77:15

**calling** 27:16 47:4

**calls** 27:13

**CAMMACK** 5:12 11:23 12:5,9 13:12 19:20 21:10 23:17 24:20 25:12,23 29:4 33:16 38:22,24 39:3 40:14,16 42:1,7 45:9,12 48:3,18 49:21 50:10 52:15,23 54:16 55:1 59:9,17,19,22 61:16,24 65:4,15,21,23,25 66:18,21,

24 67:5,7 72:13,20 84:11,14,21 86:2,6

**capacity** 7:8 10:23 24:17,20 25:24 48:10 51:11

**capture** 41:16

**care** 40:19 56:7 57:5,11 60:11 61:1, 2,8 62:19

**case** 44:22 63:7 73:5

**cases** 60:12 66:5

**Castellon** 85:19

**caused** 45:22

**causing** 52:12

**Cazares** 50:13,14 52:19 68:14

**cc'ing** 65:18

**census** 15:14,16 16:1,7,14 19:15 20:3,4,17,22 21:2,17 22:8,25 23:12 32:13 35:12 36:1 38:10 39:17,20,21 40:22,23 43:6,24 44:4,8,17 47:24 50:2,5 51:21 53:8,15 54:1,5 57:6,12, 22 59:2 60:19 64:24 69:6,9,11,19

**CFO** 15:19

**chain** 45:20 59:24 62:1

**change** 20:9,12 57:6 80:20,23 81:7, 9 82:18

**Chapter** 84:4

**charge** 15:13 83:9

**chart** 23:24,25 24:1,4,7,10 26:8

**check** 28:21 40:21 79:17

**checked** 20:15

**Christina** 17:24,25 18:3,9 31:8 38:16,18 39:4,13 70:18,19

**chronological** 70:19

**Civil** 84:4

**claims** 8:23 32:9

**clarify** 10:24 59:10 66:15 85:25

**class** 20:13

**clean** 47:20

**clear** 6:14

**cleared** 47:14

**client** 43:11 53:15

**clients** 35:19 56:13 60:2,5,7,11,13, 16,23

**code** 82:16 84:5

**collectively** 25:2

**Colleen** 45:18

**column** 21:18,23

**comfortable** 5:22

**commendable** 15:2,4

**comment** 30:19 31:19

**comments** 30:23 31:9,13,17,25 58:22

**common** 56:16,17

**communicated** 77:24

**communication** 75:1 76:25

**communications** 72:22 74:19 75:9,17

**community** 66:9

**company** 52:17,18 61:4 82:10

**comparable** 67:20 68:6

**comparators** 43:4 44:19 68:7,11

**competitors** 66:6,16,22

**complain** 83:21

**complained** 32:23 35:7 45:5

**complains** 15:6 23:8

**complaint** 13:7 32:24 33:4,5,21 75:13 78:22

**complaints** 8:12,17 9:24 13:6 28:15,24 30:7,11 32:18 43:12

**completed** 86:15

**completing** 39:25

**compliance** 9:14,18 43:8,9 49:10 79:21 84:3

**compliant** 48:12

**comply** 39:23 49:3

**complying** 35:14

**computer** 73:16

**concern** 22:10,16 56:18

**concluded** 86:11

**conclusion** 49:20 78:10

**conducted** 13:6 28:21,23 73:11 79:18

**conference** 7:2

**confident** 54:7

**confidential** 72:22

**conjunction** 18:7 72:6

**consecutive** 76:9

**consideration** 58:2

**constant** 60:9

**contacting** 47:5

**continued** 15:16

**contribute** 29:23

**contributing** 51:19

**conversation** 42:25

**conversations** 31:5 58:4 68:10 74:23 78:14

**coordinator** 50:17,21 51:2,9,15 52:16 53:3

**copy** 11:23

**corporate** 5:4,8 7:9,17 57:24 76:18

**correct** 7:14,25 8:3 9:22 12:15 14:6, 22,23 15:2,8,9 16:2,17,24 17:9 19:15,25 20:21 21:25 22:1 23:4,5,9, 10,13,14 29:9,10 31:21 32:3 33:6 34:21,24 36:5,16,17 37:18 39:5,12, 14,15,17,18 41:9 44:1,7,9,10,12 49:7,14 51:16,25 54:11 56:2 57:5,6 58:2,19 60:24 65:1 66:21,23 68:24 69:15,20 70:8 71:11 74:5,16,21,22 76:1 78:4 81:18,21,22 82:2,4,6,11, 23

**correctly** 14:12 48:21

**correlates** 65:11

**correlation** 44:17

**counseled** 37:22

**count** 51:21,24 52:3

**country** 46:6 47:10

**counts** 43:11 51:20

**couple** 12:17 58:16 60:23 81:2,3,15, 25

**covered** 9:6 82:17,22

**covers** 23:19

**current** 14:9

**customer** 43:11

**cut** 55:15 57:1

---

**D**

---

**d/b/a** 5:9

**DADS** 19:5

**daily** 58:1

**Dallas** 18:12,14,20,21 21:24

**damages** 36:12

**data** 63:17

**date** 5:1 14:16 39:10 79:12

**dates** 58:23

**day** 14:18,19,20 15:5 23:7,8 27:9 30:20,24 31:1,5 34:25 35:6 76:24 77:1,10 78:11 85:5,6

**day-to-day** 63:15 68:21

**days** 39:11 64:18 76:10

**deadline** 45:17 47:13,16

**death** 60:4

**Deaver** 71:5

**December** 15:22 29:6 60:5,15

**decided** 25:2

**decision** 14:14 15:7 23:7 24:15,21 26:3,6,15,22,25 33:18,23,25 34:5 35:6,9 42:13 57:22 70:15,24 71:3,21 74:20 75:18,21

**decision-making** 25:25

**decisions** 23:12

**decline** 15:17

**decrease** 44:16,17

**deduction** 30:4 36:21

**default** 71:17

**Defendant** 11:19 32:8 37:21 38:1 72:5 78:25 79:2,5

**defenses** 32:8

**definition** 48:23

Ryan Grisard

**degree** 7:6

**demographic** 64:9

**demoted** 37:21

**dental** 36:19,22

**department** 61:17 83:7,8

**deponent** 5:25 6:17 86:14

**deposed** 5:18

**deposition** 5:3 7:17 86:11,15

**describe** 83:3

**description** 16:3,6 19:20 43:21 44:1

**descriptions** 40:4 43:17,22

**designated** 7:20

**desk** 34:4

**detail** 77:19

**detailed** 16:6

**determination** 8:12,17 11:20 13:24 21:5

**determine** 79:2

**determined** 13:20 15:22

**development** 26:10

**difference** 19:2

**differently** 15:6

**difficulty** 52:12

**digital** 74:8

**directly** 68:15

**director** 26:10 73:6

**directors** 15:20 24:4,11

**Disability** 61:17

**disagree** 31:10

**discharge** 43:11 46:7,15

**discharged** 37:23 45:16,23 60:2

**discharges** 60:4

**discharging** 45:24

**disciplinary** 10:23 38:6

**discipline** 8:13 10:2,6 11:2,7,13,20 12:19 13:1 15:5 21:6 43:2 60:19 79:5

**disciplined** 37:21 38:4 53:25 60:22 69:11,15,19

**discovery** 11:18 17:6 30:21 70:8

**discriminated** 9:25 30:15

**discrimination** 8:18,22 9:3 13:6,7 23:9 28:16 30:8 45:5 49:5,18 75:14 79:21 80:3 81:13,20 82:2,4,6 83:15, 21,23,25

**discriminatory** 30:12 32:22

**discuss** 15:20 53:13,19 58:23 59:1 80:4

**discussed** 42:14,18 57:18,21,24 60:10 74:19,24 75:13 78:6,19,22,23 80:21

**discussing** 15:22 42:22 48:8

**discussion** 20:3 26:17 34:17

**discussions** 27:3,7,10 78:17,21

**displayed** 49:6

**disrespect** 6:16

**document** 12:10,24 20:2,4,5 21:12, 14,15 22:20,24 23:20,23 29:21 30:2 39:20 54:22 74:14

**documentation** 12:19 62:20 73:5, 10,15 83:14,17

**documents** 40:6 72:4,7,9,24 73:3, 22 74:3

**double** 20:7

**doubts** 56:4

**dozens** 33:7

**dragged** 51:1,8,10

**dress** 82:16

**drink** 6:18

**drop** 22:10,14,16,21,25 60:16,19,23

**drops** 23:11

**dual** 18:9

**due** 56:5 57:6 60:4,6,7,8,9

**duly** 5:10

**duplicate** 20:5

**duties** 43:17,22 69:2

**duty** 68:24

## E

**earlier** 33:19,20 73:15

**early** 25:15 79:15,24

**EEO** 9:14,18

**Eileen** 18:1 70:10,20

**elect** 30:3

**elected** 62:16

**electronic** 41:6,11,15 43:10

**eliminate** 25:3,4 26:19

**elimination** 18:11

**email** 7:22 13:16,19,21,23 14:1 30:15 33:1,9,10,14 34:2,6,10,11,13, 18,20 35:4,5,9 45:13,20 48:6,7 49:6 50:12 52:25 54:17 55:2 59:24 60:15 62:1,3,25 65:16 73:17,20 75:2 77:4

**emails** 33:7,17 34:21 35:1 36:8 54:8,10 73:9 74:2

**employed** 50:20,22 71:4,6 79:13

**employee** 9:9,10 15:2 20:13 28:11 31:7 35:25 36:25 43:8,9 45:15,22,24 53:4 58:6,8 64:25 68:2 80:4

**employee's** 83:14

**employees** 28:17,21 30:14 35:19 37:21 38:3 40:18 44:20 46:20,23 49:18,23 67:25 68:11 77:24 80:10 83:20

**employer** 49:3

**employment** 10:9 64:12 70:14,23 78:18

**encompassed** 37:17

**encompasses** 37:14

**end** 17:5 22:5 39:10 81:4

**ended** 51:7,8

**ends** 21:20 22:14

**enforce** 61:7,10

**enter** 11:25 12:3

**entitled** 28:11 29:19,23 36:14,15 37:3,6

**error** 8:4

**escalate** 11:15

established 20:20

estimate 67:24

evaluation 10:19 62:4

evaluations 8:13 15:1 40:5 43:3 79:6

events 66:10

eventually 83:10

evidence 14:25 36:4,6

EVV 39:24 41:4,6,13 50:1

EVV-RELATED 60:6

exact 13:22 14:16 79:12

EXAMINATION 5:11

exciting 51:20

exhibit 7:15,16 9:11,12 10:20 11:25 12:3,6,8 13:10,11 19:18,19 21:9,11 23:16,18 28:10 29:2,3 32:7 36:20 38:25 39:2 42:12 45:8,11 48:2,4 50:9,11 52:22,24 54:14,15,17 55:4, 6,9,11,20 59:21,23 61:23,25 65:3,5, 14,20,21 66:25 67:4,7 69:22

exhibits 62:3

existence 72:4

exists 34:14

expectation 53:5

expected 59:2

expire 57:4

expressed 50:16

extent 8:5

---

### F

facilities 57:11 60:11

fact 11:19 14:25 49:17 75:17

facts 37:20

failure 39:22

fall 24:6,10 69:2,6

familiar 12:9 13:16,18 20:14 23:22 29:14 38:16

family 45:19 47:8 56:23 66:5 67:24 68:3

fancy 44:19

faster 61:8,12,20 62:9,13 63:4

February 29:6 60:17

federal 5:6 49:2,4 82:1

feel 5:22 30:15 31:16

felony 7:6

felt 14:9

file 45:25 74:7,8,10,11,13,15

filed 85:13

files 45:15,22

filing 47:19,20

fill 62:17

filled 25:9 51:13

finally 45:10 78:3

financial 15:20 24:23 42:22 44:13

find 34:10

finish 6:2

finished 57:2

firing 78:25

fiscal 20:20

five-minute 72:12

flow 46:22

folder 34:9

follow 63:8 78:7

follow-up 63:7

foregone 78:10

form 62:17 69:24

formal 5:6

forms 64:11

forward 80:1

found 48:11

frame 10:15

Frances 48:7

FRCP 86:12

Freddy 71:2

full 5:15 6:24 47:20

function 68:21 76:22

---

### G

G-I-R-L-I-N-G 68:8

Garza 10:13,14 12:2,13 18:9,23 24:18 25:11,21 26:11,12,24 30:12, 19 33:15 40:13 41:24 48:7,17 49:19 50:12 51:17 52:6,10,25 54:23 59:7, 15,20,25 61:14,18 62:1 65:18,20,22 66:15,19 67:2,3 69:6 72:11,14 76:5, 24 79:11 82:25 84:5 86:4

gauge 40:22

gave 28:7

gender 75:14 83:25

general 43:14 73:24

gentleman 7:23

Girling 68:8

give 6:12 63:3 65:12 69:8

goal 68:20

Gogo 14:4 29:5 33:5,8

Gonzalez 48:7

good 5:13,14 6:6

gotcha 46:9 82:19

graded 81:4

great 62:7

Gregory 18:1

grievance 85:14

Grisard 5:5,7,13,17,18

grow 15:14 53:5 69:9

growing 16:1 56:5

growth 44:5 58:18

guess 25:10,11 35:15 39:9 44:25 61:11 68:23 82:10

guidance 68:22 69:9

---

### H

H'VILLE 21:25

hair 31:20

hand 13:9 19:17 20:7 21:10 23:17 29:1 38:21,24 45:7 48:3 50:10 52:23 59:22 61:24 65:9

---

Ryan Grisard

**handbook**  9:10 80:4,7 82:15

**handed**  34:20

**handing**  54:13

**hands-on**  40:19

**happened**  79:23,24 85:4,6

**harassment**  8:17,22 9:3 28:17
  79:22 80:3 81:13,20 83:15

**Harris**  26:11 85:16,17

**Harvey**  26:6,13

**Harveys**  26:9

**head**  28:6 57:13

**health**  29:22 36:18 63:13 68:8

**Healthcare**  61:6

**hear**  52:7 59:20

**Heather**  76:5,13,14

**Hebbronville**  18:17,18,22 21:25

**helping**  53:5 69:8

**Hernandez**  18:3,10 31:8 70:18,20

**hey**  25:17 28:1 54:4 60:15 63:3
  64:18 76:3 78:6 81:16

**high**  35:19,20 53:4 56:5,17,21

**higher**  60:8

**highlighted**  53:12

**highlights**  11:24 12:1,4

**hire**  40:21

**hired**  52:15 70:11 79:11,25 80:1,11

**hires**  66:23

**hiring**  78:25

**hold**  54:23 67:3 74:3

**holiday**  37:11,13

**home**  41:17 63:12 68:7,9

**hour**  64:19 67:14,19

**hourly**  20:9,15 46:2 63:23 64:1

**hours**  53:6 56:10,23 62:18,23 81:2,
  3,16,19,25

**HR**  14:4 48:10 64:17 76:7,21,22

**HRIS**  64:6,13

**huge**  60:16

**huh-uh**  6:12 52:11

**huh-uhs**  6:8

**human**  64:8

**Huntsville**  18:13,15

---

**I**

---

**identification**  72:8

**identify**  38:3 73:3

**identity**  37:20

**impact**  46:22

**implementation**  43:10

**implemented**  37:25 58:8

**impressed**  63:19

**impression**  63:18

**improvement**  10:7 38:13,19 39:4

**in-box**  34:8

**in-service**  39:24 41:4,12,13 82:22

**in-services**  80:19,22,24 81:1

**incentive**  58:6,8

**include**  9:13 43:4 82:1

**included**  16:20

**includes**  16:16

**including**  28:17,22 34:22 36:13
  48:12 66:10

**incomplete**  40:2

**incorporate**  20:18 44:3

**incorporated**  36:22

**increase**  53:14

**indicating**  54:18 56:12 58:20 59:25
  62:6,25 63:2,16 66:1

**individuals**  17:10 73:12

**industry**  35:20,23,24 46:1 56:16,17

**inform**  75:25

**information**  12:14 64:9 72:23 77:7

**informed**  54:11

**initial**  20:10

**initials**  20:14

**input**  42:17 66:10

**inquiries**  53:2

**instance**  22:2 55:7 60:3,5 74:7

**instances**  14:9

**insufficient**  69:1

**insurance**  29:23 61:4

**intent**  7:16

**interest**  50:16

**internal**  75:3

**interpret**  20:17 44:2

**interrogatory**  12:18

**interviews**  58:16

**investigation**  8:11,16 9:24 13:5
  28:20 32:18,20

**investigations**  10:1 28:23

**involuntarily**  36:25

**involved**  24:15 26:6 28:18,22 42:13,
  14 53:20,21 66:9 70:15,23,24 71:2
  72:8,11 73:1,12 74:20

**involvement**  42:17

**involving**  28:17,21

**issues**  17:8 21:1 22:18 35:12,14
  36:1 47:23 50:2 60:6

---

**J**

---

**Jackson**  5:21 12:13 14:25 83:16

**Jackson's**  10:25

**January**  14:2 17:5 33:8 35:1 60:16
  84:23

**job**  6:6 16:1,3,6 17:11 19:20 40:4
  43:17,18,21,22,25 46:2 68:18

**Jones**  62:23

**judge**  7:3

**July**  39:7

**June**  39:8 65:17 67:1

**jury**  7:3

---

**K**

---

**K-A-M-L-A**  18:19

Ryan Grisard

**Kamla** 18:19

**Kimberly** 65:17

**kind** 9:1 23:19 35:12 55:15 64:12 65:5 73:25 77:19 82:25 85:4,6

**Kindred** 68:7

**kitchen/break** 48:14,19

**knowing** 31:18,22

**knowledge** 8:1 9:15 33:13,17 35:8 38:7 43:14 45:6 49:18,24 54:9 66:2 69:14,16 71:18 79:7,23,24 80:2

L

**L-E-A-L** 48:10

**labor** 48:14,18,24,25 49:2 84:5

**lack** 51:14

**Lacy** 17:22,23

**laid** 37:23

**LAN** 55:15

**laws** 49:2,5,17 82:2,4

**lawsuit** 73:10

**lawyers** 44:19

**leader** 76:22

**leads** 44:14

**Leal** 48:10

**learned** 81:5

**leave** 37:16,22 50:24 71:12

**left** 21:18 55:16

**left-hand** 54:19

**legal** 49:20 73:2

**length** 80:25

**Leslie** 24:24 27:5 28:2 65:16 66:1

**level** 49:3 53:4 57:25

**light** 13:21,23

**Linda** 26:6,9,13 27:7

**Linda's** 27:1

**list** 7:21 46:16 47:1,12 49:13 66:2

**listed** 8:11 26:8,10,12 36:20 37:9 46:20 47:7 70:4,10 71:2

**location** 42:23

**locations** 35:21

**log** 27:21 64:17

**logs** 27:12,20

**long** 12:3 15:11

**long-term** 57:11 60:11

**longer** 25:5

**looked** 34:6,8 36:15 39:16

**lost** 68:9,11

**low** 19:15 38:10 39:16,17,21 57:22 69:5

**lowering** 32:13

**Luna** 17:24,25 38:16,19 39:4,13

M

**made** 9:25 14:15 15:7 20:9,12 21:5 23:8,12 30:8,19,24 31:1,9,12,17,24 32:9 33:18 34:3,5 35:6 75:18,21 83:1 84:25 86:13

**main** 15:14 16:1 27:17 32:4,16 51:4, 5

**maintaining** 39:25

**make** 6:7 23:7 25:17 31:19 32:22 49:13,20 52:10 74:4 77:9 78:12

**makes** 31:22

**making** 21:5 26:3 35:9

**manage** 20:19 26:19 63:14 64:9,10

**managed** 61:1,2,8 64:13

**management** 74:20

**manager** 15:13 17:12 19:3,11,21,23 21:6 23:3 25:5,6,18 39:5 40:1 43:18 48:9 58:2 63:8 83:11

**manager's** 16:1 40:6

**managerial** 79:1,3,7

**managers** 17:1,7,14,16,18 19:1,14, 16 38:10,11,12 43:5 44:22,24 45:2,5

**March** 29:9 51:18,23 53:1 54:21

**mark** 39:1 65:9

**marked** 10:19 12:8 13:9,11 19:19 21:9,11 23:16,18 29:3 38:25 39:2 45:7,11 48:2,4 50:9,11 52:22,24

54:13,15 59:21,23 61:23,25 65:3,4, 14

**market** 68:18

**marketer** 68:24

**marketing** 50:4,18,24 51:4,19,24 52:3 53:6,14,19 54:4 58:24 65:19

**marking** 12:6

**master's** 83:5

**material** 81:5,17

**matter** 28:18,22

**matters** 11:25

**MBA** 83:5

**Mccleary** 70:10,20

**Mcdonald's** 66:3 67:11,14,21

**MCO** 62:15,19

**MCOS** 60:25 61:12 62:8

**meant** 73:24

**measure** 44:8

**measures** 38:6

**Med** 5:9 7:12,24 11:2,9 12:23 20:12 37:1 39:23 61:7 62:16,21 83:1

**medical** 5:4,8 36:21 50:22,25 74:12 79:13

**medication** 6:20

**meet** 15:19 58:23 59:1 75:9

**meeting** 27:25 28:1 42:19 53:19,20, 21 75:10 85:8

**meetings** 59:11 75:12,16

**member** 68:3

**members** 47:8 56:23 66:5 67:25

**memorialized** 85:7

**memory** 6:21 69:18

**mention** 20:16

**Merc** 21:24

**Mercedes** 16:17 17:25 21:24 22:13 39:13

**mess** 6:14

**messages** 75:5,8

**messaging** 75:3

**method** 45:24

**methods** 72:7

**mind** 13:12

**minimum** 49:1

**minute** 16:12 33:19

**minutes** 33:13 84:15

**Monday** 78:5

**month** 21:19 42:23

**monthly** 15:19 24:23

**months** 23:13 25:2 60:23

**morning** 5:13,14 71:22 72:1

**move** 53:7 55:8,14 61:8,12,20 62:9 63:3 64:10

**moved** 57:11 60:12

**moving** 53:2

**MPI** 62:22

**MTI** 55:8,15

**multiple** 48:12 81:23

**N**

**N-G-U-Y-E-N** 73:8

**N-H-A-N** 73:8

**named** 7:23

**names** 47:1

**narrow** 44:24

**national** 83:23

**nature** 10:8 35:23,24

**NB** 21:23

**necessarily** 46:7 69:17

**needed** 35:15

**Nguyen** 73:5

**Nhan** 73:5,14

**niche** 63:12

**Nick** 24:9,24 25:24 27:5 28:1 34:3 42:20 73:15 74:2

**nods** 57:13

**nonexpert** 49:20

**Norma** 48:10

**Nos** 29:3

**note** 7:21

**notes** 84:12

**notice** 7:16 34:20 60:14 78:16 84:22

**notified** 73:8 76:2,3,4

**notify** 85:1

**November** 5:2 21:20 22:5

**number** 7:15,16 8:16,21 9:11,12 10:20 12:7,12,18 13:10 19:5,6,8,18 21:11 23:18,19 27:17 28:7,10,15,20 29:2,11 32:7,8 36:12,20 37:19,20 38:2,25 40:24,25 41:2 42:11,12 43:2,6,16 44:6 48:4 50:5,11 52:24 54:14,18 55:5 59:23,24 61:25 62:17, 18,22 65:5,16 66:4,5,15,25 67:10,23 69:23 72:3 78:24 79:1,4 83:13

**numbers** 22:8 27:15,18 43:6,7,11 44:12 62:7 63:17,18,20

**O**

**oath** 42:9

**object** 49:19

**objectives** 15:14 59:2

**occasions** 76:8

**October** 45:16 48:8

**offer** 66:3

**offering** 66:19,22 67:11

**office** 16:16,20,21 17:22 18:13,14, 17,20,22 19:21,24 22:3 35:11,16 39:13,16,21 40:4 46:23 47:24 48:11 49:9 51:1,9 57:24 69:5,12 76:18,19, 20 77:18,21

**offices** 17:15,17,19 19:7 22:19,25 76:21

**official** 24:12

**offset** 19:8

**onboarding** 64:10

**operating** 63:14

**operation** 15:21 26:20

**operations** 20:19 40:6

**opinion** 47:22

**opposed** 38:14

**oral** 5:3 7:17

**order** 70:19

**org** 23:24,25

**organization** 61:1,3,8

**organizational** 24:1

**orientation** 80:7,15

**origin** 83:23

**original** 22:8

**Outlook** 28:4 34:9,18 73:16,19

**outstanding** 62:8 63:18

**oversight** 68:21

**overtime** 64:19

**P**

**p.m.** 72:17 84:18 86:11

**pages** 12:17

**paid** 60:7 67:15 68:7,8,9

**paper** 47:19 62:21

**paperwork** 61:21 62:15 63:1,5,9 85:11

**paragraph** 14:8 48:14 53:9,16 55:7, 9,13,16,20 58:11 60:3

**paragraphs** 55:6

**parameters** 8:6 20:20 35:15

**parent** 19:5,6,8,12

**part** 9:10 12:25 15:25 16:3 26:17 42:25 56:18,25 58:17 71:16,20 73:2 83:2 85:24

**party** 86:14

**pass** 60:5 86:2

**passed** 47:9

**passes** 57:7

**past** 14:9 25:2 62:2 83:21

**patient** 41:22 43:7 44:11,14 46:21 47:5,8 62:15

**patient's** 41:16

Ryan Grisard

**patients** 40:20,24,25 41:2,8,19 44:5,6 50:6 56:9,10 57:3,11

**pay** 28:11 29:5,12,13,16 34:22 36:13,15 37:11,12,13,16 41:20 53:4 56:19 57:19 60:9 64:11 66:4 68:12

**payouts** 37:3,6

**payroll** 30:4

**pays** 67:14

**PCA** 56:6

**PCAS** 56:5,13 57:15 60:13 67:15,24

**Pembrook** 24:7 42:16 65:16

**people** 18:25 42:14 44:25 46:12 71:8 75:24

**percent** 16:8 22:7 60:23 67:24

**performance** 10:7,19 14:21 15:1,4, 12 17:8 19:15 20:23 36:2 38:13,19 39:4,17 42:22 43:3 47:24 62:4 79:6

**period** 14:17,18 19:14 22:21,22 46:5

**periods** 23:11

**perjure** 7:6

**permanently** 60:10

**person** 27:3,5 50:18 51:12 62:19 76:7 85:4

**Personal** 56:7

**personnel** 40:3 74:7,11,13 79:1,4,7

**persons** 42:12 72:8

**phone** 27:4,8,12,15,22,24 75:2 77:3, 5 84:25

**phrase** 6:10

**pick** 54:4

**PIP** 39:9,11,19,22 40:8

**place** 9:8,24 27:3,10 58:7 61:21 62:14 64:14,15

**Plaintiff** 8:14,19 9:25 36:12,13 38:1 42:13 43:18 70:11

**Plaintiff's** 8:23 10:19 12:6 13:10 19:17 21:11 23:18 28:10,23 29:1 33:8 38:25 42:12 43:4 45:8 48:4 50:11 52:24 54:14 59:23 61:25 65:5 70:5 72:4,9

**plan** 29:24 38:19 39:4 58:6 62:19

**planned** 66:11

**plans** 10:7 29:20 38:13 45:19

**platform** 63:14 64:6

**point** 44:2 46:10 70:13,22 75:24 80:24

**pointed** 80:8

**policies** 9:12,13,17 11:7 39:23 78:24 79:2,4 80:6,8,16,20,21 82:6, 12,13,14 83:13

**policy** 8:22 9:4,5,21 11:2,9,13 13:1 26:10 37:24 41:11 79:19,22 80:5,12 81:7,8,10,21 82:17,18,22 85:3

**poor** 17:8 19:15

**portion** 59:18

**position** 14:11 25:3,5,6,8,18 26:19 49:22 50:18 51:13 53:3

**positions** 44:20

**post** 33:9 34:21 49:23 62:3

**posted** 49:14,17

**posters** 48:14

**posting** 48:25 49:4

**posture** 48:17,18,25

**potential** 57:21

**potentially** 47:7

**preamble** 5:6

**preapproved** 71:14,18

**preferred** 67:25 68:2

**present** 24:22 28:18,22 32:10 71:10 73:20

**president** 24:13

**press** 6:13

**pretty** 31:16,18 54:7 56:16

**previous** 5:5 54:17 78:9

**primarily** 68:20

**prior** 8:13 10:2,3 11:20 12:19 15:5 28:15 30:7,11 32:19 33:8,13,17 35:9 36:2 76:8

**prioritize** 40:1

**priority** 49:13

**privy** 31:4 59:11 68:10

**problems** 15:12 16:14 20:23 35:18 57:14

**procedure** 37:24

**procedures** 39:23 78:25 79:2,4 80:7 83:14

**process** 18:11 61:21 62:14 72:25 73:25 80:8 83:17

**produced** 29:13 74:15

**product** 63:12 64:8

**production** 72:5,10 73:1,25

**profitable** 82:11

**program** 26:10 58:8

**progressive** 11:1,6,13 13:1

**promoted** 83:7,9,11

**promotion** 79:5

**promotions** 82:25 83:2

**prompted** 34:12,17

**proper** 45:24

**properly** 45:16,23 49:6

**Proposals** 65:19

**protested** 85:13

**provide** 6:3,7,23

**provided** 14:24 67:2 80:12 84:22 85:10

**provider** 19:4,5,6,8

**providers** 40:18

**providing** 11:11,18 12:14 57:4

**prudent** 32:22 35:25

**PTO** 37:7,13,17 64:20 71:16,24 82:15

**pursuant** 86:12

**put** 39:22 47:15 74:3

---

## Q

**qualifications** 79:3

**quarter** 67:19,20

**query** 46:11

**question** 6:2,10,17 12:21 16:13 54:25 59:16 67:10 73:23

Ryan Grisard

**questions** 8:5 12:15 30:22 55:24 72:21 74:18 85:21

**quick** 63:2

**quit** 30:16

---

**R**

---

**race** 23:8 32:18 35:7 43:4 44:25 45:5 75:13 78:22 83:21

**racial** 44:23

**Rae** 50:13,14,16 51:18 52:19 53:1,2, 3,22 60:17 68:14,23 69:1,2,10

**Rae's** 66:10 68:20

**rapid** 15:17

**rate** 15:17 56:5,18 57:19 67:21 68:12

**rates** 43:7 44:12 66:20 68:6

**read** 14:11 45:21 48:20 59:18 80:6 81:9

**reason** 6:23 31:9 32:4,14,16 40:7 51:11 75:6

**reasons** 54:1 56:21 57:22 60:1

**rebuttal** 55:23

**recall** 9:24 10:2,4 21:3 25:16 26:21 27:9 34:1,3 35:13,17,18 38:20 52:4, 20 58:10 69:21 77:3,12 78:13,17,20 79:10 82:24 85:10,12,13

**receive** 33:10 40:2 76:25 79:21

**received** 10:18 11:19 13:8 28:11 32:24,25 33:4,5 34:11,21 35:2 36:13 50:6 80:2 84:3

**receiving** 29:16

**recess** 42:4 72:17 84:18

**recognition** 58:6

**recommends** 58:5

**record** 5:2,16 6:14 27:22,23 41:24 42:2,6 72:15,19 84:16,20 86:9

**recording** 40:11

**records** 39:25 40:3 74:12

**recruit** 68:18,24

**recruiting** 65:18 66:7

**reducing** 53:6

**reference** 20:12 40:17,21 41:1 50:13

**references** 7:21,23,24 40:3,4,10,16, 21

**referral** 43:10 51:19,21,24 52:3 63:17

**referrals** 62:7 63:17

**referring** 62:12 73:23

**reflected** 9:12 22:20 29:21,25

**reflection** 29:15 50:5

**regard** 38:1 40:3

**regional** 83:11

**regular** 66:9

**regulation** 37:25

**reinstated** 25:9

**related** 8:12,17,23 9:14,17 20:4 26:21 27:12 30:11 36:9 41:11 42:17 44:11 47:23 49:5 53:2 54:1 62:7 64:12,23 69:11,19,24 70:3 72:23 73:5,10 74:18 75:9,18 78:14 79:21 80:18 81:13 82:1,6,12

**release** 69:24

**reliable** 57:15

**relocation** 60:8

**remains** 82:11

**remember** 13:22 14:16 34:15,16 75:16

**render** 62:24

**rendered** 61:13

**rendering** 61:9 62:10

**Renee** 13:20 14:1 35:10 45:14 48:9 50:12 52:25 54:10,20 55:4,20 58:3 59:24,25 60:17 62:1,6 63:19 65:17 68:22 69:16

**Renee's** 53:1

**repetitive** 32:13

**rephrase** 81:24

**replaced** 70:20

**report** 25:17 83:14

**reporting** 18:9

**representation** 32:1

**representative** 5:4,8 7:9,18 9:3 14:5

**reprimanded** 37:22

**request** 64:20 73:4 86:12

**requested** 29:5 59:18 72:7,9

**requesting** 51:12 62:18 66:10

**requests** 72:4,10 73:1,25

**required** 49:4,23

**requirement** 49:17

**requirements** 43:8,9,18

**Reserve** 86:4

**resign** 30:16

**resigned** 53:24

**resource** 64:8

**respected** 14:10

**respond** 58:17 72:25

**responded** 35:2 70:8

**responding** 53:1 55:4

**responds** 34:22

**response** 12:12 24:18 52:13 54:20 55:23 56:1 58:15,25 59:3,15 60:15 67:2 77:6

**responses** 6:7 17:6 54:18

**responsible** 12:14 43:23 69:8

**result** 85:14

**results** 15:20,22 24:23 25:1 44:13

**retaliation** 8:18,22 9:4,5 49:5,18 83:15

**retention** 43:7,9 44:4,5,12

**retirement** 29:20

**revenue** 53:8,15 59:2

**revenue's** 54:5

**review** 20:2 84:11 86:13

**reviewed** 26:3

**reviews** 20:5 62:20

**reword** 30:6

**Rhodes** 65:17

**Richard** 17:22,23

**Richard's** 74:7

**Richardson** 9:9 13:25 14:2 15:23 18:7,8 19:23 23:4,20 24:15 29:4,16 32:14 45:12,14 48:5,9 50:12 52:25 53:13 54:17 57:23 59:24 62:2 63:19 65:17 67:8,9 68:15 69:23 71:8,9 76:11 84:22

**Richardson's** 30:19 31:20 68:18 69:5

**Rick** 7:22 8:8

**Rights** 84:4

**RN** 26:12

**role** 18:9 26:15,24 39:25 50:18,24 51:4,5,9,19 53:7 58:17 68:20 76:21

**roles** 48:9 51:2

**room** 7:2 48:15,19

**rule** 37:24

**rules** 5:21

**run** 46:11

**Ryan** 5:4,7,17

———————————————

**S**

———————————————

**S-I-E-G-M-U-N-D** 76:16

**SA** 21:22

**salaried** 20:13

**salary** 20:9 63:23 64:1,2,3,4

**sales** 44:14,16

**SAM** 63:11

**San** 16:16 18:5 21:22 22:3 26:20 76:19,20

**Sarah** 14:4 29:5 33:5,8 34:10,22 35:2

**Sarah's** 34:4 73:16 74:2

**sat** 34:4 73:15

**scheduled** 58:16

**scheduling** 63:15

**scheduling/billing** 63:13

**school** 7:24 8:2

**scratched** 20:14

**search** 72:7,9,24 73:11,13,14 74:4

**searched** 73:16

**secondary** 45:23 48:6

**section** 38:2 53:12

**sends** 62:20

**sentence** 14:8 48:13 60:17

**separate** 9:5,21 17:12 27:21 30:2 37:11,13 74:12

**separated** 36:25 52:16,18 53:23

**separation** 78:18

**September** 45:13

**serve** 76:21

**served** 25:24

**server** 73:9

**services** 61:9,12,17,22 62:11,18,23

**shakes** 28:6

**she'd** 66:1

**she'll** 78:8

**Shelton** 45:18

**show** 11:22 16:10 46:16 49:1 76:24 77:18

**shown** 78:9 81:5

**shows** 49:8

**sic** 20:13 24:10 66:25

**sick** 37:14,16 72:1

**side** 28:6 54:19 64:17

**Siegmund** 76:5,13,14,17

**sign** 81:16

**signature** 81:8

**signed** 69:23

**similar** 21:13,15 27:1 44:20

**simply** 38:4

**sit** 9:20 10:5

**situation** 14:9

**skipped** 42:16

**skipping** 8:21

**smoking** 82:16

**snatch** 13:12

**sort** 18:8 26:19 63:14 71:16

**sought** 36:12

**South** 40:6

**space** 47:21

**speak** 28:25 36:24 37:15 52:7

**specific** 20:16 39:23 40:2 51:11 54:9 55:6 73:19,22 80:21 85:10

**specifically** 16:5 19:22 40:12 61:2 76:3 81:19

**specifics** 13:22 34:15,17

**spelled** 76:15

**spend** 34:25

**staff** 40:4

**staffed** 60:10 66:5

**stands** 41:6

**start** 67:6

**started** 79:14,15 83:6

**starting** 11:12 66:3

**starts** 21:19 22:3,13 55:7,9 58:12 67:8

**state** 5:15 12:3 43:8,9 49:2,4 76:23 82:4

**statement** 17:10

**statements** 31:1

**status** 63:9

**step** 11:6,12 63:7

**steps** 52:2

**sticker** 23:19 48:5

**stomach** 71:10

**stored** 74:9

**strategy** 53:14,19 58:24

**stringent** 47:13,16

**stub** 34:22 36:15

**stubs** 29:5,12,13 64:11

**stuff** 64:25

**subject** 65:18

**submit** 61:21 62:14

Ryan Grisard

**successful** 35:16

**suit** 32:10

**Superior** 61:4

**supervisors** 28:18,22 30:8 70:5,7, 12 74:19

**supervisory** 79:1,3,6

**supported** 14:10

**supposed** 16:7 51:5,6

**suspended** 37:22 38:5

**switched** 63:22

**sworn** 5:10

**system** 41:5,15 46:15 50:1 63:11,14 64:13

─────────────

**T**

**T-D-A-D-S** 61:16 62:9

**T-Z-I-R-I-M-I** 24:10

**tagged** 11:24

**taking** 9:24

**talk** 8:8 39:20 71:8

**talked** 7:22 9:2 36:16

**talking** 6:3 7:3

**tax** 64:10

**TDADS** 61:12,14,15 62:8,15,20 63:3

**team** 5:4,8,9 7:13,25 11:2 12:23 20:12 37:1 39:23 50:23,25 61:7 62:16,21 69:3,4 73:2 79:13 83:1

**Team's** 11:9

**terminate** 13:24 14:14 15:7 21:6 23:7,12 24:15,21 25:18 26:3,6,16,25 33:18,23 35:6,9 42:13 43:1 46:14 57:23 70:16,25 71:3,21 74:20 75:6, 18,21 76:11 77:25 85:8

**terminated** 13:21 17:1,3,4,7 19:14 23:4,6 30:20 32:15 33:22 37:23 38:10 46:8 53:23 75:25 78:4

**terminating** 33:13

**termination** 8:12,18 10:3 26:22 28:16 29:9 31:2 32:19 34:5,21 36:2 38:6,14 42:18 69:25 71:9 75:19 76:9 77:9 78:12,16,18 84:23 85:1,11,14

**terminations** 17:19 43:3

**test** 81:3,6,7,11,12

**testified** 5:10 59:11 83:16

**testify** 8:14,19,23 28:13

**testimony** 6:24 7:2,12 10:25 14:24 33:16,19,20 34:19 35:4,8 42:8 83:18 85:24

**Texas** 7:5 40:6 43:5,8,12 61:16 76:7,19,20,21,23 83:6,10 84:5

**text** 75:5,8

**thing** 37:8,9 67:6 68:4

**things** 57:21 66:1,2

**Tia** 76:8

**time** 9:9 10:15 14:17,18 15:23 17:5 19:14 22:20,21 23:11 25:3,7 29:17 33:21 37:4 41:16,18 46:17 53:13 60:18 64:25 68:7 71:4,6 75:9 76:7, 10 82:17 86:4,7

**timekeeping** 82:8,15

**times** 78:10

**tired** 56:13

**title** 17:11,12 24:12 84:4

**today** 6:18 7:8,12 8:14,19,24 9:6,20 10:5 25:7 28:2,13 34:19 64:14,15 75:13 76:3 78:19,22,23 79:25 83:12 85:22

**Today's** 5:1

**told** 31:24 54:3,8 85:3

**tomorrow** 77:8

**top** 21:22 66:3,6,16,22

**topic** 8:10 9:23 28:10 32:8 37:19 42:11 72:3

**topics** 7:20 8:6 36:10 43:14 70:4 79:8 80:21,22

**track** 64:23 66:7

**track-** 64:17

**tracking** 41:5 63:17

**training** 40:2 41:14 79:5,20 80:2,12 84:3,7

**transcript** 86:13

**transfer** 56:14

**transferred** 60:6,8

**transpired** 77:22

**trash** 34:8

**treated** 15:6

**trial** 86:5

**truthful** 6:24

**turn** 12:17 58:21 66:24

**turnover** 35:19,20 43:7 44:12 56:5, 17,22 57:19 64:24

**two-hour** 82:17

**two-month-long** 39:11

**type** 85:14

**Tzirimis** 34:4

─────────────

**U**

**uh-huh** 6:12 11:8 12:16 14:3 22:4,6, 9,15 25:19 28:12 37:2 44:21 47:2 52:11 59:4 67:12,18 68:25 75:23 80:14 82:3

**uh-huhs** 6:8

**uncommon** 46:19

**underneath** 55:19

**understand** 7:1,5,9 42:8 46:25 54:24 61:15 80:6 81:9

**understanding** 9:4,16 10:22 11:1, 4,17 12:20 14:4 15:10,25 16:22 19:22 23:1,23 24:14 26:5 30:5 32:17 33:20 38:18 40:7 45:20 48:24 49:16, 22 53:8,16 54:16,21 59:3 63:25 66:12 71:7 72:25 74:1 84:22,24

**understood** 85:21

**United** 61:6

**unstaffed** 56:12

**unsure** 9:19

**unwillingness** 39:24 40:1

**updates** 82:11,13

**utilized** 37:25

─────────────

**V**

**vacation** 37:4,11,14,16 46:6

**Valerie** 85:19

**valued** 53:4

**verbal** 6:7 10:6,10,11,15 11:7,11
12:23,25

**verification** 40:5 41:6,11 43:10

**Vice** 24:13

**video** 5:3

**view** 48:15 49:24

**viewing** 48:19

**VII** 84:4

**violation** 41:10

**vision** 36:19,22

**visit** 41:6,7,11 43:10

**visiting** 56:9

**voluntarily** 53:22,24

**voluntary** 29:22

**VP** 25:25 49:22

W

**wage** 49:1

**wait** 6:2 33:19

**waiting** 56:13

**walk** 77:21

**wanted** 9:1 47:20

**warning** 11:7 12:24 38:5

**warnings** 10:6,10,12,15 11:12
12:25 38:13

**Waters** 71:2

**week** 62:23 76:10 78:4,7

**weight** 7:2

**Wilkins** 7:24,25

**William** 7:23,25

**woke** 72:1

**woman** 14:11 15:7

**word** 20:16,17 44:19 52:13

**worded** 55:25

**work** 46:3,8 68:14

**worked** 46:12,17

**working** 18:6

**workplace** 32:23 82:16

**Workuments** 64:5,15

**writing** 5:25 54:20

**written** 11:15 27:21 55:16,20

**wrongful** 28:16

**wrote** 54:18

Y

**year** 25:12 46:10,12 80:22 82:1

**years** 37:24 38:9 79:13,14 80:11
83:9,21

**you-all** 18:13 64:14 74:1,3

Z

**Z-I-N-I-N-A** 85:16

**Zinina** 85:17

# Exhibit D

In the Matter Of:

*RENEE RICHARDSON*

*vs*

*THE MEDICAL TEAM, INC., ET AL.*

*SARAH GOGO*

*February 06, 2019*



SARAH GOGO - 02/06/2019

```
1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF TEXAS

3                 San Antonio Division

4

5    - - - - - - - - - - - - x

6    RENEE RICHARDSON,          :

7            Plaintiff,         :

8       vs.                     :  CA No.

9    THE MEDICAL TEAM, INC.,   : 5:18-CV-151-FB

10   d/b/a THE MED TEAM,        :

11   INC.,                      :

12           Defendant.         :

13   - - - - - - - - - - - - x

14           VIDEOTAPED DEPOSITION OF SARAH GOGO

15                 McLean, Virginia

16                 February 6, 2019

17                    3:15 p.m.

18

19

20

21

22

23   Job No.:  NY-207193

24   Pages: 1 - 21

25   Reporter:  Sandria Cox
```

1          Videotaped Deposition of Sarah Gogo, a

2     witness, held at the offices of:

3              REGUS

4              2010 Corporate Ridge

5              Suite 700

6              McLean, Virginia  22102

7

8

9

10

11             Pursuant to notice and/or agreement,

12     before Sandria L. Cox, Court Reporter and

13     Notary Public in and for the Commonwealth of

14     Virginia.

15

16

17

18

19

20

21

22

23

24

25

```
 1              A-P-P-E-A-R-A-N-C-E-S

 2

 3         ON BEHALF OF THE PLAINTIFF:

 4              (by video conference)

 5         THOMAS N. CAMMACK, III, ESQUIRE

 6         Poncio Law Offices, PC

 7         5410 Fredericksburg Road, Suite 109

 8         San Antonio, Texas  78229

 9         210-441-7058

10

11

12

13         ON BEHALF OF THE DEFENDANT:

14         JUDY BENNETT GARNER, ESQUIRE

15         Jackson Walker, LLP

16         2323 Ross Avenue, Suite 600

17         Dallas, Texas  75201

18         214-953-6167

19         jgarner@jw.com

20

21

22     Also Present:

23     Akim Graham, Video Technician

24     Nick Tzirimis, Vice President, The Med Team

25
```

```
 1                   C-O-N-T-E-N-T-S

 2

 3   EXAMINATION OF SARAH GOGO              PAGE:

 4        By Ms. Garner                       6

 5        By Mr. Cammack                      18

 6

 7

 8

 9

10                   E-X-H-I-B-I-T-S

11                    (Attached)

12

13   GOGO DEPOSITION                    MARKED:

14   Exhibit 1 (Richardson/Gogo Email)    15

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                P-R-O-C-E-E-D-I-N-G-S
 2                VIDEO TECHNICIAN:  Here begins the
 3  deposition of Sarah Gogo in the matter of
 4  Renee Richardson versus The Medical Team,
 5  Incorporated, doing business as The Med Team,
 6  Incorporated, in the United States District
 7  Court for the Western  District of Texas, San
 8  Antonio Division, Civil Action No.
 9  5:18-CV-151-FB.
10                Today's date is February 6, 2019.
11  The time on the video monitor is 3:21 p.m.
12                The video operator today is Akim
13  Graham.
14                This video deposition is taking
15  place at 2010 Corporate Ridge in McLean,
16  Virginia.
17                Counsel, please voice-identify
18  yourselves and state whom you represent.
19                MS. GARNER:  Judy Bennett Garner for
20  The Med Team.
21                MR. CAMMACK:  Thomas Cammack for
22  Renee Richardson.
23                VIDEO TECHNICIAN:  The court
24  reporter today is Sandy Cox of Epiq.  Would
25  the reporter please swear in the witness.
```

```
 1                 (Witness sworn.)
 2           Whereupon,
 3                    SARAH GOGO,
 4    a witness, was called for examination by
 5    counsel for defendant, and, after having been
 6    first duly sworn, was examined and testified
 7    as follows:
 8                 EXAMINATION BY COUNSEL FOR DEFENDANT
 9                 BY MS. GARNER:
10        Q.   Ms. Gogo, thank you so much for
11    being here today.  We hope not to keep you
12    that long.
13               Renee Richardson has filed a lawsuit
14    against The Med Team, Incorporated, and I
15    represent The Med Team.
16               Have you ever been deposed before?
17        A.   Deposed?
18        Q.   Deposed.
19        A    Oh.  No.
20        Q.   Okay.  So the court reporter just
21    swore you in.  Do you understand that you're
22    testimony here today is under oath under
23    penalty of perjury?
24        A    Yes.
25        Q.   Do you undersand that you are
```

```
 1   testifying today as if you were in a courtroom
 2   with a jury?
 3        A    Yes.
 4        Q.   And just before we get started, I
 5   would just like to set a few groundrules that
 6   just makes the deposition proceed a little bit
 7   easier.
 8             The first is I'm going to ask you a
 9   series of questions and hopefully you will
10   provide answers to those questions.
11             I just ask that you allow me to
12   finish my question before you answer.  Will
13   you agree to do that?
14        A.   Yes.
15        Q.   Also, the court reporter is here,
16   taking down everything that's said during the
17   deposition.  So that we have a clean record, I
18   just ask that you provide verbal responses for
19   all of your answers.  Will you agree to do
20   that?
21        A    Yes.
22        Q.   If you don't understand a question,
23   will you agree that you will let me know and
24   ask me to ask the question again or provide
25   clarity to the question?
```

```
1          A.    Yes.
2          Q.    Now, I don't expect that this
3    deposition will take very long.  However, if
4    at any time you need a break, that's fine.  I
5    just ask that if a question is on the floor,
6    if I've asked a question, that you answer that
7    question before we take a break.  Will you
8    agree to do that?
9          A     Yes.
10         Q.    Perfect.  Are you on any medications
11   that would prohibit you from testifying
12   truthfully and honestly today?
13         A     No.
14         Q.    Is there any other reason that you
15   would not be able to testify truthfully and
16   honestly today?
17         A     No.
18         Q.    Will you let me know anytime during
19   this deposition if anything happens that would
20   prohibit you from testifying truthfully and
21   honestly today?
22         A     Yes.
23         Q.    Just a couple background questions.
24   What is your current address?
25         A.    12865 Kitchen House Way, Germantown,
```

```
 1   Maryland  20874.
 2         Q.   And how long have you lived there?
 3         A.   A year.
 4         Q.   When did you begin working for The
 5   Med Team?
 6         A.   September 2016.
 7         Q.   Okay.  And what was your job title
 8   at the time of hire?
 9         A.   Director of HR.
10         Q.   And "HR" meaning Human Resources?
11         A    Yes.
12         Q.   Did your job title change at all
13   during your tenure with The Med Team?
14         A    No.
15         Q.   And what were some of your
16   responsibilities as the Director of Human
17   Resources?
18         A.   Oversight of the HR function,
19   training of HR staff, implementation of any
20   executive policies, participating with
21   leadership teams, some low-level employee
22   relations, benefit administration.  All HR
23   functions.
24         Q.   Did you ever receive any complaints
25   from employees while you were the Director of
```

1   Human Resources?

2        A.   No.

3        Q.   No?

4        A.   Unh-unh.

5        Q.   What was the process, I guess?  If

6   you had received complaints from someone, an

7   employee, what would have been your process to

8   deal with that complaint?

9        A.   I would notify the leadership,

10  executive leadership, Leslie and Ryan, and

11  also copy Nick in, and then recommend sending

12  it out to their attorney if it warranted it.

13       Q.   Do you currently work for The Med

14  Team?

15       A.   I do not.

16       Q.   And when was your last day of

17  employment with The Med Team?

18       A.   April 13, 2018.

19       Q.   Okay.  And are you currently

20  employed?

21       A.   And who is your current employer?

22       A.   I'm self-employed.

23       Q.   Self-employed?

24       A.   Uh-huh.

25       Q.   When you worked for The Med Team,

1   did you work out of the Reston, Virginia

2   office?

3        A.   That was my home base.

4        Q.   That was your home base.  Okay.  But

5   you traveled some in your role as the Director

6   of Human Resources?

7        A    Yes.

8        Q.   Did you know the plaintiff Renee

9   Richardson before you began working for The

10  Med Team?

11       A    No.

12       Q.   Okay.  But you met her as a result

13  of your working for The Med Team?

14       A    Yes.

15       Q.   And do you recall when you met her?

16       A.   December.

17       Q.   December of 20 --

18       A.   -- 17.

19       Q.   So you met Renee in December of

20  2017?

21       A.   Yes.

22            Oh, no.  I met her -- .  I started

23  in 2016 with The Med Team, so I met her

24  December 2016.

25       Q.   '16.  And did you interact with her

1    frequently while you were employed by The Med

2    Team?

3         A.    No.

4         Q.    And when you met her, did you first

5    meet her face-to-face or was it over the

6    e-mail or over the phone?

7         A.    It was face-to-face.

8         Q.    Okay.  Tell me about that

9    face-to-face meeting.  Was it a meeting

10   actually?

11        A.    It was on a trip to Texas.  It was

12   my initial training.  I visited San Antonio,

13   Austin, and then the office where Renee

14   worked.  So it was just a general go and see

15   the workings of Med Team and to meet some of

16   the staff and have them get to know me as

17   well.

18        Q.    Okay.  Did you meet with Ms.

19   Richardson one-on-one during that time?

20        A.    I did.

21        Q.    And tell me about your conversation

22   the one-on-one meeting with her.

23        A.    It was basic.  We talked about her

24   background, what it was like for her to work

25   in the office; any things that she thought HR

```
 1  could be doing better for her and her team,
 2  training needs.
 3       Q.   During that one-on-one meeting that
 4  occurred I guess in December of 2016 -- is
 5  that right?
 6       A.   Uh-huh.
 7       Q.   -- during that meeting did Ms.
 8  Richardson make any complaints to you of race
 9  discrimination?
10       A.   No.
11       Q.   During that meeting did Ms.
12  Richardson make any complaints to you of
13  harassment or a hostile work environment?
14       A.   No.
15       Q.   During that meeting did Ms.
16  Richardson ever tell you that she felt that
17  she was being treated unfairly because of her
18  race?
19       A.   No.
20       Q.   If Ms. Richardson had told you that
21  she felt that she was being treated unfairly
22  because of her race or would suffer from
23  discrimination or harassment, would you have
24  followed the complaint procedure we discussed
25  earlier?
```

1       A    Yes.

2       Q.   Outside of that meeting --.

3            Was that your only face-to-face

4    meeting with Ms. Richardson?

5       A.   Yes.

6       Q.   So December 2016 was the only time

7    you met with her face-to-face?

8       A.   Yes.

9       Q.   Did you have other communications

10   with her via phone and e-mail after that

11   meeting?

12      A.   No.

13      Q.   No.  Okay.  So did Ms. Richardson

14   ever call you or e-mail you with questions

15   about anything after that meeting?

16      A.   She claims to have e-mailed me but I

17   didn't receive an e-mail.

18      Q.   We'll talk about that in one second.

19           Outside of the meeting that you had

20   with her in December of 2016, during any other

21   time that you were employed by The Med Team

22   did Ms. Richardson make any complaints to you

23   of race discrimination?

24      A    No.

25      Q.   Outside of your one-on-one meeting

1   with her in December 2016, did Ms. Richardson

2   make any complaints to you of harassment or

3   hostile work environment?

4        A.    No.

5              (The Richardson/Gogo e-mail

6              dated 1/20/17 was marked

7              Gogo Exhibit 1 for

8              identification.)

9              BY MS. GARNER:

10       Q.    I'm going to hand you what I have

11   marked as Exhibit 1 there.  There you go.

12             MS. GARNER:  Thomas, I sent you the

13   copy of the exhibit.  E-mailed it to you.

14             MR. CAMMACK:  I received it.

15             MS. GARNER:  Okay.  Perfect.

16             MR. CAMMACK:  I received it.

17             MS. GARNER:  Great.

18             BY MS. GARNER:

19       Q.    Ms. Gogo, do you recognize this

20   document?  If you need time to read through

21   it, you're more than welcome to take the time

22   reading it.

23       A.    (Reading.)

24             I don't recognize it.

25       Q.    At the top it says from Renee

 1   Richardson, sent on Friday, January 20, 2017,

 2   at 7:39 a.m., to Sarah Gogo.  Subject: NB

 3   Situation.

 4            Did I read that correctly?

 5        A    Yes.

 6        Q.   Do you recall receiving a copy of

 7   this email in your Med Team e-mail in-box on

 8   January 20, 2017?

 9        A.   No, I don't recall that.

10        Q.   While you were employed with The Med

11   Team, did any other Med Team employee ever ask

12   you if you received an e-mail from Ms.

13   Richardson in which she alleged race

14   discrimination or a hostile work environment?

15        A.   Yes.

16        Q.   And who asked you about that?

17        A.   Ryan, Chris, the CFO, and Nick.

18        Q.   Do you recall when they asked you?

19        A.   It had to be this week, that week of

20   January 18th.

21        Q.   So sometime around January 20th or

22   so is when they asked you about it?

23        A.   I think so.

24        Q.   Okay.  Do you recall if they asked

25   you before Ms. Richardson was terminated?

1        A.    I don't recall that.

2        Q.    Okay.  And what did they ask you?

3        A.    They asked me if I had received an

4   e-mail from her and I said no.  And they

5   actually came in and looked at my e-mail

6   account.  And I think maybe the IT director

7   was there as well.  And they looked, searched,

8   to see if I had actually received it.

9        Q.    So they took your computer and they

10  looked through -- what you believe -- they

11  looked through your files to see if you

12  received an e-mail from Ms. Richardson?

13       A     Yes.

14       Q.    Okay.  And do you know if they found

15  an e-mail from Ms. Richardson in which she

16  made a complaint of race discrimination or

17  hostile work environment?

18       A.    I would say no, they didn't find it.

19       Q.    Okay.  If you had received this

20  e-mail which is marked as Exhibit 1, would you

21  have followed the complaint procedure that we

22  discussed earlier?

23       A     Yes.

24       Q.    Were you involved in the decision to

25  terminate Ms. Richardson's employment with The

```
 1   Med Team?

 2        A.   No.

 3        Q.   Did you make the decision to

 4   terminate Ms. Richardson's employment with The

 5   Med Team?

 6        A.   No.

 7        Q.   All right.  I'll pass the witness.

 8             EXAMINATION BY COUNSEL FOR THE

 9             PLAINTIFF

10             BY MR. CAMMACK:

11        Q.   I'm sorry, Ms. Gogo.  I didn't hear

12   what your response was when they asked if you

13   had been questioned about the e-mail before or

14   after termination.  You were questioned about

15   the e-mail before or after termination?

16        A.   I think it was before.  I don't

17   recall exactly.

18        Q.   So Ryan came to you and he was aware

19   that she sent an e-mail claiming

20   discrimination prior to her termination;

21   correct?

22        A    Yes.

23             MS. GARNER:  Objection.

24   Mischaracterizes testimony.

25             BY MR. CAMMACK:
```

1        Q.   But that is your understanding, that

2   they were looking for an e-mail claiming

3   discrimination prior to her termination;

4   correct?

5        A.   They were looking for an e-mail from

6   her to me.

7        Q.   Okay.  I have no further questions.

8   And as far as a copy of the video, I'll take

9   one. Or if you e-mail me, I can sign whatever

10   you all need.

11           MS. GARNER:  And we would like to

12   review and sign.

13           VIDEO TECHNICIAN:  This concludes

14   the deposition of Sarah Gogo.  Going off the

15   record.  The time is 3:33 p.m.

16

17

18

19

20

21

22

23

24

25

```
 1   I have examined and read the

 2   foregoing 19 pages and find the

 3   answers contained therein with

 4   changes made by me, if any, to

 5   be true and correct.

 6

 7

         _____
 8                  Sarah Gogo

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              CERTIFICATE OF REPORTER

2          I, Sandria L. Cox, do hereby certify that

3    the foregoing proceedings were taken by me in

4    stenotype and thereafter reduced to transcript

5    under my supervision; that said proceedings

6    are a true record of the testimony given by

7    said witness; that I am neither counsel for,

8    related to, nor employed by any of the parties

9    to the action in which these proceedings were

10   taken; and further, that I am not a relative

11   or employee of any attorney or counsel

12   employed by the parties hereto, nor

13   financially or otherwise interested in the

14   outcome of the action.

15         Given under my hand this 13th day of

16   February, 2019.

17                          _Sandria L. Cox_

18                          _____

19                          Sandria L. Cox

20                          Court Reporter

21

22

23

24

25

**Exhibits**

**Gogo 1**
 4:14 15:7,11 17:20

---

**1**

**1**
 15:7,11 17:20

**1/20/17**
 15:6

**12865**
 8:25

**13**
 10:18

**16**
 11:25

**17**
 11:18

**18th**
 16:20

---

**2**

**20**
 11:17 16:1,8

**2010**
 5:15

**2016**
 9:6 11:23,24 13:4 14:6,
 20 15:1

**2017**
 11:20 16:1,8

**2018**
 10:18

**2019**
 5:10

**20874**
 9:1

**20th**
 16:21

---

**3**

**3:21**

5:11

**3:33**
 19:15

---

**5**

**5:18-CV-151-FB**
 5:9

---

**6**

**6**
 5:10

---

**7**

**7:39**
 16:2

---

**A**

**a.m.**
 16:2

**able**
 8:15

**account**
 17:6

**Action**
 5:8

**address**
 8:24

**administration**
 9:22

**agree**
 7:13,19,23 8:8

**Akim**
 5:12

**alleged**
 16:13

**allow**
 7:11

**answer**
 7:12 8:6

**answers**
 7:10,19

**Antonio**
 5:8 12:12

**anytime**
 8:18

**April**
 10:18

**asked**
 8:6 16:16,18,22,24 17:3
 18:12

**attorney**
 10:12

**Austin**
 12:13

**aware**
 18:18

---

**B**

**background**
 8:23 12:24

**base**
 11:3,4

**basic**
 12:23

**began**
 11:9

**begins**
 5:2

**believe**
 17:10

**benefit**
 9:22

**Bennett**
 5:19

**better**
 13:1

**bit**
 7:6

**break**
 8:4,7

**business**
 5:5

---

**C**

**call**
 14:14

**called**
 6:4

**Cammack**
 5:21 15:14,16 18:10,25

**CFO**
 16:17

**change**
 9:12

**Chris**
 16:17

**Civil**
 5:8

**claiming**
 18:19 19:2

**claims**
 14:16

**clarity**
 7:25

**clean**
 7:17

**communications**
 14:9

**complaint**
 10:8 13:24 17:16,21

**complaints**
 9:24 10:6 13:8,12 14:22
 15:2

**computer**
 17:9

**concludes**
 19:13

**conversation**
 12:21

**copy**
 10:11 15:13 16:6 19:8

**Corporate**
 5:15

**correct**
 18:21 19:4

**correctly**
16:4

**counsel**
5:17 6:5,8 18:8

**couple**
8:23

**court**
5:7,23 6:20 7:15

**courtroom**
7:1

**Cox**
5:24

**current**
8:24 10:21

**currently**
10:13,19

---

**D**

**date**
5:10

**dated**
15:6

**day**
10:16

**deal**
10:8

**December**
11:16,17,19,24 13:4
14:6,20 15:1

**decision**
17:24 18:3

**defendant**
6:5,8

**deposed**
6:16,17,18

**deposition**
5:3,14 7:6,17 8:3,19
19:14

**didn't**
14:17 17:18 18:11

**director**
9:9,16,25 11:5 17:6

**discrimination**
13:9,23 14:23 16:14

---

17:16 18:20 19:3

**discussed**
13:24 17:22

**District**
5:6,7

**Division**
5:8

**document**
15:20

**doing**
5:5 13:1

**don't**
7:22 8:2 15:24 16:9
17:1 18:16

**duly**
6:6

---

**E**

**e-mail**
12:6 14:10,14,17 15:5
16:7,12 17:4,5,12,15,20
18:13,15,19 19:2,5,9

**e-mailed**
14:16 15:13

**earlier**
13:25 17:22

**easier**
7:7

**email**
16:7

**employed**
10:20 12:1 14:21 16:10

**employee**
9:21 10:7 16:11

**employees**
9:25

**employer**
10:21

**employment**
10:17 17:25 18:4

**environment**
13:13 15:3 16:14 17:17

**Epiq**
5:24

---

**exactly**
18:17

**examination**
6:4,8 18:8

**examined**
6:6

**executive**
9:20 10:10

**exhibit**
15:7,11,13 17:20

**expect**
8:2

---

**F**

**face-to-face**
12:5,7,9 14:3,7

**far**
19:8

**February**
5:10

**felt**
13:16,21

**filed**
6:13

**files**
17:11

**find**
17:18

**fine**
8:4

**finish**
7:12

**first**
6:6 7:8 12:4

**floor**
8:5

**followed**
13:24 17:21

**follows**
6:7

**found**
17:14

**frequently**
12:1

---

**Friday**
16:1

**function**
9:18

**functions**
9:23

**further**
19:7

---

**G**

**Garner**
5:19 6:9 15:9,12,15,17,
18 18:23 19:11

**general**
12:14

**Germantown**
8:25

**go**
12:14 15:11

**Gogo**
5:3 6:3,10 15:7,19 16:2
18:11 19:14

**going**
7:8 15:10 19:14

**Graham**
5:13

**Great**
15:17

**groundrules**
7:5

**guess**
10:5 13:4

---

**H**

**hand**
15:10

**happens**
8:19

**harassment**
13:13,23 15:2

**hear**
18:11

**hire**

9:8

**home**
11:3,4

**honestly**
8:12,16,21

**hope**
6:11

**hopefully**
7:9

**hostile**
13:13 15:3 16:14 17:17

**House**
8:25

**HR**
9:9,10,18,19,22 12:25

**Human**
9:10,16 10:1 11:6

___ **I** ___

**I'LL**
18:7 19:8

**I'M**
7:8 10:22 15:10 18:11

**I'VE**
8:6

**identification**
15:8

**implementation**
9:19

**in-box**
16:7

**Incorporated**
5:5,6 6:14

**initial**
12:12

**interact**
11:25

**involved**
17:24

___ **J** ___

**January**
16:1,8,20,21

**job**
9:7,12

**Judy**
5:19

**jury**
7:2

___ **K** ___

**keep**
6:11

**Kitchen**
8:25

**know**
7:23 8:18 11:8 12:16
17:14

___ **L** ___

**lawsuit**
6:13

**leadership**
9:21 10:9,10

**Leslie**
10:10

**little**
7:6

**lived**
9:2

**long**
6:12 8:3 9:2

**looked**
17:5,7,10,11

**looking**
19:2,5

**low-level**
9:21

___ **M** ___

**marked**
15:6,11 17:20

**Maryland**
9:1

**matter**
5:3

**Mclean**
5:15

**meaning**
9:10

**Med**
5:5,20 6:14,15 9:5,13
10:13,17,25 11:10,13,
23 12:1,15 14:21 16:7,
10,11 18:1,5

**Medical**
5:4

**medications**
8:10

**meet**
12:5,15,18

**meeting**
12:9,22 13:3,7,11,15
14:2,4,11,15,19,25

**met**
11:12,15,19,22,23 12:4
14:7

**Mischaracterizes**
18:24

**monitor**
5:11

___ **N** ___

**NB**
16:2

**need**
8:4 15:20 19:10

**needs**
13:2

**Nick**
10:11 16:17

**notify**
10:9

___ **O** ___

**oath**
6:22

**Objection**
18:23

**occurred**
13:4

**office**
11:2 12:13,25

**Oh**
6:19 11:22

**Okay**
6:20 9:7 10:19 11:4,12
12:8,18 14:13 15:15
16:24 17:2,14,19 19:7

**one-on-one**
12:19,22 13:3 14:25

**operator**
5:12

**Outside**
14:2,19,25

**Oversight**
9:18

___ **P** ___

**P-R-O-C-E-E-D-I-N-G-S**
5:1

**p.m.**
5:11 19:15

**participating**
9:20

**pass**
18:7

**penalty**
6:23

**Perfect**
8:10 15:15

**perjury**
6:23

**phone**
12:6 14:10

**place**
5:15

**plaintiff**
11:8 18:9

**please**
5:17,25

**policies**

9:20

**prior**
18:20 19:3

**procedure**
13:24 17:21

**proceed**
7:6

**process**
10:5,7

**prohibit**
8:11,20

**provide**
7:10,18,24

**Q**

**question**
7:12,22,24,25 8:5,6,7

**questioned**
18:13,14

**questions**
7:9,10 8:23 14:14 19:7

**R**

**race**
13:8,18,22 14:23 16:13
17:16

**read**
15:20 16:4

**reading**
15:22,23

**reason**
8:14

**recall**
11:15 16:6,9,18,24 17:1
18:17

**receive**
9:24 14:17

**received**
10:6 15:14,16 16:12
17:3,8,12,19

**receiving**
16:6

**recognize**

15:19,24

**recommend**
10:11

**record**
7:17 19:15

**relations**
9:22

**Renee**
5:4,22 6:13 11:8,19
12:13 15:25

**reporter**
5:24,25 6:20 7:15

**represent**
5:18 6:15

**Resources**
9:10,17 10:1 11:6

**response**
18:12

**responses**
7:18

**responsibilities**
9:16

**Reston**
11:1

**result**
11:12

**review**
19:12

**Richardson**
5:4,22 6:13 11:9 12:19
13:8,12,16,20 14:4,13,
22 15:1 16:1,13,25
17:12,15

**Richardson's**
17:25 18:4

**Richardson/gogo**
15:5

**Ridge**
5:15

**right**
13:5 18:7

**role**
11:5

**Ryan**
10:10 16:17 18:18

**S**

**San**
5:7 12:12

**Sandy**
5:24

**Sarah**
5:3 6:3 16:2 19:14

**says**
15:25

**searched**
17:7

**second**
14:18

**see**
12:14 17:8,11

**self-employed**
10:22,23

**sending**
10:11

**sent**
15:12 16:1 18:19

**September**
9:6

**series**
7:9

**set**
7:5

**sign**
19:9,12

**Situation**
16:3

**sorry**
18:11

**staff**
9:19 12:16

**started**
7:4 11:22

**state**
5:18

**States**
5:6

**Subject**
16:2

**suffer**
13:22

**swear**
5:25

**swore**
6:21

**sworn**
6:1,6

**T**

**take**
8:3,7 15:21 19:8

**talk**
14:18

**talked**
12:23

**team**
5:4,5,20 6:14,15 9:5,13
10:14,17,25 11:10,13,
23 12:2,15 13:1 14:21
16:7,11 18:1,5

**teams**
9:21

**TECHNICIAN**
5:2,23 19:13

**tell**
12:8,21 13:16

**tenure**
9:13

**terminate**
17:25 18:4

**terminated**
16:25

**termination**
18:14,15,20 19:3

**testified**
6:6

**testify**
8:15

**testifying**
7:1 8:11,20

**testimony**
6:22 18:24

**Texas**

**5:7** 12:11

**thank**
6:10

**things**
12:25

**think**
16:23 17:6 18:16

**Thomas**
5:21 15:12

**thought**
12:25

**time**
5:11 8:4 9:8 12:19 14:6,
21 15:20,21 19:15

**title**
9:7,12

**today**
5:12,24 6:11,22 7:1
8:12,16,21

**Today's**
5:10

**told**
13:20

**top**
15:25

**training**
9:19 12:12 13:2

**traveled**
11:5

**treated**
13:17,21

**trip**
12:11

**truthfully**
8:12,15,20

---

**U**

**Uh-huh**
10:24 13:6

**undersand**
6:25

**understand**
6:21 7:22

**understanding**
19:1

**unfairly**
13:17,21

**Unh-unh**
10:4

**United**
5:6

---

**V**

**verbal**
7:18

**versus**
5:4

**video**
5:2,11,12,14,23 19:8,13

**Virginia**
5:16 11:1

**visited**
12:12

**voice-identify**
5:17

---

**W**

**warranted**
10:12

**Way**
8:25

**We'll**
14:18

**week**
16:19

**welcome**
15:21

**Western**
5:7

**witness**
5:25 6:1,4 18:7

**work**
10:13 11:1 12:24 13:13
15:3 16:14 17:17

**worked**
10:25 12:14

**working**
9:4 11:9,13

**workings**
12:15

---

**Y**

**year**
9:3

**you're**
6:21 15:21

## Renee Richardson

**From:** Renee Richardson
**Sent:** Friday, January 20, 2017 7:39 AM
**To:** Sarah Gogo
**Subject:** NB Situation

**Importance:** High

Good Morning Sarah,

I want to update you on the situation I emailed you about Wednesday, January 18, 2017. I met with Christina and Ms. Harvey in person; and Alan by speaker phone on Wednesday regarding the situation I emailed you about.

The situation remains unresolved until Ms. Harvey meets with Elka. Sarah, given the current situation and past instances, I have always felt like Alan has never supported me or respected me in this position because I am a black woman. The reason I am expressing it now is because of the bias in this situation with Elka and another incident Christina informed me of recently, which I will discuss in the closing of my email.

Although, I have not worked closely with Ms. Harvey, I have always respected her and held her in high regard. However, after meeting with Ms. Harvey on Wednesday, I am still troubled by the handling of the situation and the allegations Elka has made against the staff in the NB office. Ms. Harvey's questions to me, "Is it because she's out of the office most of the time, the reason they don't want to work with her"? This type of questioning without proof, nor having witnessed her being treated inappropriately by others is something I cannot answer. This entire situation has defeated me and has created a hostile work environment, which has made me very uncomfortable. I am using the "open door communication policy" to communicate with you, the HR Corporate Director, or someone who is willing to take an unbiased approach in resolving this matter.

The last concern I have is regarding a written counseling against me regarding a self-reported incident that incurred a monetary fine against the company. I consulted with Christina regarding a case for guidance on how to handle what I considered to be Medicaid Fraud. After Christina reviewed the case, she instructed me to file an APS report which I did immediately. According to Christina, Alan informed her that I will be written up, despite her telling him that she gave me directions on how to handle my findings. I did the responsible thing by obtaining guidance from my superior on an issue. I should not be punished for instructions given to me by my direct boss. I only want to be treated fairly. Based on Alan's insistence that I be written up despite being aware that my actions were based on instructions given to me, reinforces my belief regarding his treatment towards me.

I am following company policy regarding the open door policy. Also, I am only asking that the employees, including myself, to be treated with fairness, dignity, and respect.

Respectfully,

Renee

**Renee Richardson**
Branch Manager
**MED TEAM, INC.**
1423 N. Walnut Ave. # 102



EXHIBIT

1

RICHARDSON, L. - 000484

New Braunfels, TX 78130
Office: 830-626-3525
Fax: 830-629-2465
E-mail: RRichardson@medteam.com
Visit our new website: www.medicalteam.com



THE
MEDICAL
TEAM®   Care that matters, where it counts.
At home.

CONFIDENTIALITY NOTICE: *This electronic message and all contents contain information which may be privileged, confidential or otherwise protected from disclosure. The information is intended to be for the addressee only. If you are not the addressee, any disclosure, copying, distribution or use of the contents of this message is prohibited. If you have received this electronic message in error, please notify us immediately and destroy the original message without retaining any copies. Any views or opinions presented in this email are solely those of the author and do not necessarily represent those of THE MEDICAL TEAM, INC. - MED TEAM, INC. - THE MEDICAL TEAM Personal Care Services - Catastrophic Care Solutions.*

RICHARDSON, L. - 000485

# Exhibit E

RENEE RICHARDSON - 12/04/2018

1           IN THE UNITED STATES DISTRICT COURT
2            FOR THE WESTERN DISTRICT OF TEXAS
               SAN ANTONIO DIVISION
3
4   RENEE RICHARDSON              §
          Plaintiff,              §
5                                 §        CIVIL ACTION
    VS.                           §     NO. 5:18-CV-151-FB
6                                 §
    THE MEDICAL TEAM, INC.        §
7   d/b/a THE MED TEAM, INC.      §
          Defendant.              §

8
        * * * * * * * * * * * * * * * * * * * * * * * *
9
10                    ORAL DEPOSITION OF
                       RENEE RICHARDSON
11                     DECEMBER 4, 2018

        * * * * * * * * * * * * * * * * * * * * * * * *
12

13              ORAL DEPOSITION of RENEE RICHARDSON, produced

14  as a witness at the instance of the Defendant, and duly

15  sworn, was taken in the above-styled and numbered cause

16  on the 4th day of December, 2018, from 10:02 a.m. to

17  5:05 p.m., before Joanna M. Martinez, CSR, RMR, in and

18  for the State of Texas, reported by machine shorthand,

19  at the PONCIO LAW OFFICES, 5410 Fredericksburg Road,

20  Suite 109, San Antonio, Texas, pursuant to the Federal

21  Rules of Civil Procedure.

22

23

24

25

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3           Thomas N. Cammack III
             PONCIO LAW OFFICES, P.C.
 4           5410 Fredericksburg Road, Suite 109
             San Antonio, Texas 78229
 5           (210) 212-7979

 6   FOR THE DEFENDANT:

 7           Richard G. Garza
             JACKSON WALKER L.L.P.
 8           112 E. Pecan, Suite 2400
             San Antonio, Texas 78205
 9           (210) 978-7700

10

11   ALSO PRESENT:
             Renee Richardson, The Witness
             Alan Garza
12           Joanna M. Martinez, CSR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2    Appearances ....................................    2

3

     RENEE RICHARDSON
4        Examination By Mr. Garza: ..................    5

5        Examination By Mr. Cammack: ................   177

6        Examination By Mr. Garza: ..................   181

7

8    Changes and Signature .........................   190

9                             EXHIBITS

10   NO.          DESCRIPTION                          PAGE

11   Exhibit 1    2017 W-2 issued to Laquanda Richardson   20

12   Exhibit 2    Interim Healthcare Home Care and

13                Hospice Notice of Separation ........   17

14   Exhibit 3    Letter to Laquanda Richardson from

15                The State of Texas Business & Public

16                Filings dated May 25, 2017 ..........   32

17   Exhibit 4    The Texas Workforce Commission Work

18                Search Log(s) ......................   41

19   Exhibit 5    EEO/AA Voluntary Information,

20                The Medical Team, Inc. ..............   44

21   Exhibit 6    Orientation Instructions and

22                Acknowledgments ....................   44

23   Exhibit 7    The Medical Team, Inc. page 33

24                Admin Employee Handbook ............   53

25   Exhibit 8    The Medical Team Inc. Job Description   50

```
 1                      EXHIBITS
 2    NO.           DESCRIPTION                    PAGE
 3    Exhibit 9     Administrative Personnel Policy and
 4                  Practice Manual Affirmative Action
 5                  Program ............................   54
 6    Exhibit 10    Med Team, Inc. - New Braunfels
 7                  2015-2016 organizational chart ......   54
 8    Exhibit 11    Plaintiff's Responses to Defendant's
 9                  First Set of Interrogatories ........   56
10    Exhibit 12    The Medical Team, Inc.
11                  2014 Performance Planning & Appraisal
12                  Employee Information ...............  125
13    Exhibit 13    The Medical Team, Inc.
14                  2015 Performance Planning & Appraisal
15                  Employee Information ...............  128
16    Reporter's Certificate ..........................  192
17
18
19
20
21
22
23
24
25
```

1                    (The Reading of Federal Rule 30(b)(5)(A)

2                    into the record waived by all parties

3                    present.)

4                         RENEE RICHARDSON,

5      having been first duly sworn, testified as follows:

6                         EXAMINATION

7      BY MR. GARZA:

8          Q.   Good morning, Miss Richardson.

9          A.   Good morning.

10         Q.   My name is Rick Garza.  I'm a lawyer

11     representing The Medical Team, and this is your

12     deposition.  Do you -- have you ever given a deposition

13     before?

14         A.   Yes.

15         Q.   Okay.  How long ago was that?

16         A.   I don't remember exactly.  Several months ago.

17         Q.   Okay.  So you know that a deposition is, number

18     one, under the penalty of perjury, right?

19         A.   Yes.

20         Q.   And, number two, because the court reporter is

21     taking down everything that you and I say, we need to be

22     mindful of starting my question -- I'll start my

23     question after you finish your answer, and you need to

24     finish your -- you start your answer after I finish my

25     question so that we're not talking over each other.  Is

1    that okay?

2        A.    Yes.

3        Q.    And then also as part of your deposition, as

4    you know, we need a word response to each of the

5    questions that -- whether it's a yes or a no rather than

6    uh-huh or huh-uh because it's clearer.   Okay?

7        A.    Yes.

8        Q.    All right.   If you do not understand a question

9    that I have asked, let me know.   I will try to rephrase

10   it so that it is understandable.

11       A.    Okay.

12       Q.    And I guess with that, we'll get started.

13             Where are you working now, ma'am?

14       A.    I work with the Area Agency on Aging.   Area

15   Agency on Aging.

16       Q.    Okay.

17       A.    And there's another part to that.

18       Q.    Is there an acronym that that goes by?

19       A.    AAA.

20       Q.    AAA.   Okay.   And how long have you been working

21   with that entity?

22       A.    I started -- I believe my start date was

23   April 1st of this year.

24       Q.    2018?

25       A.    Yes.

1    Q.   All right.  And you said there was another part

2    to it.  I'm just not --

3    A.   AACOG.  It's the Alamo Area Council of

4    Government.

5    Q.   Okay.  Just so I understand, is AACOG the

6    governing entity of AAA?

7    A.   Yes.

8    Q.   Okay.  And so do you work directly for AAA or

9    with -- for AACOG?

10   A.   I'm really not sure how that's set up.

11   Q.   Who is on your paycheck?

12   A.   I've never really paid attention to my

13   paycheck.

14   Q.   Have you received any pay stubs from there?

15   A.   Everything is electronic.

16   Q.   Okay.

17   A.   So I really haven't paid attention.

18   Q.   Have you reviewed those pay stubs?

19   A.   I have, but I have -- I've never really paid

20   attention to the name on the pay stub.

21   Q.   Okay.  So how much -- when you started in April

22   of 2018, what was your position?

23   A.   My position is care services coordinator.

24   Q.   Okay.  Was that your position back in April of

25   2018?

1      A.    This year, April 2018?

2      Q.    Yes.

3      A.    That's my position.

4      Q.    Okay.   That's the position you were hired into?

5      A.    Yes.

6      Q.    And say that again.   What was the position?

7      A.    Care services coordinator.

8      Q.    And what does -- what do you do in that

9  position?

10      A.    What I do in that position is I oversee eight

11  care specialists.   I assist with budgets.   I delegate

12  work assignments, and I assign cases.   I also research

13  grant opportunities.   And there are some other

14  assignments, but I can't think of everything at this

15  moment.

16      Q.    You say you assign cases.   Who do you assign

17  those cases to?

18      A.    The care specialist.

19      Q.    And those care specialists that you supervise,

20  are those employees of AAA?

21      A.    Yes.

22      Q.    Do those care specialists work for any other

23  entities?

24      A.    I wouldn't have any knowledge of that.

25      Q.    Okay.   Well, but what I'm saying, though, is

1   through AAA, do they -- do they work with any other

2   entities?

3       A.    What do you mean by that?

4       Q.    Well, is there a co-employer, is there another

5   employer in that relationship other than with AAA?  You

6   supervise the specialists.  Do they have another boss

7   somewhere else, another entity?

8       A.    Yes.

9       Q.    Okay.  Who is that entity?

10      A.    That would be my manager.

11      Q.    And who is your manager?

12      A.    Trina Salazar.

13      Q.    Okay.  How long has Miss Salazar been your

14  boss?

15      A.    Since I started, April 1st, 2018.

16      Q.    When you started in April of 2018, what was

17  your compensation?

18      A.    My compensation.  I'm not sure of the exact

19  amount, but I know my salary is somewhere around 46,000

20  a year.

21      Q.    And that is your current salary, right?

22      A.    Yes.

23      Q.    Okay.

24            MR. CAMMACK:  I hate to cut it off.  I

25  think someone is here to pick up my Jeep real quick.

1             MR. GARZA:  Let's go off the record.

2             (At 10:09 a.m. the proceedings recessed,

3             continuing at 10:12 a.m.)

4        Q.   (BY MR. GARZA)  So your compensation at this

5   time is $46,000 per year; is that right?

6        A.   Around about that amount.  I don't know the

7   exact amount.

8        Q.   Okay.  And so are you paid biweekly or

9   semimonthly?

10        A.   I'm paid on the 15th and the last day of the

11   month.

12        Q.   Okay.  So then your compensation per period

13   then is right about $1,900; is that right?

14        A.   Somewhere --

15        Q.   Okay.

16        A.   -- around there.

17        Q.   All right.  So just using the round numbers

18   then, the $46,000 divided by 24, is about $1,916.  So

19   that's an approximate number, right?

20        A.   Correct.

21        Q.   Okay.  You said you oversee a care specialist.

22   What do those specialists do?

23        A.   They provide case -- or care coordination

24   services to seniors.

25        Q.   And the care coordination services, what do you

1    mean by that?

2        A.    They provide different services.  Those

3    services can range anywhere from income support, which

4    is financial-related.  So if a senior calls in and they

5    need assistance with paying their electric bill, that

6    care specialist would assist that senior through

7    financial means.

8              And they -- also, if they are -- if they

9    need to be navigated to various resources, they provide

10   guidance.

11       Q.    Even home health type of help or assistance?

12       A.    We have vendors that we contract with.  So not

13   directly.

14       Q.    And so who are the vendors -- well, let me ask

15   this:  Is the medical team one of the vendors you

16   contract with?

17       A.    Yes.

18       Q.    And is the medical team -- how are these

19   assignments done?  Are they done on a rotating basis or

20   does a care specialist have his or her favorites?

21       A.    They're rotated.

22       Q.    Okay.  So then -- and the rotation is done in

23   what way?  Is there a system or a process to ensure

24   proper rotation of those vendors?

25       A.    I wouldn't really have any knowledge of that

```
 1   because I don't deal with vendor contracts, per se.
 2       Q.   So how do you know that the care specialists
 3   are referring cases to the appropriate vendor?
 4       A.   We do have a vendor list.
 5       Q.   Okay.  And so that's what I'm trying to ask.
 6   I'm trying to ask if it's on a rotating basis so that
 7   each specialist is responsible for rotating on his or
 8   her own?
 9       A.   You mean the different vendors?
10       Q.   Yes.
11       A.   It depends.
12       Q.   On what?
13       A.   On -- it depends.  If the vendor is reliable,
14   the care specialist will use a particular vendor.  But
15   we're supposed to use the vendors and rotation from
16   feedback that I've received, but some of the vendors we
17   have aren't necessarily following contract agreements.
18   So the care specialist does have the choice to choose
19   the vendor they deem most appropriate.
20       Q.   Have you in any way effected any referrals to
21   The Medical Team from your -- from your employer?
22       A.   No.
23       Q.   All right.  Have you told any of these care
24   specialists to not make referrals to The Medical Team?
25       A.   No.
```

1      Q.    Do you know whether or not any of these care

2   specialists have, in fact, made referrals to The Medical

3   Team?

4      A.    Yes.

5      Q.    Who are those care specialists that you know

6   have made referrals to The Medical Team since April of

7   2018?

8      A.    You want me to name someone specifically?

9      Q.    Yes, ma'am.

10     A.    I can't give you names specifically.  I've

11  heard care specialists talk about The Med Team,

12  referring cases to The Med Team.

13     Q.    And who are those individuals that you recall

14  hearing discussing referring cases to The Med Team?

15     A.    You want names specifically?

16     Q.    Yes, ma'am.

17     A.    Belinda Murguia.

18     Q.    Anyone else?

19     A.    I can't say anyone else.

20     Q.    Is it because you can't remember those

21  individuals or -- I'll ask the question:  Why can you

22  not name the others?

23     A.    I have -- she's the only person who I can

24  recall have made reference to the fact that she's

25  referred cases to The Med Team.

1      Q.   Okay.  So she's the only one that you recall
2  making the referrals or talk about making referrals?
3      A.   She's the only one that I've heard talk about
4  making referrals.
5      Q.   Okay.  What benefits do you receive as a result
6  of your employment with AAA?
7      A.   I have free benefits for myself.
8      Q.   What benefits are they?  Health?
9      A.   Health care, vision, dental,
10  long-term/short-term disability.  And I can't remember
11  if there's any others, but those are the ones that stand
12  out.
13      Q.   Okay.  And that's all provided to you by your
14  employer?
15      A.   Yes.
16      Q.   Do you pay any premium or any portion of a
17  premium for these -- any of these benefits?
18      A.   When you say premium, what do you mean?
19      Q.   Do you pay health insurance premium?  Is there
20  a copay, some amount that you pay taken out of your
21  paycheck to pay for health insurance or vision insurance
22  or dental insurance?
23      A.   Currently, no.
24      Q.   Do you also have any dependent insurance or any
25  dependents on your health insurance through your

1    employer?

2         A.    No.

3         Q.    Are you married?

4         A.    No.

5         Q.    What is your residence address?  Are you still

6    living on -- is it Ridge Path in New Braunfels, Texas?

7         A.    No.

8         Q.    Okay.  What is your current residence address?

9         A.    Do I have to give that information?

10        Q.    Well, I'm asking the question.

11        A.    My address is 1355 Ranch Parkway, New

12   Braunfels, Texas 78130.

13        Q.    And do you -- is that an -- is that a house or

14   an apartment?

15        A.    That is an apartment.

16        Q.    Okay.  And are you living in that apartment by

17   yourself, or do you live with someone else?

18        A.    I have a child.

19        Q.    All right.  And how old is your child?

20        A.    Seventeen.

21        Q.    And what is his or her name?

22        A.    Tioni.

23        Q.    T-I-A-N-I?

24        A.    T-I-O-N-I I-Y-A-N-A Benjamin.

25        Q.    And she's attending school, I take it?

1      A.    Yes.

2      Q.    Do you have any other children living with you

3   at the -- at your apartment?

4      A.    No.

5      Q.    Your employment at AAA, is that in good

6   standing right now?  Are you under some of a performance

7   improvement plan, or is your job in jeopardy in any way?

8      A.    I'm not under a performance improvement plan,

9   but I was recently informed by the director that there

10  may be some changes.

11     Q.    Who is the director?

12     A.    Gloria Vasquez.

13     Q.    What changes did she explain could occur?

14     A.    There could be the possibility of may --

15  possibly a position being eliminated because she

16  expressed not understanding why there are two positions.

17     Q.    And two positions, one being yours?

18     A.    One being mine, and then there's another

19  coordinator who is specifically over caregiver.

20     Q.    So there's a caregiver coordinator and a care

21  services coordinator; is that right?

22     A.    I'm not sure what her title is exactly.  I

23  don't know if it's the exact same title as my position.

24     Q.    And who is that other person who is in a

25  similar position to you that --

1      A.    Diane Teran.

2      Q.    Do you know how long Diane has been with AAA?

3      A.    No.

4      Q.    Have you received any evaluations during your

5   employment with AAA?

6      A.    No.

7      Q.    Have you received any notification from any of

8   your managers or any other management of AAA that you

9   are not performing up to their expected standards?

10      A.    No.

11      Q.    Have you received any notification from AAA

12   that your performance needs to improve in any way?

13      A.    No.

14      Q.    So prior to April the 1st of 2018, what other

15   companies did you work for?

16      A.    Interim Health Care.

17      Q.    And what's the dates of your employment with

18   Interim?

19      A.    I don't remember.

20            (Exhibit 2 marked.)

21      Q.    (BY MR. GARZA)   I'm going to hand to you what's

22   been marked as Deposition Exhibit No. 2.   I'll get to

23   Exhibit 1 later.   And this is a document that you

24   produced in response to discovery.   This is your notice

25   of separation from Interim Health Care.   Is that right?

```
 1        A.    Yes.

 2        Q.    And this is your signature on the bottom left?

 3        A.    Yes.

 4        Q.    And that was dated November 13, 2017, correct?

 5        A.    Correct.

 6        Q.    And it states here that you were initially

 7   hired by Interim in July of 2017 and you were terminated

 8   effective November 13 of 2017.  Is that right?

 9        A.    Correct.

10        Q.    So you were employed with Interim Health Care

11   approximately four months, right?

12        A.    Yes.

13        Q.    And what was your -- you were a CSR scheduler.

14   What is --

15        A.    Yes.

16        Q.    What does CSR mean?

17        A.    If I remember correctly, customer service

18   representative.

19        Q.    Who is your -- who is your supervisor?  The

20   signature is down on the bottom left, I think, on

21   Exhibit 2.

22        A.    I believe this is the signature of the regional

23   manager, but I can't read that.

24        Q.    Okay.  Can you recall the name of your

25   immediate supervisor when you worked with Interim Health
```

1    Care?

2         A.    I don't remember her name.

3         Q.    How much were you earning with Interim Health

4    Care?

5         A.    I don't remember the exact amount.

6         Q.    Did you have any benefits through your

7    employment with Interim Health Care?

8         A.    Yes.

9         Q.    And what were those benefits?

10        A.    Medical.  I don't know if I had dental or

11   vision because I had the benefits for maybe a month.  So

12   I really don't remember everything.

13        Q.    Okay.  So when you were notified of your

14   termination from employment with Interim Health Care,

15   who was it who notified you about that termination?

16        A.    The person -- the regional director.

17        Q.    Was there -- this document, Exhibit 2, was also

18   signed by Mary Pierce.  Do you see that?

19        A.    Uh-huh.  Yes.

20        Q.    Was she present at the time that you were

21   notified of the termination from employment?

22        A.    No.  It was just one person, and that was the

23   regional person, who was an R.N.  So . . .

24        Q.    And what was the explanation of that individual

25   as to your termination from employment?

1      A.    They made changes to the way the scheduling was

2    being done.   It was going to be done in San Antonio.

3      Q.    All right.   And between the time that you were

4    terminated from Interim Health Care until the time you

5    began working for AAA in April of 2018, did you receive

6    unemployment compensation?

7      A.    Yes.

8                  (Exhibit 1 marked.)

9      Q.    (BY MR. GARZA)   I'm going to hand to you what's

10    been marked as Deposition Exhibit No. 1.   And these are

11    documents clearly that you have produced.   Take a look

12    at those and see if you recognize those documents.

13      A.    Yes.

14      Q.    Okay.   If you will look at the third page of

15    Exhibit No. 1, which is marked Richardson Number 5.   Do

16    you see that?   The amount that's stated there is $11,377

17    that you received from the Texas Workforce Commission

18    for unemployment compensation during 2017.   Is that

19    right?

20      A.    Yes.

21      Q.    Okay.   Do you recall how much unemployment

22    compensation you received in 2018?

23      A.    No.

24      Q.    Do you remember how much you were earning --

25    receiving from the Texas Workforce Commission on a

1  weekly basis in 2018?

2       A.   No.   I don't remember.

3       Q.   If you would look at the first page of

4  Exhibit 1, and it's marked -- it's kind of hard to

5  see -- but Richardson 01.  Do you see that?

6       A.   Yes.

7       Q.   Okay.   It lists Bayou Home Care, LP as the

8  entity out of Lubbock.  Who is that?

9       A.   That would be Interim Health Care.

10      Q.   Okay.  All right.  So with Interim Health Care

11 you earned a total of $13,317 in 2017; correct?

12      A.   Correct.

13      Q.   And since your termination from employment with

14 The Medical Team through the time you became employed

15 with Interim Health Care, did you work for any other

16 entities?

17      A.   Yes.

18      Q.   What other entity was that?

19      A.   Home Instead.

20      Q.   And is that reflected as Richardson 03, which

21 is part of Exhibit 1?

22      A.   Yes.

23      Q.   Okay.  So --

24      A.   Wait a minute.  I'm sorry.  You said Exhibit 1?

25      Q.   That's what this is, Exhibit 1.  See the

1  exhibit sticker right there?

2      A.   Yes.

3      Q.   So then it would be the second page of that

4  exhibit which is marked Richardson 03.

5      A.   Yes.

6      Q.   Okay.  So then additionally you earned $2,375

7  working for Hill Country Senior Services, L.L.C.?

8      A.   Yes.

9      Q.   And does that company, to your knowledge, go by

10 another name other than Hill Country Services -- Senior

11 Services, L.L.C.?

12     A.   Home Instead, I believe.  Home Instead.

13     Q.   And your employment with Hill Country Senior

14 Services, L.L.C., when did that start and when did that

15 end?

16     A.   I don't remember the exact dates, but it was

17 shortly after I was terminated from The Med Team.

18     Q.   About how long of a period did you work for

19 Hill Country Senior Services, L.L.C.?

20     A.   I don't recall the exact time, but it was

21 brief.

22     Q.   Was it more than a month?

23     A.   Maybe, but I don't remember exactly.

24     Q.   Okay.  When you were employed with Hill Country

25 Senior Services, did you have any benefits available to

1   you?

2        A.    No.

3        Q.    Who was your supervisor at Hill Country?

4        A.    I don't remember her name.

5        Q.    Were you -- did you resign from your

6   employment?

7        A.    No.

8        Q.    Were you involuntarily terminated?

9        A.    Yes, I was terminated.

10        Q.    All right.  And what was the reason for your

11   termination?

12        A.    I don't remember.

13        Q.    Were you -- were you given an explanation of

14   the reason for your termination?

15        A.    I don't remember.

16        Q.    Were you terminated for misconduct?

17        A.    I don't remember.

18              Do you have a document?

19        Q.    No, ma'am, I don't.  That's why I'm asking.

20        A.    I don't recall.

21        Q.    The person who notified you of your termination

22   from Hill Country, was that a man or woman?

23        A.    A woman.

24        Q.    Was it a management employee of Hill Country?

25        A.    Yes.

 1       Q.    Do you recall who your immediate supervisor was

 2   at Hill Country?

 3       A.    A woman, but I don't remember her name.

 4       Q.    And what was your position for Hill Country?

 5       A.    I don't remember.

 6       Q.    You don't remember what you did for Hill

 7   Country?

 8       A.    You asked do I remember the position, correct?

 9       Q.    Well, let -- yes.  What was the position

10   called?

11       A.    I don't remember.  I don't remember.

12       Q.    What did you do on a day-to-day basis for Hill

13   Country?

14       A.    I really didn't do much of anything because I

15   was in a training period, so working on the computer a

16   lot.  I do recall going out to visit a few clients.

17       Q.    And what kind of clients were those?

18       A.    Can you be more specific?

19       Q.    Sure.  This is -- the entity is called Hill

20   Country Senior Services, correct?

21       A.    Yes.

22       Q.    What services were they providing to the

23   clients?

24       A.    I believe provider assistance services and

25   homemaker, I believe.

1    Q.   Okay.  But what is a provider assistance

2  service?  What do you mean by that?

3    A.   A person who goes into the home and provide

4  care to clients.

5    Q.   And so as part of your job, was that what you

6  were supposed to do is to go out and visit with those

7  clients?

8    A.   You mean to provide personal assistance

9  services?

10    Q.   No.  To visit with clients about the potential

11  of providing assistant services or homemakers to that

12  client.

13    A.   Yes.  I believe so.

14    Q.   All right.  So you said you were in training

15  for that month.  What kind of training were you doing?

16    A.   Most of it was computer training.

17    Q.   Relating to what?

18    A.   Related to company policies and procedures.

19    Q.   Anything else other than?

20    A.   I did go out with the manager on a few

21  occasions.

22    Q.   All right.  And so what -- what did the manager

23  train you to do?

24    A.   Assessing, from what I remember, assessing the

25  client's needs.

1       Q.    Okay.  And assessing the client's needs from
2   what perspective?  From a medical perspective or from --
3       A.    Nonmedical.
4       Q.    Okay.  And that's your background, though,
5   right?  You're a nurse?
6       A.    No.
7       Q.    Okay.  What is your background then, what -- do
8   you have any degrees or any certifications?
9       A.    I do have degrees --
10      Q.    What are those?
11      A.    -- and certifications.  My undergraduate degree
12  is a bachelor's of science in business.  And I also have
13  an MBA.
14      Q.    And the bachelor's of science and business was
15  from which school?
16      A.    DeVry University.
17      Q.    And your master's is from which school?
18      A.    DeVry Keller Graduate School of Management.
19      Q.    And when did you receive those degrees?
20      A.    The bachelor's degree I received in 2007.  And
21  the MBA is 2014.
22      Q.    So between the time that you were terminated
23  from employment with The Medical Team to now, did you
24  work for any other entities other than those entities
25  that you've already testified about?

1    A.    I did start a business of my own.  And I think
2  I recall signing up for a representative through Legal
3  Shield.
4    Q.    You said you signed up for a representative
5  through Legal Shield?
6    A.    As a representative of Legal Shield.
7    Q.    What is Legal Shield?
8    A.    They offer legal benefits.
9    Q.    All right.  And would you be selling those --
10  that -- is it insurance?
11    A.    Yes.
12    Q.    Legal insurance, okay.
13    A.    Yes.  Legal insurance.
14    Q.    All right.  And as far as the selling of legal
15  insurance, what was the name of the entity that you
16  actually -- did you do any work for an entity?
17    A.    Not work where I was paid.  Because I was not
18  successful.  So I didn't never received any payment.
19    Q.    All right.  And so what did you do for Legal
20  Shield?
21    A.    Trainings to learn the program mostly.
22    Q.    When did you go through the training?
23    A.    I don't remember.
24    Q.    Was it in 2017 or 2018?
25    A.    I don't remember.  I do know it was not in

1    2018.

2        Q.    Okay.   Was it before or after you started work

3    for Interim?

4        A.    I don't remember.

5        Q.    How long a training was it?

6        A.    I don't remember.

7        Q.    Where was the training?

8        A.    Online.

9        Q.    Did you have any sort of password access to the

10   training?

11       A.    Yes.

12       Q.    And how did you obtain -- well, first of all,

13   what did you do to sign up for -- for Legal Shield?

14       A.    Can you be more specific?

15       Q.    Sure.   Who did you contact to sign up for Legal

16   Shield?

17       A.    I didn't -- I probably -- I don't remember, but

18   probably it was something I found online.

19       Q.    Did you ever talk to an individual or a person

20   about Legal Shield and -- well, let's just leave it at

21   that.

22       A.    Can you repeat the question?

23       Q.    Sure.   Did you ever talk to a representative of

24   Legal Shield?

25       A.    Yes.

1    Q.    And who was that?

2    A.    I don't remember.

3    Q.    How many times did you speak with a

4  representative of Legal Shield?

5    A.    A few occasions, but I don't remember the exact

6  number.

7    Q.    And as far as your communications with Legal

8  Shield's representatives, did they provide you

9  information for the purpose of you performing work for

10 Legal Shield?

11   A.    Can you repeat the question?

12   Q.    Sure.   In your communications with

13 representatives of Legal Shield, did they provide you

14 information for the purpose of you working for Legal

15 Shield?

16   A.    Information?   Can you be more specific?

17   Q.    Any information.

18   A.    They did tell me about the program, how it

19 works, about the insurance.

20   Q.    Okay.   Tell me about what they said, what they

21 explained.

22   A.    I don't remember.

23   Q.    Well, what do you understand the insurance to

24 be?

25   A.    From what I remember, because I do recall

1   having the insurance myself so I'm basing it off of my

2   experience having that insurance, they provide legal

3   services.  So if you need a lawyer for various

4   situations, they can assist you.  If you need credit

5   protection, they can help resolve issues like that.  So

6   that's the -- as much as I remember.

7       Q.   Okay.  Did you ever make any sales calls for

8   Legal Shield?

9       A.   When you say sales calls, what do you mean?

10      Q.   Did you ever try to sell Legal Shield insurance

11  to any other person?

12      A.   Yes.

13      Q.   All right.

14      A.   But not through a call.

15      Q.   Well, okay.  Not through a call.  It was

16  face-to-face?

17      A.   Yes.

18      Q.   All right.  Did you ever sell Legal Shield

19  insurance, actually complete a sale?

20      A.   No.  Not that I can recall.

21      Q.   Did you keep a log of the sales calls that you

22  made or the sales pitches, if you will, that you made?

23      A.   No.

24      Q.   And so you never were paid by Legal Shield for

25  any sales?

1      A.    Not that I recall.

2      Q.    Okay.  So what was the percentage or what was

3  the method of calculating any pay that you would receive

4  in the event you had made sales?

5      A.    Can you repeat that?

6      Q.    Sure.  What was the method of calculating your

7  compensation in the event you had made sales for Legal

8  Shield?

9      A.    I don't remember.

10     Q.    Was it a commission basis?

11     A.    Yes.  I believe it was commission base.

12     Q.    What was the percentage of the commission?

13     A.    I have no clue.

14     Q.    Was it a percentage that is less than 5 percent

15  of the sale?

16     A.    I have no clue.

17     Q.    Do you have any documentation relating to the

18  Legal Shield insurance and/or program that you were

19  trying to sell?

20     A.    No.

21     Q.    Did you dispose of the documentation?

22     A.    Yes.

23     Q.    When did you dispose of the documentation?

24     A.    I have no clue.

25     Q.    Was it in 2018 or 2017?

```
 1        A.    I don't know.  I don't remember.
 2        Q.    Where is Legal Shield located?
 3        A.    I have -- I don't know.
 4        Q.    What website did you see it on?
 5        A.    I don't remember the exact website.
 6        Q.    Okay.  What -- do you remember anything about
 7   the Legal Shield website?
 8        A.    No.
 9        Q.    When is the last time you accessed the Legal
10   Shield website?
11        A.    I don't remember.
12              (Exhibit 3 marked.)
13        Q.    (BY MR. GARZA)  I've handed you what has been
14   marked as Deposition Exhibit No. 3.  Do you see that in
15   front of you?
16        A.    Yes.
17        Q.    All right.  This is documentation that
18   you've -- you have produced, and it's related to
19   something called Weekend Fun, L.L.C.  Do you see that?
20        A.    Yes.
21        Q.    Did you -- what business was this?
22        A.    An online retail business.
23        Q.    What did you sell through this business?
24        A.    It was fun items.  I can't remember the items
25   specifically, but items related to the name.
```

1    Q.    What was the -- the website that you used to

2    sell?

3    A.    If I remember correctly, I think it was

4    Weekendfun.com.

5    Q.    And it's spelled just like it is,

6    W-E-E-K-E-N-D-F-U-N.com?

7    A.    I believe so.

8    Q.    Do you still own that domain name?

9    A.    No.

10    Q.    Did you sell it?

11    A.    No.

12    Q.    And so if -- well, can it be accessed at this

13    time?

14    A.    Not that I'm aware of.

15    Q.    When was the last time you accessed that

16    website?

17    A.    I don't remember.

18    Q.    Was it in 2018 or 2017?

19    A.    I don't remember.

20    Q.    Is Weekend Fun, L.L.C. still in existence?

21    A.    No.

22    Q.    Did you dissolve it or shut it down in some

23    way?

24    A.    I just -- I just -- when you say did I shut it

25    down in some way, what do you mean?

1        Q.    Well, did you report to the -- to the Secretary

2    of State, the Texas Secretary of State, that Weekend

3    Fun, L.L.C. was no longer in existence?

4        A.    I don't remember.

5        Q.    Did you set up this business yourself?

6        A.    No.

7        Q.    Who helped you with that?

8        A.    A coach.

9        Q.    And who was the coach?

10       A.    I don't remember her name.

11       Q.    Take a look at page 14 and 15 of Exhibit 3.

12   And there's something called Lady Boss Moves, and it's

13   an invoice.

14       A.    Are the pages numbered or . . .

15       Q.    Yes, ma'am.  Bottom right.

16       A.    Oh, yes, they are.  I see.

17       Q.    14, 15.

18       A.    Okay.

19       Q.    And is -- there's a name listed up here at the

20   top left, Sharonn Cole.  Do you see that?

21       A.    Yes.

22       Q.    Is that the coach who helped you set up the

23   L.L.C.?

24       A.    Yes.

25       Q.    All right.  What kind of coaching did Miss Cole

1    provide to you for establishing this business?

2        A.    From what I recall, the training involved

3    expertise on how to set up a website.  I can't remember

4    everything.  There was some positive coaching, some

5    self-evaluation that I recall.  And there were other

6    things she did, like set up a package that included a

7    logo and some other things.

8        Q.    Okay.  And she did all of that for you; is that

9    right?

10       A.    I wouldn't say she did it.  There were certain

11   things that she did, like the package, setting up the

12   logo.  But basically, some of the functions of setting

13   up a business, she guided me through like step-by-step

14   how to do certain things.

15       Q.    And so this invoice that is page 14 of

16   Exhibit 3, is dated May the 4th, 2017, correct?

17       A.    Yes.

18       Q.    And so did Miss Cole provide you any services

19   prior to that date?

20       A.    What do you mean?

21       Q.    Well, did she -- did she help you in any way?

22   Did she do anything related to giving you coaching or

23   giving you advice before May the 4th of 2017?

24       A.    Not that I can -- not that I can remember.

25       Q.    All right.  And so did she provide any

1    documentation to you as part of this coaching or part of

2    this program she was providing?

3         A.    A contract, I believe.

4         Q.    What else did she provide you that was paper or

5    electronically sent?

6         A.    Nothing that I recall.

7         Q.    Do you have access to any information or

8    product that -- that Miss Cole may have provided to you

9    as part of this coaching program?

10        A.    No.

11        Q.    Do you have any documentation relating to the

12   coaching that was done or provided to you by Miss Cole?

13        A.    No.

14        Q.    Had you known Miss Cole before -- before

15   meeting her through this coaching program?

16        A.    When you say "know her," what do you mean?

17        Q.    Did you -- had you ever met her, did you --

18   even as an acquaintance, anything like that?

19        A.    No.

20        Q.    All right.  And you paid her $5,000; is that

21   right?

22        A.    Yes.

23        Q.    And that $5,000 was taken from your -- from

24   your own savings; is that right?

25        A.    No.

1      Q.    Who paid that $5,000?

2      A.    I used a PayPal account.

3      Q.    All right.  So was it your own money or did you

4   borrow the money?

5      A.    When you say my own money, what do you mean?

6      Q.    Well, did it come from you or did it come from

7   someone else to pay this $5,000?

8      A.    It was a PayPal account in my name.

9      Q.    Okay.  So you had a PayPal account.  And I

10  understand that that was the method by which you paid

11  her.

12     A.    Uh-huh.

13     Q.    Is that right?

14     A.    Yes.

15     Q.    And as far as the PayPal account, did you -- is

16  that -- was that tied to a bank account or was it tied

17  to a credit card?  What was the -- what was the -- the

18  source of the funds, in other words?

19     A.    Well, I don't have a physical credit card from

20  PayPal, so --

21     Q.    I understand.

22     A.    -- I can only assume that it was -- it was tied

23  to a bank account.

24     Q.    Was it your bank account?

25     A.    Not with my name on it.

1        Q.    Okay.   Who -- I'm trying to figure out who paid

2    the $5,000.   That's really what it comes down to.

3        A.    It was a PayPal account that I applied for, and

4    that's how it was paid.

5        Q.    All right.   Did you then pay back PayPal?

6        A.    No.

7        Q.    Okay.   I'm just not understanding how -- how

8    the $5,000 was paid and who it was paid by.   You said

9    you applied for a PayPal account.   What did you mean by

10   that?

11       A.    Like a regular credit account.

12       Q.    Okay.

13       A.    So if I applied for a MasterCard, I mean, that

14   MasterCard is attached to a bank with my name on it.

15   And that credit card was -- or that credit account, it

16   was the same way.

17       Q.    Okay.   So let me see if I'm understanding what

18   you're saying because I've never heard of a PayPal

19   account like that.   You applied to establish a PayPal

20   account which would provide you credit?

21       A.    Correct.

22       Q.    And you applied for -- you applied for that

23   account and you were granted that account for at least

24   $5,000; right?

25       A.    Correct.

1        Q.   And from that account, that's how you paid

2    Miss Cole at Lady Boss Moves; is that right?

3        A.   Correct.

4        Q.   Okay.  And so with that account that you

5    created that PayPal had, had you paid PayPal back?

6        A.   No.

7        Q.   Is that amount still outstanding?

8        A.   Yes.

9        Q.   If you would look at page 37 of Exhibit 3.

10   This is activity between October 1, 2017 and

11   October 31, 2017.  Is that right?

12       A.   I'm sorry.  Can you repeat that?

13       Q.   Sure.  On page 37 of Exhibit 3, it reflects

14   activity in your Wells Fargo account between October 1,

15   2017 and October 31, 2017; is that correct?

16       A.   Correct.

17       Q.   And since October 31 of 2017, has there been

18   any other activity in this particular Wells Fargo

19   account?

20       A.   I'm sorry.  Can you please repeat the question?

21       Q.   Sure.  Since October 31, 2017, have there --

22   has there been any other activity in this particular

23   Wells Fargo account?

24       A.   Not that I can recall.

25       Q.   Have you continued to receive statements from

1   Wells Fargo regarding this particular account?

2       A.   No.

3       Q.   Is the ending balance that's reflected on

4   page 37 of Exhibit 3, do you see that the ending balance

5   is $321.27?

6       A.   On what page?  I'm sorry.

7       Q.   That same page you're on.

8       A.   That same page?

9       Q.   Yes, ma'am.

10      A.   Okay.

11      Q.   Do you see there's an ending balance of

12  $321.27?

13      A.   Okay.

14      Q.   Is that amount still in this account?

15      A.   No.

16      Q.   Have you closed this particular account?

17      A.   Yes.

18      Q.   When did you close this account?

19      A.   I don't remember.

20      Q.   Was it in 2017 or 2018?

21      A.   I know it wasn't 2018.

22      Q.   Has anyone else taken over the Weekend Fun,

23  L.L.C. entity?

24      A.   No.

25      Q.   Did you transfer it to anyone in any way?

1    A.    No.

2    Q.    Is your -- is your child involved in the L.L.C.

3  in any way?

4    A.    No.

5              (Exhibit 4 marked.)

6              MR. CAMMACK:  Are these all Exhibit 4?

7              MR. GARZA:  We're going to combine these,

8  yes.

9              MR. CAMMACK:  Okay.  To Exhibit 4.

10   Q.    (BY MR. GARZA)  I'm going to hand you what's

11  been marked as Exhibit 4 and ask you to keep those two

12  together, if you don't mind, please.

13              Is this your handwriting on Exhibit 4?

14   A.    Yes.

15   Q.    And this is a work search log that you kept for

16  the Texas Workforce Commission, correct?

17   A.    Yes.

18   Q.    Did you received any offers of employment from

19  any entity in Exhibit 4, other than Interim Health

20  Care -- well, other than the entities that you've worked

21  for since your termination from employment with The

22  Medical Team?

23   A.    No.  Not that I recall.

24   Q.    So let's talk about your employment with The

25  Medical Team.  When did you first become employed with

1    The Medical Team?

2        A.    It was March of 2015.

3        Q.    And what position were you hired into?

4        A.    Provider assistance supervisor.

5        Q.    Who was your immediate supervisor?

6        A.    Eileen McClary.

7        Q.    And who notified you that you had been hired

8    into that position?

9        A.    Who notified me?

10        Q.    Yes, ma'am.

11        A.    I don't remember who exactly.

12        Q.    When did you first, learn that Miss McClary was

13    going to be your supervisor?

14        A.    I had a meeting with her and Freddie Waters.

15        Q.    You were a PAS supervisor for approximately

16    three months?

17        A.    Yes.

18        Q.    And from that position, you were promoted;

19    isn't that right?

20        A.    Yes.

21        Q.    And you were promoted to the branch manager of

22    the New Braunfels, Texas location; is that right?

23        A.    Yes.

24        Q.    Who notified you of your promotion?

25        A.    Eileen McClary and Freddie Waters.

1      Q.    Do you know who was involved in the decision to
2  promote you to the branch manager position?
3      A.    As far as I know, Eileen McClary and Freddie
4  Waters.
5      Q.    There could have been others; is that right?
6      A.    I don't know.
7      Q.    Well, it's possible, right?
8            MR. CAMMACK:  Objection, form.
9  Speculation.
10     Q.    (BY MR. GARZA)  Do you know whether or not
11  anyone was involved in the decision to promote you?
12     A.    I have no knowledge of that.
13     Q.    Okay.  And as branch manager, you were in
14  charge of the New Braunfels location operation.  Isn't
15  that right?
16     A.    Yes.
17     Q.    And you actually received a -- a job
18  description, correct?
19     A.    Yes.
20            MR. CAMMACK:  Do you mind if we take a
21  quick break?
22            MR. GARZA:  Sure.  That's fine.
23            (At 11:06 a.m. the proceedings, recessed,
24             continuing at 11:17 a.m.)
25            (Exhibit 5 marked.)

1     Q.    (BY MR. GARZA)   I'm going to hand to you what's

2  been marked as Deposition Exhibit No. 5 and ask if

3  you've seen that document before.   That page, I should

4  say.

5     A.    What was your question?

6     Q.    Have you seen this document before?

7     A.    I don't recall, but it is in front of me and

8  that is my handwriting.

9     Q.    And do you recall filling out a form like this

10  at the time that you became employed with The Medical

11  Team?

12     A.    I don't recall.

13          (Exhibit 6 marked.)

14     Q.    (BY MR. GARZA)   I'm handing to you what's been

15  marked as Deposition Exhibit No. 6.   Is that your

16  signature on that Exhibit 6?

17     A.    Yes.

18     Q.    And that is dated March 30 of 2015; is that

19  right?

20     A.    Yes.

21     Q.    And that is your acknowledgment that you

22  received and understood the information in the employee

23  handbook, correct?

24     A.    I would like to review the form, if you don't

25  mind.

1        Q.   I don't mind at all.

2        A.   And what was your question?

3        Q.   This is your acknowledgment that you received a

4    copy of the employee handbook.  Isn't that right?

5        A.   Yes.  This is my signature.

6        Q.   And this is your acknowledgment that you

7    understood the information contained in the employee

8    handbook; is that right?

9        A.   I signed it, so yes.

10       Q.   This is your acknowledgment that you became

11   familiar with the contents of the personnel policy and

12   practice manual; is that right?

13       A.   According to the document, yes.

14       Q.   And this is your agreement to observe and

15   follow the policies and procedures of The Medical Team.

16   Isn't that right?

17       A.   According to this document, yes.

18       Q.   You were a manager for The Medical Team.  Isn't

19   that right?

20       A.   Yes.

21       Q.   You, as part of your responsibility, was to

22   know and understand the policies and procedures of The

23   Medical Team as they're applied to employment; isn't

24   that right?

25       A.   According to this document, yes.

1     Q.    Well, what about in practice, were you supposed
2   to understand and know the employment rules and
3   regulations so that you could then apply them to your
4   subordinates?
5     A.    Can you give me something specific or repeat
6   the question to help me understand it?
7     Q.    Let me repeat the question.
8           You were responsible -- am I correct in
9   saying that you were responsible to make sure that your
10  subordinates adhered to the policies and procedures of
11  The Medical Team?  Isn't that right?
12    A.    Can you rephrase the question?
13    Q.    Did you supervise subordinates for The Medical
14  Team?
15    A.    Yes.
16    Q.    Did you require that those subordinates comply
17  with the employment policies and procedures of The
18  Medical Team?
19    A.    There were several policies and procedures.
20  Can you give me something specific?
21    Q.    What about the administrative employee
22  handbook, do you recall what that is?
23    A.    By name.
24    Q.    Okay.  And it is pertaining to employees; isn't
25  that right?  It pertains to employees as to what the

1    employees are to comply with?

2         A.    Do you have the policy and procedure?

3         Q.    No.  I don't have it with me.

4               Do you have an answer to my question?

5         A.    I really don't understand your question.  So

6    can you give me a specific policy from that handbook?

7         Q.    Do you remember whether or not there was a

8    handbook for The Medical Team that pertained to, let's

9    just say an open door policy?  Do you remember that

10   policy?

11        A.    I remember that policy, yes.

12        Q.    Okay.  Do you -- are you aware that that policy

13   applied to all employees of The Medical Team?

14        A.    I haven't seen that policy in a very long time,

15   so do you have the open door policy?

16        Q.    Yeah.  I'll show it to you here in a minute,

17   except that I want to find out what you remember about

18   the policies and procedures.  So what do you remember --

19   well, who was supposed to comply with the administrative

20   employee handbook?

21        A.    I would have to say anyone who read the policy

22   and signed the policy.

23        Q.    Okay.  And you as a supervisor, you were

24   supposed to ensure that those employees were complying

25   with that handbook.  Isn't that right?

```
 1        A.    But, like, what policies specifically?

 2        Q.    Did you understand my question?

 3        A.    If you could repeat the question.

 4              MR. CAMMACK:  Would you please read it

 5   back?

 6              (Requested testimony read back by the

 7              court reporter.)

 8        A.    I don't recall every policy in the handbook.

 9   That's why it makes it hard to answer your question.  So

10   if you can relate to a specific policy?  If you can give

11   me something one of the employees signed?

12        Q.    Look at Deposition Exhibit No. 6.

13        A.    Uh-huh.

14        Q.    Do you have it in front of you?

15        A.    Yes.

16        Q.    The first paragraph under the major heading,

17   Employee's Acknowledgment, do you see that?

18        A.    Yes.

19        Q.    That is your representation that you would

20   comply with the policies.  Isn't that right?

21        A.    But this says me, so yes.

22        Q.    That's my question.  That is my question.  You

23   said you would comply with the policies; isn't that

24   right?

25        A.    Yes.
```

1    Q.    Okay.  If another employee says that -- signed
2    this same type of document stating they would comply
3    with the policies, they were held accountable to comply
4    with the policies, right?
5    A.    If they assigned the policy, I would have to
6    say yes.  But many of those employees were there before
7    I was employed.
8    Q.    Okay.  And you were responsible to discipline
9    people who did not comply with the policies.  Isn't that
10   right?
11   A.    Can you give me something more specific?
12   Q.    Let's just say somebody was absent too many
13   times.  Your responsibility was to discipline that
14   employee.  Isn't that right?
15   A.    Based on what the handbook says.
16   Q.    Right.  And so knowing that was your
17   responsibility, you were obligated as a management
18   employee of The Medical Team to fully understand the
19   policies and procedures, right?
20   A.    Can you repeat the question?
21            MR. GARZA:  Please read it back.
22            (Requested testimony read back by the
23              court reporter.)
24   A.    And you're relating this to attendance policy?
25   Q.    (BY MR. GARZA)  As an example, yes.

1      A.    I would have to see the policy based on that,

2   because I don't remember.

3      Q.    Was it your job to make sure that people were

4   abiding by the policies and procedures of The Medical

5   Team?

6      A.    According to this document that I signed, this

7   has to do with me.

8                    MR. GARZA:   Objection, nonresponsive.

9                    Would you read back the question?

10                    (Requested testimony read back by the

11                    court reporter.)

12      A.    I would like to review this document again.  Do

13   you mind?

14      Q.    (BY MR. GARZA)  No.

15      A.    You make this very difficult for me to answer

16   your question because this document pertains to me.  And

17   it was when I started, which I wouldn't have been in the

18   position of branch manager.  And this document doesn't

19   talk about employees I supervised.

20                    (Exhibit 8 marked.)

21      Q.    (BY MR. GARZA)  Let me hand you what's been

22   marked as Deposition Exhibit No. 8 then.  That's the job

23   description of the branch manager.  Isn't that right?

24      A.    Do you mind if I read it?

25      Q.    No, ma'am.  Go ahead and read it.

1       A.    What's your question?

2       Q.    If you would look at Med Team 14 through 16 of

3   Exhibit 8.

4       A.    I can't see the numbers.

5       Q.    It's the last three pages of Exhibit 8.

6              MR. CAMMACK:  Yeah.  That's 14 -- yeah.

7       A.    Okay.

8       Q.    (BY MR. GARZA)   Your signature appears on the

9   last page of Exhibit 8, which is Med Team page 16,

10  correct?

11      A.    Correct.

12      Q.    All right.  Let's go to then the page right

13  before that, which is Med Team page 15.  Under number

14  one, subpart A, you were responsible for supervising all

15  branch office personnel.  Isn't that right?

16      A.    That's what this document says.

17      Q.    So what -- was it your responsibility and

18  actual practice too as a manager for Med Team?

19      A.    Can you give something specific?

20      Q.    Sure.  Did you supervise The Med Team personnel

21  at the New Braunfels, Texas location?

22      A.    Yes, I did.

23      Q.    Okay.  What is that -- what did you do to

24  supervise those individuals?

25      A.    What do you mean what did I do to supervise

1  those individuals?  Because I did a lot.

2      Q.   Did you direct them on a day-to-day operation?

3      A.   Yes.  That was part of my responsibility as a

4  manager.

5      Q.   And you directed the staff management at the

6  branch.  Isn't that right?

7      A.   The staff management?

8      Q.   Yes.

9      A.   Are you referring to --

10     Q.   Let me rephrase that.  You were the branch

11 manager.  Who was below you?  Immediately below you, who

12 did you supervise?

13     A.   That would be the administrative staff and the

14 personal assistance supervisors.

15     Q.   Okay.  And so were there any other individuals

16 below that level, the administrative staff or the

17 person -- or the PAS supervisor?

18     A.   The field staff.

19     Q.   Okay.  So then you had others that you

20 supervised; isn't that right?

21     A.   I supervised administrators -- administrative

22 assistants, I'm sorry, and the PAS supervisors who then

23 supervised the field staff.

24     Q.   But ultimately, because you're the branch

25 manager, you supervised the entire office.  Isn't that

1   right?

2       A.   I supervised the administrative assistants, the

3   PAS supervisors, the field staff, since I was over that

4   branch.   There was also a marketer there who I did not

5   supervise.

6       Q.   All right.   So if those individuals that you

7   were supervising were not doing their job, it was your

8   responsibility to make sure that they did their job,

9   correct?

10      A.   I would say that as a manager, yes.

11      Q.   Okay.   And that includes following policies and

12  procedures, right?

13      A.   Yes.

14      Q.   So if you were to enforce policies and,

15  procedures, you needed to know those policies and

16  procedures, right?

17      A.   When you say "know those policies and

18  procedures," can you give me one --

19      Q.   No.   My question is:   You needed to understand

20  what those policies and procedures were in order to

21  enforce it as to other employees --

22      A.   I would say yes.

23      Q.   -- is that right?

24              (Exhibit 7 marked.)

25      Q.   (BY MR. GARZA)   Okay.   I'm going to hand you

1  what's been marked as Deposition Exhibit No. 7.  Excuse

2  me.  I'm sorry.  Have you seen this document before?

3       A.    Can I read it?

4       Q.    Yes.

5       A.    What is your question?

6       Q.    Have you seen this document before, which is

7  Exhibit 7?

8       A.    I recall seeing this document.

9       Q.    Okay.  And this is the open door

10 communications; isn't that right?  That's the policy.

11      A.    Correct.

12      Q.    And the policy states in paragraph two of the

13 open door communications that you could contact the

14 appropriate manager, including the president of the

15 company, if you felt that there was any kind of

16 illegality or improper activity.  Isn't that right?

17      A.    Yes.  That is what the document says.

18      Q.    Okay.

19            (Exhibit 9 marked.)

20      Q.    (BY MR. GARZA)  I'm going to hand to you what's

21 been marked as Deposition Exhibit No. 9 and ask, have

22 you seen this document before?

23      A.    I don't recall seeing this document.

24            (Exhibit 10 marked.)

25      Q.    (BY MR. GARZA)  I'm going to hand to you what's

1    been marked as Deposition Exhibit No. 10.  Have you seen

2    that document or those documents before?

3         A.    The first document looks familiar.

4         Q.    So it's marked Richardson 246.  Isn't that

5    right?  And it says Renee's copy up at the top right?

6         A.    Oh, yes.

7         Q.    Whose handwriting is that?

8         A.    That's my handwriting.

9         Q.    And then if you look at the next page,

10   Richardson 247, it says Ernesto's copy.

11               First of all, who is Ernesto?

12        A.    He's the person I met at the EEOC.

13        Q.    Okay.

14        A.    And this is a document handed to me.

15        Q.    And who handed this document to you?

16        A.    That would be Ernesto.

17        Q.    He handed the copy to you?

18        A.    Yes.

19        Q.    Okay.  And so what's the significance of this

20   document that -- these documents in your mind relating

21   to your allegations that you were discriminated against

22   or retaliated against?

23        A.    These are both organizational charts.

24        Q.    Okay.  So in your mind, is this in any way

25   indicative of whether or not you were discriminated

1   against or retaliated against by The Medical Team?

2       A.   I believe I was -- I believe I was asked for

3   this from the EEOC.

4       Q.   Okay.  So the EEOC asked you for an

5   organization chart; is that right?

6       A.   I can't say that's 100 percent correct, but I

7   believe I was asked about, like, I guess the hierarchy.

8   And I have -- I knew I had this.  So I provided this

9   information.

10      Q.   Okay.

11      A.   Up at the top, the first page.

12                  (Exhibit 11 marked.)

13      Q.   (BY MR. GARZA)  I'm going to hand to you what's

14   been marked as Deposition Exhibit No. 11.  And these are

15   your responses to interrogatories.  I'd like to go over

16   these interrogatory answers with you.

17              If you would look at interrogatory number

18   two, do you see that, interrogatory number two?

19      A.   Yes.

20      Q.   All right.  The interrogatory asks you to

21   identify each of defendant's employees who you allege

22   discriminated against and terminated you or your

23   employment based on your race.  And you identified Alan

24   Garza, Sylvia Martinez, and Rebecca Marquez; is that

25   correct?

1     A.    Yes.

2     Q.    And just so we clarify, if you look at the last

3 page of Deposition Exhibit No. 11, the last page, is

4 that your signature?

5     A.    Yes.

6     Q.    Do you recall signing this verification?

7     A.    I don't really remember, but that is my

8 signature.

9     Q.    Okay.  All right.  Let's go back to

10 interrogatory number two.  You say that Alan Garza

11 discriminated against you on the basis of your race.

12          What did he do that leads you to believe

13 that he discriminated against you on the basis of your

14 race?

15    A.    I would have to say my employment class was

16 changed from salary to hourly based on my conversations

17 with Christina.  That happened to no one else.  No one

18 else was impacted by that.  And that is what I believe

19 to be true.

20    Q.    Okay.  All right.  What else?  And I would

21 like -- well, we'll go through each one of them, but

22 provide me a list of what did Alan Garza do that you

23 said was discriminatory on the basis of your race.

24 You've already identified changing you from salary to

25 hourly.

1      A.    Uh-huh.

2      Q.    What else?

3      A.    I would say I was denied resources.  Do you

4  want me to give specifics or?

5      Q.    Not yet.

6      A.    Not yet.  Okay.

7      Q.    Okay.  What else?

8      A.    I was humiliated in front of employees.

9      Q.    What else?

10     A.    I was not involved in important meetings about

11  the branch.  There were a lot of decisions that were

12  made by the people I mentioned, Alan Garza, Sylvia

13  Martinez, Rebecca Marquez.

14     Q.    What else?

15     A.    I was made to feel as though I was incompetent.

16  I was belittled in front of staff.  When I complained

17  about being discriminated against because of my color,

18  my issues were not addressed.  And I was terminated.

19          The day I was terminated, I was informed

20  by Christina that, a joke was made about my hair.  And

21  I'm sure there were other things that occurred that I

22  don't remember right off.

23     Q.    (BY MR. GARZA)  Okay.  Is there anything else

24  that you're saying that Mr. Garza did that causes you to

25  believe that you were discriminated against because of

1    your race?

2         A.    I'm sure there were other things, but like I

3    said, I don't remember everything.  Time has passed.  A

4    lot of things went on there, so I don't remember

5    everything.

6         Q.    Is there any documentation that you can refer

7    to that would help you refresh your memory about those

8    other things other than what you've already identified

9    in testimony today?

10        A.    I can't remember.

11        Q.    Okay.  So tell me what Sylvia Martinez did that

12   you say was discriminatory because of your race.

13        A.    It was the way she treated me, the way she

14   talked to me.

15        Q.    What was Miss Martinez's position?

16        A.    I don't really remember.  Maybe a supervisor --

17        Q.    Okay.

18        A.    -- if I remember correctly.

19        Q.    So what else did she do other than what you've

20   identified as the treatment and how she talked to you?

21        A.    I don't remember.  Like I said, I cannot

22   remember everything, but it was her treatment towards

23   me, the unfair treatment, the humiliating me, the -- by

24   the way she spoke to me in front of other people.

25        Q.    Okay.  Anything else?

RENEE RICHARDSON - 12/04/2018                    Page 60

1      A.    A lot of decisions came from her about the

2    branch, like I said before.  And again, I cannot

3    remember every single detail.

4      Q.    All right.  Anything else about Miss Martinez?

5      A.    Like I said, I don't remember everything.

6      Q.    Okay.  Tell me what you -- what Rebecca Marquez

7    did that you say was discriminatory on the basis of your

8    race?

9      A.    I would have to say just the way she talked to

10   me, you know, the way she treated me.  I would have to

11   say, though, that it -- it didn't -- how can I say this?

12   I feel like she was kind of -- she was just basically

13   following along.

14     Q.    What else did she do that you say was

15   discriminatory on the basis of your race?

16     A.    Again, I do not remember everything.  I would

17   just I have to say what I said before.

18     Q.    You said earlier that it was discrimination on

19   the basis of your color.  Are you limiting it only to

20   color or to race and color?

21     A.    Being black is the same as race.

22     Q.    Okay.  So then when you say color, I'm going to

23   interpret that to be race discrimination or referring to

24   race.  Is that right?

25     A.    Race discrimination --

1    Q.   Okay.

2    A.   -- based on being black.

3    Q.   All right.  Okay.  Let's talk about Rebecca

4  Martinez -- I'm sorry -- Rebecca Marquez first.  You

5  said that she -- you felt that she discriminated against

6  you by the way that she treated you.  Tell me what you

7  mean by that.

8    A.   Just unfair treatment.  Talking to me like I'm

9  stupid, treating me as I'm -- like I'm less than.

10   Q.   How did she treat you unfairly?

11   A.   There's a mutual level of respect when you

12  interact with coworkers.  And when you talk down to

13  people, that's not respect.

14   Q.   So are you then saying that she talked down to

15  you?

16   A.   She belittled me, which is to me the same as

17  talking down to me.

18   Q.   Okay.  Tell me the facts on which you base the

19  allegation that she belittled you.  When did it happen,

20  who was there, what was the circumstance relating to

21  this alleged belittling of you by Miss Marquez?

22   A.   This, I cannot remember because a lot of time

23  has passed, but I do recall it was a meeting that we had

24  about EVV.

25   Q.   And so that the jury understands what EVV

1    means, what does that stand for?

2         A.    I don't remember.  I -- I think it's electronic

3    visit verification, but I'm not 100 percent sure.

4         Q.    And what -- okay.  So you -- there was a

5    meeting about EVV.  Where did this meeting take place?

6         A.    In my office.

7         Q.    Who else was present?

8         A.    Sylvia Martinez.  Shayna Otting.

9         Q.    Shayna who?

10        A.    Otting.

11        Q.    O-T-T-I-N-G?

12        A.    Correct.

13        Q.    Okay.  Who else?

14        A.    And Rebecca Marquez.

15        Q.    Okay.

16        A.    And myself.

17        Q.    All right.  So tell me what Miss Marquez did

18   that you say belittled you in this particular meeting.

19        A.    It was the tone in their voices.  And

20   basically, I don't -- like I said, I don't remember the

21   entire conversation, but I do recall it was related to

22   the visit clock token.

23              And they were talking to me because --

24   we're talking about Rebecca -- regarding changes that

25   had taken place that was never communicated to me.  And

1    like I said, the information to me was new.  It was

2    information that was not communicated, but they were

3    talking to me as though it had been communicated.

4        Q.   Do you recall when this conversation took

5    place?

6        A.   I do not recall.  That happened a long time

7    ago.

8        Q.   Was it in 2016 or 2017?

9        A.   I don't remember.

10       Q.   It was sometime when you were the branch

11   manager, though?

12       A.   Yes.

13       Q.   Okay.  Do you recall specifically what

14   Miss Marquez said?

15       A.   I don't.

16       Q.   Do you recall specifically what Miss Martinez

17   said during this meeting?

18       A.   All I can recall is it had to do with changes

19   that were made to EVV.  What those changes were, I do

20   not remember.

21       Q.   Okay.  Do you recall what Miss Shayna Otting

22   said during this meeting?

23       A.   I don't recall her saying anything during the

24   meeting.

25       Q.   Okay.  So then Miss Otting didn't say anything,

1    and so there was nothing in her tone of voice then which

2    you felt was belittling to you then?

3         A.    Miss Otting?

4         Q.    Yes.

5         A.    She was a temp staff.  So she -- she didn't

6    belittle me.

7         Q.    Okay.

8         A.    She wasn't involved in that -- in the

9    discrimination.

10        Q.    Okay.  All right.  So then, as I'm

11   understanding you, you're saying that the tone of

12   Miss Martinez's voice and the tone of Miss Marquez's

13   voice?

14        A.    Sorry.  Repeat that.

15        Q.    What I am understanding your testimony to be is

16   that the tone of Miss Marquez's voice and the tone of

17   Miss Martinez's voice is what you were -- are saying was

18   the belittling aspect of that particular meeting?

19        A.    No.

20        Q.    So then what --

21        A.    That's not what I am saying.

22        Q.    So please explain to me, because this is my

23   only chance to try to get it.

24        A.    Okay.  What I'm saying is they were talking to

25   me as though I was incompetent.  I did not -- I guess I

1    was supposed to understand the changes even though those

2    changes were not communicated to me.

3                So they -- they made me feel like -- based

4    on the things that they were saying, they made me feel

5    like I was stupid, like I was incompetent, I didn't know

6    my job as it related to the changes that were being

7    made.

8        Q.   Okay.  So what specifically did they do that

9    made you feel that way?

10       A.   They were talking to me as though I was

11   incompetent.

12       Q.   And can you describe how they were talking to

13   you that made you feel you were incompetent?

14       A.   I can't describe how -- I don't remember

15   everything they said.  But they set up a situation when

16   we were in that meeting as though changes regarding the

17   visit clock token system had been communicated to me.

18   And I explained to them several times that that was not

19   communicated.  The changes were not communicated.

20               What those changes were specifically, I

21   cannot remember.

22       Q.   Okay.  So what was their response to you

23   explaining that the changes had not been communicated to

24   you?

25       A.   They kept responding as though the changes had

1  been communicated to me, like I should have known those

2  changes took place.

3      Q.   Okay.  Can you describe -- can you provide any

4  additional description or information pertaining to

5  Miss Marquez and your allegation that you believe she

6  discriminated against you on the basis of your race,

7  other than what you've just testified about?

8      A.   I cannot remember.

9      Q.   Okay.  Have you now testified as to all of the

10 information that you recall concerning Miss Marquez that

11 you say supports your position that she discriminated

12 against you on the basis of your race?

13     A.   Can you repeat that?

14          MR. GARZA:  Could you please read it?

15          (Requested testimony read back by the

16          court reporter.)

17     A.   That's all I can recall right now.

18     Q.   (BY MR. GARZA)  Okay.  Let's move on to

19 Miss Martinez, Sylvia Martinez.  Same type of question.

20 You said that she treated you -- she was -- you say that

21 she treated you in such a way that you believe that you

22 were discriminated against on the basis of your race.

23 And you went on to say that it was how she talked to

24 you.

25          What situations or what incidents can you

1  tell us about that support this position that you feel

2  she was -- she discriminated against you on the basis of

3  your race?

4      A.   I do recall a situation -- again, it was about

5  the visit clock tokens -- where I requested -- I don't

6  recall exactly what it was, but I was asking her some

7  information, and she refused to give me that

8  information.

9      Q.   What information were you seeking?

10     A.   It had something to do with the visit clock

11 tokens.  Like I said, I don't remember exactly what that

12 was.  But she refused to give me the information that I

13 was asking for.

14     Q.   Now, you said that she refused.  Did she

15 actually tell you, no, I am not going to give it to you,

16 or did she just fail to give it to you?

17     A.   I wouldn't say she say what you said, but

18 she -- she -- I really don't recall.  Like I said, I

19 don't recall exactly what she said.

20     Q.   Okay.  So just so I understand, you're not

21 saying that she -- she refused to give information, but

22 that she failed to give you information.  Isn't that

23 right?

24     A.   I'm not going to say that.  From what I

25 remember, she disregarded the question or the

1  information that I wanted.  And I do recall sending an
2  e-mail to Alan Garza letting him know that I ended the
3  conversation.  So I'll say that.  But like I said, I
4  don't remember exactly what was said.
5       Q.   I may have asked you this, but what was Sylvia
6  Martinez's position?
7       A.   I believe she was a supervisor.
8       Q.   And was she a supervisor in the New Braunfels
9  branch?
10       A.   No.  She was a supervisor in San Antonio.
11       Q.   Supervisor of what?
12       A.   I don't know.  I don't remember that.
13       Q.   Okay.  So other than that one incident that you
14  recall regarding the token, the visit clock token, where
15  you say she disregarded your question, are there any
16  other incidents that you can testify about or can
17  provide to us on which you say she discriminated against
18  you on the basis of your race?
19       A.   That's not the only situation.  A lot of the
20  decision-making about that branch came from Sylvia.
21  There were a lot of complaints.
22       Q.   So let's start about the decisions.  I'm sorry
23  to interrupt you, but we'll get back to the complaint
24  piece.
25       A.   Okay.

RENEE RICHARDSON - 12/04/2018                    Page 69

1    Q.    Tell me about the decisions that Miss Martinez

2    made.

3    A.    There were some issues with phone problems we

4    were having.

5    Q.    Okay.  What other decisions did she make?

6    A.    We received complaints from clients.  In some

7    kind of way, those calls were transferred to -- well,

8    excuse me.  I don't know if they were transferred to San

9    Antonio, but some kind of way, those calls got to San

10   Antonio.

11   Q.    All right.

12   A.    And a lot of communication with those

13   complaints or with those customers, Sylvia handled those

14   complaints.  So I was not given the opportunity as a

15   branch manager to address those issues.

16   Q.    Okay.  What other decisions were made by

17   Miss Martinez?

18   A.    I cannot remember everything, but those are two

19   of the situations or three that I do recall.

20   Q.    Okay.

21   A.    But again, details, I don't remember all the

22   details.

23   Q.    All right.  So then you've testified that

24   Miss Martinez disregarded the information that you

25   wanted, that she made decisions regarding phone

1    problems.

2         A.    I don't think I said that about Miss Martinez.

3         Q.    That's what we were talking about now.

4         A.    Oh, you're right.   Martinez.

5         Q.    Yes.

6         A.    Okay.   I thought you said Marquez.   Marquez.

7         Q.    And so she disregarded your questions that

8    you -- regarding the information that you wanted.   She

9    made decisions regarding the phone problems, and then

10   she handled client complaints.   Is that right?

11        A.    Yes.

12        Q.    Okay.   Is there anything else that you say that

13   Miss Martinez did which resulted in the alleged

14   discrimination on the basis of your race?

15        A.    Again, the humiliation, the belittling me in

16   front of other people, treating me as though I was

17   incompetent and didn't know my job.

18        Q.    Okay.   Let's talk about this allegation that

19   she humiliated you in front of others.   What situations

20   did that occur in and when did they happen?

21        A.    I don't remember when they happened, but I do

22   recall that it was in the meeting related to the EVV

23   situation.   And again, those same people were in the

24   office, sylvia Martinez, Rebecca Marquez and --

25        Q.    Shayna Otting?

1    A.    Shayna Otting.

2    Q.    Okay.  So your statement that she humiliated

3 you in front of others goes back to the meeting that you

4 testified earlier about involving Miss Otting,

5 Miss Martinez, and Miss Marquez?

6    A.    And that particular meeting was just

7 Miss Otting and Rebecca Marquez.  So that would be the

8 others.

9    Q.    Yes.

10    A.    Uh-huh.

11    Q.    Okay.  What are the other incidents that you

12 say she humiliated you in front of others?

13    A.    I don't recall.  Like I said, I don't recall

14 every situation that occurred.  But there were comments

15 made by others who -- for instance, Miss Otting, after

16 they left that meeting, Miss Otting came to me and she

17 told me they talked to you like you're stupid.

18    Q.    Miss Otting said that?

19    A.    Yes.  And that is how I felt.  And I often felt

20 that way interacting with Alan Garza, Sylvia Martinez

21 and Rebecca Marquez.

22    Q.    And so miss -- did Miss Otting say anything

23 else to you other than what you just testified about

24 after the meeting that you had regarding the EVV tokens

25 with Miss Martinez, Miss Otting and Miss Marquez?

1      A.    That wasn't the only comment.  She made other

2   comments about the way they treated me.  But again, I do

3   not understand -- I don't remember everything that we

4   discussed.  But based on the brief discussion that we

5   did have, she wasn't happy about that meeting.

6      Q.    How do you know she wasn't happy about the

7   meeting?

8      A.    Because she expressed it.

9      Q.    What did she say?

10     A.    I can't remember exactly what was said, but I

11  do recall vividly the statement about them treating me

12  as though I was stupid.

13     Q.    Do you remember --

14     A.    That hit home for me.

15     Q.    Do you remember any other statements by

16  Miss Otting regarding that meeting?

17     A.    I don't remember exactly what she said, but

18  that particular line, I do remember.

19     Q.    Okay.  Let's talk about -- let's go back to

20  Miss Martinez and any other incidents of humiliation in

21  front of others.  Other than the meeting regarding the

22  EVV tokens, what other incidents can you explain to us

23  that supports your position that Miss Martinez

24  discriminated on the basis of your race?

25     A.    Like I said, I can't remember everything.

```
 1        Q.   So as we sit here today, you don't remember
 2   anything other than the meeting with Miss Martinez --
 3   between Miss Martinez, yourself, Miss Otting, and
 4   Miss Marquez?
 5        A.   I'M sorry, repeat that.
 6                MR. GARZA:   Would you read it back,
 7   please?
 8                (Requested testimony read back by the
 9                court reporter.)
10        A.   All I can say is I don't remember everything.
11        Q.   (BY MR. GARZA)  Okay.  So let's talk about
12   this -- these decisions that Miss Martinez made.  You
13   said that she made decisions regarding phone problems.
14   What were those phone problems?
15        A.   I know at one point the calls were transferred
16   over to the San Antonio office because of all the issues
17   that that branch was facing.
18        Q.   You're talking about the New Braunfels branch?
19        A.   Yes.
20        Q.   Okay.
21        A.   And at some point I do recall her making the
22   decisions for the calls to be handed back to us.  Again,
23   I don't remember everything, but I do know that she made
24   that decision.  I was not involved.  I was told about it
25   through Christina.  So when I did get the information,
```

1   that decision had already been made.

2        Q.   And who is Christina?

3        A.   She was my direct manager.

4        Q.   What's her full name?

5        A.   Christina Hernandez Ayala, I believe.

6        Q.   And what was her position?

7        A.   R.N. administrator.

8        Q.   Okay.  So you're saying that Miss Martinez made

9   the decisions regarding transferring phone calls to and

10  from the New Braunfels branch?

11       A.   No.  What I'm saying is --

12       Q.   Is that right?

13       A.   -- is they decided to assist us because of

14  whatever issues were going on.  And when -- and I guess

15  those calls were a little too much for them to handle

16  based on the feedback that I received.  And Sylvia made

17  the decision that we were going to resume that

18  responsibility.

19       Q.   Okay.  And in your answer you made reference to

20  "they made the decision."  Who else was involved in that

21  decision?

22       A.   Alan Garza.

23       Q.   Who else?

24       A.   Sylvia Martinez.

25       Q.   Anyone else?

1      A.    Not that I'm aware of.

2      Q.    Okay.  You also then said that Sylvia Martinez

3   handled client complaints.  What specific complaints do

4   you recall that she handled?

5      A.    I don't recall every single complaint, but

6   there was a complaint in particular, one where I

7   recall -- I believe I received an e-mail about this.  I

8   don't recall who the e-mail came from, but there was a

9   situation where there was a provider in a client's home,

10  and the client was in prison.  And I think that employee

11  may have been disciplined regarding that issue, and she

12  was upset about it.

13          And that phone call went to San Antonio,

14  and Sylvia basically communicated something that was the

15  total opposite because the person who was supervising

16  that person was correct that you should not be in a

17  client's home when they're not present.  And that's in

18  their policy, their field employee policy.

19     Q.    So who was the provider?

20     A.    I don't remember that person's name.

21     Q.    Who was that provider's supervisor?

22     A.    That would have been Anna Fell.

23     Q.    And Miss -- and Miss Fell, did she make any

24  decisions in that situation?

25     A.    I don't recall.  I think she may have either

 1  given a verbal warning or that person may have been
 2  written up.
 3       Q.   And then what was Miss Martinez's involvement
 4  in that situation?
 5       A.   She -- I do recall her giving that employee --
 6  she provided the opposite information.  And I don't
 7  recall how it was worded, but it was in an e-mail.  So I
 8  don't -- I don't remember what the e-mail said.
 9       Q.   And so was Mr. Garza involved in that situation
10  also?
11       A.   I don't remember.
12       Q.   All right.  So we're talking about client
13  complaints that were handled by Miss Martinez.
14       A.   Uh-huh.
15       Q.   What other complaints did she handle other than
16  this one incident that you just testified to?
17       A.   What other complaints?
18       Q.   Yes.
19       A.   There were other complaints, but, again, those
20  complaints were not routed to me to address.  They,
21  meaning Sylvia, or if it got to Alan Garza, those
22  complaints were handled by them.
23       Q.   By them who?
24       A.   Alan Garza, Sylvia Martinez, and there were
25  other people that were taking calls related to

1    complaints.

2        Q.    Who were they?

3        A.    I don't know.  I can't remember a lot of those

4    people.  But I found out after the fact.  So being the

5    branch manager, those situations should have been

6    forwarded to me for me to address, but they were not.

7        Q.    And so again, who were those individuals --

8    those other individuals who took the complaints?

9        A.    I wouldn't remember.  I cannot remember their

10   names.

11       Q.    Do you remember any specific incident that was

12   handled by others other than Miss Martinez?

13       A.    It's been a long time.  There were other

14   complaints, but I don't remember all of the complaints.

15   I mean, but that was one that I do remember.

16       Q.    Okay.  So have you now testified as to all that

17   you remember concerning Miss Martinez disregarding the

18   information that you were seeking?

19       A.    Repeat that again.

20       Q.    Sure.  And let me just give you a framework

21   here.

22       A.    Uh-huh.

23       Q.    You said she disregarded information that you

24   were seeking, she handled phone problems, made decisions

25   regarding the phone problems, made decisions regarding

1    client complaints, and then she was involved in the

2    meeting with the EVV tokens?

3        A.    Yes.  She was involved in those meetings, but I

4    wouldn't say -- what I'm going to say is like I said.

5    There were other issues, but I don't remember everything

6    that occurred with these people.

7        Q.    Okay.  But have you now testified everything

8    that you can recall regarding those four examples that

9    you have provided on which you base your contention that

10   she discriminated against you because of your race?

11       A.    And you said based on these examples?

12       Q.    Based on what you provided today.

13       A.    Yes.

14       Q.    Okay.  Let's talk about -- let's talk about

15   Alan Garza.

16       A.    Uh-huh.

17       Q.    You say he discriminated against you on the

18   basis of your race by changing from salary to hourly?

19       A.    Yes.

20       Q.    How do you know that occurred?

21       A.    I know that occurred because I have a document

22   that was signed by me.

23       Q.    What's the document?

24       A.    It's -- okay. It's Exhibit 8.

25       Q.    Exhibit 8?

1      A.    Eight, yes.  And it's page 14 through 16.

2      Q.    Okay.  And where does it indicate that you were

3  an hourly employee?

4      A.    On this date, the date that I signed,

5  December 1st, 2015, Fran Gonzalez showed up at our

6  branch, at the New Braunfels branch, and she brought

7  this form with her.  This is a copy, though.  She

8  brought the original form that I signed.  And she told

9  me that I was being changed from salary to hourly and

10  that she told me that Alan Garza told her to make the

11  change.

12      Q.    Who is Fran Gonzales?

13      A.    She works in HR in San Antonio.

14      Q.    Does she still work there, to your knowledge?

15      A.    I don't know.

16      Q.    What else did she say?

17      A.    She didn't say anything else.

18      Q.    And what was your response to her?

19      A.    I didn't respond.  I was a little confused.

20      Q.    Did you ever seek clarification from anyone

21  else?

22      A.    I did discuss it with Christina, who is my

23  direct supervisor.  I questioned her, I asked her why

24  was that change made.  And I asked her, did anyone

25  else -- was anyone else changed.

1          And she told me no.  No one told her about

2    this.  I also followed up with Sarah Gogo a couple of

3    times and questioned her about the issue.

4        Q.    What was Sarah's response to -- or even

5    Christina, her response to this alleged change from

6    salary to hourly?

7        A.    I shared with you what Christina's response

8    was.

9        Q.    Okay.  So --

10       A.    And Sarah Gogo's response, I think I recall

11   e-mailing her a couple of times on this issue.  And I

12   don't know.  I can't remember if she responded via

13   email, but I do recall me asking her in a phone

14   conversation that we had about this.  And she verified

15   that I was still salary.

16       Q.    Okay.

17       A.    So to me, this document was bogus.

18       Q.    And so as far as the salaried or hourly

19   compensation during your employment with The Medical

20   Team as a manager, you have always been paid a salary.

21   Isn't that right?

22       A.    Yes.  I received a paycheck every time everyone

23   else did.

24       Q.    Okay.  Okay.  Have you now testified as to all

25   the facts on which you believe that you were

1  discriminated against on the basis of your race as a

2  result of this change from a salary to an hourly

3  compensation?

4       A.   For this particular situation or?

5       Q.   Yes.  This particular situation.

6       A.   I would have to say yes.

7       Q.   Okay.

8       A.   Because no one else was subjected to this, no

9  other branch manager.

10      Q.   All right.  You also aid that Alan Garza denied

11  resources to you.  What -- explain what you mean by

12  that.

13      A.   There was a time when I -- this was during the

14  time he hired temporary staff when EVV was being

15  implemented.  And there was Shayna Otting who was our

16  receptionist, I believe.  And there was no computer.

17 And there was work that she had to do that required a

18  computer.  And I did make the request through Christina,

19  and I don't remember if I made the request directly

20  through Alan.  But Christina's feedback to me regarding

21  that particular request, it was denied.

22      Q.   What did you request?

23      A.   A computer.  This person needed the computer to

24  handle some EVV responsibilities, and that request was

25  denied.

1    Q.    And who conveyed to you that the request was

2  denied?

3    A.    Christina.

4    Q.    What specifically did she say?

5    A.    I can't remember, but I do know that when I

6  would make requests, it was either there's no money in

7  the budget or that's not an option.  But I don't

8  remember her exact response, but it was denied.

9    Q.    Okay.  But you don't remember whether it was a

10  budget reason or any other reason, you just don't

11  remember anything that she said other than the denial of

12  the request, correct?

13    A.    All I know she said is that he denied it.

14    Q.    And by "he," who was -- who was she referring

15  to?

16    A.    Alan Garza.

17    Q.    And how do you know that?

18    A.    She said his name.

19    Q.    Okay.  So then what I'm trying to get at is I'm

20  trying to get what she said.

21    A.    Uh-huh.

22    Q.    And so you're testifying today that she said

23  Alan Garza has denied the request, essentially?

24    A.    Yes.

25    Q.    What do you recall else that Miss Hernandez,

1   Christina Hernandez, said during that conversation

2   regarding the denial of your request for a computer?

3        A.   I don't remember everything.  But what I do

4   know is that Rebecca Marquez, she came down, and I don't

5   recall what she came down to the office for.

6        Q.   I'm talking about Miss Hernandez.

7        A.   I don't remember --

8        Q.   What else did you remember?

9        A.   -- everything she said.

10       Q.   Okay.

11       A.   It wasn't a lengthy conversation.

12       Q.   Now go ahead and explain to me what you were

13  going to say about Miss Marquez.

14       A.   Miss Marquez came to the branch.  And I don't

15  recall the reason she came there.  And she discovered

16  and made a reference to Shayna not having a computer.

17  And I do recall mentioning to her that I made that

18  request.  It was denied.  So she basically said that she

19  was going to let Alan know that we do need a computer.

20  When she went back to San Antonio and communicated that,

21  it wasn't long before that that computer was delivered.

22            And I felt like it was a race issue

23  because Rebecca Marquez is Hispanic, I'm black.  And

24  when I made that request, it was denied.

25       Q.   What's her position?

1      A.    I don't recall what her position was.  I -- I

2  don't recall.

3      Q.    Okay.  Have you now testified as to all of the

4  facts on which you believe that you were discriminated

5  against by Mr. Garza on the basis of your race in

6  relation to this denial of resources?

7      A.    That's not everything.

8      Q.    Tell me what other denial of resources.

9      A.    There was another request for a computer.  I

10  believe it was two computer monitors for Valerie

11  Castillon.  She was the administrative assistant.  And I

12  don't recall what she needed those computer monitors

13  for.  I do recall making that request.  I don't remember

14  if it was through Christina or through Alan Garza

15  directly.  And I don't recall that being -- that request

16  being granted.

17          But I do recall Valerie sending an e-mail,

18  and I believe it was to Alan Garza, about those

19  monitors.  And he made reference to he was -- he had

20  been thinking about those monitors.  And she got her

21  monitors.  And again, she was a Hispanic.  She's

22  Hispanic.  I'm black.

23          There was another issue where --

24      Q.    Let me follow up on this --

25      A.    Okay.

1      Q.    -- Valerie Castillon thing.  It was a request

2   for a computer?

3      A.    Commuter monitors, from what I remember.

4      Q.    And what was needed?  Why did she need computer

5   monitors?

6      A.    I really don't recall.  I think it -- I think

7   she was kind of like in and out of systems.  And she

8   needed dual monitors because of the different tasks she

9   was managing.  So I believe it was in relation to that

10  request.

11     Q.    And so she made the request specifically to or

12  directly to Mr. Garza?

13     A.    I believe it was directly to Mr. Garza.

14     Q.    Okay.

15     A.    Via e-mail.

16     Q.    Or it could have been to Christina Hernandez;

17  is that right?

18     A.    It was one or the other, but I believe it was

19  Alan Garza.

20     Q.    When did you make the request for dual monitors

21  for Miss Castillon?

22     A.    I don't remember exactly when I made the

23  request.

24     Q.    Was it before or after Miss Castillon's e-mail

25  to Mr. Garza?

1      A.    It was before.

2      Q.    And did you make the request via e-mail?

3      A.    I don't remember.

4      Q.    Okay.  Have you now testified as to all of the

5  information that you have pertaining to this request for

6  monitors for Valerie Castillon that you say supports

7  your position that Mr. Garza discriminated against you

8  on the basis of your race?

9      A.    Related to this situation?  Is that your

10  question?

11      Q.    Related to Valerie Castillon.  See what I'm

12  trying to do --

13      A.    Yes.

14      Q.    -- is I'm trying to make sure that if you give

15  me an example --

16      A.    Uh-huh.

17      Q.    -- I want to find out have you testified to all

18  of the facts that you have pertaining to that.  And then

19  we close that off and we go to the next situation.  So

20  that's just to give you a little bit of structure on

21  what the purpose of my questions are.

22      A.    Okay.

23      Q.    So let's move on beyond the Valerie Castillon

24  incident.  What other denial of resources?

25      A.    We were having some printer issues, and those

1   printer issues, that's how we receive our referrals from

2   the State.  And for some reason, this printer was going

3   haywire.  And it kept breaking down for some-odd reason.

4   And I did put in a request, I believe, through

5   Christina.  I put in a request to have a used printer.

6               And I do -- I believe, if I remember

7   correctly, when I made that request, the response was

8   there was no money in the budget.

9        Q.   And who --

10       A.   And that was --

11       Q.   Sorry.  Go ahead.

12       A.   And that was communication I had with Christina

13  who was my direct supervisor at the time.

14       Q.   All right.  How do you know that Mr. Garza was

15  involved in that?

16       A.   All I can do is go by what Christina

17  communicated to me.  Alan was her boss.  And I cannot

18  speak to that.

19       Q.   She did --

20       A.   All I know is this is the information that she

21  provided to me.

22       Q.   Did she say Alan Garza denied the request?

23       A.   Yes.

24       Q.   Have you now testified as to all the facts

25  relating to this printer issue which you say is a denial

1    of resources available to you which leads you to believe

2    that Mr. Garza discriminated against you on the basis of

3    your race?

4         A.   Yes.

5         Q.   Okay.  Are there any other denial of resources

6    situations that you believe shows that you were

7    discriminated against on the basis of your race?

8         A.   I don't recall all of the other issues.  I do

9    recall Christina getting to the point where, you know, I

10   would make requests for resources.  And again, I don't

11   remember what they all were.  But she just got to a

12   point where she's, like, I already know what he's going

13   to say, so, you know, why bother asking.  So --

14        Q.   But as we sit here today, you don't recall any

15   other specific requests?

16        A.   Related to resources?

17        Q.   That's correct.

18        A.   I can't recall any off the top of my head.

19        Q.   Okay.  Let's move on then to your allegation

20   that Mr. Garza humiliated you in front of employees.

21        A.   Uh-huh.

22        Q.   Tell me what situations that occurred.

23        A.   I do recall one situation where we were

24   supposed to have a meeting regarding this whole EVV

25   issue.  And Christina was supposed to participate in

1    that meeting, but for some reason, she was not there.
2    Anna Fell, Shayna Otting and myself was at our branch.
3    It was a conference call meeting.  And it was Alan
4    Garza, Rebecca Marquez and Sylvia Martinez on the other
5    end of the call.
6              And according to the information that I
7    got from Alan Garza is we were supposed to have this
8    conversation to discuss some of the concerns about EVV.
9              And that phone call turned out to be a
10   bash meeting.  He was very upset.  He accused me and my
11   staff, the system being a failure because of us.  And I
12   was trying to explain that I didn't even get -- whatever
13   it was, I was going to say he basically shut me down and
14   said he didn't want to hear what I had to say, he wasn't
15   going to argue with me.  And I mean, I just literally
16   felt humiliated.
17             I think the staff, based on one of the
18   employee's actions, because Shayna Otting was just a
19   temp, they were fearful.  I was fearful.  Anna Fell
20   started removing her personal belongings.  And I do
21   remember asking her was she going to quit.  And she
22   said, no, I'm just taking my things home because, you
23   know, she felt like she was going to, you know, be
24   fired.  She didn't know if she was going to be there.
25   So that is one situation I do recall.

1    Q.    Okay.  Let's stay with that one situation.

2    A.    Uh-huh.

3    Q.    And it was a telephone conference between

4  Marquez, Martinez and Garza, Fell, Anna Fell --

5    A.    Anna Fell.

6    Q.    -- Miss Otting and yourself?

7    A.    Yes.

8    Q.    Okay.  What specific statements were made by

9  Mr. Garza that you say bashed you or your staff?

10    A.    Because I was being blamed for an issue.  And

11  this whole meeting was supposed to be to resolve

12  whatever concerns there were, but it was a meeting where

13  we were being blamed for the failure of this system.

14    Q.    And my -- and my question is --

15    A.    Go ahead.

16    Q.    -- what did he say?

17    A.    I don't remember exactly what he said.  But I

18  do know it was enough to cause fear in the people who

19  were in that room.

20    Q.    And I think you also testified that Mr. Garza

21  made statements that accused you and your staff of being

22  the reason for failure of some sort.  What were you

23  talking about?  What did you say?

24    A.    The failure of the EVV system.

25    Q.    From what you know, did that system fail

```
 1   completely?
 2        A.    I don't know.  I guess he didn't use those
 3   exact words but based on the information that he --
 4   based on the things that he said, things weren't going
 5   right with that system.
 6        Q.    Okay.  So things were not going well --
 7        A.    Uh-huh.
 8        Q.    -- with the system.  But he didn't say it was a
 9   failure either; is that right?
10        A.    He made inference.  It may not have been in
11   those exact words, but he made inference that the things
12   involving that system wasn't going right and it was our
13   fault.
14        Q.    Okay.  You also said that he shut you down.
15        A.    Well, I was trying to explain something to him,
16   and I couldn't express what I needed to express.
17        Q.    What were you trying to explain to him?
18        A.    I really don't remember.  Whatever it was, I
19   wasn't even able to communicate that.
20        Q.    Okay.  You also said that Mr. Garza said that
21   he was not going to argue with you.
22        A.    Uh-huh.
23        Q.    And what was -- what were you saying that he
24   made that comment to?
25        A.    Again, I was trying to say something, and he
```

1  shut me down.  Whatever it was that I was going to

2  express, he shut me down like I -- and I just remained

3  quiet because he was upset, and I didn't want to lose my

4  job, you know.  So I just kept quiet --

5      Q.   And so --

6      A.   -- and let him say whatever it was he said

7  during that conversation.

8      Q.   And so when you say he shut you down, that to

9  me is a conclusion.  What I'm trying to figure out is

10  what happened that led you to describe it, the conduct

11  of Mr. Garza in just -- for you to say that he shut you

12  down?

13      A.   Well, he raised his voice.  He did raise his

14  voice.  I could tell he was upset.

15      Q.   Okay.  But as to the specific statements of

16  Mr. Garza, you can't recall what the specific statements

17  were?

18      A.   I cannot recall what the specific statements

19  were because that has been a long time ago.  A lot has

20  happened between, you know, that time and now.  So I --

21  I don't remember everything that was said.

22      Q.   You also testified that Miss Fell stated that

23  she felt that she would be fired.  What other statements

24  did she make to you regarding her impressions from that

25  meeting?

1      A.    She was just upset.  Again, I do not remember
2  everything she said.  But when I saw her removing her
3  personal things and take them home, that was part of the
4  reason why she did that because she was afraid that she
5  was going to be fired.  I mean, there was conversation
6  in the office about how that meeting went, and people
7  were fearful.
8      Q.    Who was -- who were these conversations
9  between?
10     A.    Of course, I was there.  So Anna Fell, Shayna
11 Otting and Rae Cazares.  I do remember her being in the
12 office during this whole ordeal.  And I believe the door
13 may have been open, so I think she probably caught wind
14 of some of that because I do recall all of us engaged in
15 conversation.
16          But again, specifics, I don't recall,
17 other than Anna feeling fearful that she was going to be
18 fired.
19     Q.    Okay.  So just to be clear, you do not recall
20 any statements of the others, other than Miss Fell,
21 regarding their impressions of that meeting or what
22 their recollection of that meeting was?
23     A.    I mean, other than the meeting being -- them
24 feeling like it was inappropriate.  But, again, I can't
25 sit here and say to you that I remember exactly what was

1    said.

2       Q.   Okay.  So have you now testified as to all of

3    the facts that you recall pertaining to this telephonic

4    meeting regarding the EVV system on which you base your

5    contention that Mr. Garza discriminated against you on

6    the basis of your race?

7       A.   I'm sorry.  Repeat that.

8               MR. GARZA:  Can you read that back?

9               (Requested testimony read back by the

10                court reporter.)

11      A.   I would add that during that meeting, I did

12   feel humiliated and embarrassed because this was done in

13   front of the employees.  And I was fearful, so yes.

14      Q.   (BY MR. GARZA)  What caused that fear?

15      A.   Him raising his voice and him cutting me off

16   and not allowing me to express whatever it was that I

17   wanted to say.  And again, he sounded -- he was angry.

18   He was not happy at all.  It was aggressive.  So that's

19   what caused the fear for me.

20      Q.   Is there anything else pertaining to this

21   issue?

22      A.   Not that I can remember.

23      Q.   Okay.

24               MR. CAMMACK:  Do you want to think about

25   taking a lunch break?

1           MR. GARZA:  We probably should.

2           (At 12:50 p.m. the proceedings recessed,

3              continuing at 2:00 p.m..)

4      Q.   (BY MR. GARZA)  Okay.  We're back on the

5  record.  You were talking about the incidents or the

6  basis on which you say that Mr. Garza -- you feel

7  Mr. Garza discriminated against you on the basis of your

8  race.  We've gone there some things already.  We're not

9  going to rehash that.

10          But one of the things that we were talking

11 about is you said that he humiliated you in front of

12 employees.  You've already talked about the EVV call,

13 that issue.  Is there anything else other than the call

14 pertaining to the electronic visit verification system?

15     A.   Not that I can recall.

16     Q.   You also state that you feel that Mr. Garza

17 discriminated against you on the basis of your race

18 because you were not involved in important decisions

19 regarding the branch.  What decisions were you not

20 involved in?

21     A.   Again, I'm going to go back to the telephone

22 issue that I mentioned.

23          I'm sorry.  Repeat your question.

24     Q.   Sure.  You said that you were not involved in

25 important decisions regarding the New Braunfels branch.

1    What were those decisions that you were not involved in?

2                   Sorry.  Let me rephrase that.  I'm sorry.

3                   You said that you were not involved in

4    important meetings regarding the branch.  So that's what

5    I'm -- that's what I'm focusing on is the meetings

6    regarding the branch.

7        A.    Okay.  I don't have specifics, but based on

8    communications that Christina and I would have, there

9    were meetings that took place over in the San Antonio

10   office, and those are meetings that I should have been

11   involved in.  Again, I can't recall specifics because

12   that's been a long time ago, so I don't really recall.

13                  I can't recall at the moment specifics,

14   but I do know, based on conversations that Christina and

15   I had, there were meetings that I would question, well,

16   why wasn't I involved in this meeting that pertained to

17   issues with our branch?  But specifics, I can't give any

18   specifics.

19       Q.    And you can't -- you can't specify which

20   meetings they were?

21       A.    No.  Not off the top of my head.

22       Q.    Can you specify what the topics were?

23       A.    No.  It's been a long time, so I don't recall.

24       Q.    And so when you make reference to Christina,

25   are you talking about Christina Hernandez or --

1        A.    Christina Hernandez Ayala, my direct manager.

2        Q.    Okay.  So as we sit here today, have you

3   testified as to all of the -- have you testified that

4   you do not recall when or about what -- about -- let me

5   start that again.  Strike that.  Twice, if possible.

6              So as we sit here today, you cannot recall

7   the meetings that you say you were not involved in?

8        A.    Yes.  There were meetings that took place that

9   I questioned why I wasn't there.  But as it relates to

10  specifics, I can't say.

11       Q.    So did you question -- did you question in

12  writing or did you question verbally?

13       A.    Based on feedback that Christina would give me,

14  it was probably verbal.  If it was written in an e-mail,

15  I don't remember.

16       Q.    And do you remember any of the feedback that

17  Christina gave to you which caused you to question why

18  you were not involved in the meeting?

19       A.    That's been a long time ago.  I don't

20  remember.

21       Q.    Are there any documents that you've written,

22  have you kept notes that would help you refresh your

23  memory about that?

24       A.    I don't know, but if you have something that

25  you could give me, maybe that would refresh my memory.

1    Q.    Okay.  All right.  You also stated that there

2  were decisions made by Mr. Garza, Sylvia Martinez and

3  Rebecca Marquez on which you base your claim that you

4  were discriminated -- were discriminated against on the

5  basis of your race.

6              Now, you've already testified regarding

7  anything related to the conversation that you had with

8  Miss Marquez and Miss Martinez and Miss Otting.  Was

9  Mr. Garza involved in that conversation?

10   A.    Where we were in my office?

11   Q.    Yes.

12   A.    When you say involved, what do you mean?

13   Q.    Was he a participant in the conversation?

14   A.    He was not present.

15   Q.    Okay.  All right.  So then you also said that

16  Mr. Garza, Miss Marquez and Miss Martinez made

17  decisions, and that is the basis upon which you say you

18  were terminated, that you were discriminated against

19  because of your race?

20   A.    There were decisions that were made about that

21  branch that I would -- I couldn't -- that I didn't make.

22  I wasn't included in those meetings.  For example, the

23  meeting about the phone, when it was -- and I think I

24  said this before.  When the decision was made for the

25  phone calls to resume and hand us back that

1  responsibility, that was already a decision that was

2  made.

3      Q.    Okay.   What other decisions were made by

4  Mr. Garza, Miss Marquez and Miss Martinez that you say

5  support your contention that you were discriminated

6  against because of your race?

7      A.    Repeat the question.

8           MR. GARZA:   Read that back, please.

9           (Requested testimony read back by the

10              court reporter.)

11     A.    Everything that I said earlier, that's

12 everything that I'm going to stick to.  So whatever

13 information I shared earlier is the same response that I

14 want to stick to.

15     Q.    (BY MR. GARZA)  So then the decisions that you

16 testified about previously that Miss Martinez made, was

17 Mr. Garza involved in that?

18     A.    And what was that specifically?

19     Q.    Well, you said phone problems, there are were

20 client complaints and Miss Martinez disregarded

21 information that you were seeking.

22     A.    He was either involved via e-mail, some of this

23 stuff was -- transpired via e-mail.  I do recall his

24 name on e-mails, but if you have something that you can

25 show me, I -- that maybe that will refresh my memory.

1          As far as him being present at this one
2    particular meeting you're talking about, he was not
3    there, but he was involved in some way.  Whether he
4    directed them to come to the office to meet with me, his
5    name was brought up as to the reason why they were
6    there.
7          Q.    Who brought up his name?
8          A.    Sylvia and Rebecca, the reason why they were
9    there.  And I think there may have been some
10   communication, but again, I can't say with confidence
11   that it was a communication, that he was involved via
12   communication or, like I said, it was e-mail.
13         Q.    Okay.  So were there any other decisions that
14   were made by Mr. Garza and Miss Marquez and
15   Miss Martinez?
16         A.    In relation to?
17         Q.    In relation to your branch.
18         A.    Like I said, there were decisions that were
19   made about that branch that I was not involved in.
20   Basically, I was handed down a set of instructions, not
21   written, but this is how this is going to go.  Whatever
22   that may have been.
23         Q.    And you've already testified about any
24   decisions that were made by others and not by you.  Is
25   that right?

1      A.    Like I said, the decisions that were made,

2    Sylvia Martinez and Alan Garza, those decisions were

3    already made by them.

4      Q.    And I guess I need to find out from you is why

5    you believe Mr. Garza was involved in those decisions.

6      A.    A lot of the direction came from Alan Garza.

7      Q.    How do you know that?

8      A.    Either from an e-mail or a phone conversation

9    we had.  So if he directed them to meet with me or

10   whatever the situation may have been, it was his

11   direction.

12     Q.    Okay.  But if it's not in an e-mail and it's

13   not in another document, then you're relying upon your

14   memory to --

15     A.    No.  I'm relying --

16     Q.    You're relying on your memory for purposes of

17   saying that Mr. Garza was involved in the decision?

18     A.    I'm relying on communication that I had with

19   those individuals, instructions that they were given.

20     Q.    What instructions were they given?

21     A.    I cannot recall.  I do not remember.

22     Q.    That's what I'm trying to get to.  You don't

23   remember what the instructions were from Miss Marquez or

24   Miss Martinez, correct?

25     A.    I'm sorry.  Repeat that.

1    Q.    You don't remember the instructions -- or you
2  don't know of any instructions given to Miss Martinez
3  and Miss Marquez by Mr. Garza?
4    A.    What I'm saying is if they showed up at the
5  branch, they were instructed to do so by Alan Garza.
6    Q.    And --
7    A.    And this is based on either they say they --
8  we're here because Alan wants us to be here, or it could
9  have been communicated in an e-mail.
10    Q.    And so you're saying then that Mr. Garza was
11  the one who instructed Miss Marquez and Miss Martinez to
12  talk to you about the EVV system in your office?
13    A.    Yes.
14    Q.    Okay.  What other -- what other decisions
15  involved Mr. Garza then?  You gave me one instance,
16  which is the EVV system, conversation in your office.
17  Is there anything else?
18    A.    The telephone issue that I previously brought
19  up.
20    Q.    Okay.  And how do you know that he told you --
21  he was part of that process?
22    A.    When Christina and I discussed the whole issue
23  of the phones returning to that branch, his name was
24  brought up.  Sylvia's name was brought up.
25    Q.    In what regard?

1    A.    They made the decision to have the calls

2  returned to the New Braunfels branch.

3    Q.    So it's your testimony then Miss Martinez said

4  that it's -- the decision has been made -- essentially

5  the decision was made by Mr. Garza and Miss Marquez to

6  return phone calls to the New Braunfels branch?

7    A.    What I'm saying is Christina, when her and I

8  communicated regarding that issue, Alan Garza and Sylvia

9  Martinez -- I don't recall Rebecca being in that

10  conversation about the telephone calls being returned,

11  but their names were brought up, and that decision was

12  already made.  I had no involvement in that.  It was

13  never discussed with me that that was going to happen.

14  I just received a phone call one day from Christina, we

15  talked about it, and their names were brought up --

16    Q.    And their names --

17    A.    -- as the decision makers.

18    Q.    Okay.  So their names were brought up.  How?

19    A.    I can't -- this has been almost two years ago.

20  I do not remember that.

21    Q.    Okay.  And as far was the client complaints,

22  any decisions made regarding client complaints, how was

23  Mr. Garza's name brought up?

24    A.    In an -- he could have been CC'd on an e-mail

25  or just in communication.

1      Q.    And you're saying he could have, but I'm asking

2   what actually happened.

3      A.    Sir, I don't remember that.

4      Q.    Okay.  And I appreciate that because anything

5   can happen and anything is possible, but we --

6      A.    I agree with you.

7      Q.    -- have to go with facts.

8            You also said that Mr. Garza made you feel

9   incompetent.  Tell me the situations in which that

10   occurred.

11      A.    There was a situation that I remember

12   distinctly where I don't even know what he was working

13   on, but I was sent, I believe it was a Microsoft Excel

14   document.  And it was a document that I had never seen

15   before.  No one prepared me that I was going to be

16   receiving this e-mail.

17            And I do recall -- and I don't remember if

18   it was through e-mail, but I do recall having a

19   conversation with Christina about me not understanding

20   what he was requesting in that document.  And he did

21   make a comment that like I should have -- like I should

22   know what he's asking of me.  And Christina, she really

23   couldn't help me because, according to her, she really

24   didn't understand.

25            So she did share with me that she went to

1   his office and she shared with him that I needed help

2   understanding what he was requesting in that document.

3   And according to Christina, he became angry and slammed

4   his hand on the desk.  And I was kind of baffled as to

5   why he would be so upset just because I'm requesting for

6   understanding, because I didn't know what he was asking.

7   Because I had never seen that document.

8           And I do recall sending him an e-mail

9   asking him what he meant.  And again, he responded -- it

10  was negative.  I don't recall the exact response, but he

11  basically made an inference to I should understand or I

12  should know.

13      Q.   So the conversation you had with Christina

14  about this issue, when did that happen?

15      A.   I don't remember.

16      Q.   Was it telephonic or face-to-face?

17      A.   I believe we discussed it over the phone, and I

18  believe we also discussed it face-to-face because her

19  and I did -- excuse me -- her and I did meet.

20      Q.   Where did you meet?

21      A.   She would come to my office.  She would try to

22  make it every month until she was told to limit her

23  visits at the New Braunfels branch.

24      Q.   When was she told to limit her visits to New

25  Braunfels?

1    A.    I wouldn't have any idea when she was told

2  that.

3    Q.    How do you know that?

4    A.    She expressed that to me.

5    Q.    And did she express who informed her to

6  limit --

7    A.    Alan Garza.

8    Q.    Did she express why?

9    A.    Well, I asked her that question, why would he

10  say -- why would he tell you to limit your time here?

11  You're my superior, and I depend on her for support.

12    Q.    What did she say?

13    A.    I don't remember.

14    Q.    She didn't say anything, though, did she?

15    A.    I wouldn't say that.

16    Q.    You just don't remember?

17    A.    I do not recall.  That's been -- a lot of time

18  has passed since that happened.

19    Q.    Wasn't that interesting fact to remember, what

20  she said in response to what -- to what you-all were

21  talking about?

22    A.    What would be an interesting fact to me is why

23  would he tell her to limit her visits.

24    Q.    Can you think of any reason?

25    A.    Because he didn't want her supporting me.

RENEE RICHARDSON - 12/04/2018                Page 107

1       Q.    Can you think of any other reason?

2       A.    I feel a lot of what Alan Garza did was based

3   on the fact that I was black.

4             I rarely depended on Christina for -- I

5   wasn't really a needy manager, so him telling her to

6   limit her visits, I mean, why would he instruct her to

7   limit her visits if I had a concern or if I needed her

8   support at the branch?

9       Q.    And she told you that during a face-to-face

10  meeting?

11      A.    Like I said, it was either face-to-face or over

12  the phone, but we did have that discussion.

13      Q.    And you don't remember when it happened?

14      A.    A lot of time has passed by.  I do not remember

15  exactly when that happened.

16      Q.    What other incidents do you feel show that

17  Mr. Garza made you feel incompetent?

18      A.    Whenever we did have meetings -- and I just

19  remember on a couple of occasions he would involve

20  Sylvia and Rebecca.  And just based on what the meeting

21  was about, I couldn't understand why they were present.

22  So --

23      Q.    What were the meetings about?

24      A.    I don't recall.  I just know being in

25  situations, I remember how I feel -- how I felt.

1     Q.    So --

2     A.    Go ahead.  I'm sorry.

3     Q.    So if you don't remember the topics of the

4  conversation, you can't say that Sylvia and Rebecca

5  should not have been in those meetings?

6     A.    What I'm saying is there were situations where

7  we would have a phone conversation.  And there was a

8  time when he was at the branch discussing race

9  performance, and there was no reason for Sylvia to be

10  present.

11     Q.    As you understand --

12     A.    So it's situations like that.

13     Q.    As you understand it.

14     A.    It was another person's -- it was criticisms of

15  an employee he managed, and I just felt like it was

16  inappropriate for Sylvia to be there.

17     Q.    What was Sylvia's position?

18     A.    She was some type of supervisor.

19     Q.    Supervisor of people in the New Braunfels

20  branch?

21     A.    She was not supervisor -- a supervisor of

22  people of the New Braunfels branch.

23     Q.    Did she have any involvement in the New

24  Braunfels branch?

25     A.    Going back to statements that I made about her

1    involvement, again, decisions that where made.  But for

2    this particular instance, there was no reason for her to

3    be in a meeting like that.

4        Q.   And just so I'm clear, you do not remember what

5    her involve -- what her management involved pertaining

6    to people in the New Braunfels branch, do you?

7        A.   If you have a -- her job description, maybe I

8    can read some things.  But as far as I know of, she was

9    not supervising anyone over the New Braunfels branch.  I

10   was never --

11       Q.   Okay.

12       A.   -- told that she was responsible for

13   supervising people.

14       Q.   Okay.  So you said there was a couple of

15   meeting involving Sylvia and Rebecca, and you mentioned

16   this one meeting concerning Rae Cazares.

17       A.   Uh-huh.

18       Q.   What were the other meetings?

19       A.   Again, a lot of those meetings -- because the

20   whole EVV implementation, we met face-to-face.  I can't

21   say how many times exactly, but I know it wasn't

22   excessive.  It was very few times, but I'm not going to

23   give you a number because I don't know the exact number

24   of times.

25       Q.   Well, I'm talking about the meetings in which

1   you say that he -- Mr. Garza made you feel incompetent.

2       A.    Those were meetings that were, like I said,

3   conference calls.  The one where I go back -- or I have

4   to go back to the meeting where he was angry about the

5   EVV.  This meeting that we had, they were involved,

6   Sylvia and Rebecca.

7       Q.    Meeting about what?

8       A.    I'm going to get there.

9       Q.    Okay.

10      A.    The meeting about this document that I had

11  never seen, they were there.

12      Q.    The Excel spreadsheet.  Okay.

13      A.    Uh-huh.

14      Q.    What else?

15      A.    And then that's all I can recall right now.

16      Q.    Okay.  You also said that Mr. Garza belittled

17  you in front of staff.  So tell me what situations

18  occurred in which he belittled you in front of staff.

19      A.    It would be the same situations I brought up

20  before.

21      Q.    Okay.  And so from my memory, to encapsulate

22  what you said, what were those events?

23      A.    I gave them to you.

24      Q.    You're talking about the conversation

25  regarding -- or the Microsoft Excel document?

```
 1        A.     Repeat your question again.
 2                    MR. GARZA:  Read it back, please.
 3                    (Requested testimony read back by the
 4                    court reporter.)
 5        A.    Again, that would be the situations that I gave
 6   you examples of.
 7        Q.    (BY MR. GARZA)  Okay.  You just gave me the
 8   term "situations."  You have testified about a lot of
 9   things today.  So going back -- I'm going to try to
10   review these.
11        A.    That's what I was going to say, if you can
12   write off of what I wrote --
13        Q.    So you're talking about --
14        A.    -- or what I said.
15        Q.    You're talking about the Microsoft Excel
16   document?
17        A.    Uh-huh.
18        Q.    That's one; is that right?
19        A.    Yes.
20        Q.    Then there were the meetings involving Sylvia
21   and Rebecca.  Is that --
22        A.    What meetings are you referring to --
23        Q.    That's what I'm trying to --
24        A.    -- because I said a lot today?
25        Q.    Phone conversations.  There were phone
```

1    conversations, the EVV implementation?

2         A.   Yes.

3         Q.   Okay.  And so other than those, I don't

4    remember any others where you said that Mr. Garza

5    belittled you.  So I'd ask that you would help me and

6    let me know.

7         A.   There were other instances, but those are

8    the -- the instances that I gave you, those are

9    situations that I do recall, I can recall, because of

10   how those meetings -- how he reacted and those meetings

11   made me feel, the people who were involved.  So I can't

12   make up something.  I'm not going to sit here and make

13   up something.

14        Q.   And I appreciate that.

15        A.   But I'm going to stick to the things that I can

16   remember.

17        Q.   And those things that you remember and which

18   you've testified previously, you're saying that if

19   Mr. Garza was involved, that -- that he -- that you

20   specified that he belittled you.  Is that what you're

21   saying?

22        A.   What I'm trying to describe here today is the

23   way that he made me feel.  He made me feel incompetent

24   by some of the things that he said in front of those

25   individuals.  And I couldn't figure out why are these

1    people even here.  There were times I felt humiliated

2    because he made me feel incompetent.

3         Q.    Okay.

4         A.    It was embarrassing.

5         Q.    And so the -- it sounds to me then what you're

6    saying is the belittling is the making you feel

7    incompetent and the humiliation?

8         A.    That's not everything.

9         Q.    Those are the examples.

10        A.    That -- those are the things that I felt

11   strongly about.

12        Q.    And all I'm saying is those are examples that

13   you've given us --

14        A.    Yes.

15        Q.    -- today?

16        A.    Those are examples.

17        Q.    Okay.  All right.  You said that Mr. Garza did

18   not address your complaints.  What complaints were

19   those?

20        A.    I'm sure I had a lot of complaints, because

21   there was a lot of issues going on at that branch.

22        Q.    What were the complaints?

23        A.    Can you narrow the question?

24        Q.    Sure.

25        A.    Do you have anything specifically?

1      Q.    What were the complaints that you had that

2    Mr. Garza did not address during the time you were the

3    branch manager at the New Braunfels, Texas location?

4      A.    Well, some of them I've already named off.

5    Like the resources, that was the big -- one of the

6    bigger issues, not having the resources.

7                I was also concerned about the census.

8    That was one of -- I believe the first concerns I had,

9    because the census was declining before I got there, and

10   that knowledge is based on my communications with the

11   staff.  That was also based on my communication with Rae

12   Cazares.

13     Q.    What other complaints besides resources and the

14   census?

15     A.    Of course, there was complaints with EVV, the

16   system not working properly.  There was little

17   communication between our branch and the San Antonio

18   branch.  And some of these complaints did go through

19   Christina, but those specifically I do recall expressing

20   to Mr. Garza, so Christina was then involved as far as

21   me communicating with her.

22                Employees were committing fraud, the field

23   employees that I complained about.  There was also

24   instances where the staff were being verbally abused by

25   the San Antonio staff.  Employees were cursed at in the

1    New Braunfels branch.

2              Now that I'm remembering, I also made a

3    complaint to HR about -- I had a concern about one of

4    the employees, and it was based on information that I

5    received from employees at the branch, as well as things

6    that I found strange that were completely disregarded.

7         Q.   Do you remember the name of that employee?

8         A.   Who I had concerns about?

9         Q.   Yes.

10        A.   Judy.   I believe Judy Hernandez.

11        Q.   Okay.   What other complaints do you say that

12   Mr. -- were not addressed by Mr. Garza?

13        A.   Well, that one wouldn't be a direct complaint.

14   I don't know if that was communicated with HR, but that

15   was not a direct complaint to him.

16             We had a very high turnover, employee

17   turnover with the field staff.   There were also issues

18   with staff in the office.   I did have complaints about a

19   previous employee, and he was frustrated by the same

20   employee.   Her name was Colleen Shelton.

21             I also complained about Norma Leal.   She

22   was very rude to clients as well as the office staff.   I

23   did -- because San Antonio hired a marketer, he made the

24   decision to hire a marketer.

25        Q.   Who made the decision?

1    A.    Not a marketer.  I'm sorry.  This person worked

2    on recruiting.  And I did ask about the New Braunfels

3    branch receiving a recruiter.  There was no money in the

4    budget for that.  And it was later on when he did decide

5    to hire a recruiter, it was around January.

6        Q.    Of what year?

7        A.    The same time I got fired.  So it would have

8    been 2017.

9                    I cannot remember everything.  There's

10   probably some other things I complained about, but I

11   don't remember everything.

12       Q.    Okay.  Well, we have a lot to go over.  So tell

13   me about the -- have you testified as to all of the

14   complaints that you made regarding not having enough

15   resources?

16       A.    Yes, I have.

17       Q.    All right.  Tell me what complaints you made

18   regarding the census.  Who did you complain to, what was

19   said, was it in writing, was it verbal, how often?

20       A.    I do know it was Alan Garza.  It was also

21   Christina Hernandez.  But the first person I spoke to

22   about the census was Alan Garza.

23       Q.    When did you speak with him about the census?

24       A.    I don't remember.  I do recall him coming to --

25   to the office.  And I think this was prior to him being

1   hired in this position.

2       Q.    What was -- sorry.

3       A.    And the reason I expressed that as a concern

4   is because the employees who worked there shared that

5   they noticed a drop in the census.  Rae also had

6   concerns about there being a decrease in the number of

7   clients.

8       Q.    And that's a major concern, of course, isn't

9   it?

10      A.    Me being the branch manager, that is a major

11  concern because --

12      Q.    That's your responsibility, maintaining the

13  census and growing it; isn't that right?

14      A.    That was Rae Cazares's responsibility, that is

15  what she was hired for.

16      Q.    So you have no accountability for any of the

17  census issues?

18           MR. CAMMACK:  Objection, form.  Misquotes

19  the deponent.

20      Q.    (BY MR. GARZA)  Are you saying that you had no

21  responsibility in a relation to the census?

22      A.    I was not given that responsibility.  When I

23  first started working alongside Rae, that was her

24  responsibility.  And according to Rae, Eileen McClary

25  managed her before Alan took over.  Because her and I

 1    talked about this because she was so concerned about it.
 2    She informed me that Eileen McClary gave her a number of
 3    referrals as a target or as a goal per month.  And that
 4    was five to seven clients per month.  That's --
 5    according to Miss Cazares, that is the only goal that
 6    was established.
 7        Q.   If you look at the Deposition Exhibit No. 8,
 8    would you agree with me --
 9        A.   No. 8?
10        Q.   Yes.
11        A.   What page?
12        Q.   Look at page 15.
13        A.   Okay.
14        Q.   Would you agree with me that the census and the
15    maintaining of the census falls under 2I pertaining to
16    managing the operations of the branch in accordance with
17    established physical parameters?
18        A.   Do you mind if I read that?
19        Q.   Not at all.
20        A.   And you said 2?
21        Q.   "I."
22        A.   "I."
23             I'm sorry, but I cannot agree with you.
24        Q.   Why is that?
25        A.   Because this says managed operations of the

1  branch in accordance with the established physical
2  parameters.
3          I do not see in here where it talks about
4  the census.  When the census was discussed, that was in
5  relation to the number of referrals that were received.
6  So I don't see anything that says anything about the
7  census or that it was my responsibility.
8      Q.   And so just so I'm clear, you're saying that
9  maintaining and growing the patient clients that the New
10 Braunfels branch had was not your responsibility in any
11 way?  Is that what you're saying?
12     A.   I was never told that me going out to market
13 and recruit -- I don't like to use the word "recruit" --
14 but to do outreach or marketing to increase the number
15 of referrals, that was never communicated to me.
16     Q.   And so --
17     A.   That was Rae's responsibility.
18     Q.   Well --
19     A.   That is why she was hired.
20     Q.   What responsibility did you have as manager of
21 the New Braunfels branch to maintain and/or increase the
22 census of patients of the branch?
23     A.   I would have to say my responsibility as a
24 branch manager was to work with Rae, to find out if Rae
25 was having any challenges meeting whatever her target

1    was, the five to seven clients per month.  If she was

2    encountering issues, as the manager, it was my

3    responsibility to work with her.

4              And that was her expertise.  That's why

5    she was hired.  She had worked in that field for quite

6    some time.  She was actually trained by Martha

7    Henderson, who was the marketer at the San Antonio

8    branch.

9              So I think, as the branch manager, and all

10   that was going on at that particular branch, my job was

11   to ensure that we had the field workers to facilitate

12   that.  I mean, if we don't have provider assistant

13   workers to take care of those clients that she was

14   referring to the branch, I mean, I don't see how you can

15   maintain that if you don't have the workers.

16             So what we experience is she was making

17   referrals.  A lot of times, she exceeded the number that

18   she was given by Eileen McClary.  But because we were

19   having such a high turnover, there was no way we were

20   going to be able to keep those -- to be able to take

21   care of those clients that she was bringing in for the

22   branch.

23        Q.   And so as far as the turnover is concerned,

24   that was your responsibility too, right?

25        A.   That was everyone who was involved with

1    managing the branch.

2        Q.    But you're the top of that food chain, you're

3    the manager.  And so making sure that the turnover is

4    low or making sure you have enough qualified personnel

5    to maintain appropriate staffing levels, that's your

6    responsibility?

7        A.    What my responsibility was, when Rae complained

8    about us not having workers, I presented a proposal.

9    That was part of me addressing what her concern was, as

10   well as the other employees' concerns were.  And that

11   was rejected by Alan Garza on more than one occasion.

12                   MR. GARZA:  Objection, nonresponsive.

13                   Would you read my question, please.

14                   (Requested testimony read back by the

15                    court reporter.)

16       A.    That was not solely my responsibility.

17       Q.    (BY MR. GARZA)  But that is one of your

18   responsibilities in your job description, right?

19       A.    There was a person there hired to do

20   recruiting.

21                   MR. GARZA:  Objection, nonresponsive.

22       Q.    (BY MR. GARZA)  Did you understand my question?

23       A.    Rephrase your question.  If you can give me a

24   specific --

25                   MR. GARZA:  Would you please read my

1    question?

2         A.    -- example?

3               (Requested testimony read back by the

4               court reporter.)

5         A.    I'll have to read the job description again.

6         Q.    (BY MR. GARZA)  Let me help you.  Essential

7    functions.  It's on page 15, number 1d.  Tell me if I'm

8    reading this correctly.  And this is part of your job.

9    "Recruits, employs and retains qualified personnel to

10   maintain appropriate staffing levels.  Conducts timely

11   evaluations of staff."

12               Did I read that correctly?

13        A.    You did read that correctly.

14        Q.    Good.  Okay.

15        A.    But I'm not agreeing to you saying that that's

16   my responsibility.  What I feel like this is in relation

17   to -- because I did not hire field staff.  That was an

18   administrative assistant who was hired to do that.  I

19   oversaw that position, but that -- someone was

20   specifically hired to do that.

21        Q.    So it was somebody else's job to do number 1D

22   of the branch manager job description.  Is that what

23   your testimony is?

24        A.    I hired -- I recruited the administrative

25   staff.  There was one situation where that -- there was

1    a person -- there was no person in that particular role

2    to recruit field staff, because that's what we're

3    talking about, field staff.

4         Q.    I didn't say field staff.

5         A.    Well, that's what I'm talking about.  When you

6    talk about recruiting, it being my job to hire field

7    staff, what I'm trying to indicate to you is that there

8    was someone hired to recruit the field staff.  And that

9    was Colleen Shelton initially.

10        Q.    And you were her boss, right?

11        A.    Colleen Shelton?

12        Q.    Yes.

13        A.    Not in the beginning.

14        Q.    You were her boss?

15        A.    But when I took over effective July of 2015,

16   yes.

17        Q.    Okay.  That's why -- do you agree with me that

18   is why your job description under item 1D says that you

19   are responsible and your essential function is to

20   recruit, employ, retain qualified personnel?

21        A.    But that's a -- to me, that's a generalization.

22   So if you can be more specific.  Because the high

23   turnover is the field staff, and that's directly related

24   to the census.

25        Q.    And that is your responsibility.  Isn't that

1   right?

2            MR. CAMMACK:  Objection, form.

3       Q.   (BY MR. GARZA)  Per your job description.

4       A.   To hire field staff?  Is that what you --

5       Q.   Yeah.  Under 1D.

6       A.   All I can say is someone was hired to do that.

7            MR. GARZA:  Objection, nonresponsive.

8       Q.   (BY MR. GARZA)  Did you understood my question?

9       A.   Can you repeat?  Can you rephrase the question?

10  I don't want you to repeat it.  If you can rephrase your

11  question and be more specific.

12           MR. GARZA:  Would you please read the

13  question.

14           (Requested testimony read back by the

15            court reporter.)

16      A.   There were field staff, there were

17  administrative staff, there were even R.N.s that worked

18  at that branch.  So that's why it's very difficult for

19  me to agree to your statement, because I wouldn't have

20  hired an R.N. staff.  Because I'm not qualified to do

21  so.  I can assist Christina, who is qualified.

22      Q.   (BY MR. GARZA)  But the others, you are

23  qualified to hire, right?

24      A.   The administrative staff as well as --

25      Q.   Field staff.

1    A.    -- the field staff.

2    Q.    Okay.

3              MR. GARZA:   What number are we on?

4              THE COURT REPORTER:   12.

5              (Exhibit 12 marked.)

6    Q.    (BY MR. GARZA)   I'm going to hand to you what's

7    been marked as Deposition Exhibit No. 12.   And this is

8    your performance appraisal for -- well, dated April 8,

9    2016.   Have you seen this document before?   You signed

10   it, right?

11   A.    Yes.

12   Q.    Okay.   And you see right above that supervisor

13   and appraiser comments?

14   A.    Yes.

15   Q.    Is there anything in here -- why don't you take

16   a look at this.   Is there anything in here that

17   references the census?

18   A.    I do see on number six where is says increase

19   the census.

20   Q.    All right.   And so that was a goal for you to

21   achieve was to increase the census, correct?

22   A.    That was not my responsibility.   Rae was hired

23   to bring in clients.   That was her job.

24   Q.    And you had no responsibility for that to

25   increase the census, is that what you're saying?

1       A.    That was Rae's job.

2       Q.    So you're -- is that a yes?

3       A.    He did put that as a goal.

4       Q.    Yes.

5       A.    So he wanted me to spend time out in the field

6   with Rae, which I did.

7       Q.    With the goal of increasing the census, right?

8       A.    It says here spend time out on the field with

9   Rae to ensure that we are well-known out in the

10  community.

11      Q.    And number six does that have any of that, all

12  it says is increase the census?

13      A.    That was not --

14      Q.    Did I read that correctly?

15      A.    -- my job.

16      Q.    Did I read that correctly?

17      A.    You did read that correctly, but I do not agree

18  with you.  That was not my job.  That was Rae's

19  responsibility.  Alan Garza supervised Rae, he wasn't

20  punished.  He didn't have any recommendations for

21  increasing the census.  And she requested to meet with

22  him on multiple occasions, and he refused to do so.

23      Q.    He refused to meet with Rae Cazares?

24      A.    Yes.  Rae wanted to meet with him --

25      Q.    And how do you know that?

1     A.     -- I do believe.  Because we discussed it.  I

2   requested, I believe, twice for her.

3     Q.     When did you talk to Mr. Garza about that?

4     A.     I have no idea when I talked to him, but I do

5   know it was a phone conversation.  I do recall it being

6   a face-to-face conversation.  And specifically the time

7   he met -- the time he was there, and I referenced this

8   earlier, where Sylvia was included in that meeting.  So

9   that was a face-to-face request on her behalf.

10    Q.     And you're saying he never met with Rae

11  Cazares?

12    A.     To my knowledge, he and Rae never had a

13  one-on-one meeting to discuss the census.

14    Q.     Okay.  Is that what you had asked him to meet

15  with her about, the census?

16    A.     I expressed to him that Rae had concerns about

17  the census because she was frustrated that she was

18  bringing all these people in and those people weren't

19  able to be seen.  We were losing clients because of that

20  reason.  And he didn't meet with her.  But he did tell

21  her that he was going to include her in a marketing

22  meeting that took place --

23    Q.     How did --

24    A.     -- with the owner.

25    Q.     How do you know that he did not meet with her?

```
 1        A.   Rae communicated this to me.  She was very
 2   frustrated by his -- her -- by him dismissing her
 3   request.  So as far as I know, based on the things that
 4   she told me, he did not communicate -- he did not meet
 5   with her about the census.
 6                    (Exhibit 13 marked.)
 7        Q.   (BY MR. GARZA)  I'll hand to you what's been
 8   marked as Deposition Exhibit No. 13.  Have you seen that
 9   document before?
10        A.   I do recall this.
11                    MR. CAMMACK:  Did you say 15?
12                    MR. GARZA:   Thirteen.
13        Q.   (BY MR. GARZA)  If you would look on page 387.
14        A.   Uh-huh.
15        Q.   And this was filled out by you, right?
16        A.   I would have to read this.
17        Q.   Go ahead, please.  Read the whole thing.
18        A.   Okay.  And what is your question?
19        Q.   Look under -- you filled out this document.
20   Isn't that right?
21        A.   As far as I can remember.  I don't see a
22   signature or anything, but --
23        Q.   Well, you --
24        A.   -- as far as I remember, based on this.
25        Q.   Part of the process is to fill out the
```

1    self-assessment?

2        A.    Yes.

3        Q.    And that's what this is, correct?

4        A.    Yes.

5        Q.    Okay.  If you look under 3, the title is

6    Organizational Goals.

7        A.    Uh-huh.

8        Q.    Item number 2 says, "Increase census count by

9    30-50 clients by April 1, 2017."

10       A.    Okay.

11       Q.    You put that in there; isn't that right?

12       A.    That's what it says.

13       Q.    Okay.  So you at least acknowledged that one of

14   the goals that you had was to increase the census,

15   right?

16       A.    It was my goal to assist Rae in increasing the

17   census.

18       Q.    You as the manager would benefit greatly if the

19   census increased; isn't that right?

20       A.    Alan would have benefited greatly because Rae

21   was -- Rae -- he managed Rae.

22       Q.    It's your branch.

23       A.    It was also his branch.

24       Q.    So you acknowledge that that is one of the

25   things that you were responsible for, which was

1   increasing the census in this self-assessment?

2       A.   No, I do not agree to that.

3       Q.   Okay.

4       A.   I wrote this, but it was a goal to help Rae.

5   And I felt like the way I was able -- I could help her

6   was to work with upper management to address the

7   recruiting issues.

8       Q.   And you would agree with me that this

9   self-assessment, what you're referring to, does not --

10  does not reference Rae Cazares in any way regarding

11  increasing the census.  Isn't that right?

12      A.   It does not reference her.  But that was a goal

13  of mine to work in conjunction with her.

14              MR. CAMMACK:  Can we take a quick break?

15              MR. GARZA:  Sure.

16              (At 2:58 p.m. the proceedings recessed,

17                 continuing at 3:19 p.m..)

18      Q.   (BY MR. GARZA)  So we were talking about the

19  complaints that had not been addressed, and we spoke

20  about the census.  I think you've already testified

21  regarding the employee visit verification; is that

22  right?

23      A.   Yes.

24      Q.   EVV.  Is there any other conversations you had

25  about the EVV with either Mr. Garza or anybody else?

1      A.    Other than the fact that it was a complete mess

2    and it took a very long time to address the issues that

3    were going on with that system.

4      Q.    But you've already testified about all the

5    comments that you made in the meetings, right?

6      A.    From what I can remember.

7      Q.    Okay.   Okay.   Just trying to get through these

8    topic.

9            You said that there were very little

10   communication between San Antonio and New Braunfels.

11   Now, New Braunfels was a branch.   Was that under the

12   same umbrella of the San Antonio office?

13     A.    I would imagine because I do recall receiving a

14   licensure.   And when they -- because I guess they have

15   to renew every so often.   And I think that license was

16   the same as the San Antonio branch.

17     Q.    Okay.   And you said that you complained that

18   there was little communication between San Antonio and

19   New Braunfels.   What do you -- what did you mean by

20   that?

21     A.    Again, going back to expectations, the EVV

22   primarily, there was just lack of miss -- lack of

23   communication.

24     Q.    And you specifically mentioned the EVV.   Is

25   there any other examples of the lack of communication

1    between New Braunfels and the San Antonio office?

2        A.    I'm sure there were other instances.  But

3    again, a lot of time has passed and I cannot remember

4    everything.

5        Q.    Do you remember anything about other than what

6    you've already testified about concerning that lack of

7    communication?

8        A.    Again, I would have to relate it back to -- I

9    can't recall everything.  But Alan was aware that there

10   was a lack of communication between both branches and --

11   because information wasn't shared with the New Braunfels

12   branch.

13       Q.    And so when you make that kind of statement, I

14   understand that you're saying Mr. Garza was aware.  But

15   I'm trying to figure out what was the lack of

16   communication?  What did it concern?  Because that's

17   what we're having to deal with.  We're having to --

18   you're going to have to testify at some point regarding

19   what that --

20       A.    Uh-huh.

21       Q.    -- what the topic or what the substance of

22   that -- of the issues were.  You said lack of

23   communication --

24       A.    The census --

25       Q.    And my question is:  About what?

1        A.    The census.   There were no specific goals.

2   Even though it was not my responsibility to bring in

3   clients, Rae did not have any goals other than she

4   was -- other than the goals that she was given from her

5   previous boss.

6        Q.    Okay.   Other than the census?

7        A.    Other than the census, again, changes with EVV.

8   And I've talked about that.

9        Q.    Right.   Anything else?

10       A.    There may have been discussions revolving --

11   involving the -- let me get my thoughts together.

12   Involving the other issue, which was the recruiting of

13   the field clients.

14       Q.    Recruiting of the field clients?

15       A.    I mean, the field -- I'm sorry.   The field

16   staff.   That's what I meant to say.

17       Q.    So there was a lack of communication regarding

18   field staff?

19       A.    Yes.

20       Q.    Have you already testified as to all the facts

21   on which you make -- make -- which you base your

22   statement that there was a lack of communication

23   regarding field staff?

24             I think I need to rephrase that.

25             Have you now testified to all the facts on

1   which you base your allegation that you complained to

2   Mr. Garza about the lack of communication regarding

3   recruiting of field staff?

4       A.   I'm not going to say that was everything.

5   Again --

6       Q.   Other than what you've already testified, is

7   there anything new you want to add at this point?

8       A.   That's all I can remember.

9       Q.   Okay.  You also stated that you complained to

10  Mr. Garza about employees committing fraud.  What do you

11  mean by that?  Explain what you mean by that.

12      A.   Employees who -- because they were on time

13  sheets at one point.  And I would have clients who would

14  call upset because those employees weren't present, but

15  they claimed that time on their time sheet.  And after

16  talking with the client and verifying time sheets, those

17  individuals had committed fraud.  And I had mentioned

18  that to Christina as well as Alan Garza.

19      Q.   And so did you identify those individuals who

20  had, you say, committed fraud?

21      A.   I'm pretty sure at some point.  But

22  specifically I don't remember that.

23      Q.   And did you -- did you identify those

24  individuals in an e-mail communication to Mr. Garza or

25  Miss Hernandez?

1    A.    I don't remember.  But I do recall having

2  conversations regarding employees abusing the time

3  sheets.  And again, I can't recall if that was

4  face-to-face or via e-mail.

5    Q.    Okay.  And did you -- did you have any

6  suggestions as to how that could be reduced or

7  eliminated?

8    A.    One of the suggestions was to write those

9  individuals up.  As we discover people who are

10  violating -- because, I mean, it's against the law.  So

11  I did propose a recommendation to take progressive

12  measures to write those individuals up.  Even verbal

13  warnings all the way up through termination, if that's

14  what it took.

15    Q.    And Mr. Garza agreed to that.  Isn't that

16  right?

17    A.    I would not say.  I don't recall him agreeing

18  to it.

19    Q.    Okay.  And so -- but you think that that would

20  be an appropriate thing to do, would be to write people

21  up for -- for misrepresenting what it is that they

22  actually did or did not do?

23    A.    I do believe that is appropriate to take

24  progressive discipline --

25    Q.    Okay.

1    A.    -- related to fraud.

2    Q.    Was there any time when the purpose of the

3 tokens, the EVV tokens, was to eliminate the need for

4 time sheets?

5    A.    That was the overall goal of that system being

6 implemented.  But I -- as far as I can remember, we were

7 still using time sheets in conjunction with the EVV

8 system.

9    Q.    And in conjunction in order to fill gaps.

10 Isn't that right?

11    A.    Yes.

12    Q.    Okay.  And it was not the -- the primary method

13 by which time sheets were kept or the visits were kept,

14 the EVV system was the primary system.  Isn't that

15 right?

16    A.    The EVV system, that was the goal of the State

17 to eliminate paper time sheets.

18    Q.    Yes.  That's exactly right.  And it was for

19 purposes of verification of when the employee was there.

20 Isn't that right?

21    A.    Correct.

22    Q.    Okay.  And that's what The Med Team was working

23 towards?  That's what their goal was too.  Isn't that

24 right?

25    A.    That's what our goal was, to eventually

1    eliminate the paper time sheets.

2         Q.    Okay.   From what you can remember, were there

3    any other communications between you and Mr. Garza or

4    Miss Christina Hernandez regarding your allegations that

5    there were employees who were committing fraud other

6    than what you've already testified to?

7         A.    Were there any other situations?

8         Q.    Any other communications.

9         A.    Regarding the fraud?

10        Q.    Yes.

11        A.    Do you have a document that you can show me?

12        Q.    No, ma'am.   I'm asking you from what you can

13   recall.

14        A.    From what I recall, that's the only thing that

15   I can remember at this time.

16        Q.    Okay.   You also said that you complained

17   that -- you complained to Mr. Garza that the New

18   Braunfels staff was being verbally abused by the San

19   Antonio staff.

20        A.    Yes.

21        Q.    Who specifically was -- of the San Antonio

22   staff verbally abused any of the New Braunfels staff?

23        A.    I can't remember names.

24        Q.    Do you remember specific situations?

25        A.    I do recall one situation where I was in San

```
 1   Antonio, and I don't remember what for.  But I do recall
 2   Judy Hernandez being upset because of one of the
 3   employees that -- there were two occasions.  There was
 4   an issue with the person in payroll, and there was an
 5   issue with the recruiter from San Antonio.
 6             So the situation with the recruiter from
 7   San Antonio, from what I can remember, Judy Hernandez
 8   and some of the other employees, but I remember her
 9   specifically because she was crying and upset.  And she
10   said that this individual talked down to her.
11        Q.   Who --
12        A.   And I don't know what was said because I was
13   not there.
14        Q.   Who was the individual?
15        A.   I cannot remember her name.
16        Q.   Okay.
17        A.   I don't remember her name.
18             And I did address that with Christina, who
19   I believe informed Alan.  But at some point, Alan was
20   involved on a communication, as far as I can remember.
21   I do recall an e-mail.  And according to Christina, he
22   basically made the statement, and it's not an exact one,
23   but from what I recall, he made a comment that made it
24   okay what happened.
25        Q.   What was the comment?
```

RENEE RICHARDSON - 12/04/2018                    Page 139

1      A.    I don't really recall the comment exactly, but
2   it was a comment in relation to the employees.  They
3   should be able to take criticisms.
4      Q.    Well --
5      A.    Something to that effect.
6      Q.    So did Miss Hernandez tell you that this
7   recruiter cursed at her?
8      A.    I'm sorry.  Repeat that.
9      Q.    Did Miss Hernandez, Judy Hernandez, tell you
10  that that this recruiter cursed at her?
11     A.    Not in this instance, no.
12     Q.    Did Miss Judy Hernandez tell you the specific
13  statements that was made by this recruiter?
14     A.    I'm sure she did, but I don't remember.
15     Q.    Okay.  And so what I'm trying to figure out is
16  what led you to believe that it was something that was
17  inappropriate?
18     A.    She was crying and upset, and other people
19  witnessed this.
20     Q.    And anybody could be upset by any kind of
21  comment.  Isn't that right?
22           MR. CAMMACK:  Objection, form.
23  Speculation.
24     Q.    (BY MR. GARZA)  So here is my question:  Am I
25  correct in saying you don't know what the comment was

1   that was made by the recruiter to Judy Hernandez --

2             MR. CAMMACK:  Objection, form.

3       Q.   (BY MR. GARZA)  -- that she says --

4             MR. CAMMACK:  Asked and answered.

5       Q.   (BY MR. GARZA)  -- that she says upset her?

6       A.   Repeat your question.

7       Q.   Sure.  You do not know what the comment was

8   that this recruiter allegedly said to Judy Hernandez

9   that caused Judy Hernandez to be upset?

10            MR. CAMMACK:  Same objection.

11      Q.   (BY MR. GARZA)  Right?

12            MR. CAMMACK:  Asked and answered.

13      A.   Now I don't know.  I do not remember because

14  that happened a while ago.

15      Q.   (BY MR. GARZA)  Okay.

16      A.   Time has passed.

17      Q.   Let's talk about the payroll person.  First of

18  all, what was that person's name?

19      A.   I don't remember her name.

20      Q.   All right.  Tell me what Judy Hernandez said

21  that this payroll person did.

22      A.   She did express to me that this person cursed

23  at her.

24      Q.   What was the statement made by this payroll

25  person to Judy Hernandez?

1      A.    I do not recall.  That -- Judy was not only

2  person who informed me that she was verbally abused.

3      Q.    Who were the others that informed you that they

4  were similarly verbally abused?

5      A.    Rae Cazares.

6      Q.    Who else?

7      A.    As it relates to the cursing, I don't recall

8  anyone.

9      Q.    Well, let's broaden it up then because if

10  it's -- if it incorporates more than just this payroll

11  person or the recruiter or cursing, I want to be clear

12  that you're saying that you complained about this to

13  Alan Garza --

14      A.    As well as Christina Garza.

15      Q.    As well as Christina Hernandez?

16      A.    I meant Christina Hernandez.  Yes, you're

17  right.  I'm sorry.

18      Q.    So then let's stick first right now with this

19  payroll individual and interaction with Judy Hernandez.

20  Do you recall the curse words used?

21      A.    A lot of time has passed.  I do not remember.

22      Q.    Okay.  Did Miss Hernandez put that complaint to

23  you in writing?

24      A.    I don't remember.

25      Q.    Okay.  Did you advise Miss Hernandez on next

1  steps as to what she should do?

2      A.   Well, I did, like I always would tell the staff

3  to -- any complaints like that, that should happen in

4  the future, let me know and I'll address it with

5  management.

6      Q.   And what did you do to address that with

7  management?

8      A.   I talked to Christina and Alan Garza.

9      Q.   Did you talk to human resources?

10     A.   About the verbal abuse?

11     Q.   Yes.

12     A.   I was following the chain of command.  So I do

13 not recall discussing this specifically with HR, but I

14 did discuss it with Christina Hernandez and Alan Garza.

15     Q.   And you're saying that you were not satisfied

16 with the response.  Am I -- isn't that correct?

17     A.   What was his response?

18     Q.   I don't know.  You tell me.

19     A.   His response on one of the issues was what I

20 mentioned before.

21     Q.   Were you satisfied with that response?

22     A.   Was I satisfied with the response?  What do you

23 mean?

24     Q.   Well, did it resolve the issue?

25     A.   Nothing happened.  The issue wasn't addressed.

1    Q.   So then why didn't you go to human resources?

2    A.   Because I was afraid that when I made

3  complaints like that, I have fear that I would lose my

4  job.

5    Q.   Who was the human resources -- corporate human

6  resources at the time?

7    A.   I don't recall.

8    Q.   Okay.  Who was the local human resources?

9    A.   I do know Fran Gonzales.  I don't remember

10  the -- well, Heather Sigmund, she was another person.

11  And there was another person, but I can't remember her

12  name.

13    Q.   You acknowledge that you could have gone to

14  corporate human resources about it, right?

15    A.   I could have, but I still feared that I would

16  lose my job.

17    Q.   And so tell me about all other complaints other

18  than this payroll individual and the recruiter position.

19  The recruiter person who you say verbally abused Judy

20  Hernandez, were there any other situations similar to

21  that that you complained of to either Alan Garza or

22  Christina Hernandez.

23    A.   Well, I mean, staff did have complaints about

24  the way they were talked to.  Again, I do not remember

25  specifics other than the ones I mentioned.

1    Q.    But did you talk to Mr. Garza or Miss Hernandez
2  about those other complaints?

3    A.    I'm sure I did.

4    Q.    Okay.  Tell me what was said during those
5  conversations.

6    A.    That happened months go.  I do not remember.
7  The specifics that I do recall, that is what I gave you.
8  I cannot recall other instances.  I do know that there
9  were complaints that was made.

10    Q.    And the only one that you specifically remember
11  is Judy Hernandez?

12    A.    Other employees made -- like I said, Rae
13  Cazares made a complaint.

14    Q.    So tell me about that one.

15    A.    I think I shared that with you, that she
16  mentioned to me that she was cussed by one of the San
17  Antonio employees.

18    Q.    Who was it?

19    A.    What do you mean, who was it?

20    Q.    Who cussed her?

21    A.    I can't remember that.

22          MR. CAMMACK:  Objection, form.  Asked and
23  answered.

24          It's almost every question you ask her,
25  you've already asked her.

1              MR. GARZA:  I don't seem to remember it.

2    Maybe I'm just not remembering.

3              MR. CAMMACK:  Okay.

4       Q.   (BY MR. GARZA)  What was -- what was the cuss

5    word?

6              MR. CAMMACK:  Objection, form.  Asked and

7    answered.

8       A.   I don't remember.

9       Q.   (BY MR. GARZA)  You don't remember?  Okay.

10             You also said that you made a complaint to

11   human resources regarding Judy Hernandez.

12      A.   Yes.

13      Q.   What was the complaint that you made about Judy

14   Hernandez?

15      A.   Employees had concerns about her behavior.  She

16   was forgetting a lot of things.  There was some behavior

17   that they monitored.  And they came to me out of concern

18   because they felt like she may have been under the

19   influence, and I don't know if they were referring to

20   alcohol or drugs.

21             When that complaint was made, I -- I

22   didn't want to go by what they shared with me.  I

23   started to pay close attention to some of the things

24   that they mentioned.  I did notice that there were some

25   mistakes that she made in her work.  I did notice the

1    behavior.  I would watch her go to her vehicle.  I would

2    see another vehicle pull up.  And there was some sort of

3    exchange.  I could not see what was being taken from her

4    car and what the other person would give her.  And that

5    happened a few times.

6                    And I talked to Christina about it.  I

7    don't know -- I don't recall sharing it with Alan Garza,

8    but I did talk to Christina about it.  And I also talked

9    to HR about it.

10   Q.    Who in HR did you talk to about it?

11   A.    Heather Sigmund.

12   Q.    All right.  And so what -- did you just

13   verbally inform these individuals or did you put it in

14   writing?

15   A.    I think Christina.  And I may have had a phone

16   conversation.  I don't know if it was in person or if it

17   was over the phone.  It could have been sent via e-mail.

18   Again, a lot of time has passed.  I don't remember the

19   exact form of communication, but I do recall

20   communicating this.

21                   I do recall having a conversation, a brief

22   conversation with Heather over the phone, but it was

23   brief because Judy was in the next office and the walls

24   were thin.  So Heather and I planned to call so I can

25   walk away from my office.  And, you know, I just told

1    her about the complaint the employees made, some of the

2    things I had observed.  And for me, it wasn't to get her

3    in any trouble.  If she was dealing with something,

4    because I know her husband passed away and that was

5    something she was struggling with.  My goal as the

6    manager was to try to get her some help.  Again, it was

7    outside of my control whatever HR decided.

8        Q.    What did HR decide?

9        A.    Nothing was done, that complaint.  And I don't

10   know -- I think I do recall Heather saying she was going

11   to talk to Linda Harvey about it, but nothing was

12   ever -- the issue was never addressed.

13       Q.    So she continued her employment?

14       A.    She continued her employment.

15       Q.    Is she still working with the company today?

16       A.    No.  She left, I believe, before I left, from

17   what I can remember.

18       Q.    Did you have any other involvement in that Judy

19   Hernandez incident or issue?

20       A.    No.  I just -- I was waiting because I was

21   supposed to get some follow-up from HR, and it was

22   completely disregarded.

23       Q.    And so did you have any specific conversations

24   with maybe Linda Harvey regarding that issue?

25       A.    I don't ever recall Linda Harvey.  I don't

1    recall a discussion with her regarding that issue.  I

2    allowed Heather to do her job.

3         Q.    All right.  Then you also said that you made

4    complaints to Mr. Garza regarding the high turnover in

5    New Braunfels; is that right?

6         A.    Yes.  We've had quite a few conversations.

7         Q.    Exchanged e-mails about it too?

8         A.    As far as I can remember, yes.

9         Q.    Okay.  And so what were you asking Mr. Garza

10   for in relation to this high turnover issue?

11        A.    What was I asking him for?  What do you mean

12   specifically?

13        Q.    How did you want him to resolve the issue or to

14   assist you in resolving the issue?

15        A.    The reason I addressed those issues with the

16   high turnover, because it was a problem.  It was hard to

17   operate as a branch with a high turnover.  The high

18   turnover, that's something that, based on feedback from

19   the employers, that was always an issue.

20              And the issue that I was trying to address

21   was in relation to the census.  If we could -- I felt

22   like as a manager if we could somehow through an

23   employee recognition or -- I forget what my other

24   recommendation was.  It was employee incentive and

25   employee recognition program.  I felt like that would

 1 | make the field staff content.  I mean, the pay was
 2 | extremely low.  I think when I started, the pay was
 3 | below $8.
 4 |          So I wanted -- and it's really not what I
 5 | wanted.  It was just recommendations that I proposed to
 6 | address the high turnover with the field staff.  Because
 7 | if we could address that issue, we could -- that would
 8 | assist with the census.
 9 |     Q.   How does that tie together the field staff and
10 | the census?
11 |     A.   If you don't have employees to make these home
12 | visits, the clients left because of the staffing issues,
13 | they left because of numerous issues.  But that is a
14 | direct relation to the census.  If we don't have field
15 | staff, regardless of how many people Rae brought in, we
16 | weren't going to be able to keep the census growing.
17 |     Q.   Have you now testified as to all of the
18 | complaints that you made to Mr. Garza or to Christina
19 | Hernandez regarding the high turnover in the New
20 | Braunfels office?
21 |     A.   I'm sorry.  Repeat that question.
22 |          MR. GARZA:  Read that back.
23 |          (Requested testimony read back by the
24 |          court reporter.)
25 |     A.   And this is only related to the high

1    turnover --

2         Q.    (BY MR. GARZA)   That's right.

3         A.    -- is that correct?

4         Q.    That's right.

5         A.    As far as I can remember -- give me just a

6    minute.

7                    THE WITNESS:   Read that one more time.

8                    (Requested testimony read back by the

9                     court reporter.)

10                   THE WITNESS:   I do apologize.   If you

11   could read that one more time.

12                   (Requested testimony read back by the

13                    court reporter.)

14        A.    And we're talking about the field staff; is

15   that correct?

16        Q.    (BY MR. GARZA)   Any aspect of turnover that

17   affected the New Braunfels office.

18        A.    I would have to say no, because there were

19   other issues.

20        Q.    And tell me what issues you complained of

21   regarding the turnover in the New Braunfels branch to

22   Miss Hernandez or Mr. Garza.

23        A.    Because we also had administrative turnovers.

24        Q.    So when did you -- when did you complain to

25   Mr. Garza and/or Miss Hernandez regarding the high

1   turnover of administrative employees in the New

2   Braunfels branch?

3        A.   I don't remember when, but that was

4   discussed --

5        Q.   When was it discussed?

6        A.   -- on more than one occasion with Alan Garza as

7   well as Christina, because one of the -- he was aware --

8   he was aware of what was going on at the branch.

9             Now, when that was discussed, I cannot say

10  when.  But I do recall he and I having some

11  conversations about things that occurred, reasons why

12  people either quit or -- of the people -- a couple of

13  the people were terminated, that I can remember.

14       Q.   Who else was present during those conversations

15  that you had with Mr. Garza?

16       A.   Regarding the administrator staff?

17       Q.   Yes, ma'am.

18       A.   I don't really remember if anyone was present

19  specifically, but I do know we had those discussions.

20  Christina was involved at some point.  Christina wasn't

21  hired on in the beginning, as far as I can remember.

22       Q.   So did you put any of those complaints in

23  writing?

24       A.   About the administrative employee turnover?

25       Q.   Yes.

1      A.    I do recall either communicating by phone, it

2   could have been an e-mail.  Do you have an e-mail that

3   you can show me?

4      Q.    Not right now.  That's why I'm asking you if

5   you recall putting it in writing.

6      A.    If you have something you can show me, maybe

7   that will help jog my memory.

8      Q.    So at we sit here --

9      A.    I do know --

10      Q.    -- you do not recall?

11      A.    As I can recall, there were communications.

12   Now, whether that was an e-mail or whether it was a

13   phone conversation, it was discussed.  But if you have

14   some type of documentation, that may help refresh my

15   memory.

16      Q.    Okay.  So is there any -- who were the

17   individuals that you said were terminated, the

18   administrative employees that were terminated?

19      A.    Colleen Shelton.

20      Q.    And who else?

21      A.    There was another young lady, but I can't

22   remember her name.

23      Q.    Norma Leal?

24      A.    Norma Leal, she wasn't terminated.

25      Q.    Okay.  So then Colleen Shelton and one other

1    individual.  What -- why was Collen Shelton terminated?

2         A.   Well, that decision was made --

3         Q.   Do you know why she was terminated?

4         A.   There were some issues between her and Alan.

5    There was also issues with her, as far as I can

6    remember, she was disengaged when I took over.  So there

7    was some resistance there.  But Alan made the initial

8    recommendation for her to be terminated.

9         Q.   What were the reasons for termination?

10        A.   I don't quite recall.  I mean, that --

11        Q.   And that was my initial question.  Do you know

12   what the reason for her termination was?

13        A.   I don't really recall.

14        Q.   Okay.

15        A.   Like I said, there were a number of issues that

16   came up.

17        Q.   Okay.  So you don't recall the specifics?

18        A.   I don't recall the specifics, but I know there

19   were issues.

20        Q.   And you don't recall the name of the other

21   administrative employee in the New Braunfels office who

22   was terminated, right?

23        A.   No.  I do not recall her name.

24        Q.   Okay.  And what position did that person work

25   in?

1    A.    She was a supervisor, provider assistant

2  supervisor.

3    Q.    PAS supervisor?

4    A.    Yes.

5    Q.    Was that Anna Fell or Ann Fell?

6    A.    No.

7    Q.    No.  Okay.  All right.  So what other

8  administrative employees -- what other complaints

9  regarding turnover of administrative employees did you

10  make to Miss Hernandez or Mr. Garza other than what

11  you've just testified about?

12    A.    What other complaints did I have?

13    Q.    About the turnover of administrative employees

14  in the New Braunfels office.

15    A.    I do recall pay being an issue.  I wouldn't

16  necessarily say it was a complaint for me, but there

17  were -- there was an administrative assistant who was

18  not satisfied with the pay.

19    Q.    Who?

20    A.    And she asked for a pay increase.  And I do

21  recall discussing that with Alan.

22    Q.    What's the name of that administrative

23  assistant?

24    A.    I do not recall her name.

25    Q.    How much was she asking for as far as an

1    increase is concerned?

2         A.    I don't remember how much she was asking for,

3    but I do recall that she wasn't content with what she

4    agreed to.  And I shared that with Alan Garza, and she

5    eventually quit.

6         Q.    Did you share it with him in writing or

7    telephonically or verbally?

8         A.    I think it was a couple of ways we

9    communicated, because I remember it being --

10        Q.    So it was either -- it was e-mail as well

11   verbally?

12        A.    It was through e-mail.  And I do -- I do

13   believe it was by phone.

14        Q.    Okay.  And was anyone else on that phone call

15   or a part of that e-mail communication?

16        A.    I'm really not certain if anyone else was on

17   the phone call.  I can't remember if there was.

18        Q.    Okay.

19        A.    But I do know he and I discussed this issue.

20        Q.    Were there any other complaints about the

21   turnover of the administrative staff in the New

22   Braunfels office that you shared with Mr. Garza or

23   Miss Hernandez, other than what you've already testified

24   to?

25        A.    Not that if -- not that I can recall, but

1    again --

2        Q.    Okay.

3        A.    -- if there's something you can show me that

4    may help jog my memory.

5        Q.    Let's move on to the next one.  You said you

6    complained about issues with the staff in the New

7    Braunfels office.  So when did you complain about that

8    to Mr. Garza or Miss Hernandez?

9        A.    I'm sorry.  Repeat that.

10        Q.    Yes.  You said that you had made complaints

11    regarding issues with the staff of the New Braunfels

12    office.

13        A.    With the staff?

14        Q.    Yes.  You had issues with the staff.

15        A.    Oh, okay.  I'm sorry.

16        Q.    Yeah.  So when did you complain about that to

17    Mr. Garza and/or Miss Hernandez?  And then I'm going to

18    ask you --

19        A.    Do you want to know the issues?

20        Q.    I want to know when it happened.

21        A.    Sir, I have no clue about when.

22        Q.    Okay.  So then --

23        A.    I couldn't say that.

24        Q.    -- what was the issue or issues?

25        A.    One of the issues was about one person --

1    Q.   Who was it?

2    A.   -- in the office and very rude.

3    Q.   That's Norma Leal?

4    A.   Yes.

5    Q.   What allegedly did she do?

6    A.   She was just very rude.  She would yell at

7  clients as well as employees.  There were --

8    Q.   Did you relate this to Mr. Garza and

9  Miss Hernandez or Miss Hernandez, in writing?

10    A.   I don't recall in writing, but I do recall

11  having a face-to-face conversation with Alan Garza in

12  his office in the -- in San Antonio.

13    Q.   So tell me what was said during that

14  conversation.

15    A.   I don't recall everything that was said, but I

16  do recall expressing to him that she was rude.  And it

17  was an issue that needed to be addressed.  And before I

18  wrote her up, I wanted to address that with him and

19  Christina.

20    Q.   Okay.  And so what was the response or what

21  else do you remember about this conversation?

22    A.   I don't really remember everything, like I

23  said, about the conversation, but he did not -- I do not

24  remember him opposing, because it sounds like he was

25  aware that she was rude.

1    Q.   Okay.

2    A.   So he did not oppose me writing her up.

3    Q.   And you did?

4    A.   I was going to.  I think I may have written her

5    up or I had the paperwork prepared.  But again, it was a

6    situation that was going to happen.

7    Q.   So when did this happen?  Did this happen in

8    2017 or 2016?

9    A.   I don't remember.

10    Q.   Was it shortly before you were terminated from

11    employment?

12    A.   No.

13    Q.   So then I'm trying to figure out what prevented

14    you from actually completing that task of writing her

15    up?

16    A.   Oh, she resigned.  She just quit.

17    Q.   And so what was the complaint regarding Colleen

18    Shelton?

19    A.   She was resistant.

20    Q.   About what?

21    A.   She was not happy about the workload.

22    Q.   What was her position?

23    A.   I don't really recall her position, title.  But

24    as far as I know, she was the -- like the lead.  She

25    acted as the lead, but I don't recall that being her job

1  description.

2      Q.    And so what happened with her employment?  Is

3  she still employed there?

4      A.    She was terminated.

5      Q.    Okay.  And who terminated her?

6      A.    Alan Garza.  And I don't know who else was

7  involved in that decision.  But he made the decision to

8  terminate her and whoever he discussed it with.  And he

9  did call me to let me know that that was the decision

10 that was made and wanted to see what I felt about it.

11     Q.    And was that your recommendation to the

12 terminator her?

13     A.    I agreed.  I -- that was not my recommendation.

14     Q.    But you agreed that that was the -- that's what

15 needed to be done?

16     A.    I wouldn't say I said I agreed.  I was just

17 okay with it.  I don't recall exactly what I said, but I

18 didn't oppose it.

19     Q.    Okay.  Is there any other complaints about any

20 of the staff or administrative staff in the New

21 Braunfels office that you complained about to Mr. Garza

22 or Miss Hernandez?

23     A.    That office went through some turnover, so I'm

24 just trying to remember.  I don't recall anything else

25 that comes --

1      Q.    Okay.

2      A.    -- to mind.

3      Q.    All right.  You also said that you made

4  complaints to Mr. Garza that you were not being given a

5  recruiter.  First of all, when did you make that

6  complaint?

7      A.    About the recruiter?

8      Q.    That you were not being given a recruiter.

9      A.    When I learned that San Antonio had hired a

10  recruiter.

11      Q.    When was that?

12      A.    I don't remember.

13      Q.    My question was:  When did you complain to

14  Mr. Garza about New Braunfels not having a recruiter?

15  When?

16      A.    I don't remember.

17      Q.    Okay.

18      A.    But I do recall --

19      Q.    So did you -- did you put that complaint in

20  writing, or was it verbal?

21      A.    I know it was verbal.  But if it was in writing

22  per se, I don't recall, but if you have a document --

23      Q.    Did --

24      A.    -- that --

25      Q.    Did you include Miss Hernandez in either of

1    the -- the verbal or written complaints, if it was

2    written?  You just said you don't remember?

3         A.    I don't remember, unless you can --

4         Q.    Okay.

5         A.    -- show me a document.

6         Q.    And so what was the -- you said that San

7    Antonio had a recruiter.  Is that right?

8         A.    Yes.

9         Q.    What was the name of that recruiter?

10        A.    I don't remember her name.

11        Q.    All right.  And so at some point, the recruiter

12   was for purposes of doing what, to recruit staff or to

13   recruit clients?  Which one?

14        A.    To recruit field staff.

15        Q.    Okay.  And was that recruiter also to assist

16   New Braunfels in recruiting field staff?

17        A.    That is what I was told.

18        Q.    All right.  And wasn't that Rae Cazares's job?

19        A.    Rae was not hired as a recruiter.

20        Q.    But I thought you said that she was -- she was

21   to recruit?

22        A.    Rae was a marketer.

23        Q.    Okay.  So she was focusing on the clients, and

24   you wanted someone to be hired as a recruiter for New

25   Braunfels to focus on hiring the field staff, the

1   employees, right?

2        A.   Yes.

3        Q.   Okay.

4        A.   That was -- yes.

5        Q.   You also said that there was a decision to hire

6   a recruiter in January of 2017.  Is that right?

7        A.   That person was hired.

8        Q.   Who was it?

9        A.   I don't remember her name.

10       Q.   Okay.  Did you ever get a response from anyone,

11  Mr. Garza or Miss Hernandez, about why -- regarding your

12  complaint about New Braunfels not having its own

13  recruiter?

14       A.   I don't really remember.  I don't recall

15  receiving a response unless you have something that you

16  can -- like a document.  But what I was told is that the

17  person for the San Antonio office was supposed to assist

18  with recruiting for our office.

19       Q.   And who told you that?

20       A.   Alan Garza and Christina Hernandez.

21       Q.   All right.  That was the last complaint that

22  you said you submitted to Mr. Garza that was not

23  addressed.  And so you also stated that Mr. Garza

24  discriminated against you because -- by terminating your

25  employment.  Is that right?

1      A.    Yes.

2      Q.    In response to -- if you would look at

3 Exhibit 11, interrogatory number four.  I asked that you

4 identify the defendant's employees who you allege

5 terminated you based on complaints made by you of race

6 discrimination, and you identified Alan Garza and

7 Heather Sigmund.  Is that right?

8      A.    Alan Garza would be the person.

9      Q.    Okay.  And Heather Sigmund, what was her --

10     A.    She was present.

11     Q.    She was present?

12     A.    Uh-huh.

13     Q.    And where did the termination take place?

14     A.    At the New Braunfels location.

15     Q.    All right.  Tell me what was said during that

16 conversation.

17     A.    It wasn't much -- a whole lot said, other than

18 him saying that they came to talk to me because I wasn't

19 performing.  And he mentioned the census, and that is

20 the reason he said I was being terminated.

21     Q.    Is there anything else during that conversation

22 by you, Miss Sigmund or Mr. Garza?

23     A.    I didn't say -- I don't recall saying anything

24 because I was shocked.

25     Q.    All right.  And so after your termination from

1   employment, what did you next do?

2       A.   What do you mean?

3       Q.   After you left the office, what did you do?

4   That office at which you were told that you were

5   terminated from employment, did you go back to your

6   desk, did you leave immediately?  What did you do

7   immediately after being told?

8       A.   I left.

9       Q.   Okay.  Did you leave immediately without going

10  to your desk or did you return to your desk?

11      A.   We were in my office, so . . .

12      Q.   So you gathered your things and left?

13      A.   I gathered my -- it was a lamp, I do recall the

14  lamp.

15      Q.   Okay.

16      A.   I don't recall anything else.  And I left.

17      Q.   All right.  And did you have any conversations

18  with anyone else or any former employees or current

19  employees of The Medical Team after your termination

20  from employment?

21      A.   I did have discussions with Christina, some of

22  the other employees there.

23      Q.   Okay.  Let's take them one by one.  Who did you

24  talk to?  Christina.  Let's start with Christina.  And

25  that's Christina Hernandez?

1       A.   Christina Hernandez.

2       Q.   Okay.  So when did you first talk with her

3  after your termination for employment?

4       A.   I talked to her before and after, but the first

5  time I talked to her after, there was a phone call.

6       Q.   From whom?

7       A.   I don't remember if I called her or she called

8  me.

9       Q.   What was said during the phone call?

10      A.   She was upset because of what happened.

11      Q.   How do you know she was upset?

12      A.   Because she expressed it.

13      Q.   What did she say?

14      A.   She said that she was going to look for another

15  job.  She didn't feel like it was right, what they did.

16  But I don't really remember the specifics of that

17  particular conversation.  It was more so the one before

18  I was fired.

19      Q.   So keep telling me about what the first

20  conversation was after you were fired, other than what

21  you've already testified to.

22      A.   There was other communication, text message.

23      Q.   With Miss Hernandez?

24      A.   Yes.

25      Q.   What were those text messages about?

1      A.    She made a comment -- well, she text me.  I

2  think she asked me a question about my hair, did I have

3  my hair done, and that Alan made a joke about my hair to

4  her.

5      Q.    What was the joke?

6      A.    She didn't say what the joke was, but she said

7  that Hyun told her about the joke.  She said Alan didn't

8  tell her because he didn't trust her.

9      Q.    But you don't know what the joke was?

10     A.    I don't know what the joke was, but it was --

11 it was concerning my hair.

12     Q.    Okay.  And your hair is short today.  Is this

13 the way you wore your hair throughout the entire time

14 that you were employed with The Medical Team?

15     A.    No.  I wore my hair in different styles.

16     Q.    Okay.

17     A.    But this particular day, my hair was in an

18 afro.

19     Q.    Uh-huh.

20     A.    I had it pinned down at the top.

21     Q.    Did you ever find out what the joke was?

22     A.    I never found what the joke was, but it was a

23 comment that was made that was offensive to me.  It was

24 insensitive.  And I don't know if Alan knows about what

25 black women have to deal with in the workplace.  Me

1    wearing my hair in its natural state is part of my

2    culture.  I wanted to embrace that culture.  Black women

3    have been punished for wearing and embracing their

4    natural hair.  So that is a sensitive issue.  Black

5    women have been criticized.

6              So that was -- it was -- what he said, it

7    was horrible.  I felt like it was discriminatory.

8         Q.   What did he say?

9         A.   I do not know what he said.

10        Q.   So then why was it offensive, if you don't know

11   what he said?

12        A.   Why would he make a comment about my hair?

13        Q.   You don't know what the comment was, right?

14        A.   I don't have to know what the comment was.

15        Q.   Okay.

16        A.   But there was no reason for him to make a

17   comment about my hair.

18        Q.   The bottom line is you don't know what the

19   comment was, if -- and even if a comment was made;

20   right?  You're relying on somebody else to interpret

21   what was done -- allegedly done by Mr. Garza, right?

22        A.   I mean, I'm not relying on her, but she didn't

23   see my hair.  So she wouldn't have known about my hair

24   being done that day.

25        Q.   But she didn't -- but she didn't tell you about

 1  the comment, so that's what I'm trying to figure out.

 2      A.    I don't think she has to say anything about the

 3  comment.  I think it was insensitive.  It was hurtful.

 4  And what did my hair have to do with me -- him

 5  terminating me?

 6      Q.    And so you're relying upon this statement by

 7  Christina Hernandez, and you're believing that

 8  statement --

 9      A.    Why would she lie --

10      Q.    -- that Mr. Garza allegedly made a comment

11  about your hair?

12      A.    But why would she lie --

13      Q.    I don't know.  You tell me.

14      A.    How would she know I had my hair done that day?

15  How would she know that?

16      Q.    How did she -- did she comment about how your

17  hair was done that day?

18      A.    She told me what -- the conversation between

19  Alan and Hyun.  It wasn't anything, according to her,

20  that he said to her directly.  This was a conversation

21  that he and Hyun had.  And Hyun told Christina about

22  this joke or this comment that was made.

23      Q.    So Hyun told Chris -- allegedly told Christina

24  and Christina told you?

25      A.    Told me.  She actually --

| | |
|---|---|
| 1 | Q.   But at no time -- |
| 2 | A.   Go ahead. |
| 3 | Q.   -- did Christina tell you what that alleged |
| 4 | comment was? |
| 5 | A.   It doesn't matter. |
| 6 | Q.   Does it -- |
| 7 | A.   He said it. |
| 8 | Q.   Okay. |
| 9 | A.   And it hurt my feelings. |
| 10 | Q.   So what did he say? |
| 11 | A.   It was culturally insensitive.  I am my hair. |
| 12 | I'm a black woman. |
| 13 | Q.   I understand that. |
| 14 | A.   My hair is a part of me. |
| 15 | Q.   What did he say? |
| 16 | A.   He didn't say it to me, so I can't -- I can't |
| 17 | tell you. |
| 18 | Q.   Do you even know what he allegedly said? |
| 19 | A.   I cannot -- he didn't say that to me. |
| 20 | Q.   That's not my question.  My question is:  Do |
| 21 | you know what he allegedly said. |
| 22 | MR. CAMMACK:  Objection, form.  Asked and |
| 23 | answered. |
| 24 | Q.   (BY MR. GARZA)  If you know, you know, and if |
| 25 | you don't know, you don't know. |

1    A.    I'm telling you this is what was told to me by

2    Christina Hernandez.

3    Q.    And so what was the comment allegedly that was

4    made by Mr. Garza to Hyun?

5              MR. CAMMACK:  Objection, form.  Asked and

6    answered.

7    A.    All I can say is what Christina told me.

8    Q.    (BY MR. GARZA)  If you don't know, it's okay.

9    You don't know.  And that's what I understand you're

10   saying --

11   A.    He didn't say --

12   Q.    -- is that right?

13   A.    -- anything to me about my hair.  But he did --

14   according to Christina, he and Hyun had this joke or

15   this comment because those were the two things that were

16   used.

17   Q.    And I think you've already told me that

18   Christina did not tell you what the comment was or the

19   joke?

20             MR. CAMMACK:  Objection, form.

21   A.    She didn't say what the joke was.

22             MR. CAMMACK:  Asked and answered.

23   Q.    (BY MR. GARZA)  Okay.

24   A.    It was a comment about my hair.  Whatever the

25   comment or the joke was, that was not shared with me.

1    Q.   Okay.  That's what -- thank you.

2              In the question of interrogatory number

3    four, it states that you made comments about race

4    discrimination.  Who did you make complaints to -- of

5    race discrimination to?

6    A.   I talked to Christina about it.  I expressed to

7    her a lot about how I felt, about the way I was being

8    mistreated.  And I also sent an e-mail to Sarah Gogo.

9    Q.   And Miss Gogo is corporate human resources; is

10   that right?

11   A.   Yes.  I believe so.

12   Q.   Did you ever receive a response from Miss Gogo?

13   A.   No.

14   Q.   When did you send the e-mail to Miss Gogo?

15   A.   Excuse me.  It was on a Friday.  I sent her a

16   couple of e-mails.

17   Q.   You sent her two e-mails on that same Friday?

18   A.   I didn't say I sent her two e-mails --

19   Q.   You said you sent a couple of e-mails.

20        MR. CAMMACK:  Hold on.  Let her answer.

21   A.   What I said was I sent her a couple of e-mails

22   on separate occasions.

23   Q.   (BY MR. GARZA)  When was the first e-mail sent?

24   A.   It was earlier in the week.

25   Q.   That same week?

```
 1      A.    Yes.
 2      Q.    And what did -- what did you relay in that
 3  e-mail?
 4      A.    In which one?
 5      Q.    The first e-mail.
 6      A.    I don't really recall everything, but I think
 7  it had something to do with the things that were going
 8  on with the branch that week.  But I don't recall
 9  exactly what that particular e-mail entailed.
10      Q.    And what was the second e-mail, what was the
11  content of that one?
12      A.    The second e-mail was about me -- I know it had
13  to do with race that -- I'm sure that I complained about
14  being mistreated because of my race.
15            And what prompted me to send that e-mail
16  was the fact that Alan Garza wanted Christina to write
17  me up for a directive she gave me.  I don't remember if
18  I included all of that in that e-mail.  I don't know.
19  If you have it, you can show it to me, but it was
20  surrounding -- definitely surrounding race.
21      Q.    Did you receive a response from Sarah Gogo to
22  the first e-mail?
23      A.    Not that I recall.
24      Q.    Did you receive a response from Sarah Gogo
25  regarding the second e-mail?
```

```
 1        A.    Not that I recall, no.
 2        Q.    Did you -- did you call Sarah Gogo at any time
 3   during that week?
 4        A.    I don't recall making a phone call to her.
 5        Q.    And had you ever met Sarah Gogo?
 6        A.    Yes.
 7        Q.    Telephonically or --
 8        A.    Face-to-face.
 9        Q.    -- through e-mail?  All right.
10              She is African American; is that right?
11        A.    She looks African-American to me.
12        Q.    And when you did not receive a response from
13   Miss Gogo, why did you not call her?
14        A.    Well, I wanted to give her time to respond.  I
15   think that's fair, to give her time.
16        Q.    You felt like your complaint was -- was
17   serious; isn't that right?
18        A.    Yes.
19        Q.    And she didn't respond to you after the first
20   e-mail, which I don't remember, did that -- did that
21   contain a complaint of race discrimination?
22        A.    No.  Not that I recall.  No.
23        Q.    Okay.  So then the second e-mail was the one
24   that contained a complaint of race discrimination; is
25   that right?
```

1      A.    Yes.

2      Q.    Okay.  And so you sent that e-mail to her on a

3  Friday, you said?

4      A.    Yes.

5      Q.    All right.  And so then how much time

6  transpired between the date you sent that second e-mail

7  to the time that you were terminated from employment?

8      A.    The next week.

9      Q.    And were you present at work on that Monday

10 following that Friday that you sent the e-mail to

11 Miss Gogo?

12     A.    No.  I was sick.

13     Q.    What about Tuesday?

14     A.    I was sick.

15     Q.    What about Wednesday?

16     A.    I was sick.

17     Q.    What about Thursday?

18     A.    Thursday I returned to work.

19     Q.    Okay.  And so that Thursday was the day on

20 which you were terminated from employment; is that

21 right?

22     A.    No.

23     Q.    Then it was the Friday?

24     A.    Yes.

25     Q.    So when you returned to work and you hadn't

1   heard from Miss Gogo, and nor was there any sort of

2   response, why didn't you call her?

3        A.   I just didn't call.

4        Q.   You have seen documents that show that The

5   Medical Team has an affirmative action plan, it has a --

6   it is an equal opportunity employer, you have an open

7   door policy that even allows you to take this issue up

8   to the president of the company if you felt that that

9   was necessary.  Why didn't you take that opportunity?

10       A.   I was following the chain of command.

11       Q.   By notifying Miss Gogo?

12       A.   Yes.

13       Q.   And if she did not return your call or did not

14   respond, why didn't you call the president?

15       A.   I cannot take responsibility for something she

16   did not do.

17       Q.   Absolutely.  But you can take responsibility

18   for something that you yourself failed to do.  Isn't

19   that right?

20            MR. CAMMACK:  Objection, form.

21   Argumentative.

22       Q.   (BY MR. GARZA)  No?

23            So then what was keeping you from calling

24   Leslie Pembrook?

25            MR. CAMMACK:  Objection, form.

1    Argumentative, speculation.

2         A.    That was not my responsibility.  I did my part.

3         Q.    (BY MR. GARZA)  Okay.

4         A.    I felt like I was being discriminated against

5    based on everything that had occurred and I complained

6    to my manager.  I even complained to Linda Harvey about

7    working in a hostile work environment.  So I made

8    complaints.

9         Q.    When did you talk to Miss Harvey about this?

10        A.    I don't know, but I did talk to her about the

11   hostile work environment.  I do have it in an e-mail.

12        Q.    In an e-mail to Miss Harvey?

13        A.    Yes.

14        Q.    Does it specifically state that you were

15   working in a hostile environments?

16        A.    Yes.  And I sent another -- I sent another

17   e-mail that I recall with -- because that's what I felt.

18   I was working in a hostile work environment.

19        Q.    Okay.

20        A.    I do not remember when that was sent, but I do

21   recall the e-mail.

22        Q.    And in your response to interrogatory number

23   four -- well, let me ask you this:  Do you know who made

24   the decision to terminate your employment?

25        A.    I don't know who was all involved, but I do

1   feel like it was Alan Garza.  He was the reason I was

2   terminated.  I feel like he was in a position to make

3   that decision.  And again, I believe it was based on my

4   race.

5       Q.    And you believe he was the man who made the

6   decision to terminate.  Isn't that right?

7       A.    I believe it was his decision.

8              MR. GARZA:  Let me take about a

9   five-minute break.

10             (At 4:29 p.m. the proceedings recessed,

11              continuing at 4:45 p.m..)

12             MR. GARZA:  Pass the witness.

13                      EXAMINATION

14  BY MR. CAMMACK:

15      Q.    All right.  Miss Richardson, I have a couple

16  questions before we're done today.  Can you tell the

17  ladies and gentlemen of the jury how your termination

18  impacted you?

19      A.    When I was terminated, my relationship was

20  impacted.  So because of all the financial issues, the

21  home that I was living in, we lost the home.  I -- there

22  were times where I thought I would be homeless because I

23  had to make a decision based on my relationship falling

24  apart, to be on my own.

25             So there was a time when I thought that my

1    daughter and I would have to go to a homeless shelter.

2    I called a couple of places.  I ended up maxing out a

3    credit card to pay my rent up for several months.

4                   I was under a lot of stress.  I was

5    depressed.  I experienced hair loss.  I was diagnosed

6    with high blood pressure and another chronic illness.

7    But the blood pressure had been an issue that one of my

8    physicians was concerned about.

9                   Going back to the -- the home situation, I

10   had to move into a one bedroom apartment.  My daughter

11   had to sleep on the floor.  There was a lot of fear.

12   I'm sorry.  There were moments that I was fearful that I

13   wasn't going to be able to provide the basic needs for

14   my daughter or myself.

15                   I couldn't really seek medical attention

16   to address some of the medical problems because I either

17   couldn't afford to go to the doctor or I didn't have

18   insurance at all.

19                   My daughter has had issues where I just --

20   because she -- there were times where she didn't have

21   health insurance.

22                   My credit took a major hit.  I couldn't --

23   bills that I had, credit cards, student loans, my car

24   payment, I tried my best to pay those things up for as

25   long as I could.  Because I was good about keeping all

1    my debt paid on time.  There were times where my car

2    payment got behind, my student loans got behind.  I get

3    harassing calls from creditors.  I've been threatened

4    with lawsuits, wage garnishments.

5                And my confidence, I've been traumatized

6    by this whole experience.  I still have sleepless

7    nights.  I still have worries, I still have fears.

8                There are things that my daughter, she

9    needs.  She's getting ready to go off to college.

10   Things that I simply cannot supply for her.

11               My grandmother passed away during this

12   whole thing, and I was -- I wasn't able to go to her

13   funeral because I didn't have the necessary means to do

14   so financially.

15               Things that I once enjoyed, activities

16   that my daughter and I would engage in.  There's just

17   things that we used to do that I'm not able to do

18   anymore.

19               Even though right now I do have health

20   insurance, the premiums that I have to pay is expensive,

21   so issues that need to be addressed, I haven't been able

22   to do that.

23               And just the emotional turmoil.  When I

24   started working at the AAA and Alan showed up, and I

25   didn't know he was on the subcommittee, I literally

```
 1   freaked out when I saw him.  It took a lot.  I had to do

 2   a lot of self-talk because I had to make a presentation

 3   that day.  So every time I have to see him, I'm

 4   re-traumatized all over again.

 5               My job that I have now, you know, I

 6   question myself.  There are fears that I have about

 7   other people making judgments or mistreating me

 8   unfairly.  I have those fears.  A lot of things that I

 9   didn't have before.  I want it to -- I want to be able

10   to see a mental health counselor to help me address some

11   of these issues, but again, I haven't been able to do so

12   because the premiums are expensive.

13               There are a lot of issues emotionally that

14   I struggle with.  I don't know if I remember mentioning

15   hair loss.  That's part of why I cut off my hair, as

16   well as you making this joker comment, because I didn't

17   want to be perceived by other professionals as I am

18   interviewing, I didn't want any judgment to be made

19   because of my natural hair.  Just emotionally it's

20   really tough to deal with.

21               And I don't know.  My life has changed

22   since all this happened to me.  I mean, a lot of things

23   have changed.  Every time I have to face him again at my

24   current job, it just brings back everything that was

25   done to me while I worked at The Med Team.
```

1          I'm sure there are other things.  I think

2     I've highlighted all of the major things that impacted

3     me the most.

4               MR. CAMMACK:  We'll reserve the rest of

5     our questions for the time of trial, and we'd like to

6     review and sign the transcript.

7               MR. GARZA:  I have a couple questions.

8                         EXAMINATION

9     BY MR. GARZA:

10        Q.    The relationship you said was impacted, who is

11    that relationship with?

12        A.    Frank Council.

13        Q.    How to you spell his last name?

14        A.    C-O-U-N-C-I-L.

15        Q.    And how long of a relationship did you have

16    with Mr. Council?

17        A.    We met in 2014.

18        Q.    Were you married to him?

19        A.    No.  But I was engaged.

20        Q.    You were engaged to Mr. Council?

21        A.    Yes.

22        Q.    All right.  Is he living in San Antonio or

23    nearby?

24        A.    No.  He lives in another state.

25        Q.    What state is that?

```
 1        A.    Georgia.

 2        Q.    And what -- what city?

 3        A.    Valdosta, V-A-L-D-O-S-T-A.

 4        Q.    All right.  Do you have his address?

 5        A.    No.

 6        Q.    When is the last time you spoke with him?

 7        A.    We still communicate.

 8        Q.    And how do you communicate with him?

 9        A.    What do you mean?

10        Q.    Well, do you e-mail him, do you call him, do

11   you write him letters?

12        A.    Just everyday conversation, we talk to each

13   other on the phone.

14        Q.    Okay.  And were there issues that you and

15   Mr. Council were having prior to the termination from

16   employment?

17        A.    No, not about anything.  It was financial

18   reasons.

19        Q.    Was he employed?

20        A.    Yes.

21        Q.    Who was he employed by?

22        A.    I don't remember.

23        Q.    Is he employed now?

24        A.    Yes.

25        Q.    All right.  Is he gainfully employed?  Do he
```

1   has his own house?

2        A.   I just know he lives in Valdosta, Georgia with

3   his mom.

4        Q.   With his mother?

5        A.   Uh-huh.

6        Q.   You said you lost your home.  What was the name

7   of the mortgage company?

8        A.   I don't remember.  The house was in his name.

9        Q.   So you were not on that contract, but when the

10  breakup happened and he moved to Georgia, you had to

11  move to another location; right?

12       A.   Yes.  I've had to relocate.

13       Q.   Okay.  And so if your name was not on that

14  mortgage, then your name -- your credit would not have

15  been impacted on the loss of that home, right?

16       A.   I had numerous credits, so --

17       Q.   I understand.  But I'm talking specifically

18  about the mortgage.

19       A.   No.

20       Q.   All right.  And so how much did that -- how

21  much did Mr. Council purchase the house for?

22       A.   I know it was over $200,000.

23       Q.   What was his -- did he work in San Antonio or

24  New Braunfels when he was living on Ridge Path?

25       A.   I believe it was San Antonio.

1      Q.    And what kind of work did he do?

2      A.    He was a truck driver.  He also worked in the

3  oil industry.

4      Q.    Okay.  You said you couldn't pay your bills.

5  What kind of bills -- what bills did you have at the

6  time that you were terminated from employment?  Did you

7  pay a power bill or water bill or anything like that?

8      A.    I'm sorry.  Repeat that.

9      Q.    Yeah.  At the time you were terminated from

10  employment from The Med Team, were you paying a power

11  bill, electric bill?

12      A.    What -- where -- what do you mean?

13      Q.    Well, I'm talking about at the house.

14      A.    Yeah, I contributed to the household.

15      Q.    And how much did you contribute?

16      A.    I can't say.  I mean, I can't give you an exact

17  number, but there were things that I paid.

18      Q.    Like what?

19      A.    The cable bill.

20      Q.    Okay.

21      A.    The utility.  I purchased household supplies,

22  grocery, as well as contributing if there was any

23  additional needs.

24      Q.    All right.  How much was the cable bill?

25      A.    I don't remember.

1     Q.   Was it over $100?

2     A.   It was over $100.

3     Q.   And the power bill, monthly basis, over $100?

4     A.   Over $100.

5     Q.   And cell phones?

6     A.   Yes.

7     Q.   You and your daughter had the same -- the same

8  plan?

9     A.   Yes.

10    Q.   Okay.  And how much were you paying on that?

11    A.   I don't recall exactly.

12    Q.   How much are you paying now?

13    A.   170-ish.

14    Q.   All right.  And that is through which carrier?

15    A.   T-Mobile.

16    Q.   You said you also have students loans.

17              Let me back up a little bit.  You said you

18  had a car payment?

19    A.   Yes.

20    Q.   And do you still have a car payment?

21    A.   Yes.

22    Q.   And how much is that payment?

23    A.   The car payment, 400.

24    Q.   And what kind of car is that and year?

25    A.   2015 Chevy Malibu.

1    Q.    How many more months do you have to pay on
2    that?
3    A.    I have years.
4    Q.    And student loans, how much do you still owe?
5    A.    Over 100,000.
6    Q.    And that was for your education at DeVry for
7    the B.S. in business, I think it is?
8    A.    It was for my education, undergraduate,
9    graduate, and I did attend another university.  I was
10   working towards a master's in education.
11   Q.    And what university was that?
12   A.    University of Phoenix.
13   Q.    And all of those were online education; is that
14   right?
15   A.    My -- the master's degrees.
16   Q.    Was online?
17   A.    Yes.
18   Q.    And the others were on a campus?
19   A.    On campus.  Most of my undergraduate degree was
20   on campus, but I did take a few courses towards the end
21   online.
22   Q.    And where is the campus?
23   A.    That was in Orlando, Florida.
24   Q.    You said you received creditor calls.  From
25   which creditors?

1    A.    I'm sure all of them at some point because all

2  those accounts are delinquent.

3    Q.    Do you remember any specific creditors?

4    A.    Of course, the -- PayPal.  I had a few CitiBank

5  accounts.  I believe one CitiBank.  I think one

6  CitiBank.  Wells Fargo.  I mean, all the creditors, I

7  believe I supplied that information.  I can't think of

8  all of them now.  There were others because I had a few.

9    Q.    All right.  So you said you supplied the

10 creditor information?

11   A.    Yes.

12   Q.    All right.  And so which ones of those

13 creditors threatened to garnish your wages?

14   A.    I believe it was CitiBank.  And I don't know if

15 it was them per se, but that was just some of the

16 language because you do receive other letters from other

17 sources.

18   Q.    Did you get your student loans through

19 CitiBank?

20   A.    No.  I don't even remember.  I know they're

21 with AES and the Government.

22   Q.    Okay.  What kind of -- how much do you owe on

23 credit cards?

24   A.    A lot.  I don't -- I can't remember an exact

25 amount, but I would -- I mean, if I had to guess, I

1    would probably say more than 20,000.

2         Q.    And were you current on all of your bills prior

3    to the termination of your employment?

4         A.    Yes.  I was current on all of my bills.

5         Q.    Did Mr. Council pay any of your credit card

6    bills or car payment or anything along those lines?

7         A.    That wasn't his responsibility.

8         Q.    That's not what I asked.  Did he make the

9    payments?

10        A.    No.

11        Q.    You said your grandmother passed away and you

12   couldn't go to the funeral.  Where was the funeral held?

13        A.    In Florida.

14        Q.    What part of Florida?

15        A.    Arcadia, Florida.

16        Q.    Did you inform AAA had you had been terminated

17   by The Medical Team?

18        A.    Did I inform them?

19        Q.    On your application, did you put on your

20   application that you were involuntarily terminated?

21        A.    I don't remember what I put on my application.

22        Q.    Have you always been truthful to your employers

23   or prospective employers in characterizing the reason

24   for your termination from The Medical Team?

25        A.    I try to be as truthful as possible.

```
 1        Q.   And so you told AAA that you were fired from
 2   The Medical Team?
 3        A.   I don't remember.  That's been months ago I
 4   applied for that job.  I do not remember.
 5        Q.   At any time have you been terminated because
 6   you did not truthfully inform the employer of the reason
 7   for your termination from The Medical Team?
 8        A.   Repeat that question.
 9              MR. GARZA:  Read that back.
10              (Requested testimony read back by the
11               court reporter.)
12        A.   No.
13              MR. GARZA:  Pass the witness.
14              MR. CAMMACK:  We have no more questions.
15   And we'd like to review and sign the transcript.
16
17
18
19
20
21
22
23
24
25
```

```
 1                    CHANGES AND SIGNATURE

 2     PAGE     LINE              CHANGE              REASON

 3     _____

 4     _____

 5     _____

 6     _____

 7     _____

 8     _____

 9     _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20          I, RENEE RICHARDSON, have read the foregoing
       deposition and hereby affix my signature that same is
21     true and correct, except as noted above.

22                          _____
                            RENEE RICHARDSON
23
       THE STATE OF _____   )
24
       COUNTY OF _____  )
25
```

1          Before me, _____, on this day
personally appeared RENEE RICHARDSON, known to me or
2     proved to me under oath or through _____,
to be the person whose name is subscribed to the
3     foregoing instrument and acknowledged to me that they
executed the same for the purposes and consideration
4     therein expressed.

5          Given under my hand and seal of office this the

6     _____ day of _____, 2018.

7

8     _____

9     Notary Public in and for

10    the State of _____.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3
   RENEE RICHARDSON            §
 4        Plaintiff,           §
                              §        CIVIL ACTION
 5 VS.                         §     NO. 5:18-CV-151-FB
                              §
 6 THE MEDICAL TEAM, INC.      §
   d/b/a THE MED TEAM, INC.    §
 7        Defendant.           §

 8 ---------------------------------------------------

 9               CERTIFICATE FROM THE

10      ORAL DEPOSITION OF RENEE RICHARDSON

11              DECEMBER 4, 2018

12 ---------------------------------------------------

13         I, JOANNA M. MARTINEZ, a Certified Shorthand

14 Reporter in and for the State of Texas, do hereby

15 certify that the foregoing deposition is a full, true

16 and correct transcript;

17         That the foregoing deposition of Renee

18 Richardson, the Witness hereinbefore named, was at the

19 time named, taken by me in stenograph, on December 4,

20 2018, the said Witness having been by me first duly

21 cautioned and sworn to tell the truth, the whole truth,

22 and nothing but the truth, and the same were thereafter

23 reduced to typewriting by me or under my direction.  The

24 charge for the completed deposition is $_____ due

25 from Mr. Richard G. Garza (DEFENDANT);
```

```
 1            That the amount of time used by each party at
 2    the deposition is as follows:
 3        Mr. Richard G. Garza - 5 Hours:9 Minutes
         Mr. Thomas N. Cammack III- 10 Minutes
 4
 5            That this deposition transcript was sent to the
 6    Witness, on _____ for review and
 7    signature by _____ _____, 2019, and
 8    that pursuant to the Federal Rules of Civil Procedure,
 9    review and signature of the Witness must be completed
10    within 30 days of the Witness's receipt thereof;
11            Certified to by me this 14th day of December,
12    2018.
13
14
15        JOANNA M. MARTINEZ, CSR, RPR
         Texas CSR 3574
16        Expiration Date:  12/31/18
17
18
19
20
21
22
23
24
25
```

**$**

**$1,900**
10:13

**$1,916**
10:18

**$100**
185:1,2,3,4

**$11,377**
20:16

**$13,317**
21:11

**$2,375**
22:6

**$200,000**
183:22

**$321.27**
40:5,12

**$46,000**
10:5,18

**$5,000**
36:20,23 37:1,7 38:2,8,
24

**$8**
149:3

**0**

**01**
21:5

**03**
21:20 22:4

**1**

**1**
17:23 20:8,10,15 21:4,
21,24,25 39:10,14
129:9

**10**
54:24 55:1

**100**
56:6 62:3

**100,000**
186:5

**10:09**
10:2

**10:12**
10:3

**11**
56:12,14 57:3 163:3

**11:06**
43:23

**11:17**
43:24

**12**
125:4,5,7

**12:50**
95:2

**13**
18:4,8 128:6,8

**1355**
15:11

**14**
34:11,17 35:15 51:2,6
79:1

**15**
34:11,17 51:13 118:12
122:7 128:11

**15th**
10:10

**16**
51:2,9 79:1

**170-ish**
185:13

**1d**
122:7,21 123:18 124:5

**1st**
6:23 9:15 17:14 79:5

**2**

**2**
17:20,22 18:21 19:17
118:20 129:8

**20,000**
188:1

**2007**
26:20

**2014**

**26:21** 181:17

**2015**
42:2 44:18 79:5 123:15
185:25

**2016**
63:8 125:9 158:8

**2017**
18:4,7,8 20:18 21:11
27:24 31:25 33:18
35:16,23 39:10,11,15,
17,21 40:20 63:8 116:8
129:9 158:8 162:6

**2018**
6:24 7:22,25 8:1 9:15,
16 13:7 17:14 20:5,22
21:1 27:24 28:1 31:25
33:18 40:20,21

**24**
10:18

**246**
55:4

**247**
55:10

**2:00**
95:3

**2:58**
130:16

**2l**
118:15

**3**

**3**
32:12,14 34:11 35:16
39:9,13 40:4 129:5

**30**
44:18

**30(b)(5)(a)**
5:1

**30-50**
129:9

**31**
39:11,15,17,21

**37**
39:9,13 40:4

**387**

**128:13**

**3:19**
130:17

**4**

**4**
41:5,6,9,11,13,19

**400**
185:23

**46,000**
9:19

**4:29**
177:10

**4:45**
177:11

**4th**
35:16,23

**5**

**5**
20:15 31:14 43:25 44:2

**6**

**6**
44:13,15,16 48:12

**7**

**7**
53:24 54:1,7

**78130**
15:12

**8**

**8**
50:20,22 51:3,5,9
78:24,25 118:7,9 125:8

**9**

**9**
54:19,21

## A

**a.m.**
10:2,3 43:23,24

**AAA**
6:19,20 7:6,8 8:20 9:1,5
14:6 16:5 17:2,5,8,11
20:5 179:24 188:16
189:1

**AACOG**
7:3,5,9

**abiding**
50:4

**able**
91:19 120:20 127:19
130:5 139:3 149:16
178:13 179:12,17,21
180:9,11

**absent**
49:12

**Absolutely**
175:17

**abuse**
142:10

**abused**
114:24 137:18,22
141:2,4 143:19

**abusing**
135:2

**access**
28:9 36:7

**accessed**
32:9 33:12,15

**account**
37:2,8,9,15,16,23,24
38:3,9,11,15,19,20,23
39:1,4,14,19,23 40:1,
14,16,18

**accountability**
117:16

**accountable**
49:3

**accounts**
187:2,5

**accused**
89:10 90:21

**achieve**
125:21

**acknowledge**
129:24 143:13

**acknowledged**
129:13

**acknowledgment**
44:21 45:3,6,10 48:17

**acquaintance**
36:18

**acronym**
6:18

**acted**
158:25

**action**
175:5

**actions**
89:18

**activities**
179:15

**activity**
39:10,14,18,22 54:16

**actual**
51:18

**add**
94:11 134:7

**additional**
66:4 184:23

**additionally**
22:6

**address**
15:5,8,11 69:15 76:20
77:6 113:18 114:2
130:6 131:2 138:18
142:4,6 148:20 149:6,7
157:18 178:16 180:10
182:4

**addressed**
58:18 115:12 130:19
142:25 147:12 148:15
157:17 162:23 179:21

**addressing**
121:9

**adhered**
46:10

**administrative**
46:21 47:19 52:13,16,
21 53:2 84:11 122:18,
24 124:17,24 150:23
151:1,24 152:18 153:21
154:8,9,13,17,22
155:21 159:20

**administrator**
74:7 151:16

**administrators**
52:21

**advice**
35:23

**advise**
141:25

**AES**
187:21

**affirmative**
175:5

**afford**
178:17

**afraid**
93:4 143:2

**African**
173:10

**African-american**
173:11

**afro**
166:18

**Agency**
6:14,15

**aggressive**
94:18

**Aging**
6:14,15

**ago**
5:15,16 63:7 92:19
96:12 97:19 103:19
140:14 189:3

**agree**
104:6 118:8,14,23
123:17 124:19 126:17
130:2,8

**agreed**
135:15 155:4 159:13,
14,16

**agreeing**
122:15 135:17

**agreement**
45:14

**agreements**
12:17

**ahead**
50:25 83:12 87:11
90:15 108:2 128:17
169:2

**aid**
81:10

**Alamo**
7:3

**Alan**
56:23 57:10,22 58:12
68:2 71:20 74:22 76:21,
24 78:15 79:10 81:10,
20 82:16,23 83:19
84:14,18 85:19 87:17,
22 89:3,7 101:2,6
102:5,8 103:8 106:7
107:2 116:20,22 117:25
121:11 126:19 129:20
132:9 134:18 138:19
141:13 142:8,14 143:21
146:7 151:6 153:4,7
154:21 155:4 157:11
159:6 162:20 163:6,8
166:3,7,24 168:19
172:16 177:1 179:24

**alcohol**
145:20

**allegation**
61:19 66:5 70:18 88:11
134:1

**allegations**
55:21 137:4

**allege**
56:21 163:4

**alleged**
61:21 70:13 80:5 169:3

**allegedly**
140:8 157:5 167:21
168:10,23 169:18,21
170:3

**allowed**
148:2

**allowing**
94:16

**allows**
175:7

**alongside**
117:23

**American**
173:10

**amount**
9:19 10:6,7 14:20 19:5
20:16 39:7 40:14
187:25

**and/or**
31:18 119:21 150:25
156:17

**angry**
94:17 105:3 110:4

**Ann**
154:5

**Anna**
75:22 89:2,19 90:4,5
93:10,17 154:5

**answer**
5:23,24 47:4 48:9 50:15
74:19 171:20

**answered**
140:4,12 144:23 145:7
169:23 170:6,22

**answers**
56:16

**Antonio**
20:2 68:10 69:9,10
73:16 75:13 79:13
83:20 96:9 114:17,25
115:23 120:7 131:10,
12,16,18 132:1 137:19,
21 138:1,5,7 144:17
157:12 160:9 161:7
162:17 181:22 183:23,
25

**anybody**
130:25 139:20

**anymore**
179:18

**apart**
177:24

**apartment**
15:14,15,16 16:3
178:10

**apologize**
150:10

**appears**
51:8

**application**
188:19,20,21

**applied**
38:3,9,13,19,22 45:23
47:13 189:4

**apply**
46:3

**appraisal**
125:8

**appraiser**
125:13

**appreciate**
104:4 112:14

**appropriate**
12:3,19 54:14 121:5
122:10 135:20,23

**approximate**
10:19

**approximately**
18:11 42:15

**April**
6:23 7:21,24 8:1 9:15,
16 13:6 17:14 20:5
125:8 129:9

**Arcadia**
188:15

**Area**
6:14 7:3

**aren't**
12:17

**argue**
89:15 91:21

**Argumentative**
175:21 176:1

**asked**
6:9 24:8 56:2,4,7 68:5
79:23,24 106:9 127:14
140:4,12 144:22,25
145:6 154:20 163:3

166:2 169:22 170:5,22
188:8

**asking**
15:10 23:19 67:6,13
80:13 88:13 89:21
104:1,22 105:6,9
137:12 148:9,11 152:4
154:25 155:2

**asks**
56:20

**aspect**
64:18 150:16

**assessing**
25:24 26:1

**assign**
8:12,16

**assigned**
49:5

**assignments**
8:12,14 11:19

**assist**
8:11 11:6 30:4 74:13
124:21 129:16 148:14
149:8 161:15 162:17

**assistance**
11:5,11 24:24 25:1,8
42:4 52:14

**assistant**
25:11 84:11 120:12
122:18 154:1,17,23

**assistants**
52:22 53:2

**assume**
37:22

**attached**
38:14

**attend**
186:9

**attendance**
49:24

**attending**
15:25

**attention**
7:12,17,20 145:23
178:15

**available**
22:25 88:1

**aware**
33:14 47:12 75:1 132:9,
14 151:7,8 157:25

**Ayala**
74:5 97:1

_____

                 B

**B.S.**
186:7

**bachelor's**
26:12,14,20

**back**
7:24 38:5 39:5 48:5,6
49:21,22 50:9,10 57:9
66:15 68:23 71:3 72:19
73:6,8,22 83:20 94:8,9
95:4,21 98:25 99:8,9
108:25 110:3,4 111:2,3,
9 121:14 122:3 124:14
131:21 132:8 149:22,23
150:8,12 164:5 178:9
180:24 185:17 189:9,10

**background**
26:4,7

**baffled**
105:4

**balance**
40:3,4,11

**bank**
37:16,23,24 38:14

**base**
31:11 61:18 78:9 94:4
98:3 133:21 134:1

**based**
49:15 50:1 56:23 57:16
61:2 65:3 72:4 74:16
78:11,12 89:17 91:3,4
96:7,14 97:13 102:7
107:2,20 114:10,11
115:4 128:3,24 148:18
163:5 176:5 177:3,23

**bash**
89:10

**bashed**
90:9

RENEE RICHARDSON - 12/04/2018                    i4

**basic**
178:13

**basically**
35:12 60:12 62:20
75:14 83:18 89:13
100:20 105:11 138:22

**basing**
30:1

**basis**
11:19 12:6 21:1 24:12
31:10 57:11,13,23 60:7,
15,19 66:6,12,22 67:2
68:18 70:14 72:24
78:18 81:1 84:5 86:8
88:2,7 94:6 95:6,7,17
98:5,17 185:3

**Bayou**
21:7

**bedroom**
178:10

**began**
20:5

**beginning**
123:13 151:21

**behalf**
127:9

**behavior**
145:15,16 146:1

**believe**
6:22 18:22 22:12 24:24,
25 25:13 31:11 33:7
36:3 56:2,7 57:12,18
58:25 66:5,21 68:7 74:5
75:7 80:25 81:16 84:4,
10,18 85:9,13,18 87:4,6
88:1,6 93:12 101:5
104:13 105:17,18 114:8
115:10 127:1,2 135:23
138:19 139:16 147:16
155:13 171:11 177:3,5,
7 183:25 187:5,7,14

**believing**
168:7

**Belinda**
13:17

**belittle**
64:6

**belittled**

58:16 61:16,19 62:18
110:16,18 112:5,20

**belittling**
61:21 64:2,18 70:15
113:6

**belongings**
89:20

**benefit**
129:18

**benefited**
129:20

**benefits**
14:5,7,8,17 19:6,9,11
22:25 27:8

**Benjamin**
15:24

**best**
178:24

**beyond**
86:23

**big**
114:5

**bigger**
114:6

**bill**
11:5 184:7,11,19,24
185:3

**bills**
178:23 184:4,5 188:2,4,
6

**bit**
86:20 185:17

**biweekly**
10:8

**black**
60:21 61:2 83:23 84:22
107:3 166:25 167:2,4
169:12

**blamed**
90:10,13

**blood**
178:6,7

**bogus**
80:17

**borrow**

37:4

**boss**
9:6,14 34:12 39:2 87:17
123:10,14 133:5

**bother**
88:13

**bottom**
18:2,20 34:15 167:18

**branch**
42:21 43:2,13 50:18,23
51:15 52:6,10,24 53:4
58:11 60:2 63:10 68:9,
20 69:15 73:17,18
74:10 77:5 79:6 81:9
83:14 89:2 95:19,25
96:4,6,17 98:21 100:17,
19 102:5,23 103:2,6
105:23 107:8 108:8,20,
22,24 109:6,9 113:21
114:3,17,18 115:1,5
116:3 117:10 118:16
119:1,10,21,22,24
120:8,9,10,14,22 121:1
122:22 124:18 129:22,
23 131:11,16 132:12
148:17 150:21 151:2,8
172:8

**branches**
132:10

**Braunfels**
15:6,12 42:22 43:14
51:21 68:8 73:18 74:10
79:6 95:25 103:2,6
105:23,25 108:19,22,24
109:6,9 114:3 115:1
116:2 119:10,21
131:10,11,19 132:1,11
137:18,22 148:5 149:20
150:17,21 151:2 153:21
154:14 155:22 156:7,11
159:21 160:14 161:16,
25 162:12 163:14
183:24

**break**
43:21 94:25 130:14
177:9

**breaking**
87:3

**breakup**
183:10

**brief**
22:21 72:4 146:21,23

**bring**
125:23 133:2

**bringing**
120:21 127:18

**brings**
180:24

**broaden**
141:9

**brought**
79:6,8 100:5,7 102:18,
24 103:11,15,18,23
110:19 149:15

**budget**
82:7,10 87:8 116:4

**budgets**
8:11

**business**
26:12,14 27:1 32:21,22,
23 34:5 35:1,13 186:7

---

**C**

**C-O-U-N-C-I-L**
181:14

**cable**
184:19,24

**calculating**
31:3,6

**call**
30:14,15 75:13 89:3,5,9
95:12,13 103:14 134:14
146:24 155:14,17 159:9
165:5,9 173:2,4,13
175:2,3,13,14 182:10

**called**
24:10,19 32:19 34:12
165:7 178:2

**calling**
175:23

**calls**
11:4 30:7,9,21 69:7,9
73:15,22 74:9,15 76:25
98:25 103:1,6,10 110:3
179:3 186:24

**CAMMACK**
9:24 41:6,9 43:8,20
48:4 51:6 94:24 117:18
124:2 128:11 130:14
139:22 140:2,4,10,12
144:22 145:3,6 169:22
170:5,20,22 171:20
175:20,25 177:14 181:4
189:14

**campus**
186:18,19,20,22

**can't**
8:14 13:10,19,20 14:10
18:23 32:24 35:3 51:4
56:6 59:10 65:14 72:10,
25 77:3 80:12 82:5
88:18 92:16 93:24
96:11,13,17,19 97:10
100:10 103:19 108:4
109:20 112:11 132:9
135:3 137:23 143:11
144:21 152:21 155:17
169:16 184:16 187:7,24

**car**
146:4 178:23 179:1
185:18,20,23,24 188:6

**card**
37:17,19 38:15 178:3
188:5

**cards**
178:23 187:23

**care**
7:23 8:7,11,18,19,22
10:21,23,25 11:6,20
12:2,14,18,23 13:1,5,11
14:9 16:20 17:16,25
18:10 19:1,4,7,14 20:4
21:7,9,10,15 25:4 41:20
120:13,21

**caregiver**
16:19,20

**carrier**
185:14

**case**
10:23

**cases**
8:12,16,17 12:3 13:12,
14,25

**Castillon**
84:11 85:1,21 86:6,11,

23

**Castillon's**
85:24

**caught**
93:13

**cause**
90:18

**caused**
94:14,19 97:17 140:9

**causes**
58:24

**Cazares**
93:11 109:16 114:12
118:5 126:23 127:11
130:10 141:5 144:13

**Cazares's**
117:14 161:18

**CC'D**
103:24

**cell**
185:5

**census**
114:7,9,14 116:18,22,
23 117:5,13,17,21
118:14,15 119:4,7,22
123:24 125:17,19,21,25
126:7,12,21 127:13,15,
17 128:5 129:8,14,17,
19 130:1,11,20 132:24
133:1,6,7 148:21 149:8,
10,14,16 163:19

**certain**
35:10,14 155:16

**certifications**
26:8,11

**chain**
121:2 142:12 175:10

**challenges**
119:25

**chance**
64:23

**change**
79:11,24 80:5 81:2

**changed**
57:16 79:9,25 180:21,
23

**changes**
16:10,13 20:1 62:24
63:18,19 65:1,2,6,16,
19,20,23,25 66:2 133:7

**changing**
57:24 78:18

**characterizing**
188:23

**charge**
43:14

**chart**
56:5

**charts**
55:23

**Chevy**
185:25

**child**
15:18,19 41:2

**children**
16:2

**choice**
12:18

**choose**
12:18

**Chris**
168:23

**Christina**
57:17 58:20 73:25 74:2,
5 79:22 80:5 81:18 82:3
83:1 84:14 85:16 87:5,
12,16 88:9,25 96:8,14,
24,25 97:1,13,17
102:22 103:7,14
104:19,22 105:3,13
107:4 114:19,20 116:21
124:21 134:18 137:4
138:18,21 141:14,15,16
142:8,14 143:22 146:6,
8,15 149:18 151:7,20
157:19 162:20 164:21,
24,25 165:1 168:7,21,
23,24 169:3 170:2,7,14,
18 171:6 172:16

**Christina's**
80:7 81:20

**chronic**
178:6

**circumstance**
61:20

**Citibank**
187:4,5,6,14,19

**city**
182:2

**claim**
98:3

**claimed**
134:15

**clarification**
79:20

**clarify**
57:2

**class**
57:15

**clear**
93:19 109:4 119:8
141:11

**clearer**
6:6

**clearly**
20:11

**client**
25:12 70:10 75:3,10
76:12 78:1 99:20
103:21,22 134:16

**client's**
25:25 26:1 75:9,17

**clients**
24:16,17,23 25:4,7,10
69:6 115:22 117:7
118:4 119:9 120:1,13,
21 125:23 127:19 129:9
133:3,13,14 134:13
149:12 157:7 161:13,23

**clock**
62:22 65:17 67:5,10
68:14

**close**
40:18 86:19 145:23

**closed**
40:16

**clue**
31:13,16,24 156:21

**co-employer**
9:4

**coach**
34:8,9,22

**coaching**
34:25 35:4,22 36:1,9,
12,15

**Cole**
34:20,25 35:18 36:8,12,
14 39:2

**Colleen**
115:20 123:9,11
152:19,25 158:17

**college**
179:9

**Collen**
153:1

**color**
58:17 60:19,20,22

**combine**
41:7

**come**
37:6 100:4 105:21

**comes**
38:2 159:25

**coming**
116:24

**command**
142:12 175:10

**comment**
72:1 91:24 104:21
138:23,25 139:1,2,21,
25 140:7 166:1,23
167:12,13,14,17,19
168:1,3,10,16,22 169:4
170:3,15,18,24,25
180:16

**comments**
71:14 72:2 125:13
131:5 171:3

**commission**
20:17,25 31:10,11,12
41:16

**committed**
134:17,20

**committing**

114:22 134:10 137:5

**communicate**
91:19 128:4 182:7,8

**communicated**
62:25 63:2,3 65:2,17,
19,23 66:1 75:14 83:20
87:17 102:9 103:8
115:14 119:15 128:1
155:9

**communicating**
114:21 146:20 152:1

**communication**
69:12 87:12 100:10,11,
12 101:18 103:25
114:11,17 131:10,18,
23,25 132:7,10,16,23
133:17,22 134:2,24
138:20 146:19 155:15
165:22

**communications**
29:7,12 54:10,13 96:8
114:10 137:3,8 152:11

**community**
126:10

**Commuter**
85:3

**companies**
17:15

**company**
22:9 25:18 54:15
147:15 175:8 183:7

**compensation**
9:17,18 10:4,12 20:6,
18,22 31:7 80:19 81:3

**complain**
116:18 150:24 156:7,16
160:13

**complained**
58:16 114:23 115:21
116:10 121:7 131:17
134:1,9 137:16,17
141:12 143:21 150:20
156:6 159:21 172:13
176:5,6

**complaint**
68:23 75:5,6 115:3,13,
15 141:22 144:13
145:10,13,21 147:1,9
154:16 158:17 160:6,19

162:12,21 173:16,21,24

**complaints**
68:21 69:6,13,14 70:10
75:3 76:13,15,17,19,20,
22 77:1,8,14 78:1 99:20
103:21,22 113:18,20,22
114:1,13,15,18 115:11,
18 116:14,17 130:19
142:3 143:3,17,23
144:2,9 148:4 149:18
151:22 154:8,12 155:20
156:10 159:19 160:4
161:1 163:5 171:4
176:8

**complete**
30:19 131:1

**completely**
91:1 115:6 147:22

**completing**
158:14

**comply**
46:16 47:1,19 48:20,23
49:2,3,9

**complying**
47:24

**computer**
24:15 25:16 81:16,18,
23 83:2,16,19,21 84:9,
10,12 85:2,4

**concern**
107:7 115:3 117:3,8,11
121:9 132:16 145:17

**concerned**
114:7 118:1 120:23
155:1 178:8

**concerning**
66:10 77:17 109:16
132:6 166:11

**concerns**
89:8 90:12 114:8 115:8
117:6 121:10 127:16
145:15

**conclusion**
92:9

**conduct**
92:10

**Conducts**
122:10

**conference**
89:3 90:3 110:3

**confidence**
100:10 179:5

**confused**
79:19

**conjunction**
130:13 136:7,9

**contact**
28:15 54:13

**contain**
173:21

**contained**
45:7 173:24

**content**
149:1 155:3 172:11

**contention**
78:9 94:5 99:5

**contents**
45:11

**continued**
39:25 147:13,14

**continuing**
10:3 43:24 95:3 130:17
177:11

**contract**
11:12,16 12:17 36:3
183:9

**contracts**
12:1

**contribute**
184:15

**contributed**
184:14

**contributing**
184:22

**control**
147:7

**conversation**
62:21 63:4 68:3 80:14
83:1,11 89:8 92:7 93:5,
15 98:7,9,13 101:8
102:16 103:10 104:19
105:13 108:4,7 110:24
127:5,6 146:16,21,22
152:13 157:11,14,21,23

163:16,21 165:17,20
168:18,20 182:12

**conversations**
57:16 93:8 96:14
111:25 112:1 130:24
135:2 144:5 147:23
148:6 151:11,14 164:17

**conveyed**
82:1

**coordination**
10:23,25

**coordinator**
7:23 8:7 16:19,20,21

**copay**
14:20

**copy**
45:4 55:5,10,17 79:7

**corporate**
143:5,14 171:9

**correct**
10:20 18:4,5,9 21:11,12
24:8,20 35:16 38:21,25
39:3,15,16 41:16 43:18
44:23 46:8 51:10,11
53:9 54:11 56:6,25
62:12 75:16 82:12
88:17 101:24 125:21
129:3 136:21 139:25
142:16 150:3,15

**correctly**
18:17 33:3 59:18 87:7
122:8,12,13 126:14,16,
17

**couldn't**
91:16 98:21 104:23
107:21 112:25 156:23
178:15,17,22 184:4
188:12

**Council**
7:3 181:12,16,20
182:15 183:21 188:5

**counselor**
180:10

**count**
129:8

**Country**
22:7,10,13,19,24 23:3,
22,24 24:2,4,7,13,20

**couple**
80:2,11 107:19 109:14
151:12 155:8 171:16,
19,21 177:15 178:2
181:7

**course**
93:10 114:15 117:8
187:4

**courses**
186:20

**court**
5:20 48:7 49:23 50:11
66:16 73:9 94:10 99:10
111:4 121:15 122:4
124:15 125:4 149:24
150:9,13 189:11

**coworkers**
61:12

**created**
39:5

**credit**
30:4 37:17,19 38:11,15,
20 178:3,22,23 183:14
187:23 188:5

**creditor**
186:24 187:10

**creditors**
179:3 186:25 187:3,6,
13

**credits**
183:16

**criticisms**
108:14 139:3

**criticized**
167:5

**crying**
138:9 139:18

**CSR**
18:13,16

**culturally**
169:11

**culture**
167:2

**current**
9:21 15:8 164:18
180:24 188:2,4

**Currently**
14:23

**curse**
141:20

**cursed**
114:25 139:7,10 140:22

**cursing**
141:7,11

**cuss**
145:4

**cussed**
144:16,20

**customer**
18:17

**customers**
69:13

**cut**
9:24 180:15

**cutting**
94:15

**D**

**date**
6:22 35:19 79:4 174:6

**dated**
18:4 35:16 44:18 125:8

**dates**
17:17 22:16

**daughter**
178:1,10,14,19 179:8,
16 185:7

**day**
10:10 58:19 103:14
166:17 167:24 168:14,
17 174:19 180:3

**day-to-day**
24:12 52:2

**deal**
12:1 132:17 166:25
180:20

**dealing**
147:3

**debt**
179:1

**December**
79:5

**decide**
116:4 147:8

**decided**
74:13 147:7

**decision**
43:1,11 73:24 74:1,17,
20,21 98:24 99:1
101:17 103:1,4,5,11,17
115:24,25 153:2 159:7,
9 162:5 176:24 177:3,6,
7,23

**decision-making**
68:20

**decisions**
58:11 60:1 68:22 69:1,
5,16,25 70:9 73:12,13,
22 74:9 75:24 77:24,25
95:18,19,25 96:1 98:2,
17,20 99:3,15 100:13,
18,24 101:1,2,5 102:14
103:22 109:1

**declining**
114:9

**decrease**
117:6

**deem**
12:19

**defendant's**
56:21 163:4

**definitely**
172:20

**degree**
26:11,20 186:19

**degrees**
26:8,9,19 186:15

**delegate**
8:11

**delinquent**
187:2

**delivered**
83:21

**denial**
82:11 83:2 84:6,8 86:24
87:25 88:5

RENEE RICHARDSON - 12/04/2018                    i8

**denied**
58:3 81:10,21,25 82:2,
8,13,23 83:18,24 87:22

**dental**
14:9,22 19:10

**depend**
106:11

**depended**
107:4

**dependent**
14:24

**dependents**
14:25

**depends**
12:11,13

**deponent**
117:19

**deposition**
5:12,17 6:3 17:22 20:10
32:14 44:2,15 48:12
50:22 54:1,21 55:1
56:14 57:3 118:7 125:7
128:8

**depressed**
178:5

**describe**
65:12,14 66:3 92:10
112:22

**description**
43:18 50:23 66:4 109:7
121:18 122:5,22 123:18
124:3 159:1

**desk**
105:4 164:6,10

**detail**
60:3

**details**
69:21,22

**Devry**
26:16,18 186:6

**diagnosed**
178:5

**Diane**
17:1,2

**didn't**
24:14 27:18 28:17

60:11 63:25 64:5 65:5
70:17 79:17,19 89:12,
14,24 91:2,8 92:3 98:21
104:24 105:6 106:14,25
123:4 126:20 127:20
143:1 145:22 159:18
163:23 165:15 166:6,7,
8 167:22,25 169:16,19
170:11,21 171:18
173:19 175:2,3,9,14
178:17,20 179:13,25
180:9,16,18

**different**
11:2 12:9 85:8 166:15

**difficult**
50:15 124:18

**direct**
52:2 74:3 79:23 87:13
97:1 115:13,15 149:14

**directed**
52:5 100:4 101:9

**direction**
101:6,11

**directive**
172:17

**directly**
7:8 11:13 81:19 84:15
85:12,13 123:23 168:20

**director**
16:9,11 19:16

**disability**
14:10

**discipline**
49:8,13 135:24

**disciplined**
75:11

**discover**
135:9

**discovered**
83:15

**discovery**
17:24

**discriminated**
55:21,25 56:22 57:11,
13 58:17,25 61:5 66:6,
11,22 67:2 68:17 72:24
78:10,17 81:1 84:4 86:7

88:2,7 94:5 95:7,17
98:4,18 99:5 162:24
176:4

**discrimination**
60:18,23,25 64:9 70:14
163:6 171:4,5 173:21,
24

**discriminatory**
57:23 59:12 60:7,15
167:7

**discuss**
79:22 89:8 127:13
142:14

**discussed**
72:4 102:22 103:13
105:17,18 119:4 127:1
151:4,5,9 152:13
155:19 159:8

**discussing**
13:14 108:8 142:13
154:21

**discussion**
72:4 107:12 148:1

**discussions**
133:10 151:19 164:21

**disengaged**
153:6

**dismissing**
128:2

**dispose**
31:21,23

**disregarded**
67:25 68:15 69:24 70:7
77:23 99:20 115:6
147:22

**disregarding**
77:17

**dissolve**
33:22

**distinctly**
104:12

**divided**
10:18

**doctor**
178:17

**document**

17:23 19:17 23:18 44:3,
6 45:13,17,25 49:2
50:6,12,16,18 51:16
54:2,6,8,17,22,23 55:2,
3,14,15,20 78:21,23
80:17 101:13 104:14,20
105:2,7 110:10,25
111:16 125:9 128:9,19
137:11 160:22 161:5
162:16

**documentation**
31:17,21,23 32:17 36:1,
11 59:6 152:14

**documents**
20:11,12 55:2,20 97:21
175:4

**doesn't**
50:18 169:5

**doing**
25:15 53:7 161:12

**domain**
33:8

**don't**
5:16 10:6 12:1 16:23
17:19 19:2,5,10,12 21:2
22:16,20,23 23:4,12,15,
17,19,20 24:3,5,6,11
27:23,25 28:4,6,17
29:2,5,22 31:9 32:1,3,5,
11 33:17,19 34:4,10
37:19 40:19 41:12
42:11 43:6 44:7,12,24
45:1 47:3,5 48:8 50:2
54:23 57:7 58:22 59:3,
4,16,21 60:5 62:2,20
63:9,15,23 65:14 67:5,
11,18,19 68:4,12 69:8,
21 70:2,21 71:13 72:3,
17 73:1,10,23 75:5,8,
20,25 76:6,8,11 77:3,14
78:5 79:15 80:12 81:19
82:7,9,10 83:3,4,7,14
84:1,2,12,13,15 85:6,22
86:3 88:8,10,14 90:17
91:2,18 92:21 93:16
96:7,12,23 97:15,19,24
101:22 102:1,2 103:9
104:3,12,17 105:10,15
106:13,16 107:13,24
108:3 109:23 112:3
115:14 116:11,24
119:6,13 120:12,14,15

RENEE RICHARDSON - 12/04/2018                    i9

124:10 125:15 128:21
134:22 135:1,17 138:1,
12,17 139:1,14,25
140:13,19 141:7,24
142:18 143:7,9 145:1,8,
9,19 146:7,16,18 147:9,
25 149:11,14 151:3,18
153:10,13,17,18,20
155:2 157:10,15,22
158:9,23,25 159:6,17,
24 160:12,16,22 161:2,
3,10 162:9,14 163:23
164:16 165:7,16 166:9,
10,24 167:10,13,14,18
168:2,13 169:25 170:8,
9 172:6,8,17,18 173:4,
20 176:10,25 180:14,21
182:22 183:8 184:25
185:11 187:14,20,24
188:21 189:3

**door**
47:9,15 54:9,13 93:12
175:7

**driver**
184:2

**drop**
117:5

**drugs**
145:20

**dual**
85:8,20

**duly**
5:5

_____

**E**
_____

**e-mail**
68:2 75:7,8 76:7,8
84:17 85:15,24 86:2
97:14 99:22,23 100:12
101:8,12 102:9 103:24
104:16,18 105:8 134:24
135:4 138:21 146:17
152:2,12 155:10,12,15
171:8,14,23 172:3,5,9,
10,12,15,18,22,25
173:9,20,23 174:2,6,10
176:11,12,17,21 182:10

**e-mailing**
80:11

**e-mails**
99:24 148:7 171:16,17,
18,19,21

**earlier**
60:18 71:4 99:11,13
127:8 171:24

**earned**
21:11 22:6

**earning**
19:3 20:24

**education**
186:6,8,10,13

**EEOC**
55:12 56:3,4

**effect**
139:5

**effected**
12:20

**effective**
18:8 123:15

**eight**
8:10 79:1

**Eileen**
42:6,25 43:3 117:24
118:2 120:18

**either**
75:25 82:6 91:9 99:22
101:8 102:7 107:11
130:25 143:21 151:12
152:1 155:10 160:25
178:16

**electric**
11:5 184:11

**electronic**
7:15 62:2 95:14

**electronically**
36:5

**eliminate**
136:3,17 137:1

**eliminated**
16:15 135:7

**else's**
122:21

**email**
80:13

**embarrassed**
94:12

**embarrassing**
113:4

**embrace**
167:2

**embracing**
167:3

**emotional**
179:23

**emotionally**
180:13,19

**employ**
123:20

**employed**
18:10 21:14 22:24
41:25 44:10 49:7 159:3
166:14 182:19,21,23,25

**employee**
23:24 44:22 45:4,7
46:21 47:20 49:1,14,18
75:10,18 76:5 79:3
108:15 115:7,16,19,20
130:21 136:19 148:23,
24,25 151:24 153:21

**employee's**
48:17 89:18

**employees**
8:20 46:24,25 47:1,13,
24 48:11 49:6 50:19
53:21 56:21 58:8 88:20
94:13 95:12 114:22,23,
25 115:4,5 117:4
134:10,12,14 135:2
137:5 138:3,8 139:2
144:12,17 145:15 147:1
149:11 151:1 152:18
154:8,9,13 157:7 162:1
163:4 164:18,19,22

**employees'**
121:10

**employer**
9:5 12:21 14:14 15:1
175:6 189:6

**employers**
148:19 188:22,23

**employment**
14:6 16:5 17:5,17 19:7,

14,21,25 21:13 22:13
23:6 26:23 41:18,21,24
45:23 46:2,17 56:23
57:15 80:19 147:13,14
158:11 159:2 162:25
164:1,5,20 165:3 174:7,
20 176:24 182:16
184:6,10 188:3

**employs**
122:9

**encapsulate**
110:21

**encountering**
120:2

**ended**
68:2 178:2

**enforce**
53:14,21

**engage**
179:16

**engaged**
93:14 181:19,20

**enjoyed**
179:15

**ensure**
11:23 47:24 120:11
126:9

**entailed**
172:9

**entire**
52:25 62:21 166:13

**entities**
8:23 9:2 21:16 26:24
41:20

**entity**
6:21 7:6 9:7,9 21:8,18
24:19 27:15,16 40:23
41:19

**environment**
176:7,11,18

**environments**
176:15

**equal**
175:6

**Ernesto**
55:11,16

**Ernesto's**
55:10

**essential**
122:6 123:19

**essentially**
82:23 103:4

**establish**
38:19

**established**
118:6,17 119:1

**establishing**
35:1

**evaluations**
17:4 122:11

**event**
31:4,7

**events**
110:22

**eventually**
136:25 155:5

**everyday**
182:12

**EVV**
61:24,25 62:5 63:19
70:22 71:24 72:22 78:2
81:14,24 88:24 89:8
90:24 94:4 95:12
102:12,16 109:20 110:5
112:1 114:15 130:24,25
131:21,24 133:7 136:3,
7,14,16

**exact**
9:18 10:7 16:23 19:5
22:16,20 29:5 32:5 82:8
91:3,11 105:10 109:23
138:22 146:19 184:16
187:24

**exactly**
5:16 16:22 22:23 42:11
67:6,11,19 68:4 72:10,
17 85:22 90:17 93:25
107:15 109:21 136:18
139:1 159:17 172:9
185:11

**EXAMINATION**
5:6 177:13 181:8

**example**

49:25 86:15 98:22
122:2

**examples**
78:8,11 111:6 113:9,12,
16 131:25

**exceeded**
120:17

**Excel**
104:13 110:12,25
111:15

**excessive**
109:22

**exchange**
146:3

**Exchanged**
148:7

**excuse**
54:1 69:8 105:19
171:15

**exhibit**
17:20,22,23 18:21
19:17 20:8,10,15 21:4,
21,24,25 22:1,4 32:12,
14 34:11 35:16 39:9,13
40:4 41:5,6,9,11,13,19
43:25 44:2,13,15,16
48:12 50:20,22 51:3,5,9
53:24 54:1,7,19,21,24
55:1 56:12,14 57:3
78:24,25 118:7 125:5,7
128:6,8 163:3

**existence**
33:20 34:3

**expectations**
131:21

**expected**
17:9

**expensive**
179:20 180:12

**experience**
30:2 120:16 179:6

**experienced**
178:5

**expertise**
35:3 120:4

**explain**
16:13 64:22 72:22

81:11 83:12 89:12
91:15,17 134:11

**explained**
29:21 65:18

**explaining**
65:23

**explanation**
19:24 23:13

**express**
91:16 92:2 94:16 106:5,
8 140:22

**expressed**
16:16 72:8 106:4 117:3
127:16 165:12 171:6

**expressing**
114:19 157:16

**extremely**
149:2

_____

               **F**
_____

**face**
180:23

**face-to-face**
30:16 105:16,18 107:9,
11 109:20 127:6,9
135:4 157:11 173:8

**facilitate**
120:11

**facing**
73:17

**fact**
13:2,24 77:4 106:19,22
107:3 131:1 172:16

**facts**
61:18 80:25 84:4 86:18
87:24 94:3 104:7
133:20,25

**fail**
67:16 90:25

**failed**
67:22 175:18

**failure**
89:11 90:13,22,24 91:9

**fair**
173:15

**falling**
177:23

**falls**
118:15

**familiar**
45:11 55:3

**far**
27:14 29:7 37:15 43:3
80:18 100:1 103:21
109:8 114:20 120:23
128:3,21,24 136:6
138:20 148:8 150:5
151:21 153:5 154:25
158:24

**Fargo**
39:14,18,23 40:1 187:6

**fault**
91:13

**favorites**
11:20

**fear**
90:18 94:14,19 143:3
178:11

**feared**
143:15

**fearful**
89:19 93:7,17 94:13
178:12

**fears**
179:7 180:6,8

**Federal**
5:1

**feedback**
12:16 74:16 81:20
97:13,16 148:18

**feel**
58:15 60:12 65:3,4,9,13
67:1 94:12 95:6,16
104:8 107:2,16,17,25
110:1 112:11,23 113:2,
6 122:16 165:15 177:1,
2

**feeling**
93:17,24

**feelings**
169:9

**Fell**
75:22,23 89:2,19 90:4,5
92:22 93:10,20 154:5

**felt**
54:15 61:5 64:2 71:19
83:22 89:16,23 92:23
107:25 108:15 113:1,10
130:5 145:18 148:21,25
159:10 167:7 171:7
173:16 175:8 176:4,17

**field**
52:18,23 53:3 75:18
114:22 115:17 120:5,11
122:17 123:2,3,4,6,8,23
124:4,16,25 125:1
126:5,8 133:13,14,15,
18,23 134:3 149:1,6,9,
14 150:14 161:14,16,25

**figure**
38:1 92:9 112:25
132:15 139:15 158:13
168:1

**fill**
128:25 136:9

**filled**
128:15,19

**filling**
44:9

**financial**
11:7 177:20 182:17

**financial-related**
11:4

**financially**
179:14

**find**
47:17 86:17 101:4
119:24 166:21

**fine**
43:22

**finish**
5:23,24

**fired**
89:24 92:23 93:5,18
116:7 165:18,20 189:1

**first**
5:5 21:3 28:12 41:25
42:12 48:16 55:3,11
56:11 61:4 114:8

116:21 117:23 140:17
141:18 160:5 165:2,4,
19 171:23 172:5,22
173:19

**five**
118:4 120:1

**five-minute**
177:9

**floor**
178:11

**Florida**
186:23 188:13,14,15

**focus**
161:25

**focusing**
96:5 161:23

**follow**
45:15 84:24

**follow-up**
147:21

**followed**
80:2

**following**
12:17 53:11 60:13
142:12 174:10 175:10

**follows**
5:5

**food**
121:2

**forget**
148:23

**forgetting**
145:16

**form**
43:8 44:9,24 79:7,8
117:18 124:2 139:22
140:2 144:22 145:6
146:19 169:22 170:5,20
175:20,25

**former**
164:18

**forwarded**
77:6

**found**
28:18 77:4 115:6
166:22

**four**
18:11 78:8 163:3 171:3
176:23

**framework**
77:20

**Fran**
79:5,12 143:9

**Frank**
181:12

**fraud**
114:22 134:10,17,20
136:1 137:5,9

**freaked**
180:1

**Freddie**
42:14,25 43:3

**free**
14:7

**Friday**
171:15,17 174:3,10,23

**front**
32:15 44:7 48:14 58:8,
16 59:24 70:16,19 71:3,
12 72:21 88:20 94:13
95:11 110:17,18 112:24

**frustrated**
115:19 127:17 128:2

**full**
74:4

**fully**
49:18

**fun**
32:19,24 33:20 34:3
40:22

**function**
123:19

**functions**
35:12 122:7

**funds**
37:18

**funeral**
179:13 188:12

**future**
142:4

### G

**gainfully**
182:25

**gaps**
136:9

**garnish**
187:13

**garnishments**
179:4

**Garza**
5:7,10 10:1,4 17:21
20:9 32:13 41:7,10
43:10,22 44:1,14 49:21,
25 50:8,14,21 51:8
53:25 54:20,25 56:13,
24 57:10,22 58:12,23,
24 66:14,18 68:2 71:20
73:6,11 74:22 76:9,21,
24 78:15 79:10 81:10
82:16,23 84:5,14,18
85:12,13,19,25 86:7
87:14,22 88:2,20 89:4,7
90:4,9,20 91:20 92:11,
16 94:5,8,14 95:1,4,6,7,
16 98:2,9,16 99:4,8,15,
17 100:14 101:2,5,6,17
102:3,5,10,15 103:5,8
104:8 106:7 107:2,17
110:1,16 111:2,7 112:4,
19 113:17 114:2,20
115:12 116:20,22
117:20 121:11,12,17,
21,22,25 122:6 124:3,7,
8,12,22 125:3,6 126:19
127:3 128:7,12,13
130:15,18,25 132:14
134:2,10,18,24 135:15
137:3,17 139:24 140:3,
5,11,15 141:13,14
142:8,14 143:21 144:1
145:1,4,9 146:7 148:4,9
149:18,22 150:2,16,22,
25 151:6,15 154:10
155:4,22 156:8,17
157:8,11 159:6,21
160:4,14 162:11,20,22,
23 163:6,8,22 167:21
168:10 169:24 170:4,8,
23 171:23 172:16
175:22 176:3 177:1,8,
12 181:7,9 189:9,13

**Garza's**
103:23

**gathered**
164:12,13

**generalization**
123:21

**gentlemen**
177:17

**Georgia**
182:1 183:2,10

**getting**
88:9 179:9

**give**
13:10 15:9 46:5,20 47:6
48:10 49:11 51:19
53:18 58:4 67:7,12,15,
16,21,22 77:20 86:14,
20 96:17 97:13,25
109:23 121:23 146:4
150:5 173:14,15 184:16

**given**
5:12 23:13 69:14 76:1
101:19,20 102:2 113:13
117:22 120:18 133:4
160:4,8

**giving**
35:22,23 76:5

**Gloria**
16:12

**go**
10:1 22:9 25:6,20 27:22
50:25 51:12 56:15 57:9,
21 72:19 83:12 86:19
87:11,16 90:15 95:21
100:21 104:7 108:2
110:3,4 114:18 116:12
128:17 143:1 144:6
145:22 146:1 164:5
169:2 178:1,17 179:9,
12 188:12

**goal**
118:3,5 125:20 126:3,7
129:16 130:4,12 136:5,
16,23,25 147:5

**goals**
129:6,14 133:1,3,4

**goes**
6:18 25:3 71:3

**Gogo**
80:2 171:8,9,12,14
172:21,24 173:2,5,13
174:11 175:1,11

**Gogo's**
80:10

**going**
17:21 20:2,9 24:16
41:7,10 42:13 44:1
53:25 54:20,25 56:13
60:22 67:15,24 74:14,
17 78:4 83:13,19 87:2
88:12 89:13,15,21,23,
24 91:4,6,12,21 92:1
93:5,17 95:9,21 99:12
100:21 103:13 104:15
108:25 109:22 110:8
111:9,11 112:12,15
113:21 119:12 120:10,
20 125:6 127:21 131:3,
21 132:18 134:4 147:10
149:16 151:8 156:17
158:4,6 164:9 165:14
172:7 178:9,13

**Gonzales**
79:12 143:9

**Gonzalez**
79:5

**good**
5:8,9 16:5 122:14
178:25

**governing**
7:6

**Government**
7:4 187:21

**graduate**
26:18 186:9

**grandmother**
179:11 188:11

**grant**
8:13

**granted**
38:23 84:16

**greatly**
129:18,20

**grocery**
184:22

**growing**

117:13 119:9 149:16

**guess**
6:12 56:7 64:25 74:14
91:2 101:4 131:14
187:25

**guidance**
11:10

**guided**
35:13

---

## H

**hadn't**
174:25

**hair**
58:20 166:2,3,11,12,13,
15,17 167:1,4,12,17,23
168:4,11,14,17 169:11,
14 170:13,24 178:5
180:15,19

**hand**
17:21 20:9 41:10 44:1
50:21 53:25 54:20,25
56:13 98:25 105:4
125:6 128:7

**handbook**
44:23 45:4,8 46:22
47:6,8,20,25 48:8 49:15

**handed**
32:13 55:14,15,17
73:22 100:20

**handing**
44:14

**handle**
74:15 76:15 81:24

**handled**
69:13 70:10 75:3,4
76:13,22 77:12,24

**handwriting**
41:13 44:8 55:7,8

**happen**
61:19 70:20 103:13
104:5 105:14 142:3
158:6,7

**happened**
57:17 63:6 70:21 92:10,
20 104:2 106:18
107:13,15 138:24

140:14 142:25 144:6
146:5 156:20 159:2
165:10 180:22 183:10

**happy**
72:5,6 94:18 158:21

**harassing**
179:3

**hard**
21:4 48:9 148:16

**Harvey**
147:11,24,25 176:6,9,
12

**hate**
9:24

**haven't**
7:17 47:14 179:21
180:11

**haywire**
87:3

**he's**
55:12 88:12 104:22

**head**
88:18 96:21

**heading**
48:16

**health**
11:11 14:8,9,19,21,25
17:16,25 18:10,25 19:3,
7,14 20:4 21:9,10,15
41:19 178:21 179:19
180:10

**hear**
89:14

**heard**
13:11 14:3 38:18 175:1

**hearing**
13:14

**Heather**
143:10 146:11,22,24
147:10 148:2 163:7,9

**held**
49:3 188:12

**help**
11:11 30:5 35:21 46:6
59:7 97:22 104:23
105:1 112:5 122:6

130:4,5 147:6 152:7,14
156:4 180:10

**helped**
34:7,22

**Henderson**
120:7

**Hernandez**
74:5 82:25 83:1,6 85:16
96:25 97:1 115:10
116:21 134:25 137:4
138:2,7 139:6,9,12
140:1,8,9,20,25 141:15,
16,19,22,25 142:14
143:20,22 144:1,11
145:11,14 147:19
149:19 150:22,25
154:10 155:23 156:8,17
157:9 159:22 160:25
162:11,20 164:25
165:1,23 168:7 170:2

**hierarchy**
56:7

**high**
115:16 120:19 123:22
148:4,10,16,17 149:6,
19,25 150:25 178:6

**highlighted**
181:2

**Hill**
22:7,10,13,19,24 23:3,
22,24 24:2,4,6,12,19

**hire**
115:24 116:5 122:17
123:6 124:4,23 162:5

**hired**
8:4 18:7 42:3,7 81:14
115:23 117:1,15 119:19
120:5 121:19 122:18,
20,24 123:8 124:6,20
125:22 151:21 160:9
161:19,24 162:7

**hiring**
161:25

**Hispanic**
83:23 84:21,22

**hit**
72:14 178:22

**Hold**
171:20

**home**
11:11 21:7,19 22:12
25:3 72:14 75:9,17
89:22 93:3 149:11
177:21 178:9 183:6,15

**homeless**
177:22 178:1

**homemaker**
24:25

**homemakers**
25:11

**horrible**
167:7

**hostile**
176:7,11,15,18

**hourly**
57:16,25 78:18 79:3,9
80:6,18 81:2

**house**
15:13 183:1,8,21
184:13

**household**
184:14,21

**HR**
79:13 115:3,14 142:13
146:9,10 147:7,8,21

**huh-uh**
6:6

**human**
142:9 143:1,5,8,14
145:11 171:9

**humiliated**
58:8 70:19 71:2,12
88:20 89:16 94:12
95:11 113:1

**humiliating**
59:23

**humiliation**
70:15 72:20 113:7

**hurt**
169:9

**hurtful**
168:3

**husband**
147:4

**Hyun**
166:7 168:19,21,23
170:4,14

---

**I**

**I'D**
56:15 112:5

**I'LL**
5:22 13:21 17:22 47:16
68:3 122:5 128:7 142:4

**I'M**
5:10 7:2,10 8:25 9:18
10:10 12:5,6 15:10
16:8,22 17:21 20:9
21:24 23:19 30:1 33:14
38:1,7,17 39:12,20 40:6
41:10 44:1,14 52:22
53:25 54:2,20,25 56:13
58:21 59:2 60:22 61:4,
8,9 62:3 64:10,24 67:24
68:22 73:5 74:11 75:1
78:4 82:19 83:6,23
84:22 86:11,14 89:22
92:9 94:7 95:21,23
96:2,5 99:12 101:15,18,
22,25 102:4 103:7
104:1 105:5 108:2,6
109:4,22,25 110:8
111:9,23 112:12,15,22
113:12,20 115:2 116:1
118:23 119:8 122:7,15
123:5,7 124:20 125:6
132:2,15 133:15 134:4,
21 137:12 139:8,14,15
141:17 144:3 145:2
149:21 152:4 155:16
156:9,15,17 158:13
159:23 167:22 168:1
169:12 170:1 172:13
178:12 179:17 180:3
181:1 183:17 184:8,13
187:1

**I'VE**
7:12,19 12:16 13:10
14:3 32:13 38:18 114:4
133:8 179:3,5 181:2
183:12

**I-Y-A-N-A**
15:24

**idea**
106:1 127:4

**identified**
56:23 57:24 59:8,20
163:6

**identify**
56:21 134:19,23 163:4

**illegality**
54:16

**illness**
178:6

**imagine**
131:13

**immediate**
18:25 24:1 42:5

**immediately**
52:11 164:6,7,9

**impacted**
57:18 177:18,20 181:2,
10 183:15

**implementation**
109:20 112:1

**implemented**
81:15 136:6

**important**
58:10 95:18,25 96:4

**impressions**
92:24 93:21

**improper**
54:16

**improve**
17:12

**improvement**
16:7,8

**inappropriate**
93:24 108:16 139:17

**incentive**
148:24

**incident**
68:13 76:16 77:11
86:24 147:19

**incidents**
66:25 68:16 71:11
72:20,22 95:5 107:16

**include**
127:21 160:25

**included**
35:6 98:22 127:8
172:18

**includes**
53:11

**including**
54:14

**income**
11:3

**incompetent**
58:15 64:25 65:5,11,13
70:17 104:9 107:17
110:1 112:23 113:2,7

**incorporates**
141:10

**increase**
119:14,21 125:18,21,25
126:12 129:8,14 154:20
155:1

**increased**
129:19

**increasing**
126:7,21 129:16 130:1,
11

**indicate**
79:2 123:7

**indicative**
55:25

**individual**
19:24 28:19 138:10,14
141:19 143:18 153:1

**individuals**
13:13,21 51:24 52:1,15
53:6 77:7,8 101:19
112:25 134:17,19,24
135:9,12 146:13 152:17

**industry**
184:3

**inference**
91:10,11 105:11

**influence**
145:19

**inform**
146:13 188:16,18 189:6

**information**
15:9 29:9,14,16,17 36:7

44:22 45:7 56:9 63:1,2
66:4,10 67:7,8,9,12,21,
22 68:1 69:24 70:8
73:25 76:6 77:18,23
86:5 87:20 89:6 91:3
99:13,21 115:4 132:11
187:7,10

**informed**
16:9 58:19 106:5 118:2
138:19 141:2,3

**initial**
153:7,11

**initially**
18:6 123:9

**insensitive**
166:24 168:3 169:11

**instance**
71:15 102:15 109:2
139:11

**instances**
112:7,8 114:24 132:2
144:8

**instruct**
107:6

**instructed**
102:5,11

**instructions**
100:20 101:19,20,23
102:1,2

**insurance**
14:19,21,22,24,25
27:10,12,13,15 29:19,
23 30:1,2,10,19 31:18
178:18,21 179:20

**interact**
61:12

**interacting**
71:20

**interaction**
141:19

**interesting**
106:19,22

**Interim**
17:16,18,25 18:7,10,25
19:3,7,14 20:4 21:9,10,
15 28:3 41:19

**interpret**
60:23 167:20

**interrogatories**
56:15

**interrogatory**
56:16,17,18,20 57:10
163:3 171:2 176:22

**interrupt**
68:23

**interviewing**
180:18

**invoice**
34:13 35:15

**involuntarily**
23:8 188:20

**involve**
107:19 109:5

**involved**
35:2 41:2 43:1,11 58:10
64:8 73:24 74:20 76:9
78:1,3 87:15 95:18,20,
24 96:1,3,11,16 97:7,18
98:9,12 99:17,22 100:3,
11,19 101:5,17 102:15
109:5 110:5 112:11,19
114:20 120:25 138:20
151:20 159:7 176:25

**involvement**
76:3 103:12 108:23
109:1 147:18

**involving**
71:4 91:12 109:15
111:20 133:11,12

**isn't**
42:19 43:14 45:4,16,18,
23 46:11,24 47:25
48:20,23 49:9,14 50:23
51:15 52:6,20,25 54:10,
16 55:4 67:22 80:21
117:8,13 123:25 128:20
129:11,19 130:11
135:15 136:10,14,20,23
139:21 142:16 173:17
175:18 177:6

**issue**
75:11 80:3,11 83:22
84:23 87:25 88:25
90:10 94:21 95:13,22
102:18,22 103:8 105:14

133:12 138:4,5 142:24,
25 147:12,19,24 148:1,
10,13,14,19,20 149:7
154:15 155:19 156:24
157:17 167:4 175:7
178:7

**issues**
30:5 58:18 69:3,15
73:16 74:14 78:5 86:25
87:1 88:8 96:17 113:21
114:6 115:17 117:17
120:2 130:7 131:2
132:22 142:19 148:15
149:12,13 150:19,20
153:4,5,15,19 156:6,11,
14,19,24,25 177:20
178:19 179:21 180:11,
13 182:14

**it's**
6:5,6 7:3 12:6 16:23
21:4 32:18 33:5 34:12
43:7 51:5 55:4 62:2
77:13 78:24 79:1 96:23
101:12 103:3,4 108:12
122:7 124:18 129:22
135:10 138:22 141:10
144:24 149:4 170:8
180:19

**item**
123:18 129:8

**items**
32:24,25

**its**
162:12 167:1

**J**

**January**
116:5 162:6

**Jeep**
9:25

**jeopardy**
16:7

**job**
16:7 25:5 43:17 50:3,22
53:7,8 65:6 70:17 92:4
109:7 120:10 121:18
122:5,8,21,22 123:6,18
124:3 125:23 126:1,15,
18 143:4,16 148:2

158:25 161:18 165:15
180:5,24 189:4

**jog**
152:7 156:4

**joke**
58:20 166:3,5,6,7,9,10,
21,22 168:22 170:14,
19,21,25

**joker**
180:16

**judgment**
180:18

**judgments**
180:7

**Judy**
115:10 138:2,7 139:9,
12 140:1,8,9,20,25
141:1,19 143:19 144:11
145:11,13 146:23
147:18

**July**
18:7 123:15

**jury**
61:25 177:17

———————
**K**
———————

**keep**
30:21 41:11 120:20
149:16 165:19

**keeping**
175:23 178:25

**Keller**
26:18

**kept**
41:15 65:25 87:3 92:4
97:22 136:13

**kind**
21:4 24:17 25:15 34:25
54:15 60:12 69:7,9 85:7
105:4 132:13 139:20
184:1,5 185:24 187:22

**knew**
56:8

**know**
5:17 6:4,9 9:19 10:6
12:2 13:1,5 16:23 17:2

19:10 27:25 32:1,3
36:16 40:21 43:1,3,6,10
45:22 46:2 53:15,17
60:10 65:5 68:2,12 69:8
70:17 72:6 73:15,23
77:3 78:20,21 79:15
80:12 82:5,13,17 83:4,
19 87:14,20 88:9,12,13
89:23,24 90:18,25 91:2
92:4,20 96:14 97:24
101:7 102:2,20 104:12,
22 105:6,12 106:3
107:24 109:8,21,23
112:6 115:14 116:20
126:25 127:5,25 128:3
138:12 139:25 140:7,13
142:4,18 143:9 144:8
145:19 146:7,16,25
147:4,10 151:19 152:9
153:3,11,18 155:19
156:19,20 158:24
159:6,9 160:21 165:11
166:9,10,24 167:9,10,
13,14,18 168:13,14,15
169:18,21,24,25 170:8,
9 172:12,18 176:10,23,
25 179:25 180:5,14,21
183:2,22 187:14,20

**knowing**
49:16

**knowledge**
8:24 11:25 22:9 43:12
79:14 114:10 127:12

**known**
36:14 66:1 167:23

**knows**
166:24

———————
**L**
———————

**L.L.C.**
22:7,11,14,19 32:19
33:20 34:3,23 40:23
41:2

**lack**
131:22,25 132:6,10,15,
22 133:17,22 134:2

**ladies**
177:17

**lady**
34:12 39:2 152:21

**lamp**
164:13,14

**language**
187:16

**law**
135:10

**lawsuits**
179:4

**lawyer**
5:10 30:3

**lead**
158:24,25

**leads**
57:12 88:1

**Leal**
115:21 152:23,24 157:3

**learn**
27:21 42:12

**learned**
160:9

**leave**
28:20 164:6,9

**led**
92:10 139:16

**left**
18:2,20 34:20 71:16
147:16 149:12,13
164:3,8,12,16

**legal**
27:2,5,6,7,8,12,13,14,
19 28:13,15,20,24 29:4,
7,10,13,14 30:2,8,10,
18,24 31:7,18 32:2,7,9

**lengthy**
83:11

**Leslie**
175:24

**let's**
10:1 28:20 41:24 47:8
49:12 51:12 57:9 61:3
66:18 68:22 70:18
72:19 73:11 78:14
86:23 88:19 90:1
140:17 141:9,18 156:5
164:23,24

**letters**

182:11 187:16

**letting**
68:2

**level**
52:16 61:11

**levels**
121:5 122:10

**license**
131:15

**licensure**
131:14

**lie**
168:9,12

**life**
180:21

**limit**
105:22,24 106:6,10,23
107:6,7

**limiting**
60:19

**Linda**
147:11,24,25 176:6

**line**
72:18 167:18

**lines**
188:6

**list**
12:4 57:22

**listed**
34:19

**lists**
21:7

**literally**
89:15 179:25

**little**
74:15 79:19 86:20
114:16 131:9,18 185:17

**live**
15:17

**lives**
181:24 183:2

**living**
15:6,16 16:2 177:21
181:22 183:24

**loans**
178:23 179:2 185:16
186:4 187:18

**local**
143:8

**located**
32:2

**location**
42:22 43:14 51:21
114:3 163:14 183:11

**log**
30:21 41:15

**logo**
35:7,12

**long**
5:15 6:20 9:13 17:2
22:18 28:5 47:14 63:6
77:13 83:21 92:19
96:12,23 97:19 131:2
178:25 181:15

**long-term/short-term**
14:10

**longer**
34:3

**look**
20:11,14 21:3 34:11
39:9 48:12 51:2 55:9
56:17 57:2 118:7,12
125:16 128:13,19 129:5
163:2 165:14

**looks**
55:3 173:11

**lose**
92:3 143:3,16

**losing**
127:19

**loss**
178:5 180:15 183:15

**lost**
177:21 183:6

**lot**
24:16 52:1 58:11 59:4
60:1 61:22 68:19,21
69:12 77:3 92:19 101:6
106:17 107:2,14 109:19
111:8,24 113:20,21
116:12 120:17 132:3

141:21 145:16 146:18
163:17 171:7 178:4,11
180:1,2,8,13,22 187:24

**low**
121:4 149:2

**LP**
21:7

**Lubbock**
21:8

**lunch**
94:25

---

**M**

**ma'am**
6:13 13:9,16 23:19
34:15 40:9 42:10 50:25
137:12 151:17

**maintain**
119:21 120:15 121:5
122:10

**maintaining**
117:12 118:15 119:9

**major**
48:16 117:8,10 178:22
181:2

**makers**
103:17

**making**
14:2,4 73:21 84:13
113:6 120:16 121:3,4
173:4 180:7,16

**Malibu**
185:25

**man**
23:22 177:5

**managed**
108:15 117:25 118:25
129:21

**management**
17:8 23:24 26:18 49:17
52:5,7 109:5 130:6
142:5,7

**manager**
9:10,11 18:23 25:20,22
42:21 43:2,13 45:18
50:18,23 51:18 52:4,11,

25 53:10 54:14 63:11
69:15 74:3 77:5 80:20
81:9 97:1 107:5 114:3
117:10 119:20,24
120:2,9 121:3 122:22
129:18 147:6 148:22
176:6

**managers**
17:8

**managing**
85:9 118:16 121:1

**manual**
45:12

**March**
42:2 44:18

**marked**
17:20,22 20:8,10,15
21:4 22:4 32:12,14
41:5,11 43:25 44:2,13,
15 50:20,22 53:24 54:1,
19,21,24 55:1,4 56:12,
14 125:5,7 128:6,8

**market**
119:12

**marketer**
53:4 115:23,24 116:1
120:7 161:22

**marketing**
119:14 127:21

**Marquez**
56:24 58:13 60:6 61:4,
21 62:14,17 63:14 66:5,
10 70:6,24 71:5,7,21,25
73:4 83:4,13,14,23 89:4
90:4 98:3,8,16 99:4
100:14 101:23 102:3,11
103:5

**Marquez's**
64:12,16

**married**
15:3 181:18

**Martha**
120:6

**Martinez**
56:24 58:13 59:11 60:4
61:4 62:8 63:16 66:19
69:1,17,24 70:2,4,13,24
71:5,20,25 72:20,23
73:2,3,12 74:8,24 75:2

76:13,24 77:12,17 89:4
90:4 98:2,8,16 99:4,16,
20 100:15 101:2,24
102:2,11 103:3,9

**Martinez's**
59:15 64:12,17 68:6
76:3

**Mary**
19:18

**master's**
26:17 186:10,15

**Mastercard**
38:13,14

**matter**
169:5

**maxing**
178:2

**MBA**
26:13,21

**Mcclary**
42:6,12,25 43:3 117:24
118:2 120:18

**mean**
9:3 11:1 12:9 14:18
18:16 25:2,8 30:9 33:25
35:20 36:16 37:5 38:9,
13 51:25 61:7 77:15
81:11 89:15 93:5,23
98:12 107:6 120:12,14
131:19 133:15 134:11
135:10 142:23 143:23
144:19 148:11 149:1
153:10 164:2 167:22
180:22 182:9 184:12,16
187:6,25

**meaning**
76:21

**means**
11:7 62:1 179:13

**meant**
105:9 133:16 141:16

**measures**
135:12

**Med**
13:11,12,14,25 22:17
51:2,9,13,18,20 136:22
180:25 184:10

**medical**
5:11 11:15,18 12:21,24 13:2,6 19:10 21:14 26:2,23 41:22,25 42:1 44:10 45:15,18,23 46:11,13,18 47:8,13 49:18 50:4 56:1 80:19 164:19 166:14 175:5 178:15,16 188:17,24 189:2,7

**meet**
100:4 101:9 105:19,20 126:21,23,24 127:14, 20,25 128:4

**meeting**
36:15 42:14 61:23 62:5, 18 63:17,22,24 64:18 65:16 70:22 71:3,6,16, 24 72:5,7,16,21 73:2 78:2 88:24 89:1,3,10 90:11,12 92:25 93:6,21, 22,23 94:4,11 96:16 97:18 98:23 100:2 107:10,20 109:3,15,16 110:4,5,7,10 119:25 127:8,13,22

**meetings**
58:10 78:3 96:4,5,9,10, 15,20 97:7,8 98:22 107:18,23 108:5 109:18,19,25 110:2 111:20,22 112:10 131:5

**memory**
59:7 97:23,25 99:25 101:14,16 110:21 152:7,15 156:4

**mental**
180:10

**mentioned**
58:12 95:22 109:15 131:24 134:17 142:20 143:25 144:16 145:24 163:19

**mentioning**
83:17 180:14

**mess**
131:1

**message**
165:22

**messages**

165:25

**met**
36:17 55:12 109:20 127:7,10 173:5 181:17

**method**
31:3,6 37:10 136:12

**Microsoft**
104:13 110:25 111:15

**mind**
41:12 43:20 44:25 45:1 50:13,24 55:20,24 118:18 160:2

**mindful**
5:22

**mine**
16:18 130:13

**minute**
21:24 47:16 150:6

**misconduct**
23:16

**Misquotes**
117:18

**misrepresenting**
135:21

**mistakes**
145:25

**mistreated**
171:8 172:14

**mistreating**
180:7

**mom**
183:3

**moment**
8:15 96:13

**moments**
178:12

**Monday**
174:9

**money**
37:3,4,5 82:6 87:8 116:3

**monitored**
145:17

**monitors**
84:10,12,19,20,21 85:3,

5,8,20 86:6

**month**
10:11 19:11 22:22 25:15 105:22 118:3,4 120:1

**monthly**
185:3

**months**
5:16 18:11 42:16 144:6 178:3 186:1 189:3

**morning**
5:8,9

**mortgage**
183:7,14,18

**mother**
183:4

**move**
66:18 86:23 88:19 156:5 178:10 183:11

**moved**
183:10

**Moves**
34:12 39:2

**multiple**
126:22

**Murguia**
13:17

**mutual**
61:11

---

**N**

**name**
5:10 7:20 13:8,22 15:21 18:24 19:2 22:10 23:4 24:3 27:15 32:25 33:8 34:10,19 37:8,25 38:14 46:23 74:4 75:20 82:18 99:24 100:5,7 102:23, 24 103:23 115:7,20 138:15,17 140:18,19 143:12 152:22 153:20, 23 154:22,24 161:9,10 162:9 181:13 183:6,8, 13,14

**named**
114:4

**names**
13:10,15 77:10 103:11, 15,16,18 137:23

**narrow**
113:23

**natural**
167:1,4 180:19

**navigated**
11:9

**nearby**
181:23

**necessarily**
12:17 154:16

**necessary**
175:9 179:13

**need**
5:21,23 6:4 11:5,9 30:3, 4 83:19 85:4 101:4 133:24 136:3 179:21

**needed**
53:15,19 81:23 84:12 85:4,8 91:16 105:1 107:7 157:17 159:15

**needs**
17:12 25:25 26:1 178:13 179:9 184:23

**needy**
107:5

**negative**
105:10

**never**
7:12,19 27:18 30:24 38:18 62:25 103:13 104:14 105:7 109:10 110:11 119:12,15 127:10,12 147:12 166:22

**new**
15:6,11 42:22 43:14 51:21 63:1 68:8 73:18 74:10 79:6 95:25 103:2, 6 105:23,24 108:19,22, 23 109:6,9 114:3 115:1 116:2 119:9,21 131:10, 11,19 132:1,11 134:7 137:17,22 148:5 149:19 150:17,21 151:1 153:21 154:14 155:21 156:6,11 159:20 160:14 161:16,

24 162:12 163:14
183:24

**nights**
179:7

**Nonmedical**
26:3

**nonresponsive**
50:8 121:12,21 124:7

**Norma**
115:21 152:23,24 157:3

**notes**
97:22

**notice**
17:24 145:24,25

**noticed**
117:5

**notification**
17:7,11

**notified**
19:13,15,21 23:21 42:7,
9,24

**notifying**
175:11

**November**
18:4,8

**number**
5:17,20 10:19 20:15
29:6 51:13 56:17,18
57:10 109:23 117:6
118:2 119:5,14 120:17
122:7,21 125:3,18
126:11 129:8 153:15
163:3 171:2 176:22
184:17

**numbered**
34:14

**numbers**
10:17 51:4

**numerous**
149:13 183:16

**nurse**
26:5

___

**O**

**O-T-T-I-N-G**

62:11

**objection**
43:8 50:8 117:18
121:12,21 124:2,7
139:22 140:2,10 144:22
145:6 169:22 170:5,20
175:20,25

**obligated**
49:17

**observe**
45:14

**observed**
147:2

**obtain**
28:12

**occasion**
121:11 151:6

**occasions**
25:21 29:5 107:19
126:22 138:3 171:22

**occur**
16:13 70:20

**occurred**
58:21 71:14 78:6,20,21
88:22 104:10 110:18
151:11 176:5

**October**
39:10,11,14,15,17,21

**offensive**
166:23 167:10

**offer**
27:8

**offers**
41:18

**office**
51:15 52:25 62:6 70:24
73:16 83:5 93:6,12
96:10 98:10 100:4
102:12,16 105:1,21
115:18,22 116:25
131:12 132:1 146:23,25
149:20 150:17 153:21
154:14 155:22 156:7,12
157:2,12 159:21,23
162:17,18 164:3,4,11

**Oh**
34:16 55:6 70:4 156:15

158:16

**oil**
184:3

**okay**
5:15,17 6:1,6,11,16,20
7:5,8,16,21,24 8:4,25
9:9,13,23 10:8,12,15,21
11:22 12:5 14:1,5,13
15:8,16 18:24 19:13
20:14,21 21:7,10,23
22:6,24 25:1 26:1,4,7
27:12 28:2 29:20 30:7,
15 31:2 32:6 34:18 35:8
37:9 38:1,7,12,17 39:4
40:10,13 41:9 43:13
46:24 47:12,23 49:1,8
51:7,23 52:15,19 53:11,
25 54:9,18 55:13,19,24
56:4,10 57:9,20 58:6,7,
23 59:11,17,25 60:6,22
61:1,3,18 62:4,13,15
63:13,21,25 64:7,10,24
65:8,22 66:3,9,18 67:20
68:13,25 69:5,16,20
70:6,12,18 71:2,11
72:19 73:11,20 74:8,19
75:2 77:16 78:7,14,24
79:2 80:9,16,24 81:7
82:9,18 83:10 84:3,25
85:14 86:4,22 88:5,19
90:1,8 91:6,14,20 92:15
93:19 94:2,23 95:4 96:7
97:2 98:1,15 99:3
100:13 101:12 102:14,
20 103:18,21 104:4
109:11,14 110:9,12,16,
21 111:7 112:3 113:3,
17 115:11 116:12
118:13 122:14 123:17
125:2,12 127:14 128:18
129:5,10,13 130:3
131:7,17 133:6 134:9
135:5,19,25 136:12,22
137:2,16 138:16,24
139:15 140:15 141:22,
25 143:8 144:4 145:3,9
148:9 152:16,25
153:14,17,24 154:7
155:14,18 156:2,15,22
157:20 158:1 159:5,17,
19 160:1,17 161:4,15,
23 162:3,10 163:9
164:9,15,23 165:2
166:12,16 167:15 169:8

170:8,23 171:1 173:23
174:2,19 176:3,19
182:14 183:13 184:4,20
185:10 187:22

**old**
15:19

**once**
179:15

**one-on-one**
127:13

**ones**
14:11 143:25 187:12

**online**
28:8,18 32:22 186:13,
16,21

**open**
47:9,15 54:9,13 93:13
175:6

**operate**
148:17

**operation**
43:14 52:2

**operations**
118:16,25

**opportunities**
8:13

**opportunity**
69:14 175:6,9

**oppose**
158:2 159:18

**opposing**
157:24

**opposite**
75:15 76:6

**option**
82:7

**ordeal**
93:12

**order**
53:20 136:9

**organization**
56:5

**organizational**
55:23 129:6

**original**
79:8

**Orlando**
186:23

**Otting**
62:8,10 63:21,25 64:3
70:25 71:1,4,7,15,16,
18,22,25 72:16 73:3
81:15 89:2,18 90:6
93:11 98:8

**outreach**
119:14

**outside**
147:7

**outstanding**
39:7

**overall**
136:5

**oversaw**
122:19

**oversee**
8:10 10:21

**owe**
186:4 187:22

**owner**
127:24

_____

**P**

_____

**p.m**
95:3 130:17 177:11

**p.m.**
95:2 130:16 177:10

**package**
35:6,11

**page**
20:14 21:3 22:3 34:11
35:15 39:9,13 40:4,6,7,
8 44:3 51:9,12,13 55:9
56:11 57:3 79:1 118:11,
12 122:7 128:13

**pages**
34:14 51:5

**paid**
7:12,17,19 10:8,10
27:17 30:24 36:20 37:1,
10 38:1,4,8 39:1,5

80:20 179:1 184:17

**paper**
36:4 136:17 137:1

**paperwork**
158:5

**paragraph**
48:16 54:12

**parameters**
118:17 119:2

**Parkway**
15:11

**part**
6:3,17 7:1 21:21 25:5
36:1,9 45:21 52:3 93:3
102:21 121:9 122:8
128:25 155:15 167:1
169:14 176:2 180:15
188:14

**participant**
98:13

**participate**
88:25

**particular**
12:14 39:18,22 40:1,16
62:18 64:18 71:6 72:18
75:6 81:4,5,21 100:2
109:2 120:10 123:1
165:17 166:17 172:9

**parties**
5:2

**PAS**
42:15 52:17,22 53:3
154:3

**Pass**
177:12 189:13

**passed**
59:3 61:23 106:18
107:14 132:3 140:16
141:21 146:18 147:4
179:11 188:11

**password**
28:9

**Path**
15:6 183:24

**patient**
119:9

**patients**
119:22

**pay**
7:14,18,20 14:16,19,20,
21 31:3 37:7 38:5
145:23 149:1,2 154:15,
18,20 178:3,24 179:20
184:4,7 186:1 188:5

**paycheck**
7:11,13 14:21 80:22

**paying**
11:5 184:10 185:10,12

**payment**
27:18 178:24 179:2
185:18,20,22,23 188:6

**payments**
188:9

**Paypal**
37:2,8,9,15,20 38:3,5,9,
18,19 39:5 187:4

**payroll**
138:4 140:17,21,24
141:10,19 143:18

**Pembrook**
175:24

**penalty**
5:18

**people**
49:9 50:3 58:12 59:24
61:13 70:16,23 76:25
77:4 78:6 90:18 93:6
108:19,22 109:6,13
112:11 113:1 127:18
135:9,20 139:18 149:15
151:12,13 180:7

**perceived**
180:17

**percent**
31:14 56:6 62:3

**percentage**
31:2,12,14

**performance**
16:6,8 17:12 108:9
125:8

**performing**
17:9 29:9 163:19

**period**
10:12 22:18 24:15

**perjury**
5:18

**person**
13:23 16:24 19:16,22,
23 23:21 25:3 28:19
30:11 52:17 55:12
75:15,16 76:1 81:23
116:1,21 121:19 123:1
138:4 140:17,21,22,25
141:2,11 143:10,11,19
146:4,16 153:24 156:25
162:7,17 163:8

**person's**
75:20 108:14 140:18

**personal**
25:8 52:14 89:20 93:3

**personnel**
45:11 51:15,20 121:24
122:9 123:20

**perspective**
26:2

**pertained**
47:8 96:16

**pertaining**
46:24 66:4 86:5,18
94:3,20 95:14 109:5
118:15

**pertains**
46:25 50:16

**Phoenix**
186:12

**phone**
69:3,25 70:9 73:13,14
74:9 75:13 77:24,25
80:13 89:9 98:23,25
99:19 101:8 103:6,14
105:17 107:12 108:7
111:25 127:5 146:15,
17,22 152:1,13 155:13,
14,17 165:5,9 173:4
182:13

**phones**
102:23 185:5

**physical**
37:19 118:17 119:1

**physicians**

178:8

**pick**
9:25

**piece**
68:24

**Pierce**
19:18

**pinned**
166:20

**pitches**
30:22

**place**
62:5,25 63:5 66:2 96:9
97:8 127:22 163:13

**places**
178:2

**plan**
16:7,8 175:5 185:8

**planned**
146:24

**please**
39:20 41:12 48:4 49:21
64:22 66:14 73:7 99:8
111:2 121:13,25 124:12
128:17

**point**
73:15,21 88:9,12
132:18 134:7,13,21
138:19 151:20 161:11
187:1

**policies**
25:18 45:15,22 46:10,
17,19 47:18 48:1,20,23
49:3,4,9,19 50:4 53:11,
14,15,17,20

**policy**
45:11 47:2,6,9,10,11,
12,14,15,21,22 48:8,10
49:5,24 50:1 54:10,12
75:18 175:7

**portion**
14:16

**position**
7:22,23,24 8:3,4,6,9,10
16:15,23,25 24:4,8,9
42:3,8,18 43:2 50:18
59:15 66:11 67:1 68:6

72:23 74:6 83:25 84:1
86:7 108:17 117:1
122:19 143:18 153:24
158:22,23 177:2

**positions**
16:16,17

**positive**
35:4

**possibility**
16:14

**possible**
43:7 97:5 104:5 188:25

**possibly**
16:15

**potential**
25:10

**power**
184:7,10 185:3

**practice**
45:12 46:1 51:18

**premium**
14:16,17,18,19

**premiums**
179:20 180:12

**prepared**
104:15 158:5

**present**
5:3 19:20 62:7 75:17
98:14 100:1 107:21
108:10 134:14 151:14,
18 163:10,11 174:9

**presentation**
180:2

**presented**
121:8

**president**
54:14 175:8,14

**pressure**
178:6,7

**pretty**
134:21

**prevented**
158:13

**previous**
115:19 133:5

**previously**
99:16 102:18 112:18

**primarily**
131:22

**primary**
136:12,14

**printer**
86:25 87:1,2,5,25

**prior**
17:14 35:19 116:25
182:15 188:2

**prison**
75:10

**probably**
28:17,18 93:13 95:1
97:14 116:10 188:1

**problem**
148:16

**problems**
69:3 70:1,9 73:13,14
77:24,25 99:19 178:16

**procedure**
47:2

**procedures**
25:18 45:15,22 46:10,
17,19 47:18 49:19 50:4
53:12,15,16,18,20

**proceedings**
10:2 43:23 95:2 130:16
177:10

**process**
11:23 102:21 128:25

**produced**
17:24 20:11 32:18

**product**
36:8

**professionals**
180:17

**program**
27:21 29:18 31:18 36:2,
9,15 148:25

**progressive**
135:11,24

**promote**
43:2,11

**promoted**
42:18,21

**promotion**
42:24

**prompted**
172:15

**proper**
11:24

**properly**
114:16

**proposal**
121:8

**propose**
135:11

**proposed**
149:5

**prospective**
188:23

**protection**
30:5

**provide**
10:23 11:2,9 25:3,8
29:8,13 30:2 35:1,18,25
36:4 38:20 57:22 66:3
68:17 178:13

**provided**
14:13 36:8,12 56:8 76:6
78:9,12 87:21

**provider**
24:24 25:1 42:4 75:9,19
120:12 154:1

**provider's**
75:21

**providing**
24:22 25:11 36:2

**pull**
146:2

**punished**
126:20 167:3

**purchase**
183:21

**purchased**
184:21

**purpose**
29:9,14 86:21 136:2

**purposes**
101:16 136:19 161:12

**put**
87:4,5 126:3 129:11
141:22 146:13 151:22
160:19 188:19,21

**putting**
152:5

---

**Q**

**qualified**
121:4 122:9 123:20
124:20,21,23

**question**
5:22,23,25 6:8 13:21
15:10 28:22 29:11
39:20 44:5 45:2 46:6,7,
12 47:4,5 48:2,3,9,22
49:20 50:9,16 51:1
53:19 54:5 66:19 67:25
68:15 86:10 90:14
95:23 96:15 97:11,12,
17 99:7 106:9 111:1
113:23 121:13,22,23
122:1 124:8,9,11,13
128:18 132:25 139:24
140:6 144:24 149:21
153:11 160:13 166:2
169:20 171:2 180:6
189:8

**questioned**
79:23 80:3 97:9

**questions**
6:5 70:7 86:21 177:16
181:5,7 189:14

**quick**
9:25 43:21 130:14

**quiet**
92:3,4

**quit**
89:21 151:12 155:5
158:16

**quite**
120:5 148:6 153:10

---

**R**

**R.N.**

19:23 74:7 124:20

**R.n.s**
124:17

**race**
56:23 57:11,14,23 59:1,
12 60:8,15,20,21,23,24,
25 66:6,12,22 67:3
68:18 70:14 72:24
78:10,18 81:1 83:22
84:5 86:8 88:3,7 94:6
95:8,17 98:5,19 99:6
108:8 163:5 171:3,5
172:13,14,20 173:21,24
177:4

**Rae**
93:11 109:16 114:11
117:5,14,23,24 119:24
121:7 125:22 126:6,9,
19,23,24 127:10,12,16
128:1 129:16,20,21
130:4,10 133:3 141:5
144:12 149:15 161:18,
19,22

**Rae's**
119:17 126:1,18

**raise**
92:13

**raised**
92:13

**raising**
94:15

**Ranch**
15:11

**range**
11:3

**rarely**
107:4

**re-traumatized**
180:4

**reacted**
112:10

**read**
18:23 47:21 48:4,6
49:21,22 50:9,10,24,25
54:3 66:14,15 73:6,8
94:8,9 99:8,9 109:8
111:2,3 118:18 121:13,
14,25 122:3,5,12,13
124:12,14 126:14,16,17

128:16,17 149:22,23
150:7,8,11,12 189:9,10

**reading**
5:1 122:8

**ready**
179:9

**real**
9:25

**really**
7:10,12,17,19 11:25
19:12 24:14 38:2 47:5
57:7 59:16 67:18 85:6
91:18 96:12 104:22,23
107:5 139:1 149:4
151:18 153:13 155:16
157:22 158:23 162:14
165:16 172:6 178:15
180:20

**reason**
23:10,14 82:10 83:15
87:2,3 89:1 90:22 93:4
100:5,8 106:24 107:1
108:9 109:2 117:3
127:20 148:15 153:12
163:20 167:16 177:1
188:23 189:6

**reasons**
151:11 153:9 182:18

**Rebecca**
56:24 58:13 60:6 61:3,4
62:14,24 70:24 71:7,21
83:4,23 89:4 98:3 100:8
103:9 107:20 108:4
109:15 110:6 111:21

**recall**
13:13,24 14:1 18:24
20:21 22:20 23:20 24:1,
16 27:2 29:25 30:20
31:1 35:2,5 36:6 39:24
41:23 44:7,9,12 46:22
48:8 54:8,23 57:6 61:23
62:21 63:4,6,13,16,18,
21,23 66:10,17 67:4,6,
18,19 68:1,14 69:19
70:22 71:13 72:11
73:21 75:4,5,7,8,25
76:5,7 78:8 80:10,13
82:25 83:5,15,17 84:1,
2,12,13,15,17 85:6
88:8,9,14,18,23 89:25
92:16,18 93:14,16,19

94:3 95:15 96:11,12,13,
23 97:4,6 99:23 101:21
103:9 104:17,18 105:8,
10 106:17 107:24
110:15 112:9 114:19
116:24 127:5 128:10
131:13 132:9 135:1,3,
17 137:13,14,25 138:1,
21,23 139:1 141:1,7,20
142:13 143:7 144:7,8
146:7,19,21 147:10,25
148:1 151:10 152:1,5,
10,11 153:10,13,17,18,
20,23 154:15,21,24
155:3,25 157:10,15,16
158:23,25 159:17,24
160:18,22 162:14
163:23 164:13,16
172:6,8,23 173:1,4,22
176:17,21 185:11

**receive**
14:5 20:5 26:19 31:3
39:25 87:1 171:12
172:21,24 173:12
187:16

**received**
7:14 12:16 17:4,7,11
20:17,22 26:20 27:18
41:18 43:17 44:22 45:3
69:6 74:16 75:7 80:22
103:14 115:5 119:5
186:24

**receiving**
20:25 104:16 116:3
131:13 162:15

**receptionist**
81:16

**recessed**
10:2 43:23 95:2 130:16
177:10

**recognition**
148:23,25

**recognize**
20:12

**recollection**
93:22

**recommendation**
135:11 148:24 153:8
159:11,13

**recommendations**

126:20 149:5

**record**
5:2 10:1 95:5

**recruit**
119:13 123:2,8,20
161:12,13,14,21

**recruited**
122:24

**recruiter**
116:3,5 138:5,6 139:7,
10,13 140:1,8 141:11
143:18,19 160:5,7,8,10,
14 161:7,9,11,15,19,24
162:6,13

**recruiting**
116:2 121:20 123:6
130:7 133:12,14 134:3
161:16 162:18

**Recruits**
122:9

**reduced**
135:6

**refer**
59:6

**reference**
13:24 74:19 83:16
84:19 96:24 130:10,12

**referenced**
127:7

**references**
125:17

**referrals**
12:20,24 13:2,6 14:2,4
87:1 118:3 119:5,15
120:17

**referred**
13:25

**referring**
12:3 13:12,14 52:9
60:23 82:14 111:22
120:14 130:9 145:19

**reflected**
21:20 40:3

**reflects**
39:13

**refresh**

59:7 97:22,25 99:25
152:14

**refused**
67:7,12,14,21 126:22,
23

**regard**
102:25

**regarding**
40:1 62:24 65:16 68:14
69:25 70:8,9 71:24
72:16,21 73:13 74:9
75:11 77:25 78:8 81:20
83:2 88:24 92:24 93:21
94:4 95:19,25 96:4,6
98:6 103:8,22 110:25
116:14,18 130:10,21
132:18 133:17,23 134:2
135:2 137:4,9 145:11
147:24 148:1,4 149:19
150:21,25 151:16 154:9
156:11 158:17 162:11
172:25

**regardless**
149:15

**regional**
18:22 19:16,23

**regular**
38:11

**regulations**
46:3

**rehash**
95:9

**rejected**
121:11

**relate**
48:10 132:8 157:8

**related**
25:18 32:18,25 35:22
62:21 65:6 70:22 76:25
86:9,11 88:16 98:7
123:23 136:1 149:25

**relates**
97:9 141:7

**relating**
25:17 31:17 36:11
49:24 55:20 61:20
87:25

**relation**

84:6 85:9 100:16,17
117:21 119:5 122:16
139:2 148:10,21 149:14

**relationship**
9:5 177:19,23 181:10,
11,15

**relay**
172:2

**reliable**
12:13

**relocate**
183:12

**relying**
101:13,15,16,18
167:20,22 168:6

**remained**
92:2

**remember**
5:16 13:20 14:10 17:19
18:17 19:2,5,12 20:24
21:2 22:16,23 23:4,12,
15,17 24:3,5,6,8,11
25:24 27:23,25 28:4,6,
17 29:2,5,22,25 30:6
31:9 32:1,5,6,11,24
33:3,17,19 34:4,10
35:3,24 40:19 42:11
47:7,9,11,17,18 50:2
57:7 58:22 59:3,4,10,
16,18,21,22 60:3,5,16
61:22 62:2,20 63:9,20
65:14,21 66:8 67:11,25
68:4,12 69:18,21 70:21
72:3,10,13,15,17,18,25
73:1,10,23 75:20 76:8,
11 77:3,9,11,14,15,17
78:5 80:12 81:19 82:5,
8,9,11 83:3,7,8 84:13
85:3,22 86:3 87:6 88:11
89:21 90:17 91:18
92:21 93:1,11,25 94:22
97:15,16,20 101:21,23
102:1 103:20 104:3,11,
17 105:15 106:13,16,19
107:13,14,19,25 108:3
109:4 112:4,16,17
115:7 116:9,11,24
128:21,24 131:6 132:3,
5 134:8,22 135:1 136:6
137:2,15,23,24 138:1,7,
8,15,17,20 139:14
140:13,19 141:21,24

143:9,11,24 144:6,10,
21 145:1,8,9 146:18
147:17 148:8 150:5
151:3,13,18,21 152:22
153:6 155:2,9,17
157:21,22,24 158:9
159:24 160:12,16
161:2,3,10 162:9,14
165:7,16 172:17 173:20
176:20 180:14 182:22
183:8 184:25 187:3,20,
24 188:21 189:3,4

**remembering**
115:2 145:2

**removing**
89:20 93:2

**RENEE**
5:4

**Renee's**
55:5

**renew**
131:15

**rent**
178:3

**repeat**
28:22 29:11 31:5 39:12,
20 46:5,7 48:3 49:20
64:14 66:13 73:5 77:19
94:7 95:23 99:7 101:25
111:1 124:9,10 139:8
140:6 149:21 156:9
184:8 189:8

**rephrase**
6:9 46:12 52:10 96:2
121:23 124:9,10 133:24

**report**
34:1

**reporter**
5:20 48:7 49:23 50:11
66:16 73:9 94:10 99:10
111:4 121:15 122:4
124:15 125:4 149:24
150:9,13 189:11

**representation**
48:19

**representative**
18:18 27:2,4,6 28:23
29:4

RENEE RICHARDSON - 12/04/2018                     i23

**representatives**
29:8,13

**representing**
5:11

**request**
81:18,19,21,22,24 82:1,
12,23 83:2,18,24 84:9,
13,15 85:1,10,11,20,23
86:2,5 87:4,5,7,22
127:9 128:3

**requested**
48:6 49:22 50:10 66:15
67:5 73:8 94:9 99:9
111:3 121:14 122:3
124:14 126:21 127:2
149:23 150:8,12 189:10

**requesting**
104:20 105:2,5

**requests**
82:6 88:10,15

**require**
46:16

**required**
81:17

**research**
8:12

**reserve**
181:4

**residence**
15:5,8

**resign**
23:5

**resigned**
158:16

**resistance**
153:7

**resistant**
158:19

**resolve**
30:5 90:11 142:24
148:13

**resolving**
148:14

**resources**
11:9 58:3 81:11 84:6,8
86:24 88:1,5,10,16

114:5,6,13 116:15
142:9 143:1,5,6,8,14
145:11 171:9

**respect**
61:11,13

**respond**
79:19 173:14,19 175:14

**responded**
80:12 105:9

**responding**
65:25

**response**
6:4 17:24 65:22 79:18
80:4,5,7,10 82:8 87:7
99:13 105:10 106:20
142:16,17,19,21,22
157:20 162:10,15 163:2
171:12 172:21,24
173:12 175:2 176:22

**responses**
56:15

**responsibilities**
81:24 121:18

**responsibility**
45:21 49:13,17 51:17
52:3 53:8 74:18 99:1
117:12,14,21,22,24
119:7,10,17,20,23
120:3,24 121:6,7,16
122:16 123:25 125:22,
24 126:19 133:2
175:15,17 176:2 188:7

**responsible**
12:7 46:8,9 49:8 51:14
109:12 123:19 129:25

**rest**
181:4

**result**
14:5 81:2

**resulted**
70:13

**resume**
74:17 98:25

**retail**
32:22

**retain**
123:20

**retains**
122:9

**retaliated**
55:22 56:1

**return**
103:6 164:10 175:13

**returned**
103:2,10 174:18,25

**returning**
102:23

**review**
44:24 50:12 111:10
181:6 189:15

**reviewed**
7:18

**revolving**
133:10

**Richardson**
5:4,8 20:15 21:5,20
22:4 55:4,10 177:15

**Rick**
5:10

**Ridge**
15:6 183:24

**right**
5:18 6:8 7:1 9:21 10:5,
13,17,19 12:23 15:19
16:6,21 17:25 18:8,11
20:3,19 21:10 22:1
23:10 25:14,22 26:5
27:9,14,19 30:13,18
32:17 34:15,25 35:9,25
36:20,21,24 37:3,13
38:5,24 39:2,11 42:19,
22 43:5,7,15 44:19
45:4,8,12,16,19,24
46:11,25 47:25 48:20,
24 49:4,10,14,16,19
50:23 51:12,15 52:6,20
53:1,6,12,16,23 54:10,
16 55:5 56:5,20 57:9,20
58:22 60:4,24 61:3
62:17 64:10 66:17
67:23 69:11,23 70:4,10
74:12 76:12 80:21
81:10 85:17 87:14 91:5,
9,12 98:1,15 100:25
110:15 111:18 113:17
116:17 117:13 120:24
121:18 123:10 124:1,23

125:10,12,20 126:7
128:15,20 129:11,15,19
130:11,22 131:5 133:9
135:16 136:10,15,18,
20,24 139:21 140:11,20
141:17,18 143:14
146:12 148:3,5 150:2,4
152:4 153:22 154:7
160:3 161:7,11,18
162:1,6,21,25 163:7,15,
25 164:17 165:15
167:13,20,21 170:12
171:10 173:9,10,17,25
174:5,21 175:19 177:6,
15 179:19 181:22
182:4,25 183:11,15,20
184:24 185:14 186:14
187:9,12

**role**
123:1

**room**
90:19

**rotated**
11:21

**rotating**
11:19 12:6,7

**rotation**
11:22,24 12:15

**round**
10:17

**routed**
76:20

**rude**
115:22 157:2,6,16,25

**Rule**
5:1

**rules**
46:2

**S**

**salaried**
80:18

**salary**
9:19,21 57:16,24 78:18
79:9 80:6,15,20 81:2

**Salazar**
9:12,13

sale
30:19 31:15

sales
30:7,9,21,22,25 31:4,7

San
20:2 68:10 69:8,9 73:16
75:13 79:13 83:20 96:9
114:17,25 115:23 120:7
131:10,12,16,18 132:1
137:18,21,25 138:5,7
144:16 157:12 160:9
161:6 162:17 181:22
183:23,25

Sarah
80:2,10 171:8 172:21,
24 173:2,5

Sarah's
80:4

satisfied
142:15,21,22 154:18

savings
36:24

saw
93:2 180:1

saying
8:25 38:18 46:9 58:24
61:14 63:23 64:11,17,
21,24 65:4 67:21 74:8,
11 91:23 101:17 102:4,
10 103:7 104:1 108:6
112:18,21 113:6,12
117:20 119:8,11 122:15
125:25 127:10 132:14
139:25 141:12 142:15
147:10 163:18,23
170:10

says
48:21 49:1,15 51:16
54:17 55:5,10 118:25
119:6 123:18 125:18
126:8,12 129:8,12
140:3,5

scheduler
18:13

scheduling
20:1

school
15:25 26:15,17,18

science
26:12,14

se
12:1 160:22 187:15

search
41:15

second
22:3 172:10,12,25
173:23 174:6

Secretary
34:1,2

see
19:18 20:12,16 21:5,25
32:4,14,19 34:16,20
38:17 40:4,11 48:17
50:1 51:4 56:18 86:11
119:3,6 120:14 125:12,
18 128:21 146:2,3
159:10 167:23 180:3,10

seeing
54:8,23

seek
79:20 178:15

seeking
67:9 77:18,24 99:21

seen
44:3,6 47:14 54:2,6,22
55:1 104:14 105:7
110:11 125:9 127:19
128:8 175:4

self-assessment
129:1 130:1,9

self-evaluation
35:5

self-talk
180:2

sell
30:10,18 31:19 32:23
33:2,10

selling
27:9,14

semimonthly
10:9

send
171:14 172:15

sending

68:1 84:17 105:8

senior
11:4,6 22:7,10,13,19,25
24:20

seniors
10:24

sensitive
167:4

sent
36:5 104:13 146:17
171:8,15,17,18,19,21,
23 174:2,6,10 176:16,
20

separate
171:22

separation
17:25

serious
173:17

service
18:17 25:2

services
7:23 8:7 10:24,25 11:2,
3 16:21 22:7,10,11,14,
19,25 24:20,22,24 25:9,
11 30:3 35:18

set
7:10 34:5,22 35:3,6
65:15 100:20

setting
35:11,12

seven
118:4 120:1

Seventeen
15:20

share
104:25 155:6

shared
80:7 99:13 105:1 117:4
132:11 144:15 145:22
155:4,22 170:25

sharing
146:7

Sharonn
34:20

Shayna
62:8,9 63:21 70:25 71:1
81:15 83:16 89:2,18
93:10

she's
13:23,24 14:1,3 15:25
84:21 88:12 179:9

sheet
134:15

sheets
134:13,16 135:3 136:4,
7,13,17 137:1

shelter
178:1

Shelton
115:20 123:9,11
152:19,25 153:1 158:18

Shield
27:3,5,6,7,20 28:13,16,
20,24 29:4,10,13,15
30:8,10,18,24 31:8,18
32:2,7,10

Shield's
29:8

shocked
163:24

short
166:12

shortly
22:17 158:10

show
47:16 99:25 107:16
137:11 152:3,6 156:3
161:5 172:19 175:4

showed
79:5 102:4 179:24

shows
88:6

shut
33:22,24 89:13 91:14
92:1,2,8,11

sick
174:12,14,16

Sigmund
143:10 146:11 163:7,9,
22

sign
28:13,15 181:6 189:15

signature
18:2,20,22 44:16 45:5
51:8 57:4,8 128:22

signed
19:18 27:4 45:9 47:22
48:11 49:1 50:6 78:22
79:4,8 125:9

significance
55:19

signing
27:2 57:6

similar
16:25 143:20

similarly
141:4

simply
179:10

single
60:3 75:5

Sir
104:3 156:21

sit
73:1 88:14 93:25 97:2,6
112:12 152:8

situation
65:15 67:4 68:19 70:23
71:14 75:9,24 76:4,9
81:4,5 86:9,19 88:23
89:25 90:1 101:10
104:11 122:25 137:25
138:6 158:6 178:9

situations
30:4 66:25 69:19 70:19
77:5 88:6,22 104:9
107:25 108:6,12
110:17,19 111:5,8
112:9 137:7,24 143:20

six
125:18 126:11

slammed
105:3

sleep
178:11

sleepless
179:6

solely
121:16

some-odd
87:3

somebody
49:12 122:21 167:20

sorry
21:24 39:12,20 40:6
52:22 54:2 61:4 64:14
68:22 73:5 87:11 94:7
95:23 96:2 101:25
108:2 116:1 117:2
118:23 133:15 139:8
141:17 149:21 156:9,15
178:12 184:8

sort
28:9 90:22 146:2 175:1

sounded
94:17

sounds
113:5 157:24

source
37:18

sources
187:17

speak
29:3 87:18 116:23

specialist
8:18 10:21 11:6,20
12:7,14,18

specialists
8:11,19,22 9:6 10:22
12:2,24 13:2,5,11

specific
24:18 28:14 29:16 46:5,
20 47:6 48:10 49:11
51:19 75:3 77:11 88:15
90:8 92:15,16,18
121:24 123:22 124:11
133:1 137:24 139:12
147:23 187:3

specifically
13:8,10,15 16:19 32:25
48:1 63:13,16 65:8,20
82:4 85:11 99:18
113:25 114:19 122:20
127:6 131:24 134:22
137:21 138:9 142:13
144:10 148:12 151:19

176:14 183:17

specifics
58:4 93:16 96:7,11,13,
17,18 97:10 143:25
144:7 153:17,18 165:16

specified
112:20

specify
96:19,22

speculation
43:9 139:23 176:1

spell
181:13

spelled
33:5

spend
126:5,8

spoke
59:24 116:21 130:19
182:6

spreadsheet
110:12

staff
52:5,7,13,16,18,23 53:3
58:16 64:5 81:14 89:11,
17 90:9,21 110:17,18
114:11,24,25 115:17,
18,22 122:11,17,25
123:2,3,4,7,8,23 124:4,
16,17,20,24,25 125:1
133:16,18,23 134:3
137:18,19,22 142:2
143:23 149:1,6,9,15
150:14 151:16 155:21
156:6,11,13,14 159:20
161:12,14,16,25

staffing
121:5 122:10 149:12

stand
14:11 62:1

standards
17:9

standing
16:6

start
5:22,24 6:22 22:14 27:1
68:22 97:5 164:24

started
6:12,22 7:21 9:15,16
28:2 50:17 89:20
117:23 145:23 149:2
179:24

starting
5:22

state
34:2 87:2 95:16 136:16
167:1 176:14 181:24,25

stated
20:16 92:22 98:1 134:9
162:23

statement
71:2 72:11 124:19
132:13 133:22 138:22
140:24 168:6,8

statements
39:25 72:15 90:8,21
92:15,16,18,23 93:20
108:25 139:13

states
18:6 54:12 171:3

stating
49:2

stay
90:1

step-by-step
35:13

steps
142:1

stick
99:12,14 112:15 141:18

sticker
22:1

strange
115:6

stress
178:4

Strike
97:5

strongly
113:11

structure
86:20

**struggle**
180:14

**struggling**
147:5

**stub**
7:20

**stubs**
7:14,18

**student**
178:23 179:2 186:4
187:18

**students**
185:16

**stuff**
99:23

**stupid**
61:9 65:5 71:17 72:12

**styles**
166:15

**subcommittee**
179:25

**subjected**
81:8

**submitted**
162:22

**subordinates**
46:4,10,13,16

**subpart**
51:14

**substance**
132:21

**successful**
27:18

**suggestions**
135:6,8

**superior**
106:11

**supervise**
8:19 9:6 46:13 51:20,
24,25 52:12 53:5

**supervised**
50:19 52:20,21,23,25
53:2 126:19

**supervising**
51:14 53:7 75:15 109:9,

13

**supervisor**
18:19,25 23:3 24:1
42:4,5,13,15 47:23
52:17 59:16 68:7,8,10,
11 75:21 79:23 87:13
108:18,19,21 125:12
154:1,2,3

**supervisors**
52:14,22 53:3

**supplied**
187:7,9

**supplies**
184:21

**supply**
179:10

**support**
11:3 67:1 99:5 106:11
107:8

**supporting**
106:25

**supports**
66:11 72:23 86:6

**supposed**
12:15 25:6 46:1 47:19,
24 65:1 88:24,25 89:7
90:11 147:21 162:17

**sure**
7:10 9:18 16:22 24:19
28:15,23 29:12 31:6
39:13,21 43:22 46:9
50:3 51:20 53:8 58:21
59:2 62:3 77:20 86:14
95:24 113:20,24 121:3,
4 130:15 132:2 134:21
139:14 140:7 144:3
172:13 181:1 187:1

**surrounding**
172:20

**sworn**
5:5

**sylvia**
56:24 58:12 59:11 62:8
66:19 68:5,20 69:13
70:24 71:20 74:16,24
75:2,14 76:21,24 89:4
98:2 100:8 101:2 103:8
107:20 108:4,9,16
109:15 110:6 111:20

127:8

**Sylvia's**
102:24 108:17

**system**
11:23 65:17 89:11
90:13,24,25 91:5,8,12
94:4 95:14 102:12,16
114:16 131:3 136:5,8,
14,16

**systems**
85:7

---

**T**

**T-I-A-N-I**
15:23

**T-I-O-N-I**
15:24

**T-MOBILE**
185:15

**take**
15:25 20:11 34:11
43:20 62:5 93:3 120:13,
20 125:15 130:14
135:11,23 139:3 163:13
164:23 175:7,9,15,17
177:8 186:20

**taken**
14:20 36:23 40:22
62:25 146:3

**talk**
13:11 14:2,3 28:19,23
41:24 50:19 61:3,12
70:18 72:19 73:11
78:14 102:12 123:6
127:3 140:17 142:9
144:1 146:8,10 147:11
163:18 164:24 165:2
176:9,10 182:12

**talked**
59:14,20 60:9 61:14
66:23 71:17 95:12
103:15 118:1 127:4
133:8 138:10 142:8
143:24 146:6,8 165:4,5
171:6

**talking**
5:25 61:8,17 62:23,24
63:3 64:24 65:10,12

70:3 73:18 76:12 83:6
90:23 95:5,10 96:25
100:2 106:21 109:25
110:24 111:13,15
123:3,5 130:18 134:16
150:14 183:17 184:13

**talks**
119:3

**target**
118:3 119:25

**task**
158:14

**tasks**
85:8

**team**
5:11 11:15,18 12:21,24
13:3,6,11,12,14,25
21:14 22:17 26:23
41:22,25 42:1 44:11
45:15,18,23 46:11,14,
18 47:8,13 49:18 50:5
51:2,9,13,18,20 56:1
80:20 136:22 164:19
166:14 175:5 180:25
184:10 188:17,24
189:2,7

**telephone**
90:3 95:21 102:18
103:10

**telephonic**
94:3 105:16

**telephonically**
155:7 173:7

**tell**
29:18,20 59:11 60:6
61:6,18 62:17 67:1,15
69:1 84:8 88:22 92:14
104:9 106:10,23 110:17
116:12,17 122:7 127:20
139:6,9,12 140:20
142:2,18 143:17 144:4,
14 150:20 157:13
163:15 166:8 167:25
168:13 169:3,17 170:18
177:16

**telling**
107:5 165:19 170:1

**temp**
64:5 89:19

**temporary**
81:14

**Teran**
17:1

**term**
111:8

**terminate**
159:8 176:24 177:6

**terminated**
18:7 20:4 22:17 23:8,9,
16 26:22 56:22 58:18,
19 98:18 151:13
152:17,18,24 153:1,3,8,
22 158:10 159:4,5
163:5,20 164:5 174:7,
20 177:2,19 184:6,9
188:16,20 189:5

**terminating**
162:24 168:5

**termination**
19:14,15,21,25 21:13
23:11,14,21 41:21
135:13 153:9,12
163:13,25 164:19 165:3
177:17 182:15 188:3,24
189:7

**terminator**
159:12

**testified**
5:5 26:25 66:7,9 69:23
71:4,23 76:16 77:16
78:7 80:24 84:3 86:4,17
87:24 90:20 92:22 94:2
97:3 98:6 99:16 100:23
111:8 112:18 116:13
130:20 131:4 132:6
133:20,25 134:6 137:6
149:17 154:11 155:23
165:21

**testify**
68:16 132:18

**testifying**
82:22

**testimony**
48:6 49:22 50:10 59:9
64:15 66:15 73:8 94:9
99:9 103:3 111:3
121:14 122:3,23 124:14
149:23 150:8,12 189:10

**Texas**
15:6,12 20:17,25 34:2
41:16 42:22 51:21
114:3

**text**
165:22,25 166:1

**thank**
171:1

**there's**
6:17 14:11 16:18,20
34:12,19 40:11 61:11
82:6 116:9 156:3
179:16

**they're**
11:21 45:23 75:17
187:20

**thin**
146:24

**thing**
85:1 128:17 135:20
137:14 179:12

**things**
35:6,7,11,14 58:21
59:2,4,8 65:4 89:22
91:4,6,11 93:3 95:8,10
109:8 111:9 112:15,17,
24 113:10 115:5 116:10
128:3 129:25 145:16,23
147:2 151:11 164:12
170:15 172:7 178:24
179:8,10,15,17 180:8,
22 181:1,2 184:17

**think**
8:14 9:25 18:20 27:1
33:3 62:2 70:2 75:10,25
80:10 85:6 89:17 90:20
93:13 94:24 98:23
100:9 106:24 107:1
116:25 120:9 130:20
131:15 133:24 135:19
144:15 146:15 147:10
149:2 155:8 158:4
166:2 168:2,3 170:17
172:6 173:15 181:1
186:7 187:5,7

**thinking**
84:20

**third**
20:14

**Thirteen**
128:12

**thought**
70:6 161:20 177:22,25

**thoughts**
133:11

**threatened**
179:3 187:13

**three**
42:16 51:5 69:19

**Thursday**
174:17,18,19

**tie**
149:9

**tied**
37:16,22

**time**
10:5 19:20 20:3,4 21:14
22:20 26:22 32:9 33:13,
15 44:10 47:14 59:3
61:22 63:6 77:13 80:22
81:13,14 87:13 92:19,
20 96:12,23 97:19
106:10,17 107:14 108:8
114:2 116:7 120:6
126:5,8 127:6,7 131:2
132:3 134:12,15,16
135:2 136:2,4,7,13,17
137:1,15 140:16 141:21
143:6 146:18 150:7,11
165:5 166:13 169:1
173:2,14,15 174:5,7
177:25 179:1 180:3,23
181:5 182:6 184:6,9
189:5

**timely**
122:10

**times**
29:3 49:13 65:18 80:3,
11 109:21,22,24 113:1
120:17 146:5 177:22
178:20 179:1

**Tioni**
15:22

**title**
16:22,23 129:5 158:23

**today**
59:9 73:1 78:12 82:22
88:14 97:2,6 111:9,24

112:22 113:15 147:15
166:12 177:16

**token**
62:22 65:17 68:14

**tokens**
67:5,11 71:24 72:22
78:2 136:3

**told**
12:23 71:17 73:24 79:8,
10 80:1 102:20 105:22,
24 106:1 107:9 109:12
119:12 128:4 146:25
161:17 162:16,19
164:4,7 166:7 168:18,
21,23,24,25 170:1,7,17
189:1

**tone**
62:19 64:1,11,12,16

**top**
34:20 55:5 56:11 88:18
96:21 121:2 166:20

**topic**
131:8 132:21

**topics**
96:22 108:3

**total**
21:11 75:15

**tough**
180:20

**train**
25:23

**trained**
120:6

**training**
24:15 25:14,15,16
27:22 28:5,7,10 35:2

**Trainings**
27:21

**transcript**
181:6 189:15

**transfer**
40:25

**transferred**
69:7,8 73:15

**transferring**
74:9

transpired
99:23 174:6

traumatized
179:5

treat
61:10

treated
59:13 60:10 61:6 66:20,
21 72:2

treating
61:9 70:16 72:11

treatment
59:20,22,23 61:8

trial
181:5

tried
178:24

Trina
9:12

trouble
147:3

truck
184:2

true
57:19

trust
166:8

truthful
188:22,25

truthfully
189:6

try
6:9 30:10 64:23 105:21
111:9 147:6 188:25

trying
12:5,6 31:19 38:1
82:19,20 86:12,14
89:12 91:15,17,25 92:9
101:22 111:23 112:22
123:7 131:7 132:15
139:15 148:20 158:13
159:24 168:1

Tuesday
174:13

turmoil
179:23

turned
89:9

turnover
115:16,17 120:19,23
121:3 123:23 148:4,10,
16,17,18 149:6,19
150:1,16,21 151:1,24
154:9,13 155:21 159:23

turnovers
150:23

twice
97:5 127:2

two
5:20 16:16,17 41:11
54:12 56:18 57:10
69:18 84:10 103:19
138:3 170:15 171:17,18

type
11:11 49:2 66:19
108:18 152:14

---

**U**

uh-huh
6:6 19:19 37:12 48:13
58:1 71:10 76:14 77:22
78:16 82:21 86:16
88:21 90:2 91:7,22
109:17 110:13 111:17
128:14 129:7 132:20
163:12 166:19 183:5

ultimately
52:24

umbrella
131:12

undergraduate
26:11 186:8,19

understand
6:8 7:5 29:23 37:10,21
45:22 46:2,6 47:5 48:2
49:18 53:19 65:1 67:20
72:3 104:24 105:11
107:21 108:11,13
121:22 132:14 169:13
170:9 183:17

understandable
6:10

understanding
16:16 38:7,17 64:11,15

104:19 105:2,6

understands
61:25

understood
44:22 45:7 124:8

unemployment
20:6,18,21

unfair
59:23 61:8

unfairly
61:10 180:8

university
26:16 186:9,11,12

upper
130:6

upset
75:12 89:10 92:3,14
93:1 105:5 134:14
138:2,9 139:18,20
140:5,9 165:10,11

use
12:14,15 91:2 119:13

utility
184:21

---

**V**

V-A-L-D-O-S-T-A
182:3

Valdosta
182:3 183:2

Valerie
84:10,17 85:1 86:6,11,
23

various
11:9 30:3

Vasquez
16:12

vehicle
146:1,2

vendor
12:1,3,4,13,14,19

vendors
11:12,14,15,24 12:9,15,
16

verbal
76:1 97:14 116:19
135:12 142:10 160:20,
21 161:1

verbally
97:12 114:24 137:18,22
141:2,4 143:19 146:13
155:7,11

verification
57:6 62:3 95:14 130:21
136:19

verified
80:14

verifying
134:16

violating
135:10

vision
14:9,21 19:11

visit
24:16 25:6,10 62:3,22
65:17 67:5,10 68:14
95:14 130:21

visits
105:23,24 106:23
107:6,7 136:13 149:12

vividly
72:11

voice
64:1,12,13,16,17 92:13,
14 94:15

voices
62:19

---

**W**

W-E-E-K-E-N-D-F-U-
N.COM
33:6

wage
179:4

wages
187:13

Wait
21:24

waiting
147:20

waived
    5:2

walk
    146:25

walls
    146:23

want
    13:8,15 47:17 58:4
    86:17 89:14 92:3 94:24
    99:14 106:25 124:10
    134:7 141:11 145:22
    148:13 156:19,20
    180:9,17,18

wanted
    68:1 69:25 70:8 94:17
    126:5,24 149:4,5
    157:18 159:10 161:24
    167:2 172:16 173:14

wants
    102:8

warning
    76:1

warnings
    135:13

wasn't
    40:21 64:8 72:1,5,6
    83:11,21 89:14 91:12,
    19 96:16 97:9 98:22
    106:19 107:5 109:21
    126:19 132:11 142:25
    147:2 151:20 152:24
    155:3 161:18 163:17,18
    168:19 178:13 179:12
    188:7

watch
    146:1

water
    184:7

Waters
    42:14,25 43:4

way
    11:23 12:20 16:7 17:12
    20:1 33:23,25 35:21
    38:16 40:25 41:3 55:24
    59:13,24 60:9,10 61:6
    65:9 66:21 69:7,9 71:20
    72:2 100:3 112:23
    119:11 120:19 130:5,10
    135:13 143:24 166:13

171:7

ways
    155:8

we'd
    181:5 189:15

we'll
    6:12 57:21 68:23 181:4

we're
    5:25 12:15 41:7 62:24
    76:12 95:4,8 102:8
    123:2 132:17 150:14
    177:16

We've
    95:8 148:6

wearing
    167:1,3

website
    32:4,5,7,10 33:1,16
    35:3

Wednesday
    174:15

week
    171:24,25 172:8 173:3
    174:8

Weekend
    32:19 33:20 34:2 40:22

Weekendfun.com.
    33:4

weekly
    21:1

well-known
    126:9

Wells
    39:14,18,23 40:1 187:6

went
    59:4 66:23 75:13 83:20
    93:6 104:25 159:23

weren't
    91:4 127:18 134:14
    149:16

what's
    17:17,21 20:9 41:10
    44:1,14 50:21 51:1
    54:1,20,25 55:19 56:13
    74:4 78:23 83:25 125:6
    128:7 154:22

wind
    93:13

witness
    150:7,10 177:12 189:13

witnessed
    139:19

woman
    23:22,23 24:3 169:12

women
    166:25 167:2,5

word
    6:4 119:13 145:5

worded
    76:7

words
    37:18 91:3,11 141:20

wore
    166:13,15

work
    6:14 7:8 8:12,22 9:1
    17:15 21:15 22:18
    26:24 27:16,17 28:2
    29:9 41:15 79:14 81:17
    119:24 120:3 130:6,13
    145:25 153:24 174:9,
    18,25 176:7,11,18
    183:23 184:1

worked
    18:25 41:20 116:1
    117:4 120:5 124:17
    180:25 184:2

workers
    120:11,13,15 121:8

Workforce
    20:17,25 41:16

working
    6:13,20 20:5 22:7 24:15
    29:14 104:12 114:16
    117:23 136:22 147:15
    176:7,15,18 179:24
    186:10

workload
    158:21

workplace
    166:25

works
    29:19 79:13

worries
    179:7

wouldn't
    8:24 11:25 35:10 50:17
    67:17 77:9 78:4 106:1,
    15 115:13 124:19
    154:15 159:16 167:23

write
    111:12 135:8,12,20
    172:16 182:11

writing
    97:12 116:19 141:23
    146:14 151:23 152:5
    155:6 157:9,10 158:2,
    14 160:20,21

written
    76:2 97:14,21 100:21
    158:4 161:1,2

wrote
    111:12 130:4 157:18

─────────── Y ───────────

yeah
    47:16 51:6 124:5
    156:16 184:9,14

year
    6:23 8:1 9:20 10:5
    116:6 185:24

years
    103:19 186:3

yell
    157:6

you're
    26:5 38:18 40:7 49:24
    52:24 58:24 64:11
    67:20 70:4 71:17 73:18
    74:8 82:22 100:2
    101:13,16 102:10 104:1
    106:11 110:24 111:13,
    15 112:18,20 113:5
    119:8,11 121:2 125:25
    126:2 127:10 130:9
    132:14,18 141:12,16
    142:15 167:20 168:6,7
    170:9

you've
    26:25 32:18 41:20 44:3
    57:24 59:8,19 66:7

69:23 95:12 97:21 98:6
100:23 112:18 113:13
130:20 131:4 132:6
134:6 137:6 144:25
154:11 155:23 165:21
170:17

**you-all**
106:20

**young**
152:21

69:23 95:12 97:21 98:6
100:23 112:18 113:13
130:20 131:4 132:6
134:6 137:6 144:25
154:11 155:23 165:21
170:17

**you-all**
106:20

**young**
152:21

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **RENEE RICHARDSON** | § | |
| *Plaintiff* | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.  5:18-cv-00151-FB** |
| | § | |
| **THE MEDICAL TEAM, INC., d/b/a** | § | |
| **THE MED TEAM, INC.** | § | |

## <u>ORDER</u>

Before the Court Is Defendant's Motion for Summary Judgment (DKT No. 26). After due consideration of this motion and Plaintiff's Response, the Court orders that Defendant's Motion for Summary Judgment is DENIED. It is therefore ORDERED that Defendant's Motion is DENIED.

Signed on _____ 2019

_____
FRED BIERY
UNITED STATES DISTRICT JUDGE